Page 1

1          IN THE UNITED STATES DISTRICT FOR

2    THE MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION

3

4    KAREN LURIE,                    )
                                     )
5              Plaintiff,            )
                                     )
6    vs.                            )   NO. 1:06-cv-0034MEF
                                     )
7                                    )
                                     )
8    GLOBE LIFE AND ACCIDENT         )
     INSURANCE COMPANY,              )
                                     )
9              Defendant.            )

10

11

12          DEPOSITION OF SANDY WHITAKER

13     TAKEN ON BEHALF OF THE PLAINTIFF

14        IN OKLAHOMA CITY, OKLAHOMA

15          ON SEPTEMBER 14, 2006

16

17

18    REPORTED BY:  ELIZABETH CAUDILL, CSR, RMR, CRR

19

20                              EXHIBIT
                                  C
21

22

23    **REPORTING & VIDEO, INC.**

24    D&R    ROBINSON RENAISSANCE          MID-CONTINENT TOWER
            119 N. Robinson, Suite 650    401 South Boston, Suite 310
25          Oklahoma City, Oklahoma 73102  Tulsa, Oklahoma 74103
            405-235-4106                   918-599-0507

                        depo@drreporting.com

Page 2

```
 1         APPEARANCES
 2  For the Plaintiffs: Christopher E. Sanspree
    (By videoconference)Attorney at Law
 3         218 Commerce Street
           Montgomery, Alabama 36104
 4
 5  For the Defendant: Robert Poundstone, IV
           Philip H. Butler
 6         Attorneys at Law
           401 Adams Avenue, Suite 780
 7         Montgomery, Alabama 36104
 8
 9         Anastasia Pederson
           Attorney at Law
10         Globe Life Center
           204 North Robinson, Suite 300
11         Oklahoma City, Oklahoma 73102
12  Also Present:    Bilinda Hines
    (By videoconference)
13
14
15              * * * * * *
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1        STIPULATIONS
 2       IT IS HEREBY STIPULATED AND AGREED by
 3  and among the attorneys for the respective
 4  parties hereto that the deposition of SANDY
 5  WHITAKER may be taken on behalf of the PLAINTIFF
 6  on SEPTEMBER 14, 2006 in Oklahoma City, Oklahoma,
 7  by Elizabeth Caudill, Certified Shorthand
 8  Reporter within and for the State of Oklahoma,
 9  pursuant to Notice.
10       IT IS FURTHER STIPULATED AND AGREED by
11  and among the attorneys for the respective
12  parties hereto that all objections, except as to
13  the form of the question, are reserved until the
14  time of trial, at which time they may be made
15  with the same force and effect as if made at the
16  time of the taking of this deposition.
17              * * * * * *
18
19
20
21
22
23
24
25
```

Page 4

```
 1              * * * * * *
 2         SANDY WHITAKER,
 3  having been first duly sworn at 9:11 a.m.,
 4  deposes and says in reply to the questions
 5  propounded as follows, to wit:
 6        DIRECT EXAMINATION
 7  BY MR. SANSPREE:
 8     Q    Ms. Whitaker, could you state your name
 9  for the record, please, ma'am.
10     A    Sandra Joanne Whitaker.
11     Q    Ms. Whitaker, we filed a lawsuit, "we"
12  being Ms. Lurie and myself, against Globe Life.
13  And you're aware you're here to testify on behalf
14  of Globe Life?
15     A    Yes, sir.
16     Q    And have you seen the deposition notice
17  that I sent out --
18     A    Yes, sir.
19     Q    -- in this case?  And are you capable
20  of testifying to the areas that I've noticed in
21  the deposition?
22     A    Yes, sir.
23         MR. SANSPREE:  I don't know if you all
24  have got that, Phil, but I'm going to mark the
25  deposition notice as 1.  Do you have a copy of
```

Page 5

```
 1  that?
 2         MR. POUNDSTONE:  Which one?  There was
 3  an initial one that went out, and then we had
 4  individual notices to Sandy and Barbara after
 5  that.
 6         MR. SANSPREE:  The individual one,
 7  Bobby.  The individual notice.
 8         (Plaintiff's Exhibit Number 1 marked
 9             for identification purposes and made a
10             part of the record)
11     Q    (By Mr. Sanspree) Ms. Whitaker, have
12  you read all the requests that I asked for
13  documents to be produced in accordance with this
14  deposition notice?
15     A    Yes, sir, I have.
16     Q    And were there any other documents that
17  should be produced or that you have that weren't
18  given to me?
19     A    No, sir.
20     Q    Okay.  Ms. Whitaker, tell us your
21  position at Globe Life and accident.
22     A    I'm the manager of the life claim
23  department.
24     Q    How long have you been the manager of
25  life claim department?
```

Page 6

1    A    Approximately five years.
2    Q    And how long have you been with Globe
3    Life?
4    A    35 years.
5    Q    A long time. Where else have you
6    worked other than Globe Life? Anywhere?
7    A    Only in high school I worked different
8    jobs like high school jobs, but --
9    Q    In your 35 years at Globe Life, have
10    you always been in the claims department or have
11    you just evolved over to the claims department?
12    A    No.
13    Q    Tell us about it.
14    A    I've always been in the claim
15    department. I have worked in different areas of
16    the claim department. I've worked in the steno
17    section composing letters, I've worked in the
18    health claims part of it before starting in the
19    life area.
20    Q    Okay. I don't want to ask you any
21    questions -- you can see where I'm going, but
22    what I should have asked you is your different
23    sections you worked in the claim department.
24        How many sections are in the claim
25    department?

Page 7

1    A    There's just three.
2    Q    You said steno? Is that stenography?
3    A    Yes; correspondence, answering letters.
4    Q    And then you said health?
5    A    Yes, health claims.
6    Q    Tell me about that. What's involved
7    with the health section?
8    A    Processing health claims. Actually I
9    was still answering correspondence related to
10    health policies.
11    Q    And what's the third section?
12    A    It would be the life claims area. And
13    I've been in that area since sometime in the
14    '70s.
15    Q    So you've been there about 30 years in
16    the life section?
17    A    Yeah. Yes, sir.
18    Q    Are you familiar with the claim that is
19    at issue in this lawsuit?
20    A    I'm sorry?
21    Q    Are you familiar with the claim that's
22    at issue in this lawsuit?
23    A    Yes, sir, I am.
24    Q    How did you become familiar with it?
25    Were you involved in the claim, itself, or just

Page 8

1    the litigation?
2    A    Yes, sir, I was involved with the
3    claim.
4    Q    Tell me your involvement with the claim
5    before the lawsuit was filed.
6    A    I reviewed the claim, itself. And
7    based on the information we received, I indicated
8    that it was a payable claim. I oversaw the
9    handling of it as the manager.
10    Q    All right. Let me stop you there
11    because that's pretty broad. When you say you
12    oversaw it, were you actually involved in the
13    claim or did they just come -- did the people
14    involved in the claim just come to you with
15    questions if they have any?
16        MR. POUNDSTONE: Object to the form.
17        MR. BUTLER: Go ahead and answer.
18        MR. POUNDSTONE: You can answer.
19        THE WITNESS: I'm responsible for how
20    the claims are handled. The claims go through
21    various steps, and ultimately, depending on the
22    amount of the claim, it's directed to different
23    divisions. And this particular one was within my
24    realm to review.
25    Q    (By Mr. Sanspree) I understand what

Page 9

1    you're saying, but what I'm trying to ask you
2    is -- you know, I'm responsible for several
3    people, but I don't actually do the work. And
4    ultimately I am responsible for it, but I allow
5    them to do the work. Is that what you do?
6    A    Yes, sir.
7    Q    You allow your claim handlers to do the
8    work, but you're ultimately responsible, but you
9    allow the people to do the work on the file?
10    A    Yes. Other employees have
11    responsibilities in the handling of the claim.
12    Q    And you testified a second ago that you
13    indicated, based on the information you received,
14    that it was a payable claim?
15    A    At one time in the review of the claim,
16    yes, I did.
17    Q    Do you remember, you know, when was the
18    time period that you determined the claim was
19    payable, do you remember?
20    A    May I review the file to refresh my
21    memory?
22    Q    Sure.
23    A    On May 6th, '04.
24    Q    And do you remember when the claim was
25    actually filed?

Page 10

1    A   We actually got Proof of Loss, I
2   believe, approximately March 8th, '04.
3    Q   Were you aware of any other
4   correspondence from any other individuals prior
5   to March 8th of '04 letting Globe Life know that
6   the insured had been killed in an accident?
7    A   I believe the initial notice we got was
8   January 26th and received in our office January
9   30th.
10    Q   Are you referring to a letter written
11   by Mr. Matthews?
12    A   Yes.
13    Q   Attorney Matthews?
14    A   Yes, sir.
15    MR. SANSPREE:  And that's Bates
16   numbered Globe Life/Lurie Karen 027.  For the
17   record, I'm going to mark that as Exhibit 2.
18        (Plaintiff's Exhibit Number 2 marked
19        for identification purposes and made a
20        part of the record)
21    Q   (By Mr. Sanspree) Now, Ms. Whitaker,
22   you testified this was the first notice you all
23   had to the loss at issue; is that correct?
24    MR. POUNDSTONE:  Object to the form.
25    THE WITNESS:  Yes, sir.

Page 11

1    Q   (By Mr. Sanspree) In this letter dated
2   January 26th we've marked as Exhibit 2, it
3   references a prior telephone conversation that
4   Mr. Matthews had had with someone at Globe Life.
5   Do you see that?
6    A   Yes, I see that.
7    Q   So it wouldn't -- wouldn't Globe Life
8   actually have been put on notice prior to this
9   letter dated January 26, 2004, of the loss?
10    MR. POUNDSTONE:  Object to the form.
11    THE WITNESS:  Well, there's no
12   indication that there was any other communication
13   in connection with the report of the death.
14    Q   (By Mr. Sanspree) Where are you getting
15   that from?  I mean, I understand your answer, but
16   I was wondering what you're basing that answer
17   on.
18    A   Well, the information that had we been
19   put on notice through other communication, the
20   letter would have been in the file, itself.
21        But this indicates a telephone
22   conversation, and notice of death reports are
23   handled through a telephone reporting system
24   which would have been indicated in our records.
25    Q   Okay.  Ms. Whitaker, you just testified

Page 12

1   that had you gotten notice that there would be
2   something in the file, itself, with a notice?
3    A   No, I said it -- no, sir, that isn't
4   correct.  I said it would have been recorded
5   through our -- our electronic system.
6    Q   I didn't hear you say that.  I'm not
7   trying to argue with you.  I'm just saying this
8   letter was produced to us, and it was in you
9   all's file.  And it does indicate to me that
10   there was a prior telephone conversation
11   discussing the death because enclosed is a copy
12   of the accident report and death certificate.
13    A   Well, that wouldn't follow our normal
14   procedure.  Any time a death notice is received
15   by the phone, it is recorded electronically
16   through our system.
17    Q   Okay.
18    A   And there's no indication that that was
19   done.  It would be out of procedure.  That's our
20   procedure to handle notice of death in that
21   format.
22    Q   Okay.  I'm with you.  Now, if there had
23   been a telephone conversation as referenced in
24   this letter by Mr. Matthews which was in you
25   all's file regarding the death and it's not noted

Page 13

1   in the file, then that would be out of procedure?
2    MR. POUNDSTONE:  Object to the form.
3    THE WITNESS:  I'm sorry.  Say that one
4   more time.
5    Q   (By Mr. Sanspree) You testified that it
6   would be out of procedure for someone to be
7   notified at Globe Life of a death but not note
8   that in the file.
9        And my question is:  If someone at
10   Globe Life in the claims department had been
11   notified of the death of Mr. Lurie as referenced
12   in the letter that's in you all's file produced
13   to me and it's not noted in the claim file that
14   they had been notified of the death prior to this
15   letter of January 26th, would that be out of
16   procedure?
17    A   I'm sorry.  That was way too long for
18   me to understand.  Would you try to rephrase
19   that?
20    Q   I'm horrible at trying to break -- I've
21   got all these thoughts in my head.  Let me try to
22   get it out to you.
23        You testified previously that if Globe
24   Life had been notified of the death, it would
25   be -- normal procedures would be it would be in

Page 14

1  the file; is that correct?
2      MR. POUNDSTONE: Object to the form.
3      THE WITNESS: No, sir.
4      Q   (By Mr. Sanspree) Noted in the file?
5      A   No, sir.
6      Q   Tell me what the procedures are when
7  you're notified of a death, then.
8      MR. BUTLER: By telephone?
9      MR. SANSPREE: Yes, sir.
10     Q   (By Mr. Sanspree) If someone calls you
11 and tells you an insured has been killed, what do
12 you do?
13     A   The customer service department
14 receives that phone call. They have an
15 electronic system that they enter the information
16 on the system which automatically codes the
17 policy for death and assigns it a claim number.
18     Q   Was that done in this case?
19     A   No, sir.
20     Q   Do you know why?
21     A   Because there's no indication of
22 receiving a phone call by death -- I mean by
23 phone.
24     Q   Except for a letter dated January 26th,
25 2004, that we've noted we've marked as Exhibit 2

Page 15

1  that was in you all's claim file?
2      A   That's what the letter says, but there
3  would be no reason to believe that we wouldn't
4  have followed procedures in handling our regular
5  notice of death in this situation.
6      Q   But you don't know that for sure;
7  correct?
8      A   Well, it would be out of procedure, and
9  there's no indication that there's any other
10 notations made on the system that we did receive
11 a phone call.
12     Q   But and my question -- and that goes
13 back to my long question I asked a second ago.
14 If there had been a phone call and it's not noted
15 in the file, would that be out of procedure?
16     MR. BUTLER: A phone call giving notice
17 of death?
18     MR. SANSPREE: Correct.
19     THE WITNESS: Yes, a phone call giving
20 notice of death and it not being recorded on the
21 system is out of procedure.
22     Q   (By Mr. Sanspree) And you don't know
23 one way or the other whether there was a phone
24 call giving notice of death, other than what's in
25 the file; correct?

Page 16

1      A   I don't know one way or the other, but
2  I don't have any reason to believe that there was
3  one made that wouldn't have fell into our regular
4  procedure.
5      Q   Other than the letter that we've marked
6  as Exhibit 2?
7      A   Right. I understand that.
8      Q   Okay. And just for the record, I know
9  I've already asked it, but if there had been a
10 phone call made and you all had been notified of
11 the death and it not be noted in the file, would
12 that be out of procedure?
13     A   It's not noted in the file per se.
14 It's noted on our computer system.
15     Q   Right. And if it's not noted, would
16 that be out of procedure?
17     MR. POUNDSTONE: Object to the form.
18     THE WITNESS: Yes, it would be out of
19 procedure.
20     Q   (By Mr. Sanspree) Okay. So your
21 testimony is that you received a Proof of Loss
22 statement on May 8th of 2 -- March 8, 2004;
23 correct? March 6, 2004. I can't remember what
24 you said. I think it was March 8, 2004.
25     A   I believe that's correct. I'm going to

Page 17

1  look through my file to refresh my memory on
2  that.
3      Yes, on March 8th, 2004, we received
4  the Proof of Loss documents.
5      Q   So you all were on notice -- let me ask
6  you this. Were you all on notice of the death
7  prior to receiving the Proof of Loss form?
8      A   Yes. The January 30th letter we
9  received indicated that he was deceased.
10     Q   Okay. So I'm going to use -- sometimes
11 you can waive the requirement to file a Proof of
12 Loss, so I use that when you're notified of the
13 loss. What I use is when you're actually
14 notified -- when the insurance company is
15 actually notified, I use that date to go with the
16 claim, because you testified previously that when
17 you all are put on notice of a loss, it's
18 assigned a claim number; correct?
19     A   Yes, that's correct.
20     Q   All right. So I'm going to go from the
21 January 26th letter and use that it is the
22 date -- I know you received it on the 30th, but
23 I'll use that as the date of notification of the
24 loss; okay?
25     MR. POUNDSTONE: For the purposes of

Page 18

1  your question?
2      MR. SANSPREE:  Just for purposes of
3  this deposition.  Sometimes you can waive a Proof
4  of Loss -- filing a Proof of Loss requirement,
5  and just because they didn't get a Proof of Loss
6  until March 8, 2004, really doesn't amount to
7  much.
8      They were on notice of the loss at
9  least by the January 26th letter which references
10  a prior telephone conversation which is not noted
11  in the file which would be out of procedure.
12      MR. POUNDSTONE:  Object to the extent
13  that was a question, which it wasn't.  Just so
14  it's understood that you're using that as the
15  definition for the purposes of this deposition
16  and we're not making any kind of legal
17  conclusions one way or the other.
18      You know, if you want her to assume
19  that when you use that word, then, you know, I
20  just want that understood on the record.
21      Q   (By Mr. Sanspree)  Right.  I'm going to
22  use this letter -- Ms. Whitaker, when I ask you a
23  question about date of notification of the claim,
24  you agree with me that you all were on notice of
25  the claim prior to the Proof of Loss being filed;

Page 19

1  correct?
2      A   We were notified of his death but we
3  had not received adequate Proof of Loss until
4  March 8th.
5      Q   All right.  I dug through the file a
6  little bit, Ms. Whitaker, and I never did see a
7  reservation of rights letter.
8      Are you aware of any reservation of
9  rights letter prior to denying the claim in May?
10      A   I'm sorry.  I don't understand what
11  that -- what you're talking about.
12      Q   I've looked through the file a little
13  bit, and I noticed that you all denied the claim
14  in May of '04.  Is that your understanding?
15      A   The premiums were refunded in May, yes,
16  that's correct.
17      Q   Would that also be the date of denial
18  of the claim?
19      A   Yes.
20      Q   All right.  So you all denied the claim
21  in May of '04?
22      A   Yes.  We refunded the premiums that
23  were received.
24      Q   I think the date you denied the claim
25  was May 6th of 2004; correct?

Page 20

1      MR. POUNDSTONE:  Object to the form.  I
2  don't think that's right.
3      Q   (By Mr. Sanspree) I'm sorry.  It might
4  be May 13th.  I'm not sure.  What is the date
5  that you said deny the claim and refund the
6  premiums?
7      A   Well, on May 13th, we determined that
8  the premium reinstatement wasn't done
9  appropriately, and we sent it for review.  And on
10  May 19th, a check was generated.
11      Q   All right.  So on May 13th, now, you've
12  been on notice of the claim from January.  And on
13  May 13th, you testified that the premiums may not
14  have been applied correctly?  Is that what your
15  testimony is?
16      MR. POUNDSTONE:  Object to the form.
17      THE WITNESS:  I'm saying that we
18  realized the reinstatement wasn't completed
19  accurately.
20      Q   (By Mr. Sanspree) Okay.  I'm going to
21  refer you to Globe Life/Lurie Karen 03.  It's a
22  handwritten note.
23      A   Yes, sir.
24      Q   Is that the May 13th -- what you're
25  talking about?

Page 21

1      A   Yes, sir.
2      Q   Any reason why it took so long to
3  figure out how the premiums were applied?
4      A   You know, hindsight's 20/20.  Looking
5  at this, this is a special case given the
6  circumstances.  And I see that we have factors in
7  place to determine when premiums are reinstated
8  and when they're not.
9      Apparently we're not perfect, and we
10  didn't realize at the very beginning that the
11  reinstatement wasn't completed accurately.  But
12  we have steps in place to determine that we are
13  handling the claims correctly.  And as soon as
14  this was brought to our attention, we did act
15  promptly in refunding the premium.
16      Q   Who brought it to your attention?
17      A   A claims examiner.
18      Q   It took him about five months to figure
19  it out?
20      A   Well, actually, the claim was going
21  through the evaluation process whether it was
22  even eligible under the terms and exclusions of
23  the policy.
24      Q   Yes, ma'am, and I understand that.  But
25  I understand your prior testimony is you've got

Page 22

1 people working for you that you supervise and
2 you're responsible for?
3    A   Yes, sir.
4    Q   And you rely on them to gather
5 information before you make an ultimate
6 determination on the claim?
7    A   Yes, sir.
8    Q   And you already testified that you, at
9 some date, had indicated the claim was payable;
10 correct?
11   A   Yes, sir.  But at that time --
12   Q   What about --
13      MR. BUTLER:  Let her finish her answer.
14      THE WITNESS:  But at that time, I
15 wasn't aware of all the facts and circumstances
16 in this particular case.
17   Q   (By Mr. Sanspree)  All right.  We'll see
18 about it.  But what I'm getting at is you said
19 the claim was payable?
20   A   Based on the information I had in front
21 of me at the time, yes.
22   Q   And based on the information that
23 people had gathered on your behalf?
24   A   That's correct.
25   Q   And you said the claim was payable;

Page 23

1 correct?
2    A   Yes.
3    Q   And we truck on down about five months
4 down the road, and all of the sudden somebody
5 brings it to your attention that the premiums may
6 not have been applied correctly.  Is that your
7 testimony?
8    A   The premiums were applied correctly.
9 The reinstatement -- you can't reinstate a policy
10 on someone who's deceased.  They didn't -- the
11 reinstatement application wasn't valid.
12   Q   Ms. Whitaker, I understand your
13 position.  Can you explain to me, if you can't
14 reinstate a person that's deceased, why the
15 deceased wife keeps getting premium notices on
16 the same policy?
17   A   I wouldn't believe that she would.
18   Q   Have you looked through the claim file
19 and the documents your lawyers have produced to
20 me?
21   A   Yes, sir, I have.
22   Q   Do you know that there's a premium
23 notice after the death sent to my client?
24   A   Do you want to direct me to that in the
25 file so I can review it?

Page 24

1    Q   Yeah.  Where is it?  Hang on a second.
2 Let me find it.
3      It's dated January 16th, I think.
4 Yeah.  It's Lurie 01.
5      Just for the record, the death occurred
6 on January 6th, 2004.  Are you aware of that,
7 Ms. Whitaker?
8    A   Yes, sir.
9    Q   And this notice was sent to my client
10 on the 16th of 2004 asking for additional
11 premiums to be mailed in on the policy.
12   A   And you're referencing what?
13      MR. POUNDSTONE:  Hey, Chris, I don't
14 mind you asking her questions about this
15 document, but just so, you know, we put on the
16 record, this is more of a premium accounting
17 function, and Barbara Hernandez would be the
18 person most knowledgeable about this document.
19      MR. SANSPREE:  Okay.
20   Q   (By Mr. Sanspree)  Anyway, if the policy
21 hadn't been canceled by January 16th -- let me
22 ask it different.
23      If the policy had been canceled for
24 non-payment of premiums, would you all be sending
25 out some premium notices on the same policy?

Page 25

1    A   I don't understand what you mean by
2 "canceled."
3    Q   Well, I mean, the position of this
4 lawsuit is that the policy had lapsed for
5 non-payment of premiums --
6    A   Yes.
7    Q   -- prior to the death of my insured.
8 And, you know, I understand that, and I get it.
9 I know where you all are coming from.  But I
10 don't get the fact that the documents contradict
11 that.
12      And what I'm saying is if the policy
13 had lapsed for non-payment of premiums, why would
14 my client be getting in the mail premium notices
15 on the same policy after the death if the policy
16 had lapsed?
17   A   Well, we weren't notified of the death
18 until January 30th '04.
19   Q   I know.  And I'm with you on that.  But
20 that January 30th, '04, letter indicates a prior
21 telephone conversation; correct?
22   A   It indicates that.
23   Q   And then January 16th, 2004, which is
24 Lurie 03 which I'll mark as Exhibit 3 -- am I on
25 Exhibit 3 or 4?

Page 26

1      MR. POUNDSTONE: Which one is that? My
2  Lurie 03 is just a blank page.
3      MR. SANSPREE: Lurie 01. It's Exhibit
4  3.
5      MR. POUNDSTONE: I'm sorry. I
6  misunderstood what you were doing.
7      (Plaintiff's Exhibit Number 3 marked
8      for identification purposes and made a
9      part of the record)
10     Q   (By Mr. Sanspree) What I'm getting at
11  is, you get a letter from my client -- or from an
12  attorney representing my client dated January
13  26th, 2004, indicating a prior telephone
14  conversation notifying Globe Life of the death;
15  correct?
16     A   Yes.
17     Q   And then my client gets a premium
18  notice dated January 16th, 2004. It appears to
19  me the policy is still in force at that time;
20  correct?
21     MR. POUNDSTONE: Object to the form.
22     THE WITNESS: I'm sorry. The policy
23  had --
24     Q   (By Mr. Sanspree) If you look at -- go
25  ahead. I'm sorry.

Page 27

1      A   The policy had been reinstated. The
2  system -- we hadn't coded our system. The
3  premium was received prior to us receiving the
4  official notice of death by the letter. And it
5  wasn't suspended or coded for death.
6      (Cell phone)
7      MR. SANSPREE: You all need to get
8  that, Phil?
9      MR. BUTLER: I'll get it. Go ahead.
10     Q   (By Mr. Sanspree) Ms. Whitaker, what
11  you just said was the policy was reinstated prior
12  to you receiving official notification of the
13  death by writing; correct?
14     MR. POUNDSTONE: Object to the form.
15     THE WITNESS: Yes, sir.
16     Q   (By Mr. Sanspree) But you actually had
17  had notification via telephone conversation;
18  correct?
19     A   No. I don't have any reason to believe
20  we did.
21     Q   Other than Exhibit 2.
22     A   Exhibit 2 references a phone call.
23     Q   Exhibit 1. I'm sorry.
24     MR. POUNDSTONE: Exhibit 1's a depo
25  notice.

Page 28

1      MR. SANSPREE: I'm sorry. I'm getting
2  all confused. Exhibit 2 should be the letter
3  dated January 26, 2004.
4      MR. POUNDSTONE: We got that. That's
5  right.
6      Q   (By Mr. Sanspree) Other than that;
7  correct?
8      A   I'm sorry. Since we've -- I've got off
9  track here.
10     Q   You got a telephone -- Exhibit 2
11  indicates that there was notification via
12  telephone of the death; is that correct?
13     A   The letter references a telephone
14  conversation, but I have no reason to believe
15  that there was actually one made.
16     Q   Do you have any reason to believe that
17  Mr. Matthews is making up that statement in his
18  letter?
19     A   No, but it would not be following our
20  procedure on how we record deaths or notice of
21  deaths.
22     Q   And the people that would record that
23  is back in the customer service department;
24  right?
25     A   That's correct.

Page 29

1      Q   Have they made mistakes before in the
2  past?
3      A   I believe everyone makes mistakes
4  occasionally, but this is a normal -- this is a
5  normal function of handling claims on a daily
6  basis.
7      Q   Ms. Whitaker, is it possible that the
8  customer service department had made a mistake in
9  this case?
10     A   It's possible, but it's a routine
11  procedure, and I wouldn't believe that there
12  would be any reason for them to.
13     Q   What other mistakes has the customer
14  service department made if it wasn't mistakes
15  made on procedure?
16     A   Well, actually --
17     Q   You testified everybody makes mistakes.
18  And customer service is there to perform a
19  function and they're there performing a function,
20  should be performing it according to procedure;
21  correct?
22     A   That's correct.
23     Q   And you've testified that everybody
24  makes mistakes and they've made mistakes before;
25  correct?

Page 30

1    A   Yes. There's -- yes.
2    Q   What other mistakes could they have
3  made if they were not mistakes on the procedure?
4         MR. POUNDSTONE: Object to the form.
5         THE WITNESS: Well, in connection with
6  a life claim and reporting of death, I really
7  wouldn't see where there would be one.
8    Q   (By Mr. Sanspree) Other than the letter
9  that we've marked as Exhibit 2?
10    A   Well, I understand Exhibit 2 references
11  a telephone conversation, but it would be out of
12  procedure, it's not within our norm of handling
13  business affairs or recording deaths. And I have
14  no reason to believe that this claim wouldn't
15  have been handled routinely.
16    Q   Okay. Now, if you all had been
17  notified of the death on January 11th or January
18  12th via telephone conversation by Mr. Matthews,
19  should that have been noted in the file?
20    A   I'm sorry. Would you repeat that
21  again?
22    Q   Yeah. If you had been notified of the
23  death by telephone conversation by Mr. Matthews
24  who wrote the letter that's marked Exhibit 2 on
25  January 11th or March 12th, should that have been

Page 31

1  noted in the file?
2    A   It would not have been noted in the
3  file. It would have been noted on our computer
4  system.
5    Q   Should it have been noted on the
6  computer system --
7    A   Yes.
8    Q   -- if that happened? Is it possible
9  that a mistake was made on Globe Life's behalf?
10    A   It's possible, but I wouldn't feel like
11  it would be.
12    Q   But you don't know for sure?
13    A   No. But I don't have any reason to
14  believe that it wouldn't have been handled with
15  the normal realm of business.
16    Q   Right, other than the fact that you've
17  testified the customer service department has
18  made mistakes before in the past; correct?
19    A   I indicated that people make mistakes.
20  I make mistakes.
21    Q   I make mistakes, too. There's nothing
22  wrong with that. I'm just asking, based upon --
23  you're saying you don't have anything to indicate
24  that a telephone conversation was made on January
25  11th or 12th in the file, but you've also

Page 32

1  testified that the customer service department
2  has made mistakes in the past; correct?
3    A   Yes, I've testified that there has been
4  errors made in customer service, but this is a
5  routine function that I don't have any reason to
6  believe that it would have been handled any
7  different than any other notice of death that
8  would come through on a telephone reporting
9  notification.
10    Q   Right. And you don't have any reason
11  to believe that it was done erroneously other
12  than the fact that the customer service
13  department has made mistakes in the past, and the
14  letter that we've marked as Exhibit 2?
15         MR. POUNDSTONE: Object to the form.
16         THE WITNESS: Sir, my personal belief
17  is is that we handled this claim, there would be
18  no reason to believe that --
19    Q   (By Mr. Sanspree) Ma'am, I don't want
20  to interrupt you, but I don't want you to testify
21  to your belief or speculate or anything like
22  that. Just tell me what you know. I think your
23  lawyer will tell you that, too.
24         MR. BUTLER: Pardon me just a moment.
25  You're asking her to speculate on the veracity of

Page 33

1  Mr. Matthews' letter. I mean --
2         MR. SANSPREE: Well, no, I'm not,
3  actually. I'm asking her to testify -- she said
4  that the claim -- it should have been noted in
5  the file and she doesn't have any reason to
6  believe that it was not -- that the phone call
7  was not made and was not noted in the file
8  according to procedure.
9         And I asked her, well, you say that but
10  you don't have any reason to believe a mistake
11  wasn't made other than the fact that you've
12  testified previously that mistakes were made, and
13  the letter dated January 26th which indicates --
14  which obviously indicates a prior telephone
15  conversation.
16         MR. BUTLER: Chris --
17         MR. SANSPREE: I'm not asking her to
18  speculate on that.
19         MR. BUTLER: I'm objecting. I know
20  that's not a question, but your summary is
21  inaccurate, but go ahead.
22    Q   (By Mr. Sanspree) All right. So just
23  for the record, Ms. Whitaker, can we just go
24  ahead and say that the customer service
25  department has made mistakes in the past,

Page 34

1    according to procedure?
2      A   No, we can't. This is the facts. Our
3    customer service department has steps in place
4    and has procedures that when they receive a
5    notice of death by phone, it is recorded
6    electronically on the system. And there would be
7    no reason to believe that if we received a phone
8    call, this would have been handled any other way.
9      Q   Okay. And that gets back to what I was
10   asking. You keep saying there's no reason to
11   believe it, but your prior testimony is they've
12   made mistakes in the past; correct?
13     A   I indicated that everyone makes
14   mistakes occasionally.
15     Q   Okay. And then there's no reason other
16   than that; correct?
17     A   There would be no reason to not handle
18   this routinely.
19     Q   Other than the fact it could have been
20   a mistake; correct?
21     A   I'm sorry. I just feel like reviewing
22   the file, knowing our procedure and this
23   information, there would be -- there would be
24   some type of indication on the computer system
25   had there even been a phone call.

Page 35

1      Q   I understand that. Ma'am,
2    Ms. Whitaker, your testimony is that you don't
3    believe that they would have done anything other
4    than follow procedure, and you don't have any
5    reason to believe they wouldn't have done
6    anything other than follow procedure when
7    notified by phone of the death.
8          And my question is simple. You don't
9    have any reason to believe that they didn't
10   follow procedure other than the fact that you
11   know they've made mistakes in the past; correct?
12     A   I don't know that they've made
13   mistakes. I said it's possible. Everyone makes
14   mistakes. I'm classifying -- you just indicated
15   that you make mistakes, I make mistakes.
16     Q   I think everybody makes mistakes.
17   Nobody's perfect. I'm just asking the question.
18     A   I agree no one's perfect.
19     Q   Right. And my question is: You don't
20   have any reason to believe that they didn't
21   follow procedure other than the fact that it
22   could have been a mistake?
23     A   I don't believe that they made a
24   mistake. I don't believe, with a routine notice,
25   that they would make some type of mistake.

Page 36

1          You're asking me what I believe and
2    what I believe happened in this situation.
3      Q   No, I'm not. You said you don't have
4    any reason to believe that they didn't follow
5    procedure, and I'm saying other than the fact
6    that they could have made a mistake and not
7    followed procedure.
8      A   It's possible a mistake -- they could
9    have made a mistake. I don't have any reason to
10   believe they did.
11     Q   Other than the fact that they could
12   have done it?
13     A   Well, sir, I can't agree. I'm just
14   telling you that what I feel that happened on
15   this, there's no indication of anything else
16   happening on it until we received our notice on
17   January 30th.
18     Q   Is it possible that they simply -- in
19   the customer service department, simply made a
20   mistake and did not note in the computer system
21   that a phone call had been made by Mr. Matthews
22   notifying them of the death of my insured?
23     A   No, I don't believe that.
24     Q   Is it possible?
25     A   No, I don't believe that they would.

Page 37

1      Q   It's not possible a mistake could have
2    been made?
3      A   I don't believe -- I don't believe that
4    they would.
5      Q   Is it possible?
6      A   Anything's possible.
7      Q   We'll move on; all right? So building
8    on that response, you have no reason to believe
9    that procedure was not followed other than it's
10   possible that a mistake was made; correct?
11         MR. BUTLER: Object to the form. How
12   many times are we going to do that, Chris?
13         MR. SANSPREE: If she answers that one
14   without giving this long speech, I can ask my
15   next one.
16         MR. BUTLER: I don't think you can
17   dictate how she answers. But you've asked that
18   now, I think I've counted about 12 times. In a
19   minute --
20         MR. SANSPREE: I hadn't got a response.
21   I keep getting these long responses.
22         MR. BUTLER: Yes, you have.
23         MR. SANSPREE: I get a response but
24   it's non-responsive.
25         MR. BUTLER: We'll let somebody else

Page 38

1  decide that. But nevertheless, I'm not going to
2  sit here and just do it 20 times.
3      MR. SANSPREE: Can we do it one more
4  time?
5      MR. BUTLER: Go ahead. One more,
6  Chris.
7      MR. SANSPREE: I can't even remember
8  the question now, but I think it was --
9      MR. BUTLER: I'm a very patient person.
10  I'll let you do it one more time.
11      MR. SANSPREE: I know you are,
12  Mr. Butler.
13      MR. BUTLER: And don't call me Mr. I'm
14  old enough as it is.
15      MR. SANSPREE: We're on the record, so
16  I'm going to call you Mr. Butler on the record.
17      MR. BUTLER: I've been called worse.
18  Q   (By Mr. Sanspree) There's no other
19  reason to believe that procedures were not
20  followed other than the fact a mistake could
21  possibly have been made?
22  A   There is no reason -- there's no reason
23  to believe that the procedure wasn't followed in
24  this -- in this particular situation. It would
25  have been a routine customer service call.

Page 39

1      MR. SANSPREE: Mr. Butler, can I please
2  ask her one more time? Because she's not
3  answering my question.
4      I'm not trying to be difficult. I'm
5  just asking there's no reason to believe
6  procedure wasn't followed other than --
7      MR. BUTLER: One more time, and this is
8  it.
9  Q   (By Mr. Sanspree) Ms. Whitaker, I'm not
10  trying to beat a dead horse here. What I'm
11  asking is: You keep saying there's no reason for
12  you to believe procedure wasn't followed.
13      I'm just saying, other than the fact
14  that a mistake could have been made. It's
15  possible that it could have been made? Is that a
16  correct statement?
17  A   Mistakes are possible.
18  Q   All right. And also, other than the
19  fact that the letter that's marked as Exhibit 2
20  indicates that a prior telephone conversation was
21  made?
22      MR. BUTLER: Object to the form, and
23  I'm going to instruct her not to answer. You've
24  worn my patience out.
25      MR. SANSPREE: That's a different

Page 40

1  question.
2      MR. BUTLER: It's the same question --
3      MR. SANSPREE: It doesn't have anything
4  to do with mistakes. I'm just asking --
5      MR. BUTLER: Here's the problem with
6  your question. You're asking her to form a
7  belief tied in with the existence of a
8  possibility. The lady --
9      MR. SANSPREE: No, not really, but go
10  ahead.
11      MR. BUTLER: That's two different
12  things. That's two different things. She can --
13  she's admitted to you that it's possible that
14  they could have made a mistake. She doesn't
15  believe that they did.
16      MR. SANSPREE: Right. And I moved on
17  after that. I'm on this letter now. There's two
18  things here. There's two things, Mr. Butler,
19  that I was trying to get out of this.
20      She's saying that she has no reason to
21  believe procedures weren't followed, and I just
22  asked her other than the fact that a mistake's
23  possible. She said yeah, it's possible.
24      Now I'm saying, and also procedures
25  might not have been followed because of the

Page 41

1  letter that we've marked Exhibit 2 indicates that
2  there was a prior telephone conversation. And
3  her prior testimony was --
4      MR. BUTLER: You're asking her to
5  express an opinion on your co-counsel's letter,
6  and that's not appropriate.
7      MR. SANSPREE: Well, no. Actually --
8  she's testifying to how a procedure should be
9  followed in the claim department. And she's
10  testified that if a telephone conversation is
11  made notifying Globe Life of the death, then it
12  would be noted on the computer system.
13      MR. BUTLER: That's right.
14      MR. SANSPREE: And then I said, well,
15  is it possible that it was not noted on the
16  computer system because a mistake was made? We
17  went down 20 questions, according to you.
18      MR. BUTLER: We did.
19      MR. SANSPREE: She finally says yes,
20  it's possible that a mistake was made. Then I'm
21  saying on my next question, is it possible that
22  procedures wasn't followed also because of this
23  letter indicates that there was a prior telephone
24  conversation?
25      MR. BUTLER: That is not an appropriate

Page 42

1  question, and I'm going to instruct her not to
2  answer that. She's already answered it before
3  and we let it go. But you're asking her to
4  interpret your client's lawyer's at the time, her
5  lawyer, the effect of his letter and whether or
6  not that is indicative of whether a mistake was
7  made.
8       MR. SANSPREE: I was asking her if it's
9  possible that a mistake was made in the procedure
10  at the claim department based upon this letter.
11       MR. BUTLER: She's already answered
12  that. Let's move on.
13       MR. SANSPREE: How did she answer it?
14       MR. BUTLER: Huh?
15       MR. SANSPREE: Did she answer in the
16  affirmative?
17       MR. BUTLER: She answered that it's
18  possible for the customer service people to have
19  made mistakes, just like it's possible for you
20  and I and her to make mistakes.
21       MR. SANSPREE: Right. I admit I make
22  mistakes. I'm just saying -- I'm just asking if
23  it's possible. I'm asking if this letter
24  indicates it's possible a mistake was made.
25       MR. BUTLER: You're asking her to form

Page 43

1  an opinion based on the lawyer for the plaintiff,
2  and I think that's improper, and I think you know
3  that it is.
4       MR. POUNDSTONE: The letter says what
5  it says. Now you're taking it the next step.
6       MR. SANSPREE: I'm not asking for an
7  opinion. I'm just asking is it possible a
8  mistake was made, because the letter references
9  there was a telephone conversation.
10       MR. BUTLER: That's not a proper
11  question. I think you know it.
12       MR. SANSPREE: Can she answer it?
13       MR. BUTLER: No. You're asking her to
14  form a judgment based on the effect of a letter
15  of the lawyer of your client.
16       MR. SANSPREE: All right. Are you
17  going to tell her not to answer it?
18       MR. BUTLER: Yes, sir.
19       Q   (By Mr. Sanspree) Ms. Whitaker -- and
20  I've reviewed the file at least once. Can you
21  tell me why a reservation of rights letter was
22  never issued to my insured regarding the premiums
23  being late?
24       A   Regarding the premium being late? I
25  don't understand.

Page 44

1       Q   Well, I mean, we're here because Globe
2  Life is saying that they didn't receive the
3  premium payment on time; is that correct?
4       MR. BUTLER: Object to the form.
5       THE WITNESS: I'm sorry. Will you say
6  that again?
7       Q   (By Mr. Sanspree) Why was this claim
8  denied in this case?
9       A   Because the policy wasn't in force at
10  the time of his death.
11       Q   And why was it not in force?
12       A   Because the premium wasn't paid in a
13  timely manner.
14       Q   Okay. Now that gets back to what I
15  just asked you. Can you tell me why a
16  reservation of rights letter was not sent to my
17  client before her claim was denied regarding the
18  premiums being late?
19       A   I don't know what that is.
20       Q   You don't have any idea what a
21  reservation of rights letter is?
22       A   No.
23       Q   And who's responsible for sending out
24  the correspondence from the claim department to
25  insureds?

Page 45

1       A   Well, the claim -- the claim department
2  in connection with a claim.
3       Q   All right. And you've been in the
4  claim department, I guess, for about 30 years;
5  right?
6       A   Yes.
7       Q   And you have absolutely no idea what
8  a reservation of rights letter is?
9       A   No, sir.
10       Q   And you have no explanation of why a
11  reservation of rights letter was not sent to my
12  insured for over five months before her claim was
13  denied?
14       MR. BUTLER: Come on, Chris. How could
15  she answer that if she doesn't even know what a
16  reservation of rights letter is?
17       MR. SANSPREE: I'm asking her to tell
18  me why it wasn't sent. She doesn't have to know
19  what one is, just tell me why it wasn't sent, if
20  she knows.
21       THE WITNESS: I'm sorry. I don't know.
22  I mean, I don't know what a reservation of rights
23  letter is. In May we sent a letter explaining
24  the findings regarding the claim.
25       Q   (By Mr. Sanspree) Let me ask you this,

Page 46

1   Ms. Whitaker. Do you know whether or not --
2   well, I guess you do.
3       My client's premium check, do you know
4   whether it was actually deposited by Globe Life,
5   that's at issue?
6       MR. BUTLER: That, again, would be more
7   properly addressed with the other witness, but
8   I'm not going to prevent you from asking her
9   that.
10      THE WITNESS: Would you repeat it?
11   Q   (By Mr. Sanspree) Do you know
12  whether --
13      MR. SANSPREE: I've got a check that's
14  marked Lurie 02, Bobby.
15      MR. POUNDSTONE: Okay.
16      MR. SANSPREE: I'm looking at it. Is
17  that the one with her handwriting on the bottom
18  of it?
19      MR. POUNDSTONE: Yeah.
20      MR. SANSPREE: On the bottom of the
21  page, not the check. We'll mark that Exhibit 4.
22      (Plaintiff's Exhibit Number 4 marked
23      for identification purposes and made a
24      part of the record)
25   Q   (By Mr. Sanspree) Do you see Exhibit 4,

Page 47

1   Ms. Whitaker?
2    A   Pardon me?
3    Q   Have they showed it to you? Have they
4   showed you Exhibit 4 yet?
5       MR. POUNDSTONE: She's got it in front
6   of her.
7       THE WITNESS: Yes, I have it in front
8   of me.
9    Q   (By Mr. Sanspree) It should be a check.
10  Do you know -- the question probably is for a
11  different witness, but I'm just wondering: Do
12  you know whether or not that check was actually
13  cashed by Globe Life?
14      MR. BUTLER: And Sandy, don't guess. I
15  don't think he wants an answer whether you think
16  it was or not. If you know, tell him.
17      MR. SANSPREE: I just want to know
18  whether she knows.
19   Q   (By Mr. Sanspree) Do you know whether
20  this check was cashed by Globe Life? When I say
21  "cashed," was it deposited in a Globe Life
22  checking account?
23   A   Well, I don't know if it was deposited
24  in a Globe Life checking account, but it was --
25  it was processed.

Page 48

1    Q   What do you mean by "processed"?
2    A   Well -- well, it had to be cashed to
3   advance the status on the policy.
4    Q   Right. And I'm just asking what you
5   mean by "processed."
6    A   Well, it's the same as cashed.
7    Q   Okay. And do you know -- so Phil won't
8   have to waste his energy, do you know when the
9   check was actually cashed --
10   A   No, sir. That would be --
11   Q   -- by Globe Life?
12   A   That would be more of a premium
13  accounting function.
14   Q   How many depositions have you given
15  before, Ms. Whitaker?
16   A   About five.
17   Q   Were they all related to claims and
18  people disputing the claims not being paid?
19   A   Yes, sir.
20   Q   And were they all given in the course
21  of litigation where obviously an insured had to
22  file a lawsuit against Globe Life?
23   A   Yes. Actually, I think --
24   Q   And when you -- go ahead. I'm sorry.
25   A   One deposition was in connection with

Page 49

1   some other type of lawsuit someone else was
2   filing. I don't recall it.
3    Q   Were all the depositions you've given,
4   were they in your capacity as supervisor of the
5   claims department?
6    A   Yes.
7    Q   Do you know where those other lawsuits
8   were pending, what states they were in?
9    A   I don't recall.
10   Q   Do you know whether or not that any of
11  them were in Alabama?
12   A   Yes, I remember one in Alabama.
13   Q   Do you remember -- how long ago was
14  that deposition given?
15      MR. BUTLER: Chris, do you want me to
16  answer it for you?
17      MR. SANSPREE: If you want to. I
18  probably got the information. I just hadn't
19  looked at it, Phil. Go ahead.
20      MR. BUTLER: I can't for the life of me
21  remember, but I can find it, the plaintiff's
22  name. But it was a rescission case over in
23  Prattville that Cliff and Chip Cleveland had on
24  plaintiff's side. I can't remember the client's
25  name. It was about four --

Page 50

1     MR. SANSPREE:  That's fine.
2     MR. BUTLER: -- about four, four and a
3  half years ago.
4     Q   (By Mr. Sanspree) And do you remember
5  anything about that case, Ms. Whitaker?
6     A   Yes, a little bit.
7     Q   Was that a case that's similar to mine
8  that the policy was rescinded?
9     A   No, sir.
10     MR. BUTLER:  I object to the form of
11  the question.  Your policy wasn't rescinded.
12     MR. SANSPREE:  You said it was a
13  rescission case.  I was basing my question on
14  your statement.
15     MR. BUTLER:  You said "like yours."
16  Your policy wasn't rescinded.
17     MR. SANSPREE:  Well, they returned the
18  premiums back.
19     MR. BUTLER:  That's right, but it
20  wasn't a rescission.  You know it wasn't.
21     MR. SANSPREE:  All right, Phil.
22     Q   (By Mr. Sanspree) Was the plaintiff in
23  that case Selman, Ms. Whitaker?
24     A   Yes, sir.
25     Q   And I've also got a Lively versus Globe

Page 51

1  Life in Otago County.  Do you remember anything
2  about that?
3     A   No, sir.
4     Q   Did you give a deposition in that case?
5     A   I don't really recall.
6     MR. BUTLER:  I don't think so, Chris.
7     MR. SANSPREE:  Phil, I'm looking at
8  discovery responses.  The way I'm getting -- the
9  way I'm picking up this information is you all's
10  responses but also from her testimony.
11     I think she's only testified in that
12  Selman case, given a deposition in that Selman
13  case; is that correct, sir?
14     MR. BUTLER:  In Alabama, that's my
15  recollection.  The Lively case didn't proceed
16  very far.  It didn't go as far as depositions.
17     Q   (By Mr. Sanspree) Ms. Whitaker -- I'm
18  not suggesting that you should have reviewed
19  these -- but have you reviewed these
20  Interrogatory responses from Globe Life?
21     A   Yes, sir.
22     Q   And I'm looking at Interrogatory
23  response number 4.
24     MR. SANSPREE:  Phil, do you have those?
25     MR. BUTLER:  I do.

Page 52

1     Q   (By Mr. Sanspree) I think Barbara
2  Hernandez signed these so, Ms. Whitaker, don't
3  feel like you should have looked at that.  I'm
4  not saying that.  I'm not trying to imply that.
5  Well, you did sign them, too.
6     A   Yes, sir.
7     MR. POUNDSTONE:  Yes, she did.
8     MR. BUTLER:  What's your question?
9     Q   (By Mr. Sanspree) So, ma'am --
10     MR. POUNDSTONE:  Are you on number 4?
11     MR. SANSPREE:  Yeah.  I'm trying to
12  wait for her to get there.
13     MR. POUNDSTONE:  Okay.
14     THE WITNESS:  Okay.
15     Q   (By Mr. Sanspree) So, ma'am -- first
16  you see your signature back -- I'm going to flip
17  off Interrogatory number 4.  On page 17, is that
18  your signature?
19     A   Yes.
20     Q   And did you review the response before
21  you signed it?
22     A   Yes, sir.
23     Q   And so flip back to Interrogatory
24  number 4.  It lists some cases in Alabama, I
25  think seven cases.  Do you see those?

Page 53

1     A   Yes, sir.
2     Q   And, ma'am, did you give testimony in
3  any of these cases other than the Selman case
4  which is the case number one?
5     A   No, I don't believe I did.  I don't
6  recall any of the names.
7     Q   Ma'am, I'm just asking if you know what
8  any of these other cases -- I know you didn't
9  give deposition testimony.
10     Do you know what any of these other
11  cases involved, the facts of the cases or
12  anything like that?
13     A   No.  I don't recall.
14     Q   Ms. Whitaker, are you aware of any
15  other instances where phone calls were made to
16  Globe Life that were not documented on the
17  computer system?  Are you aware of any of that
18  ever happening?
19     MR. BUTLER:  Are you speaking of notice
20  of death phone calls or just any?
21     MR. SANSPREE:  Any phone calls,
22  generally, and then I'll get down to --
23     Q   (By Mr. Sanspree) Are you aware of any
24  phone calls coming in on claims that are not
25  noted on the computer system?

Page 54

1   A   No, I'm not.
2   Q   And then Phil narrowed me down. I
3   should have done that in the first place.
4       Are you aware of any phone calls coming
5   in notifying Globe Life of a death that were not
6   noted on your system?
7   A   No, I wouldn't be aware of any.
8   Q   Back to Lurie 03.
9       MR. SANSPREE:  Bobby, this is one you
10  all produced to us. It would be Globe Life 03.
11      MR. POUNDSTONE:  Okay.
12  Q   (By Mr. Sanspree) Ms. Court reporter,
13  have we marked this as an exhibit yet?
14      THE REPORTER:  No, we haven't.
15      (Plaintiff's Exhibit Number 5 marked
16      for identification purposes and made a
17      part of the record)
18  Q   (By Mr. Sanspree) Ma'am, can you tell
19  me whose handwriting that is on 03 which we've
20  marked Exhibit 5?
21  A   I'm sorry.
22  Q   I'm sorry. Ms. Whitaker, I'm talking
23  to you now.
24      Ma'am, can you tell me whose
25  handwriting that is on Exhibit 5 at the bottom

Page 55

1   part?
2   A   Yes. It's a claims examiner by the
3   name of Wendy Hamrick.
4   Q   How do you know that that's her
5   writing?
6   A   Her little initials is at the bottom,
7   and I'm familiar with her writing.
8   Q   The copy you're looking at, does it
9   have the redacted section down at the bottom,
10  looks like somebody went through with a magic
11  marker and marked something out? Do you see
12  that?
13  A   Yes.
14  Q   Do you know what's under that? Do you
15  have a copy that's not blacked out?
16  A   Yes.
17  Q   Can you tell me what it says?
18      MR. POUNDSTONE:  Chris, it's
19  communications between, I believe, Wendy and the
20  legal department. So we've asserted the
21  attorney/client privilege as to that
22  communication at the bottom.
23      MR. SANSPREE:  Sure would like to know
24  what it says, Bobby.
25      MR. BUTLER:  You probably wouldn't. We

Page 56

1   might be able to tell you if you agree that it's
2   not a waiver, but we'll talk about it later.
3       MR. SANSPREE:  There's some other
4   stuff, too, Phil. And Bobby's been nice enough
5   not to waive some privilege with me when I've
6   sent him some documents.
7       MR. BUTLER:  You mean you made a
8   mistake?
9       MR. SANSPREE:  That would be correct.
10  Q   (By Mr. Sanspree) Ms. Whitaker, do you
11  know what happened to that Selman case? Did you
12  all go ahead and pay it?
13  A   No, sir.
14  Q   Just got to ask you.
15      MR. BUTLER:  Thank you. She didn't
16  answer all the rest of the question. Huh?
17      MR. SANSPREE:  Go ahead, Phil. I'm
18  sorry.
19      MR. BUTLER:  You didn't let her answer
20  the rest of the question. You asked her if she
21  paid it and you asked her if she knew what
22  happened to it.
23      MR. SANSPREE:  I probably don't want to
24  know the answer to that one.
25      THE WITNESS:  No. We won.

Page 57

1   Q   (By Mr. Sanspree) Let me ask you this,
2   Ms. Whitaker. The Selman case, did that involve
3   a late payment of premium, too?
4   A   No, sir.
5   Q   Did that have to do with some alleged
6   misrepresentations on the application?
7   A   Yes, sir.
8   Q   Were they material?
9   A   Yes, the health history was material.
10  Q   As far as the involvement with your
11  claim, is it your testimony that you just
12  supervised the other individuals that were
13  handling this claim that we're here about today?
14  A   Well, it's my responsibility, yes, to
15  supervise the individuals.
16      MR. BUTLER:  He asked you what you did.
17      THE WITNESS:  Oh, well, I reviewed the
18  claim at one time. I've initialed the claim.
19  Q   (By Mr. Sanspree) Right. And you
20  testified previously that initially you
21  determined that the claim was payable; correct?
22  A   Yes, based on the facts of our
23  investigation of the accident.
24  Q   Go ahead. I'm sorry. We've got a
25  delay here and I keep cutting you off. I'm not

Page 58

1  intentionally doing that. It's just there's a
2  delay between me and you.
3       Do you remember the date that you
4  determined it was payable? I may have already
5  asked you that.
6       A  Yes, it was May 6th, '04.
7       Q  I noticed that you looked down at some
8  documents. Which documents were you referring
9  to, please, ma'am?
10      A  Globe Lurie 5.
11      MR. POUNDSTONE: That's the one -- the
12  documents produced by us, document 0005.
13      MR. SANSPREE: I don't have 5. I don't
14  have 5. I've got 4 and then it goes to 6. Can
15  you explain to me what the document looks like?
16      MR. POUNDSTONE: Do you want me to tell
17  you? At the top it says Life Claims Evaluation
18  Form.
19      MR. SANSPREE: I don't have that,
20  Bobby. I've got 1 -- well, yeah, I do, too.
21  It's out of order.
22      Q  (By Mr. Sanspree) Can you tell me --
23  Ms. Whitaker, the copy you have, does it have at
24  the bottom, is that blacked out, too?
25      A  Yes, sir.

Page 59

1       Q  Do you have a copy that's not blacked
2  out?
3       A  Yes, sir.
4       Q  What does it say?
5       MR. POUNDSTONE: It's the same
6  attorney/client privilege as to the other
7  document we referenced, just notations of
8  communications with the legal department.
9       Q  (By Mr. Sanspree) All right.
10  Ms. Whitaker, I noticed -- are those your
11  initials right there at the bottom by 5-6-04?
12      A  Yes, sir.
13      Q  And it says "pay", and then your
14  initials, then 5-6-04; correct?
15      A  Yes, sir.
16      Q  And then it says "but late premium"
17  after that; correct?
18      A  Yes, sir.
19      Q  Is that your handwriting?
20      A  No, sir.
21      Q  Do you know whose handwriting that is?
22      A  Yes, sir.
23      Q  Whose is it?
24      A  It's Inga Lorrah, the supervisor of the
25  life claim department.

Page 60

1       Q  Can you spell her last name for me,
2  please, ma'am? I think she's in the
3  Interrogatories.
4       A  L-O-R-R-A-H.
5       Q  And so at least by May 6th, you all are
6  going to pay the claim and you all knew the
7  premiums were late, or allegedly late?
8       MR. POUNDSTONE: Object to the form.
9       THE WITNESS: No. We didn't realize
10  that the premium reinstatement wasn't done
11  accurately until May -- approximately May 13th.
12      Q  (By Mr. Sanspree) Can you tell me why
13  it says "but late premium" written on that
14  document that is dated 5-6-04, then?
15      A  Well, someone reviewed the file after I
16  made that suggestion.
17      Q  Do you know that to be true or are you
18  just speculating as to what may have occurred?
19      A  Well, I know that to be true by the
20  fact that Wendy wrote on May 13th.
21      Q  Right. But you don't know whether or
22  not they knew the premiums were late on May 6;
23  you're just speculating based on the other
24  document; correct?
25      MR. BUTLER: Object to the form.

Page 61

1       THE WITNESS: Say that again.
2       Q  (By Mr. Sanspree) What I'm asking is,
3  that's not your handwriting. You've testified
4  that's Inga Lorrah's handwriting.
5       A  That's correct.
6       Q  And you also testified that they wrote
7  that -- you hadn't testified to that. Your
8  understanding is that was written after the claim
9  was reviewed based upon -- at a later date based
10  upon another document that's dated May 13, 2004;
11  correct?
12      A  I'm sorry. I couldn't hear you with
13  the papers shuffling.
14      Q  I'm sorry.
15      MR. SANSPREE: Let me start over, Phil.
16  Please let me ask her again so I can start over.
17      MR. BUTLER: Absolutely.
18      Q  (By Mr. Sanspree) First, your testimony
19  was that's Inga Lorrah's handwriting that says
20  "but late premium"; is that correct?
21      A  Yes, sir.
22      Q  And do you know one way or the other
23  whether that was written on there on May 6, 2004?
24      A  I don't know if -- I don't believe it
25  to be written on there on May 6th.

Page 62

1    Q    But you don't know one way or the
2  other?
3    A    No, I couldn't give you the actual date
4  other than the documents in the file.
5    Q    Right. My long question was based on
6  that, so you cleared that up.
7         It says "pay," and it has your initials
8  dated 5-4-06. After that it's blacked out. Then
9  after that it says "but late premium"; correct?
10   A    Yes, sir.
11   Q    So somebody at some point saw that you
12 said pay it or you had approved the claim;
13 correct?
14   A    That was my suggestion, yes.
15   Q    And then they said but it was late
16 premium.
17   A    Yes.
18   Q    So at least you can glean from this
19 document that the benefits were still going to be
20 paid; correct?
21       MR. POUNDSTONE: Object to the form.
22   Q    (By Mr. Sanspree) That it's just late
23 premium but they were going to pay it?
24   A    No.
25   Q    That wouldn't be a reasonable

Page 63

1  interpretation?
2    A    No, sir, because all the facts hadn't
3  come to light. That's why we have steps in place
4  to make sure the claims are handled accurately.
5    Q    Yes, ma'am. But wouldn't it be a
6  reasonable interpretation from reading this note
7  down at the bottom -- I have no idea what it says
8  under that black part -- but wouldn't it be a
9  reasonable interpretation after reading this note
10 that you all were going to pay it even though you
11 knew it was a late premium?
12   A    No, sir, that's -- that's not.
13   Q    That's not reasonable?
14   A    No. I don't agree with that at all.
15   Q    I understand you don't agree with it,
16 but would it be a reasonable interpretation?
17       MR. POUNDSTONE: Object to the form.
18       THE WITNESS: The only reason that --
19 based on the -- I indicated I believed it was
20 payable based on the information we received from
21 the accident.
22   Q    (By Mr. Sanspree) Right.
23   A    I hadn't been aware of the
24 reinstatement premium being received after the
25 date of death. I would have addressed that.

Page 64

1    Q    Okay. Would this be a reasonable
2  interpretation?
3        MR. POUNDSTONE: Object to the form.
4    Q    (By Mr. Sanspree) The claim should have
5  been paid?
6    A    No, the claim shouldn't have been paid.
7    Q    Let me ask you this, then. If it's
8  possible that the customer service department
9  made a mistake and didn't note on the computer
10 system that a call had been made notifying Globe
11 Life of the death, if that's possible and the
12 mistake had been made and the check sent and
13 Globe Life cashed it and adjusted the claim and
14 realized later that they had said the claim was
15 payable but the premium was late, would the claim
16 be payable then?
17       MR. POUNDSTONE: Object to the form.
18       THE WITNESS: The claim could have
19 never been paid. The individual was deceased
20 prior to receiving money, and the policy wasn't
21 in force.
22   Q    (By Mr. Sanspree) Right. Do you
23 know -- but you don't know whether you all were
24 notified prior to cashing the check of the death,
25 do you?

Page 65

1    A    No, but it wouldn't make any
2  difference.
3    Q    I mean, if you're notified of the death
4  and then you cashed the check, would the claim be
5  payable then?
6    A    Repeat that one more time.
7    Q    If you were notified of the death prior
8  to cashing the check and you cashed the check,
9  should Globe Life go ahead and pay the claim?
10   A    No.
11   Q    If you cashed the check after you knew
12 he was dead, you wouldn't pay it?
13   A    Well, we couldn't have reinstated it.
14 The individual was deceased. The policy lapsed.
15   Q    Tell me the safeguards that are in
16 place to protect Globe Life from receiving phone
17 calls and not noting the computer system
18 regarding death claims.
19   A    I'm sorry. I don't understand your
20 question.
21   Q    Are there any safety measures in place
22 that Globe Life has to prevent people from
23 receiving -- in the customer service department
24 from receiving telephone calls notifying them of
25 death of insureds so that they have to put it on

Page 66

1 the computer system, where they can't just make a
2 mistake and not just put it on the computer
3 system? Is there anything --
4    A   You would have to address that with --
5 a representative from customer service would be
6 able to handle that.
7    Q   Are you aware of any safety measures
8 that are in place yourself as head of the claim
9 department?
10    A   That would be a customer service
11 representative able to handle that to answer your
12 question more accurately.
13    Q   Well, actually, to answer my question
14 more accurately, are you aware? Are you aware of
15 any such measures?
16    A   I have no personal knowledge of their
17 procedures.
18    Q   Do you have any knowledge, whether it
19 be personal or as a company representative?
20       MR. BUTLER: She's not being put up in
21 that area as a company representative.
22       MR. SANSPREE: She's in the claim
23 department.
24    Q   (By Mr. Sanspree) I was asking as a
25 claims rep for the company, are you aware of any

Page 67

1 safety measures in place to keep customer service
2 employees from receiving phone calls and not
3 noting the phone calls regarding deaths on the
4 computer system? Are you aware of any such
5 measures?
6       THE WITNESS: As I said, I don't know
7 what their procedures and safeguards that they
8 have in place. I don't feel like I'm capable of
9 giving you an accurate answer on that.
10    Q   (By Mr. Sanspree) Are you aware or not?
11       MR. BUTLER: She just answered it,
12 Chris.
13       MR. SANSPREE: Well, she's not
14 answering it. She's not saying whether she's
15 aware of it or not.
16       MR. BUTLER: She hadn't used your
17 words. She doesn't have to. She said she wasn't
18 aware of the procedures for the safeguard.
19       MR. SANSPREE: Thank you. Thank you.
20    Q   (By Mr. Sanspree) Do you know whether
21 there are any at all? I know you may not be
22 aware of what they are, but are there any in
23 place at all?
24    A   I don't know what their procedures and
25 their policies are and what type of safeguards

Page 68

1 they have up there. I would -- I would feel that
2 there was --
3       MR. BUTLER: Don't guess.
4       THE WITNESS: Okay.
5    Q   (By Mr. Sanspree) Let me ask you this,
6 Ms. Whitaker. Do you all ever take claims and
7 have a meeting with your claims examiners and
8 review the files to determine whether or not they
9 should be payable or not, like in a group
10 setting?
11    A   I'm sorry. I don't really understand
12 the question.
13       MR. BUTLER: You mean like a claims
14 committee?
15       MR. SANSPREE: No. Let me try to set
16 it up first.
17       MR. BUTLER: Sure.
18    Q   (By Mr. Sanspree) Tell me how, if a
19 claim examiner has a question, how do they come
20 to you? First, do they come to you for
21 explanations?
22    A   Yes, they could come --
23    Q   Or to answer the question?
24    A   They could come to me or they could go
25 to the supervisor.

Page 69

1    Q   And do they do that on a individual
2 basis or do you all have, like, a meeting time
3 where you can meet and review files, or both?
4    A   They would do it on a individual basis.
5    Q   Do you all -- when I say "you all,"
6 does Globe Life have, in the claim department, do
7 you all ever review files like in a group setting
8 where more than two people are present?
9    A   Yes. Yes, two people could review a
10 file together.
11    Q   Do you all have any specific names for
12 those meetings? I mean, do you call it like
13 a round table meeting or anything like that?
14    A   No, sir.
15    Q   Who would be present? Do you all have
16 any people that specialize -- like a physician or
17 anything like that that would attend some of
18 these claims for benefits?
19    A   Well, we don't really have -- I think
20 you're asking if we have a group meeting that
21 discussed the claim.
22    Q   Right.
23    A   And we don't have a group meeting. I
24 thought you were talking about two people,
25 supervisor and employee, discussing how a claim

Page 70

1  should be reviewed.
2      Q   In the claim department, do you all
3  have any physicians that are employed by Globe
4  Life in your department?
5      A   No, we don't have any physician
6  employed in our department.
7      Q   What department are they employed --
8  would a physician be employed in?
9      A   We have a medical director that comes
10  in to review claims periodically.
11      Q   And does that medical director review
12  life claims?
13      A   Yes, he reviews some life claims.
14      Q   And when he reviews those life claims,
15  does he do that by himself or is someone from the
16  claim department present when he's reviewing the
17  file?
18      A   It could be either way.
19      Q   On this file, do you know whether or
20  not there was ever a meeting discussing this file
21  and the facts of this case?
22      MR. BUTLER:  With the medical director?
23      MR. SANSPREE:  No, first in general.
24      MR. BUTLER:  Okay.
25      THE WITNESS:  No, I'm not aware of any

Page 71

1  meeting.
2      Q   (By Mr. Sanspree) Did you participate
3  in -- just to clarify your answer, are you
4  referring to a meeting as being more than just
5  you and one individual or you're not aware of any
6  meeting that you had?
7      A   I'm trying to understand.
8      Q   That's probably a bad question.
9      A   Are you asking me if I'm aware of a
10  group meeting together on this particular claim?
11      Q   Yeah, right.
12      A   No, I'm not --
13      Q   More than just you and the person
14  handling the claim, the claim adjustor, was there
15  anybody that -- did you ever have a meeting where
16  it was just more than you and that person --
17      A   No.
18      Q   -- on this file?  And did you ever meet
19  with an individual on this file?
20      A   I don't really recall.  I don't believe
21  so.
22      Q   So when you reviewed the file and
23  signed off on it, did somebody just leave it in
24  your office?  How did that work?
25      A   No.  When I reviewed the file on May

Page 72

1  6th --
2      Q   Yes, sir.
3      A   -- and I suggested pay on it.  This is
4  over my limit of approval.  I can't approve a
5  $100,000 claim.  And it would have been sent to
6  our legal area to review.
7      Q   All right.  So the legal department,
8  they reviewed the file to determine whether or
9  not it should be paid; correct?
10      A   Yes.  They reviewed the file to
11  determine if it was --
12      Q   Okay.  So when you -- did you ever meet
13  with anybody from the legal department on this
14  file?
15      A   Not that I recall.
16      MR. BUTLER:  I assume you're talking
17  about before the lawsuit.
18      MR. SANSPREE:  Right.
19      THE WITNESS:  Not that I recall.
20      Q   (By Mr. Sanspree) What is your limit of
21  payability?
22      A   At this time it's 50,000.
23      Q   What was it at the time this claim was
24  made back in '04?
25      A   I don't really recall, but it would

Page 73

1  have been less than 50-.
2      Q   Did you just get a promotion?  I didn't
3  mean a promotion.  Did they just up your limit
4  recently to 50,000?
5      A   Yes, sir.
6      Q   How do you know that it -- okay.  When
7  did they up your limit to 50,000?
8      A   I don't recall that, either.
9      Q   So if I understand your testimony
10  correct, you reviewed the file on May 6th, and to
11  the best of your recollection on an individual
12  basis.  Is that a correct statement of your
13  testimony?
14      A   Yes, sir.
15      Q   And you determined, as head of the
16  claim department, that based on the facts you had
17  on May 6th, 2004, that the claim should be paid.
18      A   Yes.
19      Q   Correct?
20      A   Based on only the facts that I had in
21  the medical -- in our investigation in connection
22  with the accident.
23      Q   Right.  And so you say -- you note on
24  the file that it's payable but it's over your
25  limit; correct?

Page 74

1    A   Yes.
2    Q   And so then you forward the file to the
3   legal department; correct?
4    A   Yes.
5    Q   What is the legal department's limit of
6   payability?  Any claims or --
7    A   I don't know what their limit is.
8    Q   I mean, obviously if you have a million
9   dollar policy -- have you ever had to forward a
10  million dollar file to the legal department?
11   A   No, sir.
12   Q   What's the largest file -- when I say
13  "file," what's the largest benefit claim you have
14  forwarded to the legal department?
15   A   Oh, I believe we've had 250-, possibly
16  a 300-.  I don't recall any --
17   Q   All right.  Do you know who at the
18  legal department reviewed this file to determine
19  whether or not it should be paid after May 6,
20  2004?  Which individual?
21   A   Yes.
22   Q   Could you tell me, please, ma'am?
23   A   Mr. Mitchell.
24   Q   What's Mr. Mitchell's first name?  Do
25  you happen to know?  Is Mr. Mitchell in the room,

Page 75

1   by the way?
2        MR. BUTLER:  No.
3    Q   (By Mr. Sanspree) What's Mr. Mitchell's
4   first name, please, ma'am?
5    A   Brian.
6    Q   So he reviewed the file.  You looked
7   down like you're looking at some documents.  What
8   document were you referring to when you found his
9   name?
10   A   I was just reviewing the review sheet.
11   Q   Is that Bates numbered?
12       MR. SANSPREE:  Bobby, is that something
13  I've got?
14       MR. POUNDSTONE:  I think she was
15  looking at 0005.  But I'm not sure -- she can
16  tell you.  I'm not sure that document is what
17  jogged her memory as to who it was.
18   Q   (By Mr. Sanspree) I don't see his name
19  on there anywhere on 05.  How do you know it was
20  Brian Mitchell, ma'am?
21   A   Well, he normally reviews the files.
22       MR. SANSPREE:  Would you be opposed to
23  me taking his deposition, Phil?
24       MR. BUTLER:  Yeah.
25       MR. SANSPREE:  He's obviously involved

Page 76

1   in determining whether or not this claim should
2   be paid.
3        MR. BUTLER:  Well, you've also got a
4   situation where we've been contacted by a lawyer,
5   and I think his advice on the claims matter -- I
6   mean, we got notice from a lawyer in June --
7        MR. SANSPREE:  January.
8        MR. BUTLER:  -- and received it January
9   the 30th, and I think that fits in
10  attorney/client privilege.
11       MR. SANSPREE:  I'm with you, Phil.  I'm
12  not wanting to get into any of that information.
13  But from what I got from the file is that
14  Ms. Whitaker has said the claim was payable but
15  it was over her limit so she sent it on to the
16  legal department.  Evidently they decided they're
17  not going to pay it.
18       MR. BUTLER:  I don't think that's the
19  case.  I think the decision was made after this
20  other lady, Wendy, looked at it.  I think she's
21  addressed that, looked at the premium history.
22       I'll talk to you about deposing Brian
23  later, but I'm not --
24       MR. SANSPREE:  I may not need to, Phil.
25  The way it looks to me is that -- well, you know

Page 77

1   how it looks to me.  You've been doing it longer
2   than I have.
3        MR. BUTLER:  Do you want to go off the
4   record just a minute?  I don't want to mess up
5   your deposition.
6        MR. SANSPREE:  It doesn't matter
7   because I'm about done, Phil.  I'm not going to
8   ask her any more about it.
9        MR. BUTLER:  I think you're going to
10  find that the claims examiner by the name of
11  Wendy -- I can't recall her last name -- is the
12  one that looked at it after Ms. Whitaker, and
13  she's the one that looked at the details of the
14  premium history and on that basis that it was
15  denied, not a decision by the legal department.
16   Q   (By Mr. Sanspree) Ms. Whitaker --
17       MR. SANSPREE:  Were we back on the
18  record?
19       MR. BUTLER:  We were on the record then
20  because you never said otherwise.
21   Q   (By Mr. Sanspree) Ms. Whitaker, what is
22  Wendy's position in the claim department?  Is it
23  Wendy Hamrick?
24   A   Yes, sir.
25   Q   What is her position in the claim

Page 78

1  department?
2     A   She's a claims examiner.
3     Q   And how many claims examiners does
4  Globe Life have in their life department?
5        MR. BUTLER:  In January of '04 --
6  excuse me.  January through May of '04?
7     Q   (By Mr. Sanspree) Yes, during while
8  this claim was pending, how many did you all
9  have?
10        MR. SANSPREE:  Was that Mr. Mitchell
11  that just walked by?
12        MR. BUTLER:  No, that's me.
13        MR. SANSPREE:  I'm just playing, Phil.
14     Q   (By Mr. Sanspree) Go ahead.
15     A   I believe, to the best of my
16  recollection, it would have been about four.
17     Q   And do the claims examiners or did the
18  claims examiners back in 2004, did they report to
19  you?
20     A   Yes.
21     Q   Obviously you've had training in
22  handling life claims by Globe Life; is that
23  correct?  Is that a fair statement?
24     A   Yes, I have training.  In 35 years, I
25  hope I'm trained.

Page 79

1     Q   I was getting to my next question.
2  What training do claims examiners, those four
3  claims examiners, what training do they have
4  regarding looking up people's premium payment
5  history?  Is that something you do on every claim
6  that comes in?
7     A   Yes, before every claim's processed we
8  verify the policy was in force.
9     Q   And was that done on this case?
10     A   Yes, prior to --
11     Q   Was it --
12     A   Yeah, at the time it was being
13  processed or reviewed, examined.
14     Q   How long does it take to check
15  somebody's premium payment history?
16     A   Not very long.
17     Q   How long?
18     A   Well, it's entering -- bringing up a
19  screen on the computer.
20     Q   About 10 seconds?
21     A   No.  It takes a little longer than that
22  to research it.
23     Q   30 seconds?
24     A   No.  I would think more than a
25  couple -- maybe five minutes.  Two, three --

Page 80

1     Q   So it takes five minutes to check
2  somebody's premium payment history; correct?  Is
3  that your testimony?
4     A   It depends on how detailed it is, how
5  far you'd have to go back.  There's a lot of
6  factors involved.
7     Q   How long would it take to check premium
8  payment history on Mr. Lurie?  You reviewed the
9  file.  Just give me your best guess.
10     A   Oh, I believe that she would have spent
11  several minutes researching it, looking at the
12  premium history, seeing if there was any other
13  factors involved through the system.  I'd say
14  maybe -- I just couldn't give you a ballpark
15  figure.
16     Q   I'm looking at a document -- first off,
17  is it your testimony that when a claim comes in,
18  it's part of the procedures in the claim
19  department to check premium payment history?  Is
20  that your testimony?
21     A   Yes.
22     Q   All right.
23     A   I believe --
24     Q   I'm sorry.  We have a delay and I keep
25  cutting you off.  I don't mean to.

Page 81

1        MR. BUTLER:  Finish answering your
2  question.
3     Q   (By Mr. Sanspree) Right.  I'm sorry.
4     A   When a claim comes in, the claims clerk
5  reviews and prints out the initial screen and
6  sends the necessary claim forms.
7     Q   And you said "initial screen."  Are you
8  referring to the premium history?
9     A   No, sir.
10     Q   My question was is it procedure?  Is it
11  the claim department procedure to check the
12  premium payment history when a claim is made?  Is
13  that part of the procedure?
14     A   At the time of examination, it's the
15  procedure to check the premium history.  It's a
16  procedure to review all facts in connection with
17  the claim.
18     Q   Do you all have a procedural manual or
19  anything like that?
20     A   No, sir.
21     Q   How do the four claims examiners, how
22  do they know the procedures that they should
23  follow?
24     A   They have one-on-one training when they
25  begin with the company in our department, with

Page 82

1  our department.
2     Q   Right.  And the one-on-one training
3  that they receive, part of that training is when
4  a claim comes in, you make sure that the
5  premium's paid on time and make sure the policy
6  is in force; correct?
7        MR. POUNDSTONE: Object to the form.
8        THE WITNESS: The claim comes -- the
9  claim doesn't exact -- doesn't go to the examiner
10 at the beginning.  The notice of death is set up
11 by a claims clerk who visualizes and sees on the
12 computer system that the policy's paid current
13 and sends the necessary requirements for filing.
14       The claims examiner, prior to
15 determining what benefits would be eligible,
16 verifies the premium payments and the fact if the
17 policy was in force.
18    Q   (By Mr. Sanspree) So before a decision
19 is made on whether or not a claim should be paid,
20 the claims examiner would verify that premium
21 payments had been made and that the policy was in
22 force?  Is that your testimony?
23    A   The claims examiner would verify, prior
24 to issuing any type of benefits, that the policy
25 was in force in accordance with the provisions of

Page 83

1  the policy.
2     Q   Do you all have any manuals or anything
3  that shows -- who trains these claims examiners?
4  You said one-on-one training.  Who's responsible
5  for doing that?
6     A   Myself, the supervisor.
7     Q   Who's you all's supervisor?
8     A   Inga Lorrah.
9     Q   Do you all have anything in writing
10 that would tell you what all to train these folks
11 on?
12    A   No.  As I said, it's one on one.
13    Q   So the way I understand the file,
14 Ms. Whitaker, is that the claim was received in,
15 processed, you know, over several months, and a
16 decision was made by yourself that the claim was
17 payable, correct, on May 6th?
18    A   Based on the investigation we did in
19 connection with the cause of death --
20    Q   Right.
21    A   -- my suggestion was that it was a
22 payable claim.  Had I been aware of all the
23 circumstances and facts and the premium -- that
24 the policy wasn't in force, it wouldn't have been
25 my suggestion to make payment.

Page 84

1     Q   All right.  And you suggested to make
2  payment.  I guess did you verify the premiums had
3  been made?
4     A   No, sir, I didn't.
5     Q   Did you verify that the policy was in
6  force?
7     A   No, sir, I didn't.
8     Q   So you did not follow procedure of the
9  claims department?
10       MR. POUNDSTONE: Object to the form.
11       THE WITNESS: I wasn't the examiner to
12 process the benefits.  My suggestion was to
13 approve the claim.  And once it's -- then it goes
14 to an examiner to determine what benefits would
15 be eligible under the contract and the provisions
16 of the policy.
17    Q   (By Mr. Sanspree) Okay.  So --
18    A   And that examiner determined that the
19 policy was not in force at the time of death.
20    Q   So you all get the claim.  Evidently
21 the claim goes to a claim clerk.  Can you tell us
22 who the claim clerk is?  Who is that?
23    A   Linda Lawson in our area.
24    Q   How is that different from a claim
25 examiner is what I'm trying to get at?

Page 85

1     A   The clerk is only responsible for
2  sending out the necessary claim forms.
3     Q   So the clerk just sends out the claim
4  form.  A case was assigned to the claim clerk or
5  the claim clerk sent out the claim form -- this
6  case is what I'm referring to -- and the claim
7  came in and it was assigned to a claims examiner?
8  Is that true?
9     A   No.  The claim -- the claim goes
10 through several steps during the processing.  The
11 claims --
12    Q   All right.  I know you're going to give
13 me all these steps it goes through, but what I'm
14 trying to get at, by the time you received the
15 file on May 6th, had a claims examiner looked at
16 the file at all?
17    A   No, sir.
18    Q   Who looked at the file before you
19 decided that it was payable?
20    A   A medical reviewer reviewed the
21 documents that we received.
22    Q   All right.  So from January to May 6th,
23 a medical reviewer reviewed the file?
24       MR. BUTLER: Object to the form.
25    Q   (By Mr. Sanspree) Who else reviewed it?

Page 86

1    A   No, sir.  When we received notice of
2   death, a claims clerk reviewed the letter, sent
3   the necessary claim forms.  Once that information
4   was received in March, we conducted an
5   investigation.
6    Q   Who is "we"?
7    A   The company.
8    Q   How?  I mean, the company can't do it.
9   Did the claims examiner do it?
10    A   Our department, the people in the life
11  claims unit.
12    Q   Everybody?  I'm trying to just figure
13  out who looked at it.  Did a claims examiner look
14  at it?
15       The company's incorporated down at the
16  state.  The company can't do it and the claim
17  department can't do it.  It's got to be somebody
18  in the claim department, an employee that
19  reviewed the file.
20       Do you know who it was in your life
21  department that reviewed the file other than a
22  medical reviewer and the claim clerk --
23       MR. BUTLER:  And herself?
24    Q   (By Mr. Sanspree) -- prior to May 6th?
25    A   Yes.  Ms. Knudson reviewed the file.

Page 87

1    Q   Can you spell her last --
2    A   K-N-U-D --
3    Q   I'm sorry?
4    A   K-N-U-D-S-O-N.
5    Q   Okay.  Go ahead.  So she reviewed the
6   file.  I cut you off, and I apologize.
7    A   And she assigned it to an outside field
8   service to obtain the accident report and the
9   toxicology report -- or the coroner's report and
10  the toxicology report.
11    Q   The coroner's report and the toxicology
12  report, they're not at issue in this lawsuit, are
13  they?
14    A   No, sir.
15    Q   Okay.  And who is Ms. -- how did you
16  say her last name?  Knudson?
17    A   Knudson.
18    Q   What is her position with the company?
19  Or what was her position with the company?
20    A   I don't really recall exactly what her
21  title was back then.
22    Q   Is she a claims examiner?
23    A   No, she wouldn't have been a claims
24  examiner.  She would have been a coding.
25    Q   In your Interrogatory responses, number

Page 88

1   6, you've got her listed as a claims examiner but
2   she's no longer with the company.
3    A   Well, like I say, I just didn't recall
4   at this time.
5    Q   Was she a claims examiner, Ms. Knudson?
6   First -- I'm jumping ahead.  You can review your
7   responses if you want to.  I'm reading from
8   response number 6.
9       MR. POUNDSTONE:  Have we marked those?
10       MR. SANSPREE:  No, Bobby, I didn't.
11       MR. POUNDSTONE:  I just found them.
12       MR. SANSPREE:  I will if you want me
13  to.
14       MR. POUNDSTONE:  It's up to you.  She's
15  got them in front of her now.  I was just trying
16  to find them in my stack of paper here.
17       MR. SANSPREE:  Let's mark those as 6,
18  Bobby, if you don't mind.
19       MR. POUNDSTONE:  Okay.
20       MR. SANSPREE:  Ms. Court Reporter, what
21  did we mark as Exhibit Number 4?
22       MR. POUNDSTONE:  I've got it.  It's
23  Ms. Lurie's check, the premium check, with her
24  handwritten notes down below it.
25       MR. SANSPREE:  Thanks, Bobby.

Page 89

1       Hey, Bobby?
2       MR. POUNDSTONE:  Uh-huh.
3       MR. SANSPREE:  Can you hear me?
4       MR. POUNDSTONE:  Yeah.
5       MR. SANSPREE:  Evidently she's looking
6   at the responses; correct?
7       THE WITNESS:  Yes, sir.
8    Q   (By Mr. Sanspree) Does that refresh
9   your recollection as to Mrs. Knudson's position
10  with the company back in 2004?
11    A   Yes, sir.  Yes, sir.
12    Q   Is it your testimony that after
13  reviewing the documents, that Ms. Knudson was a
14  claims examiner?
15    A   Yes, sir.
16    Q   And so back to the file and how it was
17  handled.  The claims clerk reviewed the letter
18  and issued the claim form information.  Then a
19  medical reviewer reviewed the file; correct?
20    A   No, sir.
21    Q   All right.  Tell me the steps, then.
22  The claims clerk got the notification.
23    A   Sent the claim forms.
24    Q   Right.  Okay.
25    A   The claim information was received

Page 90

1   approximately March 8th. Ms. Knudson would have
2   looked at the information and determined if any
3   additional material was needed.
4       Q   And your prior testimony was that the
5   claims examiner should check and verify that
6   premiums had been paid and the policy was in
7   force; correct?
8       A   Yes.
9       Q   Did Ms. Knudson do that at that point?
10      A   I don't know what was in Ms. Knudson's
11  mind at that time or what her reasoning was or if
12  she verified that the system indicated that it
13  was paid to January 8th, '04.
14          MR. BUTLER: January 8th?
15          THE WITNESS: January 28th, '04.
16      Q   (By Mr. Sanspree) Okay.
17      A   And if it wasn't done --
18      Q   Go ahead. I'm sorry. I keep cutting
19  you -- we have a lag in time.
20      A   And I don't know -- I don't know what
21  was in her mind or if she didn't realize it or if
22  she believed the reinstatement was done
23  accurately or just noted that the system
24  indicated that it was paid to January 28th, '04
25  and proceeded with assigning it to ICS to obtain

Page 91

1   the additional information we needed to determine
2   if it was eligible.
3       Q   Who is ICS, please, ma'am?
4       A   It's an outside field service that we
5   use occasionally.
6       Q   Is that the outside service that got
7   the accident report and toxicology report and all
8   that you referred to earlier?
9       A   Yes, sir.
10      Q   Now, if Ms. Knudson did not verify the
11  premium payments or whether or not the policy was
12  in force, would that be a violation of the
13  procedures of the claim department?
14      A   Well, as I said, I don't know what
15  Ms. Knudson's thinking was or what her review at
16  that time was or even if she did bring it to look
17  at that screen.
18      Q   I understand you don't know what she
19  did because we'll have to ask her what she did.
20  But assume with me that that was not done. Would
21  that be a violation --
22      A   Well, her --
23      Q   Go ahead. I'm sorry.
24      A   An examiner in that certain situation,
25  she wasn't processing the benefits. She was only

Page 92

1   starting to conduct the investigation.
2       Q   And part of the investigation would be
3   to verify the premium payments; correct?
4       A   Well, she normally should have done
5   that. But as I said, if she verified the
6   reinstatement was done accurately at that time,
7   I'm just not aware of it. As I said, I don't
8   know what she looked at.
9       Q   Why is she no longer with the company?
10      A   She's transferred to another company.
11      Q   When you say "transferred," is that a
12  Globe Life company?
13      A   Yes, a sister company. She moved.
14      Q   Does Globe Life own that sister
15  company?
16      A   I don't know if we own it or how we're
17  related. I just know it's one of our sister
18  companies.
19      Q   So in response to Interrogatory number
20  6 when you said "No longer employed by Globe,"
21  you're not really sure whether she is employed by
22  Globe or not?
23      A   She's not employed by Globe.
24      Q   Do you know the name of the sister
25  company she's employed by?

Page 93

1       A   United American Insurance Company.
2       Q   Where is that located?
3       A   McKinney, Texas.
4       Q   Do you know what capacity Ms. Knudson's
5   employed with United American Insurance Company,
6   what's her job title over there?
7       A   No, sir, I don't.
8       Q   Is she in the claims department, do you
9   know?
10      A   I don't know.
11      Q   All right. Now, you said normally she
12  should have checked to verify the premium
13  payments and should have checked and verified
14  whether or not the policy was in force. What did
15  you mean by "normally"?
16      A   As a general rule, I would believe that
17  that would have been her procedure.
18      Q   And what are you basing your belief
19  upon?
20      A   Well, that's -- normally that would be
21  something that she would look at had she gone to
22  another screen.
23      Q   And you testified previously there's
24  nothing in writing, she just receives this
25  training about what she normally should have done

Page 94

1  from individuals, correct, one on one?
2      A   Yes, sir.
3      Q   And did she receive her training from
4  you?
5      A   I don't recall if I trained her in this
6  particular position or if it was Inga.
7      Q   But when you train people, do you tell
8  them to verify premium payments and to check
9  whether or not the policies are in force?
10     A   Yes, when the -- before the examiner
11 processes any benefits, yes.
12     Q   And during the investigation phase?
13     A   Yes.  It would have been -- hindsight
14 would have been great looking at it before
15 starting an investigation.
16         Had that been done -- or had we been
17 aware of all the facts, had Mr. Matthews brought
18 it to our attention that there was a question
19 regarding the premium payments back in his
20 original letter, we could have addressed that.
21 But this is an unusual case.
22     Q   So I'm trying to get down the
23 procedures.  Would you agree with me that
24 determining whether or not the premiums had been
25 paid on time and whether or not the policy was in

Page 95

1  force, is that part of an investigation phase of
2  the claim?
3      A   Yes, it would have been.  In this
4  particular case it would have been nice to have
5  realized that at the beginning or been put on
6  notice that the policy was not reinstated
7  properly.  It didn't meet reinstatement.
8      Q   Now, once a claim is -- say it's
9  approved by you and you don't have to send it to
10 legal because it's -- say it's under $50,000.
11 Once you approve a claim, take me through the
12 steps after.  What do you do with the file after
13 that?
14     A   I would give it to an examiner to
15 process the benefits or determine the eligibility
16 of the benefits.
17     Q   Wouldn't you determine eligibility of
18 benefits before you recommend that it be paid?
19     A   Well, my decision was based on the
20 facts in the file at that time.  And my
21 decision --
22     Q   Wasn't --
23         MR. BUTLER:  Wait a minute.  You're
24 cutting her off.
25         MR. SANSPREE:  I can't help it, Phil.

Page 96

1  I'm not doing it on purpose.  There's a lag
2  between her statements and my questions, and
3  sometimes I think she's done and she's not.
4          MR. BUTLER:  Well, I know it.
5      Q   (By Mr. Sanspree) Go ahead.  I'm sorry.
6  Go ahead and finish.
7          MR. BUTLER:  Finish your statement all
8  the way through without pausing so much, please,
9  ma'am.
10         THE WITNESS:  My decision was based on
11 the facts that was in the file at that time.  My
12 decision was based on -- and my recommendation on
13 the facts of investigating the accident, itself.
14         Now, assigning it to an examiner, it's
15 their responsibility at that time, before any
16 payment is issued, to verify that the
17 reinstatement was done correctly, that the policy
18 was in force at the time of death, and in
19 accordance with the provisions of the policy
20 issue any type of benefits that would be
21 available.
22         After the examiner reviewed this and
23 found that the premiums weren't paid correct on
24 time, that it wasn't reinstated accurately, it
25 was -- it was determined that the claim wasn't

Page 97

1  eligible, and we promptly refunded the premium.
2      Q   (By Mr. Sanspree) Okay.  I understand
3  on this case that's what you're claiming
4  happened.  I was asking generally if a claim -- I
5  was asking you to speculate maybe, Phil.
6          Say a claim came in under $50,000 which
7  is under your limit and you approved payment.  I
8  was just asking you what you do with it then.  I
9  mean --
10         MR. BUTLER:  She just told you, Chris.
11         MR. SANSPREE:  Right.  I know, but then
12 she went down this long statement of what
13 happened on this file.
14     Q   (By Mr. Sanspree) It just goes to --
15 tell me where it goes.  If it's under your limit
16 and you approve it, where does it go from there?
17     A   It goes to a claims examiner who
18 would --
19     Q   Okay.  And then --
20     A   -- who would determine that the policy
21 is in force and determine what benefits were
22 eligible and to question anything that they felt
23 like was inappropriate or incorrect with the
24 claim, itself, and bring it to my attention again
25 or to a supervisor.

Page 98

1    Q    Okay. Were you through? I don't want
2    to interrupt you.
3    A    Yes, sir.
4    Q    So it goes to the claims examiner.
5    Where does it go from there? Say they approved a
6    claim. Where do they send the file from there,
7    or do they send it anywhere?
8    A    No, they don't send it anywhere. They
9    would -- they would calculate the benefits that
10    would be available under the policy contract,
11    enter it into the system, and a check would be
12    generated. And the checks would be --
13    Q    Do you --
14    A    The checks would be periodically
15    audited in order to determine that they are
16    issued correctly.
17    Q    Who generates those checks? Is it a
18    separate department or do you all do it in the
19    same department?
20    A    Well, the information's entered through
21    the computer system, and then the checks are
22    issued from the computer.
23    Q    So it's your testimony that only after
24    you okay -- only after you okayed the payment on
25    this claim that we're here about today, only

Page 99

1    after that is when they determine whether the
2    policy's in force and whether the premiums have
3    been paid and whether or not they're eligible for
4    the benefits?
5    A    In this particular case, the examiner
6    reviewed it when they were determining it and
7    determined that the premiums and reinstatement
8    wasn't done correctly. It wasn't in force at the
9    time.
10    Q    And that was after -- go ahead. I'm
11    sorry. When you stop, I think you're through.
12    A    That it wasn't in force at the time of
13    death, the examiner determined that.
14    Q    And that was after it had been sent to
15    the legal department?
16    A    Yes.
17    Q    Is it standard for the company to, on
18    death claims, to always get a toxicology report?
19    A    It's not standard. It is -- it would
20    be in this particular case.
21    Q    Why?
22    MR. BUTLER: Are you limiting your
23    question to this policy type, Chris?
24    MR. SANSPREE: I was just saying death
25    claims.

Page 100

1    MR. BUTLER: I object to the form,
2    then. You know that they have a number of
3    different policy types of life insurance.
4    MR. SANSPREE: Right, but there's only
5    one type of death.
6    MR. BUTLER: No, there's not, either.
7    There's more than one type of death.
8    MR. SANSPREE: Well, there's different
9    causes of death. There's only one type of death
10    I'm aware of.
11    THE WITNESS: I'm sorry. Do you have a
12    question for me?
13    Q    (By Mr. Sanspree) What I asked you was,
14    was it you all's procedure on death claims to get
15    a toxicology report on the deceased?
16    A    No, it's not standard procedure.
17    Q    Can you tell me why -- I think you
18    testified on this case you all did? Why did you
19    all do it on this case?
20    A    Because this particular policy type has
21    several exclusions and limitations that need to
22    be met, and we didn't have enough facts and
23    circumstances surrounding the accident to
24    determine if it would have met those criterias.
25    Q    So you all were originally looking at

Page 101

1    the claim to see whether or not the deceased was
2    intoxicated so he would fall within the
3    exclusions?
4    A    That -- that would be one -- that would
5    be one question we had, but there could be many
6    other circumstances involved.
7    Q    So from the very beginning, the claim
8    was being evaluated so not to be paid but to
9    determine whether or not there were any
10    exclusions in force?
11    A    No, sir.
12    MR. POUNDSTONE: Object to the form.
13    THE WITNESS: Our job is to --
14    Q    (By Mr. Sanspree) Why did you -- go
15    ahead.
16    A    Our job is to process claims, make
17    payments on claims. We are trying -- we were
18    trying to obtain the information to determine if
19    it was eligible.
20    Q    So the toxicology report came back
21    negative; correct?
22    A    Yes, sir.
23    Q    So then you move on to some other --
24    what did you investigate the file after that?
25    How did you do it or how did somebody do it on

Page 102

1 your behalf?
2 　A　After we reviewed the toxicology
3 report, it was reviewed by our medical director.
4 　Q　And who was that, by the way? You said
5 that earlier. I never did follow up with that.
6 Who is you all's medical director at that time?
7 　A　Dr. Stanley McCampbell.
8 　Q　Okay. So he reviewed the file. Why
9 was he reviewing the file?
10 　A　Just to review the toxicology report to
11 verify that there wasn't anything that we might
12 not be aware of and that it met the guidelines of
13 accidental death.
14 　Q　I note on your Interrogatory responses
15 you got Dr. McCampbell is retired. Do you know
16 what his training was as far as the insurance
17 business, in interpreting insurance language?
18 　A　I -- he had years of experience. As
19 far as any type of degrees and that sort of
20 thing, I wouldn't be able to give that to you.
21 　Q　But is it your testimony that you are
22 allowing him to determine whether or not the
23 claim fell within the insurance policy wording?
24 　A　No. We reviewed it with him to get his
25 opinion.

Page 103

1 　Q　On -- did you get his opinion on the
2 medical records or for the insurance claim
3 purposes?
4 　A　He reviewed the medical records and the
5 medical examiner's report.
6 　Q　Okay. But you all weren't asking him
7 to make a determination whether or not a claim
8 should be paid under the terms of the policy,
9 were you?
10 　A　No, sir.
11 　Q　What type of training have the claim
12 examiners had regarding interpretation of policy
13 language? Do you all train them on that?
14 　A　Yes, they would be familiar with the
15 guidelines and the provisions of the policy.
16 　Q　How do you know that to be true?
17 　A　Well, in this particular instance, we
18 requested a duplicate policy so we would have it
19 in the file.
20 　Q　Right, but how do you know that they
21 would be familiar? When I refer to "they," I'm
22 referring to claims examiners in your department.
23 How do you know they would be familiar with the
24 policy terms?
25 　A　Well, they would be asked to read over

Page 104

1 a policy during their training.
2 　Q　Is that something that you do when
3 you're training these claims examiners? Do you
4 go over policy terms and conditions and stuff
5 like that with them?
6 　A　Yes, in the past I have.
7 　Q　When you say "in the past," you looked
8 like that's not something you normally do. Is
9 that something -- do you normally do that?
10 　A　I don't norm -- I don't do it on a
11 daily basis.
12 　Q　When you're training these claims
13 examiners, though, do you normally do it? I know
14 you probably don't train them on a daily basis.
15 But when you're providing them with training, do
16 you go over policy terms and conditions and try
17 to explain it? I've been doing insurance work
18 for several years, and I'm still learning.
19 　A　That's true.
20 　Q　As you can tell.
21 　A　Right. And we have very -- we have
22 several different types of policies. And that's
23 why we requested a duplicate policy so we would
24 have the policy terms and provisions in the file
25 in case someone --

Page 105

1 　Q　But --
2 　A　-- in case someone --
3 　Q　Go ahead. I'm sorry.
4 　A　-- in case someone needed to refer to
5 it to handle the claim correctly.
6 　Q　But I'm just trying to understand the
7 training. Any training they would receive would
8 be, again, on the one on one from either you or
9 Ms. Inga?
10 　A　Yes.
11 　　MR. SANSPREE: If you hang on one
12 second, I may be getting close to the end, which
13 I'm sure you're glad.
14 　　MR. BUTLER: Do you want me to go ahead
15 and call the other person?
16 　　MR. SANSPREE: Yeah, Phil, if you don't
17 mind.
18 　　MR. POUNDSTONE: Do you mind taking a
19 quick break?
20 　　MR. SANSPREE: Go ahead. Take one if
21 you need it.
22 　　(Break from 11:08 to 11:21)
23 　Q　(By Mr. Sanspree) Ms. Whitaker, from
24 your testimony, is it fair to say that claims
25 that are over $50,000, once you okay them to be

Page 106

1  paid, that you forward those on to the legal
2  department?
3     A  Yes.
4     Q  And then to the best of your knowledge,
5  does the legal department review the file along
6  with the policy?
7        MR. BUTLER:  If you know.
8        THE WITNESS:  I couldn't tell you what
9  all factors that they look at.
10    Q  (By Mr. Sanspree) Do you forward the
11  file to them?
12    A  Yes, they would have --
13    Q  The claim file?
14    A  Yes, they have the file.
15    Q  And in that file, is the policy
16  included or a specimen policy?
17    A  Yes.  In this case there would have
18  been.
19    Q  And to the best of your knowledge, the
20  legal department would review the whole claim
21  file; correct?
22        MR. BUTLER:  She's already answered
23  that question.  She said she didn't know what
24  they reviewed.
25        MR. SANSPREE:  That's why I said to the

Page 107

1  best of her knowledge they would review the whole
2  claim file; correct?
3        MR. BUTLER:  She can't have any
4  knowledge if she doesn't know.
5     Q  (By Mr. Sanspree) You sent the claim
6  file to the legal department.  I guess I am going
7  to have to depose somebody from the legal
8  department to see whether or not they review the
9  claim file.  I mean, it's a simple question.
10       You sent the claim file to them that
11  included the claim information you have, and you
12  okayed it May 6th, 2004; correct?
13    A  Yes.  Based on the information that was
14  in the file at that time, yes.
15    Q  And in that claim file that you
16  forwarded to the legal department, did it also
17  include a copy of the specimen policy?
18    A  Yes.
19    Q  All right.  And the duties of the legal
20  department, are they to look at the policy -- to
21  your knowledge, are their duties to look at the
22  policy in the claim file to see whether or not
23  any exclusions apply?
24        MR. BUTLER:  If you know.
25        MR. SANSPREE:  You can tell Phil's been

Page 108

1  doing it for a while because that's telling to
2  you say I don't know.
3        MR. BUTLER:  No, it's not.  If she
4  knows, I want her to testify that she knows.  I
5  don't want her to guess.  You're trying to make
6  her guess.
7        MR. SANSPREE:  I'm with you,
8  Mr. Butler.
9        MR. BUTLER:  No, I don't think you are.
10    Q  (By Mr. Sanspree) Go ahead.
11    A  I don't know every step that they have,
12  what they go through or what they look at.
13    Q  Do you know what their duties are in
14  the legal department as far as -- what is your
15  understanding of the reason why you would send
16  the claim file to the legal department?
17    A  Well, we have steps in place, as the
18  dollar amount of approval, to make sure claims
19  are handled correctly in accordance with the
20  provisions of the policy.  We have safeguards.
21    Q  Okay.  Now, it's your testimony that
22  you want to make sure the claim's handled
23  properly according to the provisions of the
24  policy; correct?
25    A  Yes.

Page 109

1     Q  And that's why you sent it to the legal
2  department?
3     A  And that it was over my authority.
4     Q  Okay.  So for two reasons you send it
5  to the legal department; first to see whether or
6  not it was handled correctly and in accordance
7  with the policy provisions; and number two, it
8  was over your legal authority -- I mean over your
9  limits of authority?
10    A  Yes.
11    Q  All right.  So the legal department,
12  it's your understanding that they'll review the
13  claim file and the policy to make sure that the
14  claim is handled correctly and is handled in
15  accordance with the policy provisions?  Is that
16  your testimony?
17    A  Yes, but I don't know all -- every
18  point that they look at within a claim file,
19  itself.
20    Q  Yes, ma'am.  And part of making sure
21  that the policy provisions are followed and that
22  the claim is handled correctly would be to
23  determine whether or not certain exclusions would
24  apply; correct?
25    A  Yes.  They would evaluate the claim or

Page 110

1  review the claim in accordance with the
2  exclusions and limitations.
3      Q   So -- I'm sorry. Yes, ma'am. So when
4  you boil it down, the legal department is really
5  determining whether or not the claim should
6  actually be payable in accordance with the policy
7  provisions; correct?
8      A   They would be reviewing the file and
9  the facts that were in the file.
10     Q   For what reason?
11     A   Again, to make sure the claim was being
12 handled correctly.
13     Q   Right. When you do that, you're
14 determining whether or not certain terms and
15 conditions or exclusions apply; correct?
16     A   Yes.
17     Q   And so in essence, they're determining
18 whether or not the claim should actually be paid
19 or not paid --
20        MR. BUTLER:  Object to the form.
21     Q   (By Mr. Sanspree) -- in accordance with
22 the policy provisions?
23     A   Yes, they would be reviewing the file
24 with the information and reviewing my suggestion
25 in accordance with the provisions and exclusions

Page 111

1  of the policy.
2      Q   So if a claim's over $50,000 and you
3  sent it to the legal department, are you all just
4  trying to figure out whether or not certain
5  exclusions would apply so you wouldn't have to
6  pay the claim?
7      A   No, sir. Our job isn't to --
8      Q   Why would you send it up?
9      A   Our job is to make sure that the claims
10 are handled properly and accurately. Our job is
11 to get claims -- my job is to see that claims get
12 paid.
13     Q   Yes, ma'am. I understand that. But it
14 appears to me from the testimony today that if a
15 claim is a certain amount and benefits, that it's
16 automatically sent to the legal department to
17 review.
18     A   We have steps --
19     Q   Is that true?
20     A   We have steps in place and authority
21 levels to make sure that the claim is looked at
22 twice, that there isn't an error made or an
23 oversight, to make sure that --
24     Q   Right. And --
25     A   To make sure that the claim is given

Page 112

1  every consideration and handled correctly.
2      Q   Right. It's your testimony -- if it's
3  under $50,000, you're going to do the same thing
4  for a claim that's under $50,000 as you are for a
5  claim that's over $50,000 in your job capacity?
6  I mean, you're going to try to make sure the
7  claim's payable or not payable -- you're not
8  going to -- that's a bad question.
9          If a claim is over $50,000 and it's
10 above your authority, you're not going to handle
11 that claim differently in your capacity as a
12 claim that's under your authority?
13     A   No. We handle all claims the same.
14     Q   Okay. On all claims, your job is to
15 make sure that the policy provisions and terms
16 and conditions and everything are adhered to;
17 correct?
18     A   Yes, sir.
19     Q   So my question to you, if you're doing
20 the same thing for under $50,000 claim as you are
21 for a over $50,000 claim and you're trying to
22 make sure that the policy and procedures are
23 followed and that the claim is handled correctly,
24 why would you send it to the legal department to
25 make sure that the policy provisions are followed

Page 113

1  for an over $50,000 policy?
2      A   Well, levels of authority for claim
3  payment is given to the supervisor and myself as
4  the manager, and even individual claims
5  processors. It's to ensure that the claim is
6  looked at twice to make sure that there hasn't
7  been anything missed.
8      Q   Right. And you testified previously
9  that there's two -- two reasons why it was sent
10 to the legal department, this claim, was, number
11 one, is to make sure it was handled correctly and
12 the policy provisions were followed; number two,
13 you said it was above your authority.
14         Is that a correct summation of your
15 prior testimony?
16     A   Yes.
17     Q   All right. And that policy provisions
18 and the claims were being handled correctly under
19 $50,000, why would you have to send a claim to
20 the legal department over $50,000 to make sure
21 the claim is handled correctly and the policy
22 provisions were followed?
23     A   As I said, we have the safeguards in
24 it, the dollar amount of the claim, so two people
25 would look at it to make sure that there's

Page 114

1  nothing missed.
2       We have the final step where the
3  examiner, who's processing the benefits and is
4  reviewing the premium payments, determining
5  reinstatement was in place at the time, that it
6  was done accurately. The claims examiner
7  ultimately has some input in it also to make sure
8  that -- that there isn't an error made.
9    Q   By the legal department?
10   A   No. The claims examiner at the end
11 would even review it when -- when the claims
12 examiner was reviewing the claim.
13      MR. BUTLER: Go ahead and finish what
14 you're going to say, please, ma'am.
15      THE WITNESS: Well, I'm just trying to
16 explain that even after I indicate that I believe
17 it was a payable claim, we have safeguards -- and
18 legal reviewed it, we have safeguards in place so
19 the examiner, when processing the benefits, would
20 determine that all other factors were met.
21   Q   (By Mr. Sanspree) And what are those
22 all other factors?
23   A   That there wasn't any late premium,
24 that the reinstatement was done correctly.
25   Q   And you understand that these all other

Page 115

1  factors are at issue in this lawsuit; correct?
2    A   Yes.
3    Q   If I understand your testimony
4  correctly, you send the claims over $50,000 to
5  the legal department to make sure and to double
6  check and make sure the claim had been handled
7  correctly and that all the policy provisions had
8  been followed. Is that your testimony?
9    A   Yes, and to review a claim that's over
10 my dollar amount.
11   Q   Who reviews or double checks the
12 policies that are under $50,000? Does anybody do
13 that?
14   A   Yes. Ms. Lorrah has a limit of
15 $35,000, so she can approve up to 35-. And then
16 from 35- to 50- I would review.
17   Q   If I understand your testimony
18 correctly, though -- I don't think we're on the
19 same page -- if it's under $50,000 -- I know it's
20 your limit, and you said you didn't know what
21 your limit was back in 2004, but assume with me
22 that your limit was $50,000.
23      If it's under $50,000 and you say
24 payable as you did in this case and you don't
25 send it to the legal department, is there anybody

Page 116

1  that double checks whether or not it should be
2  payable if you don't send it to the legal
3  department is what I'm trying to get at, other
4  than the claims examiner at the end?
5    A   No, no. The claims examiner's
6  responsibility is to go behind me and to bring
7  anything that appears inappropriate to my
8  attention.
9    Q   Is there a specific number or amount in
10 benefits that automatically goes to the legal
11 department or is it just whatever's over your
12 head, like over -- what I'm trying to get at is
13 back in 2004, you say that you can't remember
14 what your limit was but you're sure it was less
15 than $50,000. So my question is: Is it just
16 whatever -- anything that goes over your limit,
17 does it automatically go to the legal department?
18   A   Yes. It would have to have a second
19 approval on it.
20   Q   Ms. Whitaker, back in 2004, was anybody
21 above you in the claim department?
22   A   Yes.
23   Q   Who was that?
24   A   Ms. Garrison.
25   Q   Is she still with the company?

Page 117

1    A   Yes.
2    Q   Did she review the file, this file in
3  this case?
4    A   No.
5    Q   And what was her limit?
6    A   I don't recall what her limit was at
7  that time.
8    Q   Do you know whether or not this claim
9  exceeded her limit in this case?
10   A   I don't -- as I said, I don't recall
11 what her limit was at that time.
12   Q   What was -- was her position -- are you
13 in her position now?
14   A   No.
15   Q   Is she still above you in the claim
16 department now?
17   A   Yes.
18   Q   Why is it that anything that is above
19 your head would go to the legal department
20 instead of Ms. Garrison?
21   A   Well, Ms. Garrison does have a limit,
22 and she does audit certain claim limits.
23   Q   But you don't know what that limit is,
24 and you don't know what it was back in 2004?
25   A   I don't recall what it was back then.

Page 118

1    Q   And you can't explain to us why the
2   claim went immediately to the legal department
3   instead of to Ms. Garrison for review?
4    A   Other than this policy was a
5   contestable policy or an accident which had to
6   meet certain criteria, it was over my limit. And
7   as I said, I don't recall what her limit was at
8   that time.
9    Q   So if I understand your testimony
10   correctly, this policy went to the legal
11   department because it was a contestable policy
12   and there was an accident involved and that they
13   had to meet certain criteria, "they" being the
14   claimants?
15    A   Yes, sir.
16    Q   So it didn't go to the legal department
17   because it was over your head?
18       MR. BUTLER:  Object to the form.
19    Q   (By Mr. Sanspree) I mean, if
20   Ms. Garrison could have reviewed the file and you
21   don't know what her limits was, then you don't
22   know for sure if it went to the legal department
23   because it was above your authority; correct?
24       MR. POUNDSTONE:  Object to the form.
25       THE WITNESS:  Okay.  Restate that

Page 119

1   again.
2    Q   (By Mr. Sanspree) You just testified
3   that you don't know what Ms. Garrison's authority
4   was back in 2004 as far as being able to pay
5   claims.  Is that a true statement?
6    A   Yes, I don't remember what her examiner
7   limit -- or her authority limit was.
8    Q   And also, Ms. Garrison could review
9   files the make sure that the claims were being
10   handled properly and that certain policy
11   provisions and everything were being met,
12   correct, if it's above your limit?
13    A   She could review them.  That isn't in
14   her normal regular function duties.
15       MR. BUTLER:  It isn't?
16       THE WITNESS:  Well, I mean, she -- we
17   don't normally --
18       MR. BUTLER:  I just asked you which
19   word you used.  It wasn't clear when you stated
20   it.
21       THE WITNESS:  We don't --
22    Q   (By Mr. Sanspree) So based --
23    A   Okay.  On this particular claim, and
24   any claim, we don't flow them through her for her
25   initials or approval on the dollar limit.

Page 120

1    Q   If she's got a higher limit than you
2   do, why not?
3    A   Well, she audits them and releases
4   them.
5    Q   Okay.  Why didn't you all do this in
6   this particular claim?
7    A   In this particular case, the factors
8   are different.
9    Q   Right.  And your prior testimony was it
10   was sent to the legal department because it was
11   above your limit.
12    A   Yes.
13    Q   That was your prior testimony.
14    A   Yes.
15    Q   But that's not an accurate statement,
16   is it?
17       MR. POUNDSTONE:  Object to the form.
18       MR. BUTLER:  How is it not accurate?
19       MR. SANSPREE:  Because it could have
20   gone to Ms. Garrison who had a higher limit.
21       MR. BUTLER:  Could have gone to you,
22   but that doesn't make it inaccurate.
23       MR. SANSPREE:  I don't have any limits.
24   I'd pay the claim.
25       MR. BUTLER:  Go on.

Page 121

1       THE WITNESS:  This claim was being
2   handled as a current investigation.  It was over
3   my dollar amount.  It's in our normal flow to
4   send the claim to the legal department for those
5   specific reasons.
6    Q   (By Mr. Sanspree) Because it's over
7   your dollar amount?
8    A   And that it was an investigative claim,
9   that we investigated it and obtained information
10   to determine if it was eligible.
11    Q   And by "investigative claim," are you
12   referring to the policy type of insurance?
13    A   I'm referring to obtaining the medical
14   information and the ME report and toxicology
15   report to determine if it met the policy
16   provisions and exclusions.
17    Q   And you referred that on to the legal
18   department to make that decision?
19    A   To get their opinion, yes.
20    Q   Do you remember what their opinion was
21   regarding meeting the policy terms and
22   conditions?
23    A   Well, when Wendy sent it back to the
24   legal department regarding the premium and the
25   policy not being in force at the time of death,

Page 122

1  it was returned.
2      Q   And that was determined by the legal
3  department; is that correct?
4      A   To refund the premium?
5      Q   Yes, ma'am.
6      A   That was received after the date of
7  death?
8      Q   Yes, ma'am. Allegedly. Was that
9  determined by the legal department?
10     A   Our legal department would have
11  reviewed it again.
12     Q   And what I'm getting at, was the
13  decision to refund the premium, was it made by
14  the legal department?
15     A   Yes.
16     Q   All right. Ms. Whitaker, can you tell
17  us how the legal department made that decision?
18         MR. BUTLER: Object to the form. How
19  can she tell you --
20         MR. SANSPREE: Well, if you let me
21  finish.
22         MR. BUTLER: All right.
23     Q   (By Mr. Sanspree) Can you tell us --
24         MR. SANSPREE: There's a lag,
25  Mr. Butler. If I pause, you might think I'm done

Page 123

1  like I've been doing with her by accident, so --
2          MR. BUTLER: Okay.
3      Q   (By Mr. Sanspree) Can you tell me how
4  the legal department makes that decision, given
5  the fact that you had approved the claim and sent
6  it to them?
7      A   Yes. Wendy, the claims examiner,
8  reviewed the reinstatement, reviewed the date of
9  death prior to processing any benefits, and
10  returned the file to them with an explanation of
11  what was happening -- what had happened on the
12  file.
13     Q   What document are you referring to,
14  please, ma'am?
15         MR. POUNDSTONE: It's Exhibit 5. Your
16  Exhibit 5.
17         MR. SANSPREE: That's coming from
18  the --
19         MR. POUNDSTONE: It's our document
20  number 0003.
21     Q   (By Mr. Sanspree) Go ahead. Did that
22  come from the legal department? Is that what
23  you're saying?
24     A   No. I'm saying our claims examiner,
25  prior to processing the benefit, reviewed the

Page 124

1  premium payments and the reinstatement and
2  determined that we received the money after the
3  date of death, that the policy wasn't in force.
4      Q   All right. And so your testimony is
5  that the legal department made the decision to
6  refund the premiums and that this 03 somehow
7  references that decision; is that correct?
8      A   I'm referencing the 03 as it was
9  additional information sent for review to
10  determine if the policy was still eligible under
11  the provisions of the policy.
12     Q   And the statements that you've
13  testified to today on the record regarding the
14  legal department's decision to refund the
15  premiums, is that what's blacked out there at the
16  bottom?
17         MR. BUTLER: Go ahead. I'll let her
18  testify if you'll agree that we're not making a
19  blanket waiver of attorney/client privilege.
20  Will you agree to that?
21         MR. SANSPREE: Yeah. I'm not going to
22  do that to you.
23         MR. BUTLER: Okay.
24         MR. SANSPREE: I'll agree to that.
25         MR. BUTLER: Go ahead and tell him.

Page 125

1          THE WITNESS: Yes. That would have
2  been our directions.
3          MR. SANSPREE: And with Phil's
4  objection -- I'm not ever going to say you've
5  waived attorney/client privilege or anything, a
6  blanket. But with Phil's objection -- or
7  statement in mind and my agreement not to waive
8  that, what does it say under that black -- that's
9  blacked out?
10         MR. BUTLER: With that understanding,
11  I'll let her testify, that it's no waiver.
12         MR. SANSPREE: Right.
13         THE WITNESS: I don't know exactly what
14  it says.
15         MR. BUTLER: Get the original for him.
16         MR. POUNDSTONE: She's got it in front
17  of her now, Chris.
18         MR. BUTLER: I think you wanted her to
19  read that, didn't you?
20         MR. SANSPREE: I wanted just to know
21  what it said since they made the decision not to
22  pay it.
23         THE WITNESS: Our department asked "Is
24  it okay to refund the late premium?" And legal
25  indicated "yes."

Page 126

1    Q    (By Mr. Sanspree) Let's see. And do
2  you know when that was done? Is there a date on
3  there?
4    A    There's no date.
5    Q    I don't know what that date at the
6  bottom is, 5-13, 2004. You don't know how that
7  got on there, do you?
8    A    That's the date that this printout
9  screen was printed.
10   Q    But you don't know the date that this
11 information was written on there, do you?
12   A    No.
13   Q    The handwriting, you don't know when --
14   A    No, I don't know the actual date, but
15 it had to be after May 13th, '04.
16   Q    Right. Or it could have been the same
17 day?
18   A    Yes.
19       MR. SANSPREE: When was that denial
20 letter again, Bobby? I don't have it in front of
21 me.
22       MR. POUNDSTONE: My recollection is
23 it's May 18th, but don't hold me to that.
24       THE WITNESS: May 18th.
25       MR. POUNDSTONE: May 18th.

Page 127

1    Q    (By Mr. Sanspree) So the handwriting --
2  just trying to narrow it down to when the
3  handwriting could have been put on there.
4        To the best of your knowledge, it would
5  have to be between May 13th and then the denial
6  letter of May 18th; correct?
7    A    Yes.
8    Q    Which is --
9        MR. SANSPREE: Bobby, we've produced
10 the denial letter as Lurie 05. And we'll
11 probably mark that as Exhibit 7. We're going to
12 do it. We're not going to probably do it. We're
13 going to do it.
14       MR. POUNDSTONE: I think she's got my
15 version in front of her, but let me get that
16 version. Okay.
17       MR. SANSPREE: If you got writing on
18 there or anything, don't worry about it because
19 we can get the court reporter to -- we'll
20 reference the Bates and we can send them a copy
21 of the Bates.
22       MR. POUNDSTONE: So you want Lurie 0005
23 as document Number 7 or Exhibit Number 7?
24       MR. SANSPREE: Right. Exhibit number
25 7. And it's dated May 18th, 2004.

Page 128

1        (Plaintiff's Exhibit Number 7 marked
2        for identification purposes and made a
3        part of the record)
4        MR. POUNDSTONE: She's got it in front
5  of her.
6        MR. SANSPREE: I think we've marked
7  that handwritten note document previously; is
8  that correct, Ms. Court Reporter?
9        MR. POUNDSTONE: It's Number 5.
10   Q    (By Mr. Sanspree) Ms. Whitaker, so to
11 the best of your knowledge, that handwriting on
12 Exhibit 5 had to come in between the date at the
13 bottom of Exhibit 5, which is May 13, 2004, and
14 the date of Exhibit 7, which I'll refer to as the
15 denial letter which is dated May 18th, 2004; is
16 that correct?
17   A    Yes.
18   Q    And do you have any information -- I
19 mean, obviously you sent the file to the legal
20 department after May 6th, 2004, when you approved
21 the claim; right?
22   A    Yes.
23   Q    Do you have any way of knowing when the
24 legal department sent it back to you?
25   A    Can I review the file for a minute?

Page 129

1        MR. POUNDSTONE: Sure.
2        MR. SANSPREE: Yes, ma'am. Take your
3  time.
4        MR. POUNDSTONE: Here. This is a clean
5  set that you can look through.
6        THE WITNESS: Well, it had to be
7  sometime -- well, May 6th, thereabouts, I would
8  have sent it up to them, and it probably would
9  have been returned within a few days and given to
10 the examiner on May 13th.
11   Q    (By Mr. Sanspree) How do you know that,
12 ma'am?
13   A    Well, I have my date May 6th.
14   Q    Right. I'm not trying to confuse you.
15 I'm trying to follow you along in the documents.
16       How do you know that it was given to
17 the examiner on the 13th? Is that just from
18 Exhibit 5? Are you looking at Exhibit 5?
19   A    Yes. I know she had it at that time.
20       MR. BUTLER: Chris?
21       MR. SANSPREE: Sir?
22       MR. BUTLER: In looking through the
23 original of the claims file --
24       MR. SANSPREE: Yes, sir.
25       MR. BUTLER: -- and I have not compared

Page 130

1  the copy, but in reproducing the claims file,
2  there is a sticky note, a little yellow looks
3  like 1-1/2 by 2 sticky note that I'm not sure was
4  copied.
5      MR. POUNDSTONE: It was not. I hadn't
6  seen it before.
7      MR. BUTLER: Bobby says it's not.
8      MR. SANSPREE: I bet it's damaging to
9  my case, isn't it?
10     MR. BUTLER: Not really. But I do want
11 you to be sure we have all of the file.
12     MR. POUNDSTONE: Can we see it if we
13 hold it up?
14     MR. BUTLER: Or Bobby can just read it
15 to you.
16     MR. SANSPREE: Actually,
17 Ms. Whitaker -- you can put it on Ms. Whitaker's
18 forehead.
19     MR. POUNDSTONE: Can you see it?
20     MR. SANSPREE: Bobby, I can't read it.
21 The light's different.
22     MR. POUNDSTONE: It says "To life
23 claims," and there's a 5-14-04 date on it. And
24 then underneath that it says "To Wendy H."
25     Q  (By Mr. Sanspree) Okay. Ms. Whitaker,

Page 131

1  are you looking at that? Are you looking at that
2  yellow sticky?
3      MR. POUNDSTONE: She has it now.
4      THE WITNESS: Yes. Can you see it?
5      Q  (By Mr. Sanspree) I can see the sticky,
6  but I can't see the information on there. The
7  light's reflecting off of it. But who wrote that
8  memo, do you know? Is there any indication on it
9  who authored that?
10     A  That looks like Mr. Mitchell's
11 handwriting at the top.
12     Q  Just for the record, can you read what
13 Mr. Mitchell wrote?
14     A  "To life claims 5-14-04."
15     Q  All right. And then anything
16 underneath?
17     A  It says to --
18     Q  You said at the top.
19     A  It says "To Wendy H." Wendy --
20     Q  Is that --
21     A  Wendy Hamrick.
22     Q  Right. But that's not his handwriting?
23     A  No.
24     Q  Whose handwriting is it that says "To
25 Wendy H."? Do you have any idea?

Page 132

1      A  I believe it's Deborah Sager's.
2      Q  So when it comes to -- just so I can
3  understand in my head, it would come from the
4  legal department and go to somebody at the life
5  department. And I take it that note's referring
6  to he probably stuck it on the file and sent the
7  file back to the life department?
8      A  Yes, I believe that would be what would
9  happen.
10     Q  And then is there somebody in the life
11 department that would look at the file and then
12 give it to a claims examiner? Is it Deborah? Is
13 that who you said?
14     A  No.
15     Q  What I'm trying to figure out is why it
16 says "To Wendy H," why somebody would write that
17 on there. Did they look at the file and say this
18 goes to Wendy?
19     A  Well, Wendy sent the -- Wendy sent the
20 file up to them. This is her note.
21     Q  Okay.
22     MR. POUNDSTONE: She's referring to
23 Exhibit 5.
24     MR. SANSPREE: Yeah.
25     Q  (By Mr. Sanspree) Can you tell me

Page 133

1  who -- did you say the lady's name was Deborah
2  that wrote the --
3      A  Deborah Sager, the legal assistant.
4      Q  Is she in the legal department or in
5  your department?
6      A  The legal department.
7      Q  And do you know whether or not your
8  department actually got the file on the 14th or
9  was it sometime after that? Do you know one way
10 or the other?
11     A  I believe we got it on the 14th because
12 Wendy did another memo to our steno section.
13     Q  Can you refer me to the Bates number at
14 the bottom, if you don't mind?
15     MR. POUNDSTONE: It's our document
16 number 2.
17     Q  (By Mr. Sanspree) Go ahead, ma'am. I
18 didn't mean to cut you off. This indicates
19 that --
20     A  I believe that she got it on the 14th
21 and on the 14th sent it over to our steno section
22 for the letter of explanation.
23     Q  And I know you testified when we first
24 started this deposition that you were in the
25 steno section originally.

Page 134

1  Do they generate the letters for you
2  all to send out to the insureds?
3  A  Yes.
4  Q  And then that generation of the letters
5  is based on information the claim department
6  would provide the steno section; correct?
7  A  Yes.
8  Q  All right.  And they did that on the
9  14th?  Is that your understanding?
10  A  Yes, sir.
11  Q  So just so I can follow the history of
12  the file, you get the claim -- you get the claim,
13  notification of the claim at least by January
14  30th, 2004.  The claim's obviously investigated.
15  On May 6th, 2004, you recommend that it be
16  payable; correct?
17  A  Well, we received notice of death on
18  January 30th.  We didn't receive Proof of Loss
19  and claim forms until approximately March.
20  Q  Right.  And that's why I said you
21  received notice.
22  A  Okay.
23  Q  You at least had notice in January of
24  the death.
25  A  Yes, we had notice of death.

Page 135

1  Q  Okay.  Now I was trying to get how the
2  claim was handled through time.  You get
3  notification of the death, the claim's
4  investigated properly, you get Proof of Loss, and
5  on May 6th, you recommend payment.
6  A  Based --
7  Q  But it's -- right.  Go ahead.  Based on
8  what you had in the file.
9  A  You go ahead.  Yes.
10  Q  And but this policy type's different
11  and the accident is different, so you send it to
12  legal on May -- I guess May 6th.
13  A  Yes.
14  Q  And so the way I understand what we've
15  gone through recently here a few minutes ago is
16  that from May 6th to May 14th, assuming they got
17  it on the 6th, is that the file was reviewed by
18  legal or at least was up in the legal department?
19  MR. POUNDSTONE:  Object to the form.
20  That's not accurate.
21  THE WITNESS:  Okay.  Can you --
22  MR. SANSPREE:  I thought it was pretty
23  accurate.
24  MR. BUTLER:  No.
25  MR. SANSPREE:  The sticky note -- can

Page 136

1  we mark the sticky note?
2  MR. BUTLER:  Sure.
3  MR. POUNDSTONE:  It went from legal,
4  back to Wendy, back to legal, and then back to
5  Wendy again between the 6th and the 14th.
6  (Plaintiff's Exhibit Number 8 marked
7  for identification purposes and made a
8  part of the record)
9  Q  (By Mr. Sanspree)  Now, Ms. Whitaker,
10  you heard what your attorney just said.  Could
11  you explain what he was talking about, went to
12  legal, back to Wendy, back to legal, back and
13  forth in between the 6th and the 14th?
14  MR. BUTLER:  We've plowed that ground a
15  couple times, but go ahead.
16  MR. SANSPREE:  I don't think we have
17  done that.
18  MR. BUTLER:  Yeah, we have.
19  MR. SANSPREE:  Not between the 6th and
20  the 14th.
21  MR. BUTLER:  Yeah, we have.
22  MR. SANSPREE:  That's an eight-day
23  span.
24  MR. BUTLER:  Yeah, we have, but go on.
25  THE WITNESS:  From May the 6th, on my

Page 137

1  recommendations, I would have sent it to legal
2  department.
3  Q  (By Mr. Sanspree)  Right.
4  A  From there it was returned to us, to
5  our life claims section.
6  Q  On what day?  On what day?
7  A  I have to review the file again.
8  MR. BUTLER:  Chris?
9  MR. SANSPREE:  Sir?
10  MR. BUTLER:  While she's looking for
11  that, if we have the same agreement on non-waiver
12  of attorney/client privilege on that document
13  that is Exhibit Number --
14  MR. POUNDSTONE:  It's not been marked I
15  don't believe.  It is our document number 0005.
16  Have we marked that one?
17  MR. SANSPREE:  No, we didn't mark that.
18  MR. POUNDSTONE:  That's the other one
19  that was redacted.
20  MR. BUTLER:  I'll let her read that to
21  you, what is redacted, if we have the same
22  agreement on non-waiver of attorney/client
23  privilege.
24  That may help you, but I don't think
25  it's going to help you a lot on your chronology.

1    MR. POUNDSTONE: Let's read this.
2    MR. BUTLER: Do you want her to do
3  that?
4    MR. SANSPREE: Well, before we do that,
5  Phil, when you say non-waiver, I mean, is there
6  any -- if this does get past summary judgment and
7  we end up having to give a timeline, can we use
8  that to establish the timeline?
9    MR. BUTLER: Yes, you can use the
10  information. I'm just not wanting you to take
11  the position that by showing you this
12  information, which I truly believe is
13  attorney/client privileged, that I'm not making a
14  blanket waiver of attorney/client privilege.
15    MR. SANSPREE: Blanket waiver, that's
16  agreed. I would never try to do that.
17    MR. BUTLER: Okay, yeah. I'm not
18  saying you couldn't use it or I wouldn't have any
19  reason to show it to you.
20    MR. SANSPREE: Okay.
21    MR. BUTLER: I'm just trying to help
22  you, Chris.
23    MR. SANSPREE: Yeah, I believe you.
24  He's trying to help me help me.
25    MR. BUTLER: You're doing fine.

1    MR. SANSPREE: Do you all want to mark
2  that or not?
3    MR. POUNDSTONE: If you're going to
4  mark that, you need to mark both of them. You
5  didn't mark it either.
6    MR. SANSPREE: Let's just mark both of
7  them as Exhibit 9.
8    MR. BUTLER: I don't have a problem
9  with that.
10    MR. SANSPREE: Would it be 9 and 10 or
11  8 and 9?
12    MR. POUNDSTONE: You can just do them
13  collectively as 9. We'll just refer to 9 as the
14  redacted document.
15    (Plaintiff's Exhibit Number 9 marked
16    for identification purposes and made a
17    part of the record)
18    Q    (By Mr. Sanspree) Go ahead,
19  Ms. Whitaker. First would you read from the
20  document which we've marked -- Globe Life 05
21  which we've marked as 9, can you read the
22  redacted section for me at the bottom?
23    MR. POUNDSTONE: Right here.
24    THE WITNESS: Did you say 05 or 09?
25    MR. SANSPREE: There are two documents

1  that make up Exhibit 9.
2    MR. POUNDSTONE: He wants you to read
3  the document that we produced in redacted form as
4  our document Bates numbered 5 which you have in
5  front of you.
6    THE WITNESS: Okay. It says "Pay
7  SJW May 6, '04, agree BM," and then it says late
8  premium -- "but late premium."
9    Q    (By Mr. Sanspree) All right. So just
10  so the record's clear and I'm clear, the part
11  that's blacked out says "agree BM"?
12    A    Yes.
13    Q    And BM, would that be Mr. Mitchell,
14  Brian Mitchell?
15    A    Yes, sir.
16    Q    So he agreed to pay it as well in
17  legal?
18    A    Based on the facts he had at that time.
19    Q    And back to what we were talking about
20  earlier, how does that help me figure out how
21  many times the file went between the life
22  department and legal? Because the documents I
23  have, it appears that it just went to legal and
24  then back to claims one time.
25    A    Excuse me. No. From May 6th it went

1  to legal to review, the same documents that I
2  had. It came back with agreement. It went to
3  the claims examiner --
4    Q    Do you know -- real quick, just -- so
5  it came back with agreement from Brian Mitchell
6  with initial BM; correct?
7    A    Yes.
8    Q    Is there anything that you could point
9  me to that would put a date to when the file came
10  back from Brian?
11    A    Yes. It's Globe Life Lurie --
12    MR. POUNDSTONE: Our document number 17
13  is what she's looking at.
14    Q    (By Mr. Sanspree) Okay. And how does
15  that put a date for you on when it came back?
16  Just to the right, the information on the right,
17  the description section?
18    A    Yes. On May 7th, it was sent to senior
19  manager.
20    Q    Who would that be?
21    A    That's our legal area, our legal
22  department.
23    Q    Okay. So it's sent up -- you sent it
24  on the 6th, and evidently they got it on the 7th?
25  Is that the way I'm reading Lurie 17? Which

1  we'll go ahead and mark, Bobby, as Exhibit 10.
2      MR. POUNDSTONE:  Okay.
3      (Plaintiff's Exhibit Number 10 marked
4      for identification purposes and made a
5      part of the record)
6   Q   (By Mr. Sanspree)  Am I reading that
7  correctly?
8      A   It can be that, that they noted it on
9  the 7th, that they got it on the 7th, or we sent
10  it on the 7th.  Yes, they got it on the 7th.
11  Underneath it says "File to Brian to approve,
12  DS."
13    Q   What does DS mean?
14    A   That's Deborah Sager.
15    Q   So I note on the 12th it says on this
16  record, entry date, "File to examiner to process,
17  SJW."
18    A   Yes, the file --
19    Q   Is that -- go ahead.  I'm sorry.
20    A   The file was returned to me and I noted
21  it to the examiner on May 12th.
22    Q   All right.  And then it's got an entry
23  date of 5-13-04 that lapsed at DOD.
24    A   Date of death.
25    Q   Return to -- okay.  And it says it's

1  returned to senior manager.  Is that when you all
2  discovered that there was an issue with the
3  premiums and -- when you said senior manager,
4  you're talking about back to the legal
5  department?
6    A   Yes.
7    Q   So on the 13th it was sent --
8    A   Yes.  Wendy returned it with her
9  writeup.
10    Q   And then the next day, it was sent to
11  the steno for the letter to be sent out, correct,
12  that we've marked previously as Exhibit 7?
13    A   Well, yes, the file was returned to
14  Wendy, and Wendy wrote it up on the 14th, and it
15  went to steno, and they processed the letter on
16  the 18th.
17    Q   So you get the file back on the 12th
18  from -- that it has been approved to pay -- to be
19  paid by legal on the 12th?
20    A   Yes.
21    Q   On the 13th, it was discovered there's
22  an issue with the premium, so it was sent back to
23  legal?
24    A   That's correct.
25    Q   And then legal sent it back to the life

1  department on the 14th, and the file was sent
2  over to the steno for a letter of denial to be
3  generated?
4    A   That's correct.
5    Q   Which ultimately went out -- the letter
6  ultimately went out on the 18th.  Is that a
7  correct statement?
8    A   Probably on the 19th, the following
9  day.
10      MR. POUNDSTONE:  Hey, Chris, this
11  document that you're reading from is a three-page
12  printoff.  Do you want me to mark all three pages
13  as Exhibit 10?  16, 17 and 18.
14      MR. SANSPREE:  Go ahead, Bobby.  I was
15  going to read that in.  16, 17 and 18.
16      MR. POUNDSTONE:  I just want to make
17  sure we're marking the whole thing.
18      MR. SANSPREE:  Can we mark those as 10,
19  and then just for the record refer that I was
20  reading from the second page which is Bates
21  number 17 in that line of questioning.
22      MR. BUTLER:  I'm not trying to rush
23  you, Chris, but we do have your other witness
24  here.
25      MR. SANSPREE:  Thank you, Mr. Butler.

1      (Plaintiff's Exhibit Number 10 marked
2      for identification purposes and made a
3      part of the record)
4   Q   (By Mr. Sanspree)  Ms. Whitaker, I'll
5  refer you back to Exhibit 6 which are the
6  Interrogatory responses you all sent to me in
7  response to questions I sent to you all.
8      MR. POUNDSTONE:  She has them.
9   Q   (By Mr. Sanspree)  Have you got to those
10  yet?
11      MR. POUNDSTONE:  She has them.
12   Q   (By Mr. Sanspree)  Now, in Interrogatory
13  number 1, it notes that you and Barbara Hernandez
14  answered these questions.
15      Did you all sit down together and
16  answer them or did you do it -- you just put down
17  what you knew and sent it to her and she did the
18  same to you or -- how did that happen?
19    A   I worked with our legal department,
20  Mrs. Peterson.  And no, Barbara and I didn't sit
21  down together.
22    Q   So you and Ms. Peterson answered -- did
23  Barbara answer these questions, too, or was it
24  just you and Ms. Peterson?
25    A   I worked with Staci on my areas.

Page 146

1    Q   And which areas -- do you remember -- I
2   mean, can you go through these and tell me which
3   ones you answered and which ones -- they're not
4   set out like that.
5       In the response it doesn't say Sandy
6   and then it doesn't say Barbara answered these or
7   anything like that. Do you remember which one --
8    A   My knowledge would have been in
9   connection with the claim file.
10   Q   Right. See, all these questions pretty
11  much pertain to the claim. I'm not trying to be
12  difficult. I'm just wondering which ones you
13  were able to sit down and answer as opposed to
14  Barbara.
15   MR. BUTLER:  Is it really necessary
16  that we go through the entire set of
17  Interrogatories, Chris?
18   MR. SANSPREE:  Hopefully she can just
19  glance through these and -- how do you want to do
20  it, Phil? I can read these and just ask her.
21      Some of these are obvious -- some of
22  them are obviously either the legal department or
23  you had to answer them, like expert witnesses and
24  stuff like that, I don't think she's going to
25  know any of that.

Page 147

1       MR. BUTLER:  I know it. But I don't
2   think it's -- I understand she signed the
3   Interrogatories. And if you insist on it, we'll
4   take the time to do it. I just don't think it's
5   necessary, but it's not my case, it's yours.
6    Q   (By Mr. Sanspree) Well, let me ask you
7   this, then, Ms. Whitaker. Who made the ultimate
8   decision to deny this claim?
9    A   The claims examiner determined that the
10  policy was not in force at the time of the death,
11  so it was sent back to our legal department to
12  review. And it was under their instructions
13  after our recommendation was to return the
14  premium and explain that the policy wasn't in
15  force.
16   Q   Okay. So somebody in the legal
17  department ultimately said pull the trigger?
18   A   Well, they agreed with our
19  recommendations based on the new information that
20  they had regarding the premium.
21   Q   Right. But, you know, somebody in the
22  life department had to run it by legal, correct,
23  before they -- before they could just deny the
24  claim?
25   A   Yes. The supervisor and our claims

Page 148

1   examiner recognized that the premium wasn't paid
2   prior to the expiration of the grace period and
3   that the policy wasn't in force at the time of
4   death and sent it back to our legal department
5   for review.
6    Q   Could you have denied it without
7   sending it to legal?
8    A   No. That's not our -- our policy.
9    Q   So what I'm trying to get at is legal
10  pretty much made the decision to deny the claim?
11   A   We recommended it to be -- the premium
12  be returned based on our new findings.
13   Q   Right.
14   A   We recommended it one time that based
15  on the findings, it was payable.
16   Q   Right. But each time it was run by
17  legal.
18   A   Right, because we have checks and
19  balances in place to make sure that things of
20  this instance are caught and that the claims are
21  handled correctly.
22      We have an obligation as the life claim
23  department to make sure each claim is handled
24  correctly. We have a responsibility to all
25  policyholders. And they have to have checks and

Page 149

1   balances in place so there isn't a -- isn't a
2   claim mishandled.
3    Q   Well, and I understand that. But what
4   I'm trying to get at is that the ultimate
5   decision was made by the legal department to deny
6   the claim. What if they would have said pay it,
7   would you have paid it?
8    A   Based on their recommendation, yes.
9    Q   All right. So they made the ultimate
10  decision not to pay it? When I say "they," I
11  mean the legal department.
12   A   Based on our findings, based on the new
13  evaluation of the material, they agreed with us
14  that the claim wouldn't have been eligible under
15  the terms and provisions of the policy.
16   Q   So they said go ahead and deny the
17  claim?
18   A   They indicated that they agreed with us
19  to refund the premium that was received after the
20  date of death.
21   Q   Right. So they told you to go ahead
22  and do it?
23   A   They agreed with us, yes, and we
24  proceeded with that recommendation.
25   Q   All I'm trying to get at is I need to

Page 150

1  know who is the person that denied the claim;
2  okay? I'm not trying to be tricky with it. But
3  you keep saying they agreed with us, but
4  somebody's got to make the decision.
5      MR. BUTLER: She said yes.
6  Q  (By Mr. Sanspree) There has to be a
7  decision made by somebody.
8      MR. BUTLER: Object to the form. She
9  said yes in answer to your question that they
10  instructed them to do it.
11      MR. SANSPREE: Thank you. Great.
12  That's all I wanted. Just wanted to know if it
13  was the legal department that made the decision,
14  and Mr. Butler's indicated it was yes. Thank
15  you.
16      MR. BUTLER: Hopefully we ain't going
17  to ride that horse anymore.
18      MR. SANSPREE: Can I ask it one more
19  time?
20      MR. BUTLER: No.
21  Q  (By Mr. Sanspree) Have you ever been
22  named as a party defendant in a lawsuit,
23  Ms. Whitaker?
24      A  Okay. What do you mean by that? I
25  don't understand exactly what --

Page 151

1  Q  Have you ever been sued before
2  individually in your individual capacity?
3      A  Yes.
4  Q  What kind of case was that?
5      A  Well, actually it was in connection
6  with a lawsuit that was filed at Globe. The
7  attorney inadvertently sued me individually.
8  Q  Do you remember when that was?
9      A  No, I don't.
10  Q  Was it recently or --
11      A  I just don't have the date at the top
12  of my head.
13  Q  What were the allegations made against
14  you individually?
15      A  You know, it was in connection with
16  work. It wasn't individually. I mean, the
17  lawsuit -- he did file against me individually,
18  but it was in connection with a work -- with my
19  work.
20  Q  Like denial of benefit or something
21  like that?
22      A  It was in connection with a claim.
23  Q  Was it in connection with a claim not
24  being paid?
25      A  I don't recall if it was not being paid

Page 152

1  or -- I just don't remember the circumstances.
2  Q  Let me ask you this. To your
3  knowledge, has Globe Life ever been sued by an
4  insured when the claim was paid?
5      A  I'd have to think about that just a
6  moment. I think there could be an instance that
7  even if we paid the claim, there could have been
8  an instance that they were sued. I just don't
9  recall any.
10  Q  I'm just trying to do a little
11  deduction here. I don't see why anybody would
12  sue if the claim was paid.
13      What I'm trying to get at is do you
14  think the lawsuit involved a claim not being paid
15  and they probably just went through the file and
16  saw your name and named you individually? Is
17  that what happened?
18      A  You're asking me if it ever happened.
19  And in 35 years, it's possible. I just don't
20  recall any instance where that would be. But
21  you're asking me if it's ever possible, and I'm
22  trying to answer you the best that I can.
23  Q  Actually I just asked you in this case
24  that you were talking about, whether or not -- I
25  was trying to jog your memory whether or not you

Page 153

1  were sued because the claim was not paid and just
2  made the deduction that most people don't file a
3  lawsuit if the claim is paid.
4      MR. BUTLER: Surely you're not going to
5  start a series of questions asking her why
6  plaintiff's lawyers decide when to sue.
7      MR. SANSPREE: I might, Phil.
8      MR. BUTLER: You might, but you ain't
9  going to have us sitting here entertaining them.
10  Q  (By Mr. Sanspree) What I'm trying to
11  get at is were you named individually because of
12  your decision or your involvement with a claim
13  for benefits?
14      A  I don't recall the exact reasoning. It
15  wasn't warranted.
16  Q  With you being named or the lawsuit?
17      A  Well, my opinion, both, but --
18  Q  Do you know what happened to that
19  lawsuit?
20      A  No, sir, I don't.
21  Q  What was the resolution?
22      A  No, sir.
23  Q  Is it still pending, to your knowledge?
24      A  Pardon me?
25  Q  I was just asking was it still pending?

Page 154

1    A   I couldn't answer that. I don't know.
2    Q   Have you talked with Barbara about her
3   testimony today, Ms. Whitaker, Barbara Hernandez?
4    A   No, I have not.
5    Q   Did you tell her you were coming in to
6   give testimony?
7    A   I didn't tell her personally.
8    Q   And you and Ms. Hernandez have not
9   discussed your testimony, what you're going to
10  say or anything like that, prior to coming in
11  today?
12   A   No, I have not talked to her.
13   Q   What all did you look at before your
14  testimony? Did you look at the claim file before
15  you came in today?
16   A   Yes, sir.
17   Q   Did you go over the Interrogatory
18  responses and stuff like that?
19   A   Yes, sir.
20   Q   Have you ever been trained on how to
21  give a deposition, like watch any videos or
22  anything other than what your lawyers told you?
23  Did you watch any videos or stuff like that, had
24  any training from the company?
25   A   No, sir.

Page 155

1    Q   It's kind of a silly question, but
2   you'd be surprised.
3       MR. SANSPREE: That's all I've got,
4   Phil.
5       MR. BUTLER: Thank you, sir. I think
6   under our usual stipulations, she doesn't have to
7   read and sign. Isn't that right, Chris?
8       MR. SANSPREE: That's the way it is.
9   I'm not opposed to -- you can do it however you
10  want to.
11      MR. BUTLER: We'll waive.
12      (Deposition adjourned at 12:26 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 156

1       C E R T I F I C A T E
2
3   STATE OF OKLAHOMA   )
                        ) SS:
4   COUNTY OF OKLAHOMA  )
5
6       I, ELIZABETH CAUDILL, CSR in and for
7   the State of Oklahoma, certify that SANDY
8   WHITAKER was by me sworn to testify the truth;
9   that the above and foregoing deposition was taken
10  by me in stenotype and thereafter transcribed and
11  is a true and correct transcript of the testimony
12  of the witness; that the deposition was taken on
13  SEPTEMBER 14, 2006 at 9:11 a.m. in Oklahoma City,
14  Oklahoma; that I am not an attorney for or a
15  relative of either party, or otherwise interested
16  in this action.
17      Witness my hand and seal of office on
18  this 25th day of September, 2006.
19
20
21
    _____
22  ELIZABETH CAUDILL, CSR, RMR, CRR
    CSR No. 161
23
24
25

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION

KAREN LURIE,

    Plaintiff,

v.                         Case No. 1:06-cv-0034MEF

GLOBE LIFE AND ACCIDENT
INSURANCE COMPANY, et al.,

    Defendant,

## NOTICE OF TAKING DEPOSITION

**TO:**    **Sandy Whitaker**
        **Globe Life Insurance Company**
        c/o Robert E. Poundstone IV
        **Bradley Arant Rose & White, LLP**
        The Alabama Center for Commerce
        401 Adams Avenue, Suite 780
        Montgomery, Alabama 36104

PLEASE TAKE NOTICE that pursuant to Alabama Rules of Civil Procedure 30(b)(5) and 30(b)(6), Plaintiff will take the deposition of **Sandy Whitaker** who will testify regarding the claims practices of Globe Life and Accident Insurance Company. The deposition will take place **September 14, 2006,** beginning at 9:00 am at **119 N. Robinson Street, Suite 650, Oklahoma City, Oklahoma, 73102. via video conference.**

The Plaintiff requests that the deponent bring the following to the deposition:

1.    A copy of the Plaintiff's complete claims file.

2.    Copies of all documents, correspondence, policies, notes, memoranda, or other things of any manner maintained by you pertaining to Plaintiff.



PLAINTIFF'S EXHIBIT

3.     Copies of all documents, correspondence, notes, memoranda, or things of any manner received from Plaintiff.

4.     Copies of all documents, correspondence, notes, memoranda, or things of any manner generated by you, pertaining to Plaintiff or to Plaintiff's policy of insurance issued by Defendant Insurance Company.

5.     Copies of all documents, correspondence, notes, memoranda, or things of any manner sent to you concerning Plaintiff.

6.     Any diary, notes, or recordings of any nature concerning telephones conversations with Plaintiff or anyone acting on his behalf.

7.     Any and all documents in this Defendant's possession or control supporting the answer or defenses of this Defendant in this action.

8.     Copies of all documents, correspondence, notes, or memoranda between you and Defendants pertaining to Plaintiff's policy of insurance and/or claim.

9.     Any and all documents in this Defendant's possession or control supporting the answer or defenses of this Defendant in this action.


_____
CHRISTOPHER E. SANSPREE
Attorney for the Plaintiff


**OF COUNSEL:**

**BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.**
Post Office Box 4160
Montgomery, Alabama 36103-4160
(334) 269-2343 Telephone/(334) 954-7555 Facsimile

Mr. William B Matthews, Jr.
**Matthews & Filmore, L.L.C.**
Post Office Box 1145
Ozark, Alabama 36361
(334) 774-8804 telephone

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing document upon all counsel of record as listed below by placing a copy of the same in the United States Mail, first class, postage prepaid on this the 31st day of **August**, 2006.

OF COUNSEL

Robert E. Poundstone IV
**Bradley Arant Rose & White, LLP**
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, Alabama 36104
(334) 956-7700
(334) 956-7701 fax

# WILLIAM B. MATTHEWS, JR.
## ATTORNEY AT LAW

141 EAST REYNOLDS STREET
P.O. BOX 1145
OZARK, ALABAMA 36361

OZARK OFFICE: 334-774-8804
TOLL FREE:    1-800-627-1631
FAX:            334-445-0830

DOTHAN OFFICE: 334-792-0084
TOLL FREE:    1-877-496-9725
VOICE MAIL:   334-797-8804

January 26, 2004

Globe Life & Accident Insurance Company
Attn: Life Claims
P. O. Box 26400
Oklahoma City, OK   73126

JAN 3 0 2004

CLAIMS

Re: Policy # 14J522138
    David Christopher Lurie

Dear Sirs:

This letter is to inform you that Mr. Lurie was killed in an accident on or about January 6, 2004. Per my telephone conversation with your office, enclosed is a copy of the accident report and death certificate concerning Mr. Lurie. Please send the claim forms to Mr. Lurie's widow, Karen Lurie at 4181 County Road 73, Midland City, Alabama, 36350. I will fax this letter to your office and an original will be mailed to you. Should you have any questions regarding this matter, please direct them to my office.

Trusting this fully advises you with regard to this matter, I remain,

Yours very truly,

William B. Matthews, Jr.
Attorney at Law

WBM,Jr./ds

cc: Karen Lurie



**GLOBE LIFE AND ACCIDENT INSURANCE COMPANY**
Globe Life Center ● Oklahoma City, Oklahoma 73184 ● (405) 270-1410

RETURN THIS PORTION
WITH YOUR PAYMENT
DUE DATE 1-28-04

| POLICY NUMBER | INSURED | INS.AMT. | 1 MONTH | 3 MONTHS | 6 MONTHS | 12 MONTHS |
|---|---|---|---|---|---|---|
| 14J522138 | DAVID LURIE | 100,000 | 16.80 | 49.40 | 97.00 | 186.60 |

LIFE    2E

PLEASE MAKE ANY ADDRESS CHANGES BELOW AND PROVIDE YOUR PHONE NUMBER: (_____)

14-J522138    A1113
DAVID LURIE
4181 COUNTY ROAD 73
MIDLAND CITY AL 36350-4213

GLOBE LIFE AND ACCIDENT
INSURANCE COMPANY
P O BOX 268844
OKLAHOMA CITY, OK 73126-8844

PLEASE
DO NOT
FOLD

0140522138120128040016800049400097000186600001100001

▲ DETACH HERE ▲    IMPORTANT: RETAIN THIS PORTION FOR YOUR RECORDS

## Globe Life And Accident Insurance Company
Globe Life Center ■ Oklahoma City, Oklahoma 73184

| DUE DATE | POLICY NUMBER | INSURED | 1 MONTH | 3 MONTHS | 6 MONTHS | 12 MONTHS |
|---|---|---|---|---|---|---|
| 1-28-04 | 14J522138 | DAVID LURIE | 16.80 | 49.40 | 97.00 | 186.60 |

January 16, 2004

Dear David Lurie:

Attached is your premium notice for the premium that is due on January 28, 2004 for your life insurance policy number 14J522138.

Please detach the premium notice and return it with your check or money order in the enclosed envelope.

If the mailing address shown on the notice is not precisely correct or if you will have a new address for future purposes, please make the necessary corrections in the space provided for this purpose.

Anytime we can be of assistance, please call or e-mail us at CS@2701410,com.  Thank you for permitting Globe Life to provide your insurance.

Sincerely,

*Mark S. McAndrew*

Mark S. McAndrew
Chairman and
Chief Executive Officer

*received death
after death
after accepting
payment.*

PLAINTIFF'S
EXHIBIT
3

LURIE0001
F116 R5/02

CHRIS OR KAREN LURIE
DL.AL3565221 or AL4563777
DOB 4/24/58 or 11/9/61
4181 CO. RD.73 (334) 983-3887
MIDLAND CITY, AL 36350

950
61-203/621

DATE 10/10/04 11-4-03

PAY TO THE
ORDER OF  Globe Life  $ 33 60

Thirty Three & 00/100  DOLLARS

The
Heartland
National
Bank

FOR DAVID LURIE POLICY # 14J522138  Karen Lurie

⑈06210203⑈ 01 058 194⑈ 0950

"000000 3360"

Check should of said '04. My error.
Checks dated 03 by Habit - New year-
Globe corrected it as you can
see - Cashed it - accepted for
the premium due by the
17th of Jan. 2004 -
Karen
Lurie

PLAINTIFF'S
EXHIBIT

LURIE0002

```
2D4,14J522138 ;                    LURIE, DAVID
PRM HST 06-24-03 2 06-03  1     16.80+
PRM HST 08-05-03 2 07-03  1     16.80+   SUS-STAT-ENT-ASN/O-HDL-PAR-RE-NFO--TRAN
PRM HST 09-23-03 2 08-03  1     16.80+   DTH  22   AC NO /0   0  1-   0 NONE NONE
PF  ST 10-08-03 2 09-03  1     16.80+   PLAN- ADBGFC9400      LAST PREM    CASH
PF  ST 10-27-03 2 10-03  1     16.80+   DIR-A       186.60   PAID TO  01/28/04
PRM HST 01-16-04 2 11-03  2     33.60+   FACE   100,000.00   BILLED TO 01/28/05
                                         CV            .00   ISSUE     04/28/03
                                         OTHER  ** NONE **   PAY UP    04/28/69
                                         LOAN          .00   LAST BILL 01/18/04
                                         PAYOFF        .00   LAST ACCT 01/18/04
                                         SUSP          .00   LAST OTHR 02/02/04
```

**REDACTED**

:K620 DISPLAY COMPLETE

_Late Premium_

Sandy —

Policy lapsed at dod.

PLAINTIFF'S
EXHIBIT

lapsed   11/28/03

— 31 day gp expired   12/28/03

DOD   1/6/04

Globe Life/Lurie, Karen
0003

Prem. recvd after = 1/16/04

We should refund prem + advise lapsed

:te: 05/13/2004 Time: 2:55:40 PM

**IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **KAREN LURIE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:06-cv-0034MEF** |
| | ) | |
| **GLOBE LIFE AND ACCIDENT** | ) | |
| **INSURANCE COMPANY, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANT GLOBE LIFE AND ACCIDENT INSURANCE COMPANY'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES

      Comes now Defendant Globe Life and Accident Insurance Company (hereinafter "Defendant" or "Globe"), by and through its undersigned counsel of record, and in accordance with Rule 33 of Federal Rules of Civil Procedure hereby serves its response to Plaintiff's First Interrogatories to Defendants:

### GENERAL OBJECTIONS

    1.     Defendant objects to Plaintiff's Interrogatories to the extent they seek any information and/or document that is privileged, not in Defendant's possession, custody, or control, no longer in existence, overbroad, redundant, irrelevant, not reasonably calculated to lead to the discovery of admissible evidence or that would impose on Defendant obligations greater than or different from those imposed under the *Federal Rules of Civil Procedure*. Defendant also objects to supplementation of responses and to the identification of persons involved in preparing responses. In responding to Plaintiff's



PLAINTIFF'S EXHIBIT

1

interrogatories, Defendant makes its responses in accordance with the applicable provisions of the *Federal Rules of Civil Procedure*.

2.      Inadvertent production of privileged information and documents by Defendant shall not constitute a waiver of any applicable privilege nor shall the production of any document be construed as a waiver of any objection to the admissibility of such documents. Further, Defendant's response to any particular request shall not be construed as an admission by Defendant that any documents or things responsive to that request exist.

3.      Defendant objects to Plaintiff's Interrogatories to the extent each request therein is vague, ambiguous, overly broad, unduly burdensome, and/or oppressive.

4.      Defendant objects to Plaintiff's Interrogatories to the extent it seeks documents or things not within Defendant's possession, custody, or control, or that are easily available to Plaintiff.

5.      Defendant objects to Plaintiff's Interrogatories to the extent that the numbered requests are duplicative of each other or of other discovery propounded by Plaintiff.

6.      Defendant objects to Plaintiff's definition of "Document" to the extent that it seeks to impose obligations greater than those imposed by Rule 34 of the *Federal Rules of Civil Procedure*.

7.      Defendant objects to Plaintiff's use of the terms "all," "any," "in any way," "every," "of whatever kind," and/or "each." Defendant has conducted a reasonable investigation and search with respect to documents and things responsive to Plaintiff's Request for Production. To the extent Plaintiff's Interrogatories seek to impose a greater

2

burden on Defendant, it is unduly burdensome, overbroad, and not reasonably calculated to lead to the discovery of admissible evidence. Defendant's investigation of this matter is continuing, and Defendant reserves the right to supplement these responses as it deems necessary.

## SPECIFIC OBJECTIONS AND RESPONSES

1.    Identify the name of the person preparing the answers to these interrogatories and identify any person aiding in the preparation.

**RESPONSE:**    **Sandy J. Whitaker, Manager of Globe's Life Claims Department and Barbara Hernandez, Vice President of Premium Accounting.**

2.    Please sate the legal name of this Defendant.

**RESPONSE:**    **The correct name of this Defendant is Globe Life and Accident Insurance Company.**

3.    If this Defendant is a corporation, please identify the state in which this Defendant was incorporated and the state in which this Defendant has its principal place of business.

**RESPONSE:**    **Globe is incorporated in the State of Delaware and its principal place of business is Oklahoma City, Oklahoma.**

4.    If this Defendant has ever been sued for fraud and/or bad faith for failure to pay a claim in the past ten (10) years, please state:

    a.    When was such suit filed?

3

b.    Who made such claim or filed such suit, giving the address of the person who made such claim?

c.    Please produce documents showing such.

d.    The lawyers' name and address that sued this Defendant.

e.    Please provide a copy of the complaint.

**RESPONSE:**  **Globe objects to this interrogatory to the extent it seeks information prepared in anticipation of litigation and/or protected from discovery by the work product doctrine and/or the attorney client privilege. Globe objects to this interrogatory on the grounds that it is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Globe further objects on the grounds that this interrogatory is vague, ambiguous, overly broad and unlimited in time period and scope. Without waiving its objections, Globe states that the following lawsuits have been filed against Globe in Alabama during the past 5 years:**

**Selman v. Globe, CV-2001-190; Autauga County Circuit Court**
**Newman v. Globe, CV-2002-64; Blount County Circuit Court**
**Lively v. Globe, CV-2001-336; Autauga County Circuit Court**
**Parsons v. Globe, CV-2002-47; Clay County Circuit Court**
**Lett v. Globe, CV-2003-224; Monroe County Circuit Court**
**Allen v. Globe, CV-2005-145; Russell County Circuit Court**
**Cannon v. Globe, CV-2005-168; Macon County Circuit Court**

5.    Explain the relationship between this Defendant and all other Defendants.

**RESPONSE:**    **There are no other defendants named in this lawsuit.**

6.    State the name, address, and job title of each person, now known to this Defendant, who has any knowledge or information relating to the incident and allegations made the basis of the Plaintiff's Complaint.

4

**RESPONSE:**        Sandy J. Whitaker
Globe Life and Accident Insurance Company
Life Claims Department, Manager

Linda S. Lawson
Globe Life and Accident Insurance Company
Life Benefits Division, Clerical Level Employee

Karen Lurie, Plaintiff

Jim Krueger
Claim Consultant
International Claims Specialists

Inga Lorrah
Globe Life and Accident Insurance Company
Life Claims Department, Supervisor

Denise Knudson
Globe Life and Accident Insurance Company
Life Claims Examiner, No longer employed by Globe

Wendy Hamrick
Globe Life and Accident Insurance Company
Claims Department

Barbara Hernandez
Globe Life and Accident Insurance Company
Vice President of Premium Accounting

Dr. Stanley McCampbell
Globe Life and Accident Insurance Company
Medical Director, Retired

7.    Identify all persons who have any knowledge or witnessed the execution of documents by Plaintiff.

**RESPONSE:** Globe objects to this interrogatory on the grounds that it is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Globe further objects on the grounds that this interrogatory is vague,

ambiguous, overly broad and unlimited in time period and scope. Without waiving its objection, Globe states that it knows of no such person.


8.    State the names and addresses of any and all persons with whom this Defendant has consulted as an expert witness and their opinion.

**RESPONSE:**  Discovery in this matter has only begun and, accordingly, Globe has not yet identified any potential expert witnesses. Globe further states that it will identify any expert witnesses as required by and in accordance with the Court's scheduling order.


9.    State the names of all employees of this Defendant who had any contact with the Plaintiff at any time and describe the contact.

**RESPONSE:**  Globe's records indicate that Karen Lurie called Globe via telephone and spoke with a Globe phone representative identified as "DGD." Globe believes, but cannot be certain, that the person identified as DGD was Donald Dennis. Mr. Dennis is no longer employed by Globe. Globe's records indicate that Karen Lurie or someone calling from her phone placed additional calls to Globe, however, Globe cannot identify which Globe employees actually answered the calls. The phone calls were made on the following dates: 3/11/2004, 3/22/2004, 3/22/2004, 3/24/2004, 3/24/2004, 4/8/2004, 4/9/2004, 4/22/2004, 5/20/2004, 5/24/2004 and 5/28/2004. Globe further states that it is producing the record of these calls in response to Plaintiff's Requests for Production. To the extent there was any written contact with Karen Lurie or any of her representatives, any such documents in

Globe's possession are contained in the documents produced in response to Plaintiff's Requests for Production.

10.     Prior to the institution of this action, did you or anyone on your behalf make any investigation to determine whether or not there was, in fact, a valid claim presented by the Plaintiff? If so, please state:

    a.    The person making such investigation;

    b.    The date on which such investigation was performed;

    c.    The results of such investigation.

**RESPONSE:** Globe objects to this interrogatory to the extent it seeks information prepared in anticipation of litigation and/or protected from discovery by the work product doctrine and/or the attorney client privilege. Without waiving its objection, Globe states that an investigation was conducted, upon receipt of the Plaintiff's claim, to determine if the Plaintiff's husband's death qualified as an "accidental death" under the terms of the policy. At some point during the processing and evaluation of the Plaintiff's claim, Globe realized that the policy had lapsed prior to the death of the Plaintiff's husband. Accordingly, any investigation into whether the death would otherwise qualify as an accidental death became irrelevant. Sandy J. Whitaker, who is the Manager of Globe's Life Claims Department, is ultimately responsible for all claims evaluations and/or investigations.

11.    Please state the name, address, and specify duties of any and all persons associated with the Defendant who participated in the issuance, processing, or approval of the policy of insurance, issued to Plaintiff, along with a detailed description of their participation.

**RESPONSE:    Globe objects to this interrogatory on the grounds that it is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Specifically, Globe objects in that this case does not concern underwriting issues. Without waiving its objection, Globe states that any underwriting-related documents it has concerning the policy at issue are being produced in response to Plaintiff's Requests for Production.**

12.    Was the insurance agent who had dealings with the Plaintiff regarding the sale of the insurance policy an agent of this Defendant?

**RESPONSE:    There was no agent involved with the sale of this policy.**

13.    Was the agent licensed by this Defendant to sell policies?

**RESPONSE:    There was no agent involved with the sale of this policy.**

14.    Please state which, if any, premiums of Plaintiff's insurance policy were due or unpaid prior to the filing of this lawsuit.

**RESPONSE:    Globe objects to this interrogatory on the grounds that it is vague, ambiguous, overly broad and unlimited in time period and scope. Without waiving its objection, Globe states that the premium that was due on November 28,**

2003, was not paid prior to the death of the Plaintiff's husband and, accordingly, the policy lapsed prior to his death.

15.    If this Defendant has ever received any complaints, written or verbal, about the agent that dealt with Plaintiff, please give the substance of those complaints in detail.

**RESPONSE:**    **There was no agent involved with the sale of the policy at issue.**

16.    Please state the names, addresses and telephone numbers of all current and former employees of this Defendant's office in Hamilton County or the office in charge of Hamilton County.

**RESPONSE:**    **Globe objects to this interrogatory on the grounds that it is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Globe further objects on the grounds that this interrogatory is overly broad and unlimited in time period and scope. Specifically, Globe objects because Hamilton County has no relation whatsoever to this lawsuit.**

17.    List each person from whom a statement has been taken by this Defendant.

**RESPONSE:  Globe objects to this interrogatory to the extent it seeks information prepared in anticipation of litigation, protected by the attorney/client**

9

privilege and/or work product doctrine. **Without waiving its objection, Globe states that it is not aware of any statements that have been taken.**

18.    Had this Defendant done any investigation of Plaintiff's claim prior to this lawsuit? If so, please explain your answer in detail.

**RESPONSE:    Without waiving its objection, Globe states that an investigation was conducted, upon receipt of the Plaintiff's claim, to determine if the Plaintiff's husband's death qualified as an "accidental death" under the terms of the policy. At some point during the processing and evaluation of the Plaintiff's claim, Globe realized that the policy had lapsed prior to the death of the Plaintiff's husband. Accordingly, any investigation into whether the death would otherwise qualify as an accidental death became irrelevant. Sandy J. Whitaker, who is the Manager of Globe's Life Claims Department, is ultimately responsible for all claims evaluations and/or investigations.**

19.    Please state the name of any liability insurance company that provides coverage for any portions of the Plaintiff's Complaint. State the amount of coverage you have.

**RESPONSE:    Globe states that there is no such coverage.**

20.    Has this Defendant had any complaints filed against them with any agency of the State of Tennessee or federal government? If so, explain the basis of such complaint(s) and the results(s).

**RESPONSE:**    Globe objects to this interrogatory on the grounds that it is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Globe further objects on the grounds that that this interrogatory is vague, ambiguous, overly broad and unlimited in time period and scope. Specifically, Globe objects because the State of Tennessee has no relation whatsoever to this lawsuit. Globe further objects in that the term "complaints" has not been adequately defined. Without waving its objection, Globe states that it is unaware of any complaints that have been filed against it with any federal agency.

21.    Has this Defendant ever been investigated by or had their license suspended or revoked by any state or federal agency? If so, explain the circumstances regarding the incident(s) in detail.

**RESPONSE:**    Globe objects to this interrogatory on the grounds that it is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Globe further objects on the grounds that this interrogatory is vague, ambiguous, overly broad and unlimited in time period and scope. Specifically, Globe objects to the term "investigated" in that it cannot discern if the Plaintiff is seeking information concerning some allegation of wrongdoing on the part of Globe or if the Plaintiff is seeking information relating to routine examinations undertaken by governmental entities in the regular course of insurance regulation. Without waiving its objection, Globe states that it is unaware of any instance where it has been prohibited by any state or federal agency from doing business.

11

22.    Please state the name, address and telephone number of all disability insurance policyholders for this Defendant in the State of Tennessee for the past eight (8) years.

**RESPONSE:    Globe objects to this interrogatory on the grounds that it is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Globe further objects on the grounds that this interrogatory is vague, ambiguous, overly broad and unlimited in time period and scope. Specifically, Globe objects in that the State of Tennessee has no relation whatsoever to this lawsuit and because this lawsuit does not involve disability insurance.**

23.    Did this Defendant investigate the agent that sold the policy prior to the agent's hiring? If so, please produce any documents showing results of such investigation.

**RESPONSE:    Globe states that there was no agent involved with the sale of the insurance policy in question.**

24.    State the name and job title of the person who denied the claim and state the reason for denial.

**RESPONSE:    The claim in question was denied by Sandy J. Whitaker who is the Manager of Globe's Life Claims Department. The claim was denied because the policy had lapsed.**

12

25.    State in detail why the Plaintiff's claim was denied or has been denied.

**RESPONSE:**    Globe states that the claim was denied because the policy lapsed. Specifically, the premium due on November 28, 2003, was not paid by November 28, 2003, and was not paid during the 31-day grace period, provided by the policy, which expired on December 29, 2003. After not receiving payment by December 29, 2003, Globe sent a Final Notice to the insured which advised that the premium due on November 28, 2003, still had not been paid. This notice provided the insured with a special reinstatement opportunity if payment was received by January 17, 2004, and the insured was <u>still in good health</u>. Payment was finally received on January 16, 2004, however, the insured died on January 6, 2004 and, accordingly, was not still in good health when the premium was received. Accordingly, the policy was lapsed at the time of the death of insured, the claim was properly denied and the untimely premium was returned to the Plaintiff.

26.    State this Defendant's basis for denying the Plaintiff's claim(s).

**RESPONSE:**    Globe states that the claim was denied because the policy lapsed. Specifically, the premium due on November 28, 2003, was not paid by November 28, 2003, and was not paid during the 31-day grace period, provided by the policy, which expired on December 29, 2003. After not receiving payment by December 29, 2003, Globe sent a Final Notice to the insured which advised that the premium due on November 28, 2003, still had not been paid. This notice provided the insured with a special reinstatement opportunity if payment was received by January 17, 2004, and the insured was <u>still in good health</u>. Payment was finally

received on January 16, 2004, however, the insured died on January 6, 2004 and, accordingly, was not still in good health when the premium was received. Accordingly, the policy was lapsed at the time of the death of insured, the claim was properly denied and the untimely premium was returned to the Plaintiff.

27.    State each fact upon which this Defendant relies on for denial of Plaintiff's claim(s) and the source of any said facts.

**RESPONSE:**    Globe states that the claim was denied because the policy lapsed. Specifically, the premium due on November 28, 2003, was not paid by November 28, 2003, and was not paid during the 31-day grace period, provided by the policy, which expired on December 29, 2003. After not receiving payment by December 29, 2003, Globe sent a Final Notice to the insured which advised that the premium due on November 28, 2003, still had not been paid. This notice provided the insured with a special reinstatement opportunity if payment was received by January 17, 2004, and the insured was <u>still in good health</u>. Payment was finally received on January 16, 2004, however, the insured died on January 6, 2004 and, accordingly, was not still in good health when the premium was received. Accordingly, the policy was lapsed at the time of the death of insured, the claim was properly denied and the untimely premium was returned to the Plaintiff.

28.    State the name and address of each witness who can or will support Defendant's denial, basis of denial and/or facts surrounding denial of Plaintiff's claim(s).

**RESPONSE:** Globe states that discovery in this lawsuit is just beginning and, accordingly, Globe is not in a position to identify every witness who may support its denial, basis of denial and/or facts surrounding denial. Globe further states that any of the individuals listed in response to Interrogatory #6 may possess such information. Globe further states that it will identify witnesses it may call at trial in accordance with any scheduling order entered by the Court.

29.    State and identify every document and its location which this Defendant contends supports its basis for denying Plaintiff's claim(s).

**RESPONSE:** All such documents of which Globe is currently aware have been produced in response to the Plaintiff's Requests for Production.

30.    Does more than one claims file exist on the Plaintiff in regard to the claim(s) in this lawsuit?

**RESPONSE:    No.**

31.    Does a separate investigation file exist on this Plaintiff or the claims which are the subject of this lawsuit?

**RESPONSE:    No.**

32.    Are any documents being withheld in regard to the Plaintiff or the claim in this lawsuit from any files maintained by this Defendant? If so, identify each document, its location, and the basis for non-production.

**RESPONSE:**   Globe objects to this interrogatory on the grounds that it is vague, ambiguous, overly broad and unlimited in time period and scope. Without waiving its objection, Globe states that all documents, of which it is currently aware, which concern the claim in question have been produced in response to Plaintiff's Requests for Production.

33.    Are there any electronic communications (computer or otherwise) concerning Plaintiff's claim(s) that this Defendant has not printed and produced? If so, identify each document, its location, and the basis for non-production.

**RESPONSE:**   Globe objects to this interrogatory on the grounds that it is overly broad and unlimited in time period and scope. Without waiving its objection, Globe states that it is not aware of any such documents that have not been produced.

34.    Is there a separate adjuster diary, log, list, notes, etc. which references Plaintiff's claim(s) which are the subject of this lawsuit? If so, identify each document, its location, who maintains it, and the basis for non-production?

**RESPONSE:**   No.

The foregoing responses to interrogatories have been compiled by me, in my capacity as a representative of Globe Life and Accident Insurance Company based upon my reasonable inquiry into available records of Globe Life and Accident Insurance Company, to obtain appropriate information; the responses set forth herein, subject to inadvertent error, are based on, and therefore necessarily limited by, the records and information still in existence, presently recollected and thus far discovered in the course of preparation of these responses. Consequently, Globe Life and Accident Insurance Company reserves the right to make any changes in the answers if it appears at any time that omissions or errors have been therein, or that more accurate information becomes available. Subject to limitations set forth herein, the responses to interrogatories are true and correct to the best of my knowledge, information and belief.

This the 10th day of March, 2006.

Sandy J. Whitaker
as Representative of Globe Life &
Accident Insurance Company

Barbara Hernandez
as Representative of Globe Life &
Accident Insurance Company

Robert E. Poundstone IV (POU006)
**One of the Attorneys for**
**Defendant Globe Life and**
**Accident Insurance Company**

OF COUNSEL

Philip H. Butler
Robert E. Poundstone IV
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this document on:

Christopher E. Sanspree, Esq.    (via Hand Delivery)
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
Post Office Box 4160
Montgomery, Alabama 36103-4160

William B. Matthews, Jr., Esq.
Matthews & Filmore, LLC
Post Office Box 1145
Ozark, Alabama 36361

by placing copies in the United States Mail, first-class postage prepaid and addressed to their regular mailing addresses, on this 13th day of March, 2006.

OF COUNSEL

May 18, 2004

**GLOBE LIFE**
AND ACCIDENT
INSURANCE CO.

RECEIVED
JUN 0 3 2004
BY: _____

William B. Matthews, Jr.
Attorney at Law
PO Box 1145
Ozark AL  36361

RE:  Insured:        David Lurie
     Policy:         14-J522138
     DOD:            January 6, 2004
     Beneficiary:    Karen Lurie

Dear Mr. Matthews:

We are in receipt of your correspondence and related claim forms submitted on behalf of David Lurie for the consideration of benefits under the above referenced accidental death insurance policy.  Thank you for your assistance in providing us with this information. However, a problem has arisen in our review of this claim and we want to clearly explain our findings to you.

Our records indicate Policy 14-J522138 lapsed due to non-payment of premium on November 28, 2003.  The policy does have a 31-day grace period for receiving a premium payment which expired on December 28, 2003.  A further review of our records indicates a premium payment in the amount of $33.60 was received in our office on January 16, 2004. Since this payment was received for processing after the insured's date of death and expiration of the policy's grace period for receiving a premium payment, we are unable to accept this premium.  Enclosed, please find a refund of this premium amount payable to the designated beneficiary, Karen Lurie, for the appropriate delivery.

In light of the above findings, a claim under this policy would not be eligible for benefits because the policy was not in force at the time of the insured's death.

Mr. Matthews, we regret we are unable to be of service to you regarding a claim, but trust we have satisfactorily explained the circumstances of the matter.  Should you have any questions, please let us know.

Sincerely,

S. J Whitaker/mjp

S. J. Whitaker
Life Benefits Division

SJW/mjp
Encl: Refund of Premium Check


PLAINTIFF'S
EXHIBIT
7

90% Life Claims
5/14/04.

to Wendy H.

PLAINTIFF'S
EXHIBIT

# LIFE CLAIMS EVALUATION FORM

NAME: *David Lewis*   AGE: _48_   STATE: _AL_

DATE OF DEATH: _1-6-04_   BENEFICIARY: *Karen Lewis*

POLICY: _14 J 5 22 1 38_

APP DT: _4-11-03_   *Accident Only Policy*

EFF DT: _4-58-03_

FACE: _100,000 Base_

DIRECT RESPONSE: _____   AGENT WRITTEN: _____

CAUSE: *Blunt Force injuries*        *Date of Accident 1-6-04*

---

**APPLICATION REVIEW:**
Question _____ should have had a positive response due to a history of _____

---

**APPLICATION REVIEW:**
Question _____ should have had a positive response due to a history of _____

---

**APPLICATION REVIEW:**
Question _____ should have had a positive response due to a history of _____

---

**APPLICATION REVIEW:**
Question _____ should have had a positive response due to a history of _____

---

Based on the above medical history:

_____ Policy would NOT have been issued.

_____ Policy would have been issued as is.

_____ Policy would have been issued SUB-STANDARD.

*Pay $?W 5/6/04*
*Agree*
*BM*
*But late premium*

Signature: _____   Date: _____

(Rev. 03/02)

PLAINTIFF'S EXHIBIT

```
2D4,14J522138 ; .                LURIE, DAVID
PRM HST 06-24-03 2 06-03  1      16.80+
PRM HST 08-05-03 2 07-03  1      16.80+  SUS-STAT-ENT-ASN/O-HDL-PAR-RE-NFO--TRAN
PRM HST 09-23-03 2 08-03  1      16.80+  DTH 22   AC NO /0  0  1-   0 NONE NONE
   HST 10-08-03 2 09-03  1      16.80+  PLAN- ADBGFC9400      LAST PREM    CASH
   HST 10-27-03 2 10-03  1      16.80+  DIR-A       186.60  PAID TO   01/28/04
PRM HST 01-16-04 2 11-03  2      33.60+  FACE   100,000.00  BILLED TO 01/28/05
                                        CV            .00  ISSUE     04/28/03
                                        OTHER  ** NONE **  PAY UP    04/28/69
                                        LOAN          .00  LAST BILL 01/18/04
                                        PAYOFF        .00  LAST ACCT 01/18/04
                                        SUSP          .00  LAST OTHR 02/02/04
```

CK620 DISPLAY COMPLETE

<u>Late Premium</u>

Sandy —

Policy lapsed at dod.

lapsed   11/28/03
31 day gp expired   12/28/03
DOD   1/6/04

Prem. recvd after = 1/16/04
We should refund prem + advise lapsed
Ok to refund late prem. Yes. rm

te: 05/13/2004  Time: 2:55:40 PM

#34

| ENTR DATE | REEL | FRAME | TYPE | DESCRPTION |
|---|---|---|---|---|
| 1/30/04 | O | O | FYI | RCVD CORR/CDC/ACCIDENT RPT//JAS |
| 2/02/04 | O | O | FYI | //FILE MADE///TO PEND FOR CS,APS//JAS |
| 2/02/04 | O | O | LET | L26, 05 JULIE/ |
| 3/08/04 | O | O | FYI | RCVD CLMST/APS/    KAR |
| 3/16/04 | O | O | FYI | FILE TO DMK TO REVIEW |
| 3/16/04 | O | O | TEL | R- DUPLICATE POLICY ISSUED        BY PT |
| 3/17/04 | O | O | FYI | DUP POL TO DENISE/CLAIMS, PT |
| 3/18/04 | O | O | FYI | ATTN CALLED IN ADV THAT WE WOULD NOT |
|  |  |  |  | BE BLE TO RELEASE ANY INFO EXCEPT TO BE |
|  |  |  |  | NE SAYS THAT HE HAS CALLED AND RECEIVED |
|  |  |  |  | INFO BEFORE ADV OF HIPPA ACT SJY |
|  |  |  |  | FILE TO INGA |
| 3/18/04 | O | O |  | FILE TO DMK TO ASSGN TO ICS TO OBTAIN T |
|  |  |  |  | HE ME REPORT IL |
| 3/22/04 | O | O | FYI | FILE ASSIGNED TO. ICS DMK |
| 3/22/04 | O | O | LET | L82, 05-DMK |
| 3/29/04 | O | O | FYI | RCVD ICS AKNWLG LTR    KAR |

DEPRESS 'ENTER' FOR MORE DATA ON THIS POLICY

No NOT # initial notice by letter



PLAINTIFF'S
EXHIBIT
/0.

Globe Life/Lurie, Karen
0016

MICROFILM FOR 14052413B

| ENTRY DATE | REEL | FRAME | TYPE | DESCRIPTION |
|---|---|---|---|---|
| 4/14/04 | 0 | 0 | FYI | RCVD ICS FINAL RPRT. KAR |
| 4/23/04 | 0 | 0 | ICS | PD 127.50 FOR INV#02620040324 5711 |
| 4/23/04 | 0 | 0 | FYI | FILE TO DR. MAC DMK                DMK |
| 5/07/04 | 0 | 0 | LET | L33, 05-DMK |
| 5/07/04 | 0 | 0 | FYI | FILE TO SR MGR |
| 5/12/04 | 0 | 0 | LGL | FILE TO BRIAN TO APPROVE.DS |
| 5/13/04 | 0 | 0 | FYI | FILE TO EXAMINER TO PROCESS. SJW |
|  |  |  |  | ////PLCY LAPSED AT DOD//RTND TO |
|  |  |  |  | SR MRGR//WH |
| 5/13/04 | 0 | 0 | LGL | FILE TO BRIAN.DS |
| 5/14/04 | 0 | 0 | LGL | FILE RET TO WH.DS |
| 5/14/04 | 0 | 0 | FYI | RCVD CLM/WH |
| 5/14/04 | 0 | 0 | FYI | CLM RTD TO MAYVA FOR SPCL LETTER/ |
|  |  |  |  | RETURNING PREM RCVD AFTER DOD//CLM |
|  |  |  |  | NOT ELIGABLE/WH |
| 5/18/04 | 0 | 0 | FYI | LTR TO ATTY WILLIAM B MATTHEWS JR. |
|  |  |  |  | EXPL PLCY LAPSED AT TIME OF INSDS DTH |

DEPRESS 'ENTER' FOR MORE DATA ON THIS POLICY

Globe Life/Lurie, Karen
0017

| ENTRY DATE | REEL | FRAME | TYPE | DESCRIPTION |
|---|---|---|---|---|
| 5/18/04 | O O O O O O O O | O O O O O O O O | FYI | CLM NOT ELG/ALSO PREM PYMNT OF 01/16/ /04 RECVD AFTER INSDS DOD & PLCY'S GRACE PERIOD EXP/UNABLE TO ACCEPT/REF THIS PREM W/ LTR/FL TO WH FOR CHK ENCL-MJP |
| 5/28/04 | O O O | O O O | FYI | ADV KAREN OF ABOVE LETTER, ALSO ADV ALL CORR WITH US MUST BE IN WRITING BECAUSE ATTYS ARE INVOLVED. - DGD |
| 3/22/04 | O | O | LET | L82, 05 KEN S |

ENTER 'F' TO FORWARD-PAGE, 'B' TO BACK-PAGE, OR MAKE CHANGES AND ENTER

Globe Life/Lurie, Karen
0018