7/25/2006                                    Karen Lurie Britton

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

KAREN LURIE,
      Plaintiff,
vs.                 CIVIL ACTION NO.
GLOBE LIFE AND      1:06-cv-0034MEF
ACCIDENT
INSURANCE
COMPANY, et al.,

      Defendants.


        *    *    *    *    *    *

            DEPOSITION OF

    KAREN FRANCES LURIE BRITTON,

taken pursuant to notice and

stipulation on behalf of the

Defendants, in the Law Offices of

Morris, Cary, Andrews & Talmadge, 170

East Main Street, Dothan, Alabama,

before Tiffany B. Beasley, Certified

Court Reporter and Notary Public in

and for the State of Alabama at Large,

on July 25, 2006, commencing at 10:38

a.m.

PLAINTIFF'S
EXHIBIT
tabbies
B

Tiffany Beasley              Montgomery Reporting Service
(334) 262-3331                        (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

1                     APPEARANCES

2

3    FOR THE PLAINTIFF:

4         CHRISTOPHER E. SANSPREE, ESQUIRE

5         Beasley, Allen, Crow, Methvin,

6              Portis & Miles

7         218 Commerce Street

8         Montgomery, Alabama 36104

9

10   FOR THE DEFENDANTS:

11        GEORGE R. PARKER, ESQUIRE

12        Bradley, Arant, Rose & White

13        The Alabama Center for Commerce

14        401 Adams Avenue

15        Montgomery, Alabama 36104

16

17

18

19

20

21

22

23

Tiffany Beasley                Montgomery Reporting Service
(334) 262-3331                          (877) 834-6048

7/25/2006                              Karen Lurie Britton

1              STIPULATIONS

2              It is stipulated and agreed

3       by and between counsel representing

4       the parties that the deposition of

5       KAREN FRANCES LURIE BRITTON may be

6       taken before Tiffany B. Beasley,

7       Certified Court Reporter and Notary

8       Public in and for the State of Alabama

9       at Large, without the formality of a

10      commission; and all formality with

11      respect to other procedural

12      requirements is waived; that

13      objections to questions, other than

14      objections as to the form of the

15      questions, need not be made at this

16      time, but may be reserved for a ruling

17      at such time as the deposition may be

18      offered in evidence or used for any

19      other purpose by either party as

20      provided by the Federal Rules of Civil

21      Procedure.

22              It is further stipulated and

23      agreed by and between the parties

7/25/2006                                    Karen Lurie Britton

Page 4

1    hereto and the witness, that the

2    signature of the witness to this

3    deposition is hereby not waived.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Tiffany Beasley                    Montgomery Reporting Service
(334) 262-3331                            (877) 834-6048

7/25/2006                                    Karen Lurie Britton

Page 5

```
 1                          INDEX
 2
 3   EXAMINATION                        Page
 4     MR. PARKER...................... 6
 5     MR. SANSPREE...................126
 6
 7   DEFENDANTS' EXHIBITS               Page
 8
     A       Complaint                  31
 9
     B       January 2004 Calendar      41
10
     C       Cumulative Exhibit,        57
11           Bates-Stamped LURIE 0001
             to LURIE 0075
12
     D       Cumulative Exhibit,        100
13           Documents Produced By
             Globe
14
     E       Plaintiff's Response to    102
15           Defendants'
             Interrogatories and
16           Request for Production,
             dated April 10, 2006
17
18   PLAINTIFF'S EXHIBITS               Page
19   1       Photocopies of Checks,     127
             various dates
20
     2       Photocopies of Checks,     128
21           various dates
22
23
```

Tiffany Beasley                 Montgomery Reporting Service
(334) 262-3331                          (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 6

1                KAREN FRANCES LURIE BRITTON, of
2          lawful age, having first been duly
3          sworn, testified as follows:
4                    THE REPORTER:  Usual
5                    stipulations?
6                    MR. SANSPREE:  She wants to --
7                    we want to reserve the
8                    right to read and sign.
9                    MR. PARKER:  Okay.
10                   EXAMINATION
11         BY MR. PARKER:
12    Q.   Please state your name.
13    A.   Karen Frances Britton.
14              (Off-the-record discussion.)
15    Q.   My name is George Parker, and I
16         represent Globe Life in the lawsuit
17         that you filed against it.  Do you
18         understand that you're here today to
19         give your deposition?
20    A.   Yes, I do.
21    Q.   Okay.  Do you understand the answers
22         that you're going to give are under
23         oath?

Tiffany Beasley              Montgomery Reporting Service
(334) 262-3331                        (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

1    A.    Yes, I do.

2    Q.    Have you ever given a deposition

3          before?

4    A.    No.

5    Q.    Okay.  What I'm going to do is I'm

6          going to ask you a series of

7          questions, and if you would, answer

8          them in the best way that you can.  To

9          avoid a problem for the court reporter

10         taking down what's said, if the answer

11         is a yes or no, answer with a yes or a

12         no rather than a nod or an uh-huh or

13         huh-uh so Tiffany can take down

14         what's -- what's being said here

15         today, okay?

16   A.    Okay.

17   Q.    If you need a break, just let me know.

18         We can certainly accommodate you.  If

19         you don't understand what I'm asking

20         you, you know, ask me to repeat it,

21         because I want you to understands what

22         I'm asking you, okay?

23   A.    Okay.

Tiffany Beasley              Montgomery Reporting Service
(334) 262-3331                       (877) 834-6048

7/25/2006                              Karen Lurie Britton

Page 8

1    Q.    Are you taking any type medication
2          today that would impair your ability
3          to testify?
4    A.    No.
5    Q.    Okay.  If you would, will you tell me
6          your date of birth?
7    A.    11/9/61.
8    Q.    Okay.  And your Social Security
9          number?
10   A.    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.
11   Q.    Okay.  And where do you currently
12         live?
13   A.    4181 County Road 73, Midland City,
14         Alabama 36350.
15   Q.    36350?
16   A.    Uh-huh.
17   Q.    Okay.  Is that in Dale County?
18   A.    Yes.
19   Q.    Okay.  How long have you lived at that
20         address?
21   A.    About 20 years.
22   Q.    Okay.  And who lives at that address
23         with you?

Tiffany Beasley                  Montgomery Reporting Service
(334) 262-3331                          (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 9

1   A.   My husband and my children.

2   Q.   Okay.  What is your husband's name?

3   A.   Michael.

4   Q.   And the last name Britton,

5        B-R-I-T-T-O-N?

6   A.   Yes.

7   Q.   Okay.  And which children -- what are

8        your children's names that live with

9        you?

10  A.   Arian.

11  Q.   How do you spell that?

12  A.   A-R-I-A-N Britton.

13  Q.   Okay.

14  A.   And Jadon, J-A-D-O-N, Britton.

15  Q.   Okay.

16            (Brief interruption.)

17  Q.   Okay.  And how old are Arian and

18       Jadon?

19  A.   Arian is 4; Jadon is eight months.

20  Q.   Okay.  Does anybody else live in that

21       house with you?

22  A.   No.

23  Q.   Is Jadon your -- your child with

Tiffany Beasley              Montgomery Reporting Service
(334) 262-3331                        (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 10

1          Michael?

2    A.    Yes.

3    Q.    Is Arian a step-child of yours?

4    A.    Yes.

5    Q.    What does Michael do for a living?

6    A.    He farms.

7    Q.    Do you live on a farm?

8    A.    Yes.

9    Q.    Okay.  Does he farm at this --

10   A.    Yes.

11   Q.    -- County Road address?  Okay.  What

12         type farming?

13   A.    Endangered poultry and livestock.

14   Q.    Okay.  What is endangered poultry?

15         What does that mean?

16   A.    You're probably not familiar with the

17         ALBC, but it's an organization that

18         through Mother Earth News and other

19         organizations -- I don't know how to

20         explain this.  Some of the birds that

21         we have are endangered --

22   Q.    Okay.

23   A.    -- or near extinction, and so we're

7/25/2006                                    Karen Lurie Britton

Page 11

1        trying to preserve that breed.  We

2        also have Boer, B-O-E-R, meat goats,

3        which is for breeding and meat.

4   Q.   Okay.  What type -- what would be

5        examples of the type poultry that you

6        have -- what type birds?

7   A.   Barred Rock chickens, Rhode Island Red

8        chickens, Wyandotte chickens, Guineas,

9        peacocks, geese, rare geese, ducks,

10       etc.

11  Q.   Okay.  Do you farm those to breed

12       them, or to sell them to stores, or to

13       sell them for -- what do you sell --

14       who do you sell the product to?  Does

15       that make sense?

16  A.   Uh-huh.

17  Q.   Okay.

18  A.   With the ALBC, they are -- in the

19       process of breeding them up for them,

20       and they turn around and -- I can't

21       remember the name of it.  Michael

22       handles all of this.  I don't.

23            MR. SANSPREE:  He's just

Tiffany Beasley               Montgomery Reporting Service
(334) 262-3331                        (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 12

1              asking who you sold them

2              to.  Do you sell them

3              back to the ALBC?  Is

4              that what you said?

5    A.    You raise some of their birds, and you

6          turn around -- and then they do a

7          series of testing and eating and

8          stuff, and, yeah, they do.  But we

9          haven't done that yet.  We're in the

10         process of that.  But, then, if

11         somebody -- yeah.  We sell ducks; we

12         sell geese.  And we hatch and breed --

13         you know, breed and hatch eggs.  It's

14         a hatchery.

15              MR. SANSPREE:  He just wanted

16              to know who you sold them

17              to.

18   Q.    Yeah.  So you would --

19              MR. SANSPREE:  Who did you

20              sell them to, basically,

21              what he wants to know.

22              People?

23   A.    Yeah.

Tiffany Beasley                 Montgomery Reporting Service
(334) 262-3331                          (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 13

1   Q.   Okay.

2   A.   I'm sorry.

3   Q.   Sure.  No.  No.

4   A.   I misunderstood.

5   Q.   I was just trying -- that's just kind

6        of an interesting type farm.  It's

7        different than the usual type farm you

8        hear about, and I was just trying to,

9        you know, understand who --

10  A.   It's a rare niche, yeah.

11  Q.   Do you farm any type -- any type

12       produce on that farm?

13  A.   No.

14  Q.   Okay.  And how long has -- has that

15       type farming been going on at that

16       farm?

17  A.   Since, I believe, September of '05.

18  Q.   Okay.  And how long have you and

19       Michael been married?

20  A.   We were married on June the 27, 2005.

21  Q.   Okay.  And then a couple of months

22       after you got married, he started this

23       type farming on that land where y'all

7/25/2006                                    Karen Lurie Britton

Page 14

1        live?

2    A.    Uh-huh.

3    Q.    Okay.

4              MR. SANSPREE:  Answer yes or

5                   no --

6    A.    Yes.

7              MR. SANSPREE:  -- or however

8                   you want to answer.

9    Q.    Did he have experience doing that

10        before?

11   A.    No.

12   Q.    Okay.  And you were also married to

13        David?

14   A.    Yes.

15   Q.    Okay.  And when were y'all married?

16        What years?

17   A.    April 1st, 1983, until his death,

18        January the 6th, 2004.

19   Q.    Okay.  Other than Michael and David,

20        have you been married to anyone else?

21   A.    Yes.

22   Q.    Okay.  Tell me who else you've been

23        married to.

7/25/2006                                    Karen Lurie Britton

Page 15

1   A.   My first husband was Myron Johnson.

2   Q.   Okay.

3   A.   From Headland, Alabama.

4   Q.   And when were y'all married?  What

5        dates?

6   A.   June 22nd, 1979 --

7             MR. SANSPREE:  I don't know

8                  how you remember that.

9   A.   -- through -- well, until I married

10       Chris -- or David; it's David

11       Christopher.  He went by Chris.

12  Q.   Okay.  Just -- I want to make sure I

13       call him the right name.  Chris is how

14       you referred to him?

15  A.   Chris is David, yes.

16  Q.   So I'm going to call him Chris

17       throughout the deposition, okay?

18  A.   Okay.

19  Q.   So June 22nd, 1979, until when were

20       you married to Myron?

21  A.   January of '82, I believe, if I

22       remember correctly.

23  Q.   Okay.  Did you and Myron divorce?

Tiffany Beasley                Montgomery Reporting Service
(334) 262-3331                        (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

Page 16

1    A.    Yes.

2    Q.    Did y'all have children?

3    A.    Yes.

4    Q.    Okay.  Tell me the names of your

5          children with Myron.

6    A.    One daughter, Kylie, K-Y-L-I-E,

7          Johnson.

8    Q.    Okay.  And when you and Myron were

9          married, where did y'all live?

10   A.    In Headland.

11   Q.    Do you remember the address where

12         y'all lived in Headland?

13   A.    Route 1, Headland.

14   Q.    Okay.  And Kylie, where does she live

15         today?

16   A.    She lives in Mobile.

17   Q.    How old is she?

18   A.    26.

19   Q.    Is she married?

20   A.    No.

21   Q.    Okay.  Do you know what she does for a

22         living?

23   A.    She has a master's degree in speech

7/25/2006                                    Karen Lurie Britton

1          pathology.

2    Q.    Okay.

3    A.    She's working at a local hospital

4          there in Mobile.

5    Q.    And is her name Kylie Johnson; is that

6          her name?

7    A.    Yes.

8    Q.    Now, did you and Chris have children?

9    A.    Yes.

10   Q.    Okay.  Tell me the names or name of

11         your children with Chris.

12   A.    Christopher.

13   Q.    Okay.

14   A.    And William.

15   Q.    Do they go by the last name Lurie?

16   A.    Yes.

17   Q.    And where do they live?

18   A.    Dothan.

19   Q.    Okay.  How old is Christopher?

20   A.    21.

21   Q.    And what does he do for a living?

22   A.    He works at Chili's, and he's going to

23         school.

Tiffany Beasley                    Montgomery Reporting Service
(334) 262-3331                              (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

Page 18

| | | |
|---|---|---|
| 1 | Q. | Okay.  Does he work as a waiter or |
| 2 | | bartender or manager? |
| 3 | A. | A waiter. |
| 4 | Q. | Okay.  At the Chili's here in Dothan? |
| 5 | A. | Uh-huh. |
| 6 | Q. | And William, what does he do for a |
| 7 | | living? |
| 8 | A. | He's self-employed. |
| 9 | Q. | Where does he live? |
| 10 | A. | Where does? |
| 11 | Q. | Where does he live?  Does he live in |
| 12 | | Dothan? |
| 13 | A. | Dothan. |
| 14 | Q. | What type work does he do? |
| 15 | A. | He has his own little business. |
| 16 | | It's -- I can't recall the name of it. |
| 17 | | He just started it up.  It has to do |
| 18 | | with providing services to -- etching |
| 19 | | glass. |
| 20 | Q. | Okay.  And how old is William? |
| 21 | A. | 20. |
| 22 | Q. | 20.  Are either William or Christopher |
| 23 | | married? |

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

1     A.     William is.

2     Q.     Okay.  What's his wife's name?

3     A.     Natalie.

4     Q.     Okay.  Do you know what she does for a

5            living, where she works?

6     A.     No.

7     Q.     So you and Michael have lived County

8            Road 73 the entire time that y'all

9            have been married; is that right?

10    A.     Yes.

11    Q.     Okay.  When you and Chris were

12           married, where did y'all live?

13    A.     Same house, 4181 County Road 73 in

14           Midland City, Alabama 36350.

15    Q.     Okay.  And that's the same address you

16           gave me earlier?

17    A.     Yes.

18    Q.     Okay.  Who lived at that address with

19           you during y'all's marriage?  Who

20           lived at that address with you and

21           Chris when you and Chris were married?

22    A.     William and Christopher.

23    Q.     Okay.  Nobody else from time to time

7/25/2006                                    Karen Lurie Britton

Page 20

1          lived there; they were the only two
2          people that lived there?
3    A.    Yes.
4    Q.    Okay.  And in 2004, when Chris passed
5          away, William was about 18 or 17 years
6          old?
7    A.    Seventeen, I believe.
8    Q.    Christopher was 19 or 20; is that
9          close?
10   A.    Eighteen.
11   Q.    Okay.
12   A.    If I recall correctly.
13   Q.    Do you have any other children?
14   A.    Yeah -- well --
15   Q.    Other than the ones that we've talked
16         about so far?
17   A.    No.
18   Q.    Okay.  Let me ask you just a little
19         bit about your educational background.
20         Did you graduate from high school?
21   A.    Yes, I got a GED.
22   Q.    Okay.  When did you get your GED?  Do
23         you have any idea of the year?

7/25/2006                                    Karen Lurie Britton

Page 21

1        Just in the '80s, in the --
2    A.    1980.
3    Q.    Okay.  Where did you go to high school
4          before getting your GED?
5    A.    Berry High School in Birmingham,
6          Alabama.  Hoover.
7    Q.    Okay.  And how far along did you get
8          in school?
9    A.    Eleventh.
10             (Off-the-record discussion.)
11   Q.    What year was it when you -- when you
12         left school in 11th grade?
13   A.    It would have been in '79.
14   Q.    Okay.  And once you got your GED, have
15         you been to any type classes or any
16         schools or any junior colleges or
17         colleges since that time?
18   A.    No.
19   Q.    No more education since getting your
20         GED in 1980?
21   A.    No.
22   Q.    Okay.  Are you able to read and write?
23   A.    Yes.

7/25/2006                                    Karen Lurie Britton

Page 22

1   Q.   Okay.  Never had any problem with
2        reading or with writing?
3   A.   No.
4   Q.   And let me just tell you, some of the
5        questions, I have to ask you.  Not
6        meant to patronize you or make light
7        of anything.  I just have to ask some
8        type questions, okay, and that's just
9        one of them.
10                    Are you currently
11       employed?
12  A.   No.
13  Q.   When is the last time you were
14       employed?
15  A.   I want to say '88, slash, '89.
16  Q.   What was the last job that you can
17       remember having?
18  A.   I worked at Double D Food Mart, which
19       no longer exists, in Midland City.
20  Q.   What type work did you do there?
21  A.   Clerk.
22  Q.   Is that a grocery store?
23  A.   Yes.

Tiffany Beasley                    Montgomery Reporting Service
(334) 262-3331                            (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                     Karen Lurie Britton

Page 23

1    Q.    Okay.  Did you work the register
2          and --
3    A.    Yes.
4    Q.    -- do different things in the store
5          that needed to be done?
6    A.    Yes.
7    Q.    Okay.  How long did you have that job?
8    A.    About a year.
9    Q.    Do you remember why you left?
10   A.    My grandmother passed away.
11   Q.    Is that a family business?
12   A.    No.
13   Q.    Okay.  Where else can you recall
14         working?
15   A.    Prior to that, I had my own dance
16         studio.
17   Q.    Okay.  What was that called?
18   A.    Karen's Studio of Dance, Midland City.
19   Q.    Okay.  Is that a dance studio for
20         younger children?
21   A.    Teaching small children tap, ballet.
22   Q.    How long was that -- that business
23         open?

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

1    A.    Two years.

2    Q.    Okay.  Was that before you worked as a

3          clerk at the WD Food Mart (phonetic)?

4    A.    I believe so.

5    Q.    Do you remember the two years that

6          that business were open, which years

7          those might have been?

8    A.    Not right off, no.

9    Q.    Was it in the 1980s?

10   A.    Yes.

11   Q.    Okay.  Did you own that business by

12         yourself?

13   A.    Yes.

14   Q.    What other jobs can you remember

15         having in the past?

16   A.    I'm going way back now.

17   Q.    Just do the best you can.

18   A.    I worked at various restaurants.

19   Q.    In the Dothan --

20   A.    Dothan.

21   Q.    -- Houston County, Dale County area?

22   A.    Yes.  And I was -- worked security at

23         K-Mart.

7/25/2006                                    Karen Lurie Britton

Page 25

1    Q.    Okay.  Here in the Dothan area?

2    A.    Yeah -- yes.

3    Q.    Was that in the '80s?

4    A.    Yes.

5    Q.    Did you -- where did you grow up?

6    A.    Birmingham, the Hoover area.

7    Q.    And then when did you move to the

8          south Alabama area?

9    A.    '79.

10   Q.    After finishing -- or after getting a

11         GED or after finishing school?

12   A.    Yes.

13   Q.    Okay.  And since that time, 1979, have

14         you lived down in the Dale or Houston

15         County area?

16   A.    Yes.

17   Q.    Since that time, you haven't had any

18         periods of time where you've moved

19         away?

20   A.    No.

21   Q.    The address that you gave me earlier,

22         the County Road 73 address, is that

23         some land that you've had in your

Tiffany Beasley                    Montgomery Reporting Service
(334) 262-3331                           (877) 834-6048

7/25/2006                                    Karen Lurie Britton

Page 26

1        family, or did you purchase the land?

2   A.   Both.

3   Q.   Okay.  How much land is it?  How many

4        acres is the farm?

5   A.   Where we reside?  Two.

6   Q.   Because that -- is the two acres where

7        you have a house and live?

8   A.   Yes.

9   Q.   Okay.  And then how much farmland is

10       there over there?

11  A.   A hundred and thirty-five acres.

12  Q.   And you've lived in that area at the

13       two-acre plot of the 135 acres for the

14       past 20 years; am I right on that?

15  A.   Yes.

16  Q.   Okay.  Before you married William,

17       what did -- what was done with the

18       land out there?  He started farming,

19       as I understand it, in September of

20       2005.  Was it farmed by others, or was

21       there any type farming activity

22       performed on the land before that?

23            MR. SANSPREE:  Before she

Tiffany Beasley                Montgomery Reporting Service
(334) 262-3331                      (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                          Karen Lurie Britton

Page 27

1                    married Michael.  You
2                    said William.
3    Q.    I'm sorry.  I'm sorry.  Michael.
4    A.    Repeat the question.
5    Q.    Okay.  Before you married Mike -- and
6          as I understand it, Michael started
7          farming that land in September of
8          2005?
9    A.    Yes.
10   Q.    Okay.  Before that time, was there --
11         were there other people that were
12         farming that 135 acres?
13   A.    That's my father's business.
14   Q.    Okay.  Was your father a farmer?
15   A.    No.  He rents land out to farmers.
16   Q.    Okay.  Do other family members live
17         out there near that?
18   A.    On that land, no.
19   Q.    Okay.  Is your father still alive?
20   A.    Yes.  But he's ill.
21   Q.    Okay.  Is your mother still alive?
22   A.    Yes.
23   Q.    Okay.  Do they -- does she or he live

Tiffany Beasley                    Montgomery Reporting Service
(334) 262-3331                           (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 28

1           out near the farm?

2    A.     Yes.

3    Q.     And so your father would -- would rent

4           the land to other farmers in the area

5           that wanted to, maybe, farm the land,

6           the 135 acres that we're talking

7           about?

8    A.     Yes.

9    Q.     Okay.  Did you ever help out with any

10          of that farming in the past 20 years

11          or so?

12   A.     No.

13   Q.     Were you -- were you, basically,

14          raising children for the past

15          20 years?

16   A.     Homemaker, yes.

17   Q.     Do you have any type hobbies or things

18          that you like to do that aren't --

19          aren't work, but they're maybe

20          associations or groups that you do

21          things with or activities that you do?

22   A.     As in?

23   Q.     Well, different -- maybe associations,

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 29

1          like civic groups that you might be
2          involved in, church groups that you
3          might be involved in?
4    A.    Church.
5    Q.    Where do you go to church?
6    A.    Cornerstone Bible Church.  John D.
7          Odom Road, Dothan, Alabama.
8    Q.    Okay.  How long have you been going
9          there?
10   A.    Off and on since 2001.
11   Q.    Okay.  Are you active in the choir or
12         the Sunday school group or any of the
13         different types of groups that may
14         be --
15   A.    Not at this time, no.
16   Q.    Okay.  Have you in the past been?
17   A.    Not in choir, no.
18   Q.    Any type group in the church you've
19         been actively involved with?
20   A.    Yes.  I've worked with the children,
21         yes.
22   Q.    Okay.  Any other type hobbies,
23         activities, interests that you've been

7/25/2006                                    Karen Lurie Britton

Page 30

1        active in?

2    A.   An occasional fishing trip.

3    Q.   Okay.  Have you ever been involved in

4        a lawsuit before?

5    A.   No.

6    Q.   Okay.  Have you ever been convicted of

7        a crime?

8    A.   No.

9    Q.   Have you ever had any type worker's

10        compensation claim?

11   A.   No.

12   Q.   Okay.  Ever filed a claim for any type

13        of insurance benefits that you can

14        recall in the past other than the one

15        that we're here about today?

16   A.   I don't remember.

17   Q.   Okay.  Have you ever had to testify in

18        court before?

19   A.   Yes.

20   Q.   Okay.  What type cases have you had to

21        testify in court about?

22   A.   Custody.

23   Q.   Was that custody case involving your

7/25/2006                                    Karen Lurie Britton

Page 31

1          own children?

2    A.    Uh-huh, yes.

3    Q.    Other than maybe -- maybe lawsuits or

4          disputes you may have had in the

5          domestic relations court dealing with

6          custody or with a divorce, have you

7          ever had to go to court to testify

8          about anything else?

9    A.    No.

10   Q.    Okay.  I'm going to let you look at

11         the complaint that's been filed in

12         this case, and I'm going to mark it as

13         Exhibit A.  Have you read the

14         complaint that's been filed in this

15         case?

16   A.    I'm not sure.

17   Q.    Okay.  I'm going to let you look at

18         this and mark it Defendants' Exhibit

19         A, and let me know if you've ever read

20         that before.

21              (The referred-to document was

22              marked for identification as

23              Defendants' Exhibit A.)

7/25/2006                                    Karen Lurie Britton

Page 32

1          MR. SANSPREE:  Do you remember

2              his question?  He asked

3              if you ever read that

4              before.

5    A.    I believe I have.

6    Q.    Okay.  Do you know when you may have

7          read it?

8    A.    I don't remember.

9    Q.    Okay.  Did you -- were you involved

10         with drafting it or helping out with

11         the wording of it?

12   A.    No.

13   Q.    Okay.  You just looked at it a second

14         ago while we were sitting here; is

15         that right?

16   A.    Yes.

17   Q.    Okay.  Is there anything in it that

18         you believe is inaccurate as you sit

19         here today and you've just reviewed

20         the complaint?

21         MR. SANSPREE:  She needs to

22             take her time to read

23             it --

Tiffany Beasley              Montgomery Reporting Service
(334) 262-3331                        (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                              Karen Lurie Britton

1              MR. PARKER:  Sure.

2              MR. SANSPREE:  -- if you're

3                   going to ask her that.

4                   Put an objection in to

5                   any legal terms.  She's

6                   not going to be able to

7                   answer those.

8              MR. PARKER:  Sure.

9    A.    Page 2, No. 11.

10   Q.    Bear with me one second.  Page 2, No.

11         11?

12   A.    Am I correct in saying that's supposed

13         to be defendant or decedent.

14              MR. SANSPREE:  That means the

15                   deceased.

16   A.    See, I don't know that.

17              MR. SANSPREE:  She didn't

18                   draft this, for the

19                   record.  I mean, I did

20                   it.

21              MR. PARKER:  Okay.

22   Q.    Okay.

23   A.    It's okay.

7/25/2006                                    Karen Lurie Britton

Page 34

1    Q.    Looks accurate to you?

2    A.    Yes.

3    Q.    Have you ever been represented by the

4          Beasley firm before in any other type

5          case or in any --

6    A.    No.

7    Q.    -- any other matter?  Okay.  Have you

8          talked to anybody other than your

9          lawyers about any of the facts or

10         circumstances regarding your dispute

11         with Globe Life?

12   A.    No.

13   Q.    I know you've produced some documents

14         in this case.  Other than what's been

15         produced so far, do you maintain or

16         have you maintained any type diary or

17         notes regarding your dispute with

18         Globe Life?

19   A.    No.

20   Q.    Everything you've got maybe at your

21         home has been turned over to your

22         attorneys for production in this case?

23   A.    Yes.

7/25/2006                                    Karen Lurie Britton

                                                              Page 35

```
 1    Q.    Okay.  To prepare for today's
 2          deposition, did you review any
 3          documents?
 4    A.    Yes.
 5    Q.    Do you remember what you reviewed?
 6    A.    No.
 7    Q.    Let me ask you a couple of questions
 8          about Chris.  Where did he work?
 9    A.    Service Machine.
10    Q.    Okay.  And how long did he work there?
11    A.    This was his -- he worked there prior.
12          This was his third day on the job.  He
13          had gone back there -- prior to that,
14          he was at Maha.
15    Q.    Can you spell that?
16    A.    M-A-H-A.
17    Q.    Okay.  When was he at Maha?  Kind of
18          give me a history of where he worked,
19          the best you can remember.
20    A.    Best I can remember, he was at Maha
21          from 2001 to 2004.  Do you want me to
22          go back further?
23    Q.    Well -- okay.  2001 to 2004, was he
```

Tiffany Beasley                    Montgomery Reporting Service
(334) 262-3331                               (877) 834-6048

7/25/2006                                    Karen Lurie Britton

Page 36

1          working there at the time he passed?

2     A.    At Maha, no.

3     Q.    Okay.

4     A.    He had been hired with Service

5          Machine.

6     Q.    Okay.  Did he work one or two days

7          during 2004 at Maha?  My question is

8          if he passed on the 6th, then I'm just

9          trying to figure out --

10               MR. SANSPREE:  It was his

11                    third day at work at

12                    Service Machine when he

13                    died.

14    A.    It was his second day on the job.

15    Q.    Okay.  So he worked 2001 to 2003 at

16          Maha?

17    A.    I think so.

18    Q.    Okay.  And then Service Machine, he

19          passed on his second day on the job.

20          Would he have started on the 5th?

21          Worked the 5th and then the 6th?

22    A.    Yes.

23    Q.    What did he do at Maha?

7/25/2006                          Karen Lurie Britton

Page 37

1   A.    He was a machinist.

2   Q.    What type machines would he work on?

3         Do you know?

4   A.    Mills, drills, lays, shapers.

5   Q.    Okay.  Do you remember how much he was

6         making at Maha?

7   A.    Hourly?

8   Q.    Well, if he was paid hourly.  If he

9         was paid a salary, then if you can

10        remember his salary.

11  A.    I believe 12.50.

12  Q.    Okay.  That's per hour?

13  A.    Yes.

14  Q.    Okay.  Do you remember how much he was

15        making at Service Machine?

16  A.    No.

17  Q.    Okay.  Was it in that range, in the

18        12.50 area?

19  A.    Yes.

20  Q.    Okay.  And do you know what he was

21        going to be doing at Service Machine,

22        what his job there was going to be?

23  A.    Machinist.

7/25/2006                                    Karen Lurie Britton

Page 38

1    Q.    Had he worked there before?

2    A.    Yes.

3    Q.    When did he work there previously,

4          Service Machine?

5    A.    Prior to Maha.

6    Q.    Okay.  Do you remember how long or

7          what years?

8    A.    No.

9    Q.    Okay.  How many years had he worked at

10         Service Machine in the past prior to

11         going back to work for them in 2004?

12   A.    Four or five.  Maybe more.  I do not

13         remember.

14   Q.    Sure.  How many stints did he have at

15         Service Machine?  How many different

16         times did he work at Service Machine?

17   A.    Those two times.

18   Q.    Okay.  So he had four years straight

19         with Service Machine, and then he --

20         then he also worked at Maha, and then

21         he went back to Service Machine?

22   A.    Yes.  And Maha is no longer open.

23   Q.    Okay.

7/25/2006                                    Karen Lurie Britton

Page 39

1   A.   Prior to them closing, he knew what to
2        do.
3   Q.   Okay.  Did he have the same job at
4        Service Machine when he went back in
5        2004 that he did before?
6   A.   Yes.
7   Q.   Okay.  And when you say, he had four
8        years at Service Machine, would those
9        have been in the late '90s, early
10       2000s, or would that have been earlier
11       in the 1990s?  I'm just trying to get
12       an idea of where he worked during what
13       years.
14  A.   Late '90s, early 2000.
15  Q.   Okay.  Can you recall other places
16       where he worked?
17  A.   Dothan Machine Shop.
18  Q.   Do you remember how long he worked
19       there and when?
20  A.   No.
21  Q.   Okay.
22  A.   Tri-State Machine Shop.
23  Q.   Same question, do you remember when or

7/25/2006                                        Karen Lurie Britton

Page 40

1           how long he worked there?

2    A.     '80s.

3    Q.     Okay.  Any other places you can recall

4           that he worked?

5    A.     No.

6    Q.     Okay.  During the, I guess, 20 years

7           that y'all were married, did he always

8           work as a machinist?

9    A.     Yes.

10   Q.     And there may have been places he

11          worked in addition, but the places you

12          recall that he worked were Dothan

13          Machine Shop, Tri-State Machine Shop,

14          Maha, and Service Machine?

15   A.     Yes.

16   Q.     Okay.

17                 (Off-the-record discussion.)

18                 (Brief recess taken.)

19   Q.     Before we broke I was talking -- or we

20          were talking about Chris's past jobs,

21          and you told me the different places

22          that he worked as a machinist in the

23          past.

Tiffany Beasley                    Montgomery Reporting Service
(334) 262-3331                            (877) 834-6048

7/25/2006                                    Karen Lurie Britton

Page 41

1    A.    Yes.

2    Q.    And we -- when we left off, we were

3          talking about that he had taken a job

4          with Service Machine, where he had

5          worked before, and he had worked a

6          couple of days before he passed away;

7          is that -- is that accurate?

8    A.    Yes.

9    Q.    I've got a calendar here, because I

10         think that it may be helpful to make

11         sure we're on the same page on dates

12         and everything.  And this is a

13         January '04 calendar that I just

14         printed off of my calendar at the

15         office.  I'm hoping there's no

16         appointments on here.

17                   (The referred-to document was

18                    marked for identification as

19                    Defendants' Exhibit No. B.)

20              (Off-the-record discussion.)

21   Q.    According to this calendar, the 5th

22         was a Monday of January '04?

23   A.    Oh, there's the number.  Okay.

Tiffany Beasley                  Montgomery Reporting Service
(334) 262-3331                        (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 42

1              MR. SANSPREE:  That's
2                 December.  This is
3                 January.
4              MR. PARKER:  Yeah.
5    A.    Yes.
6    Q.    Okay.  And the 6th was a Tuesday?
7    A.    Yes.
8    Q.    So he would have started back at the
9          new job on the 5th, on that Monday?
10   A.    Yes.
11   Q.    Okay.  And he passed away on the
12         Tuesday?
13   A.    Yes.  He was killed Tuesday morning.
14   Q.    What were his hours at Service Machine
15         when he went back to work?
16   A.    Excuse me.  Seven to 3:30, I believe.
17   Q.    Okay.  When he died, was he on his way
18         to work?
19              (Off-the-record discussion.)
20   A.    Pardon?
21   Q.    Was he on his way to work when he
22         passed away on the 6th?
23   A.    When he was killed on the 6th, yes.

Tiffany Beasley                Montgomery Reporting Service
(334) 262-3331                       (877) 834-6048

7/25/2006                                    Karen Lurie Britton

Page 43

1   Q.    Okay.  And he was riding a motorcycle?

2   A.    Yes.

3   Q.    Do you know if he ever was involved in

4         any type lawsuits while he was alive?

5   A.    No.

6   Q.    Okay.  Did he have any -- any problems

7         with -- with the law, any criminal

8         convictions, anything like that?

9   A.    No.

10  Q.    What was his educational background?

11  A.    High school.  He graduated from tool

12        and die school.

13  Q.    Is that like a vocational school?

14  A.    I believe.  That would have been

15        before I met him.  And -- and had a

16        year of college.

17  Q.    When did y'all meet?

18  A.    June '82, I believe.

19  Q.    Okay.  Now, at the time that he died,

20        he was making 12.50 an hour; is that

21        right?

22  A.    If I recall correctly.

23  Q.    In that range, maybe a little more,

7/25/2006                                      Karen Lurie Britton

Page 44

1         maybe a little less --

2    A.   In that range.

3    Q.   -- but in that range?  Was there any

4         other income coming into the family at

5         the time?

6    A.   No.

7    Q.   Okay.  At the time that he died, what

8         was the -- what debt did the family

9         owe?  Did you owe a mortgage on the

10        house?

11   A.   Yes.

12   Q.   Okay.  Do you remember how much it

13        was?

14   A.   No.

15   Q.   Do you remember how much in a range it

16        was?

17   A.   No.  Thirty-five to 50, somewhere in

18        there.

19   Q.   Okay.  Thousand?

20   A.   Yes.

21   Q.   Okay.

22   A.   Yes.

23   Q.   Okay.  Did you owe on cars, owe money

Tiffany Beasley                Montgomery Reporting Service
(334) 262-3331                         (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                      Karen Lurie Britton

1        on cars?

2    A.    At that time, no.  I don't believe.

3    Q.    Okay.  Owe money on credit cards?

4    A.    No.

5    Q.    Okay.  Other than the mortgage, did

6          you owe any money to anybody that you

7          can recall, anybody or any companies?

8    A.    No.

9    Q.    Okay.  Have you or Chris or the two of

10         you together, had you ever had to file

11         bankruptcy or had any type financial

12         problems?

13   A.    No.

14   Q.    Following his death, did you receive

15         any benefits from any source by virtue

16         of his passing away?

17   A.    Yes.

18   Q.    Okay.  Can you recall who you received

19         benefits from and why you received

20         those benefits?  For example, did he

21         have any life insurance policies?

22   A.    Would be the automobile.

23              MR. SANSPREE:  Just tell him.

7/25/2006                              Karen Lurie Britton

Page 46

1   A.    I'm trying to remember.  The
2         automobile policy; the other people
3         that were in the accident paid out.
4   Q.    Do you remember how much you got?
5   A.    I want to say 50.
6   Q.    Okay.  And that was from the other
7         people's insurance?
8   A.    Uh-huh.
9   Q.    Did you get some money from your own
10        insurance, underinsured or uninsured
11        motorist coverage; does that ring a
12        bell?
13  A.    I don't remember.
14  Q.    Okay.  Any life insurance policies
15        pay?
16  A.    I don't remember.
17              (Off-the-record discussion.)
18  Q.    Other than the 50,000 that you
19        received, can you recall any other
20        monies that any other companies or
21        persons paid you or your family as a
22        result of the death?  May be that the
23        other person that he was involved in

Tiffany Beasley            Montgomery Reporting Service
(334) 262-3331                      (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 47

1          the wreck with had monies that were

2          paid to you but it was an insurance

3          company that paid.  Any benefits or

4          any monies that you can recall other

5          than the 50,000?

6     A.   A hundred and ten, I think it was,

7          from CNA.

8     Q.   What was that for?

9     A.   It was a -- AD&D through the bank.

10    Q.   Was that a credit life type policy

11         or --

12    A.   I don't know.  He just took it out.  I

13         don't know.

14    Q.   Okay.  So he had $110,000 amount that

15         CNA --

16    A.   Yeah.

17    Q.   -- insurance company paid for a bank;

18         is that...

19    A.   The premiums were taken out through

20         the bank.  You know, they have those

21         little --

22    Q.   A bank draft.

23    A.   It's, like, a thousand-dollar policy

7/25/2006                                    Karen Lurie Britton

Page 48

1         if you have an account with the bank.

2         And then they do the little -- you pay

3         a certain amount ever so often and --

4         yeah.  That.

5    Q.   So he got through the bank -- which

6         bank?

7    A.   Headland.

8    Q.   Through that bank --

9    A.   Well, it didn't come -- well, it came

10        directly from CNA, but through the

11        bank.  They was just the middle man

12        for the payment.

13   Q.   Headland Bank was the bank you did

14        your --

15   A.   Yes.

16   Q.   -- banking business with?

17   A.   Yes.

18   Q.   And through, maybe, something that was

19        automatic when you banked with them or

20        through some policies that he may have

21        taken out, y'all received $110,000 but

22        the payment was received on a CNA

23        insurance check?

7/25/2006                              Karen Lurie Britton

Page 49

1   A.    I think so.

2   Q.    Okay.  Any other amounts such as that

3         that you can recall?

4   A.    Not that I can recall, no.

5   Q.    Okay.  Did you -- other than Globe --

6         and I'm going to ask you about the

7         Globe dispute in a minute.  But other

8         than Globe, were there any other

9         companies that you made claims?

10  A.    Not that I recall, no.

11  Q.    Okay.  No denials of any claims by any

12        other companies?

13  A.    No.

14  Q.    Okay.  At his job, did he have health

15        insurance?

16  A.    No.

17  Q.    Did you owe medical bills from any

18        type medical treatment due to the

19        accident?  Were there any medical

20        bills -- were there any medical bills

21        associated with the accident?

22  A.    No, there -- no, there wasn't --

23              MR. SANSPREE:  I think he

7/25/2006                                    Karen Lurie Britton

Page 50

1              passed immediately.

2    A.    There was not even -- there was

3          nothing left.

4    Q.    Okay.  And, I'm sorry.  These are

5          questions I just have to ask.  And I'm

6          not doing it to make you

7          uncomfortable.  These are just

8          questions I have to ask, and I'm

9          trying to do it in the most sensitive

10         way that I can, and I apologize if I

11         don't, okay?

12   A.    Just move along.

13   Q.    Okay.  In the past, had y'all taken

14         out any insurance, such as this Globe

15         Life policy, with any companies such

16         as life insurance or disability

17         insurance, any type insurance that you

18         and Chris had taken out that you can

19         recall that you paid monthly premium

20         on?

21   A.    Not that I recall.

22   Q.    Okay.  What was Chris's general health

23         history?

7/25/2006                                          Karen Lurie Britton

Page 51

1   A.    Good.

2   Q.    Okay.  Did he have any type health

3         problems?

4   A.    He was diabetic.

5   Q.    How long was he diabetic?

6   A.    Since he was about 16.

7   Q.    Who was the doctor that treated him

8         for that condition?

9   A.    Doctor Paulk.

10  Q.    Doctor Paulk?

11  A.    Yeah.

12  Q.    Is he in Headland or Dothan?

13  A.    Dothan.

14  Q.    Are there any other doctors that you

15        knew of that treated him for diabetes?

16  A.    Yes.  But I can't recall the name

17        really.

18  Q.    Okay.  Were there any other conditions

19        such as diabetes that he suffered

20        from?

21  A.    No.

22  Q.    Okay.  Did he ever have to be

23        hospitalized for any reason that you

Tiffany Beasley                 Montgomery Reporting Service
(334) 262-3331                          (877) 834-6048

7/25/2006                                    Karen Lurie Britton

Page 52

1          can recall?

2   A.     No.

3   Q.     Okay.

4   A.     He was controlled.

5   Q.     Okay.  Any illnesses or injuries that

6          required him to go to the emergency

7          room that you can ever recall?

8   A.     No.

9   Q.     Was he on any medications when he died

10         for diabetes or for any type

11         condition?

12  A.     Diabetes, yes.

13  Q.     Do you remember what he took?

14  A.     Insulin.

15  Q.     Okay.  Is that something he took

16         daily?

17  A.     Yes.

18  Q.     Okay.  Do you recall when the -- this

19         Globe Life policy was first taken out?

20  A.     I believe he took it out in...

21                MR. SANSPREE:  You don't need

22             to be testifying on what

23             you believe or what you

7/25/2006                                    Karen Lurie Britton

1                           think.  You need to

2                           testify to what you know.

3       A.    April 2003.

4       Q.    Okay.  And did he discuss with you the

5             policy before he took it out?

6       A.    As in?

7       Q.    Did you know he took it out when he

8             took it out?

9       A.    Yeah.

10      Q.    Okay.  Were you with him when he was

11            talking about maybe taking it out?

12      A.    All I know is he took it out.

13      Q.    Okay.  In 2003 he took out a

14            disability or an accident policy?

15      A.    Yes.

16      Q.    And did he discuss with you how much

17            it was going to cost or how much it

18            was going to pay or why he thought it

19            would be a good idea to take it out or

20            how he learned about the policy or

21            other people that may have had the

22            same type policy, just that kind of

23            stuff; did y'all talk about any of

7/25/2006                                    Karen Lurie Britton

1           that before he took it out?

2    A.     No.  I just paid the premiums.

3    Q.     Okay.  How did he alert you that a

4           premium was owed?

5    A.     Statement came in the mail.

6    Q.     Okay.  So the statement came in the

7           mail, but before it did, you already

8           knew he had applied for the policy?

9    A.     Yes.

10   Q.     Okay.  And that's something he talked

11          to you about before he did it or while

12          he was filling it out or after he had

13          sent it in?  Do you remember?

14   A.     I don't recall.

15   Q.     Okay.  You recall a statement came in

16          the mail, and you paid it?

17   A.     Yes.

18   Q.     Okay.  And you -- but you already knew

19          what it was for because he had either

20          told you that he had taken it out, or

21          y'all had talked about --

22   A.     Yes.

23   Q.     -- the policy?  Were you the one when

Tiffany Beasley                Montgomery Reporting Service
(334) 262-3331                        (877) 834-6048

7/25/2006                                    Karen Lurie Britton

Page 55

| | | |
|---|---|---|
| 1 | | you and Chris were married that paid |
| 2 | | the bills? |
| 3 | A. | Yes. |
| 4 | Q. | Okay.  Did he do any of the -- write |
| 5 | | any of the checks for the family? |
| 6 | A. | Sometimes. |
| 7 | Q. | Okay.  How would it -- how would you |
| 8 | | decide who would pay which bills |
| 9 | | during the course of a month? |
| 10 | A. | I did the majority of it. |
| 11 | Q. | Did he ever write checks for the |
| 12 | | premium for this policy? |
| 13 | A. | No.  I did. |
| 14 | Q. | Okay.  Would you agree -- well, let me |
| 15 | | ask you this:  Up until November of |
| 16 | | 2003, did you pay the premium on it |
| 17 | | each month on time? |
| 18 | A. | Yes. |
| 19 | Q. | Okay.  After November 2003, would you |
| 20 | | agree with me that -- that a payment |
| 21 | | was not made in association with your |
| 22 | | November -- November invoice of 2003? |
| 23 | A. | Repeat that. |

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                          Karen Lurie Britton

Page 56

1    Q.    Okay.  There was an invoice in
2          November of 2003.  Do you remember
3          that?
4    A.    Yes.
5    Q.    And would you agree with me that you
6          didn't pay it?
7    A.    No.
8    Q.    You would not agree with me?
9    A.    No.
10   Q.    Okay.  Would you agree with me that
11         you did not pay the invoice due
12         November -- or for November 28th,
13         2003, before December 29th, 2003?
14   A.    Yes.
15   Q.    Okay.  That -- you would agree with me
16         that one was not paid?  There was an
17         invoice that went to you in November
18         that was to be paid by or before
19         December 29th, 2003; do you recall
20         that?
21   A.    I'm just looking at what you were
22         thumbing --
23   Q.    Oh, no.  I --

Tiffany Beasley              Montgomery Reporting Service
(334) 262-3331                    (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 57

1   A.      -- what you were --

2   Q.      No, no.  I was just trying to see if

3           that's how you recalled it, that in

4           November, there was a premium due that

5           was not paid?

6   A.      That premium was paid on January the

7           4th.

8   Q.      Okay.  Let me let you look at this.

9           This may help.  This is on -- let me

10          just do this:  The documents here

11          are -- L-U-R-I-E 01 to L-U-R-I-E 075,

12          the documents that were produced in

13          this case.  And I'm just going to

14          attach them all as a cumulative

15          exhibit because there may be some

16          questions I'm going to ask you about

17          these documents.  I'm going to attach

18          these all as Exhibit C.

19                  (The referred-to document was

20                   marked for identification as

21                   Defendants' Exhibit C.)

22  Q.      If you look through there, I think

23          it's No. 18, L-U-R-I-E 18, that has a

7/25/2006                                    Karen Lurie Britton

Page 58

1          due date 11/28/03 up in the top
2          right-hand side of the invoice.
3     A.   Uh-huh.
4     Q.   Okay.  Was that -- was this -- is this
5          an invoice for premium that's owed; is
6          that what you understand this to be?
7     A.   Yes.
8     Q.   Was this one paid?
9     A.   Yes.
10    Q.   Okay.  And is this the one you said
11         was paid -- when was this one paid?
12    A.   January 4th, 2003.
13    Q.   Okay.  Can you tell from this sheet
14         when -- when the amount was due?
15    A.   It says here November 28th, '03.
16    Q.   Okay.  The due date 11/28/03?
17    A.   Uh-huh.
18    Q.   Okay.  Was it paid on or before the
19         due date?
20    A.   No.
21    Q.   Okay.  Was not.  Do you remember this
22         invoice coming to you that was due
23         11/28/03?

Tiffany Beasley                  Montgomery Reporting Service
(334) 262-3331                        (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 59

1     A.     I don't recall.

2     Q.     Okay.  Did you ever have any problems

3            receiving or -- or getting payments to

4            Globe Life?  Did you ever have any

5            problems with the mail and with

6            receiving statements from them?

7     A.     No.

8     Q.     Okay.  Did you ever have any problems

9            with your checks getting to them?

10    A.     No.

11    Q.     Okay.  Would you agree with me -- and

12           these are documents that I received

13           from you -- that you did receive this

14           invoice here, that I have here in my

15           group of documents, No. 18; you

16           received the invoice that had a due

17           date 11/28/03?

18    A.     I don't recall receiving that

19           particular invoice, no.

20    Q.     Okay.  Do you recall if you received

21           an invoice in December?

22    A.     Pardon?

23    Q.     Do you recall if you received an

Tiffany Beasley                 Montgomery Reporting Service
(334) 262-3331                           (877) 834-6048

7/25/2006                                    Karen Lurie Britton

1         invoice in December at any point

2         stating that they did not receive your

3         November payment?

4   A.    I don't know.  Where is that --

5               MR. SANSPREE:  I'm sorry.

6                     Here.  Here it is.

7   A.    What I'm looking for --

8               MR. SANSPREE:  He just asked

9                     if you recalled receiving

10                    an invoice in December.

11  A.    Yeah -- yes.

12  Q.    Okay.

13  A.    Sorry.

14  Q.    I'm just trying to make sure I've got

15        the facts straight as you -- you

16        remember them.  In early '03, an

17        application was taken out, and you

18        were the one that made the premium

19        payments for this policy --

20  A.    Yes.

21  Q.    -- to Globe Life?

22  A.    Yes.

23  Q.    And you get a series of invoices in

Page 61

1          the mail at this 4181 County Road 73

2          address?

3    A.    Yes.

4    Q.    And in November, one came to you that

5          stated the due date was November 28th,

6          2003, as reflected in L-U-R-I-E 0018?

7    A.    Yes.

8    Q.    And no payment was made before the due

9          date of 11/28/03?

10   A.    There was a payment made in October

11         for the October premium.

12   Q.    True.  In relation to this invoice

13         that was due -- the November invoice

14         that was due 11/28/03, no payment was

15         made before --

16   A.    No.

17   Q.    -- 11/28/03?

18   A.    No.

19   Q.    Okay.  And the next time you heard

20         back from Globe Life was when, that

21         you can recall in relation to this

22         policy?

23   A.    I think it was sometime around -- on

7/25/2006                                    Karen Lurie Britton

Page 62

1       or around January the 2nd.

2   Q.   So January 2nd -- and I think there's

3        a copy of this letter 0020.

4            MR. SANSPREE:  Flip through

5                there.

6   A.   I looked, and I didn't see it.

7            MR. SANSPREE:  Go ahead,

8                George.  I'm sorry.

9   Q.   Look at 0020.

10           MR. SANSPREE:  Two pages after

11               that.  There it is.

12  Q.   Is that a copy of the next

13       correspondence --

14  A.   Yes.

15  Q.   -- you received from them?

16  A.   Yes.

17  Q.   Okay.  And the date up there is

18       January 2nd, 2004?

19  A.   Yes.

20  Q.   Okay.  Now, do you recall when you

21       received this letter from Globe Life

22       that's dated Lurie 0020?

23  A.   A week or so around that date.

7/25/2006                                    Karen Lurie Britton

1    Q.    Okay.  It was after January --

2    A.    You said January 20 or January 2nd?

3    Q.    I'm sorry.  January 2nd.

4    A.    January 2nd.

5    Q.    Okay.  It's Lurie 0020.  That's the

6          one I'm looking at.

7    A.    All right.

8    Q.    Do you remember when you would have

9          received this January 2nd letter from

10         Globe Life?

11   A.    I would say it was about a week or so

12         after that --

13   Q.    Okay.

14   A.    -- after I had already made the

15         payment on the 4th.

16   Q.    So you received this letter after you

17         had already made the payment?

18   A.    Yes.

19   Q.    Okay.  And between the statement or

20         invoice that's marked as LURIE 0018

21         and the letter or LURIE 0020, do you

22         recall if there was any other

23         correspondence --

7/25/2006                              Karen Lurie Britton

Page 64

1   A.   No, I don't.

2   Q.   -- to you from Globe Life?

3   A.   No, I don't.  It was holiday time.

4   Q.   What did y'all do during that holiday

5        period?  Do you remember if you were

6        in town or out of town, or do you

7        remember anything about that holiday?

8   A.   In town.

9   Q.   Okay.  During Christmas and New

10       Year's?

11  A.   Uh-huh.

12  Q.   Okay.  Did you go on any trips during

13       that --

14  A.   No.

15  Q.   -- at Christmastime?

16  A.   Did the -- you know, the Santa Clause

17       thing and --

18  Q.   Okay.  Was your husband working --

19       before he went back to his old place

20       of employment on the 5th, was he

21       working during that time for the other

22       machine shop that he worked for?  Was

23       there any gap in employment for him at

7/25/2006                                    Karen Lurie Britton

Page 65

1          that time?

2    A.    I -- no, I don't think so.  No.  That

3          would have been -- where is the

4          calendar?  His last day was Friday,

5          December -- no, December -- the Friday

6          prior to that -- to the beginning of

7          2004, his first day with Service

8          Machine would have been --

9    Q.    Look at that.  Does that help you?

10   A.    Is this '03?

11   Q.    Yes.

12   A.    Okay.  So then -- that's right.

13         Because his last day would have been,

14         I believe, based on looking at this

15         calendar, the 31st.

16   Q.    Okay.  The 31st was a Wednesday.  So

17         it would have been the 2nd -- would

18         have been the Friday?

19   A.    Yes, I believe.

20   Q.    Okay.  So the best that you can

21         recall, January 2nd was his last day

22         at Maha, and January 5th was his first

23         day at Service?

7/25/2006                                    Karen Lurie Britton

Page 66

1   A.    December -- yeah, January 2nd was last
2         day.  And then back over here.
3               MR. SANSPREE:  Right there.
4   A.    This calendar is odd.
5   Q.    There's January 1, January 2, January
6         3 and 4, then 5, 6.  So it starts
7         right -- there's January 1, so --
8   A.    Okay.
9   Q.    -- these are the last few days of
10        December.
11  A.    If I recall correctly, the last day
12        was Friday that he worked with Maha.
13        He started with Service Machine on the
14        5th and was killed on the 6th.
15  Q.    And the 6th, he was killed in the
16        early morning hours of the 6th?
17  A.    Yes.
18  Q.    Approximately 6 a.m.?
19  A.    5:40.
20  Q.    Okay.  But in any event, he was
21        working a regular schedule; your
22        family was in the Headland area?
23  A.    No.

Tiffany Beasley              Montgomery Reporting Service
(334) 262-3331                        (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                          Karen Lurie Britton

Page 67

1    Q.    Midland City area?

2    A.    Yes.

3    Q.    Okay.  And you don't recall going on

4          vacation or out of town or anything

5          like that?

6    A.    No.

7    Q.    Okay.  Now, when did you write the

8          check, the $33.60 -- I think a copy of

9          that check is in this stack as 02 --

10         when did you write that check?

11   A.    January 4th.  It would be a Sunday

12         night after the holidays paying the

13         bills.

14   Q.    And what triggered you to write that

15         check?

16   A.    The bills were due.  That notice was

17         in my stack of bills there.  I looked

18         at it and said pay that.

19   Q.    Okay.  Which notice?

20   A.    This one, 0020.

21   Q.    Okay.  On January 4th, 0020, dated

22         January 2nd, was in your stack of

23         bills?

7/25/2006                              Karen Lurie Britton

Page 68

1    A.    Yes.  Yes.

2    Q.    So you received -- that was dated

3          January 2nd.  You wrote the check on

4          January 4th.  So you must have

5          received that mail on January 3rd?

6    A.    Yes.  I guess.  No.  Yeah.  I don't

7          remember.  All I know is I got this;

8          this was laying there; I saw here

9          where it says had to receive a payment

10         by January the 17th, 2004; this was

11         the 4th; I said, good deal; wrote the

12         check out; put it in the mailbox that

13         night.

14   Q.    Earlier I thought I remembered you

15         saying that you had already mailed the

16         check when you got that letter?

17   A.    Is it this one or the -- or that one?

18               MR. SANSPREE:  Look at it.  I

19                   don't know.

20   A.    I'm trying to remember.  Oh, yeah.

21         Okay.  I apologize.  I said that I had

22         gotten this letter about a week or so,

23         give or take a day or two, after I had

Tiffany Beasley                 Montgomery Reporting Service
(334) 262-3331                       (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                Karen Lurie Britton

Page 69

1        already made the payment on the 4th.

2    Q.    Okay.

3    A.    And that -- and then I -- when I got

4          this, that was -- I said, well, I'm

5          okay because it was mailed out on the

6          4th and here it is -- it had to be

7          there by the 17th, so I'm sure that

8          was ample time for Globe to receive my

9          premium.

10   Q.    So what triggered you to write that

11         check on the 4th?  You said there was

12         a bill in your stack of things, and

13         I'm wondering what -- what it was that

14         you saw that triggered you to write

15         the check?

16   A.    I don't know.  I mean, the bills were

17         due.  I owe -- that was also received

18         afterwards.

19   Q.    Okay.

20             MR. SANSPREE:  She doesn't

21             know what you're pointing

22             to.  You're going to have

23             to identify --

Tiffany Beasley              Montgomery Reporting Service
(334) 262-3331                      (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                          Karen Lurie Britton

Page 70

1    A.    I was pointing to 0001.  This was
2          received after Chris's death, after
3          they had already -- which one is that?
4                MR. SANSPREE:  It's Document
5                No. 1.
6    Q.    Okay.  Okay.  I just want to make sure
7          we're on the same page and I
8          understand what you're saying.  You
9          wrote the check on January 4th in the
10         p.m., afternoon --
11   A.    Right.  I always sat down on Sunday
12         nights to pay my bills, and whether I
13         had a document in my hand or not, I
14         had one of the little calendars that
15         had what was due when.
16   Q.    Well, according to 0018, that was due
17         November 28th.
18   A.    Yes.  I said I was late on that.
19   Q.    Did you -- did you call anybody at
20         Globe and ask them if you could still
21         make that payment --
22   A.    No.
23   Q.    -- almost five or six weeks late?

Tiffany Beasley                Montgomery Reporting Service
(334) 262-3331                          (877) 834-6048

7/25/2006                                    Karen Lurie Britton

Page 71

1    A.    No.

2    Q.    Had you been late ever before on a

3          payment on the Globe policy?

4    A.    Not that I recall, no.

5    Q.    Okay.  So at the time you wrote the

6          check on January 4th, the only thing

7          you would have received from Globe was

8          0018, which is the invoice showing a

9          due date of 11/28/03?

10   A.    Yes.

11   Q.    Okay.  And --

12   A.    Excuse me.

13   Q.    When you wrote the check, did you

14         enclose a stub or anything from Globe

15         Life with your payment that you can

16         recall?

17   A.    Yes.  I'm sure I did.

18   Q.    Okay.  You would have torn something

19         off of -- off of one of the invoices?

20         There's something on there you would

21         include with your payment?

22   A.    Yes.  But I don't remember if I did or

23         not.  All I know is I put the payment

7/25/2006                                    Karen Lurie Britton

Page 72

1       in the envelope --

2    Q.    Okay.

3    A.    -- and mailed it out on June the 4th,

4          2004.

5    Q.    Okay.  You put it in the mailbox on

6          June 4th -- I mean, January 4th?

7    A.    Yes.  Did I say June?  Forgive me.

8          January.

9    Q.    Okay.  January 4th you put the letter

10         in the mailbox at your house?

11   A.    Yes.

12   Q.    What time does the mail usually run

13         out at your house?

14   A.    It varies.

15   Q.    What's the general time?  In January

16         of 2004, do you remember when the mail

17         would run?  Afternoon?  Morning?  Late

18         afternoon?  Do you remember anything

19         like that?

20   A.    Usually ran around between 9 and 10 in

21         the morning.

22   Q.    Okay.  Do you remember any other

23         checks that you wrote on that Sunday?

7/25/2006                                        Karen Lurie Britton

Page 73

1        Because you said you paid -- you

2        usually paid your bills on Sunday.  Do

3        you remember any other checks that you

4        wrote on that Sunday?

5    A.  I think -- I don't remember.  Car

6        insurance or something.

7    Q.  And that would have gone -- or the

8        power -- I don't --

9            MR. SANSPREE:  You can't --

10           you can't sit here and

11           testify under oath to

12           stuff you don't remember.

13           If you don't remember,

14           that's fine.

15   A.  Okay.  I don't remember.

16   Q.  Okay.  And you would have put a stamp

17       on the letter and put it in your

18       mailbox, put up the little flag; and

19       the mail carrier would have come by

20       and gotten your mail out of your

21       mailbox on that Monday?

22   A.  Yes.

23   Q.  And that would be January the 5th?

Tiffany Beasley                Montgomery Reporting Service
(334) 262-3331                        (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 74

1    A.    Yes.

2    Q.    Okay.  I see that this check is

3          written on the Headland National Bank

4          account.  Chris and Karen Lurie are

5          the names on the account.  Were there

6          any other checking accounts that you

7          would write checks out of for family

8          type bills?

9    A.    No.

10   Q.    Okay.  This was the general family

11         checking account?

12   A.    Yes.

13   Q.    And the one that you would deposit

14         money that the family received into --

15   A.    Yes.

16   Q.    -- and pay, for example, the mortgage

17         or different premiums that are owed

18         out of this account?

19   A.    Yes.

20   Q.    Okay.  So then the next day on the

21         6th, after you -- after the mail runs

22         on the 5th, your husband dies on the

23         6th?

7/25/2006                                    Karen Lurie Britton

Page 75

1    A.    He was killed on the 6th.

2    Q.    And when is the next time you can

3          recall receiving any correspondence

4          from Globe Life?

5    A.    It would have been this, wouldn't it?

6    Q.    It would have been the letter?

7    A.    0020.

8    Q.    Okay.  That's the letter dated

9          January 2nd, 2004?

10   A.    Yes.

11   Q.    Okay.  So -- and I know I've asked you

12         this a couple of times, but I just

13         want to make sure we're on the same

14         page.  The check was dated

15         January 4th?

16   A.    Yes.

17   Q.    Put in the mailbox and taken by the

18         mail carrier on January 5th?

19   A.    I don't know what happened to it after

20         I put it in the mailbox on

21         January 4th.

22   Q.    You never saw it again after you put

23         it in the mailbox on --

Tiffany Beasley                    Montgomery Reporting Service
(334) 262-3331                              (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 76

1    A.      No, sir.

2                MR. SANSPREE:  Well, that's

3                    not actually true.  We've

4                    got it -- you're under

5                    oath.  You need to listen

6                    to his questions.

7                MR. PARKER:  I know.  You're

8                    right.  You're right.

9    Q.      You put it in the mail on the 4th.

10           Your mail doesn't run on Sundays;

11           right?

12   A.      Right.

13   Q.      Okay.  After it goes out on the -- on

14           the next day, you don't see this

15           envelope until it comes up -- the

16           check until it comes up again in this

17           lawsuit; that's correct?

18   A.      Yeah.

19   Q.      Okay.  And then after you mail it,

20           after you write the check, after your

21           husband passes away, you get a letter

22           from Globe Life that's marked here as

23           0020 that has the date of January 2nd,

Tiffany Beasley                 Montgomery Reporting Service
(334) 262-3331                          (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 77

1       2006, on it?

2   A.  I didn't write the check after my

3       husband passed away.

4   Q.  Let me make sure.  You write the

5       check; it's dated January 4th?

6   A.  Right.

7   Q.  You put it in the mail; husband passes

8       away; and then you receive a letter

9       from Globe, dated January 2nd, 2004?

10  A.  Yes.

11  Q.  Okay.  When you got the letter that's

12      marked as 0020, what did you do?

13  A.  I said, as I said before, I had

14      already made that payment, and I had

15      to have it there by the 17th.  And I

16      said, so I'm in good standing; it was

17      paid as they stated.

18  Q.  Okay.

19  A.  As Globe stated.

20  Q.  Did you contact them when you received

21      this letter and advise them that your

22      husband had passed away?

23  A.  Yes.

7/25/2006                                    Karen Lurie Britton

1    Q.    You did contact them?

2    A.    Yes.

3    Q.    Okay.  How long -- how many days after

4          you received this letter did you

5          contact them?

6    A.    The 12th.

7    Q.    Contacted Globe Life on January 12th?

8    A.    Monday, January 12th.

9    Q.    Okay.  And what can you recall about

10         that conversation with them?

11   A.    My attorney, Will Matthews, contacted

12         them on the 12th.  I was present in

13         his office.

14   Q.    Okay.  Can you remember anything about

15         the conversation?

16   A.    He -- he called to notify them of his

17         death, told them that he had been

18         killed on January the 6th, 2004, and

19         wanted to know what steps we had to

20         take -- he was helping me get my

21         paperwork up, claim.

22   Q.    Okay.  At that time did they look to

23         see if they had received the check

7/25/2006                                    Karen Lurie Britton

Page 79

1          that was referenced in -- on the

2          January 2nd letter?

3     A.   I don't know.

4     Q.   That never came up in the

5          conversation?

6     A.   They -- no.

7     Q.   Okay.  What did they tell your

8          attorney that he needed to do?

9     A.   They told him that -- that -- we told

10         them that the payment had been put in

11         the mail on the 4th, and they said

12         that it was okay so long it was

13         there -- it was there by the 17th; the

14         policy was still in effect.

15    Q.   Okay.  Did -- if you look at this

16         calendar and you see that the 12th is

17         a Monday and you just recalled calling

18         Globe with your attorney on the

19         12th --

20    A.   (Nods head.)

21    Q.   -- can you give me an estimate as to

22         when -- if you keep that date in mind,

23         when you may have received this

7/25/2006                                Karen Lurie Britton

Page 80

1    January 2nd letter?  Was it before you

2    made that call with your attorney on

3    the 12th?

4  A.    Yeah.

5  Q.    Okay.  So you already had the letter?

6  A.    Yeah.  Because it would have been a

7    couple of days.

8  Q.    Okay.  So would you agree with me that

9    in your recollection you received the

10   January 2nd letter sometime after your

11   husband passed away but before you

12   made the call on the 12th?

13 A.    Yes.

14 Q.    Okay.  Sometime between the 6th and

15   the 12th?

16 A.    Yes.

17 Q.    Were you checking your mail every day

18   when all of this was going on when

19   your husband had passed away, or did

20   you have mail that was kind of

21   stacking up around your house just

22   because you were busy with a lot of

23   things?

Tiffany Beasley              Montgomery Reporting Service
(334) 262-3331                          (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 81

1    A.    During that week, yeah, sure, I
2          checked the mail.  But he was buried
3          on Friday the 9th.
4    Q.    Okay.  You just don't recall when you
5          received the letter that was dated the
6          2nd?
7    A.    (Shakes head.)
8    Q.    Okay.  Do you recall receiving the
9          January 16th letter, the letter with
10         the 0001 on the bottom right?
11   A.    I don't recall the exact day, but I
12         know I received that after, you know,
13         they had accepted payment and after he
14         had died --
15   Q.    Okay.
16   A.    -- or was killed.
17   Q.    After you talked to Globe on the 12th
18         with your attorney or after your
19         attorney made the call and there was a
20         conversation with somebody at Globe,
21         can you recall other conversations you
22         had with anybody at Globe about this?
23   A.    I don't recall.

7/25/2006                                    Karen Lurie Britton

1    Q.    Okay.  Did you let your attorney make

2          the calls, or did you make some of the

3          calls?

4    A.    After that time over -- he made some.

5          I know I made a few.  I don't recall

6          exactly when.  It was, like, you know,

7          what is the status of this claim, you

8          know.  The first thing they would say

9          whenever a call was, I'd give them the

10         number, and they'd say, yes, this

11         policy is still in effect.

12   Q.    Okay.  After you -- after the

13         payment -- or let me ask this:  After

14         the due date of 11/28/2003 was

15         passed -- and I'm referencing the

16         invoice of No. 18 that has 11/28/03 as

17         the due date -- did you discuss with

18         your husband that you had -- that you

19         didn't make that payment?

20   A.    No.

21   Q.    Was there a reason why that payment

22         wasn't made?

23   A.    Well, just I was late on some bills.

7/25/2006                                    Karen Lurie Britton

1    Q.    Okay.  Can you recall --

2    A.    It was the holiday and just...

3    Q.    Can you recall any other bills that

4          you were late with in that November,

5          December time frame?

6    A.    No.  No.

7    Q.    Do you recall anybody that was at the

8          house or in any way had knowledge of

9          your making this payment and writing

10         this check on January 4th, 2004 -- and

11         one thing before I ask you that, it

12         says 2003 on this check.  Is this your

13         writing on LURIE 02 that says, check

14         should have said '04, my error; check

15         dated '03 by habit, new year, Globe --

16         can you help me with that word?

17   A.    I can't see it from here.

18             MR. SANSPREE:  What page?

19   Q.    02.

20             MR. SANSPREE:  There it is.

21   A.    Yes, that's my handwriting.

22   Q.    It says, check should have said '04,

23         my error; check dated '03 by habit,

7/25/2006                              Karen Lurie Britton

Page 84

1      new year; Globe corrected it, as you

2      can see; cashed it, accepted, for the

3      premium due by the 17th of

4      January 2004, Karen Lurie?

5  A.  Correct.

6  Q.  Okay.  That's your handwriting right

7      there.  Okay.  So the check that says

8      January 4, 2003, was written

9      January 4, 2004?

10 A.  Yes.

11 Q.  Okay.

12 A.  You write 2003 all year, you know, and

13     you just --

14 Q.  Okay.  Did you tell anybody that you

15     can recall that you had written that

16     check?

17 A.  No.

18 Q.  Okay.  Was there anybody in the house

19     that was with you helping you pay the

20     bills when you were making the

21     payment?

22 A.  No.

23 Q.  Okay.

7/25/2006                                    Karen Lurie Britton

Page 85

1    A.    The kids don't get involved in that.

2    Q.    Okay.  If you would, let me take you

3          through these documents real quick.

4          If you look at No. 1, I notice there's

5          a little bit of writing on the

6          right -- I'm sorry; it's going to be

7          on the left-hand side, received after

8          death after accepting payment?

9    A.    Uh-huh.

10   Q.    Is that your writing there?

11   A.    Yes.

12   Q.    Okay.  Do you remember when you wrote

13         that or why you wrote that?

14   A.    It was jotted down for attorney's

15         notes, just what each document was in

16         reference to.

17   Q.    Okay.  And that's the same with 2;

18         that's just a note that you made?

19   A.    Exactly.

20              MR. SANSPREE:  I don't know

21                 what 3 is.

22   Q.    I don't know what 3 is either.  Four

23         is a letter from William Matthews,

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

1          your attorney, to Globe discussing the

2          death?

3     A.   Yes.

4     Q.   And you would get copies of those

5          letters from your attorney; is that

6          right?

7     A.   Yes.

8     Q.   Okay.  The next one appears to be some

9          correspondence from Globe where they

10         returned the payment to you, the

11         33.60?

12    A.   Yes.  It went to Will Matthews, not

13         me.

14    Q.   Okay.  And then the check is the next

15         page, the refund check; is that right?

16    A.   Yeah.  And notice this -- records

17         indicate a premium payment in the

18         amount of 33.60 was received in our

19         office on January 16th.  Which is

20         before the 17th when it had to be

21         there.

22    Q.   When you wrote the check on the 4th,

23         when did you think it needed to be to

Tiffany Beasley                Montgomery Reporting Service
(334) 262-3331                        (877) 834-6048

7/25/2006                                    Karen Lurie Britton

1         the -- to Globe Life?

2    A.    It had to be there before the 17th of

3         January.

4    Q.    How did you know that?

5    A.    Well, at the time of writing the

6         check, I hadn't received this yet so I

7         wouldn't have known that.

8              MR. SANSPREE:  When you say

9                   "this," you need to

10                  identify it for the

11                  record, because she

12                  doesn't know what you're

13                  talking about.

14   A.    Speaking of 020.

15   Q.    So that's my question.  How did you

16        know when it needed to be over to

17        Globe Life in order to -- to still

18        have the policy in effect?

19   A.    Well, when I was doing my bills, I saw

20        that it needed to be paid, so I paid

21        it.

22   Q.    But you didn't know when it needed to

23        make it to Globe Life by?

7/25/2006                                Karen Lurie Britton

Page 88

1    A.    No.  I mailed the check on the 4th and
2          then, like I say, later on that week
3          or so, I got this and looked back --
4                MR. SANSPREE:  When you say
5                     "this," please identify
6                     it for the record,
7                     please.
8    A.    I'm sorry.
9    Q.    The letter of January 2nd?
10   A.    Still speaking of 020.
11   Q.    So when you wrote the check on the
12         4th, you didn't know when it needed to
13         make it to Globe; would that be a fair
14         statement?
15   A.    Uh-huh, yes.
16   Q.    Because you hadn't received the letter
17         of January 2nd?
18   A.    Yes.
19   Q.    Let's see.  Number 10 has a note on
20         the top of.  It says Check No. 350 for
21         33.60 mailed by me and paid on 1/4/05,
22         posted on 1/21/04, paren, cleared; is
23         that what that says?

7/25/2006                                    Karen Lurie Britton

Page 89

1   A.    Yeah, that's what it says.

2   Q.    Okay.  And when it says, posted, does

3         that mean it went through your bank on

4         the 21st?

5   A.    I assume.

6   Q.    Okay.  That's your writing?

7   A.    I know it's my writing, but I'm

8         trying -- you know, I'm having to

9         remember --

10  Q.    Sure.  Sure.

11  A.    -- back.  I paid it on 1/4; posted

12        on -- cleared, question mark.  It

13        was --

14              THE WITNESS:  You can jump in

15                 there any time.

16              MR. SANSPREE:  I can't answer

17                 the questions.  I wish I

18                 could, but I can't.

19  A.    I don't know how --

20  Q.    I'm just trying to confirm that that's

21        your writing, and I'm just trying to

22        get an idea if posted means -- and you

23        may not remember -- but posted might

7/25/2006                                    Karen Lurie Britton

Page 90

1       mean that that's when it cleared your

2       checking account; is that what posted

3       means to you?

4   A.   Yeah.  Yeah.  Because they received

5        the payment prior to that.

6   Q.   Okay.

7   A.   I believe they received the payment on

8        the 16th.

9   Q.   Okay.  And then the next couple of

10       pages, I guess, 11, 12, 13, 14, 15,

11       and 16, are -- that's the actual

12       policy?

13  A.   Uh-huh.

14  Q.   And the page that shows the benefits

15       and how much your premium is going to

16       be and that type information; is that

17       correct?

18  A.   Yes.

19  Q.   Okay.  There's -- I see there's a mark

20       on Page 13 and Page 14.  There's a

21       line drawn down there.  Is that --

22            MR. SANSPREE:  Thirteen.

23  Q.   And a star.  There's a star on 13 and

7/25/2006                               Karen Lurie Britton

1        a line on 14?

2   A.   Uh-huh.

3   Q.   Is that a mark that you would have

4        made, or if you have any idea who made

5        it?

6   A.   That's probably -- I was reading over

7        this and highlighted these areas,

8        because on Page 14, where it states,

9        written notice of claim must be given

10       within 20 days after accidental death

11       or as soon as reasonably possible --

12       they had already received the payment

13       prior to that and -- well, and then

14       Will got up with them on the 12th,

15       which was, you know, ample time to

16       abide by that.

17            MR. SANSPREE:  You just need

18                 to answer his question.

19  A.   Well, I'm trying -- did I underline

20       that?  Yes.

21  Q.   Okay.

22  A.   Why did I underline it?  Okay.  (As

23       read:) Unless accepted by us under the

Tiffany Beasley              Montgomery Reporting Service
(334) 262-3331                        (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 92

1      reinstatement provision in the

2      certificate.

3              MR. SANSPREE:  You just need

4                  to answer the question

5                  that he's asked.

6  A.   Okay.  What's the question?  I'm

7      sorry.

8  Q.   I just asked if you drew the line

9      under it, and if you can recall why

10     you underlined it?

11 A.   That's what I was responding to.  When

12     you wanted to know why.

13 Q.   Okay.

14 A.   That's what I was -- these were --

15     this was paperwork I was sending to

16     the attorney's office, and in that

17     reinstatement provision, the premium

18     was received by Globe before the 17th.

19     That was just like, look at this and

20     see if this is where -- this is for

21     them.

22 Q.   Okay.  Seventeen is a note, appears to

23     be in your handwriting; is that right?

7/25/2006                                    Karen Lurie Britton

Page 93

1    A.    Yes.

2    Q.    Okay.  And just to save time, it says,

3          payment made on January 4th, $33.60,

4          Check No. 950, mailed on January 5th,

5          2004.  Chris was killed on January 6,

6          2004.  Received notice from Globe on

7          or around January 12th?

8    A.    Uh-huh, yes.

9    Q.    Would that be the January 2nd letter

10         that we've been talking about, that

11         received notice from Globe?

12   A.    Yes.

13   Q.    So when you say, received notice from

14         Globe on or around January 12th, that

15         would probably be the January 2nd --

16         the letter dated January 2nd?

17              MR. SANSPREE:  Which is

18                   Bates-marked 020.

19   A.    Yes.

20   Q.    And then it says, notice generated on

21         January 2nd, but not postmarked until

22         January 7th?

23   A.    Yeah.

7/25/2006                                    Karen Lurie Britton

Page 94

1    Q.    Do you still have the letter -- the
2          actual envelope that that January 2nd
3          letter came in?
4    A.    No.
5    Q.    Do you -- did it get discarded?  Do
6          you have any idea where it might be?
7    A.    It's gone.
8    Q.    Okay.
9    A.    Yeah.
10   Q.    And then it says, check written on
11         January 4th mailed out January 5th,
12         postmark.  Have you seen the envelope
13         that your check was in since it left
14         your possession?
15   A.    No.
16   Q.    Okay.  Do you remember when you wrote
17         this 0017, when you wrote this note?
18   A.    No.
19   Q.    We've already talked about 18.
20         Nineteen has a note on it.  It says,
21         Will phone number.  Is that Will
22         Matthews' phone number?
23   A.    His office, yes.

Tiffany Beasley                Montgomery Reporting Service
(334) 262-3331                      (877) 834-6048

7/25/2006                                    Karen Lurie Britton

1   Q.    Office number, okay.  Twenty, we've
2         talked about.  And is that your
3         writing on the right-hand margin of
4         20?
5   A.    Yes.
6   Q.    Okay.  And you note, mailed
7         January 5th, 2004; received by Globe
8         January 16, '04?
9   A.    It was put in the box on January the
10        4th.
11  Q.    Next one is a copy of a check but with
12        no writing.  And 22 is the back of
13        your check?
14  A.    That's what it appears to be.
15  Q.    Do you know where you got this -- the
16        back of the check from?
17  A.    Off of the cleared check.
18  Q.    Okay.  That you got back from the
19        bank?
20  A.    Yes.
21  Q.    Okay.  Your bank statement?
22  A.    Yes.
23  Q.    Okay.  Then, let's see, 23 is a letter

Page 96

1        from Globe to your attorney?

2    A.   Yes.

3    Q.   Okay.  Twenty-four is the request for

4        premium due January 28th?

5    A.   Yeah.

6    Q.   And you didn't pay that one?

7    A.   Why, no.

8    Q.   Okay.  Twenty-five appears to be the

9        same letter that we've seen before in

10       0020, except for it's turned over a

11       different direction.

12   A.   Yes.

13            MR. SANSPREE:  We probably

14               copied those, George, a

15               couple of times.

16            MR. PARKER:  Sure.

17   Q.   Twenty-six looks like the same thing

18       as 18 just turned in, maybe, a

19       different direction?

20            MR. SANSPREE:  It is.  We

21               probably just copied

22               these documents twice,

23               George.  Eighteen.

7/25/2006                                    Karen  Lurie  Britton

                                                        Page 97

1    A.      Okay.  Yes.

2    Q.      Okay.  And then if you would, look

3            through 27 to 33, and those records

4            appear to be some medical records

5            associated with making the accident

6            claim?

7    A.      Yes.

8                    MR. SANSPREE:  Look through

9                    these before you answer

10                   any questions.  He said

11                   look through 27 through

12                   33.

13   A.      Yes.

14   Q.      Okay.  And then I think we may be

15           looking at some duplicates --

16           Documents 0034 through 0041, and I

17           think may be documents we've already

18           seen before, just documents regarding

19           the coverage and the policy type and

20           the policy provisions.

21                   MR. SANSPREE:  Did you

22                   understand the question?

23   A.      Yes.

Tiffany Beasley                 Montgomery Reporting Service
(334)  262-3331                        (877)  834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 98

1    Q.    Does that appear to be what those

2          pages are?

3    A.    Yes.

4    Q.    Let me ask you about 42 and 43.  This

5          looks like a brochure that may have

6          been a two-sided brochure that -- with

7          a folded up -- I mean like a tri-fold?

8    A.    Yes.

9    Q.    Have you seen that before?

10   A.    Yes.

11   Q.    Was that some information about the

12         policy that your husband may have

13         looked at before he took it out?

14   A.    Yes.

15   Q.    Okay.  And then the rest of the

16         documents are documents that you've

17         received from Globe mailed to David

18         since his death; those are just copies

19         of mailings maybe you've received from

20         Globe?

21   A.    Yes.

22              MR. SANSPREE:  Again, look

23                   through them all.  I

7/25/2006                                    Karen Lurie Britton

Page 99

1              don't think you're trying

2              to pull anything on her,

3              George; I just want to

4              make sure she's right.

5          MR. PARKER:  Just

6              double-check.  I think

7              that's what it is, but

8              double-check.

9    A.    Those are...

10         MR. SANSPREE:  Go ahead and

11             answer if you want to

12             answer.

13   A.    Yes.  Those are the same type -- same

14         type mail that still invades my

15         mailbox two years after his death.

16   Q.    You're still getting that mail today?

17   A.    Yeah.

18   Q.    I've got a couple of documents here.

19         Those are marked as C.  I've got a

20         couple here I'm going to mark as D.

21         And there are a couple of records out

22         of what I think Globe has produced

23         to --

Tiffany Beasley                 Montgomery Reporting Service
(334) 262-3331                        (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 100

1              (The referred-to document was

2              marked for identification as

3              Defendants' Exhibit No. D.)

4         MR. SANSPREE:  George, if

5              you'll throw me that

6              clamp, I was going to

7              clamp this together.

8    Q.    Here's a group of documents that Globe

9          has produced to your attorney.

10             MR. PARKER:  I think you've

11             already gotten those.  I

12             just want to ask her

13             about a couple of those

14             pages.

15   A.    Yeah.

16             MR. SANSPREE:  Yeah.  Seen

17             those.  Death certificate

18             and everything.

19   Q.    Looks like the top document in this

20         group of documents that are marked

21         collectively as D is a letter to Globe

22         from your attorney, where he was

23         trying to get some information

7/25/2006                                    Karen Lurie Britton

Page 101

1          together that they requested; is that

2          what that letter appears to be?

3     A.   Yes.

4     Q.   Okay.  And --

5               MR. SANSPREE:  Just for the

6                    record, "they requested"

7                    would be Globe Life?

8               MR. PARKER:  Yeah.

9     Q.   0015 is -- is that a copy of the

10         application that your husband took out

11         in order to get this policy, if you

12         know?

13    A.   I don't know.

14    Q.   Okay.  You don't know.

15               (Off-the-record discussion.)

16    Q.   And then the rest of these, I think,

17         are documents that are associated with

18         records that may have been sent to

19         Globe by your attorney?

20    A.   (Nods head.)

21    Q.   Okay.

22    A.   Yes.

23    Q.   Okay.  I'm going to mark these

1        responses that you've already made in

2        this case as E.  I just have a couple

3        of questions out of these.  Do you

4        remember signing off on these

5        interrogatories, these responses that

6        your attorney may have helped you

7        prepare?

8                    (The referred-to document was

9                     marked for identification as

10                    Defendants' Exhibit No. E.)

11               MR. SANSPREE:  Let me get to

12                    it, George.

13               MR. PARKER:  Sure.

14    A.    Yes.

15    Q.    Okay.  On Question No. 2 on the second

16        page of those documents, there's a

17        question that asks the names, address,

18        telephone number of each person who

19        has knowledge of any of the

20        allegations contained in the

21        complaint.  And listed are Philip

22        Christopher Lurie and yourself and

23        Michael Britton.

7/25/2006                              Karen Lurie Britton

Page 103

1   A.      Yes.

2   Q.      Are there any other persons that know

3           anything about any of the facts and

4           circumstances surrounding this

5           dispute?

6   A.      No.

7   Q.      Okay.  What does Philip -- or what

8           does Christopher know -- what does he

9           know about it?

10  A.      Just that Globe didn't pay up like

11          they were supposed to.

12                  MR. SANSPREE:  And, George,

13                  just so -- because I know

14                  we're in federal court,

15                  and I want to make sure

16                  you know about all the

17                  witnesses -- we may call

18                  her first attorney, Will,

19                  because there was a phone

20                  call.  So make a note

21                  that we need to

22                  supplement this response

23                  so it's not held against

Tiffany Beasley                Montgomery Reporting Service
(334) 262-3331                         (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                Karen Lurie Britton

1              me later on.

2                   MR. PARKER:  Sure.

3      Q.    So Will Matthews, he knows?

4      A.    He notified them of his death, Globe.

5            He notified Globe of Chris's death.

6      Q.    And you already mentioned one

7            conversation that you had while he was

8            talking to Globe on the 12th?

9      A.    Yes.

10     Q.    And you've shown me some letters that

11           he wrote on your behalf to Globe?

12     A.    Yes.

13     Q.    Okay.  Philip -- or, I'm sorry,

14           Christopher, did he ever talk to

15           anybody at Globe that you know of?

16     A.    No.

17     Q.    He didn't see you write the check or

18           put the check in the mail?

19     A.    No.

20     Q.    He just knows that you've talked about

21           Globe not paying in this case?

22     A.    He was aware of that.

23     Q.    Okay.  Is that extent of what he

7/25/2006                                    Karen Lurie Britton

Page 105

1      knows?

2   A.    Yes.

3   Q.    Okay.  Will -- what does your husband

4         Michael know about the facts and

5         circumstances of this case?

6              MR. SANSPREE:  I mean, just to

7                   state that what does she

8                   know that he knows.  I

9                   mean, she really -- you

10                  may just want to call him

11                  and ask him.

12             MR. PARKER:  That's true.

13             MR. SANSPREE:  But answer the

14                  question.  I was just

15                  making sure that you're

16                  not going to sit here and

17                  tell him everything he

18                  knows if you don't know.

19                  But you tell him what you

20                  know he knows.

21  A.    I know he's aware of the fact that

22        Globe didn't pay me.

23  Q.    Okay.  He's aware of the lawsuit; he's

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 106

1        aware of your contention that they

2        didn't pay, those type things?

3    A.  Yes.

4    Q.  He has no knowledge of when the check

5        was written or all that?

6    A.  No.

7    Q.  How long have you known Michael?

8    A.  We met May 15th.

9            MR. SANSPREE:  How do you

10               remember all these dates?

11   A.  Because I'm ready.

12           MR. SANSPREE:  I can't

13               remember anything.

14   A.  Wait a minute -- because, see -- you

15       know, January jumps in the middle of

16       things.

17   Q.  Sure.

18   A.  So May -- May 2004.

19   Q.  Okay.

20   A.  May 15th, '04.

21   Q.  Okay.  So you didn't meet him until

22       after your husband passed and after

23       you had written the check and after

7/25/2006                                    Karen Lurie Britton

Page 107

1       you --

2   A.   Yes.

3   Q.   Okay.  There's some doctors listed

4        here as -- in No. 9 as doctors,

5        hospitals, pharmacists, medical

6        providers, or healthcare providers

7        that provided you with medical

8        treatment for the emotional distress

9        alleged in your complaint?

10  A.   What number?

11            MR. SANSPREE:  He was reading

12               the question to you.

13  A.   Yes.

14  Q.   Okay.  Did you -- do all these --

15       well, does Dr. Cook work at First Med?

16  A.   Yes.

17  Q.   Okay.  Did you see Dr. Cook because of

18       your allegations that Globe Life

19       didn't pay on this policy?  Is that

20       the reason why you had to go see him?

21  A.   I had gone and seen him initially, I

22       guess, a month or so after Chris's

23       death for depression and -- as far as

7/25/2006                                    Karen Lurie Britton

Page 108

1          having to go and see Dr. Cook for --
2          because Globe didn't pay as they
3          should, no.
4     Q.   You did not see Dr. Cook because of
5          anything having to do with this
6          lawsuit relating to Globe Life not
7          paying your claim?
8     A.   Not that I remember, no.
9     Q.   Same question for Dr. Faulk.  Is that
10         Paulk?
11    A.   It's supposed to be Paulk, yes.
12    Q.   Same question for him.
13    A.   Yes.
14    Q.   You did see him because of your
15         allegations that Globe should have
16         paid the claim but did not?
17    A.   Well, just trying to remember.  I know
18         you want a simple yes or no.  I will
19         say no at this time.
20    Q.   Okay.  How about any doctors at
21         Westgate Parkway?
22    A.   That's the address of Dr. Cook and
23         Dr. Paulk.

7/25/2006                                    Karen Lurie Britton

Page 109

1    Q.    Okay.

2               MR. SANSPREE:   He's asking

3                      about any doctors there.

4    Q.    Yeah.  First Med is on Westgate

5          Parkway?

6    A.    Yes.  Yes, sir.

7    Q.    And Dr. Cook and Dr. Paulk work

8          together?

9    A.    Yes, sir.

10   Q.    Okay.  You've seen them for different

11         health-related reasons both before and

12         after your husband passed away?

13   A.    Yes.

14   Q.    Okay.  But as you sit here today,

15         you're not saying that you saw them

16         specifically because of the

17         allegations against Globe Life in your

18         complaint?

19   A.    Not specifically, no, but the

20         allegations against Globe would not

21         have come about had it not been linked

22         to the fact that Chris died.  Chris

23         died, and I was in a really sad state,

Tiffany Beasley                  Montgomery Reporting Service
(334) 262-3331                              (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 110

1          so that fed into it.

2    Q.    Would you agree with me that you saw

3          them because of your having to deal

4          with the death --

5    A.    Yes.

6    Q.    -- rather than because of this lawsuit

7          or the issues around the Globe Life

8          case?

9    A.    Yes.  It was six months off and on

10         that I saw them, if I recall right.

11         That's what I'm trying to remember.

12         And during which time, the claim was

13         denied, if I recall correctly.

14              MR. SANSPREE:  Listen to his

15                   question.

16   Q.    I'm just trying to find out if you saw

17         Dr. Cook, as asked in the question,

18         for medical treatment for the

19         emotional distress alleged in your

20         complaint that you allege was caused

21         by Globe?

22   A.    Yes.

23   Q.    Okay.  And the same for Dr. Paulk?

7/25/2006                                          Karen Lurie Britton

Page 111

1    A.    Yes.

2    Q.    So you saw them for emotional distress

3          allegedly caused by Globe Life?

4    A.    I'm not sure.

5    Q.    Okay.  You said you saw Dr. Cook

6          before your husband passed away for

7          depression?  Did I hear that right?

8    A.    No.

9    Q.    Never before -- you never were treated

10         for depression --

11   A.    No.

12   Q.    -- before --

13   A.    No.  Never.

14   Q.    After you saw him for depression?

15   A.    Never had, no.

16              MR. SANSPREE:  He's asking you

17                   after his death, you saw

18                   him for depression;

19                   right?

20   A.    Yes.

21   Q.    But not before; you did not see him

22         for depression before the death?

23   A.    No.

7/25/2006                                    Karen Lurie Britton

Page 112

1    Q.    Got you.  Same question for Dr. Paulk,
2          did you see him for depression-related
3          issues after your husband passed away?
4    A.    Yes.
5    Q.    Okay.  And then it says, director of
6          funeral home referred you to a grief
7          counselor.
8    A.    Yes.
9    Q.    And you spoke to this person,
10         apparently, over the phone?
11   A.    Yes.
12   Q.    Okay.  Did that -- did any discussions
13         with this grief counselor have
14         anything to do with the emotional
15         distress you claim Globe Life has
16         caused you?
17   A.    No.
18   Q.    Okay.  Have you talked to or relied on
19         any of your family or friends to help
20         you cope with emotional distress that
21         you claim that Globe Life has caused
22         you?
23   A.    Repeat that.

Tiffany Beasley                    Montgomery Reporting Service
(334) 262-3331                              (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 113

1    Q.    Okay.  Have you relied on family
2          members or friends to help you cope
3          with the emotional distress that you
4          claim Globe Life has caused you?
5    A.    Yes.
6    Q.    Okay.  Who are those persons?
7    A.    My husband.
8    Q.    Anybody else that you can recall?
9    A.    No.
10   Q.    Okay.  Tell me about the emotional
11         distress that you claim Globe Life has
12         caused you.
13   A.    I don't know how to answer that.
14         Honestly.
15   Q.    Okay.  You're claiming mental anguish
16         in this case, or emotional distress?
17   A.    Yes.
18   Q.    Okay.
19   A.    What did I mean by that?
20   Q.    Sure.
21   A.    I had a husband of 22 years, and he
22         was the bread winner, and he died, and
23         I was left with two teenage boys and

1    no income.  And when I -- relying on

2    the policies and the financial

3    provisions he had made for me should

4    anything ever happen to him, and then

5    finding that Globe was denying that

6    responsibility to fulfill the claim,

7    was pretty emotional and left me in a

8    pretty bad situation.

9    Q.    Did you have some savings that you

10          could rely on after he passed away, or

11          how did you make ends meet after he

12          did pass away?

13   A.    I didn't have any savings.  I had

14          that -- the amount that I stated that

15          CNA paid.

16   Q.    And the auto insurance?

17   A.    Yeah.  I had to pay for the funeral

18          expenses out of that, which was right

19          at 8,000.  I had to pay all of the --

20                MR. SANSPREE:  Just answer

21                      what he asked you.

22   Q.    Did -- have you talked to any

23          expert-type witnesses in this case

7/25/2006                                    Karen Lurie Britton

1       about your -- your case or any

2       opinions they may want to make, if you

3       know?

4    A.    No.

5    Q.    Never spoken to anybody?

6    A.    (Shakes head.)

7    Q.    Tell me in your words what -- you may

8       have already told me; if you want to

9       rely on what you've already told me,

10      that's fine -- but what do you contend

11      that Globe did wrong in this case?

12              MR. SANSPREE:  Can we get her

13                  some tissue?  Would you

14                  like a tissue?

15   A.    Globe didn't pay as they should have.

16      They didn't fulfill the claim.

17   Q.    Other than the doctors that we talked

18      about just a minute ago, are there any

19      other doctors that you have seen

20      because of any of the issues relating

21      to this lawsuit?

22   A.    No.

23   Q.    Okay.  Do you have any appointments

7/25/2006                                    Karen Lurie Britton

Page 116

1          scheduled in the future with any

2          doctors or psychiatrists,

3          psychologists, therapists, or any type

4          counselor for any of the issues

5          pertaining to this lawsuit against

6          Globe?

7     A.   No.

8     Q.   Okay.  It's your testimony under oath

9          here today that you did not send in a

10         check to Globe for the amount of the

11         premium after your husband passed

12         away?

13    A.   Repeat that.

14    Q.   It's your testimony here under oath

15         that you did not send in the check

16         that we've looked at here today for

17         the premium after your husband passed

18         away?

19    A.   It is my testimony that I did not send

20         in the premium after my husband passed

21         away.  No, I did not send in the

22         payment after he passed away.

23    Q.   Okay.

7/25/2006                                    Karen Lurie Britton

Page 117

1    A.    Did I get that right?  Well, you kind

2          of twisted --

3                MR. SANSPREE:  He's not -- he

4                      just wants to know

5                      whether or not you sent

6                      the payment in after he

7                      died.

8    A.    No, I did not send the payment in

9          after he died.

10   Q.    All right.  If you give me five

11         minutes, I think I'm about through.

12               (Brief recess taken.)

13   Q.    I should have asked you this before

14         when we were talking about your

15         husband's accident, but I forgot to

16         ask you.  How did you find out

17         about -- that he had been in a wreck,

18         and when did you find out about it?

19   A.    Strange car pulled up in my driveway,

20         and I didn't know who it was.  And I

21         went to the door, and this big tall

22         white-haired man staring at me kind of

23         funny met me at the door.  And I said,

7/25/2006                                        Karen Lurie Britton

Page 118

1        yes; and he said, are you alone?  And

2        I said, yes, why?  And he said, is

3        Chris your husband?  And I said, yes.

4        And he said, well, he's been killed.

5        Just like that.  And I hit the ground.

6    Q.   Did -- and then did you go out to the

7        scene or go to the hospital?

8    A.   No.  There was no hospital involved,

9        and, no, nobody would let me go.  And

10       they said it was so bad.

11   Q.   Okay.  Do you have any -- we talked

12       about the funeral expenses -- and I

13       don't know if this is exactly the

14       answer to this question I'm fixing to

15       ask, but do you have any out-of-pocket

16       expenses associated with this case or

17       this claim that you're making against

18       Globe?

19   A.   I don't understand what you --

20   Q.   Do you have any out-of-pocket expenses

21       that you've had to pay yourself as a

22       result of this case and your dispute

23       with Globe?

7/25/2006                                    Karen Lurie Britton

Page 119

1    A.    I had to pay -- are you speaking of
2          paying off bills, or are you
3          speaking --
4              MR. SANSPREE:  Just -- I mean,
5                    I've got her on a
6                    contingency-fee basis, so
7                    she hasn't had to pay me.
8    Q.    Sometimes when there's a lawsuit and
9          somebody is suing somebody else there
10         will be items that the person suing
11         another will claim she's had to pay
12         because of what somebody else has
13         done, out-of-pocket expenses
14         associated with the wrong alleged in
15         the complaint.  And what I'm asking is
16         do you have any of those type
17         out-of-pocket expenses associated with
18         this case of any sort?  And it may be
19         something that you don't.  I'm just
20         asking if you know of any
21         out-of-pocket expenses you've had to
22         pay because of your dispute with
23         Globe.

Tiffany Beasley                 Montgomery Reporting Service
(334) 262-3331                           (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 120

1    A.    No, not that I recall.

2    Q.    Do you have any expenses that you

3          anticipate having to pay in the future

4          because of what you claim Globe may or

5          may not have done?

6    A.    No.

7    Q.    Okay.  In this case, you've sued Globe

8          for breach of contract, and you've

9          also sued them for bad faith.  And

10         what I'm asking is, are you alleging

11         that Globe failed to investigate your

12         claim?

13   A.    Repeat that.

14   Q.    Okay.  Well, let me ask you this:  One

15         of the allegations in your complaint

16         is that Globe Life has intentionally

17         and in bad faith failed and refused to

18         properly pay or investigate

19         plaintiff's claim for accident --

20         accidental death benefits.  And let me

21         ask you, do you have any first-hand

22         knowledge or evidence that Globe Life

23         intentionally and in bad faith failed

7/25/2006                                        Karen Lurie Britton

Page 121

1          to investigate this claim?

2      A.    Yes.

3      Q.    Okay.  What is it?

4      A.    Well, they led me to believe all along

5            that they were going to fulfill this

6            claim, and then told me they were

7            cutting a check.  I said, okay.  And

8            then, in fact, did receive a check,

9            but it was a reimbursement check of my

10           premium.

11     Q.    Okay.  Is that the evidence that you

12           have that Globe intentionally and in

13           bad faith failed to investigate your

14           claim?

15     A.    Yeah.  The payment was made -- the

16           payment was made when it had to be

17           there.  The policy was still in

18           effect, had not lapsed.  And they

19           didn't pay me what they owed me.

20     Q.    Are you alleging in this case that

21           Globe had no arguable reason for re --

22           for refusing to pay the benefits owed

23           to you?

7/25/2006                                          Karen Lurie Britton

                                                              Page 122

1    A.       Rephrase that.

2    Q.       Okay.  Are you saying in your

3             complaint that Globe had no arguable

4             reason for failing or refusing to pay

5             the benefits that you allege are owed

6             to you?

7                     MR. SANSPREE:  I'm going to

8                     have to object to that.

9                     Arguable is legal,

10                    George.  I mean, can you

11                    rephrase it?

12                    MR. PARKER:  Sure.

13   Q.       Are you alleging in your complaint

14            that Globe had no reason for refusing

15            to pay the amounts that you allege

16            were owed?

17   A.       Yes.

18   Q.       If -- if this payment was made

19            after -- I know what you've told me; I

20            know what your testimony has been --

21            but if the payment was made after your

22            husband had passed, would you think

23            that Globe would owe money under this

Tiffany Beasley                    Montgomery Reporting Service
(334) 262-3331                            (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 123

1        policy?

2                  MR. SANSPREE:   Same objection.

3                     You have to answer, but I

4                     was objecting.   It

5                     depends on a lot of

6                     things.

7    Q.   I'm asking you a hypothetical, but

8         under the facts that we know of -- and

9         I know what you've already testified

10        about -- but under the facts that we

11        know of, if a payment was made by

12        somebody else under the same and

13        similar circumstances after the person

14        on the policy had deceased, would you

15        think that the insurance company would

16        still owe payments under that

17        scenario?

18                  MR. SANSPREE:   Object to the

19                     form of the question.   Go

20                     ahead and answer it.

21   A.   Payment being made or payment being

22        received by Globe?

23   Q.   Payment being sent in and mailed.

Tiffany Beasley              Montgomery Reporting Service
(334) 262-3331                        (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                Karen Lurie Britton

Page 124

1              MR. SANSPREE:   After --
2    Q.    The check being written and the check
3          being mailed after that person had
4          died.
5    A.    Mailed in after that person -- written
6          and mailed in after that person died
7          in a hypothetical situation, would I
8          think --
9    Q.    That the insurance company would have
10         to pay the benefits under the policy?
11   A.    In a perfect situation like that, no.
12         But with all other -- you know, people
13         have other...
14   Q.    Okay.  Let's assume that -- that the
15         exact same set of circumstances
16         happened to somebody else, not you,
17         and --
18              (Off-the-record discussion.)
19   Q.    In your case and you've already
20         testified you mailed the check on
21         the -- you wrote the check on the 4th,
22         mailed the check on the 5th.  Let's
23         assume somebody else with the exact

Tiffany Beasley              Montgomery Reporting Service
(334) 262-3331                       (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 125

1        same set of facts happened to them,

2        but that person, the widow in that

3        case, mailed the check on the 8th,

4        wrote the check and mailed the check

5        on the 8th to Globe Life -- you follow

6        me?

7    A.  But it can't be that way.  If you say

8        that she wrote the check and mailed

9        the check in the same -- like I did,

10       in the same situation, before he

11       died --

12   Q.  Right.  I'm saying --

13               MR. SANSPREE:  He's asking if

14                   it's after.

15   Q.  The only thing difference -- the only

16       thing different would be instead of

17       the way you say it happened, the

18       person in Scenario B wrote the check

19       on the 7th, after somebody had died,

20       and mailed the check on the 7th, after

21       somebody had died, and it was received

22       by the insurance company on the 16th,

23       under those circumstances, would you

7/25/2006                                    Karen Lurie Britton

Page 126

1        say that the insurance company

2        should -- should pay that claim?

3   A.   Are you trying to trick me?

4              MR. SANSPREE:  He's just

5                  asking you a hypothetical

6                  question.

7   Q.   I'm just asking you a hypothetical.

8   A.   No.  I don't guess.

9   Q.   Okay.  Did anybody do your -- you and

10       your husband's taxes around the 2003,

11       2004 time frame, or did y'all just do

12       them yourselves?

13  A.   I did.

14  Q.   You did them?

15  A.   I believe, yeah.

16            (Off-the-record discussion.)

17  Q.   Okay.  I think that's all I have.

18            (Off-the-record discussion.)

19                 EXAMINATION

20  BY MR. SANSPREE:

21  Q.   I'm going to show you what I've marked

22       as Plaintiff's 1.

23            (The referred-to document was

Tiffany Beasley              Montgomery Reporting Service
(334) 262-3331                         (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

Page 127

1              marked for identification as

2              Plaintiff's Exhibit No. 1.)

3          MR. PARKER:  Is that the --

4          MR. SANSPREE:  My subpoenas,

5              yeah.

6          MR. PARKER:  Can I look at

7              that?  Do you have it

8              marked?

9          MR. SANSPREE:  I just took a

10             page out.

11         MR. PARKER:  Okay.

12         MR. SANSPREE:  What I did is I

13             usually just write a

14             letter -- when you send a

15             subpoena, I just write a

16             letter saying give them

17             to me too.

18   Q.     In Plaintiff's 1, do you see Check No.

19          949 down at the bottom left-hand

20          corner?

21   A.     Yes, I do.

22   Q.     And what's the date on 949?

23   A.     1/4/04.

7/25/2006                                    Karen Lurie Britton

Page 128

1    Q.    And then do you see at the top or in

2          the middle of left-hand side, Check

3          No. 951?

4    A.    Yes, I do.

5    Q.    And what date is that?

6    A.    1/8/04.

7    Q.    I show you what I'm going to mark as

8          Plaintiff's 2.

9                (The referred-to document was

10                marked for identification as

11                Plaintiff's Exhibit No. 2.)

12               MR. PARKER:  Can I come behind

13                y'all?

14               MR. SANSPREE:  Yeah.

15   Q.    I show you on top of Plaintiff's 2 at

16         the top left-hand corner, do you see

17         where it's Check No. 950, which is the

18         check at issue in this case; do you

19         see that?

20   A.    Yes.

21   Q.    And what is the date at the top of the

22         Check 950?

23   A.    1/4/03.

Tiffany Beasley                    Montgomery Reporting Service
(334) 262-3331                              (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                          Karen Lurie Britton

Page 129

1    Q.    And, just for the record, again, Check
2          No. 949, which is before 950, is dated
3          what date?

4    A.    1/4/04.

5    Q.    And you mailed -- did you mail 949 at
6          the same time you mailed Check No.
7          950?

8    A.    Yes.

9    Q.    Back to Defendants' Exhibit C, which
10         is Lurie 001, what's the date of that
11         notice -- premium notice?

12   A.    Here?

13   Q.    Yes, ma'am.

14   A.    January 16th, 2004.

15   Q.    Is January 16th, 2004, is that after
16         your husband's death?

17   A.    Yes, it is.

18   Q.    Is that after you and Mr. Matthews
19         notified Mr. Matthews of your
20         husband's death?

21   A.    Yes, it is.

22   Q.    And what date did you notify Globe
23         Life of your husband's death with

7/25/2006                                          Karen Lurie Britton

Page 130

1          Mr. Matthews?

2     A.   January 12th, 2004.

3     Q.   And what date was Check No. 950 cashed

4          by -- or deposited by Globe Life?

5     A.   January 16th.

6     Q.   Okay.  I'm sorry.  In Lurie 020 -- and

7          you testified earlier that you

8          received that -- you see where it

9          states that they must -- Globe Life

10         must receive your premium payment by

11         January 17th, 2004?

12    A.   Yes, I do.

13    Q.   Did they receive your premium payment

14         by January 17th, 2004?

15    A.   Yes, they did.

16    Q.   And you received LURIE 1 after that,

17         again; correct?

18    A.   Yes.

19    Q.   And what does LURIE 1 indicate to you,

20         the premium notice of January 16th,

21         2004?  What does that indicate to you?

22    A.   It indicates to me that the policy was

23         still in effect.

7/25/2006                                    Karen Lurie Britton

Page 131

1    Q.    At any time prior to May 18th, 2004 --
2          you filed the claim with Globe Life on
3          January 12th; you notified them of the
4          death; correct?
5    A.    Right.
6    Q.    At any time between January 12th and
7          May 18th, 2004, were you told by Globe
8          Life that they were going to use the
9          fact that the premium payment was late
10         to deny your claim?
11   A.    No.
12   Q.    And did you ever receive a letter -- a
13         reservation of rights by Globe Life
14         regarding the premium payment being
15         late prior to May 18th, 2004?
16   A.    No.
17   Q.    Do you know why -- do you have any
18         reason to believe or any knowledge
19         why -- not any reason to believe -- do
20         you have any knowledge why Globe Life
21         would send you another premium notice
22         on January 16th, 2004, if your policy
23         had, in fact, elapsed, or your

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                    Karen Lurie Britton

1      husband's policy had lapsed?

2  A.      I wondered why they would do that.

3  Q.      That's all I've got.

4              MR. SANSPREE:  Do you have

5                  anything, George?

6              MR. PARKER:  No.  Just hold on

7                  a second.  I don't think

8                  I have any more

9                  questions.  That's it.

10                 Thank you.

11        (The deposition of KAREN FRANCES LURIE

12         BRITTON concluded at approximately

13         1:33 p.m. on July 25, 2006.)

14

15

16

17

18

19

20

21

22

23

Tiffany Beasley                 Montgomery Reporting Service
(334) 262-3331                          (877) 834-6048

7/25/2006                                          Karen Lurie Britton

Page 133

```
1                    *   *   *   *   *   *   *   *

2                    REPORTER'S CERTIFICATE

3                    *   *   *   *   *   *   *   *

4

5       STATE OF ALABAMA

6       COUNTY OF ELMORE

7

8               I, Tiffany B. Beasley,

9       Certified Court Reporter and Notary

10      Public in and for the State of Alabama

11      at Large, do hereby certify that on

12      July 25, 2006, pursuant to notice and

13      stipulation on behalf of the

14      Defendants, I reported the deposition

15      of KAREN FRANCES LURIE BRITTON, who

16      was first duly sworn by me to speak

17      the truth, the whole truth, and

18      nothing but the truth, in the matter

19      of KAREN LURIE, Plaintiff, versus

20      GLOBE LIFE AND ACCIDENT INSURANCE

21      COMPANY, et al., Defendants, Civil

22      Action Number 1:06-cv-0034MEF, now

23      pending in the United States District
```

7/25/2006                          Karen Lurie Britton

Page 134

1    Court for the Middle District of

2    Alabama, Southern Division; that the

3    foregoing 133 typewritten pages

4    contain a true and accurate

5    transcription of the examination of

6    said witness by counsel for the

7    parties set out herein; that the

8    reading and signing of said deposition

9    was not waived by witness and counsel

10   for the parties.

11            I further certify that I am

12   neither of kin nor of counsel to the

13   parties to said cause, nor in any

14   manner interested in the results

15   thereof.

16        This 8th day of August, 2006

17

18

19

20        Tiffany B. Beasley, CCR
          Reporter and Notary Public
21        State of Alabama at Large

22

23

Tiffany Beasley                 Montgomery Reporting Service
(334) 262-3331                       (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec

7/25/2006                                              Karen Lurie Britton

Page 135

1                    *   *   *   *   *   *   *   *
                     WITNESS SIGNATURE PAGE
2                    *   *   *   *   *   *   *   *
3            IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF ALABAMA
4                      SOUTHERN DIVISION
5        KAREN LURIE,
6              Plaintiff,
7        vs.                      CIVIL ACTION NO.
                                  1:06-cv-0034MEF
8
9        GLOBE LIFE ACCIDENT
         INSURANCE COMPANY, et al.,
10
             Defendants.
11
             I, KAREN FRANCES LURIE BRITTON,
12       hereby certify that I have read the
         deposition enclosed herein and that it
13       is a true and accurate transcription
         of the deposition given by me in this
14       cause with the corrections or
         additions, if any, indicated by me on
15       the attached errata sheet.
16
17            Signature of Witness
18       Subscribed and sworn to before me this
              day of        , 2006.
19
20
21
                              Notary Public
22
23

Tiffany Beasley                Montgomery Reporting Service
(334) 262-3331                        (877) 834-6048

9d12be5e-daae-4636-92fc-b1084f2da9ec