Page 1

IN THE UNITED STATES DISTRICT FOR

THE MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION


KAREN LURIE,                  )
                              )
          Plaintiff,          )
                              )
vs.                           )  NO. 1:06-cv-0034MEF
                              )
                              )
GLOBE LIFE AND ACCIDENT       )
INSURANCE COMPANY,            )
                              )
          Defendant.          )



DEPOSITION OF BARBARA HERNANDEZ

TAKEN ON BEHALF OF THE PLAINTIFF

IN OKLAHOMA CITY, OKLAHOMA

ON SEPTEMBER 14, 2006



REPORTED BY:  ELIZABETH CAUDILL, CSR, RMR, CRR


PLAINTIFF'S
EXHIBIT
tabbies
E

1
A P P E A R A N C E S

2
For the Plaintiffs: Christopher E. Sanspree
(By videoconference)Attorney at Law
3
218 Commerce Street
Montgomery, Alabama 36104
4

5
For the Defendant:    Robert Poundstone, IV
Philip H. Butler
6
Attorneys at Law
401 Adams Avenue, Suite 780
7
Montgomery, Alabama 36104

8

9
Anastasia Pederson
Attorney at Law
10
Globe Life Center
204 North Robinson, Suite 300
11
Oklahoma City, Oklahoma 73102

12
Also Present:    Bilinda Hines
(By videoconference)
13

14

15

16

17

18

19

20

21

22

23

24

25

44f87bbd-3d1e-4943-9569-5a564215285e

1                        CONTENTS

2                                              Page   Line

3    Direct Examination by          . . . .

4    Cross-Examination by           . . . .

5    Redirect Examination by         . . .

6    Jurat Page . . . . . . . . . . . . . . .

7    Witness Signature Page . . . . . . . . .

8    Reporter's Certificate. . . . . . . . .

9


10              DEFENDANT'S INDEX OF EXHIBITS

11                                             Page   Line

12

13   Exhibit 1 . . . . . . . . . . . . . . .

14   Exhibit 2 . . . . . . . . . . . . . . .

15   Exhibit 3 . . . . . . . . . . . . . . .

16   Exhibit 4 . . . . . . . . . . . . . . .

17

18

19                        * * * * * *

20

21

22

23

24

25

Page 4

1           S T I P U L A T I O N S

2           IT IS HEREBY STIPULATED AND AGREED by

3    and among the attorneys for the respective

4    parties hereto that the deposition of BARBARA

5    HERNANDEZ may be taken on behalf of the PLAINTIFF

6    on SEPTEMBER 14, 2006 in Oklahoma City, Oklahoma,

7    by Elizabeth Caudill, Certified Shorthand

8    Reporter within and for the State of Oklahoma,

9    pursuant to Notice.

10          IT IS FURTHER STIPULATED AND AGREED by

11   and among the attorneys for the respective

12   parties hereto that all objections, except as to

13   the form of the question, are reserved until the

14   time of trial, at which time they may be made

15   with the same force and effect as if made at the

16   time of the taking of this deposition.

17                  *   *   *   *   *   *

Page 5

1                    *  *  *  *  *  *
2                    BARBARA HERNANDEZ,
3    having been first duly sworn at 12:39 p.m.,
4    deposes and says in reply to the questions
5    propounded as follows, to wit:
6                    DIRECT EXAMINATION
7    BY MR. SANSPREE:
8         Q    Ms. Hernandez, my name is Chris
9    Sanspree, and I'm representing Ms. Lurie in a
10   lawsuit we filed against Globe Life Insurance,
11   actually Globe Life and Accident Insurance
12   Company.  And we've noticed your deposition.
13   We've asked that you come and testify regarding
14   premium payments and stuff like that.
15            Are you aware of why you're here?
16        A    Yes.
17        Q    And have you seen what I'll call a
18   deposition notice?  I sent your attorneys a
19   notice of your deposition.  I just want to know
20   whether you've seen it or not.
21        A    Yes, I have.
22            MR. SANSPREE:  I'm going to go ahead
23   and mark that, Bobby, as Exhibit 1.
24            MR. POUNDSTONE:  I'm trying to think,
25   would it be easier to renumber them all or for

Page 6

1    you to just pick up where you ended of numbering

2    on that last deposition?

3            MR. SANSPREE:  My legal assistant's

4    here, and she said we want to renumber them.  Is

5    it easier for the court reporter to -- how do you

6    want to handle it?

7            (Off the record)

8            (Plaintiff's Exhibit Number 1 marked

9            for identification purposes and made a

10           part of the record)

11   Q    (By Mr. Sanspree) Ms. Hernandez, now,

12   on this depo notice that I sent your attorneys, I

13   ask that certain -- if you had them, if you had

14   any documents that are listed here -- we can read

15   over them as 1 through 9 -- if you have anything

16   to bring it with you.

17           Do you have anything responsive to

18   those requests?

19   A    I did bring copies of everything that

20   we've provided with me, and they're all -- as

21   requested.

22   Q    And I asked a bad question.  Anything

23   additional that you haven't given to me, do you

24   have anything else that has not been produced to

25   me?

Page 7

1    A    I have a copy of my inventory sheets
2    where it shows where our mail inventory was on
3    the days that the payment was processed.  That
4    wasn't specific to the plaintiff, so I don't
5    think that that was provided.
6         MR. POUNDSTONE:  Actually, I think we
7    may have.
8         MR. SANSPREE:  I think they did,
9    Ms. Hernandez.  I think Bobby sent me that this
10   morning, but I'll ask you about that.
11        Bobby, I guess we'll mark everything
12   you've sent to me today as Exhibit 2?
13        MR. POUNDSTONE:  There's one thing that
14   I don't think came from either Sandy or Barbara,
15   now that I look at it.  Did you --
16        MS. PEDERSON:  I thought we faxed that
17   last night.
18        MR. POUNDSTONE:  We faxed this, but was
19   this something that you gave me, or was that
20   something that we just --
21        THE WITNESS:  That's actually something
22   that I had provided to Staci.
23        MR. POUNDSTONE:  So you know what it
24   is?
25        THE WITNESS:  Yes.

Page 8

1       MR. SANSPREE:  Bobby, just for the
2   record, these aren't -- what you faxed to me last
3   night aren't Bates labeled, so I really can't
4   refer to them as that, but without the cover
5   page --
6       MR. POUNDSTONE:  One way to do them is
7   you have the phone -- just the sheet with just
8   the phone computer notations on them.
9       Then the other documents, one of them
10  is page 1 of 1 and the other one is page 82
11  through 90 of 198, so you could probably refer to
12  those pages by their numbers.
13      MR. SANSPREE:  You're right.  The
14  first -- how I've got it set up is the first page
15  that I'm going to mark collectively as Exhibit 2
16  just has the telephone numbers.  And I don't
17  know, looks like -- let's see -- like 15 times or
18  12 to 15 times.  I hadn't counted them, but just
19  guessing.  And that's the first page of Exhibit
20  2.  And then the second group of pages would be
21  the 82 through 90 of 198.
22      MR. POUNDSTONE:  Do you want to mark
23  those as Exhibit 3?
24      MR. SANSPREE:  No.  So you all have the
25  exhibits set up like I'm reading it.

Page 9

1      MR. POUNDSTONE:  Okay.

2      MR. SANSPREE:  Then the last page will

3  be that 1 of 1 that you just referenced.

4      MR. POUNDSTONE:  Okay.

5      MR. SANSPREE:  All of that together

6  would make up Exhibit 2.

7      MR. POUNDSTONE:  I think they're going

8  to be separate documents.  You may want to do the

9  first page with the telephone listing as Exhibit

10  2, and then the other ones collectively as 3.

11      MR. SANSPREE:  Let's do that.  The

12  telephone records, or the page with the telephone

13  numbers on there, is Exhibit 2.  Exhibit 3 will

14  be the 82 through 90 of 198, and then Exhibit 4

15  would be that 1 of 1.

16          (Plaintiff's Exhibit Number 2, 3 and 4

17          marked for identification purposes and

18          made a part of the record)

19      Q    (By Mr. Sanspree) Now, Ms. Hernandez,

20  looking at Exhibit 2 which is that first page

21  with the telephone numbers, did you generate this

22  information?

23      A    I did generate it, yes.

24      Q    How did you come about this

25  information?  Did you get it off the computer

Page 10

1   system?

2       A    Yes.

3       Q    Did you do that at the request of your

4   attorneys or acting on your attorney's behalf?

5       A    I did after a conversation Staci and I

6   had about the upcoming lawsuit.

7       Q    Can you tell me, just for the record,

8   what Exhibit 2 is?  I can look at it and tell you

9   it's some phone numbers, but tell us what Exhibit

10  2 is.

11      A    This list actually comes from an

12  application that's used in customer service.  I

13  have access to it on my computer because I

14  routinely monitor telephone calls, and so I

15  pulled a list of all of the calls that came from

16  a phone number that I found on the master file

17  that belonged to the Luries.

18      Q    And Ms. Hernandez, how familiar are you

19  with the telephone systems at Globe Life?

20      A    Fairly familiar.  I -- you know --

21      Q    Do you know -- go ahead.  I'm sorry.

22  That's one thing we ran into last time.  Stop

23  real quick.

24           One thing we ran into in the last

25  deposition is there's like a two second lag

1  between what you say -- my questions and what you

2  say.  If you stop for one second, I'll ask

3  another question.  I'll do the same, you'll do

4  the same.

5          First let me ask you this.  I know you

6  use the telephone and everything like that in

7  your day-to-day activities, but are you familiar

8  with the recording and how the telephone numbers

9  are recorded on the telephone system?

10     A     Yes, I am.

11     Q     Can you tell us how those are recorded?

12     A     The Eon system is the software vendor

13  that we use, has a mechanism that records the

14  phone numbers, much like you would have Caller

15  ID at home.  And that information is maintained

16  in a database that can be queried.

17     Q     Just for the record, what type of

18  system?  You said Eon.  Can you spell that for

19  me?

20     A     E-O-N.

21     Q     Okay.  You said it's kind of like a

22  Caller ID system.  I know at my house I can mash

23  a button and it will show all the numbers.

24          Is there a certain amount of time --

25  does this keep the numbers forever or does it

Page 12

1  purge itself?

2      A    It does not purge itself; however, I

3  don't know the details about how long we maintain

4  information.

5          When we first got the system -- and I

6  don't know the exact date but it was early in

7  2004 -- when we first got the system, we had not

8  yet set archive dates as far as how long we would

9  keep calls.

10     Q    Did you have this system in January of

11 2004?

12     A    I don't know that for sure.  I don't

13 believe so.

14     Q    Who would know that, what date you all

15 got this system?

16     A    Our customer service supervisors may

17 know the date.

18     Q    And would that be --

19     MR. SANSPREE:  Phil, is that the guy

20 that's coming in later?

21     MR. BUTLER:  Yeah.  I think, Chris,

22 don't hold me to this, but I think it was

23 sometime in March that we got it.

24     Q    (By Mr. Sanspree) Now, Ms. Hernandez,

25 these numbers, are they recorded when a phone

Page 13

1  call is made or comes in, or when somebody has

2  to -- does somebody have to enter it on the

3  computer?

4       A    They're automatically recorded when the

5  phone call comes in.

6       Q    And this generation -- the information

7  that's generated by you regarding the phone

8  calls, evidently there were some specific to

9  a certain telephone number.  How did you come

10 across this number?

11      A    It was on --

12      Q    Were you provided that information by

13 your attorney?

14      A    It was on the master file record for

15 the policy in question.  The phone number was

16 a part of that record.  I put the phone number

17 into a query to the database.

18      Q    And these are all the calls -- can you

19 do a cutoff?  Are these all the calls you

20 received, I guess, from March 11th, 2004, to

21 present or did you stop it down at May 28th?

22      A    To the -- to my knowledge, these are

23 all the calls.  I don't recall putting in a time

24 frame.

25      Q    Okay.  Can you tell us your position

1    with Globe Life?

2        A    Vice-president of the premium

3    accounting department.

4        Q    And how long have you been employed

5    with Globe Life, please, ma'am?

6        A    26 years.  I've actually been there for

7    30.

8        Q    What do you mean, you've been employed

9    for 26 but been there for 30?

10        A    I'm sorry.  I left the company for a

11    short period of time.  I've been there since 1976

12    but have a total work history of 26 years.

13        Q    And have you always been in the premium

14    accounting department?

15        A    No, I haven't.

16        Q    Can you tell us what other departments

17    you were in before?

18        A    I started in premium accounting.  I

19    rotated through some other functions that

20    included a piece of customer service, living

21    benefits, some other customer service functions,

22    our general accounting department which we also

23    called financial accounting at the time, and then

24    back to premium accounting.

25        Q    And how long have you been in premium

Page 15

1    accounting this time?

2        A    I've been back at Globe for five years.

3    I've been in premium accounting that entire time.

4    I was in premium accounting just prior to leaving

5    Globe as well.

6        Q    You say premium accounting.  Can you

7    tell us what that -- what your job duties are?

8        A    I manage the receipt and processing of

9    all premium collections.  And that's for all

10    collection types, not only for our direct bill

11    business but all of the payment options that we

12    offer to policyholders.

13        Q    And do you have an accounting degree or

14    anything like that?  You're not having to do any

15    mathematic computations, are you?

16        A    I'm not, no.  And no, I don't have a

17    degree.

18        Q    I'm just trying to figure out what that

19    department -- so basically the department,

20    premium accounting department is that you just

21    get the premiums and make sure they are credited

22    to the proper policy?

23        A    That's correct.

24        Q    And now I'm going to refer you to

25    Exhibit 3 which is one of the documents that

1  Bobby faxed -- somebody faxed to us.  I think

2  Phil did, either that or Bobby.  I can't

3  remember.

4          Now, do you have those, ma'am?

5      A    Yes, I do.

6      Q    Okay.  Can you tell us what Exhibit 3

7  is?

8      A    Exhibit 3 is a print of the detail of

9  items processed by the clerk that processed the

10 Lurie's check on January 16th.  I printed a

11 detail of all of the pages that encompassed the

12 premiums she processed that day.

13     Q    And when you say "she," are you

14 referring to this Jeannie at the top?

15     A    Yes.  Yes, I am.

16     Q    So when it says Globe -- I'm reading

17 from the top of the first page, it says "Globe

18 Life," and it says "Premium accounting exception

19 transactions."  Then under that it says "Balance

20 report - detail for Jeannie Reaka"?

21     A    Jeannie Reaka.

22     Q    Now, she's the one that would enter all

23 this information?  I guess these are her --

24     A    That's correct, she entered the

25 information for all of these payments.

Page 17

1    Q    And it's your testimony that you

2    printed this off of the computer system yourself;

3    correct --

4    A    That's correct.

5    Q    -- Exhibit 3?  The second page of

6    Exhibit 3, if you go the third check down, says

7    check number 950, premium payment of 33.60.

8    $33.60?

9    A    Yes, I see it.

10    Q    And to your information, is that a

11    Lurie payment for the policy we're here today on?

12    A    Yes, it is.

13    Q    And it has a process date, do you see

14    over to the right where it says 1/16/04?  Do you

15    see that?

16    A    Yes.

17    Q    And could you tell us, does that mean

18    that the check was processed on January 16th,

19    2004, by Globe Life?

20    A    Yes, that's what it means.

21    Q    And could you tell us what "processed"

22    means?

23    A    Processed means that that payment

24    information was put into our system for it to be

25    used to update the policy.  That would have

Page 18

1    happened in the nightly cycle on January 16th.

2        Q    Obviously that was done for this

3    policy; correct?

4        A    That's correct.

5        Q    In the premium accounting department,

6    are you familiar or do you know one way or the

7    other whether somebody's late on their premium

8    payments or not?

9        A    We do, yes.

10       Q    And how are you made aware of that?  Is

11   it something that's on the computer system?  Tell

12   me how you would know if somebody was late on

13   their premium payments.

14       A    By the -- by the paid to date.  We have

15   certain criteria that if the payment is being

16   systematically processed, the machine would not

17   allow a payment to process after a certain number

18   of days.  This payment was handled manually.  The

19   clerk would have --

20       Q    What do you mean by that?

21       A    The clerk entered this information by

22   keying it into the computer.

23       Q    Did the machine allow her to process

24   this claim or this check for payment?

25       A    The computer did allow her to process

44f87bbd-3d1e-4943-9569-5a564215285e

Page 19

1  this payment, yes.

2      Q    So there was no hold or anything like

3  that on the policy when this premium payment was

4  made; correct?

5      A    That's correct.

6      Q    And I noticed, just by looking through

7  these documents pretty quick, that on page 2 it's

8  got, right next to where it says check number 950

9  and you go across the middle, at the top it says

10  "over-under" and it has .60.  Looks like 60

11  cents.  Do you know what -- what does that mean?

12      A    Over-under is the terminology used on

13  this system for long and short.  The two-month

14  premium calculated by the system was $33 even.

15  We received a payment for $33.60.  Our tolerance

16  rules allowed us to take that 60 cents to long

17  and short.

18      Q    Can you explain -- a lot of folks that

19  might be listening to this or hearing this

20  testimony won't know anything about insurance or

21  accounting or anything like that.  Can you

22  explain what long and short is?

23      A    Long and short would be an amount that

24  we will accept a payment, whether it is long, in

25  this case it was 60 cents long for what the

Page 20

1    calculation for the two-month mode was, or it

2    could have been short by the same amount and we

3    still would have accepted it.

4         Q    And just for the record, long means an

5    overpayment?

6         A    Yes.

7         Q    And short would be an underpayment?

8         A    That's correct.

9         Q    So they overpaid -- the Luries overpaid

10   60 cents, and that's acceptable; correct?

11        A    That's correct.

12        Q    But they could also have paid 60 cents

13   less, which would be 29.40, and that still would

14   be acceptable?

15        A    We still would have accepted it.

16        Q    Okay.  In your premium accounting

17   department, are you all responsible for sending

18   out premium notices?

19        A    That's a function of our billing area.

20        Q    That wouldn't be part of your --

21        A    In 2004, it actually was my

22   responsibility for billing.  I no longer have

23   responsibility for the billing area.

24        Q    Do you know when in two thousand --

25   when did it switch over to go to the billing

Page 21

1    department from the premium notice department?

2        A    The responsibility for billing switched

3    over in late 2005.

4        Q    In your capacity with your employment

5    with Globe Life back in 2004, did you oversee the

6    issue of premium notices?

7        A    Yes, I did.

8        Q    And did you oversee -- to your

9    knowledge, did you oversee the issue of some

10    premium notices in this case?

11        A    It would have been in my

12    responsibility, yes.

13            MR. SANSPREE:  Bobby, I'm referring to

14    Lurie 24.  This should be something we produced

15    to you.

16            MR. POUNDSTONE:  Okay.

17            MR. SANSPREE:  Can you show the

18    witness, please, if you don't mind.

19            THE WITNESS:  I have it.

20        Q    (By Mr. Sanspree) Have you seen that

21    document before?

22        A    Yes, I have.

23        Q    And when did you see this document?

24    When is the first time you remember seeing this

25    one?

44f87bbd-3d1e-4943-9569-5a564215285e

Page 22

1    A    I reviewed a copy of this document

2 yesterday.

3    Q    Okay.  Other than reviewing it

4 yesterday, do you remember seeing this document

5 back in 2004?

6    A    No, I would not have personally seen

7 this document in 2004.

8    Q    And this document that I'm referring

9 to --

10    MR. SANSPREE:   Bobby, I guess we'll

11 mark it as 5.

12        (Plaintiff's Exhibit Number 5 marked

13         for identification purposes and made a

14         part of the record)

15    Q    (By Mr. Sanspree) Is this what you were

16 testifying to earlier that would come out of the

17 premium accounting office back then?

18    A    It would have come out of our billing

19 department which I had responsibility for at that

20 time.

21    Q    All right.  Maybe I'm confused, but the

22 billing -- you said it's the responsibility of

23 the billing department now but that changed in

24 2005.

25        Back in 2004, the premium notices, were

Page 23

1    they sent out by the premium accounting offices

2    back in 2004?

3         A    Not by the premium accounting office

4    specifically.  I was in charge of billing and

5    collections at that time.  I'm no longer in

6    charge of billing.

7         Q    Okay.  Are you familiar in any way with

8    the claim in this lawsuit?

9         A    Only what I have reviewed that is in

10   the file of what was provided.

11        Q    Is it standard accounting -- premium

12   accounting or billing practices in the billing

13   department to send out premium notices on

14   policies that have lapsed?

15        A    We send out a billing notice that is an

16   offer for reinstatement, and that is a standard

17   practice.

18        Q    What about on policies that have

19   lapsed, do you all send out premium notices that

20   there's no longer any policy in effect?

21        A    It is a premium notice but it's also an

22   offer of reinstatement.

23        Q    All right.  Well, I mean, say, for

24   instance, that a person doesn't have a policy --

25   or quit paying premiums a year ago.  Would you

Page 24

1    all send an offer of reinstatement to that

2    insured?

3        A    We would not.

4        Q    What I'm trying to get at, is there a

5    time period where you would stop sending premium

6    notices or offers of reinstatement?

7        A    Yes.  After 60 days we do not send

8    another offer.

9        Q    Ms. Hernandez, I guess you're here just

10   to tell us that the premium was made and

11   processed on the 16th of January, 2004, and

12   that's basically it?

13       MR. BUTLER:  She's here to answer your

14   questions.

15       Q    (By Mr. Sanspree) Was the premium made

16   and processed on January 16th, 2004?

17       A    There was, indeed, a premium processed

18   on January 16th.

19       MR. SANSPREE:  Well, thank you for your

20   time.

21       THE WITNESS:  Thank you.

22       MR. SANSPREE:  I don't have any other

23   questions.

24       (Deposition adjourned at 1:03 p.m.)

25

Page 25

C E R T I F I C A T E

STATE OF OKLAHOMA     )
                      ) SS:
COUNTY OF OKLAHOMA    )


        I, ELIZABETH CAUDILL, CSR in and for
the State of Oklahoma, certify that BARBARA
HERNANDEZ was by me sworn to testify the truth;
that the above and foregoing deposition was taken
by me in stenotype and thereafter transcribed and
is a true and correct transcript of the testimony
of the witness; that the deposition was taken on
SEPTEMBER 14, 2006 at 12:39 p.m. in Oklahoma
City, Oklahoma; that I am not an attorney for or
a relative of either party, or otherwise
interested in this action.
        Witness my hand and seal of office on
this 25th day of September, 2006.


_____
ELIZABETH CAUDILL, CSR, RMR, CRR
CSR No. 161