IN THE UNITED STATES DISTRICT FOR

THE MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION


KAREN LURIE,                )
                            )
          Plaintiff,        )
                            )
vs.                         ) NO. 1:06-cv-0034MEF
                            )
                            )
GLOBE LIFE AND ACCIDENT     )
INSURANCE COMPANY,          )
                            )
          Defendant.        )



DEPOSITION OF SANDY WHITAKER

TAKEN ON BEHALF OF THE PLAINTIFF

IN OKLAHOMA CITY, OKLAHOMA

ON SEPTEMBER 14, 2006



REPORTED BY:  ELIZABETH CAUDILL, CSR, RMR, CRR



PLAINTIFF'S
EXHIBIT
G

```
 1              A P P E A R A N C E S
 2    For the Plaintiffs: Christopher E. Sanspree
      (By videoconference)Attorney at Law
 3                        218 Commerce Street
                          Montgomery, Alabama 36104
 4

 5    For the Defendant:  Robert Poundstone, IV
                          Philip H. Butler
 6                        Attorneys at Law
                          401 Adams Avenue, Suite 780
 7                        Montgomery, Alabama 36104
 8

 9                        Anastasia Pederson
                          Attorney at Law
10                        Globe Life Center
                          204 North Robinson, Suite 300
11                        Oklahoma City, Oklahoma 73102
12    Also Present:       Bilinda Hines
      (By videoconference)
13

14

15              *   *   *   *   *   *
16

17

18

19

20

21

22

23

24

25
```

2cbf423b-0719-40e2-8137-40b55a4de177

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and among the attorneys for the respective parties hereto that the deposition of SANDY WHITAKER may be taken on behalf of the PLAINTIFF on SEPTEMBER 14, 2006 in Oklahoma City, Oklahoma, by Elizabeth Caudill, Certified Shorthand Reporter within and for the State of Oklahoma, pursuant to Notice.

IT IS FURTHER STIPULATED AND AGREED by and among the attorneys for the respective parties hereto that all objections, except as to the form of the question, are reserved until the time of trial, at which time they may be made with the same force and effect as if made at the time of the taking of this deposition.

* * * * * *

Page 4

1                       *  *  *  *  *  *

2                    SANDY WHITAKER,

3      having been first duly sworn at 9:11 a.m.,

4      deposes and says in reply to the questions

5      propounded as follows, to wit:

6                    DIRECT EXAMINATION

7      BY MR. SANSPREE:

8           Q     Ms. Whitaker, could you state your name

9      for the record, please, ma'am.

10          A     Sandra Joanne Whitaker.

11          Q     Ms. Whitaker, we filed a lawsuit, "we"

12     being Ms. Lurie and myself, against Globe Life.

13     And you're aware you're here to testify on behalf

14     of Globe Life?

15          A     Yes, sir.

16          Q     And have you seen the deposition notice

17     that I sent out --

18          A     Yes, sir.

19          Q     -- in this case?  And are you capable

20     of testifying to the areas that I've noticed in

21     the deposition?

22          A     Yes, sir.

23               MR. SANSPREE:  I don't know if you all

24     have got that, Phil, but I'm going to mark the

25     deposition notice as 1.  Do you have a copy of

1    that?

2           MR. POUNDSTONE:  Which one?  There was

3    an initial one that went out, and then we had

4    individual notices to Sandy and Barbara after

5    that.

6           MR. SANSPREE:  The individual one,

7    Bobby.  The individual notice.

8           (Plaintiff's Exhibit Number 1 marked

9           for identification purposes and made a

10          part of the record)

11   Q    (By Mr. Sanspree) Ms. Whitaker, have

12   you read all the requests that I asked for

13   documents to be produced in accordance with this

14   deposition notice?

15   A    Yes, sir, I have.

16   Q    And were there any other documents that

17   should be produced or that you have that weren't

18   given to me?

19   A    No, sir.

20   Q    Okay.  Ms. Whitaker, tell us your

21   position at Globe Life and accident.

22   A    I'm the manager of the life claim

23   department.

24   Q    How long have you been the manager of

25   life claim department?

Page 6

1       A    Approximately five years.

2       Q    And how long have you been with Globe

3  Life?

4       A    35 years.

5       Q    A long time.  Where else have you

6  worked other than Globe Life?  Anywhere?

7       A    Only in high school I worked different

8  jobs like high school jobs, but --

9       Q    In your 35 years at Globe Life, have you

10 you always been in the claims department or have

11 you just evolved over to the claims department?

12      A    No.

13      Q    Tell us about it.

14      A    I've always been in the claim

15 department.  I have worked in different areas of

16 the claim department.  I've worked in the steno

17 section composing letters, I've worked in the

18 health claims part of it before starting in the

19 life area.

20      Q    Okay.  I don't want to ask you any

21 questions -- you can see where I'm going, but

22 what I should have asked you is your different

23 sections you worked in the claim department.

24           How many sections are in the claim

25 department?

1    A    There's just three.

2    Q    You said steno?  Is that stenography?

3    A    Yes; correspondence, answering letters.

4    Q    And then you said health?

5    A    Yes, health claims.

6    Q    Tell me about that.  What's involved

7  with the health section?

8    A    Processing health claims.  Actually I

9  was still answering correspondence related to

10  health policies.

11    Q    And what's the third section?

12    A    It would be the life claims area.  And

13  I've been in that area since sometime in the

14  '70s.

15    Q    So you've been there about 30 years in

16  the life section?

17    A    Yeah.  Yes, sir.

18    Q    Are you familiar with the claim that is

19  at issue in this lawsuit?

20    A    I'm sorry?

21    Q    Are you familiar with the claim that's

22  at issue in this lawsuit?

23    A    Yes, sir, I am.

24    Q    How did you become familiar with it?

25  Were you involved in the claim, itself, or just

1    the litigation?

2         A    Yes, sir, I was involved with the

3    claim.

4         Q    Tell me your involvement with the claim

5    before the lawsuit was filed.

6         A    I reviewed the claim, itself.  And

7    based on the information we received, I indicated

8    that it was a payable claim.  I oversaw the

9    handling of it as the manager.

10        Q    All right.  Let me stop you there

11   because that's pretty broad.  When you say you

12   oversaw it, were you actually involved in the

13   claim or did they just come -- did the people

14   involved in the claim just come to you with

15   questions if they have any?

16             MR. POUNDSTONE:  Object to the form.

17             MR. BUTLER:  Go ahead and answer.

18             MR. POUNDSTONE:  You can answer.

19             THE WITNESS:  I'm responsible for how

20   the claims are handled.  The claims go through

21   various steps, and ultimately, depending on the

22   amount of the claim, it's directed to different

23   divisions.  And this particular one was within my

24   realm to review.

25        Q    (By Mr. Sanspree) I understand what

Page 9

1  you're saying, but what I'm trying to ask you

2  is -- you know, I'm responsible for several

3  people, but I don't actually do the work.  And

4  ultimately I am responsible for it, but I allow

5  them to do the work.  Is that what you do?

6       A    Yes, sir.

7       Q    You allow your claim handlers to do the

8  work, but you're ultimately responsible, but you

9  allow the people to do the work on the file?

10      A    Yes.  Other employees have

11 responsibilities in the handling of the claim.

12      Q    And you testified a second ago that you

13 indicated, based on the information you received,

14 that it was a payable claim?

15      A    At one time in the review of the claim,

16 yes, I did.

17      Q    Do you remember, you know, when was the

18 time period that you determined the claim was

19 payable, do you remember?

20      A    May I review the file to refresh my

21 memory?

22      Q    Sure.

23      A    On May 6th, '04.

24      Q    And do you remember when the claim was

25 actually filed?

2cbf423b-0719-40e2-8137-40b55a4de177

1    A    We actually got Proof of Loss, I

2  believe, approximately March 8th, '04.

3    Q    Were you aware of any other

4  correspondence from any other individuals prior

5  to March 8th of '04 letting Globe Life know that

6  the insured had been killed in an accident?

7    A    I believe the initial notice we got was

8  January 26th and received in our office January

9  30th.

10    Q    Are you referring to a letter written

11  by Mr. Matthews?

12    A    Yes.

13    Q    Attorney Matthews?

14    A    Yes, sir.

15    MR. SANSPREE:  And that's Bates

16  numbered Globe Life/Lurie Karen 027.  For the

17  record, I'm going to mark that as Exhibit 2.

18        (Plaintiff's Exhibit Number 2 marked

19        for identification purposes and made a

20        part of the record)

21    Q    (By Mr. Sanspree) Now, Ms. Whitaker,

22  you testified this was the first notice you all

23  had to the loss at issue; is that correct?

24    MR. POUNDSTONE:  Object to the form.

25    THE WITNESS:  Yes, sir.

Page 11

1    Q    (By Mr. Sanspree) In this letter dated
2  January 26th we've marked as Exhibit 2, it
3  references a prior telephone conversation that
4  Mr. Matthews had had with someone at Globe Life.
5  Do you see that?

6    A    Yes, I see that.

7    Q    So it wouldn't -- wouldn't Globe Life
8  actually have been put on notice prior to this
9  letter dated January 26, 2004, of the loss?

10    MR. POUNDSTONE:  Object to the form.

11    THE WITNESS:  Well, there's no
12  indication that there was any other communication
13  in connection with the report of the death.

14    Q    (By Mr. Sanspree) Where are you getting
15  that from?  I mean, I understand your answer, but
16  I was wondering what you're basing that answer
17  on.

18    A    Well, the information that had we been
19  put on notice through other communication, the
20  letter would have been in the file, itself.

21    But this indicates a telephone
22  conversation, and notice of death reports are
23  handled through a telephone reporting system
24  which would have been indicated in our records.

25    Q    Okay.  Ms. Whitaker, you just testified

2cbf423b-0719-40e2-8137-40b55a4de177

Page 12

1  that had you gotten notice that there would be

2  something in the file, itself, with a notice?

3       A    No, I said it -- no, sir, that isn't

4  correct.  I said it would have been recorded

5  through our -- our electronic system.

6       Q    I didn't hear you say that.  I'm not

7  trying to argue with you.  I'm just saying this

8  letter was produced to us, and it was in you

9  all's file.  And it does indicate to me that

10  there was a prior telephone conversation

11  discussing the death because enclosed is a copy

12  of the accident report and death certificate.

13       A    Well, that wouldn't follow our normal

14  procedure.  Any time a death notice is received

15  by the phone, it is recorded electronically

16  through our system.

17       Q    Okay.

18       A    And there's no indication that that was

19  done.  It would be out of procedure.  That's our

20  procedure to handle notice of death in that

21  format.

22       Q    Okay.  I'm with you.  Now, if there had

23  been a telephone conversation as referenced in

24  this letter by Mr. Matthews which was in you

25  all's file regarding the death and it's not noted

Page 13

1    in the file, then that would be out of procedure?

2                MR. POUNDSTONE:  Object to the form.

3                THE WITNESS:  I'm sorry.  Say that one

4    more time.

5        Q    (By Mr. Sanspree) You testified that it

6    would be out of procedure for someone to be

7    notified at Globe Life of a death but not note

8    that in the file.

9                And my question is:  If someone at

10    Globe Life in the claims department had been

11    notified of the death of Mr. Lurie as referenced

12    in the letter that's in you all's file produced

13    to me and it's not noted in the claim file that

14    they had been notified of the death prior to this

15    letter of January 26th, would that be out of

16    procedure?

17        A    I'm sorry.  That was way too long for

18    me to understand.  Would you try to rephrase

19    that?

20        Q    I'm horrible at trying to break -- I've

21    got all these thoughts in my head.  Let me try to

22    get it out to you.

23                You testified previously that if Globe

24    Life had been notified of the death, it would

25    be -- normal procedures would be it would be in

2cbf423b-0719-40e2-8137-40b55a4de177

Page 14

1    the file; is that correct?

2            MR. POUNDSTONE:  Object to the form.

3            THE WITNESS:  No, sir.

4        Q    (By Mr. Sanspree) Noted in the file?

5        A    No, sir.

6        Q    Tell me what the procedures are when

7    you're notified of a death, then.

8            MR. BUTLER:  By telephone?

9            MR. SANSPREE:  Yes, sir.

10       Q    (By Mr. Sanspree) If someone calls you

11   and tells you an insured has been killed, what do

12   you do?

13       A    The customer service department

14   receives that phone call.  They have an

15   electronic system that they enter the information

16   on the system which automatically codes the

17   policy for death and assigns it a claim number.

18       Q    Was that done in this case?

19       A    No, sir.

20       Q    Do you know why?

21       A    Because there's no indication of

22   receiving a phone call by death -- I mean by

23   phone.

24       Q    Except for a letter dated January 26th,

25   2004, that we've noted we've marked as Exhibit 2

1   that was in you all's claim file?

2        A    That's what the letter says, but there

3   would be no reason to believe that we wouldn't

4   have followed procedures in handling our regular

5   notice of death in this situation.

6        Q    But you don't know that for sure;

7   correct?

8        A    Well, it would be out of procedure, and

9   there's no indication that there's any other

10  notations made on the system that we did receive

11  a phone call.

12       Q    But and my question -- and that goes

13  back to my long question I asked a second ago.

14  If there had been a phone call and it's not noted

15  in the file, would that be out of procedure?

16            MR. BUTLER:  A phone call giving notice

17  of death?

18            MR. SANSPREE:  Correct.

19            THE WITNESS:  Yes, a phone call giving

20  notice of death and it not being recorded on the

21  system is out of procedure.

22       Q    (By Mr. Sanspree) And you don't know

23  one way or the other whether there was a phone

24  call giving notice of death, other than what's in

25  the file; correct?

1    A    I don't know one way or the other, but

2    I don't have any reason to believe that there was

3    one made that wouldn't have fell into our regular

4    procedure.

5    Q    Other than the letter that we've marked

6    as Exhibit 2?

7    A    Right.  I understand that.

8    Q    Okay.  And just for the record, I know

9    I've already asked it, but if there had been a

10   phone call made and you all had been notified of

11   the death and it not be noted in the file, would

12   that be out of procedure?

13   A    It's not noted in the file per se.

14   It's noted on our computer system.

15   Q    Right.  And if it's not noted, would

16   that be out of procedure?

17            MR. POUNDSTONE:  Object to the form.

18            THE WITNESS:  Yes, it would be out of

19   procedure.

20   Q    (By Mr. Sanspree) Okay.  So your

21   testimony is that you received a Proof of Loss

22   statement on May 8th of 2 -- March 8, 2004;

23   correct?  March 6, 2004.  I can't remember what

24   you said.  I think it was March 8, 2004.

25   A    I believe that's correct.  I'm going to

1    look through my file to refresh my memory on

2    that.

3            Yes, on March 8th, 2004, we received

4    the Proof of Loss documents.

5        Q    So you all were on notice -- let me ask

6    you this.  Were you all on notice of the death

7    prior to receiving the Proof of Loss form?

8        A    Yes.  The January 30th letter we

9    received indicated that he was deceased.

10       Q    Okay.  So I'm going to use -- sometimes

11   you can waive the requirement to file a Proof of

12   Loss, so I use that when you're notified of the

13   loss.  What I use is when you're actually

14   notified -- when the insurance company is

15   actually notified, I use that date to go with the

16   claim, because you testified previously that when

17   you all are put on notice of a loss, it's

18   assigned a claim number; correct?

19       A    Yes, that's correct.

20       Q    All right.  So I'm going to go from the

21   January 26th letter and use that it is the

22   date -- I know you received it on the 30th, but

23   I'll use that as the date of notification of the

24   loss; okay?

25            MR. POUNDSTONE:  For the purposes of

Page 18

1    your question?

2              MR. SANSPREE:  Just for purposes of

3    this deposition.  Sometimes you can waive a Proof

4    of Loss -- filing a Proof of Loss requirement,

5    and just because they didn't get a Proof of Loss

6    until March 8, 2004, really doesn't amount to

7    much.

8              They were on notice of the loss at

9    least by the January 26th letter which references

10   a prior telephone conversation which is not noted

11   in the file which would be out of procedure.

12             MR. POUNDSTONE:  Object to the extent

13   that was a question, which it wasn't.  Just so

14   it's understood that you're using that as the

15   definition for the purposes of this deposition

16   and we're not making any kind of legal

17   conclusions one way or the other.

18             You know, if you want her to assume

19   that when you use that word, then, you know, I

20   just want that understood on the record.

21        Q    (By Mr. Sanspree) Right.  I'm going to

22   use this letter -- Ms. Whitaker, when I ask you a

23   question about date of notification of the claim,

24   you agree with me that you all were on notice of

25   the claim prior to the Proof of Loss being filed;

2cbf423b-0719-40e2-8137-40b55a4de177

1    correct?

2         A    We were notified of his death but we

3    had not received adequate Proof of Loss until

4    March 8th.

5         Q    All right.  I dug through the file a

6    little bit, Ms. Whitaker, and I never did see a

7    reservation of rights letter.

8              Are you aware of any reservation of

9    rights letter prior to denying the claim in May?

10        A    I'm sorry.  I don't understand what

11   that -- what you're talking about.

12        Q    I've looked through the file a little

13   bit, and I noticed that you all denied the claim

14   in May of '04.  Is that your understanding?

15        A    The premiums were refunded in May, yes,

16   that's correct.

17        Q    Would that also be the date of denial

18   of the claim?

19        A    Yes.

20        Q    All right.  So you all denied the claim

21   in May of '04?

22        A    Yes.  We refunded the premiums that

23   were received.

24        Q    I think the date you denied the claim

25   was May 6th of 2004; correct?

Page 20

1    MR. POUNDSTONE:  Object to the form.  I

2  don't think that's right.

3    Q    (By Mr. Sanspree) I'm sorry.  It might

4  be May 13th.  I'm not sure.  What is the date

5  that you said deny the claim and refund the

6  premiums?

7    A    Well, on May 13th, we determined that

8  the premium reinstatement wasn't done

9  appropriately, and we sent it for review.  And on

10  May 19th, a check was generated.

11    Q    All right.  So on May 13th, now, you've

12  been on notice of the claim from January.  And on

13  May 13th, you testified that the premiums may not

14  have been applied correctly?  Is that what your

15  testimony is?

16    MR. POUNDSTONE:  Object to the form.

17    THE WITNESS:  I'm saying that we

18  realized the reinstatement wasn't completed

19  accurately.

20    Q    (By Mr. Sanspree) Okay.  I'm going to

21  refer you to Globe Life/Lurie Karen 03.  It's a

22  handwritten note.

23    A    Yes, sir.

24    Q    Is that the May 13th -- what you're

25  talking about?

Page 21

1      A     Yes, sir.

2      Q     Any reason why it took so long to

3  figure out how the premiums were applied?

4      A     You know, hindsight's 20/20.  Looking

5  at this, this is a special case given the

6  circumstances.  And I see that we have factors in

7  place to determine when premiums are reinstated

8  and when they're not.

9           Apparently we're not perfect, and we

10 didn't realize at the very beginning that the

11 reinstatement wasn't completed accurately.  But

12 we have steps in place to determine that we are

13 handling the claims correctly.  And as soon as

14 this was brought to our attention, we did act

15 promptly in refunding the premium.

16     Q     Who brought it to your attention?

17     A     A claims examiner.

18     Q     It took him about five months to figure

19 it out?

20     A     Well, actually, the claim was going

21 through the evaluation process whether it was

22 even eligible under the terms and exclusions of

23 the policy.

24     Q     Yes, ma'am, and I understand that.  But

25 I understand your prior testimony is you've got

Page 22

1    people working for you that you supervise and

2    you're responsible for?

3        A    Yes, sir.

4        Q    And you rely on them to gather

5    information before you make an ultimate

6    determination on the claim?

7        A    Yes, sir.

8        Q    And you already testified that you, at

9    some date, had indicated the claim was payable;

10   correct?

11       A    Yes, sir.  But at that time --

12       Q    What about --

13           MR. BUTLER:  Let her finish her answer.

14           THE WITNESS:  But at that time, I

15   wasn't aware of all the facts and circumstances

16   in this particular case.

17       Q    (By Mr. Sanspree) All right.  We'll see

18   about it.  But what I'm getting at is you said

19   the claim was payable?

20       A    Based on the information I had in front

21   of me at the time, yes.

22       Q    And based on the information that

23   people had gathered on your behalf?

24       A    That's correct.

25       Q    And you said the claim was payable;

1   correct?

2       A    Yes.

3       Q    And we truck on down about five months

4   down the road, and all of the sudden somebody

5   brings it to your attention that the premiums may

6   not have been applied correctly.  Is that your

7   testimony?

8       A    The premiums were applied correctly.

9   The reinstatement -- you can't reinstate a policy

10  on someone who's deceased.  They didn't -- the

11  reinstatement application wasn't valid.

12      Q    Ms. Whitaker, I understand your

13  position.  Can you explain to me, if you can't

14  reinstate a person that's deceased, why the

15  deceased wife keeps getting premium notices on

16  the same policy?

17      A    I wouldn't believe that she would.

18      Q    Have you looked through the claim file

19  and the documents your lawyers have produced to

20  me?

21      A    Yes, sir, I have.

22      Q    Do you know that there's a premium

23  notice after the death sent to my client?

24      A    Do you want to direct me to that in the

25  file so I can review it?

Page 24

1      Q      Yeah.   Where is it?   Hang on a second.
2   Let me find it.
3          It's dated January 16th, I think.
4   Yeah.   It's Lurie 01.
5          Just for the record, the death occurred
6   on January 6th, 2004.   Are you aware of that,
7   Ms. Whitaker?
8      A      Yes, sir.
9      Q      And this notice was sent to my client
10   on the 16th of 2004 asking for additional
11   premiums to be mailed in on the policy.
12      A      And you're referencing what?
13          MR. POUNDSTONE:   Hey, Chris, I don't
14   mind you asking her questions about this
15   document, but just so, you know, we put on the
16   record, this is more of a premium accounting
17   function, and Barbara Hernandez would be the
18   person most knowledgeable about this document.
19          MR. SANSPREE:   Okay.
20      Q      (By Mr. Sanspree) Anyway, if the policy
21   hadn't been canceled by January 16th -- let me
22   ask it different.
23          If the policy had been canceled for
24   non-payment of premiums, would you all be sending
25   out some premium notices on the same policy?

2cbf423b-0719-40e2-8137-40b55a4de177

1    A    I don't understand what you mean by

2    "canceled."

3    Q    Well, I mean, the position of this

4    lawsuit is that the policy had lapsed for

5    non-payment of premiums --

6    A    Yes.

7    Q    -- prior to the death of my insured.

8    And, you know, I understand that, and I get it.

9    I know where you all are coming from.  But I

10    don't get the fact that the documents contradict

11    that.

12        And what I'm saying is if the policy

13    had lapsed for non-payment of premiums, why would

14    my client be getting in the mail premium notices

15    on the same policy after the death if the policy

16    had lapsed?

17    A    Well, we weren't notified of the death

18    until January 30th '04.

19    Q    I know.  And I'm with you on that.  But

20    that January 30th, '04, letter indicates a prior

21    telephone conversation; correct?

22    A    It indicates that.

23    Q    And then January 16th, 2004, which is

24    Lurie 03 which I'll mark as Exhibit 3 -- am I on

25    Exhibit 3 or 4?

Page 26

1    MR. POUNDSTONE:  Which one is that?  My

2 Lurie 03 is just a blank page.

3    MR. SANSPREE:  Lurie 01.  It's Exhibit

4 3.

5    MR. POUNDSTONE:  I'm sorry.  I

6 misunderstood what you were doing.

7    (Plaintiff's Exhibit Number 3 marked

8    for identification purposes and made a

9    part of the record)

10   Q    (By Mr. Sanspree) What I'm getting at

11 is, you get a letter from my client -- or from an

12 attorney representing my client dated January

13 26th, 2004, indicating a prior telephone

14 conversation notifying Globe Life of the death;

15 correct?

16   A    Yes.

17   Q    And then my client gets a premium

18 notice dated January 16th, 2004.  It appears to

19 me the policy is still in force at that time;

20 correct?

21   MR. POUNDSTONE:  Object to the form.

22   THE WITNESS:  I'm sorry.  The policy

23 had --

24   Q    (By Mr. Sanspree) If you look at -- go

25 ahead.  I'm sorry.

Page 27

1      A     The policy had been reinstated.  The

2  system -- we hadn't coded our system.  The

3  premium was received prior to us receiving the

4  official notice of death by the letter.  And it

5  wasn't suspended or coded for death.

6                (Cell phone)

7                MR. SANSPREE:  You all need to get

8  that, Phil?

9                MR. BUTLER:  I'll get it.  Go ahead.

10     Q     (By Mr. Sanspree) Ms. Whitaker, what

11  you just said was the policy was reinstated prior

12  to you receiving official notification of the

13  death by writing; correct?

14                MR. POUNDSTONE:  Object to the form.

15                THE WITNESS:  Yes, sir.

16     Q     (By Mr. Sanspree) But you actually had

17  had notification via telephone conversation;

18  correct?

19     A     No.  I don't have any reason to believe

20  we did.

21     Q     Other than Exhibit 2.

22     A     Exhibit 2 references a phone call.

23     Q     Exhibit 1.  I'm sorry.

24                MR. POUNDSTONE:  Exhibit 1's a depo

25  notice.

1          MR. SANSPREE:  I'm sorry.  I'm getting

2     all confused.  Exhibit 2 should be the letter

3     dated January 26, 2004.

4          MR. POUNDSTONE:  We got that.  That's

5     right.

6          Q     (By Mr. Sanspree) Other than that;

7     correct?

8          A     I'm sorry.  Since we've -- I've got off

9     track here.

10          Q     You got a telephone -- Exhibit 2

11     indicates that there was notification via

12     telephone of the death; is that correct?

13          A     The letter references a telephone

14     conversation, but I have no reason to believe

15     that there was actually one made.

16          Q     Do you have any reason to believe that

17     Mr. Matthews is making up that statement in his

18     letter?

19          A     No, but it would not be following our

20     procedure on how we record deaths or notice of

21     deaths.

22          Q     And the people that would record that

23     is back in the customer service department;

24     right?

25          A     That's correct.

1    Q    Have they made mistakes before in the

2  past?

3    A    I believe everyone makes mistakes

4  occasionally, but this is a normal -- this is a

5  normal function of handling claims on a daily

6  basis.

7    Q    Ms. Whitaker, is it possible that the

8  customer service department had made a mistake in

9  this case?

10    A    It's possible, but it's a routine

11  procedure, and I wouldn't believe that there

12  would be any reason for them to.

13    Q    What other mistakes has the customer

14  service department made if it wasn't mistakes

15  made on procedure?

16    A    Well, actually --

17    Q    You testified everybody makes mistakes.

18  And customer service is there to perform a

19  function and they're there performing a function,

20  should be performing it according to procedure;

21  correct?

22    A    That's correct.

23    Q    And you've testified that everybody

24  makes mistakes and they've made mistakes before;

25  correct?

Page 30

1    A    Yes.  There's -- yes.

2    Q    What other mistakes could they have

3  made if they were not mistakes on the procedure?

4        MR. POUNDSTONE:  Object to the form.

5        THE WITNESS:  Well, in connection with

6  a life claim and reporting of death, I really

7  wouldn't see where there would be one.

8    Q    (By Mr. Sanspree) Other than the letter

9  that we've marked as Exhibit 2?

10    A    Well, I understand Exhibit 2 references

11  a telephone conversation, but it would be out of

12  procedure, it's not within our norm of handling

13  business affairs or recording deaths.  And I have

14  no reason to believe that this claim wouldn't

15  have been handled routinely.

16    Q    Okay.  Now, if you all had been

17  notified of the death on January 11th or January

18  12th via telephone conversation by Mr. Matthews,

19  should that have been noted in the file?

20    A    I'm sorry.  Would you repeat that

21  again?

22    Q    Yeah.  If you had been notified of the

23  death by telephone conversation by Mr. Matthews

24  who wrote the letter that's marked Exhibit 2 on

25  January 11th or March 12th, should that have been

1  noted in the file?

2       A    It would not have been noted in the

3  file.  It would have been noted on our computer

4  system.

5       Q    Should it have been noted on the

6  computer system --

7       A    Yes.

8       Q    -- if that happened?  Is it possible

9  that a mistake was made on Globe Life's behalf?

10      A    It's possible, but I wouldn't feel like

11 it would be.

12      Q    But you don't know for sure?

13      A    No.  But I don't have any reason to

14 believe that it wouldn't have been handled with

15 the normal realm of business.

16      Q    Right, other than the fact that you've

17 testified the customer service department has

18 made mistakes before in the past; correct?

19      A    I indicated that people make mistakes.

20 I make mistakes.

21      Q    I make mistakes, too.  There's nothing

22 wrong with that.  I'm just asking, based upon --

23 you're saying you don't have anything to indicate

24 that a telephone conversation was made on January

25 11th or 12th in the file, but you've also

1    testified that the customer service department

2    has made mistakes in the past; correct?

3         A    Yes, I've testified that there has been

4    errors made in customer service, but this is a

5    routine function that I don't have any reason to

6    believe that it would have been handled any

7    different than any other notice of death that

8    would come through on a telephone reporting

9    notification.

10        Q    Right.  And you don't have any reason

11   to believe that it was done erroneously other

12   than the fact that the customer service

13   department has made mistakes in the past, and the

14   letter that we've marked as Exhibit 2?

15            MR. POUNDSTONE:  Object to the form.

16            THE WITNESS:  Sir, my personal belief

17   is is that we handled this claim, there would be

18   no reason to believe that --

19        Q    (By Mr. Sanspree) Ma'am, I don't want

20   to interrupt you, but I don't want you to testify

21   to your belief or speculate or anything like

22   that.  Just tell me what you know.  I think your

23   lawyer will tell you that, too.

24            MR. BUTLER:  Pardon me just a moment.

25   You're asking her to speculate on the veracity of

Page 33

1    Mr. Matthews' letter.  I mean --

2            MR. SANSPREE:  Well, no, I'm not,

3    actually.  I'm asking her to testify -- she said

4    that the claim -- it should have been noted in

5    the file and she doesn't have any reason to

6    believe that it was not -- that the phone call

7    was not made and was not noted in the file

8    according to procedure.

9            And I asked her, well, you say that but

10   you don't have any reason to believe a mistake

11   wasn't made other than the fact that you've

12   testified previously that mistakes were made, and

13   the letter dated January 26th which indicates --

14   which obviously indicates a prior telephone

15   conversation.

16           MR. BUTLER:  Chris --

17           MR. SANSPREE:  I'm not asking her to

18   speculate on that.

19           MR. BUTLER:  I'm objecting.  I know

20   that's not a question, but your summary is

21   inaccurate, but go ahead.

22      Q    (By Mr. Sanspree) All right.  So just

23   for the record, Ms. Whitaker, can we just go

24   ahead and say that the customer service

25   department has made mistakes in the past,

2cbf423b-0719-40e2-8137-40b55a4de177

1  according to procedure?

2      A    No, we can't.  This is the facts.  Our

3  customer service department has steps in place

4  and has procedures that when they receive a

5  notice of death by phone, it is recorded

6  electronically on the system.  And there would be

7  no reason to believe that if we received a phone

8  call, this would have been handled any other way.

9      Q    Okay.  And that gets back to what I was

10  asking.  You keep saying there's no reason to

11  believe it, but your prior testimony is they've

12  made mistakes in the past; correct?

13      A    I indicated that everyone makes

14  mistakes occasionally.

15      Q    Okay.  And then there's no reason other

16  than that; correct?

17      A    There would be no reason to not handle

18  this routinely.

19      Q    Other than the fact it could have been

20  a mistake; correct?

21      A    I'm sorry.  I just feel like reviewing

22  the file, knowing our procedure and this

23  information, there would be -- there would be

24  some type of indication on the computer system

25  had there even been a phone call.

1    Q    I understand that.  Ma'am,

2  Ms. Whitaker, your testimony is that you don't

3  believe that they would have done anything other

4  than follow procedure, and you don't have any

5  reason to believe they wouldn't have done

6  anything other than follow procedure when

7  notified by phone of the death.

8        And my question is simple.  You don't

9  have any reason to believe that they didn't

10  follow procedure other than the fact that you

11  know they've made mistakes in the past; correct?

12    A    I don't know that they've made

13  mistakes.  I said it's possible.  Everyone makes

14  mistakes.  I'm classifying -- you just indicated

15  that you make mistakes, I make mistakes.

16    Q    I think everybody makes mistakes.

17  Nobody's perfect.  I'm just asking the question.

18    A    I agree no one's perfect.

19    Q    Right.  And my question is:  You don't

20  have any reason to believe that they didn't

21  follow procedure other than the fact that it

22  could have been a mistake?

23    A    I don't believe that they made a

24  mistake.  I don't believe, with a routine notice,

25  that they would make some type of mistake.

2cbf423b-0719-40e2-8137-40b55a4de177

Page 36

1          You're asking me what I believe and
2    what I believe happened in this situation.
3          Q    No, I'm not.  You said you don't have
4    any reason to believe that they didn't follow
5    procedure, and I'm saying other than the fact
6    that they could have made a mistake and not
7    followed procedure.
8          A    It's possible a mistake -- they could
9    have made a mistake.  I don't have any reason to
10   believe they did.
11         Q    Other than the fact that they could
12   have done it?
13         A    Well, sir, I can't agree.  I'm just
14   telling you that what I feel that happened on
15   this, there's no indication of anything else
16   happening on it until we received our notice on
17   January 30th.
18         Q    Is it possible that they simply -- in
19   the customer service department, simply made a
20   mistake and did not note in the computer system
21   that a phone call had been made by Mr. Matthews
22   notifying them of the death of my insured?
23         A    No, I don't believe that.
24         Q    Is it possible?
25         A    No, I don't believe that they would.

2cbf423b-0719-40e2-8137-40b55a4de177

1    Q    It's not possible a mistake could have

2  been made?

3    A    I don't believe -- I don't believe that

4  they would.

5    Q    Is it possible?

6    A    Anything's possible.

7    Q    We'll move on; all right?  So building

8  on that response, you have no reason to believe

9  that procedure was not followed other than it's

10  possible that a mistake was made; correct?

11        MR. BUTLER:  Object to the form.  How

12  many times are we going to do that, Chris?

13        MR. SANSPREE:  If she answers that one

14  without giving this long speech, I can ask my

15  next one.

16        MR. BUTLER:  I don't think you can

17  dictate how she answers.  But you've asked that

18  now, I think I've counted about 12 times.  In a

19  minute --

20        MR. SANSPREE:  I hadn't got a response.

21  I keep getting these long responses.

22        MR. BUTLER:  Yes, you have.

23        MR. SANSPREE:  I get a response but

24  it's non-responsive.

25        MR. BUTLER:  We'll let somebody else

Page 38

1    decide that.  But nevertheless, I'm not going to

2    sit here and just do it 20 times.

3              MR. SANSPREE:  Can we do it one more

4    time?

5              MR. BUTLER:  Go ahead.  One more,

6    Chris.

7              MR. SANSPREE:  I can't even remember

8    the question now, but I think it was --

9              MR. BUTLER:  I'm a very patient person.

10   I'll let you do it one more time.

11             MR. SANSPREE:  I know you are,

12   Mr. Butler.

13             MR. BUTLER:  And don't call me Mr.  I'm

14   old enough as it is.

15             MR. SANSPREE:  We're on the record, so

16   I'm going to call you Mr. Butler on the record.

17             MR. BUTLER:  I've been called worse.

18        Q    (By Mr. Sanspree) There's no other

19   reason to believe that procedures were not

20   followed other than the fact a mistake could

21   possibly have been made?

22        A    There is no reason -- there's no reason

23   to believe that the procedure wasn't followed in

24   this -- in this particular situation.  It would

25   have been a routine customer service call.

Page 39

1        MR. SANSPREE:  Mr. Butler, can I please

2    ask her one more time?  Because she's not

3    answering my question.

4        I'm not trying to be difficult.  I'm

5    just asking there's no reason to believe

6    procedure wasn't followed other than --

7        MR. BUTLER:  One more time, and this is

8    it.

9    Q    (By Mr. Sanspree) Ms. Whitaker, I'm not

10   trying to beat a dead horse here.  What I'm

11   asking is:  You keep saying there's no reason for

12   you to believe procedure wasn't followed.

13       I'm just saying, other than the fact

14   that a mistake could have been made.  It's

15   possible that it could have been made?  Is that a

16   correct statement?

17   A    Mistakes are possible.

18   Q    All right.  And also, other than the

19   fact that the letter that's marked as Exhibit 2

20   indicates that a prior telephone conversation was

21   made?

22       MR. BUTLER:  Object to the form, and

23   I'm going to instruct her not to answer.  You've

24   worn my patience out.

25       MR. SANSPREE:  That's a different

1    question.

2            MR. BUTLER:  It's the same question --

3            MR. SANSPREE:  It doesn't have anything

4    to do with mistakes.  I'm just asking --

5            MR. BUTLER:  Here's the problem with

6    your question.  You're asking her to form a

7    belief tied in with the existence of a

8    possibility.  The lady --

9            MR. SANSPREE:  No, not really, but go

10   ahead.

11           MR. BUTLER:  That's two different

12   things.  That's two different things.  She can --

13   she's admitted to you that it's possible that

14   they could have made a mistake.  She doesn't

15   believe that they did.

16           MR. SANSPREE:  Right.  And I moved on

17   after that.  I'm on this letter now.  There's two

18   things here.  There's two things, Mr. Butler,

19   that I was trying to get out of this.

20           She's saying that she has no reason to

21   believe procedures weren't followed, and I just

22   asked her other than the fact that a mistake's

23   possible.  She said yeah, it's possible.

24           Now I'm saying, and also procedures

25   might not have been followed because of the

Page 41

1   letter that we've marked Exhibit 2 indicates that

2   there was a prior telephone conversation.  And

3   her prior testimony was --

4           MR. BUTLER:  You're asking her to

5   express an opinion on your co-counsel's letter,

6   and that's not appropriate.

7           MR. SANSPREE:  Well, no.  Actually --

8   she's testifying to how a procedure should be

9   followed in the claim department.  And she's

10  testified that if a telephone conversation is

11  made notifying Globe Life of the death, then it

12  would be noted on the computer system.

13          MR. BUTLER:  That's right.

14          MR. SANSPREE:  And then I said, well,

15  is it possible that it was not noted on the

16  computer system because a mistake was made?  We

17  went down 20 questions, according to you.

18          MR. BUTLER:  We did.

19          MR. SANSPREE:  She finally says yes,

20  it's possible that a mistake was made.  Then I'm

21  saying on my next question, is it possible that

22  procedures wasn't followed also because of this

23  letter indicates that there was a prior telephone

24  conversation?

25          MR. BUTLER:  That is not an appropriate

Page 42

1    question, and I'm going to instruct her not to

2    answer that.  She's already answered it before

3    and we let it go.  But you're asking her to

4    interpret your client's lawyer's at the time, her

5    lawyer, the effect of his letter and whether or

6    not that is indicative of whether a mistake was

7    made.

8         MR. SANSPREE:  I was asking her if it's

9    possible that a mistake was made in the procedure

10   at the claim department based upon this letter.

11        MR. BUTLER:  She's already answered

12   that.  Let's move on.

13        MR. SANSPREE:  How did she answer it?

14        MR. BUTLER:  Huh?

15        MR. SANSPREE:  Did she answer in the

16   affirmative?

17        MR. BUTLER:  She answered that it's

18   possible for the customer service people to have

19   made mistakes, just like it's possible for you

20   and I and her to make mistakes.

21        MR. SANSPREE:  Right.  I admit I make

22   mistakes.  I'm just saying -- I'm just asking if

23   it's possible.  I'm asking if this letter

24   indicates it's possible a mistake was made.

25        MR. BUTLER:  You're asking her to form

2cbf423b-0719-40e2-8137-40b55a4de177

Page 43

1    an opinion based on the lawyer for the plaintiff,

2    and I think that's improper, and I think you know

3    that it is.

4              MR. POUNDSTONE:  The letter says what

5    it says.  Now you're taking it the next step.

6              MR. SANSPREE:  I'm not asking for an

7    opinion.  I'm just asking is it possible a

8    mistake was made, because the letter references

9    there was a telephone conversation.

10             MR. BUTLER:  That's not a proper

11   question.  I think you know it.

12             MR. SANSPREE:  Can she answer it?

13             MR. BUTLER:  No.  You're asking her to

14   form a judgment based on the effect of a letter

15   of the lawyer of your client.

16             MR. SANSPREE:  All right.  Are you

17   going to tell her not to answer it?

18             MR. BUTLER:  Yes, sir.

19       Q    (By Mr. Sanspree) Ms. Whitaker -- and

20   I've reviewed the file at least once.  Can you

21   tell me why a reservation of rights letter was

22   never issued to my insured regarding the premiums

23   being late?

24       A    Regarding the premium being late?  I

25   don't understand.

Page 44

1    Q    Well, I mean, we're here because Globe

2    Life is saying that they didn't receive the

3    premium payment on time; is that correct?

4         MR. BUTLER:  Object to the form.

5         THE WITNESS:  I'm sorry.  Will you say

6    that again?

7    Q    (By Mr. Sanspree) Why was this claim

8    denied in this case?

9    A    Because the policy wasn't in force at

10   the time of his death.

11   Q    And why was it not in force?

12   A    Because the premium wasn't paid in a

13   timely manner.

14   Q    Okay.  Now that gets back to what I

15   just asked you.  Can you tell me why a

16   reservation of rights letter was not sent to my

17   client before her claim was denied regarding the

18   premiums being late?

19   A    I don't know what that is.

20   Q    You don't have any idea what a

21   reservation of rights letter is?

22   A    No.

23   Q    And who's responsible for sending out

24   the correspondence from the claim department to

25   insureds?

2cbf423b-0719-40e2-8137-40b55a4de177

Page 45

1      A      Well, the claim -- the claim department

2  in connection with a claim.

3      Q      All right.  And you've been in the

4  claim department, I guess, for about 30 years;

5  right?

6      A      Yes.

7      Q      And you have absolutely no idea what

8  a reservation of rights letter is?

9      A      No, sir.

10      Q      And you have no explanation of why a

11  reservation of rights letter was not sent to my

12  insured for over five months before her claim was

13  denied?

14      MR. BUTLER:  Come on, Chris.  How could

15  she answer that if she doesn't even know what a

16  reservation of rights letter is?

17      MR. SANSPREE:  I'm asking her to tell

18  me why it wasn't sent.  She doesn't have to know

19  what one is, just tell me why it wasn't sent, if

20  she knows.

21      THE WITNESS:  I'm sorry.  I don't know.

22  I mean, I don't know what a reservation of rights

23  letter is.  In May we sent a letter explaining

24  the findings regarding the claim.

25      Q      (By Mr. Sanspree) Let me ask you this,

Page 46

1    Ms. Whitaker.  Do you know whether or not --

2    well, I guess you do.

3         My client's premium check, do you know

4    whether it was actually deposited by Globe Life,

5    that's at issue?

6         MR. BUTLER:  That, again, would be more

7    properly addressed with the other witness, but

8    I'm not going to prevent you from asking her

9    that.

10        THE WITNESS:  Would you repeat it?

11   Q    (By Mr. Sanspree) Do you know

12   whether --

13        MR. SANSPREE:  I've got a check that's

14   marked Lurie 02, Bobby.

15        MR. POUNDSTONE:  Okay.

16        MR. SANSPREE:  I'm looking at it.  Is

17   that the one with her handwriting on the bottom

18   of it?

19        MR. POUNDSTONE:  Yeah.

20        MR. SANSPREE:  On the bottom of the

21   page, not the check.  We'll mark that Exhibit 4.

22        (Plaintiff's Exhibit Number 4 marked

23        for identification purposes and made a

24        part of the record)

25   Q    (By Mr. Sanspree) Do you see Exhibit 4,

Page 47

1    Ms. Whitaker?

2         A     Pardon me?

3         Q     Have they showed it to you?  Have they

4    showed you Exhibit 4 yet?

5              MR. POUNDSTONE:  She's got it in front

6    of her.

7              THE WITNESS:  Yes, I have it in front

8    of me.

9         Q     (By Mr. Sanspree) It should be a check.

10   Do you know -- the question probably is for a

11   different witness, but I'm just wondering:  Do

12   you know whether or not that check was actually

13   cashed by Globe Life?

14             MR. BUTLER:  And Sandy, don't guess.  I

15   don't think he wants an answer whether you think

16   it was or not.  If you know, tell him.

17             MR. SANSPREE:  I just want to know

18   whether she knows.

19        Q     (By Mr. Sanspree) Do you know whether

20   this check was cashed by Globe Life?  When I say

21   "cashed," was it deposited in a Globe Life

22   checking account?

23        A     Well, I don't know if it was deposited

24   in a Globe Life checking account, but it was --

25   it was processed.

1    Q    What do you mean by "processed"?

2    A    Well -- well, it had to be cashed to

3  advance the status on the policy.

4    Q    Right.  And I'm just asking what you

5  mean by "processed."

6    A    Well, it's the same as cashed.

7    Q    Okay.  And do you know -- so Phil won't

8  have to waste his energy, do you know when the

9  check was actually cashed --

10    A    No, sir.  That would be --

11    Q    -- by Globe Life?

12    A    That would be more of a premium

13  accounting function.

14    Q    How many depositions have you given

15  before, Ms. Whitaker?

16    A    About five.

17    Q    Were they all related to claims and

18  people disputing the claims not being paid?

19    A    Yes, sir.

20    Q    And were they all given in the course

21  of litigation where obviously an insured had to

22  file a lawsuit against Globe Life?

23    A    Yes.  Actually, I think --

24    Q    And when you -- go ahead.  I'm sorry.

25    A    One deposition was in connection with

1    some other type of lawsuit someone else was

2    filing.  I don't recall it.

3         Q    Were all the depositions you've given,

4    were they in your capacity as supervisor of the

5    claims department?

6         A    Yes.

7         Q    Do you know where those other lawsuits

8    were pending, what states they were in?

9         A    I don't recall.

10        Q    Do you know whether or not that any of

11   them were in Alabama?

12        A    Yes, I remember one in Alabama.

13        Q    Do you remember -- how long ago was

14   that deposition given?

15             MR. BUTLER:  Chris, do you want me to

16   answer it for you?

17             MR. SANSPREE:  If you want to.  I

18   probably got the information.  I just hadn't

19   looked at it, Phil.  Go ahead.

20             MR. BUTLER:  I can't for the life of me

21   remember, but I can find it, the plaintiff's

22   name.  But it was a rescission case over in

23   Prattville that Cliff and Chip Cleveland had on

24   plaintiff's side.  I can't remember the client's

25   name.  It was about four --

Page 50

1          MR. SANSPREE:  That's fine.

2          MR. BUTLER:  -- about four, four and a

3   half years ago.

4      Q    (By Mr. Sanspree) And do you remember

5   anything about that case, Ms. Whitaker?

6      A    Yes, a little bit.

7      Q    Was that a case that's similar to mine

8   that the policy was rescinded?

9      A    No, sir.

10         MR. BUTLER:  I object to the form of

11  the question.  Your policy wasn't rescinded.

12         MR. SANSPREE:  You said it was a

13  rescission case.  I was basing my question on

14  your statement.

15         MR. BUTLER:  You said "like yours."

16  Your policy wasn't rescinded.

17         MR. SANSPREE:  Well, they returned the

18  premiums back.

19         MR. BUTLER:  That's right, but it

20  wasn't a rescission.  You know it wasn't.

21         MR. SANSPREE:  All right, Phil.

22     Q    (By Mr. Sanspree) Was the plaintiff in

23  that case Selman, Ms. Whitaker?

24     A    Yes, sir.

25     Q    And I've also got a Lively versus Globe

2cbf423b-0719-40e2-8137-40b55a4de177

Page 51

1    Life in Otago County.  Do you remember anything

2    about that?

3         A    No, sir.

4         Q    Did you give a deposition in that case?

5         A    I don't really recall.

6             MR. BUTLER:  I don't think so, Chris.

7             MR. SANSPREE:  Phil, I'm looking at

8    discovery responses.  The way I'm getting -- the

9    way I'm picking up this information is you all's

10   responses but also from her testimony.

11            I think she's only testified in that

12   Selman case, given a deposition in that Selman

13   case; is that correct, sir?

14            MR. BUTLER:  In Alabama, that's my

15   recollection.  The Lively case didn't proceed

16   very far.  It didn't go as far as depositions.

17        Q    (By Mr. Sanspree) Ms. Whitaker -- I'm

18   not suggesting that you should have reviewed

19   these -- but have you reviewed these

20   Interrogatory responses from Globe Life?

21        A    Yes, sir.

22        Q    And I'm looking at Interrogatory

23   response number 4.

24            MR. SANSPREE:  Phil, do you have those?

25            MR. BUTLER:  I do.

Page 52

1   Q     (By Mr. Sanspree) I think Barbara

2   Hernandez signed these so, Ms. Whitaker, don't

3   feel like you should have looked at that.  I'm

4   not saying that.  I'm not trying to imply that.

5   Well, you did sign them, too.

6   A     Yes, sir.

7         MR. POUNDSTONE:  Yes, she did.

8         MR. BUTLER:  What's your question?

9   Q     (By Mr. Sanspree) So, ma'am --

10        MR. POUNDSTONE:  Are you on number 4?

11        MR. SANSPREE:  Yeah.  I'm trying to

12  wait for her to get there.

13        MR. POUNDSTONE:  Okay.

14        THE WITNESS:  Okay.

15  Q     (By Mr. Sanspree) So, ma'am -- first

16  you see your signature back -- I'm going to flip

17  off Interrogatory number 4.  On page 17, is that

18  your signature?

19  A     Yes.

20  Q     And did you review the response before

21  you signed it?

22  A     Yes, sir.

23  Q     And so flip back to Interrogatory

24  number 4.  It lists some cases in Alabama, I

25  think seven cases.  Do you see those?

2cbf423b-0719-40e2-8137-40b55a4de177

Page 53

1    A    Yes, sir.

2    Q    And, ma'am, did you give testimony in

3  any of these cases other than the Selman case

4  which is the case number one?

5    A    No, I don't believe I did.  I don't

6  recall any of the names.

7    Q    Ma'am, I'm just asking if you know what

8  any of these other cases -- I know you didn't

9  give deposition testimony.

10        Do you know what any of these other

11  cases involved, the facts of the cases or

12  anything like that?

13    A    No.  I don't recall.

14    Q    Ms. Whitaker, are you aware of any

15  other instances where phone calls were made to

16  Globe Life that were not documented on the

17  computer system?  Are you aware of any of that

18  ever happening?

19        MR. BUTLER:  Are you speaking of notice

20  of death phone calls or just any?

21        MR. SANSPREE:  Any phone calls,

22  generally, and then I'll get down to --

23    Q    (By Mr. Sanspree) Are you aware of any

24  phone calls coming in on claims that are not

25  noted on the computer system?

Page 54

1      A     No, I'm not.

2      Q     And then Phil narrowed me down.  I

3  should have done that in the first place.

4            Are you aware of any phone calls coming

5  in notifying Globe Life of a death that were not

6  noted on your system?

7      A     No, I wouldn't be aware of any.

8      Q     Back to Lurie 03.

9            MR. SANSPREE:  Bobby, this is one you

10 all produced to us.  It would be Globe Life 03.

11           MR. POUNDSTONE:  Okay.

12     Q     (By Mr. Sanspree) Ms. Court reporter,

13 have we marked this as an exhibit yet?

14           THE REPORTER:  No, we haven't.

15           (Plaintiff's Exhibit Number 5 marked

16           for identification purposes and made a

17           part of the record)

18     Q     (By Mr. Sanspree) Ma'am, can you tell

19 me whose handwriting that is on 03 which we've

20 marked Exhibit 5?

21     A     I'm sorry.

22     Q     I'm sorry.  Ms. Whitaker, I'm talking

23 to you now.

24           Ma'am, can you tell me whose

25 handwriting that is on Exhibit 5 at the bottom

Page 55

1    part?

2        A    Yes.  It's a claims examiner by the

3    name of Wendy Hamrick.

4        Q    How do you know that that's her

5    writing?

6        A    Her little initials is at the bottom,

7    and I'm familiar with her writing.

8        Q    The copy you're looking at, does it

9    have the redacted section down at the bottom,

10   looks like somebody went through with a magic

11   marker and marked something out?  Do you see

12   that?

13       A    Yes.

14       Q    Do you know what's under that?  Do you

15   have a copy that's not blacked out?

16       A    Yes.

17       Q    Can you tell me what it says?

18           MR. POUNDSTONE:  Chris, it's

19   communications between, I believe, Wendy and the

20   legal department.  So we've asserted the

21   attorney/client privilege as to that

22   communication at the bottom.

23           MR. SANSPREE:  Sure would like to know

24   what it says, Bobby.

25           MR. BUTLER:  You probably wouldn't.  We

Page 56

1    might be able to tell you if you agree that it's

2    not a waiver, but we'll talk about it later.

3         MR. SANSPREE:  There's some other

4    stuff, too, Phil.  And Bobby's been nice enough

5    not to waive some privilege with me when I've

6    sent him some documents.

7         MR. BUTLER:  You mean you made a

8    mistake?

9         MR. SANSPREE:  That would be correct.

10   Q    (By Mr. Sanspree) Ms. Whitaker, do you

11   know what happened to that Selman case?  Did you

12   all go ahead and pay it?

13   A    No, sir.

14   Q    Just got to ask you.

15        MR. BUTLER:  Thank you.  She didn't

16   answer all the rest of the question.  Huh?

17        MR. SANSPREE:  Go ahead, Phil.  I'm

18   sorry.

19        MR. BUTLER:  You didn't let her answer

20   the rest of the question.  You asked her if she

21   paid it and you asked her if she knew what

22   happened to it.

23        MR. SANSPREE:  I probably don't want to

24   know the answer to that one.

25        THE WITNESS:  No.  We won.

Page 57

1     Q     (By Mr. Sanspree) Let me ask you this,

2   Ms. Whitaker.  The Selman case, did that involve

3   a late payment of premium, too?

4     A     No, sir.

5     Q     Did that have to do with some alleged

6   misrepresentations on the application?

7     A     Yes, sir.

8     Q     Were they material?

9     A     Yes, the health history was material.

10    Q     As far as the involvement with your

11  claim, is it your testimony that you just

12  supervised the other individuals that were

13  handling this claim that we're here about today?

14    A     Well, it's my responsibility, yes, to

15  supervise the individuals.

16          MR. BUTLER:  He asked you what you did.

17          THE WITNESS:  Oh, well, I reviewed the

18  claim at one time.  I've initialed the claim.

19    Q     (By Mr. Sanspree) Right.  And you

20  testified previously that initially you

21  determined that the claim was payable; correct?

22    A     Yes, based on the facts of our

23  investigation of the accident.

24    Q     Go ahead.  I'm sorry.  We've got a

25  delay here and I keep cutting you off.  I'm not

Page 58

1   intentionally doing that.  It's just there's a

2   delay between me and you.

3          Do you remember the date that you

4   determined it was payable?  I may have already

5   asked you that.

6      A    Yes, it was May 6th, '04.

7      Q    I noticed that you looked down at some

8   documents.  Which documents were you referring

9   to, please, ma'am?

10     A    Globe Lurie 5.

11         MR. POUNDSTONE:  That's the one -- the

12  documents produced by us, document 0005.

13         MR. SANSPREE:  I don't have 5.  I don't

14  have 5.  I've got 4 and then it goes to 6.  Can

15  you explain to me what the document looks like?

16         MR. POUNDSTONE:  Do you want me to tell

17  you?  At the top it says Life Claims Evaluation

18  Form.

19         MR. SANSPREE:  I don't have that,

20  Bobby.  I've got 1 -- well, yeah, I do, too.

21  It's out of order.

22     Q    (By Mr. Sanspree) Can you tell me --

23  Ms. Whitaker, the copy you have, does it have at

24  the bottom, is that blacked out, too?

25     A    Yes, sir.

Page 59

1    Q    Do you have a copy that's not blacked
2  out?
3    A    Yes, sir.
4    Q    What does it say?
5         MR. POUNDSTONE:  It's the same
6  attorney/client privilege as to the other
7  document we referenced, just notations of
8  communications with the legal department.
9    Q    (By Mr. Sanspree) All right.
10  Ms. Whitaker, I noticed -- are those your
11  initials right there at the bottom by 5-6-04?
12    A    Yes, sir.
13    Q    And it says "pay", and then your
14  initials, then 5-6-04; correct?
15    A    Yes, sir.
16    Q    And then it says "but late premium"
17  after that; correct?
18    A    Yes, sir.
19    Q    Is that your handwriting?
20    A    No, sir.
21    Q    Do you know whose handwriting that is?
22    A    Yes, sir.
23    Q    Whose is it?
24    A    It's Inga Lorrah, the supervisor of the
25  life claim department.

Page 60

1    Q    Can you spell her last name for me,

2   please, ma'am?  I think she's in the

3   Interrogatories.

4    A    L-O-R-R-A-H.

5    Q    And so at least by May 6th, you all are

6   going to pay the claim and you all knew the

7   premiums were late, or allegedly late?

8         MR. POUNDSTONE:  Object to the form.

9         THE WITNESS:  No.  We didn't realize

10   that the premium reinstatement wasn't done

11   accurately until May -- approximately May 13th.

12    Q    (By Mr. Sanspree) Can you tell me why

13   it says "but late premium" written on that

14   document that is dated 5-6-04, then?

15    A    Well, someone reviewed the file after I

16   made that suggestion.

17    Q    Do you know that to be true or are you

18   just speculating as to what may have occurred?

19    A    Well, I know that to be true by the

20   fact that Wendy wrote on May 13th.

21    Q    Right.  But you don't know whether or

22   not they knew the premiums were late on May 6;

23   you're just speculating based on the other

24   document; correct?

25         MR. BUTLER:  Object to the form.

2cbf423b-0719-40e2-8137-40b55a4de177

Page 61

1          THE WITNESS:  Say that again.

2      Q    (By Mr. Sanspree) What I'm asking is,

3  that's not your handwriting.  You've testified

4  that's Inga Lorrah's handwriting.

5      A    That's correct.

6      Q    And you also testified that they wrote

7  that -- you hadn't testified to that.  Your

8  understanding is that was written after the claim

9  was reviewed based upon -- at a later date based

10  upon another document that's dated May 13, 2004;

11  correct?

12      A    I'm sorry.  I couldn't hear you with

13  the papers shuffling.

14      Q    I'm sorry.

15          MR. SANSPREE:  Let me start over, Phil.

16  Please let me ask her again so I can start over.

17          MR. BUTLER:  Absolutely.

18      Q    (By Mr. Sanspree) First, your testimony

19  was that's Inga Lorrah's handwriting that says

20  "but late premium"; is that correct?

21      A    Yes, sir.

22      Q    And do you know one way or the other

23  whether that was written on there on May 6, 2004?

24      A    I don't know if -- I don't believe it

25  to be written on there on May 6th.

Page 62

1     Q    But you don't know one way or the

2  other?

3     A    No, I couldn't give you the actual date

4  other than the documents in the file.

5     Q    Right.  My long question was based on

6  that, so you cleared that up.

7         It says "pay," and it has your initials

8  dated 5-4-06.  After that it's blacked out.  Then

9  after that it says "but late premium"; correct?

10     A    Yes, sir.

11     Q    So somebody at some point saw that you

12  said pay it or you had approved the claim;

13  correct?

14     A    That was my suggestion, yes.

15     Q    And then they said but it was late

16  premium.

17     A    Yes.

18     Q    So at least you can glean from this

19  document that the benefits were still going to be

20  paid; correct?

21     MR. POUNDSTONE:  Object to the form.

22     Q    (By Mr. Sanspree) That it's just late

23  premium but they were going to pay it?

24     A    No.

25     Q    That wouldn't be a reasonable

1    interpretation?

2        A    No, sir, because all the facts hadn't

3    come to light.  That's why we have steps in place

4    to make sure the claims are handled accurately.

5        Q    Yes, ma'am.  But wouldn't it be a

6    reasonable interpretation from reading this note

7    down at the bottom -- I have no idea what it says

8    under that black part -- but wouldn't it be a

9    reasonable interpretation after reading this note

10   that you all were going to pay it even though you

11   knew it was a late premium?

12       A    No, sir, that's -- that's not.

13       Q    That's not reasonable?

14       A    No.  I don't agree with that at all.

15       Q    I understand you don't agree with it,

16   but would it be a reasonable interpretation?

17            MR. POUNDSTONE:  Object to the form.

18            THE WITNESS:  The only reason that --

19   based on the -- I indicated I believed it was

20   payable based on the information we received from

21   the accident.

22       Q    (By Mr. Sanspree) Right.

23       A    I hadn't been aware of the

24   reinstatement premium being received after the

25   date of death.  I would have addressed that.

Page 64

1    Q    Okay.  Would this be a reasonable

2  interpretation?

3         MR. POUNDSTONE:  Object to the form.

4    Q    (By Mr. Sanspree) The claim should have

5  been paid?

6    A    No, the claim shouldn't have been paid.

7    Q    Let me ask you this, then.  If it's

8  possible that the customer service department

9  made a mistake and didn't note on the computer

10  system that a call had been made notifying Globe

11  Life of the death, if that's possible and the

12  mistake had been made and the check sent and

13  Globe Life cashed it and adjusted the claim and

14  realized later that they had said the claim was

15  payable but the premium was late, would the claim

16  be payable then?

17         MR. POUNDSTONE:  Object to the form.

18         THE WITNESS:  The claim could have

19  never been paid.  The individual was deceased

20  prior to receiving money, and the policy wasn't

21  in force.

22    Q    (By Mr. Sanspree) Right.  Do you

23  know -- but you don't know whether you all were

24  notified prior to cashing the check of the death,

25  do you?

Page 65

1    A    No, but it wouldn't make any

2  difference.

3    Q    I mean, if you're notified of the death

4  and then you cashed the check, would the claim be

5  payable then?

6    A    Repeat that one more time.

7    Q    If you were notified of the death prior

8  to cashing the check and you cashed the check,

9  should Globe Life go ahead and pay the claim?

10    A    No.

11    Q    If you cashed the check after you knew

12  he was dead, you wouldn't pay it?

13    A    Well, we couldn't have reinstated it.

14  The individual was deceased.  The policy lapsed.

15    Q    Tell me the safeguards that are in

16  place to protect Globe Life from receiving phone

17  calls and not noting the computer system

18  regarding death claims.

19    A    I'm sorry.  I don't understand your

20  question.

21    Q    Are there any safety measures in place

22  that Globe Life has to prevent people from

23  receiving -- in the customer service department

24  from receiving telephone calls notifying them of

25  death of insureds so that they have to put it on

2cbf423b-0719-40e2-8137-40b55a4de177

1    the computer system, where they can't just make a

2    mistake and not just put it on the computer

3    system?  Is there anything --

4         A    You would have to address that with --

5    a representative from customer service would be

6    able to handle that.

7         Q    Are you aware of any safety measures

8    that are in place yourself as head of the claim

9    department?

10        A    That would be a customer service

11   representative able to handle that to answer your

12   question more accurately.

13        Q    Well, actually, to answer my question

14   more accurately, are you aware?  Are you aware of

15   any such measures?

16        A    I have no personal knowledge of their

17   procedures.

18        Q    Do you have any knowledge, whether it

19   be personal or as a company representative?

20        MR. BUTLER:  She's not being put up in

21   that area as a company representative.

22        MR. SANSPREE:  She's in the claim

23   department.

24        Q    (By Mr. Sanspree) I was asking as a

25   claims rep for the company, are you aware of any

Page 67

1  safety measures in place to keep customer service

2  employees from receiving phone calls and not

3  noting the phone calls regarding deaths on the

4  computer system?  Are you aware of any such

5  measures?

6          THE WITNESS:  As I said, I don't know

7  what their procedures and safeguards that they

8  have in place.  I don't feel like I'm capable of

9  giving you an accurate answer on that.

10     Q    (By Mr. Sanspree) Are you aware or not?

11         MR. BUTLER:  She just answered it,

12  Chris.

13         MR. SANSPREE:  Well, she's not

14  answering it.  She's not saying whether she's

15  aware of it or not.

16         MR. BUTLER:  She hadn't used your

17  words.  She doesn't have to.  She said she wasn't

18  aware of the procedures for the safeguard.

19         MR. SANSPREE:  Thank you.  Thank you.

20     Q    (By Mr. Sanspree) Do you know whether

21  there are any at all?  I know you may not be

22  aware of what they are, but are there any in

23  place at all?

24     A    I don't know what their procedures and

25  their policies are and what type of safeguards

2cbf423b-0719-40e2-8137-40b55a4de177

Page 68

1    they have up there.  I would -- I would feel that

2    there was --

3         MR. BUTLER:  Don't guess.

4         THE WITNESS:  Okay.

5         Q    (By Mr. Sanspree) Let me ask you this,

6    Ms. Whitaker.  Do you all ever take claims and

7    have a meeting with your claims examiners and

8    review the files to determine whether or not they

9    should be payable or not, like in a group

10   setting?

11        A    I'm sorry.  I don't really understand

12   the question.

13        MR. BUTLER:  You mean like a claims

14   committee?

15        MR. SANSPREE:  No.  Let me try to set

16   it up first.

17        MR. BUTLER:  Sure.

18        Q    (By Mr. Sanspree) Tell me how, if a

19   claim examiner has a question, how do they come

20   to you?  First, do they come to you for

21   explanations?

22        A    Yes, they could come --

23        Q    Or to answer the question?

24        A    They could come to me or they could go

25   to the supervisor.

1    Q    And do they do that on a individual

2  basis or do you all have, like, a meeting time

3  where you can meet and review files, or both?

4    A    They would do it on a individual basis.

5    Q    Do you all -- when I say "you all,"

6  does Globe Life have, in the claim department, do

7  you all ever review files like in a group setting

8  where more than two people are present?

9    A    Yes.  Yes, two people could review a

10  file together.

11    Q    Do you all have any specific names for

12  those meetings?  I mean, do you call it like

13  a round table meeting or anything like that?

14    A    No, sir.

15    Q    Who would be present?  Do you all have

16  any people that specialize -- like a physician or

17  anything like that that would attend some of

18  these claims for benefits?

19    A    Well, we don't really have -- I think

20  you're asking if we have a group meeting that

21  discussed the claim.

22    Q    Right.

23    A    And we don't have a group meeting.  I

24  thought you were talking about two people,

25  supervisor and employee, discussing how a claim

1    should be reviewed.

2        Q    In the claim department, do you all

3    have any physicians that are employed by Globe

4    Life in your department?

5        A    No, we don't have any physician

6    employed in our department.

7        Q    What department are they employed --

8    would a physician be employed in?

9        A    We have a medical director that comes

10   in to review claims periodically.

11       Q    And does that medical director review

12   life claims?

13       A    Yes, he reviews some life claims.

14       Q    And when he reviews those life claims,

15   does he do that by himself or is someone from the

16   claim department present when he's reviewing the

17   file?

18       A    It could be either way.

19       Q    On this file, do you know whether or

20   not there was ever a meeting discussing this file

21   and the facts of this case?

22            MR. BUTLER:  With the medical director?

23            MR. SANSPREE:  No, first in general.

24            MR. BUTLER:  Okay.

25            THE WITNESS:  No, I'm not aware of any

Page 71

1    meeting.

2        Q    (By Mr. Sanspree) Did you participate

3    in -- just to clarify your answer, are you

4    referring to a meeting as being more than just

5    you and one individual or you're not aware of any

6    meeting that you had?

7        A    I'm trying to understand.

8        Q    That's probably a bad question.

9        A    Are you asking me if I'm aware of a

10   group meeting together on this particular claim?

11       Q    Yeah, right.

12       A    No, I'm not --

13       Q    More than just you and the person

14   handling the claim, the claim adjustor, was there

15   anybody that -- did you ever have a meeting where

16   it was just more than you and that person --

17       A    No.

18       Q    -- on this file?  And did you ever meet

19   with an individual on this file?

20       A    I don't really recall.  I don't believe

21   so.

22       Q    So when you reviewed the file and

23   signed off on it, did somebody just leave it in

24   your office?  How did that work?

25       A    No.  When I reviewed the file on May

Page 72

1    6th --

2         Q    Yes, sir.

3         A    -- and I suggested pay on it.  This is

4    over my limit of approval.  I can't approve a

5    $100,000 claim.  And it would have been sent to

6    our legal area to review.

7         Q    All right.  So the legal department,

8    they reviewed the file to determine whether or

9    not it should be paid; correct?

10        A    Yes.  They reviewed the file to

11   determine if it was --

12        Q    Okay.  So when you -- did you ever meet

13   with anybody from the legal department on this

14   file?

15        A    Not that I recall.

16             MR. BUTLER:  I assume you're talking

17   about before the lawsuit.

18             MR. SANSPREE:  Right.

19             THE WITNESS:  Not that I recall.

20        Q    (By Mr. Sanspree) What is your limit of

21   payability?

22        A    At this time it's 50,000.

23        Q    What was it at the time this claim was

24   made back in '04?

25        A    I don't really recall, but it would

2cbf423b-0719-40e2-8137-40b55a4de177

Page 73

1  have been less than 50-.

2       Q    Did you just get a promotion?  I didn't

3  mean a promotion.  Did they just up your limit

4  recently to 50,000?

5       A    Yes, sir.

6       Q    How do you know that it -- okay.  When

7  did they up your limit to 50,000?

8       A    I don't recall that, either.

9       Q    So if I understand your testimony

10 correct, you reviewed the file on May 6th, and to

11 the best of your recollection on an individual

12 basis.  Is that a correct statement of your

13 testimony?

14      A    Yes, sir.

15      Q    And you determined, as head of the

16 claim department, that based on the facts you had

17 on May 6th, 2004, that the claim should be paid.

18      A    Yes.

19      Q    Correct?

20      A    Based on only the facts that I had in

21 the medical -- in our investigation in connection

22 with the accident.

23      Q    Right.  And so you say -- you note on

24 the file that it's payable but it's over your

25 limit; correct?

2cbf423b-0719-40e2-8137-40b55a4de177

Page 74

1    A    Yes.

2    Q    And so then you forward the file to the

3    legal department; correct?

4    A    Yes.

5    Q    What is the legal department's limit of

6    payability?  Any claims or --

7    A    I don't know what their limit is.

8    Q    I mean, obviously if you have a million

9    dollar policy -- have you ever had to forward a

10   million dollar file to the legal department?

11   A    No, sir.

12   Q    What's the largest file -- when I say

13   "file," what's the largest benefit claim you have

14   forwarded to the legal department?

15   A    Oh, I believe we've had 250-, possibly

16   a 300-.  I don't recall any --

17   Q    All right.  Do you know who at the

18   legal department reviewed this file to determine

19   whether or not it should be paid after May 6,

20   2004?  Which individual?

21   A    Yes.

22   Q    Could you tell me, please, ma'am?

23   A    Mr. Mitchell.

24   Q    What's Mr. Mitchell's first name?  Do

25   you happen to know?  Is Mr. Mitchell in the room,

Page 75

1    by the way?

2         MR. BUTLER:  No.

3         Q    (By Mr. Sanspree) What's Mr. Mitchell's

4    first name, please, ma'am?

5         A    Brian.

6         Q    So he reviewed the file.  You looked

7    down like you're looking at some documents.  What

8    document were you referring to when you found his

9    name?

10        A    I was just reviewing the review sheet.

11        Q    Is that Bates numbered?

12             MR. SANSPREE:  Bobby, is that something

13   I've got?

14             MR. POUNDSTONE:  I think she was

15   looking at 0005.  But I'm not sure -- she can

16   tell you.  I'm not sure that document is what

17   jogged her memory as to who it was.

18        Q    (By Mr. Sanspree) I don't see his name

19   on there anywhere on 05.  How do you know it was

20   Brian Mitchell, ma'am?

21        A    Well, he normally reviews the files.

22             MR. SANSPREE:  Would you be opposed to

23   me taking his deposition, Phil?

24             MR. BUTLER:  Yeah.

25             MR. SANSPREE:  He's obviously involved

Page 76

1  in determining whether or not this claim should

2  be paid.

3         MR. BUTLER:  Well, you've also got a

4  situation where we've been contacted by a lawyer,

5  and I think his advice on the claims matter -- I

6  mean, we got notice from a lawyer in June --

7         MR. SANSPREE:  January.

8         MR. BUTLER:  -- and received it January

9  the 30th, and I think that fits in

10  attorney/client privilege.

11         MR. SANSPREE:  I'm with you, Phil.  I'm

12  not wanting to get into any of that information.

13  But from what I got from the file is that

14  Ms. Whitaker has said the claim was payable but

15  it was over her limit so she sent it on to the

16  legal department.  Evidently they decided they're

17  not going to pay it.

18         MR. BUTLER:  I don't think that's the

19  case.  I think the decision was made after this

20  other lady, Wendy, looked at it.  I think she's

21  addressed that, looked at the premium history.

22         I'll talk to you about deposing Brian

23  later, but I'm not --

24         MR. SANSPREE:  I may not need to, Phil.

25  The way it looks to me is that -- well, you know

1  how it looks to me.  You've been doing it longer
2  than I have.
3         MR. BUTLER:  Do you want to go off the
4  record just a minute?  I don't want to mess up
5  your deposition.
6         MR. SANSPREE:  It doesn't matter
7  because I'm about done, Phil.  I'm not going to
8  ask her any more about it.
9         MR. BUTLER:  I think you're going to
10  find that the claims examiner by the name of
11  Wendy -- I can't recall her last name -- is the
12  one that looked at it after Ms. Whitaker, and
13  she's the one that looked at the details of the
14  premium history and on that basis that it was
15  denied, not a decision by the legal department.
16     Q    (By Mr. Sanspree) Ms. Whitaker --
17         MR. SANSPREE:  Were we back on the
18  record?
19         MR. BUTLER:  We were on the record then
20  because you never said otherwise.
21     Q    (By Mr. Sanspree) Ms. Whitaker, what is
22  Wendy's position in the claim department?  Is it
23  Wendy Hamrick?
24     A    Yes, sir.
25     Q    What is her position in the claim

1  department?

2      A    She's a claims examiner.

3      Q    And how many claims examiners does

4  Globe Life have in their life department?

5           MR. BUTLER:  In January of '04 --

6  excuse me.  January through May of '04?

7      Q    (By Mr. Sanspree) Yes, during while

8  this claim was pending, how many did you all

9  have?

10          MR. SANSPREE:  Was that Mr. Mitchell

11  that just walked by?

12          MR. BUTLER:  No, that's me.

13          MR. SANSPREE:  I'm just playing, Phil.

14     Q    (By Mr. Sanspree) Go ahead.

15     A    I believe, to the best of my

16  recollection, it would have been about four.

17     Q    And do the claims examiners or did the

18  claims examiners back in 2004, did they report to

19  you?

20     A    Yes.

21     Q    Obviously you've had training in

22  handling life claims by Globe Life; is that

23  correct?  Is that a fair statement?

24     A    Yes, I have training.  In 35 years, I

25  hope I'm trained.

1    Q    I was getting to my next question.

2    What training do claims examiners, those four

3    claims examiners, what training do they have

4    regarding looking up people's premium payment

5    history?  Is that something you do on every claim

6    that comes in?

7    A    Yes, before every claim's processed we

8    verify the policy was in force.

9    Q    And was that done on this case?

10    A    Yes, prior to --

11    Q    Was it --

12    A    Yeah, at the time it was being

13    processed or reviewed, examined.

14    Q    How long does it take to check

15    somebody's premium payment history?

16    A    Not very long.

17    Q    How long?

18    A    Well, it's entering -- bringing up a

19    screen on the computer.

20    Q    About 10 seconds?

21    A    No.  It takes a little longer than that

22    to research it.

23    Q    30 seconds?

24    A    No.  I would think more than a

25    couple -- maybe five minutes.  Two, three --

Page 80

1    Q    So it takes five minutes to check

2  somebody's premium payment history; correct?  Is

3  that your testimony?

4    A    It depends on how detailed it is, how

5  far you'd have to go back.  There's a lot of

6  factors involved.

7    Q    How long would it take to check premium

8  payment history on Mr. Lurie?  You reviewed the

9  file.  Just give me your best guess.

10    A    Oh, I believe that she would have spent

11  several minutes researching it, looking at the

12  premium history, seeing if there was any other

13  factors involved through the system.  I'd say

14  maybe -- I just couldn't give you a ballpark

15  figure.

16    Q    I'm looking at a document -- first off,

17  is it your testimony that when a claim comes in,

18  it's part of the procedures in the claim

19  department to check premium payment history?  Is

20  that your testimony?

21    A    Yes.

22    Q    All right.

23    A    I believe --

24    Q    I'm sorry.  We have a delay and I keep

25  cutting you off.  I don't mean to.

Page 81

1      MR. BUTLER:  Finish answering your

2  question.

3      Q    (By Mr. Sanspree) Right.  I'm sorry.

4      A    When a claim comes in, the claims clerk

5  reviews and prints out the initial screen and

6  sends the necessary claim forms.

7      Q    And you said "initial screen."  Are you

8  referring to the premium history?

9      A    No, sir.

10      Q    My question was is it procedure?  Is it

11  the claim department procedure to check the

12  premium payment history when a claim is made?  Is

13  that part of the procedure?

14      A    At the time of examination, it's the

15  procedure to check the premium history.  It's a

16  procedure to review all facts in connection with

17  the claim.

18      Q    Do you all have a procedural manual or

19  anything like that?

20      A    No, sir.

21      Q    How do the four claims examiners, how

22  do they know the procedures that they should

23  follow?

24      A    They have one-on-one training when they

25  begin with the company in our department, with

Page 82

1   our department.

2        Q    Right.  And the one-on-one training

3   that they receive, part of that training is when

4   a claim comes in, you make sure that the

5   premium's paid on time and make sure the policy

6   is in force; correct?

7             MR. POUNDSTONE:  Object to the form.

8             THE WITNESS:  The claim comes -- the

9   claim doesn't exact -- doesn't go to the examiner

10  at the beginning.  The notice of death is set up

11  by a claims clerk who visualizes and sees on the

12  computer system that the policy's paid current

13  and sends the necessary requirements for filing.

14            The claims examiner, prior to

15  determining what benefits would be eligible,

16  verifies the premium payments and the fact if the

17  policy was in force.

18       Q    (By Mr. Sanspree) So before a decision

19  is made on whether or not a claim should be paid,

20  the claims examiner would verify that premium

21  payments had been made and that the policy was in

22  force?  Is that your testimony?

23       A    The claims examiner would verify, prior

24  to issuing any type of benefits, that the policy

25  was in force in accordance with the provisions of

1    the policy.

2        Q    Do you all have any manuals or anything

3    that shows -- who trains these claims examiners?

4    You said one-on-one training. Who's responsible

5    for doing that?

6        A    Myself, the supervisor.

7        Q    Who's you all's supervisor?

8        A    Inga Lorrah.

9        Q    Do you all have anything in writing

10   that would tell you what all to train these folks

11   on?

12        A    No. As I said, it's one on one.

13        Q    So the way I understand the file,

14   Ms. Whitaker, is that the claim was received in,

15   processed, you know, over several months, and a

16   decision was made by yourself that the claim was

17   payable, correct, on May 6th?

18        A    Based on the investigation we did in

19   connection with the cause of death --

20        Q    Right.

21        A    -- my suggestion was that it was a

22   payable claim. Had I been aware of all the

23   circumstances and facts and the premium -- that

24   the policy wasn't in force, it wouldn't have been

25   my suggestion to make payment.

Page 84

1    Q    All right.  And you suggested to make

2  payment.  I guess did you verify the premiums had

3  been made?

4    A    No, sir, I didn't.

5    Q    Did you verify that the policy was in

6  force?

7    A    No, sir, I didn't.

8    Q    So you did not follow procedure of the

9  claims department?

10    MR. POUNDSTONE:  Object to the form.

11    THE WITNESS:  I wasn't the examiner to

12  process the benefits.  My suggestion was to

13  approve the claim.  And once it's -- then it goes

14  to an examiner to determine what benefits would

15  be eligible under the contract and the provisions

16  of the policy.

17    Q    (By Mr. Sanspree)  Okay.  So --

18    A    And that examiner determined that the

19  policy was not in force at the time of death.

20    Q    So you all get the claim.  Evidently

21  the claim goes to a claim clerk.  Can you tell us

22  who the claim clerk is?  Who is that?

23    A    Linda Lawson in our area.

24    Q    How is that different from a claim

25  examiner is what I'm trying to get at?

1      A     The clerk is only responsible for

2   sending out the necessary claim forms.

3      Q     So the clerk just sends out the claim

4   form.  A case was assigned to the claim clerk or

5   the claim clerk sent out the claim form -- this

6   case is what I'm referring to -- and the claim

7   came in and it was assigned to a claims examiner?

8   Is that true?

9      A     No.  The claim -- the claim goes

10  through several steps during the processing.  The

11  claims --

12     Q     All right.  I know you're going to give

13  me all these steps it goes through, but what I'm

14  trying to get at, by the time you received the

15  file on May 6th, had a claims examiner looked at

16  the file at all?

17     A     No, sir.

18     Q     Who looked at the file before you

19  decided that it was payable?

20     A     A medical reviewer reviewed the

21  documents that we received.

22     Q     All right.  So from January to May 6th,

23  a medical reviewer reviewed the file?

24          MR. BUTLER:  Object to the form.

25     Q     (By Mr. Sanspree) Who else reviewed it?

Page 86

1    A    No, sir.  When we received notice of

2    death, a claims clerk reviewed the letter, sent

3    the necessary claim forms.  Once that information

4    was received in March, we conducted an

5    investigation.

6    Q    Who is "we"?

7    A    The company.

8    Q    How?  I mean, the company can't do it.

9    Did the claims examiner do it?

10    A    Our department, the people in the life

11    claims unit.

12    Q    Everybody?  I'm trying to just figure

13    out who looked at it.  Did a claims examiner look

14    at it?

15         The company's incorporated down at the

16    state.  The company can't do it and the claim

17    department can't do it.  It's got to be somebody

18    in the claim department, an employee that

19    reviewed the file.

20         Do you know who it was in your life

21    department that reviewed the file other than a

22    medical reviewer and the claim clerk --

23         MR. BUTLER:  And herself?

24    Q    (By Mr. Sanspree) -- prior to May 6th?

25    A    Yes.  Ms. Knudson reviewed the file.

Page 87

1     Q    Can you spell her last --

2     A    K-N-U-D --

3     Q    I'm sorry?

4     A    K-N-U-D-S-O-N.

5     Q    Okay.  Go ahead.  So she reviewed the

6 file.  I cut you off, and I apologize.

7     A    And she assigned it to an outside field

8 service to obtain the accident report and the

9 toxicology report -- or the coroner's report and

10 the toxicology report.

11     Q    The coroner's report and the toxicology

12 report, they're not at issue in this lawsuit, are

13 they?

14     A    No, sir.

15     Q    Okay.  And who is Ms. -- how did you

16 say her last name?  Knudson?

17     A    Knudson.

18     Q    What is her position with the company?

19 Or what was her position with the company?

20     A    I don't really recall exactly what her

21 title was back then.

22     Q    Is she a claims examiner?

23     A    No, she wouldn't have been a claims

24 examiner.  She would have been a coding.

25     Q    In your Interrogatory responses, number

2cbf423b-0719-40e2-8137-40b55a4de177

Page 88

1    6, you've got her listed as a claims examiner but

2    she's no longer with the company.

3        A    Well, like I say, I just didn't recall

4    at this time.

5        Q    Was she a claims examiner, Ms. Knudson?

6    First -- I'm jumping ahead.  You can review your

7    responses if you want to.  I'm reading from

8    response number 6.

9            MR. POUNDSTONE:  Have we marked those?

10           MR. SANSPREE:  No, Bobby, I didn't.

11           MR. POUNDSTONE:  I just found them.

12           MR. SANSPREE:  I will if you want me

13   to.

14           MR. POUNDSTONE:  It's up to you.  She's

15   got them in front of her now.  I was just trying

16   to find them in my stack of paper here.

17           MR. SANSPREE:  Let's mark those as 6,

18   Bobby, if you don't mind.

19           MR. POUNDSTONE:  Okay.

20           MR. SANSPREE:  Ms. Court Reporter, what

21   did we mark as Exhibit Number 4?

22           MR. POUNDSTONE:  I've got it.  It's

23   Ms. Lurie's check, the premium check, with her

24   handwritten notes down below it.

25           MR. SANSPREE:  Thanks, Bobby.

1          Hey, Bobby?

2          MR. POUNDSTONE:  Uh-huh.

3          MR. SANSPREE:  Can you hear me?

4          MR. POUNDSTONE:  Yeah.

5          MR. SANSPREE:  Evidently she's looking

6    at the responses; correct?

7          THE WITNESS:  Yes, sir.

8     Q    (By Mr. Sanspree) Does that refresh

9    your recollection as to Mrs. Knudson's position

10   with the company back in 2004?

11    A    Yes, sir.  Yes, sir.

12    Q    Is it your testimony that after

13   reviewing the documents, that Ms. Knudson was a

14   claims examiner?

15    A    Yes, sir.

16    Q    And so back to the file and how it was

17   handled.  The claims clerk reviewed the letter

18   and issued the claim form information.  Then a

19   medical reviewer reviewed the file; correct?

20    A    No, sir.

21    Q    All right.  Tell me the steps, then.

22   The claims clerk got the notification.

23    A    Sent the claim forms.

24    Q    Right.  Okay.

25    A    The claim information was received

Page 90

1  approximately March 8th.  Ms. Knudson would have

2  looked at the information and determined if any

3  additional material was needed.

4      Q    And your prior testimony was that the

5  claims examiner should check and verify that

6  premiums had been paid and the policy was in

7  force; correct?

8      A    Yes.

9      Q    Did Ms. Knudson do that at that point?

10     A    I don't know what was in Ms. Knudson's

11  mind at that time or what her reasoning was or if

12  she verified that the system indicated that it

13  was paid to January 8th, '04.

14          MR. BUTLER:  January 8th?

15          THE WITNESS:  January 28th, '04.

16     Q    (By Mr. Sanspree) Okay.

17     A    And if it wasn't done --

18     Q    Go ahead.  I'm sorry.  I keep cutting

19  you -- we have a lag in time.

20     A    And I don't know -- I don't know what

21  was in her mind or if she didn't realize it or if

22  she believed the reinstatement was done

23  accurately or just noted that the system

24  indicated that it was paid to January 28th, '04

25  and proceeded with assigning it to ICS to obtain

1   the additional information we needed to determine

2   if it was eligible.

3        Q    Who is ICS, please, ma'am?

4        A    It's an outside field service that we

5   use occasionally.

6        Q    Is that the outside service that got

7   the accident report and toxicology report and all

8   that you referred to earlier?

9        A    Yes, sir.

10        Q    Now, if Ms. Knudson did not verify the

11   premium payments or whether or not the policy was

12   in force, would that be a violation of the

13   procedures of the claim department?

14        A    Well, as I said, I don't know what

15   Ms. Knudson's thinking was or what her review at

16   that time was or even if she did bring it to look

17   at that screen.

18        Q    I understand you don't know what she

19   did because we'll have to ask her what she did.

20   But assume with me that that was not done.  Would

21   that be a violation --

22        A    Well, her --

23        Q    Go ahead.  I'm sorry.

24        A    An examiner in that certain situation,

25   she wasn't processing the benefits.  She was only

Page 92

1    starting to conduct the investigation.

2        Q    And part of the investigation would be

3    to verify the premium payments; correct?

4        A    Well, she normally should have done

5    that.  But as I said, if she verified the

6    reinstatement was done accurately at that time,

7    I'm just not aware of it.  As I said, I don't

8    know what she looked at.

9        Q    Why is she no longer with the company?

10       A    She's transferred to another company.

11       Q    When you say "transferred," is that a

12   Globe Life company?

13       A    Yes, a sister company.  She moved.

14       Q    Does Globe Life own that sister

15   company?

16       A    I don't know if we own it or how we're

17   related.  I just know it's one of our sister

18   companies.

19       Q    So in response to Interrogatory number

20   6 when you said "No longer employed by Globe,"

21   you're not really sure whether she is employed by

22   Globe or not?

23       A    She's not employed by Globe.

24       Q    Do you know the name of the sister

25   company she's employed by?

1    A    United American Insurance Company.

2    Q    Where is that located?

3    A    McKinney, Texas.

4    Q    Do you know what capacity Ms. Knudson's

5    employed with United American Insurance Company,

6    what's her job title over there?

7    A    No, sir, I don't.

8    Q    Is she in the claims department, do you

9    know?

10    A    I don't know.

11    Q    All right.  Now, you said normally she

12    should have checked to verify the premium

13    payments and should have checked and verified

14    whether or not the policy was in force.  What did

15    you mean by "normally"?

16    A    As a general rule, I would believe that

17    that would have been her procedure.

18    Q    And what are you basing your belief

19    upon?

20    A    Well, that's -- normally that would be

21    something that she would look at had she gone to

22    another screen.

23    Q    And you testified previously there's

24    nothing in writing, she just receives this

25    training about what she normally should have done

Page 94

1    from individuals, correct, one on one?

2    A    Yes, sir.

3    Q    And did she receive her training from

4    you?

5    A    I don't recall if I trained her in this

6    particular position or if it was Inga.

7    Q    But when you train people, do you tell

8    them to verify premium payments and to check

9    whether or not the policies are in force?

10   A    Yes, when the -- before the examiner

11   processes any benefits, yes.

12   Q    And during the investigation phase?

13   A    Yes.  It would have been -- hindsight

14   would have been great looking at it before

15   starting an investigation.

16         Had that been done -- or had we been

17   aware of all the facts, had Mr. Matthews brought

18   it to our attention that there was a question

19   regarding the premium payments back in his

20   original letter, we could have addressed that.

21   But this is an unusual case.

22   Q    So I'm trying to get down the

23   procedures.  Would you agree with me that

24   determining whether or not the premiums had been

25   paid on time and whether or not the policy was in

1   force, is that part of an investigation phase of

2   the claim?

3       A    Yes, it would have been.  In this

4   particular case it would have been nice to have

5   realized that at the beginning or been put on

6   notice that the policy was not reinstated

7   properly.  It didn't meet reinstatement.

8       Q    Now, once a claim is -- say it's

9   approved by you and you don't have to send it to

10  legal because it's -- say it's under $50,000.

11  Once you approve a claim, take me through the

12  steps after.  What do you do with the file after

13  that?

14      A    I would give it to an examiner to

15  process the benefits or determine the eligibility

16  of the benefits.

17      Q    Wouldn't you determine eligibility of

18  benefits before you recommend that it be paid?

19      A    Well, my decision was based on the

20  facts in the file at that time.  And my

21  decision --

22      Q    Wasn't --

23          MR. BUTLER:  Wait a minute.  You're

24  cutting her off.

25          MR. SANSPREE:  I can't help it, Phil.

1    I'm not doing it on purpose.  There's a lag

2    between her statements and my questions, and

3    sometimes I think she's done and she's not.

4              MR. BUTLER:  Well, I know it.

5         Q    (By Mr. Sanspree)  Go ahead.  I'm sorry.

6    Go ahead and finish.

7              MR. BUTLER:  Finish your statement all

8    the way through without pausing so much, please,

9    ma'am.

10             THE WITNESS:  My decision was based on

11   the facts that was in the file at that time.  My

12   decision was based on -- and my recommendation on

13   the facts of investigating the accident, itself.

14             Now, assigning it to an examiner, it's

15   their responsibility at that time, before any

16   payment is issued, to verify that the

17   reinstatement was done correctly, that the policy

18   was in force at the time of death, and in

19   accordance with the provisions of the policy

20   issue any type of benefits that would be

21   available.

22             After the examiner reviewed this and

23   found that the premiums weren't paid correct on

24   time, that it wasn't reinstated accurately, it

25   was -- it was determined that the claim wasn't

Page 97

1    eligible, and we promptly refunded the premium.

2         Q    (By Mr. Sanspree) Okay.  I understand

3    on this case that's what you're claiming

4    happened.  I was asking generally if a claim -- I

5    was asking you to speculate maybe, Phil.

6              Say a claim came in under $50,000 which

7    is under your limit and you approved payment.  I

8    was just asking you what you do with it then.  I

9    mean --

10             MR. BUTLER:  She just told you, Chris.

11             MR. SANSPREE:  Right.  I know, but then

12   she went down this long statement of what

13   happened on this file.

14        Q    (By Mr. Sanspree) It just goes to --

15   tell me where it goes.  If it's under your limit

16   and you approve it, where does it go from there?

17        A    It goes to a claims examiner who

18   would --

19        Q    Okay.  And then --

20        A    -- who would determine that the policy

21   is in force and determine what benefits were

22   eligible and to question anything that they felt

23   like was inappropriate or incorrect with the

24   claim, itself, and bring it to my attention again

25   or to a supervisor.

Page 98

1    Q    Okay.  Were you through?  I don't want

2    to interrupt you.

3    A    Yes, sir.

4    Q    So it goes to the claims examiner.

5    Where does it go from there?  Say they approved a

6    claim.  Where do they send the file from there,

7    or do they send it anywhere?

8    A    No, they don't send it anywhere.  They

9    would -- they would calculate the benefits that

10   would be available under the policy contract,

11   enter it into the system, and a check would be

12   generated.  And the checks would be --

13   Q    Do you --

14   A    The checks would be periodically

15   audited in order to determine that they are

16   issued correctly.

17   Q    Who generates those checks?  Is it a

18   separate department or do you all do it in the

19   same department?

20   A    Well, the information's entered through

21   the computer system, and then the checks are

22   issued from the computer.

23   Q    So it's your testimony that only after

24   you okay -- only after you okayed the payment on

25   this claim that we're here about today, only

Page 99

1   after that is when they determine whether the

2   policy's in force and whether the premiums have

3   been paid and whether or not they're eligible for

4   the benefits?

5        A    In this particular case, the examiner

6   reviewed it when they were determining it and

7   determined that the premiums and reinstatement

8   wasn't done correctly.  It wasn't in force at the

9   time.

10       Q    And that was after -- go ahead.  I'm

11  sorry.  When you stop, I think you're through.

12       A    That it wasn't in force at the time of

13  death, the examiner determined that.

14       Q    And that was after it had been sent to

15  the legal department?

16       A    Yes.

17       Q    Is it standard for the company to, on

18  death claims, to always get a toxicology report?

19       A    It's not standard.  It is -- it would

20  be in this particular case.

21       Q    Why?

22       MR. BUTLER:  Are you limiting your

23  question to this policy type, Chris?

24       MR. SANSPREE:  I was just saying death

25  claims.

1      MR. BUTLER:  I object to the form,

2  then.  You know that they have a number of

3  different policy types of life insurance.

4      MR. SANSPREE:  Right, but there's only

5  one type of death.

6      MR. BUTLER:  No, there's not, either.

7  There's more than one type of death.

8      MR. SANSPREE:  Well, there's different

9  causes of death.  There's only one type of death

10 I'm aware of.

11     THE WITNESS:  I'm sorry.  Do you have a

12 question for me?

13     Q    (By Mr. Sanspree) What I asked you was,

14 was it you all's procedure on death claims to get

15 a toxicology report on the deceased?

16     A    No, it's not standard procedure.

17     Q    Can you tell me why -- I think you

18 testified on this case you all did?  Why did you

19 all do it on this case?

20     A    Because this particular policy type has

21 several exclusions and limitations that need to

22 be met, and we didn't have enough facts and

23 circumstances surrounding the accident to

24 determine if it would have met those criterias.

25     Q    So you all were originally looking at

Page 101

1   the claim to see whether or not the deceased was

2   intoxicated so he would fall within the

3   exclusions?

4       A    That -- that would be one -- that would

5   be one question we had, but there could be many

6   other circumstances involved.

7       Q    So from the very beginning, the claim

8   was being evaluated so not to be paid but to

9   determine whether or not there were any

10  exclusions in force?

11      A    No, sir.

12           MR. POUNDSTONE:  Object to the form.

13           THE WITNESS:  Our job is to --

14      Q    (By Mr. Sanspree) Why did you -- go

15  ahead.

16      A    Our job is to process claims, make

17  payments on claims.  We are trying -- we were

18  trying to obtain the information to determine if

19  it was eligible.

20      Q    So the toxicology report came back

21  negative; correct?

22      A    Yes, sir.

23      Q    So then you move on to some other --

24  what did you investigate the file after that?

25  How did you do it or how did somebody do it on

Page 102

1    your behalf?

2         A    After we reviewed the toxicology

3    report, it was reviewed by our medical director.

4         Q    And who was that, by the way?  You said

5    that earlier.  I never did follow up with that.

6    Who is you all's medical director at that time?

7         A    Dr. Stanley McCampbell.

8         Q    Okay.  So he reviewed the file.  Why

9    was he reviewing the file?

10        A    Just to review the toxicology report to

11   verify that there wasn't anything that we might

12   not be aware of and that it met the guidelines of

13   accidental death.

14        Q    I note on your Interrogatory responses

15   you got Dr. McCampbell is retired.  Do you know

16   what his training was as far as the insurance

17   business, in interpreting insurance language?

18        A    I -- he had years of experience.  As

19   far as any type of degrees and that sort of

20   thing, I wouldn't be able to give that to you.

21        Q    But is it your testimony that you are

22   allowing him to determine whether or not the

23   claim fell within the insurance policy wording?

24        A    No.  We reviewed it with him to get his

25   opinion.

1    Q    On -- did you get his opinion on the
2  medical records or for the insurance claim
3  purposes?
4    A    He reviewed the medical records and the
5  medical examiner's report.
6    Q    Okay.  But you all weren't asking him
7  to make a determination whether or not a claim
8  should be paid under the terms of the policy,
9  were you?
10    A    No, sir.
11    Q    What type of training have the claim
12  examiners had regarding interpretation of policy
13  language?  Do you all train them on that?
14    A    Yes, they would be familiar with the
15  guidelines and the provisions of the policy.
16    Q    How do you know that to be true?
17    A    Well, in this particular instance, we
18  requested a duplicate policy so we would have it
19  in the file.
20    Q    Right, but how do you know that they
21  would be familiar?  When I refer to "they," I'm
22  referring to claims examiners in your department.
23  How do you know they would be familiar with the
24  policy terms?
25    A    Well, they would be asked to read over

Page 104

1    a policy during their training.

2          Q     Is that something that you do when

3    you're training these claims examiners?  Do you

4    go over policy terms and conditions and stuff

5    like that with them?

6          A     Yes, in the past I have.

7          Q     When you say "in the past," you looked

8    like that's not something you normally do.  Is

9    that something -- do you normally do that?

10         A     I don't norm -- I don't do it on a

11   daily basis.

12         Q     When you're training these claims

13   examiners, though, do you normally do it?  I know

14   you probably don't train them on a daily basis.

15   But when you're providing them with training, do

16   you go over policy terms and conditions and try

17   to explain it?  I've been doing insurance work

18   for several years, and I'm still learning.

19         A     That's true.

20         Q     As you can tell.

21         A     Right.  And we have very -- we have

22   several different types of policies.  And that's

23   why we requested a duplicate policy so we would

24   have the policy terms and provisions in the file

25   in case someone --

Page 105

1    Q    But --

2    A    -- in case someone --

3    Q    Go ahead.  I'm sorry.

4    A    -- in case someone needed to refer to

5    it to handle the claim correctly.

6    Q    But I'm just trying to understand the

7    training.  Any training they would receive would

8    be, again, on the one on one from either you or

9    Ms. Inga?

10   A    Yes.

11       MR. SANSPREE:  If you hang on one

12   second, I may be getting close to the end, which

13   I'm sure you're glad.

14       MR. BUTLER:  Do you want me to go ahead

15   and call the other person?

16       MR. SANSPREE:  Yeah, Phil, if you don't

17   mind.

18       MR. POUNDSTONE:  Do you mind taking a

19   quick break?

20       MR. SANSPREE:  Go ahead.  Take one if

21   you need it.

22       (Break from 11:08 to 11:21)

23   Q    (By Mr. Sanspree) Ms. Whitaker, from

24   your testimony, is it fair to say that claims

25   that are over $50,000, once you okay them to be

1   paid, that you forward those on to the legal

2   department?

3        A    Yes.

4        Q    And then to the best of your knowledge,

5   does the legal department review the file along

6   with the policy?

7             MR. BUTLER:  If you know.

8             THE WITNESS:  I couldn't tell you what

9   all factors that they look at.

10       Q    (By Mr. Sanspree) Do you forward the

11  file to them?

12       A    Yes, they would have --

13       Q    The claim file?

14       A    Yes, they have the file.

15       Q    And in that file, is the policy

16  included or a specimen policy?

17       A    Yes.  In this case there would have

18  been.

19       Q    And to the best of your knowledge, the

20  legal department would review the whole claim

21  file; correct?

22            MR. BUTLER:  She's already answered

23  that question.  She said she didn't know what

24  they reviewed.

25            MR. SANSPREE:  That's why I said to the

Page 107

1    best of her knowledge they would review the whole

2    claim file; correct?

3         MR. BUTLER:  She can't have any

4    knowledge if she doesn't know.

5         Q    (By Mr. Sanspree) You sent the claim

6    file to the legal department.  I guess I am going

7    to have to depose somebody from the legal

8    department to see whether or not they review the

9    claim file.  I mean, it's a simple question.

10        You sent the claim file to them that

11   included the claim information you have, and you

12   okayed it May 6th, 2004; correct?

13        A    Yes.  Based on the information that was

14   in the file at that time, yes.

15        Q    And in that claim file that you

16   forwarded to the legal department, did it also

17   include a copy of the specimen policy?

18        A    Yes.

19        Q    All right.  And the duties of the legal

20   department, are they to look at the policy -- to

21   your knowledge, are their duties to look at the

22   policy in the claim file to see whether or not

23   any exclusions apply?

24        MR. BUTLER:  If you know.

25        MR. SANSPREE:  You can tell Phil's been

Page 108

1   doing it for a while because that's telling to

2   you say I don't know.

3           MR. BUTLER:  No, it's not.  If she

4   knows, I want her to testify that she knows.  I

5   don't want her to guess.  You're trying to make

6   her guess.

7           MR. SANSPREE:  I'm with you,

8   Mr. Butler.

9           MR. BUTLER:  No, I don't think you are.

10      Q    (By Mr. Sanspree) Go ahead.

11      A    I don't know every step that they have,

12  what they go through or what they look at.

13      Q    Do you know what their duties are in

14  the legal department as far as -- what is your

15  understanding of the reason why you would send

16  the claim file to the legal department?

17      A    Well, we have steps in place, as the

18  dollar amount of approval, to make sure claims

19  are handled correctly in accordance with the

20  provisions of the policy.  We have safeguards.

21      Q    Okay.  Now, it's your testimony that

22  you want to make sure the claim's handled

23  properly according to the provisions of the

24  policy; correct?

25      A    Yes.

2cbf423b-0719-40e2-8137-40b55a4de177

Page 109

1    Q    And that's why you sent it to the legal

2    department?

3    A    And that it was over my authority.

4    Q    Okay.  So for two reasons you send it

5    to the legal department; first to see whether or

6    not it was handled correctly and in accordance

7    with the policy provisions; and number two, it

8    was over your legal authority -- I mean over your

9    limits of authority?

10    A    Yes.

11    Q    All right.  So the legal department,

12    it's your understanding that they'll review the

13    claim file and the policy to make sure that the

14    claim is handled correctly and is handled in

15    accordance with the policy provisions?  Is that

16    your testimony?

17    A    Yes, but I don't know all -- every

18    point that they look at within a claim file,

19    itself.

20    Q    Yes, ma'am.  And part of making sure

21    that the policy provisions are followed and that

22    the claim is handled correctly would be to

23    determine whether or not certain exclusions would

24    apply; correct?

25    A    Yes.  They would evaluate the claim or

Page 110

1    review the claim in accordance with the

2    exclusions and limitations.

3         Q    So -- I'm sorry.  Yes, ma'am.  So when

4    you boil it down, the legal department is really

5    determining whether or not the claim should

6    actually be payable in accordance with the policy

7    provisions; correct?

8         A    They would be reviewing the file and

9    the facts that were in the file.

10        Q    For what reason?

11        A    Again, to make sure the claim was being

12   handled correctly.

13        Q    Right.  When you do that, you're

14   determining whether or not certain terms and

15   conditions or exclusions apply; correct?

16        A    Yes.

17        Q    And so in essence, they're determining

18   whether or not the claim should actually be paid

19   or not paid --

20             MR. BUTLER:  Object to the form.

21        Q    (By Mr. Sanspree) -- in accordance with

22   the policy provisions?

23        A    Yes, they would be reviewing the file

24   with the information and reviewing my suggestion

25   in accordance with the provisions and exclusions

Page 111

1  of the policy.

2       Q    So if a claim's over $50,000 and you

3  sent it to the legal department, are you all just

4  trying to figure out whether or not certain

5  exclusions would apply so you wouldn't have to

6  pay the claim?

7       A    No, sir.  Our job isn't to --

8       Q    Why would you send it up?

9       A    Our job is to make sure that the claims

10  are handled properly and accurately.  Our job is

11  to get claims -- my job is to see that claims get

12  paid.

13       Q    Yes, ma'am.  I understand that.  But it

14  appears to me from the testimony today that if a

15  claim is a certain amount and benefits, that it's

16  automatically sent to the legal department to

17  review.

18       A    We have steps --

19       Q    Is that true?

20       A    We have steps in place and authority

21  levels to make sure that the claim is looked at

22  twice, that there isn't an error made or an

23  oversight, to make sure that --

24       Q    Right.  And --

25       A    To make sure that the claim is given

Page 112

1  every consideration and handled correctly.

2       Q    Right.  It's your testimony -- if it's

3  under $50,000, you're going to do the same thing

4  for a claim that's under $50,000 as you are for a

5  claim that's over $50,000 in your job capacity?

6  I mean, you're going to try to make sure the

7  claim's payable or not payable -- you're not

8  going to -- that's a bad question.

9       If a claim is over $50,000 and it's

10 above your authority, you're not going to handle

11 that claim differently in your capacity as a

12 claim that's under your authority?

13      A    No.  We handle all claims the same.

14      Q    Okay.  On all claims, your job is to

15 make sure that the policy provisions and terms

16 and conditions and everything are adhered to;

17 correct?

18      A    Yes, sir.

19      Q    So my question to you, if you're doing

20 the same thing for under $50,000 claim as you are

21 for a over $50,000 claim and you're trying to

22 make sure that the policy and procedures are

23 followed and that the claim is handled correctly,

24 why would you send it to the legal department to

25 make sure that the policy provisions are followed

Page 113

1   for an over $50,000 policy?

2       A    Well, levels of authority for claim

3   payment is given to the supervisor and myself as

4   the manager, and even individual claims

5   processors.  It's to ensure that the claim is

6   looked at twice to make sure that there hasn't

7   been anything missed.

8       Q    Right.  And you testified previously

9   that there's two -- two reasons why it was sent

10  to the legal department, this claim, was, number

11  one, is to make sure it was handled correctly and

12  the policy provisions were followed; number two,

13  you said it was above your authority.

14          Is that a correct summation of your

15  prior testimony?

16      A    Yes.

17      Q    All right.  And that policy provisions

18  and the claims were being handled correctly under

19  $50,000, why would you have to send a claim to

20  the legal department over $50,000 to make sure

21  the claim is handled correctly and the policy

22  provisions were followed?

23      A    As I said, we have the safeguards in

24  it, the dollar amount of the claim, so two people

25  would look at it to make sure that there's

Page 114

1  nothing missed.

2         We have the final step where the

3  examiner, who's processing the benefits and is

4  reviewing the premium payments, determining

5  reinstatement was in place at the time, that it

6  was done accurately.  The claims examiner

7  ultimately has some input in it also to make sure

8  that -- that there isn't an error made.

9     Q     By the legal department?

10    A     No.  The claims examiner at the end

11 would even review it when -- when the claims

12 examiner was reviewing the claim.

13         MR. BUTLER:  Go ahead and finish what

14 you're going to say, please, ma'am.

15         THE WITNESS:  Well, I'm just trying to

16 explain that even after I indicate that I believe

17 it was a payable claim, we have safeguards -- and

18 legal reviewed it, we have safeguards in place so

19 the examiner, when processing the benefits, would

20 determine that all other factors were met.

21    Q     (By Mr. Sanspree) And what are those

22 all other factors?

23    A     That there wasn't any late premium,

24 that the reinstatement was done correctly.

25    Q     And you understand that these all other

Page 115

1    factors are at issue in this lawsuit; correct?

2        A    Yes.

3        Q    If I understand your testimony

4    correctly, you send the claims over $50,000 to

5    the legal department to make sure and to double

6    check and make sure the claim had been handled

7    correctly and that all the policy provisions had

8    been followed.  Is that your testimony?

9        A    Yes, and to review a claim that's over

10   my dollar amount.

11       Q    Who reviews or double checks the

12   policies that are under $50,000?  Does anybody do

13   that?

14       A    Yes.  Ms. Lorrah has a limit of

15   $35,000, so she can approve up to 35-.  And then

16   from 35- to 50- I would review.

17       Q    If I understand your testimony

18   correctly, though -- I don't think we're on the

19   same page -- if it's under $50,000 -- I know it's

20   your limit, and you said you didn't know what

21   your limit was back in 2004, but assume with me

22   that your limit was $50,000.

23            If it's under $50,000 and you say

24   payable as you did in this case and you don't

25   send it to the legal department, is there anybody

1  that double checks whether or not it should be

2  payable if you don't send it to the legal

3  department is what I'm trying to get at, other

4  than the claims examiner at the end?

5      A    No, no.  The claims examiner's

6  responsibility is to go behind me and to bring

7  anything that appears inappropriate to my

8  attention.

9      Q    Is there a specific number or amount in

10 benefits that automatically goes to the legal

11 department or is it just whatever's over your

12 head, like over -- what I'm trying to get at is

13 back in 2004, you say that you can't remember

14 what your limit was but you're sure it was less

15 than $50,000.  So my question is:  Is it just

16 whatever -- anything that goes over your limit,

17 does it automatically go to the legal department?

18     A    Yes.  It would have to have a second

19 approval on it.

20     Q    Ms. Whitaker, back in 2004, was anybody

21 above you in the claim department?

22     A    Yes.

23     Q    Who was that?

24     A    Ms. Garrison.

25     Q    Is she still with the company?

1       A    Yes.

2       Q    Did she review the file, this file in

3   this case?

4       A    No.

5       Q    And what was her limit?

6       A    I don't recall what her limit was at

7   that time.

8       Q    Do you know whether or not this claim

9   exceeded her limit in this case?

10      A    I don't -- as I said, I don't recall

11  what her limit was at that time.

12      Q    What was -- was her position -- are you

13  in her position now?

14      A    No.

15      Q    Is she still above you in the claim

16  department now?

17      A    Yes.

18      Q    Why is it that anything that is above

19  your head would go to the legal department

20  instead of Ms. Garrison?

21      A    Well, Ms. Garrison does have a limit,

22  and she does audit certain claim limits.

23      Q    But you don't know what that limit is,

24  and you don't know what it was back in 2004?

25      A    I don't recall what it was back then.

Page 118

1    Q    And you can't explain to us why the

2    claim went immediately to the legal department

3    instead of to Ms. Garrison for review?

4    A    Other than this policy was a

5    contestable policy or an accident which had to

6    meet certain criteria, it was over my limit.  And

7    as I said, I don't recall what her limit was at

8    that time.

9    Q    So if I understand your testimony

10    correctly, this policy went to the legal

11    department because it was a contestable policy

12    and there was an accident involved and that they

13    had to meet certain criteria, "they" being the

14    claimants?

15    A    Yes, sir.

16    Q    So it didn't go to the legal department

17    because it was over your head?

18    MR. BUTLER:  Object to the form.

19    Q    (By Mr. Sanspree) I mean, if

20    Ms. Garrison could have reviewed the file and you

21    don't know what her limits was, then you don't

22    know for sure if it went to the legal department

23    because it was above your authority; correct?

24    MR. POUNDSTONE:  Object to the form.

25    THE WITNESS:  Okay.  Restate that

Page 119

1   again.

2        Q    (By Mr. Sanspree) You just testified

3   that you don't know what Ms. Garrison's authority

4   was back in 2004 as far as being able to pay

5   claims.  Is that a true statement?

6        A    Yes, I don't remember what her examiner

7   limit -- or her authority limit was.

8        Q    And also, Ms. Garrison could review

9   files the make sure that the claims were being

10  handled properly and that certain policy

11  provisions and everything were being met,

12  correct, if it's above your limit?

13       A    She could review them.  That isn't in

14  her normal regular function duties.

15            MR. BUTLER:  It isn't?

16            THE WITNESS:  Well, I mean, she -- we

17  don't normally --

18            MR. BUTLER:  I just asked you which

19  word you used.  It wasn't clear when you stated

20  it.

21            THE WITNESS:  We don't --

22       Q    (By Mr. Sanspree) So based --

23       A    Okay.  On this particular claim, and

24  any claim, we don't flow them through her for her

25  initials or approval on the dollar limit.

Page 120

1      Q    If she's got a higher limit than you

2  do, why not?

3      A    Well, she audits them and releases

4  them.

5      Q    Okay.  Why didn't you all do this in

6  this particular claim?

7      A    In this particular case, the factors

8  are different.

9      Q    Right.  And your prior testimony was it

10  was sent to the legal department because it was

11  above your limit.

12      A    Yes.

13      Q    That was your prior testimony.

14      A    Yes.

15      Q    But that's not an accurate statement,

16  is it?

17      MR. POUNDSTONE:  Object to the form.

18      MR. BUTLER:  How is it not accurate?

19      MR. SANSPREE:  Because it could have

20  gone to Ms. Garrison who had a higher limit.

21      MR. BUTLER:  Could have gone to you,

22  but that doesn't make it inaccurate.

23      MR. SANSPREE:  I don't have any limits.

24  I'd pay the claim.

25      MR. BUTLER:  Go on.

Page 121

1          THE WITNESS:  This claim was being
2     handled as a current investigation.  It was over
3     my dollar amount.  It's in our normal flow to
4     send the claim to the legal department for those
5     specific reasons.
6          Q    (By Mr. Sanspree) Because it's over
7     your dollar amount?
8          A    And that it was an investigative claim,
9     that we investigated it and obtained information
10    to determine if it was eligible.
11         Q    And by "investigative claim," are you
12    referring to the policy type of insurance?
13         A    I'm referring to obtaining the medical
14    information and the ME report and toxicology
15    report to determine if it met the policy
16    provisions and exclusions.
17         Q    And you referred that on to the legal
18    department to make that decision?
19         A    To get their opinion, yes.
20         Q    Do you remember what their opinion was
21    regarding meeting the policy terms and
22    conditions?
23         A    Well, when Wendy sent it back to the
24    legal department regarding the premium and the
25    policy not being in force at the time of death,

Page 122

1    it was returned.

2        Q    And that was determined by the legal

3    department; is that correct?

4        A    To refund the premium?

5        Q    Yes, ma'am.

6        A    That was received after the date of

7    death?

8        Q    Yes, ma'am.  Allegedly.  Was that

9    determined by the legal department?

10       A    Our legal department would have

11   reviewed it again.

12       Q    And what I'm getting at, was the

13   decision to refund the premium, was it made by

14   the legal department?

15       A    Yes.

16       Q    All right.  Ms. Whitaker, can you tell

17   us how the legal department made that decision?

18            MR. BUTLER:  Object to the form.  How

19   can she tell you --

20            MR. SANSPREE:  Well, if you let me

21   finish.

22            MR. BUTLER:  All right.

23       Q    (By Mr. Sanspree) Can you tell us --

24            MR. SANSPREE:  There's a lag,

25   Mr. Butler.  If I pause, you might think I'm done

Page 123

1    like I've been doing with her by accident, so --

2              MR. BUTLER:  Okay.

3         Q    (By Mr. Sanspree) Can you tell me how

4    the legal department makes that decision, given

5    the fact that you had approved the claim and sent

6    it to them?

7         A    Yes.  Wendy, the claims examiner,

8    reviewed the reinstatement, reviewed the date of

9    death prior to processing any benefits, and

10   returned the file to them with an explanation of

11   what was happening -- what had happened on the

12   file.

13        Q    What document are you referring to,

14   please, ma'am?

15             MR. POUNDSTONE:  It's Exhibit 5.  Your

16   Exhibit 5.

17             MR. SANSPREE:  That's coming from

18   the --

19             MR. POUNDSTONE:  It's our document

20   number 0003.

21        Q    (By Mr. Sanspree) Go ahead.  Did that

22   come from the legal department?  Is that what

23   you're saying?

24        A    No.  I'm saying our claims examiner,

25   prior to processing the benefit, reviewed the

Page 124

1    premium payments and the reinstatement and

2    determined that we received the money after the

3    date of death, that the policy wasn't in force.

4         Q    All right.  And so your testimony is

5    that the legal department made the decision to

6    refund the premiums and that this 03 somehow

7    references that decision; is that correct?

8         A    I'm referencing the 03 as it was

9    additional information sent for review to

10   determine if the policy was still eligible under

11   the provisions of the policy.

12        Q    And the statements that you've

13   testified to today on the record regarding the

14   legal department's decision to refund the

15   premiums, is that what's blacked out there at the

16   bottom?

17             MR. BUTLER:  Go ahead.  I'll let her

18   testify if you'll agree that we're not making a

19   blanket waiver of attorney/client privilege.

20   Will you agree to that?

21             MR. SANSPREE:  Yeah.  I'm not going to

22   do that to you.

23             MR. BUTLER:  Okay.

24             MR. SANSPREE:  I'll agree to that.

25             MR. BUTLER:  Go ahead and tell him.

Page 125

1      THE WITNESS:  Yes.  That would have

2  been our directions.

3      MR. SANSPREE:  And with Phil's

4  objection -- I'm not ever going to say you've

5  waived attorney/client privilege or anything, a

6  blanket.  But with Phil's objection -- or

7  statement in mind and my agreement not to waive

8  that, what does it say under that black -- that's

9  blacked out?

10      MR. BUTLER:  With that understanding,

11  I'll let her testify, that it's no waiver.

12      MR. SANSPREE:  Right.

13      THE WITNESS:  I don't know exactly what

14  it says.

15      MR. BUTLER:  Get the original for him.

16      MR. POUNDSTONE:  She's got it in front

17  of her now, Chris.

18      MR. BUTLER:  I think you wanted her to

19  read that, didn't you?

20      MR. SANSPREE:  I wanted just to know

21  what it said since they made the decision not to

22  pay it.

23      THE WITNESS:  Our department asked "Is

24  it okay to refund the late premium?"  And legal

25  indicated "yes."

1    Q    (By Mr. Sanspree)  Let's see.  And do

2  you know when that was done?  Is there a date on

3  there?

4    A    There's no date.

5    Q    I don't know what that date at the

6  bottom is, 5-13, 2004.  You don't know how that

7  got on there, do you?

8    A    That's the date that this printout

9  screen was printed.

10    Q    But you don't know the date that this

11  information was written on there, do you?

12    A    No.

13    Q    The handwriting, you don't know when --

14    A    No, I don't know the actual date, but

15  it had to be after May 13th, '04.

16    Q    Right.  Or it could have been the same

17  day?

18    A    Yes.

19    MR. SANSPREE:  When was that denial

20  letter again, Bobby?  I don't have it in front of

21  me.

22    MR. POUNDSTONE:  My recollection is

23  it's May 18th, but don't hold me to that.

24    THE WITNESS:  May 18th.

25    MR. POUNDSTONE:  May 18th.

Page 127

1    Q    (By Mr. Sanspree) So the handwriting --

2 just trying to narrow it down to when the

3 handwriting could have been put on there.

4         To the best of your knowledge, it would

5 have to be between May 13th and then the denial

6 letter of May 18th; correct?

7    A    Yes.

8    Q    Which is --

9         MR. SANSPREE:  Bobby, we've produced

10 the denial letter as Lurie 05.  And we'll

11 probably mark that as Exhibit 7.  We're going to

12 do it.  We're not going to probably do it.  We're

13 going to do it.

14        MR. POUNDSTONE:  I think she's got my

15 version in front of her, but let me get that

16 version.  Okay.

17        MR. SANSPREE:  If you got writing on

18 there or anything, don't worry about it because

19 we can get the court reporter to -- we'll

20 reference the Bates and we can send them a copy

21 of the Bates.

22        MR. POUNDSTONE:  So you want Lurie 0005

23 as document Number 7 or Exhibit Number 7?

24        MR. SANSPREE:  Right.  Exhibit number

25 7.  And it's dated May 18th, 2004.

Page 128

1           (Plaintiff's Exhibit Number 7 marked

2           for identification purposes and made a

3           part of the record)

4           MR. POUNDSTONE:  She's got it in front

5    of her.

6           MR. SANSPREE:  I think we've marked

7    that handwritten note document previously; is

8    that correct, Ms. Court Reporter?

9           MR. POUNDSTONE:  It's Number 5.

10      Q    (By Mr. Sanspree) Ms. Whitaker, so to

11   the best of your knowledge, that handwriting on

12   Exhibit 5 had to come in between the date at the

13   bottom of Exhibit 5, which is May 13, 2004, and

14   the date of Exhibit 7, which I'll refer to as the

15   denial letter which is dated May 18th, 2004; is

16   that correct?

17      A    Yes.

18      Q    And do you have any information -- I

19   mean, obviously you sent the file to the legal

20   department after May 6th, 2004, when you approved

21   the claim; right?

22      A    Yes.

23      Q    Do you have any way of knowing when the

24   legal department sent it back to you?

25      A    Can I review the file for a minute?

2cbf423b-0719-40e2-8137-40b55a4de177

Page 129

1          MR. POUNDSTONE:  Sure.

2          MR. SANSPREE:  Yes, ma'am.  Take your

3    time.

4          MR. POUNDSTONE:  Here.  This is a clean

5    set that you can look through.

6          THE WITNESS:  Well, it had to be

7    sometime -- well, May 6th, thereabouts, I would

8    have sent it up to them, and it probably would

9    have been returned within a few days and given to

10   the examiner on May 13th.

11      Q    (By Mr. Sanspree) How do you know that,

12   ma'am?

13      A    Well, I have my date May 6th.

14      Q    Right.  I'm not trying to confuse you.

15   I'm trying to follow you along in the documents.

16          How do you know that it was given to

17   the examiner on the 13th?  Is that just from

18   Exhibit 5?  Are you looking at Exhibit 5?

19      A    Yes.  I know she had it at that time.

20          MR. BUTLER:  Chris?

21          MR. SANSPREE:  Sir?

22          MR. BUTLER:  In looking through the

23   original of the claims file --

24          MR. SANSPREE:  Yes, sir.

25          MR. BUTLER:  -- and I have not compared

Page 130

1    the copy, but in reproducing the claims file,

2    there is a sticky note, a little yellow looks

3    like 1-1/2 by 2 sticky note that I'm not sure was

4    copied.

5         MR. POUNDSTONE:  It was not.  I hadn't

6    seen it before.

7         MR. BUTLER:  Bobby says it's not.

8         MR. SANSPREE:  I bet it's damaging to

9    my case, isn't it?

10         MR. BUTLER:  Not really.  But I do want

11    you to be sure we have all of the file.

12         MR. POUNDSTONE:  Can we see it if we

13    hold it up?

14         MR. BUTLER:  Or Bobby can just read it

15    to you.

16         MR. SANSPREE:  Actually,

17    Ms. Whitaker -- you can put it on Ms. Whitaker's

18    forehead.

19         MR. POUNDSTONE:  Can you see it?

20         MR. SANSPREE:  Bobby, I can't read it.

21    The light's different.

22         MR. POUNDSTONE:  It says "To life

23    claims," and there's a 5-14-04 date on it.  And

24    then underneath that it says "To Wendy H."

25         Q    (By Mr. Sanspree) Okay.  Ms. Whitaker,

Page 131

1   are you looking at that?  Are you looking at that

2   yellow sticky?

3           MR. POUNDSTONE:  She has it now.

4           THE WITNESS:  Yes.  Can you see it?

5       Q    (By Mr. Sanspree) I can see the sticky,

6   but I can't see the information on there.  The

7   light's reflecting off of it.  But who wrote that

8   memo, do you know?  Is there any indication on it

9   who authored that?

10      A    That looks like Mr. Mitchell's

11  handwriting at the top.

12      Q    Just for the record, can you read what

13  Mr. Mitchell wrote?

14      A    "To life claims 5-14-04."

15      Q    All right.  And then anything

16  underneath?

17      A    It says to --

18      Q    You said at the top.

19      A    It says "To Wendy H."  Wendy --

20      Q    Is that --

21      A    Wendy Hamrick.

22      Q    Right.  But that's not his handwriting?

23      A    No.

24      Q    Whose handwriting is it that says "To

25  Wendy H."?  Do you have any idea?

Page 132

1      A    I believe it's Deborah Sager's.

2      Q    So when it comes to -- just so I can

3  understand in my head, it would come from the

4  legal department and go to somebody at the life

5  department.  And I take it that note's referring

6  to he probably stuck it on the file and sent the

7  file back to the life department?

8      A    Yes, I believe that would be what would

9  happen.

10     Q    And then is there somebody in the life

11 department that would look at the file and then

12 give it to a claims examiner?  Is it Deborah?  Is

13 that who you said?

14     A    No.

15     Q    What I'm trying to figure out is why it

16 says "To Wendy H," why somebody would write that

17 on there.  Did they look at the file and say this

18 goes to Wendy?

19     A    Well, Wendy sent the -- Wendy sent the

20 file up to them.  This is her note.

21     Q    Okay.

22         MR. POUNDSTONE:  She's referring to

23 Exhibit 5.

24         MR. SANSPREE:  Yeah.

25     Q    (By Mr. Sanspree) Can you tell me

Page 133

1   who -- did you say the lady's name was Deborah

2   that wrote the --

3        A    Deborah Sager, the legal assistant.

4        Q    Is she in the legal department or in

5   your department?

6        A    The legal department.

7        Q    And do you know whether or not your

8   department actually got the file on the 14th or

9   was it sometime after that?  Do you know one way

10  or the other?

11       A    I believe we got it on the 14th because

12  Wendy did another memo to our steno section.

13       Q    Can you refer me to the Bates number at

14  the bottom, if you don't mind?

15            MR. POUNDSTONE:  It's our document

16  number 2.

17       Q    (By Mr. Sanspree) Go ahead, ma'am.  I

18  didn't mean to cut you off.  This indicates

19  that --

20       A    I believe that she got it on the 14th

21  and on the 14th sent it over to our steno section

22  for the letter of explanation.

23       Q    And I know you testified when we first

24  started this deposition that you were in the

25  steno section originally.

Page 134

1          Do they generate the letters for you

2    all to send out to the insureds?

3          A    Yes.

4          Q    And then that generation of the letters

5    is based on information the claim department

6    would provide the steno section; correct?

7          A    Yes.

8          Q    All right.  And they did that on the

9    14th?  Is that your understanding?

10          A    Yes, sir.

11          Q    So just so I can follow the history of

12    the file, you get the claim -- you get the claim,

13    notification of the claim at least by January

14    30th, 2004.  The claim's obviously investigated.

15    On May 6th, 2004, you recommend that it be

16    payable; correct?

17          A    Well, we received notice of death on

18    January 30th.  We didn't receive Proof of Loss

19    and claim forms until approximately March.

20          Q    Right.  And that's why I said you

21    received notice.

22          A    Okay.

23          Q    You at least had notice in January of

24    the death.

25          A    Yes, we had notice of death.

Page 135

1     Q    Okay.  Now I was trying to get how the

2   claim was handled through time.  You get

3   notification of the death, the claim's

4   investigated properly, you get Proof of Loss, and

5   on May 6th, you recommend payment.

6     A    Based --

7     Q    But it's -- right.  Go ahead.  Based on

8   what you had in the file.

9     A    You go ahead.  Yes.

10    Q    And but this policy type's different

11  and the accident is different, so you send it to

12  legal on May -- I guess May 6th.

13    A    Yes.

14    Q    And so the way I understand what we've

15  gone through recently here a few minutes ago is

16  that from May 6th to May 14th, assuming they got

17  it on the 6th, is that the file was reviewed by

18  legal or at least was up in the legal department?

19         MR. POUNDSTONE:  Object to the form.

20  That's not accurate.

21         THE WITNESS:  Okay.  Can you --

22         MR. SANSPREE:  I thought it was pretty

23  accurate.

24         MR. BUTLER:  No.

25         MR. SANSPREE:  The sticky note -- can

Page 136

1  we mark the sticky note?

2         MR. BUTLER:  Sure.

3         MR. POUNDSTONE:  It went from legal,

4  back to Wendy, back to legal, and then back to

5  Wendy again between the 6th and the 14th.

6              (Plaintiff's Exhibit Number 8 marked

7              for identification purposes and made a

8              part of the record)

9    Q    (By Mr. Sanspree) Now, Ms. Whitaker,

10  you heard what your attorney just said.  Could

11  you explain what he was talking about, went to

12  legal, back to Wendy, back to legal, back and

13  forth in between the 6th and the 14th?

14         MR. BUTLER:  We've plowed that ground a

15  couple times, but go ahead.

16         MR. SANSPREE:  I don't think we have

17  done that.

18         MR. BUTLER:  Yeah, we have.

19         MR. SANSPREE:  Not between the 6th and

20  the 14th.

21         MR. BUTLER:  Yeah, we have.

22         MR. SANSPREE:  That's an eight-day

23  span.

24         MR. BUTLER:  Yeah, we have, but go on.

25         THE WITNESS:  From May the 6th, on my

Page 137

1  recommendations, I would have sent it to legal

2  department.

3       Q    (By Mr. Sanspree) Right.

4       A    From there it was returned to us, to

5  our life claims section.

6       Q    On what day?  On what day?

7       A    I have to review the file again.

8       MR. BUTLER:  Chris?

9       MR. SANSPREE:  Sir?

10      MR. BUTLER:  While she's looking for

11 that, if we have the same agreement on non-waiver

12 of attorney/client privilege on that document

13 that is Exhibit Number --

14      MR. POUNDSTONE:  It's not been marked I

15 don't believe.  It is our document number 0005.

16 Have we marked that one?

17      MR. SANSPREE:  No, we didn't mark that.

18      MR. POUNDSTONE:  That's the other one

19 that was redacted.

20      MR. BUTLER:  I'll let her read that to

21 you, what is redacted, if we have the same

22 agreement on non-waiver of attorney/client

23 privilege.

24      That may help you, but I don't think

25 it's going to help you a lot on your chronology.

1    MR. POUNDSTONE:  Let's read this.

2    MR. BUTLER:  Do you want her to do

3    that?

4    MR. SANSPREE:  Well, before we do that,

5    Phil, when you say non-waiver, I mean, is there

6    any -- if this does get past summary judgment and

7    we end up having to give a timeline, can we use

8    that to establish the timeline?

9    MR. BUTLER:  Yes, you can use the

10   information.  I'm just not wanting you to take

11   the position that by showing you this

12   information, which I truly believe is

13   attorney/client privileged, that I'm not making a

14   blanket waiver of attorney/client privilege.

15   MR. SANSPREE:  Blanket waiver, that's

16   agreed.  I would never try to do that.

17   MR. BUTLER:  Okay, yeah.  I'm not

18   saying you couldn't use it or I wouldn't have any

19   reason to show it to you.

20   MR. SANSPREE:  Okay.

21   MR. BUTLER:  I'm just trying to help

22   you, Chris.

23   MR. SANSPREE:  Yeah, I believe you.

24   He's trying to help me help you.

25   MR. BUTLER:  You're doing fine.

Page 139

1        MR. SANSPREE:  Do you all want to mark

2   that or not?

3        MR. POUNDSTONE:  If you're going to

4   mark that, you need to mark both of them.  You

5   didn't mark it either.

6        MR. SANSPREE:  Let's just mark both of

7   them then as Exhibit 9.

8        MR. BUTLER:  I don't have a problem

9   with that.

10        MR. SANSPREE:  Would it be 9 and 10 or

11   8 and 9?

12        MR. POUNDSTONE:  You can just do them

13   collectively as 9.  We'll just refer to 9 as the

14   redacted document.

15        (Plaintiff's Exhibit Number 9 marked

16        for identification purposes and made a

17        part of the record)

18        Q    (By Mr. Sanspree) Go ahead,

19   Ms. Whitaker.  First would you read from the

20   document which we've marked -- Globe Life 05

21   which we've marked as 9, can you read the

22   redacted section for me at the bottom?

23        MR. POUNDSTONE:  Right here.

24        THE WITNESS:  Did you say 05 or 09?

25        MR. SANSPREE:  There are two documents

2cbf423b-0719-40e2-8137-40b55a4de177

Page 140

that make up Exhibit 9.

MR. POUNDSTONE:  He wants you to read the document that we produced in redacted form as our document Bates numbered 5 which you have in front of you.

THE WITNESS:  Okay.  It says "Pay SJW May 6, '04, agree BM," and then it says late premium -- "but late premium."

Q    (By Mr. Sanspree) All right.  So just so the record's clear and I'm clear, the part that's blacked out says "agree BM"?

A    Yes.

Q    And BM, would that be Mr. Mitchell, Brian Mitchell?

A    Yes, sir.

Q    So he agreed to pay it as well in legal?

A    Based on the facts he had at that time.

Q    And back to what we were talking about earlier, how does that help me figure out how many times the file went between the life department and legal?  Because the documents I have, it appears that it just went to legal and then back to claims one time.

A    Excuse me.  No.  From May 6th it went

Page 141

1   to legal to review, the same documents that I

2   had.  It came back with agreement.  It went to

3   the claims examiner --

4        Q    Do you know -- real quick, just -- so

5   it came back with agreement from Brian Mitchell

6   with initial BM; correct?

7        A    Yes.

8        Q    Is there anything that you could point

9   me to that would put a date to when the file came

10  back from Brian?

11       A    Yes.  It's Globe Life Lurie --

12            MR. POUNDSTONE:  Our document number 17

13  is what she's looking at.

14       Q    (By Mr. Sanspree) Okay.  And how does

15  that put a date for you on when it came back?

16  Just to the right, the information on the right,

17  the description section?

18       A    Yes.  On May 7th, it was sent to senior

19  manager.

20       Q    Who would that be?

21       A    That's our legal area, our legal

22  department.

23       Q    Okay.  So it's sent up -- you sent it

24  on the 6th, and evidently they got it on the 7th?

25  Is that the way I'm reading Lurie 17?  Which

Page 142

1    we'll go ahead and mark, Bobby, as Exhibit 10.

2            MR. POUNDSTONE:  Okay.

3            (Plaintiff's Exhibit Number 10 marked

4            for identification purposes and made a

5            part of the record)

6       Q    (By Mr. Sanspree) Am I reading that

7    correctly?

8       A    It can be that, that they noted it on

9    the 7th, that they got it on the 7th, or we sent

10   it on the 7th.  Yes, they got it on the 7th.

11   Underneath it says "File to Brian to approve,

12   DS."

13      Q    What does DS mean?

14      A    That's Deborah Sager.

15      Q    So I note on the 12th it says on this

16   record, entry date, "File to examiner to process,

17   SJW."

18      A    Yes, the file --

19      Q    Is that -- go ahead.  I'm sorry.

20      A    The file was returned to me and I noted

21   it to the examiner on May 12th.

22      Q    All right.  And then it's got an entry

23   date of 5-13-04 that lapsed at DOD.

24      A    Date of death.

25      Q    Return to -- okay.  And it says it's

Page 143

1    returned to senior manager.  Is that when you all

2    discovered that there was an issue with the

3    premiums and -- when you said senior manager,

4    you're talking about back to the legal

5    department?

6           A    Yes.

7           Q    So on the 13th it was sent --

8           A    Yes.  Wendy returned it with her

9    writeup.

10          Q    And then the next day, it was sent to

11   the steno for the letter to be sent out, correct,

12   that we've marked previously as Exhibit 7?

13          A    Well, yes, the file was returned to

14   Wendy, and Wendy wrote it up on the 14th, and it

15   went to steno, and they processed the letter on

16   the 18th.

17          Q    So you get the file back on the 12th

18   from -- that it has been approved to pay -- to be

19   paid by legal on the 12th?

20          A    Yes.

21          Q    On the 13th, it was discovered there's

22   an issue with the premium, so it was sent back to

23   legal?

24          A    That's correct.

25          Q    And then legal sent it back to the life

1    department on the 14th, and the file was sent

2    over to the steno for a letter of denial to be

3    generated?

4         A    That's correct.

5         Q    Which ultimately went out -- the letter

6    ultimately went out on the 18th.  Is that a

7    correct statement?

8         A    Probably on the 19th, the following

9    day.

10        MR. POUNDSTONE:  Hey, Chris, this

11   document that you're reading from is a three-page

12   printoff.  Do you want me to mark all three pages

13   as Exhibit 10?  16, 17 and 18.

14        MR. SANSPREE:  Go ahead, Bobby.  I was

15   going to read that in.  16, 17 and 18.

16        MR. POUNDSTONE:  I just want to make

17   sure we're marking the whole thing.

18        MR. SANSPREE:  Can we mark those as 10,

19   and then just for the record refer that I was

20   reading from the second page which is Bates

21   number 17 in that line of questioning.

22        MR. BUTLER:  I'm not trying to rush

23   you, Chris, but we do have your other witness

24   here.

25        MR. SANSPREE:  Thank you, Mr. Butler.

Page 145

1          (Plaintiff's Exhibit Number 10 marked

2          for identification purposes and made a

3          part of the record)

4     Q    (By Mr. Sanspree) Ms. Whitaker, I'll

5  refer you back to Exhibit 6 which are the

6  Interrogatory responses you all sent to me in

7  response to questions I sent to you all.

8          MR. POUNDSTONE:  She has them.

9     Q    (By Mr. Sanspree) Have you got to those

10  yet?

11         MR. POUNDSTONE:  She has them.

12    Q    (By Mr. Sanspree) Now, in Interrogatory

13  number 1, it notes that you and Barbara Hernandez

14  answered these questions.

15         Did you all sit down together and

16  answer them or did you do it -- you just put down

17  what you knew and sent it to her and she did the

18  same to you or -- how did that happen?

19    A    I worked with our legal department,

20  Mrs. Peterson.  And no, Barbara and I didn't sit

21  down together.

22    Q    So you and Ms. Peterson answered -- did

23  Barbara answer these questions, too, or was it

24  just you and Ms. Peterson?

25    A    I worked with Staci on my areas.

Page 146

1    Q    And which areas -- do you remember -- I

2   mean, can you go through these and tell me which

3   ones you answered and which ones -- they're not

4   set out like that.

5        In the response it doesn't say Sandy

6   and then it doesn't say Barbara answered these or

7   anything like that.  Do you remember which one --

8    A    My knowledge would have been in

9   connection with the claim file.

10    Q    Right.  See, all these questions pretty

11  much pertain to the claim.  I'm not trying to be

12  difficult.  I'm just wondering which ones you

13  were able to sit down and answer as opposed to

14  Barbara.

15        MR. BUTLER:  Is it really necessary

16  that we go through the entire set of

17  Interrogatories, Chris?

18        MR. SANSPREE:  Hopefully she can just

19  glance through these and -- how do you want to do

20  it, Phil?  I can read these and just ask her.

21        Some of these are obvious -- some of

22  them are obviously either the legal department or

23  you had to answer them, like expert witnesses and

24  stuff like that, I don't think she's going to

25  know any of that.

Page 147

1          MR. BUTLER:  I know it.  But I don't

2     think it's -- I understand she signed the

3     Interrogatories.  And if you insist on it, we'll

4     take the time to do it.  I just don't think it's

5     necessary, but it's not my case, it's yours.

6          Q    (By Mr. Sanspree) Well, let me ask you

7     this, then, Ms. Whitaker.  Who made the ultimate

8     decision to deny this claim?

9          A    The claims examiner determined that the

10    policy was not in force at the time of the death,

11    so it was sent back to our legal department to

12    review.  And it was under their instructions

13    after our recommendation was to return the

14    premium and explain that the policy wasn't in

15    force.

16         Q    Okay.  So somebody in the legal

17    department ultimately said pull the trigger?

18         A    Well, they agreed with our

19    recommendations based on the new information that

20    they had regarding the premium.

21         Q    Right.  But, you know, somebody in the

22    life department had to run it by legal, correct,

23    before they -- before they could just deny the

24    claim?

25         A    Yes.  The supervisor and our claims

Page 148

1  examiner recognized that the premium wasn't paid

2  prior to the expiration of the grace period and

3  that the policy wasn't in force at the time of

4  death and sent it back to our legal department

5  for review.

6      Q    Could you have denied it without

7  sending it to legal?

8      A    No.  That's not our -- our policy.

9      Q    So what I'm trying to get at is legal

10  pretty much made the decision to deny the claim?

11      A    We recommended it to be -- the premium

12  be returned based on our new findings.

13      Q    Right.

14      A    We recommended it one time that based

15  on the findings, it was payable.

16      Q    Right.  But each time it was run by

17  legal.

18      A    Right, because we have checks and

19  balances in place to make sure that things of

20  this instance are caught and that the claims are

21  handled correctly.

22          We have an obligation as the life claim

23  department to make sure each claim is handled

24  correctly.  We have a responsibility to all

25  policyholders.  And they have to have checks and

Page 149

1  balances in place so there isn't a -- isn't a

2  claim mishandled.

3      Q    Well, and I understand that.  But what

4  I'm trying to get at is that the ultimate

5  decision was made by the legal department to deny

6  the claim.  What if they would have said pay it,

7  would you have paid it?

8      A    Based on their recommendation, yes.

9      Q    All right.  So they made the ultimate

10 decision not to pay it?  When I say "they," I

11 mean the legal department.

12     A    Based on our findings, based on the new

13 evaluation of the material, they agreed with us

14 that the claim wouldn't have been eligible under

15 the terms and provisions of the policy.

16     Q    So they said go ahead and deny the

17 claim?

18     A    They indicated that they agreed with us

19 to refund the premium that was received after the

20 date of death.

21     Q    Right.  So they told you to go ahead

22 and do it?

23     A    They agreed with us, yes, and we

24 proceeded with that recommendation.

25     Q    All I'm trying to get at is I need to

Page 150

1   know who is the person that denied the claim;

2   okay?  I'm not trying to be tricky with it.  But

3   you keep saying they agreed with us, but

4   somebody's got to make the decision.

5           MR. BUTLER:  She said yes.

6       Q    (By Mr. Sanspree) There has to be a

7   decision made by somebody.

8           MR. BUTLER:  Object to the form.  She

9   said yes in answer to your question that they

10  instructed them to do it.

11          MR. SANSPREE:  Thank you.  Great.

12  That's all I wanted.  Just wanted to know if it

13  was the legal department that made the decision,

14  and Mr. Butler's indicated it was yes.  Thank

15  you.

16          MR. BUTLER:  Hopefully we ain't going

17  to ride that horse anymore.

18          MR. SANSPREE:  Can I ask it one more

19  time?

20          MR. BUTLER:  No.

21      Q    (By Mr. Sanspree) Have you ever been

22  named as a party defendant in a lawsuit,

23  Ms. Whitaker?

24      A    Okay.  What do you mean by that?  I

25  don't understand exactly what --

1     Q     Have you ever been sued before

2  individually in your individual capacity?

3     A     Yes.

4     Q     What kind of case was that?

5     A     Well, actually it was in connection

6  with a lawsuit that was filed at Globe.  The

7  attorney inadvertently sued me individually.

8     Q     Do you remember when that was?

9     A     No, I don't.

10    Q     Was it recently or --

11    A     I just don't have the date at the top

12  of my head.

13    Q     What were the allegations made against

14  you individually?

15    A     You know, it was in connection with

16  work.  It wasn't individually.  I mean, the

17  lawsuit -- he did file against me individually,

18  but it was in connection with a work -- with my

19  work.

20    Q     Like denial of benefit or something

21  like that?

22    A     It was in connection with a claim.

23    Q     Was it in connection with a claim not

24  being paid?

25    A     I don't recall if it was not being paid

Page 152

1  or -- I just don't remember the circumstances.

2      Q    Let me ask you this.  To your

3  knowledge, has Globe Life ever been sued by an

4  insured when the claim was paid?

5      A    I'd have to think about that just a

6  moment.  I think there could be an instance that

7  even if we paid the claim, there could have been

8  an instance that they were sued.  I just don't

9  recall any.

10     Q    I'm just trying to do a little

11 deduction here.  I don't see why anybody would

12 sue if the claim was paid.

13          What I'm trying to get at is do you

14 think the lawsuit involved a claim not being paid

15 and they probably just went through the file and

16 saw your name and named you individually?  Is

17 that what happened?

18     A    You're asking me if it ever happened.

19 And in 35 years, it's possible.  I just don't

20 recall any instance where that would be.  But

21 you're asking me if it's ever possible, and I'm

22 trying to answer you the best that I can.

23     Q    Actually I just asked you in this case

24 that you were talking about, whether or not -- I

25 was trying to jog your memory whether or not you

2cbf423b-0719-40e2-8137-40b55a4de177

1    were sued because the claim was not paid and just

2    made the deduction that most people don't file a

3    lawsuit if the claim is paid.

4            MR. BUTLER:  Surely you're not going to

5    start a series of questions asking her why

6    plaintiff's lawyers decide when to sue.

7            MR. SANSPREE:  I might, Phil.

8            MR. BUTLER:  You might, but you ain't

9    going to have us sitting here entertaining them.

10       Q    (By Mr. Sanspree) What I'm trying to

11   get at is were you named individually because of

12   your decision or your involvement with a claim

13   for benefits?

14       A    I don't recall the exact reasoning.  It

15   wasn't warranted.

16       Q    With you being named or the lawsuit?

17       A    Well, my opinion, both, but --

18       Q    Do you know what happened to that

19   lawsuit?

20       A    No, sir, I don't.

21       Q    What was the resolution?

22       A    No, sir.

23       Q    Is it still pending, to your knowledge?

24       A    Pardon me?

25       Q    I was just asking was it still pending?

Page 154

1    A    I couldn't answer that.  I don't know.

2    Q    Have you talked with Barbara about her

3  testimony today, Ms. Whitaker, Barbara Hernandez?

4    A    No, I have not.

5    Q    Did you tell her you were coming in to

6  give testimony?

7    A    I didn't tell her personally.

8    Q    And you and Ms. Hernandez have not

9  discussed your testimony, what you're going to

10  say or anything like that, prior to coming in

11  today?

12    A    No, I have not talked to her.

13    Q    What all did you look at before your

14  testimony?  Did you look at the claim file before

15  you came in today?

16    A    Yes, sir.

17    Q    Did you go over the Interrogatory

18  responses and stuff like that?

19    A    Yes, sir.

20    Q    Have you ever been trained on how to

21  give a deposition, like watch any videos or

22  anything other than what your lawyers told you?

23  Did you watch any videos or stuff like that, had

24  any training from the company?

25    A    No, sir.

Page 155

1    Q    It's kind of a silly question, but

2    you'd be surprised.

3         MR. SANSPREE:  That's all I've got,

4    Phil.

5         MR. BUTLER:  Thank you, sir.  I think

6    under our usual stipulations, she doesn't have to

7    read and sign.  Isn't that right, Chris?

8         MR. SANSPREE:  That's the way it is.

9    I'm not opposed to -- you can do it however you

10   want to.

11        MR. BUTLER:  We'll waive.

12        (Deposition adjourned at 12:26 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 156

1                    C E R T I F I C A T E

2

3   STATE OF OKLAHOMA        )
                             )  SS:
4   COUNTY OF OKLAHOMA       )

5

6           I, ELIZABETH CAUDILL, CSR in and for

7   the State of Oklahoma, certify that SANDY

8   WHITAKER was by me sworn to testify the truth;

9   that the above and foregoing deposition was taken

10  by me in stenotype and thereafter transcribed and

11  is a true and correct transcript of the testimony

12  of the witness; that the deposition was taken on

13  SEPTEMBER 14, 2006 at 9:11 a.m. in Oklahoma City,

14  Oklahoma; that I am not an attorney for or a

15  relative of either party, or otherwise interested

16  in this action.

17          Witness my hand and seal of office on

18  this 25th day of September, 2006.

19

20

21          _____

22          ELIZABETH CAUDILL, CSR, RMR, CRR
            CSR No. 161

23

24

25