Page 1

IN THE UNITED STATES DISTRICT FOR

THE MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION


KAREN LURIE,                )
                            )
          Plaintiff,        )
                            )
vs.                         ) NO. 1:06-cv-0034MEF
                            )
                            )
GLOBE LIFE AND ACCIDENT     )
INSURANCE COMPANY,          )
                            )
          Defendant.        )



        DEPOSITION OF DANIEL MENDOZA

    TAKEN ON BEHALF OF THE PLAINTIFF

       IN OKLAHOMA CITY, OKLAHOMA

          ON SEPTEMBER 14, 2006




    REPORTED BY:  ELIZABETH CAUDILL, CSR, RMR, CRR



PLAINTIFF'S
EXHIBIT
tabbies®
H

1                   A P P E A R A N C E S

2    For the Plaintiffs: Christopher E. Sanspree
     (By videoconference)Attorney at Law
3                        218 Commerce Street
                         Montgomery, Alabama 36104
4

5    For the Defendant:  Robert Poundstone, IV
                         Philip H. Butler
6                        Attorneys at Law
                         401 Adams Avenue, Suite 780
7                        Montgomery, Alabama 36104

8

9                        Anastasia Pederson
                         Attorney at Law
10                       Globe Life Center
                         204 North Robinson, Suite 300
11                       Oklahoma City, Oklahoma 73102

12   Also Present:       Bilinda Hines
     (By videoconference)
13

14

15

16

17

18

19

20

21

22

23

24

25

ab8c6437-8580-4497-9fb5-ff4da07be182

S T I P U L A T I O N S

1

2       IT IS HEREBY STIPULATED AND AGREED by

3   and among the attorneys for the respective

4   parties hereto that the deposition of DANIEL

5   MENDOZA may be taken on behalf of the PLAINTIFF

6   on SEPTEMBER 14, 2006 in Oklahoma City, Oklahoma,

7   by Elizabeth Caudill, Certified Shorthand

8   Reporter within and for the State of Oklahoma,

9   pursuant to agreement.

10      IT IS FURTHER STIPULATED AND AGREED by

11  and among the attorneys for the respective

12  parties hereto that all objections, except as to

13  the form of the question, are reserved until the

14  time of trial, at which time they may be made

15  with the same force and effect as if made at the

16  time of the taking of this deposition.

17                  *  *  *  *  *  *

18

19

20

21

22

23

24

25

1              * * * * * *

2                 DANIEL MENDOZA,

3    having been first duly sworn at 1:26 p.m.,

4    deposes and says in reply to the questions

5    propounded as follows, to wit:

6                 DIRECT EXAMINATION

7    BY MR. SANSPREE:

8        Q    Could you state your name for the

9    record, please, sir.

10       A    Daniel Mendoza.

11       Q    Mr. Mendoza, I'm Chris Sanspree, and I

12   represent Ms. Lurie in a lawsuit we filed against

13   Globe Life.  And your name was provided to me

14   today as being probably the person most familiar

15   with the customer service department.  Is that

16   your understanding of why you're here?

17       A    Yes, sir.

18       Q    And are you here today to testify on

19   the -- I guess the procedures that are in place

20   in the customer service department?

21       A    Yes, I am.

22       Q    On behalf of Globe Life?

23       A    Yes.

24       Q    And how long have you been -- tell me

25   your job title.

1    A    I'm a supervisor in our customer

2 service department.

3    Q    How long have you been the supervisor

4 in the customer service department?

5    A    Five years.

6    Q    How long have you been with the

7 company?

8    A    Eight years.

9    Q    Have you always been in the customer

10 service department?

11    A    Yes.

12    Q    Can you tell us what the customer

13 service department, what is it?

14    A    We take incoming phone calls from our

15 policyholders and answer their questions.

16    Q    And Barbara was just in here and

17 testified.  Have you talked with her or

18 Ms. Whitaker before coming in today?

19    A    No.

20    Q    Did you know they were coming in and

21 giving testimony today?

22    A    Yes.

23    MR. SANSPREE:  Ms. Court Reporter, I

24 think what I marked as Barbara's exhibit was

25 Exhibit Number 2.  Do you still have those out,

1    Bobby?

2           MR. POUNDSTONE:  I can get it in two

3    seconds.

4           Okay.  He's got it in front of him.

5       Q    (By Mr. Sanspree) Now, Mr. Mendoza,

6    Ms. Hernandez testified that these are the logs

7    from the telephone calls made from this specific

8    number from March 11th, 2003, through May 28th of

9    2004.

10          Do you see where I'm referencing those

11   dates on the left-hand side?

12      A    Yes, I do.

13      Q    And you see the telephone numbers on

14   the right-hand side?

15      A    Yes, I do.

16          MR. BUTLER:  Excuse me.  I think you

17   said 2003.  You meant to say 2004, didn't you?

18          MR. SANSPREE:  Yes.  Thank you.

19      Q    (By Mr. Sanspree) Now, Mr. Mendoza, are

20   you familiar with a document that would look like

21   this from the customer service department?

22      A    Not printed out.  Normally when we view

23   these, they are actually on our PC, on our

24   computer system.

25      Q    Is this -- go ahead.

Page 7

1      A      But this would be an accurate

2  representation of what we have available to us.

3      Q      Just so we're clear, Exhibit 2 to

4  Ms. Hernandez's deposition, the form that it's

5  produced in this piece of paper, is that how it

6  appears on the PC --

7      A      It appears to be, yes, sir.

8      Q      -- when you pull up this?  And

9  Ms. Hernandez testifies that there is a system,

10  it's Eon system?

11      A      That is the name of the company.

12      Q      Are you familiar with that?

13      A      Yes.

14      Q      And do you know when that system first

15  began being utilized by Globe Life?

16      A      The system for recording or the entire

17  IVR system, itself?

18      Q      Recording.

19      A      The recording?  That would have been

20  March of 2004.

21      Q      Now, I guess you are in the customer

22  service department back in 2004.

23      A      Yes.

24      Q      What was the system for recording

25  telephone conversations or telephone calls back

ab8c6437-8580-4497-9fb5-ff4da07be182

Page 8

1   before March of 2004?

2        A     We really didn't have anything that was

3   like this where we could go back.  It was much

4   more archaic.  We had to actually put a cassette

5   tape in and actively choose who we wanted to

6   record.

7             So we didn't have anything that

8   actually was continuously recording our calls all

9   the time.  It was only when we decided to record.

10       Q     Okay.  Let me ask you this.  Were you

11  asked to review your records to see whether or

12  not a telephone call was made back in January of

13  2004 regarding this claim?

14       A     I was not, no.

15       Q     Have you done that?

16       A     I have not.

17       Q     Even though you may not -- you have?

18       A     I have not, no.

19       Q     Okay.  Now, earlier today Ms. Whitaker

20  was -- I asked her some questions about the

21  customer service department, and she testified to

22  some things.

23            Tell me what you would do typically in

24  a typical situation when somebody calls and

25  reports a death --

Page 9

1    A    First thing we'd do is ask for the --

2    Q    -- of an insured.

3    A    We ask for the policy number.  We'll go

4  to our notification of death screen.  We'll ask

5  for the caller's name, relationship to the

6  insured person.  We'll take their telephone

7  number and mailing address.  We'll advise the

8  status of the policy, whether it's current or

9  lapsed.  And then we would advise if the policy

10  is current and in force, what information needs

11  to be sent in to us, such as death certificate,

12  so that we can begin processing the claim.

13    Q    All right.  Now, what you just

14  testified to when you say you get the caller's

15  name and address and you said you can pull up to

16  see whether or not the policy was in force or had

17  lapsed, is this information that you had back in

18  January of 2004?

19    A    Yes.

20    Q    Or is this new?

21    A    Yes, we did.

22    Q    You did have it back -- there's a lag

23  in time between my questions, so give me a pause

24  or two before you answer it.

25          But just so the record's clear, you

Page 10

1  could pull up this information back in January of

2  2004, everything you just testified to?

3      A    Yes.

4      Q    Okay.  So back in January of 2004, if a

5  caller had called in to report a death, you would

6  immediately know whether or not the policy had

7  lapsed or whether or not the premiums needed to

8  be paid; correct?

9      A    That is correct.

10     Q    Did you speak with the plaintiff in

11 this lawsuit at any point in time?

12     A    Not that I am aware of.

13     Q    Are you aware of any notes that would

14 indicate that you specifically talked to them

15 yourself, Ms. Lurie?

16     A    No.

17     Q    Did you talk to Ms. Lurie's attorney, a

18 guy by the name of Mr. Matthews, at any point in

19 time?

20     A    No.

21     Q    During your employment in the customer

22 service department, are you aware of any

23 instances where someone has called in and that

24 phone call was not logged on the computer system

25 when they're reporting a death?

Page 11

1    A    That it's not logged onto the

2 NDTH system, onto our death screen system or

3 recorded?

4    Q    Just recorded.

5    A    I'm unaware of any times.

6    Q    You probably need to -- I need to ask

7 you to explain to me the difference in the

8 recording systems, because I'm not familiar with

9 your system.

10    A    Uh-huh.

11    Q    Is there a difference between the death

12 reporting screen and just the recording?

13    A    Well, recording -- I'm sorry.

14    Q    Go ahead.  You seem to make a

15 distinction between the two, and I was just

16 wondering where the distinction is.

17    A    Recording is the actual -- when I'm

18 referring to recording, I mean the actual

19 physical recording of the call, itself, by our

20 recorder, voice recorder.

21    Q    Okay.

22    A    And then the recording of the claim --

23 I'm sorry -- I meant actually entering it onto

24 our what's called our NDTH screen, that's our

25 notification of death screen, physically

Page 12

1    inputting the information.

2         Q    Explain to me again what you refer to
3    as that.

4         A    NDTH.

5         Q    When you said death screen, that's what
6    you were referring to?

7         A    Yes.

8         Q    Are you aware of any time somebody
9    had -- or any instances where somebody had called
10   in and reported a death where they did not enter
11   it into the notification screen?

12        A    I am unaware of any times.

13        Q    Is it possible that that has happened
14   in the past?

15        A    It is possible.  I'm unaware of it, but
16   it is possible.

17        Q    Tell me the training that a customer
18   service, I guess, representative would go through
19   before they would be able to be allowed to take
20   phone calls and answer questions.

21        A    Training specific to death claims or
22   just --

23        Q    Just -- if I understand your testimony,
24   when someone calls in to Globe Life, they're put
25   through to customer service; is that correct?

ab8c6437-8580-4497-9fb5-ff4da07be182

1     A     Yes.

2     Q     So you would answer a wide range of

3  different questions; correct?

4     A     That is correct.

5     Q     So -- and then I guess my question:

6  What type of training does one go through before

7  they're allowed to field phone calls and attempt

8  to answer questions?

9     A     Okay.  Basic training starts with the

10  teaching of all the different screens that we

11  use; for example, the death claim screen, premium

12  screen, address change screen.

13          New hires are then given mock policy

14  numbers to test on our system where they actually

15  input data into these screens.  They then get

16  test calls, which are not actual calls from

17  policyholders but from our trainers regarding

18  premium questions, address change questions or

19  death questions, et cetera.

20     Q     And I notice that you referenced a mock

21  policy number that they're given.  When they

22  enter a mock policy number, does a policy come on

23  the screen so you can see the terms and

24  conditions?

25     A     I have --

Page 14

1    Q    Go ahead.

2    A    We do have test policy numbers that we

3    use that are created for this purpose.

4    Q    Does that mean -- okay.  When you say

5    "test policy numbers," what I'm trying to get at,

6    does an actual policy come up on the screen where

7    you can see the terms and conditions of that

8    person's insurance policy?

9    A    Yes.

10    Q    And so you're able to field questions

11    regarding coverage issues and stuff like that?

12    Do you do that?

13    A    Yes.

14    Q    What type of training are the customer

15    service reps given regarding the coverage

16    issues --

17    A    Regarding --

18    Q    -- if any?

19    A    Well, they learn the basic types of

20    plans that we have, different coverages that we

21    have available.

22         Is there a specific -- I'm not sure --

23    Q    Right.  You're talking about coverages.

24    What about exclusions?  Are you all made aware of

25    any exclusions that may exist in a certain type

ab8c6437-8580-4497-9fb5-ff4da07be182

1    of policy?

2         A    Not on a specific plan, no.

3         Q    Say I called in with a specific policy

4    number.  And I'll use their policy number, which

5    is J522139.  And I call in and give you that

6    number.

7              When you type in that policy number,

8    does a sample policy with my terms and conditions

9    pop up on your screen?

10        A    It does not; however, the CSR's do have

11   access to an intranet site which would have an

12   example of that policy where they can then read

13   it if they need to.

14        Q    And just for the record, when you said

15   CSR, you're referring to customer service

16   representatives; correct?

17        A    I'm -- yes.

18        Q    So when somebody -- say, for instance,

19   I did call in and ask about that specific policy

20   number.  The customer service rep would have to

21   actually get on the Internet and pull it up;

22   correct?

23        A    Intranet, yes.

24        Q    My policy?

25        A    Yes, if there were questions that the

Page 16

1  policyholder had that were in the policy, itself,
2  yes.
3      Q    Is there any type of recording device
4  that would tell me whether or not Mrs. Lurie's
5  policy was accessed back in January of 2004 if a
6  phone call was actually made by her attorney at
7  that time reporting the death?
8          MR. POUNDSTONE:  Object to the form.
9          THE WITNESS:  There is not, no.
10     Q    (By Mr. Sanspree) Are the sample
11  policies, are they like on a central database at
12  Globe Life?
13     A    Yes.
14     Q    Is there any way that we could go back
15  and look and see if this policy number and policy
16  type was accessed back in January of 2004 by
17  anybody from the customer service department?
18     A    There is not, no.
19     Q    Say I called back in January of 2004
20  and gave you the policy number and you did access
21  my policy and answer some questions I had
22  regarding coverages.
23          Would there be any way that we could
24  tell that that actually happened?
25     A    No.

1    Q    There's no way at all to document me
2    calling in and asking questions about a specific
3    type of policy type other than -- back in January
4    of 2004?

5         I understand you have the recorded
6    telephone now, but back in January of 2004,
7    there's no way that we could evidence that that
8    happened?

9    A    No.

10   Q    Let me ask you this, Mr. Mendoza.  If a
11   customer service representative did field a phone
12   call from an attorney representing Ms. Lurie and
13   was notified of the death back in January of 2004
14   and did not document that on the system, would
15   that be a violation of policy and procedures in
16   the customer service department?

17   A    Yes, it would.

18   Q    Would it be possible that that could
19   have happened?

20   A    It is possible.  I'm unaware that it
21   did happen in this case or any other case.  Of
22   not knowing the entire time that I've been in
23   customer service, it's possible, but it's not
24   happened to my knowledge.

25   Q    Could a customer service

Page 18

1    representative -- if I called in and reported the

2    death of an insured and gave you my policy

3    number, could the customer service rep pull up

4    whether or not I owed premiums on that policy?

5         A    Yes.

6         Q    And how long would that take?

7         A    Once the policy number is entered, it

8    comes up immediately, the information.

9         Q    Do you know anything about the claims

10   department?

11        A    Only that they do process our claims.

12   Basically we take the information.  From that

13   point it's our claims department that handles all

14   the processing.

15        Q    Does the question of whether or not the

16   policy's in force and premiums have been paid, is

17   that something that's addressed initially when

18   the claim is filed or you're notified of a claim?

19        A    We would give information to the caller

20   indicating whether or not the policy is current,

21   in force, or lapsed.

22        Q    And is that something that would be

23   done initially once you're notified of a death of

24   an insured?

25        A    Yes.

ab8c6437-8580-4497-9fb5-ff4da07be182

Page 19

1          MR. BUTLER:  By the customer service

2    department?

3          MR. SANSPREE:  Yeah, or just anyone.

4          MR. BUTLER:  Huh?

5          MR. SANSPREE:  That and anyone from the

6    claim department, too.

7          MR. BUTLER:  Well, I think your

8    question was a little unclear.  I couldn't hear

9    it all, Chris.

10         MR. SANSPREE:  Don't believe him,

11   Mr. Mendoza.  He's deceptively southern.

12         MR. BUTLER:  I can't hear very well.

13   Would you mind repeating it?

14         MR. SANSPREE:  I really can't remember

15   the question, Mr. Butler.  Can the court reporter

16   read it back real quick?

17              (The record was read as requested)

18         MR. BUTLER:  I think it was the

19   question before that.

20         MR. SANSPREE:  I'll be willing to move

21   on, Mr. Butler, if you want to.

22         MR. BUTLER:  I just want to be sure

23   that the witness understood the question.

24         MR. POUNDSTONE:  I think the question

25   may have inferred that he knew what the practices

ab8c6437-8580-4497-9fb5-ff4da07be182

Page 20

1    of the claims department are, and I think that's

2    what the concern is.

3         You know, he can testify to what the

4    customer service folks do, but I don't think he

5    would have knowledge of what the practices of the

6    claims department are.

7    Q    (By Mr. Sanspree) Do you have any

8    knowledge of what the practices are in the claims

9    department?

10   A    Not specific practices, I do not.

11   Q    In general?

12   A    Just that they do process our claims.

13   Q    And you're aware that they do process

14   your claims.  Are you aware of the procedures

15   they use to process those claims?

16   A    Just very general.  That they request

17   the death certificates on contestable policies,

18   they request claim forms to be completed.

19   Q    What is your involvement -- are you

20   involved at all with gathering or requesting the

21   death certificates?

22   A    No, we're not.

23   Q    When I say "you," the customer service

24   department?

25   A    The customer service department is not,

ab8c6437-8580-4497-9fb5-ff4da07be182

Page 21

1    no.

2         Q    I noticed that a contestable policy --

3    what do you mean by that, a contestable policy?

4         A    Well, some policies are contestable for

5    the first two years of coverage where we will

6    request claim forms to be completed on some types

7    of policies.

8         Q    And you're referring to the

9    contestability clause in policies --

10        A    Yes.

11        Q    -- when you say some policies -- okay.

12   All right.

13             Do you have any knowledge whatsoever

14   about this claim that you haven't gathered from

15   talking with your attorneys?

16        A    No.  I have not heard of it prior to

17   being asked to come in.

18             MR. SANSPREE:  Appreciate it.  I don't

19   have anything else.

20             MR. BUTLER:  Thank you.

21             (Deposition adjourned at 1:46 p.m.)

22

23

24

25

Page 22

1          C E R T I F I C A T E

2

3    STATE OF OKLAHOMA      )
                           ) SS:
4    COUNTY OF OKLAHOMA     )

5

6          I, ELIZABETH CAUDILL, CSR in and for

7    the State of Oklahoma, certify that DANIEL

8    MENDOZA was by me sworn to testify the truth;

9    that the above and foregoing deposition was taken

10   by me in stenotype and thereafter transcribed and

11   is a true and correct transcript of the testimony

12   of the witness; that the deposition was taken on

13   SEPTEMBER 14, 2006 at 1:26 p.m. in Oklahoma City,

14   Oklahoma; that I am not an attorney for or a

15   relative of either party, or otherwise interested

16   in this action.

17         Witness my hand and seal of office on

18   this 25th day of September, 2006.

19

20

21          _____

22          ELIZABETH CAUDILL, CSR, RMR, CRR
            CSR No. 161

23

24

25