# Exhibit A

FREEDOM COURT REPORTING

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT

 2            FOR THE MIDDLE DISTRICT OF ALABAMA

 3                    SOUTHERN DIVISION

 4

 5   KAREN LURIE,

 6              Plaintiff,

 7     versus                    1:06-CV-0034MEF

 8   GLOBE LIFE AND ACCIDENT

 9   INSURANCE COMPANY, et al.,

10              Defendants.

11

12

13          *  *  *  *  *  *  *  *  *  *  *  *

14

15          DEPOSITION OF JOHN H. ALLEN,

16   taken pursuant to stipulation and agreement

17   before Jackie Parham, Certified Shorthand

18   Reporter and Commissioner for the State of

19   Alabama at Large, in the law offices of

20   Beasley, Allen, Crow, Methvin, Portis & Miles,

21   272 Commerce Street, Montgomery, Alabama, on

22   Thursday, the 7th day of December, 2006,

23   commencing at approximately 9:30 a.m.
```

FREEDOM COURT REPORTING

Page 2

```
1        APPEARANCES
2
3   APPEARING ON BEHALF OF THE PLAINTIFF:
4   CHRISTOPHER E. SANSPREE, ESQUIRE
5   Beasley, Allen, Crow, Methvin,
6      Portis & Miles
7   272 Commerce Street
8   Montgomery, Alabama  36104
9
10
11  APPEARING ON BEHALF OF THE DEFENDANTS:
12  PHILIP H. BUTLER, ESQUIRE
13  Bradley, Arant, Rose & White
14  401 Adams Avenue
15  Suite 780
16  Montgomery, Alabama  36104
17
18
19        * * * * * * * * * * * * *
20
21
22
23
```

Page 3

```
1            STIPULATION
2         It is hereby stipulated and agreed by
3   and between counsel representing the parties
4   that the deposition of
5            JOHN H. ALLEN
6   may be taken before Jackie Parham, Certified
7   Shorthand Reporter and Commissioner for the
8   State of Alabama at Large, without the
9   formality of a commission, and all formality
10  with respect to other procedural requirements
11  is waived; that objections to questions, other
12  than objections as to the form of the question,
13  need not be made at this time, but may be
14  reserved for a ruling at such time as the said
15  deposition may be offered in evidence or used
16  for any other purpose, by either party, as
17  provided for by the Federal Rules of Civil
18  Procedure.
19         It is further stipulated and agreed by
20  and between the parties hereto and the witness
21  that the signature of the witness to this
22  deposition is hereby not waived.
23
```

Page 4

```
1        INDEX OF EXHIBITS
2
3   DX-1 (Allen depo in Moorer case) ..... 13
4   DX-1A (Page 158 of Allen depo in  .... 13
5      Moorer case)
6   DX-2 (CV) ........................... 16
7   DX-3 (John Allen depo in  ........... 23
8      Provident case)
9   DX-3A (Pages 33 - 36 of John  ....... 23
10     Allen depo in Provident
11     case)
12  DX-4 (John Allen depo in American  ... 32
13     Fidelity case)
14  DX-4A (Page 19 of John Allen depo  ... 32
15     in Am. Fidelity case)
16  DX-1B (Page 25 of John Allen depo  ... 36
17     in Moorer case)
18  DX-5 (John Allen depo in American  ... 55
19     Pioneer case)
20  DX-5A (Page 16 of depo of John  ...... 55
21     Allen in Am. Pioneer case)
22  DX-6 (Cover of book entitled  ........ 68
23     Liability Claim Practices)
```

Page 5

```
1   DX-6A (Chapter 4 of Liability  ....... 68
2      Claim Practices' book)
3   DX-7 (List of cases) ................ 69
4   DX-8 (Report from Mr. Allen) ......... 82
5   DX-9 (Current depo list) ............ 82
6   DX-10 (Final Notice of premium  ...... 88
7      due)
8   DX-11 (Premiums and Reinstatement  ... 95
9      document)
10  DX-12 (Notebook) ................... 153
11
12        * * * * * * * * * * * * *
13       INDEX OF EXAMINATION
14  MR. BUTLER .........................   6
15  MR. SANSPREE ....................... 148
16  MR. BUTLER ......................... 151
17
18
19
20
21
22
23
```

FREEDOM COURT REPORTING

Page 6

1         JOHN H. ALLEN,
2      The witness, after having first been
3   duly sworn to speak the truth, the whole truth,
4   and nothing but the truth, testified as follows:
5             EXAMINATION
6   BY MR. BUTLER:
7   Q.   Mr. Allen, would you please state your
8        full name, your residence address, and
9        your business address?
10  A.   John H. Allen, 5721 Fifth Court South,
11       Birmingham, Alabama. Business address is
12       the same.
13  Q.   So your office is out of your home?
14  A.   Correct.
15  Q.   All right. And what is your Social
16       Security number, please, sir?
17  A.   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.
18  Q.   And your date of birth?
19  A.   3/27/49.
20  Q.   All right. What do you call your
21       business?
22  A.   John H. Allen Consulting.
23  Q.   Okay. Is there anybody associated with

Page 7

1        you in your business, or do you work by
2        yourself, or what?
3   A.   Work by myself. Yes.
4   Q.   Okay. Are you married?
5   A.   Divorced.
6   Q.   Okay. And please give me the names and
7        ages and where your children live, if you
8        have children.
9   A.   Yeah. I've got four of them. Got a son,
10       John Clifford. He lives here in
11       Montgomery. He's thirty-three. Then I've
12       got a daughter, Natalie, who lives --
13  Q.   Let me interrupt you just a moment because
14       that'll save us some time, unbelievably.
15  A.   All right.
16  Q.   Your son, John, where does he work?
17  A.   He works at Jackson Hospital.
18  Q.   What's he do there?
19  A.   He's an anesthetist.
20  Q.   Got 'ya. All right. I interrupted. Go
21       ahead.
22  A.   Okay. Then I've got a daughter, Natalie.
23       I think she's approximately twenty-five.

Page 8

1        Supposed to know these things, but close.
2        And she's a flight attendant out in Denver
3        with Sky West. And then I've got a
4        daughter, Rachel, who's about
5        twenty-three, twenty-four, and she's in
6        Washington, D.C. She's working with a
7        real estate firm up there. And then I've
8        got a seventeen-year-old, Austin, who is a
9        student in Birmingham.
10  Q.   Okay. Is that all your children?
11  A.   Yeah.
12  Q.   Do you have a son named Grant?
13  A.   Grant. That was -- That was through
14       another woman back -- back in the -- I
15       guess he's about fourteen, fifteen years
16       old, something like that, maybe a little
17       older.
18  Q.   So when you told me you had four children,
19       you really have five children?
20  A.   Yeah. Right.
21  Q.   Okay. Have you ever been arrested for a
22       criminal offense, other than a normal
23       traffic offense?

Page 9

1   A.   Yes.
2   Q.   What's that?
3   A.   1978 for misdemeanor possession of
4        marijuana, and 2003 for a DUI.
5   Q.   Is that all?
6   A.   Yes.
7   Q.   Okay. You've given a number of
8        depositions in your career, haven't you,
9        sir?
10  A.   Yes.
11  Q.   And you realize that your testimony is
12       under oath in those depositions as well as
13       this one here today?
14  A.   Right.
15  Q.   Okay. In 1978, were you convicted of that
16       offense?
17  A.   I pled guilty to misdemeanor possession.
18  Q.   Of marijuana?
19  A.   Right.
20  Q.   Okay. And is that when you were married
21       and had children?
22  A.   Yes.
23  Q.   Okay. It wasn't when you were a college

3 (Pages 6 to 9)

FREEDOM COURT REPORTING

Page 10

1    student or anything?
2  A.  No.
3  Q.  Okay. And then you had a DUI in 2003; is
4       that right?
5  A.  Right.
6  Q.  And that's the only thing you've been
7       arrested for?
8  A.  Yes.
9  Q.  Isn't it a fact that you were arrested for
10      and pled guilty to a felony drug offense
11      in 2004?
12 A.  No.
13 Q.  In Clanton?
14 A.  No. I only pled guilty to a DUI.
15 Q.  Oh, is that right?
16 A.  Yeah. The rest was dismissed.
17 Q.  The drug conviction was dismissed?
18 A.  There wasn't any conviction.
19 Q.  I mean, the drug charge was dismissed?
20 A.  The allegations were dismissed. Yes.
21 Q.  You were arrested for that, weren't you?
22 A.  Yes.
23 Q.  What were you accused of with regard to

Page 11

1       the drug offense in Chilton County?
2  A.  That was concerning a minuscule amount of
3       cocaine and a small amount of marijuana.
4  Q.  And were you also charged with possession
5       of drug paraphernalia?
6  A.  Yeah.
7  Q.  And those were dismissed?
8  A.  Yes.
9  Q.  What was the disposition of the DUI?
10 A.  Paid a fine and went to the driving school
11      thing.
12 Q.  Okay. Were you placed on probation?
13 A.  No, sir.
14 Q.  Who was your attorney in that action?
15 A.  Tommy --
16 Q.  Kirk?
17 A.  Kirk. Yeah.
18 Q.  When was it disposed of?
19 A.  2000 -- Let's see. -- I can't remember
20      whether it was 2005 or 2006.
21 Q.  Okay.
22 A.  May have been 2006.
23 Q.  Was this in front of Judge Fuller in

Page 12

1       Chilton County?
2  A.  I believe that's correct.
3  Q.  With regard to the misdemeanor possession
4       of marijuana in 1978, was that in
5       Tuscaloosa County?
6  A.  Correct.
7  Q.  Have you ever lied under oath about that
8       arrest?
9  A.  Yes.
10 Q.  Okay. In depositions in civil cases?
11 A.  One deposition.
12 Q.  Okay. Was that in the Moorer versus
13      Republic American Deposition?
14 A.  I don't recall which one that was in.
15 Q.  Was Dee Miles, one of the lawyers in this
16      firm at Beasley, Allen, the lawyer when
17      you did that?
18 A.  I don't know.
19 Q.  Let me see if I can refresh your
20      recollection. I've got a copy. And what
21      I'm going to ask the court reporter to do
22      is just copy the first page of it so that
23      we'll have the style, and then I have a

Page 13

1       travel transcript, and just copy the page
2       that's involved. If you want the rest of
3       it, you're certainly welcome to it.
4            MR. SANSPREE: I might have the
5            whole thing. I don't have a
6            copy.
7            MR. BUTLER: I'll be glad to
8            furnish it to you. But do
9            you think we ought to
10           clutter the Record by having
11           the whole thing or --
12           MR. SANSPREE: If it's easier
13           just to mark it as an
14           exhibit, she can just copy
15           it. However you want to do
16           it, Phil.
17           (Defendant's Exhibit 1 marked
18           for purposes of identification)
19           (Defendant's Exhibit 1-A marked
20           for purposes of identification)
21 Q.  Let me show you a copy, which is a
22      condensed version or a travel transcript,
23      of the deposition of Joseph Moorer versus

4 (Pages 10 to 13)

FREEDOM COURT REPORTING

Page 14

1       Republic American Life Insurance Company.
2       And I have marked on page 158, I think,
3       the page number involved.
4   A.  Yes.
5   Q.  When you answered the question there,
6       "Have you ever been arrested," you
7       answered "No," and that was incorrect,
8       wasn't it?
9   A.  Correct.
10  Q.  And you knew it was incorrect when you
11      gave that answer, didn't you?
12  A.  It was a judgment error.
13  Q.  A judgment error?
14  A.  Yes, sir.
15  Q.  Is it a judgment error, in your view, as a
16      witness when you knowingly answer a
17      question falsely under oath?
18  A.  I mean, it was a judgment error, and I
19      gave the wrong answer.
20  Q.  Yes, sir. And you knew it was wrong at
21      the time you gave it, didn't you?
22  A.  Yes.
23  Q.  Approximately how many depositions have

Page 15

1       you given in your career, Mr. Allen?
2   A.  Fifty-eight.
3   Q.  Fifty-eight?
4   A.  Fifty-eight or fifty-nine. Yeah.
5   Q.  To refresh your recollection, does it
6       appear that Dee Miles of the Beasley,
7       Allen firm was counsel for the plaintiff
8       in that case of Moorer versus Republic?
9   A.  Yes.
10  Q.  Okay. Thank you.
11      Have you ever filed any grievances
12      with the Alabama Bar Association against
13      lawyers who have taken your deposition in
14      civil cases wherein you were put up as an
15      expert witness?
16  A.  Yes.
17  Q.  Who have you filed grievances against?
18  A.  There was one Birmingham --
19  Q.  John Dodson?
20  A.  Huh?
21  Q.  John Dodson?
22  A.  Yeah. That may be him.
23  Q.  Anyone else?

Page 16

1   A.  I filed a grievance on a payment of a bill
2       with Jack Hollingsworth.
3   Q.  Okay. What was the nature of the
4       grievance against Mr. Dodson?
5   A.  Wasn't paying the bill.
6   Q.  That was all?
7   A.  Yes, sir.
8   Q.  What was the disposition of that?
9   A.  Paid the bill.
10  Q.  With regard to your formal education,
11      Mr. Sanspree has been kind enough to
12      furnish me, along with your report, of
13      course, your curriculum vitae. As I
14      understand your formal education -- We can
15      just mark that as an exhibit. That will
16      be fine. Thank you, sir.
17          (Defendant's Exhibit 2 marked
18           for purposes of identification)
19  Q.  Exhibit 2 is a copy of your current
20      curriculum vitae, is it not?
21  A.  Correct.
22  Q.  Have you reviewed that to see that it is,
23      in fact, current?

Page 17

1   A.  Yes.
2   Q.  Okay. And as I understand from your CV,
3       your formal education was at the
4       University of Alabama, Bachelor of Science
5       in General Business Administration; is
6       that correct?
7   A.  Yeah. Commerce and Business
8       Administration.
9   Q.  Understood. Okay.
10      Do you have any degrees from formal
11      education institutions subsequent to your
12      graduation from the University of Alabama
13      in 1971?
14  A.  I assume you're excluding from that, like,
15      the Insurance Institute of America, the
16      Associate in Claims designation? I mean,
17      that is a formal --
18  Q.  I'm going to get to that.
19  A.  All right. But as far as other colleges,
20      no, I don't have any other college
21      degrees.
22  Q.  All right, sir. Go ahead and tell me
23      about -- I think you were telling me about

5 (Pages 14 to 17)

FREEDOM COURT REPORTING

Page 18

1      your AIC designation.
2  A.  Right.
3  Q.  And what is that, please, sir?
4  A.  That's an Associate in Claims designation
5      that's -- You go through a series of
6      courses. I believe there are four courses
7      involved on multiple claims areas. You
8      take each course individually and then you
9      take a written exam. And upon completion
10     of the -- I believe it's a four-course
11     program, then you receive your Associate
12     in Claims designation.
13  Q.  All right. And did you accomplish that
14     while you were employed with Aetna?
15  A.  That's correct.
16  Q.  Did that course involve basically
17     commercial lines, property and
18     casualty-type insurance?
19  A.  It was all different types of insurance.
20     I don't recall the four courses as such.
21     But it was -- I mean, you had everything
22     from ocean marine. It was, I guess, a
23     litany of different insurance courses.

Page 19

1  Q.  All right, sir. Let me go back to your
2      college course, if I may, and ask one
3      question. In your courses at the
4      University of Alabama, did you take any
5      courses in life insurance claims or life
6      insurance?
7  A.  No.
8  Q.  Did the AIC involve life insurance claims?
9  A.  I don't recall all that was in the books
10     at the time.
11  Q.  Have you ever taught on the subject of
12     insurance at seminars or things of that
13     nature?
14  A.  I discussed -- At one of the Association
15     of Certified Fraud Examiners, I have
16     talked at one time about insurance and
17     insurance claims.
18  Q.  Okay. That's just one time?
19  A.  May have been twice.
20  Q.  Okay. Has Mr. Sanspree shared the podium
21     with you in that seminar?
22  A.  Yes.
23  Q.  And Mr. Sanspree is the lawyer here today

Page 20

1      representing Ms. Lurie?
2  A.  Yes.
3  Q.  Okay. Thank you.
4      Now, the Certified Fraud Examiners,
5      did you have to take any course or
6      complete any qualifications to become a
7      certified fraud examiner?
8  A.  You had to complete an application. And
9      then based on my training, education and
10     experience, I was grandfathered into the
11     organization without having to take the
12     formal test.
13  Q.  Yes, sir. That is not really an insurance
14     organization, is it?
15  A.  Well, it's made up of all realms of
16     people, from insurance to accountants.
17     You've got FBI agents. You've got
18     treasury agents. A lot of internal
19     auditors. We've got several different
20     folks that are insurance company-oriented.
21     So it's a big cross-section of folks that
22     are involved.
23  Q.  Would you describe it as an insurance

Page 21

1      professional organization?
2  A.  I don't know whether it's totally
3      insurance. It's fraud-oriented, which,
4      you know, dovetails with insurance. But
5      it's not strictly related to the insurance
6      line.
7  Q.  I see. During the course of your work as
8      an expert or professional witness, have
9      you utilized documents that you've
10     received in other cases to assist you in
11     forming your opinions in later cases?
12  A.  Sometimes.
13  Q.  Yes, sir. In doing so, do you attempt to
14     honor and obey court orders?
15  A.  Yes, sir.
16  Q.  Did you use some information in a
17     Provident case that had been ordered to be
18     protected or privileged?
19  A.  I don't know of any.
20     MR. BUTLER: I'm going to do this
21     one the same way. But --
22     MR. SANSPREE: Am I on that one?
23     Do I have a copy of that

FREEDOM COURT REPORTING

Page 22

1      one?
2      MR. BUTLER: I don't know.
3      MR. SANSPREE: Was I the
4      attorney?
5      MR. BUTLER: You were not the
6      attorney.
7      MR. SANSPREE: Okay.
8      MR. BUTLER: So for my purposes,
9      I would like to mark the
10     first page of it, which is
11     the cover page and some
12     other pages. It, again, is
13     a travel transcript. And
14     I'm interested in -- it's
15     all on one page, but it
16     covers pages 33, 34, 35 and
17     36.
18     MR. SANSPREE: That's fine.
19     However you want to do it,
20     Phil. If you don't mark the
21     whole thing, I'll just ask
22     you later about it.
23     MR. BUTLER: You're certainly

Page 23

1      welcome to it. This will
2      be, I think, Exhibit 3 and
3      then 3-A, please, ma'am.
4      (Defendant's Exhibit 3 and 3-A
5      marked for purposes of
6      identification)
7   Q.  Let me show you Defendant's Exhibit 3,
8      please, sir, which is a case called
9      Pebbles versus Provident Life and Accident
10     Insurance Company. The lawyers in that,
11     if I can find them, appear to be a
12     Mr. Arnston, whom I don't know, a
13     Mr. Wilson Jenkins and Mr. Keith Medley.
14     That's marked as Defendant's Exhibit 3.
15     And then the reference that I have is over
16     on page -- I think I said 33 through 36.
17  A.  Okay.
18  Q.  I don't want to rush you. But you're
19     welcome to read that first.
20  A.  Okay. This is on the Hangarter documents?
21  Q.  Yes, sir. You might want to spell that.
22     It's a little unusual.
23  A.  Hangarter.

Page 24

1   Q.  Thank you, sir. And that was a previous
2      Provident case, was it not?
3   A.  Yes.
4   Q.  Handled by Mr. Sanspree?
5      MR. SANSPREE: No.
6   A.  No.
7   Q.  It wasn't?
8   A.  No.
9   Q.  Do you know whether it was handled by the
10     Beasley firm?
11  A.  No. I think that was a California case.
12     MR. SANSPREE: It was a San
13     Francisco case.
14  Q.  Did Mr. Sanspree furnish those documents
15     to you?
16  A.  Yes.
17  Q.  And did you know that they were under a
18     Protective Order?
19     MR. SANSPREE: They weren't,
20     Phil. I just got them from
21     the courthouse. I flew out
22     there to get them.
23  A.  That's my understanding. They just came

Page 25

1      straight out of the courthouse.
2      MR. SANSPREE: If they were, then
3      the Court didn't protect
4      them, because I just flew
5      out there and got them.
6   Q.  Well, my question is, there seems to be a
7      discussion on these pages that I've marked
8      about the documents being privileged. And
9      as to when they were privileged, I think
10     you mentioned in your deposition here on
11     page -- on Exhibit 3-A that they became
12     privileged after your report or something
13     of that nature.
14     MR. SANSPREE: They were marked
15     "Privileged" at the
16     courthouse out of San
17     Francisco. But I just flew
18     out there and got them.
19     Nobody tried to protect
20     them.
21  A.  There were several things out of the
22     Provident thing that came up about
23     Privileged documents.

7 (Pages 22 to 25)

FREEDOM COURT REPORTING

Page 26

1     MR. SANSPREE: I remember. They
2          marked everything
3          "Privileged," and the Court
4          said it was not privileged.
5          You just can't mark a
6          document "Privileged" and
7          say it's privileged.
8  A.  Also, the New York thing was also marked
9       "Privileged and Confidential" and, yet, it
10      was later released.
11 Q.  Okay. But Mr. Sanspree was not involved
12      in this Pebbles case, was he?
13 A.  No.
14 Q.  Okay. But you did obtain from
15      Mr. Sanspree documents from other
16      Provident cases to assist you in your
17      investigation and forming opinions in the
18      Pebbles case; is that right?
19 A.  Well, I had been working on the cases. It
20      was just coincidental that this one came
21      along during the time that I had been
22      working on these other cases.
23 Q.  Okay. All right. If I may go a bit to

Page 27

1       your employment background. Upon
2       graduating from the University of Alabama,
3       was your first job with Alabama Power
4       Company?
5  A.  Yes. I mean, I had had other part-time
6       jobs, but that was the first, as such,
7       formal job.
8  Q.  Full-time job?
9  A.  Full-time job. Yeah.
10 Q.  Like most of us, you probably had
11      summertime jobs and things of that nature
12      going through school and that sort of
13      thing?
14 A.  Right.
15 Q.  All right. And what was your position at
16      Alabama Power?
17 A.  Resident claim agent.
18 Q.  And did that involve property claims?
19 A.  All kinds of claims. You had -- At that
20      time when I started, you handled some
21      workers' comp. You handled property. You
22      handled automobile, electrical contracts,
23      slip-and-fall, general liability stuff.

Page 28

1  Q.  It did not involve life insurance, did it?
2  A.  No.
3  Q.  Okay. Were you terminated from that
4       position?
5  A.  Yes.
6  Q.  When?
7  A.  '78.
8  Q.  How long did you work for Alabama Power?
9  A.  From '71 to '78.
10 Q.  Okay. And why were you terminated?
11 A.  Because of the arrest.
12 Q.  The marijuana?
13 A.  The marijuana arrest. Yes, sir.
14 Q.  And you pled guilty to that, did you not?
15 A.  Yes.
16 Q.  Have you ever lied under oath in a
17      deposition in a civil case, such as this
18      one, about the reason you left Alabama
19      Power?
20 A.  No, sir.
21 Q.  Okay.
22 A.  I mean, the other case there, where I
23      didn't acknowledge that.

Page 29

1  Q.  Okay. Where you didn't -- I'm sorry. I
2       didn't follow you.
3  A.  The first case that you talked about with
4       Mr. Miles, where I didn't acknowledge
5       being arrested.
6  Q.  Oh, yes, sir. I know that. I wasn't
7       asking that same question.
8  A.  Oh.
9  Q.  No, sir. Have you ever lied about the
10      marijuana conviction on job applications?
11 A.  Yes.
12 Q.  Okay. Why did you do that?
13 A.  Needed a job for my family.
14 Q.  Okay. It was not that you had forgotten
15      about your marijuana conviction, was it?
16 A.  Correct.
17 Q.  After you were terminated from Alabama
18      Power Company, where did you then go to
19      work?
20 A.  National Producers.
21 Q.  And what did you do at National Producers?
22 A.  Majority of the stuff was involving
23      inventory in cemeteries down in Columbus

8 (Pages 26 to 29)

FREEDOM COURT REPORTING

Page 30

1    and Phenix City. Then some small amounts
2    of litigation, but not much.
3    Q.    Okay. Why did you leave National
4          Producers?
5    A.    It didn't look like it was going to be a
6          fruitful job.
7    Q.    Did it go bankrupt?
8    A.    The company did, I believe.
9    Q.    Yes, sir. Where did you next become
10         employed?
11   A.    Stonewall Dixie.
12   Q.    Is that an insurance company?
13   A.    Yes.
14   Q.    Did you go immediately from National
15         Producers to Stonewall Dixie?
16   A.    I'm not sure what the time lag was. It
17         wasn't real long.
18   Q.    All right. At Stonewall Dixie, were you
19         involved in adjusting claims?
20   A.    Yes.
21   Q.    And were those primarily automobile
22         accident claims and liquor liability
23         claims?

Page 31

1    A.    Correct.
2    Q.    Did not --
3    A.    And subrogation claims.
4    Q.    Yeah.
5    A.    Right.
6    Q.    But the subrogation would, yet and still,
7          generally involve automobile accidents,
8          wouldn't it?
9    A.    Correct.
10   Q.    Did not involve life insurance, did it?
11   A.    No.
12   Q.    Were you fired from Stonewall Dixie?
13   A.    Yeah.
14   Q.    Have you ever lied under oath in
15         depositions in civil cases, wherein you
16         were identified as an expert witness,
17         about whether or not you were fired from
18         Stonewall Dixie?
19   A.    I don't recall.
20   Q.    Let's see if I can help you. Do you
21         recall giving a deposition in a case
22         called Brooks versus American Fidelity?
23   A.    You know, I must have.

Page 32

1    Q.    Let's do this one the same way, the next
2          number, and then that number as A on page
3          19.
4                (Defendant's Exhibit 4 and 4-A
5                marked for purposes of
6                identification)
7    Q.    To refresh your recollection, I think it
8          was a case where the plaintiff's lawyer
9          was Archie Lamb.
10   A.    Okay.
11   Q.    Does that help you remember?
12   A.    You know, I know Archie Lamb, but I
13         don't --
14   Q.    You don't remember who the defense lawyer
15         was?
16   A.    No.
17   Q.    That's very disappointing. Look at that.
18   A.    Was it you?
19   Q.    What I've done is marked the title page as
20         4, or asked the court reporter to do that,
21         and 4-A, the page in reference which I
22         think is page 19. I think you were
23         answering my questions in that deposition.

Page 33

1    A.    Okay.
2    Q.    What was the question?
3    A.    "Why did you leave Stonewall Dixie"?
4    Q.    You didn't tell me you had been fired, did
5          you?
6    A.    No.
7    Q.    Why not?
8    A.    Well, I indicated I was basically tired of
9          handling those claims, and I was.
10   Q.    Yes, sir. Do you think that was a fair
11         and complete answer?
12   A.    I think it covered what you asked. And
13         there was a reduction in force, and that's
14         what Jim Sullivan agreed to.
15   Q.    Yes, sir. But that agreement that you
16         signed also referenced that it was an
17         involuntary separation that they were
18         firing you for, wasn't it?
19   A.    I believe so. It's been -- I don't know
20         how long since I've seen that.
21   Q.    Right.
22   A.    But, you know, I feel like I answered the
23         question.

9 (Pages 30 to 33)

FREEDOM COURT REPORTING

Page 34

1 Q.  Yes, sir.
2 A.  Because it was true.
3 Q.  Right.  And you think that's a complete
4     answer to my question, "Why did you leave
5     Stonewall Dixie"?  And you said, "I
6     basically was tired of handling automobile
7     claims and the homeowners' claims and
8     wanted something different.  And Aetna had
9     an opening in the commercial insurance
10    division.  So I went and applied for that
11    and was accepted for that position."  You
12    don't think it would have been responsive
13    to my question to let me know, as to my
14    question "Why did you leave Stonewall
15    Dixie," that you remember being fired by
16    Stonewall Dixie?
17         MR. SANSPREE:  Object to the
18         form.
19 A.  I mean, I felt like I answered the
20    question at the time.  To go back and say
21    how I would have answered it umpteen years
22    later, I can't.
23 Q.  You're comfortable with that answer as

Page 35

1     being a full response to the question?
2 A.  I feel like I answered your question at
3     that point in time.
4 Q.  Thank you, sir.
5     That's not the only time you lied
6     about having been fired from Stonewall
7     Jackson, is it?
8         MR. SANSPREE:  Object to the
9         form.
10 A.  Dixie.
11 Q.  Stonewall Dixie Insurance Company.
12    Have you lied in other depositions
13    where you were put up as an expert witness
14    as to the reasons that you left Stonewall
15    Dixie Insurance Company?
16         MR. SANSPREE:  Object to the
17         form.
18 A.  I don't recall all the answers.
19 Q.  Let me show you again this same
20    deposition, Moorer versus Republic
21    American Insurance Company, which we've
22    already marked as Defendant's Exhibit 1.
23    Let me ask the reporter to mark as Exhibit

Page 36

1     1-B page 25.
2          (Defendant's Exhibit 1-B marked
3           for purposes of identification)
4 Q.  Read the bottom of 24 and page 25, which
5     I've marked as 1-B, please, sir.
6 A.  Okay.
7 Q.  Would you agree with me that you did not
8     give an honest answer to the question on
9     page 25 with regard to your employment at
10    Stonewall Dixie Insurance Company?
11 A.  I didn't recall any specific things about
12    that.
13 Q.  Oh, you didn't?
14 A.  At the time, you know --
15 Q.  Well, let's be a little more clear about
16    it, if I might borrow it back.  I hate to
17    go back and forth, but it's the only copy
18    I have with me.
19 A.  All right.
20 Q.  The question was -- and I was not the
21    defense attorney involved in that.  But it
22    starts at the bottom of page 24, and the
23    question is, "Now, before we get to Aetna,

Page 37

1     was there any time at Alabama Power
2     Company when you were disciplined or
3     criticized about your job"?  And your
4     answer was "No"; is that correct?
5 A.  Right.
6 Q.  And that's not true either, is it?
7 A.  Well, it wasn't about my job.
8 Q.  Oh, okay.  I withdraw the question.
9     The question in this Exhibit 1-B,
10    "How about when you were at National
11    Producers"?  And you said "No."  And the
12    question, "And Stonewall"?  "And when I
13    say "criticized," I'm talking about any
14    complaints, oral or written, any
15    reprimands, oral or written, discipline
16    for any reason."  And you said, "I don't
17    recall any specific things at Stonewall
18    Dixie."
19 A.  Yes.
20 Q.  You don't consider having been fired from
21    Stonewall Dixie a disciplinary action?
22 A.  Well, I mean, as far as the way I consider
23    that, I blew the whistle on some illegal

10 (Pages 34 to 37)

FREEDOM COURT REPORTING

Page 38

1    activities that were taking place in the
2    company. And I felt like, you know, there
3    was retribution taken against me for
4    blowing the whistle.
5  Q.  What did you blow the whistle on?
6  A.  Folks stealing money and stealing
7    property.
8  Q.  Who stole money?
9  A.  Folks out of Florida.
10 Q.  What are their names?
11 A.  I don't recall the names. I found out in
12   the subro where checks were going out.
13   And then the president of Stonewall at the
14   time converted a vehicle to his own use
15   out of salvage.
16 Q.  Who was that?
17 A.  Jim Sullivan.
18 Q.  Okay. Well, did you report that to the
19   stockholders?
20 A.  I reported it to the Great American.
21 Q.  To Great American?
22 A.  Yeah.
23 Q.  Was Stonewall Dixie a subsidiary of Great

Page 39

1    American?
2  A.  Yes.
3  Q.  Okay. And whether or not you think it was
4    appropriate or not, you do consider a
5    termination from a job a disciplinary
6    action, don't you?
7  A.  I guess it can be. I mean, I considered
8    what happened was a whistle-blowing
9    retribution. So, I mean, as far as what
10   they write down, they can write anything
11   they want down to criticize you,
12   after-the-fact-type thing. But I blew the
13   whistle, and they terminated me and
14   terminated a lot of folks within the
15   claims department.
16 Q.  Okay. And you don't agree with their
17   action in terminating you, do you?
18 A.  Correct.
19 Q.  But, nevertheless, it was disciplinary,
20   wasn't it?
21       MR. SANSPREE: Object to the
22       form.
23 A.  You think whatever -- You know, that's --

Page 40

1    You know --
2  Q.  Do you consider that it was not
3    disciplinary?
4  A.  Well, "disciplinary" is more of, you know,
5    trying to change things. I mean, all I
6    did was end up getting the ax. So, you
7    know, there's a difference between
8    discipline and just having the ax fall on
9    you.
10 Q.  On this same page, Exhibit 1-B, you
11   answered a moment ago that you had never
12   lied about the reason you left Alabama
13   Power Company. On this same page of the
14   exhibit, on page 20 and 21 of this same
15   deposition, you did, in fact, lie about
16   the reason why you left Alabama Power,
17   didn't you?
18       MR. SANSPREE: He's already said
19       that, though. Because
20       that's the same deposition
21       where he denied the
22       marijuana arrest.
23       MR. BUTLER: That's right. But

Page 41

1    he answered a moment ago
2    that he had never lied about
3    the reason he left Alabama
4    Power.
5    MR. SANSPREE: He tried to point
6    to that --
7    MR. BUTLER: The Record will
8    speak for itself.
9    MR. SANSPREE: He tried to point
10   you to the deposition a
11   second ago.
12   MR. BUTLER: Could be my
13   misunderstanding, but the
14   Record will speak for
15   itself.
16 Q.  Look at Exhibit 1-B, and the pages that
17   are referenced, I think, are 20 and 21.
18 A.  "Why did you leave Alabama Power Company?
19   I had a better opportunity with National
20   Producers. Is that the only reason you
21   left? Yes."
22 Q.  And that's not the truth, is it?
23 A.  Correct.

11 (Pages 38 to 41)

FREEDOM COURT REPORTING

Page 42

1 Q.  And you knew it was not the truth at the
2      time you gave the answer?
3 A.  Yes.
4 Q.  Why did you answer knowingly something
5      that was untrue when you had sworn to give
6      testimony under oath?
7 A.  Again, you know, I made a judgment error
8      on not admitting my arrest or being fired.
9 Q.  It was just a judgment error?
10 A.  I consider it a judgment error.  Yes, sir.
11 Q.  You consider giving false testimony under
12      oath a judgment error?
13 A.  I mean --
14 Q.  Is that right?
15 A.  I'd have to think about that.  I mean, I
16      made some judgment errors on the status of
17      employment.
18 Q.  Do you want to answer it any further, or
19      is that your answer?
20 A.  That's my answer.
21 Q.  Thank you.
22          This is the deposition where Dee
23      Miles with Beasley, Allen was the lawyer

Page 43

1      for the plaintiff?
2 A.  Yes.
3 Q.  Thank you.
4          Have you ever lied about the reason
5      you left Stonewall Dixie on employment
6      applications?
7 A.  That would have been related to Aetna.
8      Yeah.  I had answered that question
9      before.
10 Q.  Well, on the Aetna application, you said
11      that you lied about your termination with
12      Alabama Power, on the Aetna application.
13      You also lied about the reason you left
14      Stonewall Dixie Insurance Company to
15      Aetna, didn't you?
16 A.  The reason I -- What I stated to Aetna was
17      my conversation with Jim Sullivan, who
18      said that he would back me on a reduction
19      in force; that that would be an
20      explanation he would give to my employer.
21      And Aetna called Sullivan, talked with
22      him, and he explained my abilities, and
23      they hired me.

Page 44

1 Q.  So your position in not telling Aetna the
2      truth on your application was based upon
3      somebody else agreeing not to tell the
4      truth; is that right?
5 A.  It was based on an agreement I had with
6      the company on the reason that they would
7      say for my leaving.
8 Q.  Thank you.
9          When did you go to work for Aetna?
10 A.  July of '83.
11 Q.  Okay.  And what type of work did you do at
12      Aetna, please, sir?
13 A.  Commercial claims.  Started out in
14      commercial claims.
15 Q.  I think I know what you're talking about.
16      But so that the jury will know, what are
17      we talking about when we speak of
18      commercial claims?
19 A.  Commercial claims would be like businesses
20      -- mainly it would be a business
21      environment, workers' comp-type claims.
22      It would --
23 Q.  Casualty claims?

Page 45

1 A.  Casualty claims, bonds, fidelity bonds,
2      surety bonds, reclamation bonds.
3 Q.  Business interruption claims?
4 A.  Business interruption.  Any type business
5      insurance.
6 Q.  It did not involve life insurance, did it?
7 A.  No.
8 Q.  While at Aetna, were you ever criticized
9      for your claims-adjusting; that Aetna felt
10      like it placed the company at unreasonable
11      and unnecessary risk?
12 A.  I had seen one criticism on that.  I got
13      praised and got bonuses for doing good.
14 Q.  Yes, sir.
15 A.  And any criticism I had was a very small
16      percentage of the thousands of claims I
17      had.  So to me that's just inherent in the
18      claims.
19 Q.  Because, like everyone else, claims
20      adjusters make errors every day, don't
21      they, maybe not every day?
22 A.  Maybe not every day.
23 Q.  But they make errors?

12 (Pages 42 to 45)

FREEDOM COURT REPORTING

Page 46

1   A.   They make errors.
2   Q.   And you're not exempt from that, are you?
3   A.   Correct. I mean, people have different
4       thoughts about the way things are going to
5       be handled. And, I mean, on one of them
6       they had, I was criticized. So they
7       didn't want me to handle the claim. And
8       what did they do? They gave me the claim
9       anyway. So --
10   Q.   Okay. And do you recall an instance where
11      you made an in excess of a half million
12      dollar offer on behalf of Alabama Power
13      that had been sued?
14   A.   Oh, that -- I don't know whether it was a
15      half-million dollar offer. I think it was
16      a contractual defense that was owed to
17      Alabama Power, as a result of a cable
18      company that was attaching to a power
19      pole, that agreed to indemnify Alabama
20      Power if anything happened on their
21      property.
22   Q.   Yes, sir. Do you recall your error being,
23      in that situation, where you did not

Page 47

1      review the policy to determine whether
2      Alabama Power was even a named insured
3      under the policy?
4   A.   We had contractual coverage.
5   Q.   Was Alabama Power the named insured under
6      the policy that you were making the offer
7      on?
8   A.   I don't recall.
9   Q.   Was it generally your practice to review
10      the policy involved in the course of your
11      claims investigation and adjusting?
12   A.   And contracts. Any contracts that would
13      have existed between the insureds and the
14      Power Company.
15   Q.   All right. How long did you work for
16      Aetna?
17   A.   For who?
18   Q.   For Aetna.
19   A.   Oh, okay. That was between '83 to
20      December of '92.
21   Q.   Okay. Why did you leave Aetna?
22   A.   My job was eliminated.
23   Q.   Okay.

Page 48

1   A.   And that's contrary to Chadwick saying I
2      was fired, which was an outright lie.
3   Q.   Chadwick was one of your supervisors,
4      wasn't he?
5   A.   For a short period of time. He wasn't
6      there that long.
7   Q.   Was he your supervisor when you left?
8   A.   No. No. He was an assistant manager. I
9      had a supervisor that was between him.
10   Q.   So, basically, he supervised your
11      supervisor?
12   A.   Yes.
13   Q.   Okay. Therefore, do you think he would be
14      in a position to know why you left Aetna?
15   A.   You know, he got up there and lied. So,
16      you know, I think it was, you know,
17      uncalled-for what he did. But he lied and
18      I couldn't do anything about it.
19   Q.   But he did testify under oath that you
20      were fired, didn't he?
21   A.   That's right. And that wasn't the case.
22   Q.   Okay. You say your job was eliminated?
23   A.   Yes.

Page 49

1   Q.   Okay. And where were you working for
2      Aetna at the time?
3   A.   Birmingham.
4   Q.   There were people still in the Birmingham
5      Aetna office when you left, weren't there?
6   A.   It had shrunk significantly.
7   Q.   Had you been demoted by Aetna before you
8      left?
9   A.   Yes.
10   Q.   Why?
11   A.   It was on the way I was handling the
12      claims. But they still gave me the same
13      claims. They didn't change anything. I
14      received the same pay. Got the same
15      claims. Continued to handle the same
16      stuff for the entire period I was there.
17   Q.   Have you ever testified that you were
18      deselected for new positions from Aetna in
19      Birmingham when you left?
20   A.   I guess I may have. I recall the word
21      "deselected."
22   Q.   It was your word, wasn't it?
23   A.   Huh?

13 (Pages 46 to 49)

FREEDOM COURT REPORTING

Page 50

1  Q.  It was your word, wasn't it?
2  A.  I believe so.
3  Q.  Okay.  Do you believe you were unjustly
4      criticized for your claims-handling
5      activities at Aetna?
6  A.  Yes.
7  Q.  Has your work for any of these insurance
8      companies that you worked for ever
9      involved the handling or adjusting of life
10     insurance claims?
11 A.  No.
12 Q.  Okay.  Have you ever worked as a life
13     claims adjuster?
14 A.  No.
15 Q.  Have you ever been licensed as a life
16     insurance agent?
17 A.  No.
18 Q.  And have you ever taken any life insurance
19     courses?
20 A.  I can't remember whether AIC had some life
21     insurance in that.  They may or may not
22     have.  I don't recall.
23 Q.  When you left Aetna, you went into the

Page 51

1      consulting business, is that right, the
2      same business you're in today?
3  A.  Yes.
4  Q.  And what does that business generally
5      involve, please, sir?
6  A.  I do some investigation from time to time
7      for -- I've done some for insurance
8      companies, for individuals, for attorneys.
9      Most of it involved expert witness work.
10     But it's generally a combination of expert
11     witness work and some investigation work.
12 Q.  All right, sir.  With regard to your
13     income, what overall -- it doesn't have to
14     be exact.  But, in general, what is your
15     percentage of your income that comes from
16     being a professional witness in insurance
17     matters?
18 A.  Majority of it.
19 Q.  More than 75 percent?
20 A.  I mean, it can vary from year-to-year as
21     far as what happens there.  But probably
22     75 percent, at least.
23 Q.  Okay.  Are you a member of any expert

Page 52

1      witness groups or associations, such as
2      TASA or anybody like that?
3  A.  I was at one time.
4  Q.  Now are you?
5  A.  No.
6  Q.  Do you have any type of an advertising
7      brochure or website that you use to let
8      people know what you're holding yourself
9      out as an expert in?
10 A.  No.
11 Q.  Do you hold yourself out to those that
12     might be interested in hiring you as a
13     consultant as an expert in the field of
14     life insurance claims?
15 A.  Yes.
16 Q.  Oh, you do?
17 A.  Yes.
18 Q.  On what basis do you contend that you are
19     an expert in life insurance claims?
20 A.  Because the principles of investigation
21     and coverage analysis are consistent in
22     life insurance claims as they are other
23     claims.

Page 53

1  Q.  How do you know that if you've not taken
2      any courses on life insurance claims and
3      you've not worked as a life insurance
4      claims examiner?
5          MR. SANSPREE:  Object to the
6          form.
7  A.  That'd be from handling various cases in
8      which you review the manuals of the
9      various companies, on those that might
10     have a manual that, you know, say what's
11     involved, and it's consistent -- I believe
12     it's just years of reviewing multiple,
13     different companies' policies and
14     procedures.  And, you know, the aspects of
15     the investigation and coverage analysis
16     are all consistent with what you do on an
17     insurance claim.
18 Q.  So then your expertise in life insurance
19     and life insurance claims have come from
20     your involvement as a professional witness
21     hired in connection with cases involving
22     life insurance; is that right?
23 A.  Yes.

14 (Pages 50 to 53)

FREEDOM COURT REPORTING

Page 54

1  Q.  Okay. How many cases have you been
2      employed as an expert witness in life
3      insurance?
4  A.  I don't know.
5  Q.  You have no idea?
6  A.  No.
7  Q.  Can you think of more than one, not
8      counting this case?
9  A.  Not counting this case? I don't recall.
10     I couldn't tell you specifically. I know
11     there have been others, but I just don't
12     recall which cases they are.
13 Q.  There was one where Bill Wood at Norman,
14     Wood in Birmingham was the defense lawyer,
15     wasn't he, that again Dee Miles was the
16     plaintiff's lawyer?
17 A.  I don't know what case you're talking
18     about.
19 Q.  The case of Mobile Scottish Rite Bodies
20     versus New Hampshire Insurance Company.
21 A.  That wasn't a life claim.
22 Q.  It wasn't?
23 A.  No.

Page 55

1  Q.  Okay. What kind of claim was it?
2  A.  That was employee theft.
3  Q.  Employee theft. Okay.
4  A.  Yeah.
5  Q.  You are correct. I've got the wrong one
6      in my mind.
7          (Brief recess)
8          (Defendant's Exhibit 5 and 5-A
9           marked for purposes of
10          identification)
11 Q.  Let me show you what's been marked as
12     Defendant's Exhibit 5, which is a case
13     called American Pioneer Life Insurance
14     Company versus Transportation Techniques,
15     Inc. and John Esposito. Do you remember
16     that case? It involved Dee Miles with the
17     Beasley, Allen firm for the plaintiff --
18     excuse me. I think it was a dec action --
19     for the defendant, and William Wood as the
20     plaintiff lawyer filing the dec action.
21 A.  I remember the name Esposito, but I don't
22     remember much specifics about the case.
23 Q.  All right. Let me ask you to look at

Page 56

1      Exhibit 5-A, which is the bottom of page
2      16 in the deposition, and read -- I've
3      taken the time to highlight the question
4      and the answer there. You can read any
5      portion of it you'd like. But that's what
6      I'm going to be asking you about.
7  A.  The top of 16?
8  Q.  I think it's the highlighted portion.
9  A.  Okay.
10 Q.  This question asks you whether you had in
11     the past ever claimed to have experience
12     in reviewing, supervising or actually
13     handling life insurance claims, didn't it?
14 A.  Yes.
15 Q.  And it says, "Do you ever recollect where
16     you've taken that position?" And your
17     answer was "No"; isn't that right?
18 A.  That's what's down there.
19 Q.  is that correct? Did you answer
20     truthfully there?
21 A.  Which question are you talking about?
22 Q.  Right here (indicating).
23 A.  Okay. I'm sorry. I was on the wrong

Page 57

1      page. Okay. I mean, it was coincidental
2      on life insurance claims. I mean, that
3      would --
4  Q.  Yes, sir. But this asks whether you had
5      in the past ever claimed to have had
6      experience in reviewing, supervising or
7      actually handling life insurance claims.
8  A.  Well, reviewing. You know, I mean,
9      there's a difference between being an
10     expert as a witness and a consultant,
11     where you're reviewing claims and looking
12     at stuff that may never go to a expert or
13     -- I mean, you can do work as a consultant
14     that you don't necessarily handle as an
15     expert. So there are a couple of
16     different things involved there. So you
17     can be involved with reviewing stuff and
18     still not have handled the thing on a --
19     you know, from an insurance company
20     perspective.
21 Q.  I see. And I understand you're not a
22     lawyer, are you, sir?
23 A.  Correct.

15 (Pages 54 to 57)

FREEDOM COURT REPORTING

Page 58

1    Q.    Okay. And, so, I don't mean for this
2          question to be addressed to you in the
3          capacity of a lawyer. It's not a legal
4          question. Because Mr. Sanspree will
5          object to that, and I don't want him to
6          object. But, nevertheless, you told me a
7          moment ago that you had gained your
8          experience in life insurance as a
9          professional witness in reviewing life
10         insurance claims manuals, and life
11         insurance policies, and things of that
12         nature, and working on cases as a
13         consultant, professional witness; isn't
14         that right?
15   A.    Yeah. I mean, you would have life
16         insurance stuff that would be involved
17         with accidental deaths and stuff like
18         that.
19   Q.    Right.
20   A.    Where you would have inquiries and then
21         you'd look at, you know, potential for
22         subro or whatever involved in the thing.
23   Q.    But you wouldn't be acting in the capacity

Page 59

1          of life insurance claims-handling or an
2          adjuster, would you?
3    A.    Well, I mean, as far as a consultant, you
4          may be looking at it from the claims
5          adjuster's perspective, and giving a
6          review of claims-handling procedures as it
7          relates to a claim. Again, you're going
8          to have --
9    Q.    Well, maybe I better ask it this way. And
10         I don't mean to cut you off. But what is
11         your view, as a consultant, not in the
12         legal --
13         (Brief interruption)
14   Q.    Let me ask this: I need to get your
15         understanding what enables you to give
16         expert opinion testimony on a subject
17         matter. And let me finish my question.
18         It's going to be kind of a long question.
19         But what I'm interested in, you are here
20         expressing opinions in this case on life
21         insurance claims-handling. You've told me
22         that you do not have recollection of any
23         courses on life insurance.

Page 60

1    A.    I didn't say that. I just said I didn't
2          recall what was in the AIC courses that
3          may have related to life insurance.
4    Q.    Is that different from what I said?
5    A.    Yeah. You're saying that, you know, I
6          never looked at any stuff.
7    Q.    No, I didn't. I said that you don't
8          recall having taken any life insurance
9          courses. Is that wrong?
10   A.    Well, I wasn't ruling it out. To me, your
11         question is ruling it out.
12               MR. BUTLER: Read my question
13            back, please, ma'am.
14            (Requested portion of Record
15            read by the Reporter)
16   Q.    Do you have recollection of life insurance
17         courses?
18   A.    Again, I don't recall what was in the AIC
19         group of courses as to -- you know,
20         because that falls under personal
21         insurance, which you can have a lot of
22         things under personal insurance. So --
23   Q.    Yes, sir. But, I mean, we may be

Page 61

1          quibbling with words here and
2          understanding of words. But let me be
3          sure that I've got your testimony correct.
4          Do you recall having taken any life
5          insurance courses?
6    A.    Again, specifically on life alone --
7    Q.    I didn't say life alone.
8    A.    Again, I don't recall what's in the four
9          different courses, as to whether some of
10         the personal insurance is covered on life.
11   Q.    Okay.
12   A.    So --
13   Q.    All right. All right. And I think you
14         told me that you gained your knowledge and
15         experience on life insurance claims from
16         your work as a professional witness hired
17         to consult on life insurance cases; isn't
18         that correct?
19   A.    Yes. To me it's training, education, job
20         experience, job knowledge, and having been
21         through multiple companies and their
22         procedures manuals, for those companies
23         that have procedures manuals.

16 (Pages 58 to 61)

FREEDOM COURT REPORTING

Page 62

1  Q.  Yes, sir.
2  A.  And the difference in this case is --
3  Q.  I didn't ask you that.
4  A.  Well --
5  Q.  I will, though.
6  A.  I mean, but -- I mean, the fact of the
7     matter is, the way it's going, the folks
8     testify that they have no training
9     manuals.  So, I mean, I've had the benefit
10    of reviewing multiple companies' manuals
11    and procedures, for which this company
12    says they don't have any manuals or
13    procedures, and it's one-on-one training
14    and word-of-mouth.
15 Q.  Yes, sir.
16 A.  Now, that to me -- I've had much more
17    experience than any of these folks have,
18    because all of theirs is word-of-mouth
19    without any procedures.
20 Q.  In life insurance claims you've had much
21    more experience?
22 A.  Well, as far as going through and
23    understanding industry standards and

Page 63

1     manuals and procedures, for which Globe
2     says they have no manuals and procedures
3     or guidelines to go by.  So I'm used to
4     reviewing industry standards and reviewing
5     the standards of the various companies.
6     But in this case they say they don't have
7     any.  So, you know, for me, I think I'm
8     more qualified on handling claims relative
9     to this.  I mean, even
10    Ms. What's-her-name, she states she didn't
11    even know what a reservation of rights was
12    -- Ms. Whitaker said she didn't know what
13    a reservation of rights was after thirty
14    years of being in insurance.
15 Q.  Right.
16 A.  So it's those type things.  You know, it's
17    one-on-one.  "I don't know anything about
18    reservation of rights.  And we don't have
19    any claims or procedures manual, and
20    everything is one-on-one training."  So
21    that to me -- I've had a lot more training
22    and experience than these folks who go
23    around operating without manuals or

Page 64

1     procedures.
2  Q.  Yes, sir.  You would agree with me that
3     different kinds of insurance, be it life
4     insurance versus property and casualty,
5     for example, would have different
6     procedures and different terminology that
7     would apply to them, wouldn't you?
8  A.  Some would be consistent.  Some might be a
9     little different.
10 Q.  Tell me, please, sir, how the terminology
11    of reservation of rights could possibly
12    apply in a life insurance claim.
13 A.  Because of having a coverage situation.
14    And it's my experience that whenever
15    you've got a coverage dispute, you should
16    notify the insured of the coverage
17    dispute.  And I know a lot of companies
18    take the position, "Well, you don't have
19    to do that."  But when you've got a
20    coverage issue, it's been my thing that
21    you advise the insured and let them know.
22 Q.  What is your understanding of the term in
23    the insurance industry, in general, of the

Page 65

1     term "reservation of rights"?
2  A.  That's advising the insured of a coverage
3     situation for which there is a issue as to
4     whether or not it's coverage.  You define
5     what's in the policy.  You define what's
6     in the -- or what the situation is.  And
7     that there is a question between the
8     policy coverages and the situation of the
9     individual filing the claim.
10 Q.  Do you know of any place in the insurance
11    industry where the term "reservation of
12    rights" is used, except in the liability
13    insurance context, where a liability
14    insurance carrier is proceeding to defend
15    its insured in a liability claim, but
16    reserving its rights and defenses to
17    challenge coverage in indemnity?
18 A.  I mean, usually it bonds to me; any time
19    you had a question of coverage, you advise
20    the insured and you reserve your rights.
21 Q.  Okay.  So we've said liability insurance
22    carriers for casualty claims and for
23    bonds.  Can you tell me anywhere in the

17 (Pages 62 to 65)

FREEDOM COURT REPORTING

Page 66

1   insurance industry than it's used other
2   than that?
3           MR. SANSPREE:  Object to the
4       form.
5   A.  In the liability claims practices, which
6       is broad-based, and this is a
7       authoritative insurance document -- or
8       treatise, and it references the use of the
9       reservation of rights where you've got
10      questions of coverage.  So --
11  Q.  And it talks about liability coverage?
12  A.  It's speaking -- Basically, it's speaking
13      generic.  Whenever you've got -- I mean,
14      it is the liability claims.  It doesn't
15      say --
16  Q.  That's the entire title of this whole
17      treatise is "Liability Insurance Claim
18      Practice" -- or "Liability Claim
19      Practices"?
20  A.  Right.
21  Q.  We're not dealing here with liability
22      coverage, are we?
23  A.  Well, it's a form of liability coverage,

Page 67

1   but it's not liability coverage per se.
2   But, I mean, there is a liability for the
3   coverage that you've written.
4   Q.  You're saying that life insurance
5       coverage --
6   A.  No.
7   Q.  -- is the same as liability coverage?
8   A.  No, I'm not.
9           MR. SANSPREE:  Object to the
10      form.
11  Q.  Thank you.
12          MR. BUTLER:  Please, ma'am, mark
13      this as our next exhibit,
14      and specifically the page
15      number that the witness has
16      referred us to, being --
17      THE WITNESS:  Basically it's that
18      chapter.
19  Q.  The whole chapter, Chapter 4?
20  A.  Yeah.  I'll say Chapter 4.
21          MR. BUTLER:  -- Chapter 4 of this
22      book.  And I would ask the
23      court reporter to mark this

Page 68

1       and --
2       THE WITNESS:  We need to make a
3           copy of that.
4       MR. BUTLER:  -- to mark this as
5           our next numbered exhibit,
6           Chapter 4, that is the
7           chapter the witness relies
8           on for his testimony, and
9           then return it to
10          Mr. Sanspree so that
11          Mr. Allen will have it back.
12      THE WITNESS:  I just don't want
13          to put a sticker on there
14          because it'll tear the cover
15          up.
16      (Off-the-Record discussion)
17      MR. BUTLER:  Put a note on there
18          for our exhibit number for
19          the cover and first -- the
20          Roman numeral pages to
21          describe the edition, and
22          then Chapter 4, please,
23          ma'am.

Page 69

1       (Defendant's Exhibit 6 and 6-A
2           marked for purposes of
3           identification)
4   Q.  You told me that your experience with
5       regard to life insurance claims was
6       limited to your investigation as a
7       professional witness of civil cases in
8       which you've been hired.
9   A.  And a consultant.
10  Q.  And a consultant in those cases, right?
11  A.  Yes, sir.
12  Q.  All right.  This particular case, American
13      Pioneer Life versus Transportation
14      Techniques, did involve life insurance,
15      didn't it?
16  A.  I don't recall it specifically involving
17      life.
18  Q.  Well, you identified it as -- Just a
19      moment.
20      (Defendant's Exhibit 7 marked
21          for purposes of identification)
22  Q.  Let me show you Exhibit 7.  That comes
23      from your own documents, doesn't it?

18 (Pages 66 to 69)

FREEDOM COURT REPORTING

Page 70

1   A.   Yes.
2   Q.   And there you describe that case as a life
3        insurance benefits case, don't you?
4   A.   Oh, okay. You're talking about -- I've
5        just got number 8 as "Denial of Life
6        Insurance Benefits." I didn't have the
7        name.
8   Q.   You didn't have the name of the case, but
9        you've got the names of the lawyers, don't
10       you?
11  A.   Yes.
12  Q.   And they're Dee Miles and Bill Wood,
13       aren't they?
14  A.   Yes.
15  Q.   And certainly there were questions in that
16       deposition that you've seen about life
17       insurance, weren't there?
18  A.   Yes.
19  Q.   Does that refresh your recollection that
20       this was a life insurance benefits case?
21  A.   Yes, sir.
22  Q.   What others have you served as a
23       professional expert or consultant witness

Page 71

1        in?
2   A.   I don't recall. I didn't --
3   Q.   Are there any?
4   A.   I don't recall. You know, I don't keep
5        track of stuff like that.
6   Q.   Well, you keep a list of them, don't you?
7   A.   I've got a list, but that doesn't
8        necessarily mean what type it is.
9   Q.   Well, look at whatever you need to know.
10       If that's the basis of your expertise, I
11       need to know what other life insurance
12       benefit cases that you have been involved
13       in.
14  A.   I don't recall.
15  Q.   You can't tell me any?
16  A.   Well, I don't recall.
17  Q.   Okay.
18  A.   I just don't recall all of them.
19  Q.   Can you tell me there have been more than
20       this one marked Defendant's Exhibit 5?
21  A.   As a consultant or as an expert?
22  Q.   Either.
23  A.   I know I've had numerous ones, but I just

Page 72

1        don't recall the names.
2   Q.   Can you tell me anything about them, who
3        the lawyers were, what court they were in
4        or anything?
5   A.   No, sir.
6   Q.   Okay. You have expressed opinions about
7        industry standards in this case with
8        regard to life insurance claims-handling,
9        have you not?
10  A.   Yes.
11  Q.   Okay. Where do you get your knowledge of
12       industry standards with regard to
13       adjusting and handling life insurance
14       claims, except for serving as a consultant
15       or an expert witness in other civil cases?
16  A.   And reviewing treatises and claims manuals
17       and procedures manuals.
18  Q.   What treatises have you reviewed?
19  A.   That's one that I had had and read from a
20       long time ago that has stuff on life.
21  Q.   Okay. Can you, to save us time so that I
22       won't have to read this treatise, can you
23       narrow it any for me by telling me which

Page 73

1        section or chapter or page that you would
2        rely upon for the subject of knowledge of
3        industry standards in handling of life
4        insurance claims?
5   A.   That would be under Chapter 10.
6   Q.   Okay.
7   A.   Looks like page 235 to 265.
8   Q.   Might I borrow it a moment? Show me,
9        Mr. Allen, where in Chapter 10 of this
10       book, "Personal Insurance" by J. J.
11       Lonnie, George Raider, Donald Oakes, 1st
12       Edition, 1987, show me in Chapter 10, that
13       you've identified, what portion of that
14       chapter you rely upon with regard to your
15       opinions in this case, with regard to
16       claims-handling procedures for life
17       insurance claims.
18  A.   I don't think this discusses
19       claims-handling procedures.
20  Q.   Doesn't discuss it at all, does it?
21  A.   Correct. And that's what I was telling
22       you, that the liability claims practices
23       of the claims-adjusting procedures have

19 (Pages 70 to 73)

FREEDOM COURT REPORTING

Page 74

1  basic concepts that are involved in
2  investigating and handling claims that
3  are, you know, consistent for all types of
4  insurance policies.
5  Q.  And you're referring again to Exhibit 6?
6  A.  Well, that and, you know, you have, you
7  know, claims procedures in the property
8  end of the thing.
9  Q.  And you're showing me now a book called
10  "Adjustment of Property Losses."
11  A.  But it has some unfair claims practices,
12  which is what I was looking at on some of
13  this on fair claims-handling.
14  Q.  All right. We'll get to that in a moment.
15  Keep that handy for me. But it doesn't
16  have anything on life insurance claims,
17  does it?
18  A.  Which one? On property? No.
19  Q.  What is the name of it?
20  A.  "Adjustment of Property Losses." It has
21  unfair claims practices in there.
22  Q.  Any other treatises that you've relied
23  upon to form your opinions in this case

Page 75

1  dealing with life insurance claims?
2  A.  No, sir.
3  Q.  Thank you.
4  A.  Well, Bibb Allen's book. I've relied on
5  that for the aspects of acceptance of the
6  premium.
7  Q.  On the waiver issue?
8  A.  Waiver, yeah.
9  Q.  Okay. And you think his treatise is --
10  And you've cited a case in your report.
11  Does that comes from Bibb Allen's book?
12  A.  Yes.
13  Q.  You don't pretend to have expertise in the
14  law governing insurance, do you?
15  A.  What do you mean?
16  Q.  Well, you don't hold yourself out as an
17  expert in insurance law, do you?
18  A.  No. I'm not a lawyer. So I'm not
19  rendering any legal opinions.
20  Q.  Thank you.
21  A.  I mean, I can read the information that
22  comes, that's common in the insurance
23  industry, to receive case law and other

Page 76

1  documents from various sources regarding
2  how claims are handled. So it's not
3  unusual to see case law as an adjuster for
4  handling claims.
5  Q.  All right. You and I had a discussion a
6  moment ago about the term, quote,
7  "reservation of rights," end quote.
8  A.  Right.
9  Q.  You use also the term, quote, "nonwaiver,"
10  end quote --
11  A.  Right.
12  Q.  -- in your report on this case, don't you?
13  A.  Yes, sir.
14  Q.  What does nonwaiver have to do with life
15  insurance claims-handling?
16  A.  Well, nonwaiver is in the same purview as
17  a reservation of rights, in that it's just
18  a -- Generally, a nonwaiver is a
19  standardized form-type thing, although it
20  can be manuscripted out, and basically
21  says you're investigating the claim, and
22  you'll get back with the insured at a
23  later time. I mean, that's --

Page 77

1  Q.  That's your understanding of "nonwaiver"?
2  A.  Well, "nonwaiver" is you set out that you
3  have a claim. You're looking at the
4  claim. There may be a question of
5  coverage. You know, you're reserving your
6  rights to review the coverage aspects, and
7  then you'll advise thereafter.
8  Q.  But what you're doing in that is, you're
9  offering to defend the insured in a
10  liability context, while you are reserving
11  the right to challenge coverage issues,
12  aren't you?
13  A.  You would use the reservation of rights,
14  or a nonwaiver, in first-party.
15  First-party fire has a lot of reservation
16  of rights and nonwaivers involved. So you
17  see that -- you see it a lot in, you know,
18  the fire-type claim, or any first-party
19  claim where there's a question of coverage
20  involving the insured.
21  Q.  Have you ever seen it used in the life
22  insurance context?
23  A.  Not yet.

20 (Pages 74 to 77)

FREEDOM COURT REPORTING

Page 78

1  Q.  Neither have I.
2  A.  If the person doesn't even know what a
3      reservation of rights is, it's hard for
4      them to use one.
5  Q.  Or if a person has no need of application
6      of the term "reservation of rights,"
7      there's no need to use one?
8  A.  I'd disagree with that. Because any time
9      you've got a question of coverage, there's
10     a need. And as claims manager, you're
11     going to run into situations involving
12     coverage. So if you've got twenty-five,
13     thirty years experience and you don't even
14     know how to reserve rights, or when to
15     question coverage, or notice coverage
16     questions --
17 Q.  Can you point me to any -- any
18     authoritative source that would suggest
19     that the terms, quote, "reservation of
20     rights," end quote, or the term, quote,
21     "nonwaiver," end quote, has a place and
22     application in the context of handling
23     life insurance claims?

Page 79

1  A.  Not at this time.
2  Q.  Well, this is the only time I've got to
3      ask you.
4  A.  I know. I haven't seen anything.
5  Q.  Neither have I.
6  A.  But, you know, if I go looking, I may find
7      something. If I do, I will let you know.
8  Q.  I'd appreciate it.
9           Have you ever been a plaintiff or a
10     defendant in a lawsuit?
11 A.  Yes.
12 Q.  Okay. What types of cases have you been a
13     plaintiff in?
14 A.  As a landlord, as an individual.
15 Q.  Were you other than an individual in your
16     landlord cases?
17 A.  No. I was an individual in landlord
18     cases. Then sued a few folks. Dismissed
19     the last suit I filed against an
20     individual from Mobile -- or two
21     individuals in Mobile. Didn't dismiss
22     that one. Venue was changed.
23 Q.  What was that case about?

Page 80

1  A.  Individual was interfering in my father's
2      funeral.
3  Q.  Okay.
4  A.  And had been a defendant in a defamation
5      of character suit.
6  Q.  And you were a cross-claimant in that,
7      weren't you?
8  A.  Yeah.
9  Q.  Did you serve as your own lawyer?
10 A.  Yes.
11 Q.  And your own expert witness?
12 A.  Yes.
13 Q.  Were you ever involved in a lawsuit
14     against Allstate, involving your ex-wife,
15     concerning an auto accident?
16 A.  I don't know whether I was involved -- I
17     don't know whether suit was filed against
18     Allstate.
19 Q.  Wasn't there a bad faith suit filed?
20 Q.  Against Allstate and my ex-wife?
21 Q.  Yeah.
22 A.  I don't recall.
23 Q.  Okay. So then you wouldn't recall whether

Page 81

1      you acted as an expert witness in that
2      either?
3  A.  That one was settled with Allstate.
4  Q.  It was settled?
5  A.  Yeah.
6  Q.  Before or after the suit was filed?
7  A.  I don't even -- I don't recall whether the
8      lawsuit was filed. Do you have the style
9      on it?
10 Q.  I do somewhere. Just a moment and I'll
11     see if I can help you with it. John and
12     Carol Allen versus S. Freeman Green and
13     Allstate Insurance Company. Civil action
14     number CV-1986-1088. Circuit Court of
15     Jefferson County, Alabama.
16 A.  What year?
17 Q.  1986.
18 A.  Okay. That was when I was still with
19     Aetna. Yeah. I didn't recall -- I recall
20     the claim against Allstate. That was
21     where she was rear-ended.
22 Q.  You were a plaintiff in that case, weren't
23     you?

21 (Pages 78 to 81)

FREEDOM COURT REPORTING

Page 82

1   A.   Yeah, I guess.  I didn't recall that.
2   Q.   You don't recall suing them for bad faith?
3   A.   Not from that one.  No.
4   Q.   Okay.
5   A.   It may have been worded in there.
6            (Defendant's Exhibit 8 marked
7            for purposes of identification)
8   Q.   Mr. Allen, let me show you what is marked
9        as Defendant's Exhibit 8, which appears to
10       be a report from you in this case dated
11       October 22nd, 2006.  See if that is an
12       accurate copy of that, please, sir.
13  A.   I think they had another list of the court
14       trials.  It's not a current list.
15  Q.   Do you have a current list?
16  A.   Here's a current list.
17  Q.   Let's mark this as the next number
18       exhibit, which will be the current list.
19           (Defendant's Exhibit 9 marked
20           for purposes of identification)
21  Q.   And the current list would be Defendant's
22       Exhibit 9; is that right, sir?
23  A.   Yes.

Page 83

1   Q.   Okay.  Going back to a question I asked
2        you earlier on the current list.  Can you
3        point out to me on Exhibit 9 any cases
4        that involve life insurance claims, other
5        than the one that Mr. Miles and Mr. Bill
6        Wood were involved in?
7   A.   Number 57, I know, is a life insurance
8        claim.
9   Q.   Okay.  That's Victoria Johnson versus
10       Northwestern Mutual Life?
11  A.   Right.
12  Q.   Is that case over?
13  A.   I don't know whether it's on appeal or
14       not.
15  Q.   Okay.  Gusty Yearout was one of the
16       plaintiff's attorneys?
17  A.   Right.
18  Q.   And Chris King was one of the defense
19       attorneys?
20  A.   Right.
21  Q.   Has it been tried?
22  A.   No.
23  Q.   Well, I don't want you to tell me

Page 84

1        something that would jeopardize either
2        side of the lawyers of this case --
3   A.   Right.
4   Q.   -- on information.  But what can you tell
5        me -- You say it might be on appeal; you
6        don't know?
7   A.   I don't know exactly what the status of
8        the case is.  They had some motions, but I
9        don't know if --
10  Q.   Summary judgment motions?
11  A.   Yeah.  But I don't know what's happened,
12       as far as whether there's been any appeal
13       on the motions or what that is there.
14       So --
15  Q.   Okay.  What type of issue was involved in
16       that case or is involved in that case?
17  A.   I think that involved -- Well, I know it
18       had issues on the payment of premium and a
19       potential lapse of premium payment.
20  Q.   Did the company, Northwestern Mutual,
21       contend that the policy was out of benefit
22       due to nonpayment of premium?
23  A.   Well, it had some other issues as far as

Page 85

1        some accounts that were involved in
2        funding the payment of the premium.  So
3        there was a dispute on that issue as far
4        as what was available to fund it, and then
5        the value of the policy at the time of the
6        alleged lapse, and then whether there were
7        any -- you know, what benefits might have
8        been due.
9   Q.   Was this a universal life policy, or
10       interest-sensitive policy, or something
11       like that?
12  A.   I think part of it had interest and part
13       of it didn't.  I think there were a couple
14       different types of policy.
15  Q.   Was the issue involving whether or not the
16       cash value, or the fund in the policy, was
17       sufficient to carry the premium payment?
18  A.   There was some issues of cash value.  Yes.
19  Q.   It was not a death claim, right?
20  A.   Yeah.
21  Q.   Oh, it was a death claim?
22  A.   Yeah.
23  Q.   Okay.  And did the insurance company take

22 (Pages 82 to 85)

FREEDOM COURT REPORTING

Page 86

1  the position that the policy had lapsed
2  because the fund in the policy was not
3  sufficient to carry the premium?
4  A.  That was part of it.  Yes.
5  Q.  Do you remember anything else?
6  A.  I remember there was -- also you had a
7  question on the effective date of the
8  policy, and whether this was a renewal, or
9  whether it was a continuation, or whether
10  it was a new policy.  And there were those
11  issues involved, too.
12  Q.  Okay.  Is that about all you can remember
13  about the issues involved in the case?
14  A.  Yeah.  I mean, that's the -- I mean,
15  whether the policy had cash value in it,
16  some portions, you know, would have
17  allowed for cash value.  Some policies
18  didn't have cash value.  So it was a
19  combination of those.
20  Q.  I see.  Okay.  Any others?
21  A.  53, I think, had some elements.  It was --
22  I'm thinking that may be on accidental
23  death, involving benefits on accidental

Page 87

1  death.
2  Q.  Okay.  Any others?  Was the issue in that
3  Cottingham versus CNA case whether or not
4  the death was, in fact, accidental?
5  A.  There's more to it than that.  This was
6  where the guy had sustained -- I believe
7  this is the one where he had sustained a
8  burn.  He was a diabetic.  And he got
9  burned by the heater.  And then he ended
10  up with having his leg amputated, and then
11  he ended up dying.  So it was kind of a
12  chain of causal events associated with it.
13  Q.  And the insurance company contended that
14  he died of disease as opposed to an
15  accident?  Is that fair to say?
16  A.  No, I don't think so.
17  Q.  Okay.  Do you remember what the issue was,
18  then?
19  A.  It was over him dying, and whether there
20  was a causal relationship between the
21  injury and the death.  That's all I
22  remember there.
23  Q.  Any others?

Page 88

1  A.  That's all I recall.
2  Q.  Thank you, sir.
3      In your role as an expert witness
4  hired by the party to civil litigation, do
5  you attempt to give fair treatment to all
6  of the language in a policy or a document,
7  or do you consider your role to be that of
8  an advocate for the party who has hired
9  you?
10  A.  I don't consider myself an advocate.
11  Q.  Do you try to give fair treatment to all
12  of the documents?
13  A.  Absolutely.
14      (Defendant's Exhibit 10 marked
15       for purposes of identification)
16  Q.  Okay.  Let me show you what is marked as
17  Defendant's Exhibit 10, which appears to
18  be a letter dated January the 2nd, I
19  think, 2004.
20  A.  Yes.
21  Q.  All right.  Now, if you would, your pages
22  of your report do not appear to be
23  numbered.

Page 89

1  A.  They are.  Top right.
2  Q.  Yes, they are.  I'm sorry.
3  A.  Top left, I mean.
4  Q.  They sure are.  Let me find where I'm
5  talking about.  Okay.  The second page of
6  your report, if you will turn to that,
7  please, sir.
8  A.  All right.
9  Q.  And in the second paragraph on the second
10  page you refer to this particular letter,
11  do you not?
12  A.  Yes.
13  Q.  And your letter says, and I quote, "The
14  letter stated that if premium was received
15  by January 17, 2004, that the policy would
16  be reinstated."
17  A.  Uh-huh (positive response).
18  Q.  Okay.  You did not mention the rest of
19  that sentence, did you, from the letter?
20  A.  Which part are you talking about?
21  Q.  The part that says "provided the insured
22  is still in good health."
23  A.  Correct.

FREEDOM COURT REPORTING

Page 90

1  Q.  Why not?
2  A.  Well, you know, that's just the way I
3      worded it.
4  Q.  I know it. But why didn't you give the
5      rest of what the letter said with regard
6      to that same sentence that you are
7      paraphrasing?
8  A.  That's just the way I worded the sentence.
9  Q.  Is that not material to you, the condition
10     provided in there, quote, "provided the
11     insured is still in good health"?
12 A.  At the time the payment was mailed, he was
13     in good health.
14 Q.  That's not what I asked. Is that not
15     material to you at all, that it says,
16     quote, "provided the insured is still in
17     good health"?
18 A.  I wasn't addressing the issue of his
19     health. I was addressing the issue if it
20     was received by the 17th, it would be
21     reinstated.
22 Q.  Even if he was dead?
23 A.  And, you know, I went on to mention "A"

Page 91

1      and "B" under the policy.
2  Q.  Yes, sir.
3  A.  So, you know, I reference what the
4      certificate said, as far as, you know,
5      whether they require any evidence of
6      insurability, and the overdue premiums
7      were paid.
8  Q.  Okay. Have you read this policy?
9  A.  Yes.
10 Q.  The entire policy?
11 A.  Well, whatever I had. I don't recall
12     whether we have a certified copy of that
13     policy or not. Whatever I had policy-wise
14     is in the notebook here.
15 Q.  Right. If you will turn, please, sir, to
16     page 6 of your report.
17 A.  Okay.
18 Q.  The very top sentence up there where it
19     says, "It has been my experience that the
20     date anything is mailed is considered as
21     the date the item was transferred to the
22     addressee."
23 A.  Yes.

Page 92

1  Q.  Where does that experience come from with
2      regard to life insurance premium payers?
3  A.  That's not necessarily involving life
4      insurance, but just, in general, of when
5      payment is considered as being, you know,
6      sent, received. I mean, I remember that
7      going back to college. You know, once you
8      put it in the mail at that point in time,
9      that's when you've sent it on to the other
10     person. So --
11 Q.  And that's when it's deemed received in
12     every instance, in your judgment?
13     MR. SANSPREE: Object to form.
14 A.  I mean, as far as the taxes go, I mean,
15     that's the example I gave. If you got it
16     in there before midnight on the 15th, it's
17     deemed as having been transferred over to
18     the Feds. So, I mean, that's the best
19     example.
20 Q.  I'm painfully familiar with taxes. But,
21     nevertheless, is it your understanding
22     that always an item is deemed received
23     when it is placed in the mail to the

Page 93

1      addressee?
2  A.  I haven't read anything to the contrary to
3      that position, that once you put it in the
4      mail, it's deemed on the received side.
5  Q.  You would agree that parties can contract
6      otherwise, wouldn't you?
7  A.  What do you mean "contract"?
8  Q.  Contract differently as to when something
9      is deemed received or payment made.
10 A.  Are you talking about a written contract,
11     or an oral contract, or just --
12 Q.  Either.
13 A.  You know, you can have variations, I
14     guess.
15 Q.  And if the rule is, as you stated, that an
16     item is deemed received by the addressee
17     once it's placed in the United States
18     mail, you would agree with me that parties
19     can contract otherwise, wouldn't you,
20     based on your knowledge? I'm not asking
21     you for a legal interpretation.
22     (Brief interruption)
23 A.  Would you repeat the question again?

24 (Pages 90 to 93)

FREEDOM COURT REPORTING

Page 94

1  Q.  You told me that your understanding as to
2      -- regardless of what document or anything
3      that's placed in the mail is generally
4      deemed received by the addressee once it
5      is placed in the United States mail.
6  A.  Correct.
7  Q.  My next question was, wouldn't you agree
8      that parties could contract otherwise?
9  A.  I mean, you know, you can contract for a
10     lot of different things.  So the
11     possibility is there.
12 Q.  Yes, sir.  Have you read this policy with
13     regard to its definitions as to when
14     premiums are payable and how?
15 A.  I remember there was, like, thirty-one
16     days per premium payment due on the other
17     side.  Which one are you specifically
18     referring to?
19 Q.  I'm going to refer you just a moment.  But
20     as we sit here, do you remember, from your
21     review and investigation of the subject
22     Globe Life policy insuring the life of
23     David Lurie, what it said as to payments

Page 95

1      of premiums, and where they were to be
2      made, and such as that?
3            MR. SANSPREE:  Without looking at
4            it?
5            MR. BUTLER:  Yeah.  Without
6            looking at it.
7  A.  I would have to look at it.
8  Q.  Thank you.  I'll give you that
9      opportunity.
10           MR. BUTLER:  Would you mark that
11           as the next number?
12           (Defendant's Exhibit 11 marked
13           for purposes of identification)
14 Q.  Defendant's Exhibit 11, right up under the
15     top bold print "Premiums and
16     Reinstatement," it has "Payment".  And
17     doesn't it say, "Each premium is payable
18     in advance at our administrative office"?
19 A.  Yes.
20 Q.  And that's in Oklahoma City, Oklahoma,
21     isn't it, wherever the administration
22     office is?
23 A.  Wherever that is.  Right.

Page 96

1  Q.  Okay.  Now, did you read Ms. Lurie's
2      deposition?
3  A.  Yes.
4  Q.  Did you read the deposition or a summary
5      provided to you?
6  A.  I didn't get a summary.  I read her
7      deposition.
8  Q.  Okay.  And what was her testimony as to
9      when she made a payment on this policy
10     that had lapsed?
11 A.  She indicated that she had written a check
12     on January 4th and -- of 2004.  Although,
13     the check stated January 4th, 2003.  So we
14     had the year change.
15 Q.  There would be no issue about that.
16 A.  Okay.  And then she said she had placed
17     that in the mail the evening of the 4th,
18     and that the mail was picked up the
19     morning of the 5th.
20 Q.  Of 2004?
21 A.  Of 2004.  Yes.
22 Q.  January the 5th of 2004?
23 A.  Correct.

Page 97

1  Q.  And for purposes of your report, had you
2      deemed that it was received by Globe Life
3      when it was placed in the United States
4      mail; is that right?
5  A.  Yes.
6  Q.  Okay.  Defendant's Exhibit 11, however,
7      under "Premiums and Reinstatement," states
8      that "Premium is payable in advance at our
9      administrative office," doesn't it?
10 A.  Yes.
11 Q.  Clearly it would not have been received by
12     the date of death of David Lurie, would
13     it?
14           MR. SANSPREE:  Object to the
15           form.
16 A.  I don't know.  You know, if it was mailed
17     on the 5th -- You don't know about the
18     mail, as to whether it was there the next
19     day.  I don't know what day.  And there's
20     nothing I've seen in the evidence that
21     says what day it was received by Globe.
22     So I don't know.
23 Q.  Have you read the depositions of the Globe

25 (Pages 94 to 97)

FREEDOM COURT REPORTING

Page 98

1        people that were deposed?
2    A.  Yes.
3    Q.  Well, let me save some time.
4    A.  All right.
5    Q.  Assuming for the purposes of my question
6        that there's testimony that it was
7        received on or about January the 16th of
8        2004.
9    A.  I know that's the date that it was posted.
10       Now, as to whether it was received what
11       day, that's unknown.  The day it was
12       posted to the account would have been the
13       16th.  So you don't know -- I mean, that's
14       a date of posting, which was a day prior
15       to the date of the 17th, which was what
16       was indicated that it had to, you know, be
17       posted by that date.
18   Q.  Yes, sir.  But did you get any information
19       from those depositions as to when would
20       have been the earliest that it would have
21       been received?
22   A.  I don't recall that.
23   Q.  Would you agree it would have been after

Page 99

1        the date of death of the insured, David
2        Lurie?
3    A.  Well, I don't know.
4    Q.  Okay.  Nevertheless, the policy requires
5        it be "paid in advance at our
6        administrative office," doesn't it?
7            MR. SANSPREE:  Object to the
8            form.
9    A.  That's what it says.
10   Q.  And if it wasn't received at the Globe
11       administrative office, then the
12       reinstatement offered in Defendant's
13       Exhibit 10 says that they must receive
14       their payment by January 17th, doesn't it?
15   A.  Yes.
16   Q.  And it says that the insured must be still
17       in good health, doesn't it?
18   A.  Yeah.
19   Q.  In fact, he was dead, wasn't he?
20   A.  Not on the 2nd.
21   Q.  Not on the 2nd, but he was dead --
22   A.  The morning of the 6th.
23   Q.  -- the morning of the 6th.

Page 100

1    A.  Right.
2    Q.  And the premium was only picked up by the
3        postman on January the 5th, right?
4    A.  Yes.
5    Q.  If Globe did not receive it until after
6        the 6th, then this reinstatement could not
7        have been, according to this letter,
8        effected, could it?
9    A.  Well, that's if you're negating that it's
10       in the mail and it's in their possession.
11       And as far as the physical possession for
12       the dateline set there, it was in their
13       physical possession and posted before the
14       17th.
15   Q.  Yes, sir.  But he was not in good health,
16       you know, in between the time they
17       received the payment and the 17th, was
18       he --
19           MR. SANSPREE:  Object to the
20           form.
21   Q.  -- if they received it after the 6th?
22   A.  Correct.
23   Q.  Okay.  You wouldn't expect a life

Page 101

1        insurance company to knowingly reinstate a
2        life insurance policy that had been lapsed
3        and out of benefit, if they knew that the
4        insured was dead, would you?
5    A.  Well, you know, the statement by Attorney
6        Mitchell is contrary to that, in that
7        Attorney Mitchell indicates that he
8        advised them as of the 12th of January
9        that Mr. Lurie was dead, and they said,
10       okay, just send the premium on in.
11       There's no problem as long as it's
12       received before the 17th.  So the
13       affidavit of the attorney is reflective
14       that they were with the knowledge of the
15       death as of the 12th, and then the account
16       was posted on the 16th.
17   Q.  My question is, from what you know about
18       life insurance, would you expect a life
19       insurance company to reinstate a life
20       insurance policy that was out of benefit
21       with knowledge that the insured was
22       already dead?
23   A.  I think it's circumstantial as to the

26 (Pages 98 to 101)

FREEDOM COURT REPORTING

Page 102

1  facts concerning the notice to the
2  insurance company.
3  Q.  How is that?
4  A.  Well, the attorney had advised them of
5  that.
6  Q.  That wasn't my question at all.  Listen
7  very carefully.  I'm going to ask it the
8  third time.
9  Based on your knowledge of life
10  insurance practices, would you expect a
11  life insurance company to knowingly agree
12  to reinstate a life insurance policy that
13  was out of benefit, knowing that the
14  insured was already dead?
15  A.  I don't think you can -- you know, that's
16  second-guessing what an insurance company
17  would do.  They might --
18  Q.  Well, that's what you're doing in this
19  case.
20  A.  Well, no.  Huh-uh (negative response).
21  I'm taking it on the facts of what was
22  shown as testimony by the insured's
23  attorney and the notice to the company.

Page 103

1  So --
2  Q.  Can you answer my question?
3  A.  No.
4  Q.  Thank you.
5  Since you referred to the attorney --
6  His name is Mitchell?
7  MR. SANSPREE:  His name is
8  Matthews.
9  MR. BUTLER:  I didn't think it
10  was Mitchell.
11  Q.  Have you talked to Mr. Matthews?
12  A.  No.
13  Q.  Do you know to whom he talked at Globe
14  Life?
15  A.  No.
16  Q.  Based on your experience in the insurance
17  business or industry, would you think it
18  reasonable to assume that an employee, an
19  unidentified at this point-in-time
20  employee at Globe, would say, go ahead,
21  and, you know, if we get the premium, it
22  doesn't matter whether the insured is dead
23  or not?  Does that make sense to you?

Page 104

1  A.  I don't think you can ever truly say what
2  any employee may say about --
3  Q.  I didn't ask you what they might have
4  said.  I said, does it make sense to you,
5  as a person that's been in the insurance
6  business for a lot of years?
7  A.  Makes sense that they would knowingly say
8  that?  They had the information in front
9  of them, as far as the computer
10  information, on whether the account is
11  current, whether it's not current.  They
12  have the information in front of them in
13  this situation.  So, I mean, as far as
14  saying what the employee did or didn't do,
15  there's nothing tendered by Globe to show
16  that the event didn't happen.
17  Q.  Is it logical that such a Globe employee
18  would have said that?
19  A.  It's possible.
20  Q.  Is it logical?
21  A.  I don't know whether you could draw a fine
22  line of logic to the possibility that it,
23  you know, took effect.  I mean, logically

Page 105

1  -- You may say, well, logically this
2  shouldn't happen, but "logically" doesn't
3  necessarily mean it doesn't happen.
4  Q.  That's right.  You use logic every day,
5  don't you?
6  A.  I think most everybody does.
7  Q.  I do, too.  Is it logical that such an
8  employee would have said that, knowing
9  that the person was already dead and
10  saying, "We'll reinstate anyway if we get
11  the premium in time"?
12  A.  I don't know what the employee knew about
13  the premium payment.
14  Q.  I don't either.
15  A.  And there's nothing been tendered by
16  anybody there that says that they did or
17  didn't talk with the attorney.
18  Q.  All right, sir.  Would you agree that
19  people who have actually worked in life
20  insurance claims for several years would
21  have more expertise than you with regard
22  to appropriate procedures, with regard to
23  life insurance claims?

27 (Pages 102 to 105)

FREEDOM COURT REPORTING

Page 106

1  A.  Well, since Globe doesn't have any
2      policies or procedures, I would say no.
3  Q.  Okay. Would you agree that they would
4      have more knowledge of industry standards
5      with regard to life insurance claims?
6  A.  No. Not the Globe folks. I mean, if you
7      haven't got any policies and procedures,
8      and everything is word-of-mouth, then that
9      would be impossible, in my opinion, for
10     these folks to have greater knowledge than
11     me when they haven't even read, you know,
12     any policies or procedures.
13 Q.  Okay. You did learn from review of the
14     Globe depositions that the claims
15     examiners actually reviewed the policy
16     involved, and the benefits and exclusions
17     in those policies, in adjusting the claim?
18 A.  After the fact.
19 Q.  After the death?
20 A.  No. Because as far as what Ms. Whitaker
21     indicated, she indicated that she got the
22     claim. She looked at it. She approved
23     it. She sent it to Legal. They approved

Page 107

1      it. And then she gave it to the adjuster
2      to see if it was covered after the claim
3      manager had approved the thing, which is
4      totally contrary to what I've seen as an
5      industry standard.
6  Q.  You're not listening to my question.
7          Did you not find in the Globe
8      depositions of the Globe employees, the
9      three Globe employees that were deposed,
10     that the Globe procedure was to get a
11     printout of the actual policy involved in
12     the claim?
13 A.  Wasn't the actual policy. I think it
14     would have been a specimen.
15 Q.  All right. A specimen of the policy
16     involved in the claim?
17 A.  But you don't know that the specimen is a
18     certified copy of the policy that existed.
19 Q.  And you're not being an advocate here
20     today; is that right?
21 A.  I'm just telling you the way --
22 Q.  I understand. Keep on.
23 A.  -- the way it was.

Page 108

1  Q.  All right, sir. So did you read in the
2      depositions that the Globe adjusters would
3      have the policy language in front of them
4      as to benefits and exclusions?
5  A.  They would have a specimen, which I don't
6      know whether it was the actual policy
7      verbiage and addition dates that would
8      have been involved. But there would have
9      been some form of a specimen policy with
10     them.
11 Q.  Do you have any knowledge or information
12     that it was not?
13 A.  No.
14 Q.  So with regard to your thought that it
15     might not have been exact is basically
16     totally guess and surmise, isn't it?
17 A.  Well, I don't know, because I haven't seen
18     a certified copy of the policy, and them
19     saying that, "Yes, I reviewed the
20     declaration sheets, and then I've reviewed
21     a certified copy of the policy as
22     certified by ONRA" (phonetic).
23 Q.  If it's not totally guess and surmise,

Page 109

1      what is it based on, your comment that it
2      might not have been the same benefit and
3      exclusion language that Mr. Lurie had in
4      his policy?
5  A.  The experience of seeing different
6      policies submitted as being the policy in
7      force when they weren't.
8  Q.  Okay. But you yourself, in analyzing the
9      actions of Globe Life after the fact, did
10     not read and rely on all of the provisions
11     of Mr. Lurie's policy that was represented
12     to you by Ms. Lurie's counsel as being a
13     copy of his policy, did you?
14 A.  I made my observation based on what was
15     submitted to me.
16 Q.  Yes, sir. And you did not take note of
17     the language with regard to payment of
18     premiums under "Premiums and
19     Reinstatement" contained on Exhibit 11,
20     did you?
21 A.  What do you mean? As far as addressing
22     that in my report, or what?
23 Q.  Yes, sir.

28 (Pages 106 to 109)

FREEDOM COURT REPORTING

Page 110

1   A.   On which part, are you saying?
2   Q.   The thing we just got through a moment --
3        under "Payment."
4   A.   You know, I mean, it says what it says,
5        and "at the administrative office." I
6        mean, I guess it was addressed to the
7        administrative office. I don't know what
8        the address was on the envelope, but I
9        assume it was to the administrative
10       office.
11  Q.   Okay. But this says "Premium is payable
12       in advance at our administrative office."
13       And you interpret that to mean if it was
14       placed in the mail and mailed to the
15       administrative office, it's the date of
16       mailing? Is that your interpretation?
17  A.   I think it's subject to ambiguity.
18  Q.   Okay. You refer often in your report to
19       industry standards, and breach of industry
20       standards, with regard to the adjustment
21       of life insurance claims. Where are those
22       industry standards published in a manual
23       or a guideline?

Page 111

1   A.   Deviation from industry standards?
2   Q.   No, sir. The industry standards
3        themselves.
4   A.   Well, I mean, you've got a combination of
5        all the different industry treatises which
6        address claims of various forms. So as
7        far as one particular book that I can say
8        encompasses it all, I don't think there's
9        one book in itself that encompasses it.
10       It's a variety of industry treatises that
11       govern how claims are handled.
12  Q.   Well, I'm speaking of life insurance
13       claims here in this case. Because you do
14       understand that's what is involved in this
15       case?
16  A.   Yes.
17  Q.   Okay. Can you tell me where those
18       industry standards that you claim are
19       breached are set forth in any manual,
20       treatise or guideline?
21  A.   I mean, we'd have to take that one-by-one
22       on what's in the letter, and then I'd have
23       to go back and look through the various

Page 112

1        books and see what's there. I'm going to
2        my training, education and experience as
3        far as what is within an industry standard
4        and what's outside of an industry
5        standard. Industry standards say you're
6        supposed to have some sort of procedures
7        and manual, and Globe doesn't have any.
8        So how do they know what they're supposed
9        to do, other than word-of-mouth?
10  Q.   Well --
11  A.   I mean, they don't have any standards
12       within the company itself.
13  Q.   Yes, sir. Yes, sir. But you relied on
14       your training and experience, didn't you?
15  A.   And review of -- You know, my years of
16       experience and looking at things from a
17       consultant and an expert witness, same
18       point.
19  Q.   Yes, sir. But the Globe people, that you
20       read the depositions of, relied and
21       utilized their training and experience in
22       the very field of life claims-handling,
23       didn't they?

Page 113

1   A.   Their training and experience is strictly
2        a one-on-one, word-of-mouth with no
3        procedures in mind, or no set procedures
4        for the company.
5   Q.   And yours is superior because your
6        training and experience is working on
7        plaintiffs' cases as a professional
8        witness to give testimony in civil
9        lawsuits; is that right?
10       MR. SANSPREE: Object to the
11       form.
12  A.   I do plaintiff and defense work. So
13       it's --
14  Q.   I'm sorry. Plaintiff and defense work.
15       Your training and experience would be
16       superior, in your judgment, to their
17       training and experience with regard to
18       life claims-adjusting; is that right?
19  A.   I would say with these folks, from what I
20       read, with them not having any training,
21       or education, or any certification, and
22       then having nothing to go on within the
23       company.

29 (Pages 110 to 113)

FREEDOM COURT REPORTING

Page 114

1  Q.  Well, they have the policy, don't they,
2      that sets forth the contract?
3  A.  Yeah. But they don't have any policies
4      and procedures manual. I know you've seen
5      them, and they go down and explain how
6      you're supposed to do things when you get
7      a coverage issue, how it's supposed to be
8      addressed, how it's supposed to be
9      handled. But here they say they've got
10     nothing but word-of-mouth to guide any of
11     these folks. And then you've got a person
12     that says they've been there thirty years
13     and they don't know what a reservation of
14     rights is. I know my experience is better
15     than theirs if they don't even have a
16     concept of that.
17 Q.  I might agree with you if you can point to
18     me any place that any company on life
19     insurance claims utilizes the terminology,
20     quote, "reservation of rights," end quote,
21     or "nonwaiver." But you don't have any
22     such information, do you?
23 A.  Not today.

Page 115

1  Q.  And you're going to research that and
2      report that back to Mr. Sanspree if you
3      can find it?
4  A.  Only if I see anything on it.
5  Q.  I would appreciate it.
6          But you say it would be a breach of
7      industry standard for the Globe Life
8      claims personnel to use their training and
9      experience wherein they adjust claims
10     every day on these same type life
11     insurance policies and they actually
12     utilize the contract of insurance itself
13     to go by with regard to benefits and
14     exclusions?
15 A.  Well, I mean, this one, they accepted the
16     -- I mean, initially Globe says, "Yeah,
17     it's paid. It's payable." And then the
18     law firm looked at it and they say it's
19     payable. And then you come back to the
20     examiner and they say, "Oh, no, we're not
21     going to pay the thing." I mean, that's
22     just a total backwards approach from what
23     industry standards are. And so --

Page 116

1  Q.  You say that what they should have done
2      initially, the first claims person that
3      touched the claim -- Do you know when the
4      proof of loss came in?
5  A.  I don't recall the date on that.
6  Q.  Wasn't it sometime in March? I don't
7      either.
8  A.  It was after January.
9  Q.  I would hope it was after January. But
10     assuming it was sometime in March of 2004,
11     once you've got proof of loss of the
12     claim, is it your view that the first
13     claims person that touched that should
14     have determined whether the policy was in
15     force or not at the date of death?
16 A.  Well, Ms. Whitaker never determined
17     whether --
18 Q.  Can you answer my question?
19 A.  Ms. Whitaker never determined whether the
20     policy was in force. She never looked at
21     the policy. She didn't determine anything
22     on the premium payment, and she okayed the
23     payment.

Page 117

1  Q.  Do you think that's an answer to my
2      question?
3  A.  That's what happened.
4  Q.  That's not an answer to my question,
5      though. I'm entitled to get answers to
6      the questions I ask, Mr. Allen. And I've
7      got all day.
8  A.  All right.
9          MR. BUTLER: Read back my
10         question, please.
11         (Requested portion of Record
12         read by the Reporter)
13 A.  Yes.
14 Q.  Thank you.
15         And it appears in this instance that
16     was not done; is that right?
17 A.  To my knowledge. Well, you know, I don't
18     know what -- I don't know exactly what was
19     done about that.
20 Q.  Let me ask you this, Mr. Allen: Do you
21     know any legitimate, logical reason that
22     Globe would have gone through the time and
23     expense to investigate the merits of this

30 (Pages 114 to 117)

FREEDOM COURT REPORTING

Page 118

1    claim, if it knew from the outset that the
2    insured had died while the policy was out
3    of benefit?
4              MR. SANSPREE:  Object to the
5              form.
6    A.   Repeat it one more time.
7    Q.   Yes, sir.  Do you know whether there is
8    any legitimate, logical, reasonable basis
9    that Globe would have gone to the time and
10   expense of going into investigation of the
11   merits of whether this claim is payable,
12   if they already knew that the insured had
13   died while this policy was out of benefit?
14             MR. SANSPREE:  Same objection.
15   A.   You'd still have some elements to
16   investigate on the timing, and when the
17   payments were submitted.  There's a lot of
18   stuff you can look at from an
19   investigative standpoint.  I mean, the way
20   the claim was sent in, it was sent in and
21   approved, and then the investigation was
22   started after the claim was approved.
23   Q.   Well, the investigation as to whether the

Page 119

1    policy was in force was investigated,
2    right, after the merits issue had been
3    investigated, the merits of the payability
4    of the claim as an accidental death?
5    A.   Yes.
6    Q.   Thank you.
7         And you say that was an error in the
8    order in which they went through this, in
9    your judgment?
10   A.   Yes.
11   Q.   Okay.  And that ties back into your view
12   that the first claims person should have
13   determined whether the policy was in
14   benefit at the date of the insured's
15   death; isn't that right?
16   A.   That would be one thing you would look at.
17   Q.   What else would you look at?
18   A.   Well, you'd look at the cause of death,
19   and whether it might have been suicidal,
20   or whether it might have been accidental,
21   suicidal, homicide.
22   Q.   If the claims adjuster determined that the
23   policy was not in benefit on the date of

Page 120

1    death, that would be the end of it, in
2    your view, wouldn't it, or not?
3    A.   Not necessarily the end of it.  I mean,
4    you've still got an obligation to
5    investigate the claim, investigate all
6    avenues, and make an informed decision and
7    subject it to a cognitive review where you
8    know all the factors involved before you
9    make a decision.
10   Q.   Yes, sir.  And would that include
11   investigating what I call the merits?  It
12   may be a poor phrase.  But when I say
13   "merits," I'm talking about if there was
14   no issue of whether the policy was in
15   benefit, whether this was a payable claim
16   or not?
17   A.   Well, I mean, still you've got a question
18   as to, you know, whether it was in benefit
19   or not.  I mean, you've got the
20   reinstatement thing.  So it's kind of
21   convoluted as to the way the thing works.
22   Q.   Yes, sir.  You would agree with me, would
23   you not, that this policy had clearly

Page 121

1    lapsed and was beyond the grace period on
2    January the 4th of 2004?
3    A.   Now, they had the reinstatement portion --
4    On the grace period, it says, "A grace
5    period of thirty-one days will be allowed
6    each insured for the payment of each
7    premium after the 1st, during which period
8    his or her insurance shall continue in
9    force."
10   Q.   Okay.
11   A.   Where you're having each insured and each
12   premium.  So it's stating a thirty-one-day
13   grace period on each premium, which would
14   be if you've got a November premium and
15   then you've got a December premium, it's
16   saying a thirty-one-day grace period on
17   each of the premiums.
18   Q.   Yes, sir.  But the policy had lapsed as
19   of, I think, December the 28th or toward
20   the end -- I can't remember the exact date
21   -- but toward the -- The policy had lapsed
22   and was out of benefit before the
23   beginning of 2004, wasn't it?

31 (Pages 118 to 121)

FREEDOM COURT REPORTING

Page 122

1  A.  Yes, sir.
2  Q.  There's no issue about that, is there?
3  A.  No issue on the lapse. They did reinstate
4      it, though.
5          MR. BUTLER: Move to strike as
6          nonresponsive.
7  Q.  All right, sir. So whether or not this
8      policy was in benefit on the date of death
9      turns on the issue of whether or not the
10     premium mailed on January the 5th is
11     deemed received by Globe on that date; is
12     that right?
13 A.  That's part of it.
14 Q.  Anything else?
15 A.  Well, the fact that you've got the
16     attorney that calls and advises them, as
17     he indicated on the 12th, that this had
18     happened, and then he receives word that
19     as long as it's received before the 17th.
20 Q.  Okay. In your reading, and investigation,
21     and review and analysis of the policy in
22     question in this case, did you determine
23     whether or not the insurance contract

Page 123

1      could be modified and changed by an oral
2      statement?
3  A.  As a general rule, they're not supposed to
4      be. That doesn't mean that it doesn't
5      happen or you don't get those statements
6      from employees.
7  Q.  Well, let's forget about general rules and
8      things of a general nature. Let's talk
9      about the language in this policy. Did
10     you read in this policy where it can't be?
11 A.  I don't recall the exact section. That's
12     a standard condition in most policies.
13 Q.  Yes, sir. You wouldn't be surprised to
14     find it in here?
15 A.  Correct.
16 Q.  Okay.
17         (Brief recess)
18 Q.  Let me see if I've got this right,
19     Mr. Allen. Do I understand that it is
20     your opinion, that with regard to this
21     particular claim on Mr. Lurie's death,
22     that initially the claims person that
23     handled the review of the proof of loss

Page 124

1      should have initially determined whether
2      the contract or policy of life insurance
3      was still in force at the day of this
4      death? Is that fair?
5  A.  That would be one of the things.
6  Q.  All right. But do I also understand your
7      testimony, that, nevertheless, whatever --
8      you know, even if the adjuster determined
9      that the contract was not in benefit at
10     the date of his death, the adjuster should
11     have gone forward to determine whether the
12     claim was otherwise payable?
13 A.  Well, I mean, you need to investigate the
14     whole thing. I mean, as far as the
15     premium payment, whether it was, you know,
16     sent and received in accordance with the
17     thing, the question on the letter -- or
18     the premium payment mailed by Ms. Lurie, I
19     mean, if it had the address of Globe Life
20     on it at the prescribed place, then that
21     would be in accordance with the policy
22     provisions on the premium payment, by
23     having it properly addressed to them when

Page 125

1      it's put in the mail. So you've got all
2      these little things you need to look at in
3      order to ascertain, you know, what
4      happened, what was due, what wasn't due,
5      if they had any problem with the coverage,
6      any problem with the payment, any problem
7      with the reinstatement. Was it in
8      accordance with normal procedures?
9  Q.  Do you think they should have gone ahead
10     and determined whether the claim -- for
11     example, this is an accidental death
12     policy -- whether the claim was payable as
13     an accidental death, but for the issues
14     with regard to premium payment?
15 A.  I think they should have investigated the
16     whole thing before you go and you approve
17     payment, and then after you approve
18     payment by management and legal, and both
19     of those approve of payment, and then you
20     give it to an adjuster and say, all right,
21     now go investigate it, and see if there's
22     any reason to pay it. But that's after
23     you receive the approval, which is just

32 (Pages 122 to 125)

FREEDOM COURT REPORTING

Page 126

1    totally contrary to the way I've seen
2    business done, which is where the adjuster
3    determines all the facts, submits that to
4    management, determines if there's any
5    question there, and then the management,
6    if they've got any further question, then
7    they may seek a legal opinion after that.
8    Here they passed it through both
9    management and legal, and then came back
10   and relied on the adjuster to come up with
11   a basis for denial.
12   Q.   But with regard to the procedures, you
13   think that they handled it somewhat
14   backwards based on procedures they should
15   have followed?
16   A.   Well, they don't have any procedures.
17   Q.   Well --
18   A.   I mean, they say --
19   Q.   They didn't say they --
20   A.   She said they didn't have a policies and
21   procedures manual, and it was
22   word-of-mouth.  But that again is --
23   Q.   That's right.  She said it was also based

Page 127

1    on experience, too, didn't she?
2    A.   The experience of not reading any manuals
3    or knowing what policy --
4    Q.   Is that what she said?
5    A.   No, she didn't say that.  She says they
6    have no manuals, and everything is done
7    one-on-one.
8    Q.   Yes, sir.
9    A.   And that's not the way you find the
10   business is done within the insurance
11   companies.
12   Q.   And she said they train their adjusters
13   based on experience, and based on the
14   policies and benefits and exclusions,
15   don't they?
16   A.   That's one-on-one person.
17   Q.   Yes, sir.  Okay.  But, nevertheless, you
18   agree that they should have investigated
19   the -- regardless of the premium payment,
20   and whether the policy was in force or
21   not, they should have investigated the
22   entire claim?
23   A.   Yes.

Page 128

1    Q.   Okay.  And the only difference is, they
2    didn't make the determinations in the
3    order that you say they should have; isn't
4    that correct?
5    A.   Yes.
6    Q.   Okay.  Because they did do a -- Would you
7    agree with me that they did a thorough
8    investigation as to what we've been
9    calling the merits of the claim, as to
10   whether it was payable, but for the issues
11   concerning whether the policy was in
12   force?  Did you look at that?
13   A.   Repeat the question again.
14   Q.   In other words -- Let's forget about the
15   issue, for right now, for the purpose of
16   my question, about whether the policy was
17   in force or not.  I understand your
18   opinion on that.
19   A.   Okay.
20   Q.   Did you read what was done by the claims
21   personnel to investigate the merits of the
22   claim, in other words, whether he died of
23   accidental death, and things of that

Page 129

1    nature, and that sort of thing?  Did you
2    read that?
3    A.   Yeah.  They did make a determination based
4    on the -- I think they ordered the
5    coroner's report or police report.
6    Q.   Yes, sir.  And did you find that that part
7    of the investigation appeared to have been
8    done reasonably?
9    A.   Yes.
10   Q.   Okay.  And the determination on that
11   portion was that it was a payable claim,
12   wasn't it?
13   A.   Correct.
14   Q.   And that was the opinion of Ms. Whitaker,
15   who's in charge of the Claims Department,
16   and it was the opinion of Brian Mitchell
17   in the Legal Department, wasn't it?
18   A.   Okay.  Yeah.  Because we've got Matthews
19   and Mitchell.
20   Q.   Right.  So if there was any negligence
21   involved here, it was in regard to the
22   first person in the Claims Department at
23   Globe that first looked at the claim,

33 (Pages 126 to 129)

FREEDOM COURT REPORTING

Page 130

1    because she apparently did not determine
2    whether the policy was in force or not at
3    the date of death; is that right?
4    A.    That would have been the claim manager and
5    the Legal Department. Because she made
6    the -- Ms. Whitaker made the decision.
7    Q.    I don't think you're following my
8    question. I may not have stated it very
9    clearly. But I'm talking about the first
10    person that --
11    A.    Whoever took the phone call in?
12    Q.    No. I'm talking about when they received
13    the proof of loss.
14    A.    Okay.
15    Q.    Do you know who that person was that first
16    handled the claim upon receipt of the
17    proof of loss?
18    A.    I don't recall the name.
19    Q.    Okay. Fair enough.
20          Whoever that person was, in your
21    judgment, should have made the
22    investigation as to whether the policy was
23    in force, and investigated the issues with

Page 131

1    regard to premiums; is that right?
2    A.    Well, it should have been an
3    all-encompassing investigation. And as to
4    whether they have theirs segmented out for
5    each person doing a given task, and then
6    somebody pulls everything together, you
7    know, I don't know specifically as to how
8    they handled that.
9    Q.    But it's your opinion that that should
10    have been the first order of business?
11    A.    Yeah. That's one of the first things you
12    look at, is your coverage.
13    Q.    So, then, if there is negligence involved
14    here in the processing of the Lurie claim,
15    it was with regard to that person not
16    doing that initially in this case; is that
17    right?
18    A.    Well, it moves on down the line. Because
19    one person is not doing it and then other
20    folks don't ask any questions about that,
21    and then they accept some basic things.
22    So it's moving on down where, you know,
23    several people are not doing a good

Page 132

1    overview.
2    Q.    Okay. But that information should have
3    been determined initially, shouldn't it
4    have, about whether the policy was in
5    force or not on the premium issues?
6    A.    That should have been done before any
7    decision was made.
8    Q.    What possible benefit, in your judgment,
9    would there have been to Globe to spend
10    the time and expense to investigate the
11    merits if the policy was not in benefit at
12    the date of death?
13    A.    They wouldn't be in this lawsuit today if
14    they had investigated the thing properly.
15    Q.    You're not listening to my question.
16    Please take your time and listen to it.
17    We'll both get out of here a lot quicker.
18          My question is this: What possible
19    benefit would there have been to Globe to
20    spend the time and expense to investigate
21    the merits of the claim if Globe already
22    knew that the policy was not in benefit on
23    the date of Mr. Lurie's death?

Page 133

1    A.    You would still need to investigate it to
2    make sure that the entire investigative
3    process for the claim was completed and
4    that you've obtained all the relevant data
5    to make the decision -- make the informed
6    decision, and then you can make a
7    cognitive review of what information you
8    have and determine whether you have the
9    information you need to make the decision.
10    Q.    Do you agree with me that the options
11    facing Globe on the Lurie claim were
12    either to refund the premium, or to pay
13    the claim?
14    A.    I think they would have denied it, too,
15    and not refunded the premium or not paid
16    the claim.
17    Q.    Well, it wouldn't be appropriate to deny
18    the claim and not to refund this premium,
19    would it?
20    A.    Well, again, you know, what should be and
21    what is are two different things. And I'm
22    not --
23    Q.    I'm not talking about "should be." Do you

34 (Pages 130 to 133)

FREEDOM COURT REPORTING

Page 134

1  actually believe, from an objective
2  standpoint, that Globe would have held the
3  $33.00 in premium after denying the claim?
4  A.  Shouldn't.  But, I mean, you know, they
5  refunded it.  But, I mean, you can't make
6  a general rule and say, okay, well, this
7  doesn't make sense.  Well, there are a lot
8  of things that are done that don't make
9  sense.
10  Q.  That's right.  So if Globe viewed their
11  options on this claim as either refunding
12  the premium or paying the claim, if they
13  determine that the claim should be denied
14  and should not be paid, if they view that
15  their option ultimately was refund of the
16  premium, it wouldn't be of much benefit
17  for Globe to hold that premium of $33.00
18  for three months, would it?
19  A.  Benefit to Globe strictly on withholding
20  the premium or the premium reimbursement?
21  Q.  Yes.
22  A.  No.
23  Q.  Okay.  And if, in fact, this claim was not

Page 135

1  payable under the policy and the governing
2  law -- and I'm not asking you to agree
3  with me on that, but to assume that that's
4  a fact -- the only damages that Ms. Lurie
5  would have, possibly, is the delay
6  occasioned by the refund of her premium,
7  wouldn't it, the loss of the use of her
8  $33.00?
9  A.  Repeat it one more time.  I mean, you're
10  asking -- you're getting multi-part
11  questions and then throwing --
12      MR. SANSPREE:  Just let him ask
13      it.
14      THE WITNESS:  All right.
15  Q.  Assuming for the purposes of my question
16  that Mr. Lurie, based on all the facts --
17  I'm not asking you to agree.  I'm asking
18  you to assume for the purposes of my
19  question, if the claim was not payable
20  according to what all took place, and the
21  provisions in the policy, and the
22  applicable law, then Ms. Lurie received
23  her refund of premium, so the only loss

Page 136

1  that she would have had would have been
2  the loss of use of that $33.00 for the
3  three months involved in the claims
4  determination; isn't that right?
5  A.  That's if you're saying everything else is
6  right, and that it's just the premium.
7  Q.  Yes, sir.
8  A.  That would be correct on the premium
9  alone.  I don't agree, as you said it,
10  with the end result.
11  Q.  Okay.  I noticed in your report -- or, at
12  least, I didn't find it, any reference to
13  your expressing an opinion of bad faith.
14  Have I missed something in your report?
15  A.  I believe bad faith is a jury
16  determination, and it's not my judgment
17  call as to what constitutes bad faith.
18  Mine is an evaluation of the deviation
19  from industry standards.  So I don't
20  comment on what -- I don't make the
21  judgment call on the bad faith.
22  Q.  Did you find any evidence of intentional
23  or malicious conduct on Globe's part of

Page 137

1  handling this claim as opposed to simply
2  violation of industry standards, in your
3  view, and negligence?
4  A.  They were intentionally looking for a way
5  to get rid of the claim.
6  Q.  Excuse me?
7  A.  I feel that after the claim manager
8  approved it and after Legal approved the
9  thing, then I think they intentionally
10  went looking for some other way to not pay
11  the claim.
12  Q.  If, in fact, the policy was out of benefit
13  at the date of death, wouldn't that be a
14  legitimate reason, in your judgment, to
15  deny the claim?
16  A.  Well, I mean, you would have to again --
17  Q.  Please answer my question, and then
18  explain it as long as you wish.
19  A.  Repeat it one more time.
20  Q.  See, that's our problem, is that you start
21  doing something other than answering my
22  question, and then you can't remember what
23  was asked of you.

35 (Pages 134 to 137)

FREEDOM COURT REPORTING

Page 138

1   MR. BUTLER: Please read it back.
2   (Requested portion of Record
3   read by the Reporter)
4  A.  Could be.
5  Q.  Thank you.
6      In other words, you think the claim
7   could be payable if, in fact, the policy
8   was out of benefit at the date of the
9   death?
10 A.  Well, I think this again --
11 Q.  Can you answer first and then explain?
12 A.  I'd like to explain it and then answer.
13 Q.  Then we don't remember the question. But
14   go ahead.
15 A.  Well, let's repeat the question one more
16   time since --
17 Q.  See.
18 A.  I get started and then you stop me and
19   then we lose the role.
20 Q.  It's because you're answering something
21   other than the question, John.
22 A.  I'm getting to your question. You're just
23   not --

Page 139

1  Q.  Go ahead. Answer it as you want.
2  A.  Okay. Well, give me the question again
3   and we'll start again.
4  Q.  Do you remember it?
5  A.  No.
6  Q.  See.
7      MR. BUTLER: Give him the
8   question again.
9   (Requested portion of Record
10   read by the Reporter)
11 A.  I'd say no, as a qualified, due to the
12   fact that you've got to determine what
13   factors surround the basis for denial. If
14   everything is clean, and everything was
15   done as it should be, then you may have a
16   legitimate reason. If it wasn't done in
17   accordance with what should have been
18   done, then you may not have a reason.
19 Q.  Well, see, that's what my question is,
20   because you leave provisions in your
21   answer. You said if everything was done
22   appropriately and the policy was out of
23   benefit, you may have a legitimate reason.

Page 140

1   Under what circumstances would you not,
2   under that scenario?
3  A.  Well, I mean, in this one you've got a lot
4   of things that didn't go right.
5  Q.  Yeah. But didn't I ask you to assume for
6   the purposes of my question --
7  A.  But to assume is to get an answer that is
8   more in line with what you want to hear
9   and not in accordance with what I see.
10 Q.  I understand that. I don't think I'm
11   going to get you to agree with me on every
12   provision, every issue in this case that
13   is my contention, Mr. Allen. But if you
14   agree that, unquestionably, this
15   particular policy was out of benefit on
16   the date of death, wouldn't that be a
17   legitimate reason to deny the claim? Yes
18   or no?
19 A.  Could be.
20 Q.  All right.
21 A.  That's what it is. Because you want a
22   specific, and there are too many other
23   things that go in there that can cause a

Page 141

1   variance.
2  Q.  Are you working for Mr. Sanspree in this
3   case on an hourly rate?
4  A.  Yes.
5  Q.  And what is your hourly rate?
6  A.  $175.00.
7  Q.  Okay. Approximately how many hours do you
8   have in the case?
9  A.  Let's see. I sent one bill for 39.10
10   hours. And I may have another 11 or 12
11   hours that I haven't billed for on that.
12 Q.  Can we get a copy?
13 A.  You can have a copy of the whole thing.
14   If she wants to copy this and then send it
15   to you, you can have a copy of everything
16   I've got in here.
17 Q.  Well, does that entire notebook include
18   everything that you used to form your
19   opinions in this case?
20 A.  I mean, it doesn't include the treatises.
21   But as far as the documents, I mean, these
22   would be the other documents, and then
23   whatever documents I had in here.

36 (Pages 138 to 141)

FREEDOM COURT REPORTING

Page 142

1  Q.  I call myself marking the treatise that
2      you relied on for your opinions in the
3      case.  But didn't -- We can go back
4      through it.  But didn't we discuss all the
5      other treatises, and that you did not rely
6      on those for your opinions?  Do you have
7      other treatises that --
8  A.  I've got other treatises.  I mean, as far
9      as --
10 Q.  I'm only interested in those that you used
11     for opinions in this case, Mr. Allen.  I
12     don't want to clutter the Record.
13 A.  Yeah.
14 Q.  If you did, then I want --
15 A.  I think as far as looking at that, that
16     has some -- on coverage aspects of the
17     things that I felt were germane.  It's
18     nothing new that I didn't know.  It's just
19     supportive to my position.
20 Q.  I understand that.  And are there others
21     other than this Exhibit 6?
22 A.  No, sir.  Again, we haven't -- there
23     wasn't anything --

Page 143

1  Q.  What's that one?
2  A.  That was on the personal insurance.  It
3      didn't have anything on the adjusting.
4  Q.  That's what I recalled.
5  A.  This has some unfair claim practices,
6      which are across-the-board.
7  Q.  You express opinions of unfair claims
8      practices in this case?
9  A.  And then Bibb's book.
10 Q.  On unfair claims practices, what is your
11     basis for expressing an opinion that the
12     handling of this claim was an unfair
13     claims practice?
14 A.  Well, there's not an unfair claims
15     practice recognized in the State of
16     Alabama.  But insurance companies who
17     handle claims across the nation are
18     required to abide by unfair claims
19     practices in their handling of claims.  So
20     I think they would be subject to it in all
21     the states.  And even though Alabama
22     doesn't have it, I think the folks -- from
23     what I've seen with other companies, even

Page 144

1      though Alabama doesn't recognize an unfair
2      claims practice, they abide by those in
3      administering claims within the State of
4      Alabama.
5  Q.  Okay.  Well, what amounted to a violation
6      -- is it -- didn't you say Unfair Claims
7      Practice Act?
8  A.  Well, it's referred to as the --
9  Q.  I'm trying to see how you referred to it
10     in your report.
11 A.  I don't know that I've got -- That's just
12     -- I don't think I went into any unfair
13     claims practices on that.
14 Q.  I think you did.
15 A.  I may have.
16 Q.  Mr. Allen's book is "Alabama Liability
17     Insurance Handbook," isn't it?
18 A.  Right.
19 Q.  And this is not liability insurance, is
20     it?
21 A.  He covers a wide variety of insurance
22     claims, I think.  So --
23 Q.  Can you find in your report any reference

Page 145

1      to Unfair Claims Act?  It's on page 7, I
2      see, about the middle of the page.  You
3      say, "Since there are no claims procedures
4      or claims manuals, this is an unfair
5      claims practice."
6  A.  Right.
7  Q.  Okay.  So you're saying that there is a
8      requirement under the law that an
9      insurance company have a claims manual and
10     claims procedures printed?
11 A.  For Alabama there's not an unfair claims
12     practices law.  But as far as the National
13     Association of Insurance Commissioners,
14     the NAIC, under Section C it says,
15     "Failing to adopt and implement reasonable
16     standards for the prompt investigation of
17     claims arising under insurance policies."
18 Q.  And you say those can't be done by
19     experience and word-of-mouth of the claims
20     examiners?
21 A.  I think you have to have some policies and
22     procedures that were evidenced in that
23     other case.

37 (Pages 142 to 145)

FREEDOM COURT REPORTING

Page 146

1 Q.   That doesn't say so, though, does it, what
2      you just read from NAIC?
3 A.   It says, "Failing to adopt and implement
4      reasonable standards for the prompt
5      investigation of claims arising under
6      insurance policies."
7 Q.   But that doesn't say it has to be a
8      written manual or written procedures, does
9      it?
10 A.  Correct. But that other case I had
11     references written procedures.
12 Q.  Which one?
13 A.  Madison.
14         MR. SANSPREE: Maddox.
15 Q.  That said you had to have written claims
16     procedures and manuals?
17 A.  It references not having procedures, and
18     word-of-mouth stuff, leads itself to
19     problems.
20 Q.  Does it say it's illegal?
21 A.  I don't recall it saying it's illegal.
22 Q.  This is where there was no mechanism to
23     ensure that applicants were treated

Page 147

1      uniformly during the underwriting process,
2      doesn't it?
3 A.   That's part of it. Yes.
4 Q.   Wasn't this case about underwriting?
5 A.   It has underwriting. That's predominantly
6      underwriting.
7 Q.   Well, is it on claims?
8 A.   I think it speaks to the claim issues.
9 Q.   Where?
10 A.  As far as the fact of what you need to
11     have, in my opinion.
12 Q.  Where?
13 A.  It discusses claims from the standpoint of
14     bad faith, abnormal or just regular bad
15     faith.
16 Q.  Yes, sir. But with regard -- You point
17     out to me where in that provision it says
18     you've got to have written procedures and
19     published guidelines for the handling of
20     claims.
21 A.  It doesn't, to my recollection. It's
22     predominantly underwriting.
23 Q.  Thank you.

Page 148

1         Do you want to read and sign or --
2 A.   Please.
3 Q.   Okay.
4         MR. SANSPREE: I've got just a
5      few questions to follow up.
6            EXAMINATION
7 BY MR. SANSPREE:
8 Q.   John, during your work experience with the
9      various insurance companies you've
10     testified to having worked with earlier,
11     would the process of gathering information
12     to see whether or not a claim was covered,
13     would that be the same for liability and
14     property insurance as it would be with
15     life insurance?
16 A.  Yes.
17 Q.  And would you also, when you're adjusting
18     on liability of property and insurance
19     claim, would you look at the policy
20     language to determine coverages and
21     exclusions just like you would in a life
22     insurance claim case?
23 A.  Yes.

Page 149

1 Q.   And would the procedures in doing so be
2      the same for liability and property cases
3      as it would with life insurance?
4 A.   Yes.
5 Q.   Would the industry standards be the same,
6      as it relates to property and casualty and
7      liability insurance, as it would be with
8      life insurance?
9 A.   In the handling of claims, yes.
10 Q.  And do you remember giving testimony for
11     me in a life case in front of Judge Dement
12     in Alegro versus Monumental case?
13 A.  I remember Alegro.
14 Q.  And was that a death case involving life
15     insurance?
16 A.  I believe that's correct. Yes.
17 Q.  And was your opinion accepted as an expert
18     opinion in Judge Dement's courtroom?
19 A.  Yes, I believe so. I didn't give a
20     deposition, but I think I gave a report on
21     that.
22 Q.  John, you gave some testimony earlier
23     about the first sentence at the top of

38 (Pages 146 to 149)

FREEDOM COURT REPORTING

Page 150

1    Defendant's 11, which states "Payment,"
2    and then it goes on to read, "Each premium
3    is payable in advance at our
4    administrative office." Do you remember
5    giving that testimony earlier?
6  A.   Yes.
7  Q.   Assume with me that Ms. Lurie put the
8    premium payment in the mail on January 5th
9    and addressed it to the administrative
10    office. Would that premium have been paid
11    at that administrative office at that
12    time?
13         MR. BUTLER: Object to the form.
14              Calls for a legal
15              conclusion. The witness is
16              not competent to testify as
17              to that.
18  Q.   In industry standards, would that premium
19    have been payable at that time?
20         MR. BUTLER: Object to the form.
21  A.   Yes.
22  Q.   And was Mr. Lurie, to the best of your
23    knowledge, was he alive on January 5th,

Page 151

1    2004?
2  A.   Yes.
3  Q.   That's all I've got.
4  A.   That would have been the 4th, which would
5    have been when it was put in the mailbox,
6    and then the 5th when it was picked up.
7         REEXAMINATION
8  BY MR. BUTLER:
9  Q.   So your date is the 4th? All you've got
10    to do is put it in the mailbox and that's
11    it?
12  A.   It was addressed to the administrative
13    office.
14  Q.   Okay. Is the Alegro case on your list?
15  A.   I didn't give a deposition in that one.
16  Q.   Did you give trial testimony?
17         MR. SANSPREE: No. He just gave
18              a report.
19  A.   No. I think it was just a report.
20  Q.   Well, explain to me how Judge Dement would
21    have had an opportunity to accept your
22    testimony as an expert based on a report,
23    as opposed to sworn testimony.

Page 152

1         MR. SANSPREE: It was just filed
2              with a brief.
3         MR. BUTLER: I understand that.
4  A.   I didn't make the decision. You know, I
5    did my thing.
6  Q.   Is it your understanding -- Do you have
7    knowledge that Judge Dement accepted your
8    qualifications as an expert on life claims
9    when you didn't even give any testimony in
10    the case?
11  A.   Well, I gave a report. I don't know
12    whether it was an affidavit or my report.
13    I don't recall.
14  Q.   Well, were you examined as to your
15    qualifications as an expert in life claims
16    in the Alegro case?
17  A.   I don't recall.
18  Q.   How do you know whether the procedures
19    would be the same in life insurance
20    claims-adjusting and property and
21    casualty, if you have no experience in
22    life insurance claims-adjusting?
23         MR. SANSPREE: Object to the

Page 153

1         form.
2  A.   That would be from having reviewed and
3    worked with life claims as an expert and
4    as a consultant.
5  Q.   For lawyers in civil cases?
6  A.   Yes.
7  Q.   Thank you, sir. That's all.
8         (Off-the-Record discussion)
9         MR. BUTLER: Let's mark this as
10              our next number, number 12.
11              We will mark it as 12 and
12              we'll get that back to you,
13              Mr. Allen.
14         (Defendant's Exhibit 12 marked
15              for purposes of identification)
16         MR. BUTLER: What is 12?
17         THE WITNESS: Exhibit 12 is a
18              three-ring binder that I
19              prepared that has my
20              handwritten notes,
21              deposition summaries, and
22              documents that were produced
23              by the plaintiff and

39 (Pages 150 to 153)

FREEDOM COURT REPORTING

Page 154

1    defendant.
2        MR. BUTLER:  Thank you, sir.
3
4        * * * * * * * * * * * *
5        FURTHER DEPONENT SAITH NOT
6        * * * * * * * * * * * *
7
8        REPORTER'S CERTIFICATE
9    STATE OF ALABAMA,
10   MONTGOMERY COUNTY,
11       I, Jackie Parham, Certified Shorthand
12   Reporter and Commissioner for the State of
13   Alabama at Large, do hereby certify that I
14   reported the deposition of:
15           JOHN H. ALLEN,
16   who was first duly sworn by me to speak the
17   truth, the whole truth, and nothing but the
18   truth, in the matter of:
19
20       IN THE UNITED STATES DISTRICT COURT
21       FOR THE MIDDLE DISTRICT OF ALABAMA
22           SOUTHERN DIVISION
23

Page 155

1    KAREN LURIE,
2            Plaintiff,
3        versus                1:06-CV-0034MEF
4    GLOBE LIFE AND ACCIDENT
5    INSURANCE COMPANY, et al.,
6            Defendants.
7
8    on Thursday, the 7th day of December, 2006.
9        The foregoing 154 computer-printed pages
10   contain a true and correct transcript of the
11   examination of said witness by counsel for the
12   parties set out herein.  The reading and signing
13   of same is hereby not waived.
14       I further certify that I am neither of kin
15   nor of counsel to the parties to said cause, nor
16   in any manner interested in the results thereof.
17
18       _____
19       JACKIE PARHAM, Certified
20       Shorthand Reporter and
21       Commissioner for the State
22       of Alabama at Large
23

40 (Pages 154 to 155)



# John H. Allen, AIC, CFE
## Consultant

Phone (205) 592-4507



Fax (205) 595-7832

October 22, 2006

Christopher E. Sanspree, Esquire
PO Box 4160
Montgomery, Alabama 36103-4160

**Re: Karen Lurie v. Globe Life and Accident**

Dear Mr. Sanspree:

Per your request I have reviewed the documents you provided in the above referred matter. Attached as Exhibit "A" is a listing of the documents and Industry Treatises that I reviewed in the formulation of my opinion.

I am a Consultant and Expert Witness on Insurance Claims. Attached as Exhibit "B" is a copy of my CV which reflects my training , education and experience in the field of insurance. I have been admitted as an Expert Witness on Claims and Claims handling in the State and Federal Courts in Alabama and in State Court in Mississippi.

Based on my review of the pertinent information and documents to-date, the following opinions are rendered in evaluation of this claim. It should be noted that these opinions are not legal opinions and I am not a lawyer. The opinions expressed are from a claims handling perspective. If additional documentation is reviewed and examined, it may necessitate the supplementation of the opinions expressed in this report. Once any additional information is reviewed, and if it changes any opinions I have expressed, or results in the need to modify and supplement the expressed opinions, I will do so upon completion of the review of these documents. I have first hand personal knowledge of the matters contained herein and I am competent to affirm and testify to same.

Post Office Box 531166    Mountain Brook, Alabama 35253

**DEFENDANT'S EXHIBIT**



Page 2:
Lurie v Globe

David Lurie obtained a policy of Insurance from Globe Life in the amount
of $ 100,000.00, that was effective 04-28-03. This was an Accidental Death Policy
with family coverage under certificate number - 14-J522138.

All payments were made until a payment was missed for the due date of
November 28, 2003. By a letter dated 01-02-04, from Globe Life ( Lurie 0020)
to David Lurie it indicated that this was a final notice. The letter stated that if the
premium was received by January 17,2004, that the policy would be reinstated.
The options for payment were 2,3,6 and 12 months. After receipt of this notice
Mrs. Lurie mailed a check in payment on 01-05-04, in the amount of $ 33.60 for two
Months of payments that paid the policy to 01-28-04. The check on their joint account
was dated 01-04-03, and due to the New Year date change this was an error on the year.
The check was written 01-04-04, in the amount of $ 33.60 and the policy number was
Correctly provided in the "FOR" section of the check.

The Certificate provisions provide a Grace Period of 31, days (Lurie 14) will be
allowed each Insured of each premium after the first, during which period his or her
insurance shall continue in force. Since this was not the first payment there was a Grace
Period of 31 days for **EACH** premium due.

The Certificate provides for Reinstatement at any time within a "one year after
default in premium payments, If:"

    a.  The insured provides Evidence of Insurability satisfactory to Us; and
    b.  All overdue premiums are paid."

Barbara Hernandez, of Globe, indicated in her deposition, page 23, that it was
Standard practice of the company to offer reinstatement of the policy in a Premium
Notice. She further stated that after 60 days they do not send another offer of
reinstatement and there are notices after one year( page 24). The premium on the Lurie
policy was processed by Globe on 01-16-04. Processed means that they cashed the check
and recorded the transaction in the computer system. On page 18 she states that the
system will not allow a payment to process after a certain number of days. The Lurie
payment was handled manually by a Clerk that keyed the information into the computer
system. The computer allowed the transaction and the Clerk processed the payment into
the system. There was no hold or anything on the policy.

Page 3:
Lurie v. Globe

It should be noted that while the Certificate says there is a Grace Period of 31 days for each payment the Reinstatement portion clearly shows that this is available up to ONE YEAR after any default in premium.

There is no question that Mr. and Mrs. Lurie intended to reinstate the policy and This was accepted and reinstated by Globe as part of their standard practice to accept premium within one year of a lapsed policy and allow 31 days for each payment due. At the time of the payment there were two payments due to reinstate the policy with a paid to date of 01-28-04.

Ms. Hernandez indicated in her deposition ( page 18) that you know if someone is late on premium and it is part of the account information that comes up on the computer. When you get the screen of information it clearly provides this information and you know by the PAID TO DATE information shown. The Final Notice gave the due by date of 10-17-06, and the payment was processed for two months coverage with a paid to date of 01-28-04.

Mr. Mendez indicate also in his deposition ( page 10 & 18) that for any call received on a policy that Globe would know immediately if a policy had lapsed or if the premium needed to be paid.

Review of the documents indicate that it is Globe's common practice not to require any Evidence if Insurability on policies less than 60 days past due. This evident by the actions of Globe. The payment was processed and there was no request by Globe to David Lurie to provide any Evidence of Insurability. At the time of the payment being Mailed, January 5,2004, there was absolutely no change in the health condition of Mr. Lurie that would restrict reinstatement. Mrs. Lurie mailed the payment immediately after receipt of the Final Notice and the payment was processed , check cashed, on 01-16-04 and prior to the due date of 01-17-04. The reinstatement was made in accordance with Globe's standard practice and procedure with the policy being effective until 01-28-04.

The documents reflect that Mrs. Lurie retained the services of an Attorney Matthews who made calls and written notification to Globe, in January,2004, concerning the accident and death of Mr. Lurie.

In the deposition of Sandy Whitaker she indicates, (page 149), that Globe has checks and balances to see a claim is not mishandled. On page 81, of her deposition she states that in the Claims Department of Globe there is no procedural manual or anything. Their training is based on one on one training so there is nothing in writing at Globe that Sets out how the claims on any policies are administrated. There is nothing in writing for training an individual( page 83).

Page 4:
Lurie v Globe

Other than the policies everything else is by word of mouth and only known in the minds of the different individuals in the Claims Department. This is a Deviation From Industry Standards to administrate Claims without any written Policies and Procedures to guide the individuals handling the claims nor train the persons that will be handling claims.

Ms. Whitaker admits:

Page 84: She approves the claim and suggest payment of the Claim.

She did not verify the policy was in force.

She did not verify the premiums had been made.

After she approves the claims and Legal approves the claim it is then up to the Claims Examiner to determine what benefits due under the policy.

This is a deviation from Industry Standards where the Manager approves payment, Legal approves payment and then it is left to the Claims Examiner to determine any coverages due. Industry Standards are just the opposite. First you review the policy and determine if it was in effect on the date of loss and if the Company had received and Accepted the premium before or after the due date. The Claims Examiner must explain the coverages afforded under the policy and then Management will approve the payment. Here the payment was initially Approved by the Manager and Corporate Legal and then it was submitted to the Claims Examiner to look for a denial basis. Based on the Training of the Claims Examiner being only oral it is obvious that Globe never considered the ramifications of Acceptance of Premium after lapse and cancellation. It is obvious from the documents reviewed that there is nothing to show that the Claim Manager nor Corporate Legal gave consideration to this **CRITICAL** aspect of coverage.

Review of the Book - **ALABAMA LIABILITY INSURANCE HANDBOOK** - BY: Attorney Bibb Allen ( No relation to me)

He states: on page 509 of his book - 23-7(g). That:

**Acceptance of Premium After Cancellation Waives Cancellation.**

"Where an insurer accepts a premium after knowledge of a breach of policy provision, the insurer waives its right to cancel the policy. - Nationwide Mut.Ins.Co.v. Clay,525So.2d 1339(Ala.1987),cert denied,488 U.S.1040(1989).

Page 5:
Lurie v. Globe


Bates document LURIE 0005 shows that payment was approved with full knowledge that there was a late premium payment. This was correct as Globe routinely accepts overdue premium for up to one year and routinely reinstates policies upon receipt of all the overdue premium. Globe's policy does not show it questions insurability within 60 days and Mr. Lurie died from an accident that had nothing to do with his insurability. There was nothing to contest about Mr. Lurie's death and his policy application. The cause of death was accidental and was specifically covered under the policy. Moreover since the deposition testimony of Mrs. Lurie states , page78, Globe Life was notified of the Insured's death as of 01-12-04, before cashing the premium.  On page 79 it shows that even though Globe knew of the death they said that this was not a problem with the policy being in force as long as the premium was received by January 17, 2004. The records are undisputed in that the premium was cashed on January 16,2004. In fact there is no dispute that Globe Life was notified of the Insured's death by Attorney Matthews and Mrs. Lurie as of January 12, 2004. This was before the date that Globe Life cashed the check. Give the fact that the above is undisputed Globe Life accepted the risk, reinstated the policy and should have paid the claim. All defenses as to the Insured being deceased were thereby waived and the policy was reinstated. Please refer to Bibb Allen's book on this issue.

Globe elected not to reject the premium payment full well knowing of the Insured's death, and that the crediting of the past due premium from a lapse, a breach of policy conditions, would reinstate coverage and provide coverage forward of the dates in arrears.

Globe knew that the policy had lapsed, a breach of policy conditions, Globe knew of the Insured's death and then accepted the premium payment from the Insured. The requirement that the payment had to be manually input reflected on the knowledge of Globe that they were accepting payment after the known breach of policy conditions. This is within the standard Company procedure to reinstate any policy up to one year when the payment is made for all amounts due and to not require any evidence of insurability within 60 days. Based on the Globe procedures the policy was correctly reinstated as the payment was credited to the Policy before the due date stated in the final notice, there was no requirement for evidence of insurability, and all overdue premiums had been paid. The policy was effective and paid up to 01-28-06. Based upon Globe's own testimony, the claim should have therefore been paid.

Page 6:
Lurie v. Globe


It has been my experience that the date anything is mailed is considered as the date the item was transferred to the addressee. Example: Taxes are Due on the 15th of April. As long as the item is mailed by that date it is considered as having been received for delivery to the IRS/State. Mrs. Lurie mailed the payment on the 5th of January for the policy to be reinstated and this was accepted and done by Globe on 01-16-04. When the payment was mailed there was no conceivable way that Ms. Lurie could have known of the impending accidental doom that was facing her husband. The payment was made in Good Faith and was appropriately credited to the policy in accordance with Globe's accepted and usual procedure on accepting past due premiums and reinstating a lapsed policy without evidence of insurability within 60 days of a lapsed policy.

After Globe knew of the breach of the policy condition and the Insured's death they elected to waive the breach and reinstate the policy. It is a Deviation of Industry Standards to have knowledge of the Insured's death, accept the premium, acknowledge and accept the late payment, reinstate the policy in accordance with accepted and standard practice of the Company and then deny the claim with coverage in full force and effect.

Bates document Lurie - 0019, Policy information screen shows that ;

The last premium was cash.

The policy was paid to 01-28-04

The policy was billed to 01-28-05

The last bill was 01-18-04.

There is no question the policy was reinstated and in fact had been billed again after the payment was posted on 01-16-04, and the policy was paid to 01-28-04.

Bates document Lurie-0047 also shows the policy is paid to 01-28-04. This is a different document from Lurie -0019.

There is no question that Globe accepted the premium, waived the lapse and reinstated the policy back to 11-28-03 and recorded that the policy was paid to 01-28-04. This was accepted and normal Company procedure.

Page 7;
Lurie v Globe.

The Claims Examiner for Globe only started to look for a denial basis after payment was approved and the claim was recommended to be paid by the Claim Manager and Corporate Legal. Claim Manager Whitaker said it was the Claims Examiners role to go in behind her and bring anything that appears inappropriate to her attention. This is a Deviation from Industry Standards. Based on Globe having no written procedures and the Claims Examiners only receiving limited verbal training it is obvious that neither the Claims Examiner nor anyone at Globe properly understood that Globe waived any lapse/cancellation by accepting the premium on 01-16-04, and within the time limit set by Globe of 01-17-04.

Claim Manager Whitaker further acknowledged ( page 90 of depo.) that She doesn't know if she verified that the system indicated that the policy was paid up to January 28, 2004. On page 94 she further indicated that Globe did not verify any payments before starting an investigation. This is also a Deviation from Industry Standards.

The first thing Claims Examiner should do is verify the coverages and the effective dates. Had this been done then, CM Whitaker would have known that coverage was in force for the date of loss and that Globe had accepted the reinstatement in accordance with the usual and customary practice of the Company and within the stated time frame. Since there are no Claims procedures or Claim manuals, this is an Unfair Claims Practice , to guide to people in Claims or Corporate Legal no one understood that once the company had been notified of the Insured's death, the premium was accepted and posted that there was an absolute waiver of the cancellation/lapse. No one at Globe recognized that the claim was undeniable due to their knowledge and actions. The policy provides for reinstatement, the policy was reinstated and then when the claim arrived Globe did not administrate the policy in accordance with the written and accepted conditions providing coverage for this loss.

Even after recognition of a coverage problem there was no notice sent to the Insured of any coverage problem. Industry Standards call for the Insured to be notified for any coverage problem in the form of a Reservation of Rights or a Non-Waiver letter. On page 44 of the Whitaker deposition she indicates that she does not even know what a Reservation of Rights is and she has had 30 years in claims. Any experienced claims examiner who has had proper Industry Training would know what a Reservation of Rights is and that it needed to be sent on any issue of coverage. There is nothing in place to keep Globe from making up the rules as they go along in handling claims.

Page 8:
Lurie v Globe

This reflects further how Globe cannot follow Industry Standards as they have no written procedures to inform and train people of what the Industry Standards are and only rely on word of mouth from 2 people to train their personnel. The Management has nothing to guide anyone in the administration of claims and this is why this claim was wrongfully denied . No one at Globe knew that Based on Industry Standards and Alabama Legal Opinions- See Bibb Allen's book- that Globe had waived its cancellation/lapse rights based on acceptance of the premium. Apparently,  it was an intentional act on the part of Globe not to have any written policies and procedures and Globe acted in a Deviation from Industry Standards by failing to have any written guidelines to administer their policies. This is an Unfair Claims Practice. ( see Loyal American v. Mattiace 679 So.2nd 229 Ala.1996).

Ms. Whitaker and the Legal Department were correct in their initial approval of the claim and authorized payment of benefits  based on the facts as of May 6, 2004, Whitaker Depo Page 73. After this a Globe Claims Examiner apparently brought forth a conceived reason for a denial of benefits that was erroneous from it's inception. Since no one has any written guidelines, procedures, understanding of Industry Standards, or an understanding of Alabama Law the claim was wrongfully denied.

In sum it is my expert opinion that the denial of benefits in this case  was inconsistent with Industry Standards and  deviated from Industry Standards.

If you have any further questions - please advise.

Sincerely,

John H. Allen

# EXHIBIT "A"

1).   Deposition of Barbara Hernandez.

2).   Deposition of Daniel Mendoza

3).   Deposition of Sandy Whitaker

4).   Bates Documents - Laurie 0001 to 0062

5).   Multiple Industry Treatises-
      **Alabama Liability Insurance Handbook - Attorney Bibb Allen**

      **Liability Claims Practices - 1st Edition -American Institute for Chartered
      Property Casualty Underwriters/Insurance Institute of America.**

      **Personal Insurance - 1st Edition -Launie,Reida and Oakes.**

6).   Attorney Matthews correspondence of 10-17-06 to Attorney Poundstone.

7).   Deposition of Karen Lurie.

8).   Case Law - Loyal American Life Ins. v. Mattiace. Ala.1996

*Exhibit "B"*

## CURRICULUM VITAE

 

JOHN H. ALLEN, A I C, C F E
P. O. BOX 531166
MOUNTAIN BROOK, ALABAMA 35253
OFFICE (205) 592-4507
FAX (205) 595-7832

**EDUCATION:**

University of Alabama – B. S. – Commerce and Business Administration – 1971
Aetna Advanced Claim School – 1984
Insurance Institute of America – Associate in Claims – 1991
Multiple Seminars conducted in Proper Claims Handling
Society of Certified Insurance Counselors – Agency Management Institute – 1994
Association of Certified Fraud Examiners – Certified Fraud Examiner – 1996

**EMPLOYMENT:**

### John H. Allen Consulting – January 1993 to Present

Consultant and expert witness in insurance claims coverage and claims handling involving commercial lines, bonds, personal lines, health, life, workers compensation, and disability policies for Bad Faith, Fraud and Tort of Outrage in claims handling.

Stockholder audits of carrier claims practices and sales.

Investigations of claims and accidents involving, but not limited to: trucks, autos, general liability, dram shop, commercial liability, personal liability, professional liability, workers compensation, real and personal property, products liability, uninsured/underinsured motorist, fire loss, accidental shootings, and witness locations. Disability Coverage, Indemnity Coverage, Agent Fraud, Agent E&O. Carrier liabilities to other carriers in policy coverage. Pattern and Practice. Group Policies. Life Insurance Fraud.

Service of Process.

### Aetna Casualty and Surety – July 1983 to December 1992

Responsible for the complete development and disposition of complex and unique claims / catastrophic cases / lawsuits within Alabama. Technical advisor on technical claim related matters. Counsel and assisted in training of claims personnel. Coordinator of departments technical training.
Reclamation, Fidelity, and Surety Bonds. All hazardous Waste claims for the state. Commercial auto, trucking, property, medical malpractice claims. Extra-contractual suits for state involving bad faith, fraud and tort of outrage. Workmen's compensation claims. Large account consultations of pending claims.

-2-

<u>Stonewall/Dixie Insurance Companies 1979 - 1983</u>

Claims Manager – Personal lines.  Supervised Auto and Property Unit,  Subrogation Unit of handling of claims in 26 states.

Responsible for training and supervision of claims examiners for each unit, granting of authority for settlement of claims in each unit.  Coverage approval for acceptance and denial of claim.

Coordination of defense for cases.

Claims Examiner – Liquor Liability Unit.  Handling of investigations and directing independent investigations on Dram Shop cases in Michigan and Minnesota. Evaluated and negotiated settlements of claims, coordination of defense.

Claims Examiner – Auto Unit

<u>National Producers Life Insurance Company 1978 – 1979</u>

Consultant for litigation and accounting systems.

<u>Alabama Power Company 1971 – 1978</u>

Resident Claims Agent – Responsible for investigation, evaluation and settlement or defense of product liability, general liability, auto, truck, and electrical contact claims.

Workmen's compensation claims, employee dishonesty investigations, and power theft investigation.

Court Trials

1. Paul Turner v. Liberty National Fire Ins.
   A. Plaintiff Attorney .Don Word
   B. Defense Attorney .Tom Ellis
   Circuit Court of Jefferson County, Alabama
   Trial in Butler, Alabama

2. Susie Palmer v. State Farm Insurance
   A. Plaintiff Attorney .James Thompson
   B. Defense Attorney .Bert Nettles
   Circuit Court of Tuscaloosa County, Alabama
   Trial in Tuscaloosa, Alabama

3. Pennsylvania National Mutual Ins. Co. v. The Tape-Craft
   Corporation, Aetna Casualty and Surety Co.,Liberty Mutual Ins.
   Co.
   A. Plaintiff Attorney .Susan S. Hayes
   B. Defense Attorney .Christopher M. Hopkins
   Circuit Court of Calhoun County, Alabama
   Trial in Anniston, Alabama

4. Danny & Cheryl Nixon v. Norman Wilder and Fire Insurance
   Exchange.

   A. Plaintiff Attorney .Terrell Wynn
   B. Defense Attorney .Robert Mckenzie
   Circuit Court of St. Clair County, Alabama
   Trial in Pell City, Alabama

5. Karen Shelby v. Safeway Insurance Company

   A. Plaintiff Attorney .Roger K. Fuston
   B. Defense Attorney .Tom Ellis
   Circuit Court of Jefferson County, Alabama
   Trial in Birmingham, Alabama

6. Luellin Wagner v. National Security Fire and Casualty Co. Inc.
   A. Plaintiff Attorney .Tom Willingham
   B. Defense Attorney .Rod Nelson
   Circuit Court of Jefferson County, Alabama
   Trial in Birmingham, Alabama

7. CCEDC v. National Security Fire and Casualty Co. Inc.
   A. Plaintiff Attorney .Chris Hopkins & Virginia Hopkins
   B. Defense Attorney .Charlie Gaines

8.  Carolin Marie Barton v. Shelter Mutual Insurance Company
    A. Plaintiff Attorney – Jonathan Lowe
    B. Defense Attorney – Nicholas J. Steles

9.  Ava Jackson vs. Crossroads Insurance et al.

    A. Plaintiff Attorney – Deborah McDonald
    B. Defense Attorney – Richard Edmonson

Page 2:

12. Joseph Moorer v. Republic American Life.

    A. Plaintiff Attorney : Dee Miles
    B. Defense Attorney : David Allred

13. John Carton v. Casualty Reciprocal Exchange
    A. Plaintiff Attorney .Richard D. Stratton
    B. Defense Attorney .    J. Michael Tanner

14. Campbell v. Golden Rule Insurance
    A. Plaintiff Attorney .Tom Dutton
    B. Defense Attorney .Ben Albritton

15. Paul Turner v. Liberty National Fire Ins.
    A. Plaintiff Attorney .Don Word
    B. Defense Attorney .    Tom E. Ellis

16. Williams v. Ford Motor Credit
    A. Plaintiff Attorney .Tom Methvin
    B. Defense Attorney .Unknown

17. Alfa v.Alabama City Church of God
    A. Plaintiff Attorney .Jim Sasser
    B. Defense Attorney .    Tony Hebson

18. Ava Greene v. Washingtin National Insurance Co.
    A. Plaintiff Attorney .Banks Herndon
    B. Defense Attorney .Bo Perry and Frank Lankford

19. Colonial Life and Accident Ins. Co. v. Home Insurance Co
    A. Plaintiff Attorney .Ross Forman,Robert Given
    B. Defense Attorney .S. Allen Baker Jr.

20. Susie Palmer v. State Farm Insurance
    A. Plaintiff Attorney .James Thompson
    B. Defense Attorney .Bert Nettles

21 Murrell Campbell v. Central Reserve Life Insurance
    A. Plaintiff Attorney .Houston Howard
    B. Defense Attorney .Joe Carpenter

22. Pennsylvania National Mutual Insurance Co. v.
    The Tape- Craft Corporation,Aetna Casualty &
    Surety Co., Liberty Mutual Insurance Co.
    A. Plaintiff Attorney .Susan S. Hayes
    B. Defense Attorney .Christopher M. Hopkins

Page 2:

23. Industrial Distribution Services v. U.S.F. & C.
    A. Plaintiff Attorney .Richard. D. Stratton
    B. Defense Attorney .Rod Nelson

24. Missouri Electric Works, et al. v. U.S.F. & C.
    A. Plaintiff Attorney .John Cowling
    D. Defense Attorney .Lon A. Berk

25. J.A. Faircloth & Co, Inc. v. U.S.F. & G.
    A. Plaintiff Attorney .Randall B. James
    B. Defense Attorney .James J. Bushnell, Jr.

26. Al. Central Credit Union v. J. and B. Padgett v. CUNA Mutual
    A. Plaintiff/Counterdefendant .Al. Central .
    B. Defendant/3RD Party Plaintiff J&B Padgett.Dawn W. Hare .
    C. Third Party Defendant .CUNA Mutual .Ben Brooks

27. Danny and Cheryll Nixon v. Norman Wilder and Fire Ins.Exch.
    A. Plaintiff Attorney .Terrell Wynn
    B. Defense Attorney .Robert Mckenzie

28. Jerry Bell v. Nationwide Insurance
    A. Plaintiff Attorney .Tom Willingham
    B. Defense Attorney .Edgar Elliott IV

29. Wilburn v. Illinois National Insurance
    A. Plaintiff Attorney .Joey James
    B. Defense Attorney .Tony Fox

30. Swinney v. Empire Fire and Marine
    A. Plaintiff Attorney .Joey James
    B. Defense Attorney .Woody Sanderson

31. Swinney v. General Agents Insurance Company of America
    A. Plaintiff Attorney .Joey James
    B. Defense Attorney .Joe Stott

32. Michael E. Chadwell vs. American States Insurance
    A. Plaintiff Attorney Desmond Tobias
    B. Defense Attorney : Larry Bradford

Page 2:

33.    Safeway Insurance Company vs. David Mann and Estate
                                        of Shawn Mann
       A.  Plaintiff Attorney : Deborah Braden
       B.  Defense Attorney : Philip K. Seay.

34.    Shady Grove Baptist Church vs. State Farm Ins.
       A.  Plaintiff Attorney : Patrick Patronas
       B.  Defense Attorney Bert Nettles .

35.    Ted Thrift vs. UNUM Life Insurance Co.
       A.  Plaintiff Attorney: Thomas P. Willingham
       B.  Defense Attorney : Carter H. Dukes

36.    Luellin Wagner vs. National Security Fire and Casualty Co.,
                               Inc.
       A.  Plaintiff Attorney: Thomas P. Willingham
       B.  Defense Attorney:: Rod Nelson

37.    Planet Insurance vs. C & C Riggers

       A.  Plaintiff Attorney : Taz Shepard
                                Vernon Wells
       B.  Defense Attorney     Robert Potter

38.    CCEDC vs. National Security Fire and Casualty CO. Inc.

       A.  Plaintiff Attorney : Chris Hopkins Virginia Hopkins
       B.  Defense Attorney : Charlie Gaines

39.    Ava Jackson vs. Crossroads Ins. et al.

       A.  Plaintiff Attorney : Deborah McDonald

       B.  Defense Attorney: Richard Edmonson

40.    Carolin Marie Barton v. Shelter Mutual Insurance company

       A.  Plaintiff Attorney : Jonathan Lowe

       B.  Defense Attorney : Nicholas J. Steles

Page 2:

41. Thompson Tractor Comnpany vs. U. S. F. & G.

    A. Plaintiff Attorney : Blane H. Crutchfield

    B. Defense Attorney : Tom Coleman


42. Mary Pelt, et al. Vs. Liberty National Life Insurance Company

    A. Plaintiff Attorney : Booker T. Forte Jr.

    B. Defense Attorney : Bill Donald


43. Southern Cleaning Service vs. C N A and R L Insurance Companies

    A. Plaintiff Attorney - Alan C. Furr

    B. Defense Attorney - C N A - Bryan S. Tyra

    C. Defense Attorney - R L I - Brenen G. Ely


44. Joan Palmer vs. New York Life

    A. Plaintiff Attorney - Joey James

    B. Defense Attorney - John N. Bolus


45. Mr. And Mrs. Barakat vs. Nationwide Insurance

    A. Plaintiff Attorney - Jason Shamblin

    B. Defense Attorney - Lynn Hare

A DETACH HERE A    IMPORTANT: RETAIN THIS PORTION FOR YOUR RECORDS.

## Globe Life And Accident Insurance Company
Globe Life Center ■ Oklahoma City, Oklahoma 73184

| DUE DATE | POLICY NUMBER | INSURED | 2 MONTHS | 3 MONTHS | 6 MONTHS | 12 MONTHS |
|----------|--------------|---------|----------|----------|----------|-----------|
| 11-28-03 | 14J522138 | DAVID LURIE | 33.60 | 49.40 | 97.00 | 186.60 |

# F I N A L   N O T I C E !

January 2, 2004

Dear David Lurie:

Our records show that we have not received the premium that was due on November 28, 2003. That is why we are sending this friendly reminder.

The reasons for starting this plan are the same good reasons for keeping it. Your insurance provides valuable protection and we want to make sure it is there when you need it. If you have already mailed in your payment, please accept our thanks.

If you have not had a chance to do so, please send in your payment along with the attached notice and the benefits of your policy will be reinstated provided the insured is still in good health. We must receive your payment by January 17, 2004.

For your convenience your premiums can be charged to your VISA or MasterCard. To choose this option, please complete the Credit Card Payment Option above, sign it, and return it in the enclosed envelope. We will charge your credit card for the total amount of premium due to keep your policy in force. After that, we will charge your credit card on the due date for the amount shown above.

Anytime we can be of assistance, please call or e-mail us at CS@2701410.com. Thank you for permitting Globe Life to provide your insurance.

Sincerely,

Mark S. McAndrew
Chairman and
Chief Executive Officer



**DEFENDANT'S EXHIBIT**
10

**LURIE0025**