IN THE UNITED STATES DISTRICT FOR

THE MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION

```
KAREN LURIE,                )
                            )
       Plaintiff,           )
                            )
vs.                         ) NO. 1:06-cv-0034MEF
                            )
                            )
GLOBE LIFE AND ACCIDENT     )
INSURANCE COMPANY,          )
                            )
       Defendant.           )
```

DEPOSITION OF BARBARA HERNANDEZ

TAKEN ON BEHALF OF THE PLAINTIFF

IN OKLAHOMA CITY, OKLAHOMA

ON SEPTEMBER 14, 2006

REPORTED BY: ELIZABETH CAUDILL, CSR, RMR, CRR

Page 2

```
 1           A P P E A R A N C E S
 2  For the Plaintiffs: Christopher E. Sanspree
    (By videoconference)Attorney at Law
 3              218 Commerce Street
                Montgomery, Alabama 36104
 4
 5  For the Defendant:  Robert Poundstone, IV
                Philip H. Butler
 6              Attorneys at Law
                401 Adams Avenue, Suite 780
 7              Montgomery, Alabama 36104
 8
 9          Anastasia Pederson
            Attorney at Law
10          Globe Life Center
            204 North Robinson, Suite 300
11          Oklahoma City, Oklahoma 73102
12  Also Present:    Bilinda Hines
    (By videoconference)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1            CONTENTS
 2                  Page  Line
 3  Direct Examination by         . . . .
 4  Cross-Examination by          . . . .
 5  Redirect Examination by       . . .
 6  Jurat Page . . . . . . . . . . . . . . .
 7  Witness Signature Page . . . . . . . . .
 8  Reporter's Certificate. . . . . . . . .
 9
10
         DEFENDANT'S INDEX OF EXHIBITS
11
                    Page  Line
12
13  Exhibit 1 . . . . . . . . . . . . . .
14  Exhibit 2 . . . . . . . . . . . . . .
15  Exhibit 3 . . . . . . . . . . . . . .
16  Exhibit 4 . . . . . . . . . . . . . .
17
18
19
            * * * * * *
20
21
22
23
24
25
```

Page 4

```
 1              S T I P U L A T I O N S
 2      IT IS HEREBY STIPULATED AND AGREED by
 3  and among the attorneys for the respective
 4  parties hereto that the deposition of BARBARA
 5  HERNANDEZ may be taken on behalf of the PLAINTIFF
 6  on SEPTEMBER 14, 2006 in Oklahoma City, Oklahoma,
 7  by Elizabeth Caudill, Certified Shorthand
 8  Reporter within and for the State of Oklahoma,
 9  pursuant to Notice.
10      IT IS FURTHER STIPULATED AND AGREED by
11  and among the attorneys for the respective
12  parties hereto that all objections, except as to
13  the form of the question, are reserved until the
14  time of trial, at which time they may be made
15  with the same force and effect as if made at the
16  time of the taking of this deposition.
17              * * * * * *
18
19
20
21
22
23
24
25
```

Page 5

```
 1              * * * * * *
 2          BARBARA HERNANDEZ,
 3  having been first duly sworn at 12:39 p.m.,
 4  deposes and says in reply to the questions
 5  propounded as follows, to wit:
 6          DIRECT EXAMINATION
 7  BY MR. SANSPREE:
 8     Q   Ms. Hernandez, my name is Chris
 9  Sanspree, and I'm representing Ms. Lurie in a
10  lawsuit we filed against Globe Life Insurance,
11  actually Globe Life and Accident Insurance
12  Company.  And we've noticed your deposition.
13  We've asked that you come and testify regarding
14  premium payments and stuff like that.
15         Are you aware of why you're here?
16     A   Yes.
17     Q   And have you seen what I'll call a
18  deposition notice?  I sent your attorneys a
19  notice of your deposition.  I just want to know
20  whether you've seen it or not.
21     A   Yes, I have.
22         MR. SANSPREE:  I'm going to go ahead
23  and mark that, Bobby, as Exhibit 1.
24         MR. POUNDSTONE:  I'm trying to think,
25  would it be easier to renumber them all or for
```

Page 6

1  you to just pick up where you ended of numbering
2  on that last deposition?
3      MR. SANSPREE:  My legal assistant's
4  here, and she said we want to renumber them.  Is
5  it easier for the court reporter to -- how do you
6  want to handle it?
7      (Off the record)
8      (Plaintiff's Exhibit Number 1 marked
9       for identification purposes and made a
10      part of the record)
11  Q   (By Mr. Sanspree) Ms. Hernandez, now,
12  on this depo notice that I sent your attorneys, I
13  ask that certain -- if you had them, if you had
14  any documents that are listed here -- we can read
15  over them as 1 through 9 -- if you have anything
16  to bring it with you.
17      Do you have anything responsive to
18  those requests?
19  A   I did bring copies of everything that
20  we've provided with me, and they're all -- as
21  requested.
22  Q   And I asked a bad question.  Anything
23  additional that you haven't given to me, do you
24  have anything else that has not been produced to
25  me?

Page 7

1  A   I have a copy of my inventory sheets
2  where it shows where our mail inventory was on
3  the days that the payment was processed.  That
4  wasn't specific to the plaintiff, so I don't
5  think that that was provided.
6      MR. POUNDSTONE:  Actually, I think we
7  may have.
8      MR. SANSPREE:  I think they did,
9  Ms. Hernandez.  I think Bobby sent me that this
10 morning, but I'll ask you about that.
11     Bobby, I guess we'll mark everything
12 you've sent to me today as Exhibit 2?
13     MR. POUNDSTONE:  There's one thing that
14 I don't think came from either Sandy or Barbara,
15 now that I look at it.  Did you --
16     MS. PEDERSON:  I thought we faxed that
17 last night.
18     MR. POUNDSTONE:  We faxed this, but was
19 this something that you gave me, or was that
20 something that we just --
21     THE WITNESS:  That's actually something
22 that I had provided to Staci.
23     MR. POUNDSTONE:  So you know what it
24 is?
25     THE WITNESS:  Yes.

Page 8

1      MR. SANSPREE:  Bobby, just for the
2  record, these aren't -- what you faxed to me last
3  night aren't Bates labeled, so I really can't
4  refer to them as that, but without the cover
5  page --
6      MR. POUNDSTONE:  One way to do them is
7  you have the phone -- just the sheet with just
8  the phone computer notations on them.
9      Then the other documents, one of them
10 is page 1 of 1 and the other one is page 82
11 through 90 of 198, so you could probably refer to
12 those pages by their numbers.
13     MR. SANSPREE:  You're right.  The
14 first -- how I've got it set up is the first page
15 that I'm going to mark collectively as Exhibit 2
16 just has the telephone numbers.  And I don't
17 know, looks like -- let's see -- like 15 times or
18 12 to 15 times.  I hadn't counted them, but just
19 guessing.  And that's the first page of Exhibit
20 2.  And then the second group of pages would be
21 the 82 through 90 of 198.
22     MR. POUNDSTONE:  Do you want to mark
23 those as Exhibit 3?
24     MR. SANSPREE:  No.  So you all have the
25 exhibits set up like I'm reading it.

Page 9

1      MR. POUNDSTONE:  Okay.
2      MR. SANSPREE:  Then the last page will
3  be that 1 of 1 that you just referenced.
4      MR. POUNDSTONE:  Okay.
5      MR. SANSPREE:  All of that together
6  would make up Exhibit 2.
7      MR. POUNDSTONE:  I think they're going
8  to be separate documents.  You may want to do the
9  first page with the telephone listing as Exhibit
10 2, and then the other ones collectively as 3.
11     MR. SANSPREE:  Let's do that.  The
12 telephone records, or the page with the telephone
13 numbers on there, is Exhibit 2.  Exhibit 3 will
14 be the 82 through 90 of 198, and then Exhibit 4
15 would be that 1 of 1.
16     (Plaintiff's Exhibit Number 2, 3 and 4
17      marked for identification purposes and
18      made a part of the record)
19 Q   (By Mr. Sanspree) Now, Ms. Hernandez,
20 looking at Exhibit 2 which is that first page
21 with the telephone numbers, did you generate this
22 information?
23 A   I did generate it, yes.
24 Q   How did you come about this
25 information?  Did you get it off the computer

Page 10

1  system?
2      A   Yes.
3      Q   Did you do that at the request of your
4  attorneys or acting on your attorney's behalf?
5      A   I did after a conversation Staci and I
6  had about the upcoming lawsuit.
7      Q   Can you tell me, just for the record,
8  what Exhibit 2 is? I can look at it and tell you
9  it's some phone numbers, but tell us what Exhibit
10 2 is.
11     A   This list actually comes from an
12 application that's used in customer service. I
13 have access to it on my computer because I
14 routinely monitor telephone calls, and so I
15 pulled a list of all of the calls that came from
16 a phone number that I found on the master file
17 that belonged to the Luries.
18     Q   And Ms. Hernandez, how familiar are you
19 with the telephone systems at Globe Life?
20     A   Fairly familiar. I -- you know --
21     Q   Do you know -- go ahead. I'm sorry.
22 That's one thing we ran into last time. Stop
23 real quick.
24         One thing we ran into in the last
25 deposition is there's like a two second lag

Page 11

1  between what you say -- my questions and what you
2  say. If you stop for one second, I'll ask
3  another question. I'll do the same, you'll do
4  the same.
5          First let me ask you this. I know you
6  use the telephone and everything like that in
7  your day-to-day activities, but are you familiar
8  with the recording and how the telephone numbers
9  are recorded on the telephone system?
10     A   Yes, I am.
11     Q   Can you tell us how those are recorded?
12     A   The Eon system is the software vendor
13 that we use, has a mechanism that records the
14 phone numbers, much like you would have Caller
15 ID at home. And that information is maintained
16 in a database that can be queried.
17     Q   Just for the record, what type of
18 system? You said Eon. Can you spell that for
19 me?
20     A   E-O-N.
21     Q   Okay. You said it's kind of like a
22 Caller ID system. I know at my house I can mash
23 a button and it will show all the numbers.
24         Is there a certain amount of time --
25 does this keep the numbers forever or does it

Page 12

1  purge itself?
2      A   It does not purge itself; however, I
3  don't know the details about how long we maintain
4  information.
5          When we first got the system -- and I
6  don't know the exact date but it was early in
7  2004 -- when we first got the system, we had not
8  yet set archive dates as far as how long we would
9  keep calls.
10     Q   Did you have this system in January of
11 2004?
12     A   I don't know that for sure. I don't
13 believe so.
14     Q   Who would know that, what date you all
15 got this system?
16     A   Our customer service supervisors may
17 know the date.
18     Q   And would that be --
19         MR. SANSPREE: Phil, is that the guy
20 that's coming in later?
21         MR. BUTLER: Yeah. I think, Chris,
22 don't hold me to this, but I think it was
23 sometime in March that we got it.
24     Q   (By Mr. Sanspree) Now, Ms. Hernandez,
25 these numbers, are they recorded when a phone

Page 13

1  call is made or comes in, or when somebody has
2  to -- does somebody have to enter it on the
3  computer?
4      A   They're automatically recorded when the
5  phone call comes in.
6      Q   And this generation -- the information
7  that's generated by you regarding the phone
8  calls, evidently there were some specific to
9  a certain telephone number. How did you come
10 across this number?
11     A   It was on --
12     Q   Were you provided that information by
13 your attorney?
14     A   It was on the master file record for
15 the policy in question. The phone number was
16 a part of that record. I put the phone number
17 into a query to the database.
18     Q   And these are all the calls -- can you
19 do a cutoff? Are these all the calls you
20 received, I guess, from March 11th, 2004, to
21 present or did you stop it down at May 28th?
22     A   To the -- to my knowledge, these are
23 all the calls. I don't recall putting in a time
24 frame.
25     Q   Okay. Can you tell us your position

Page 14

1  with Globe Life?
2     A    Vice-president of the premium
3  accounting department.
4     Q    And how long have you been employed
5  with Globe Life, please, ma'am?
6     A    26 years.  I've actually been there for
7  30.
8     Q    What do you mean, you've been employed
9  for 26 but been there for 30?
10    A    I'm sorry.  I left the company for a
11 short period of time.  I've been there since 1976
12 but have a total work history of 26 years.
13    Q    And have you always been in the premium
14 accounting department?
15    A    No, I haven't.
16    Q    Can you tell us what other departments
17 you were in before?
18    A    I started in premium accounting.  I
19 rotated through some other functions that
20 included a piece of customer service, living
21 benefits, some other customer service functions,
22 our general accounting department which we also
23 called financial accounting at the time, and then
24 back to premium accounting.
25    Q    And how long have you been in premium

Page 15

1  accounting this time?
2     A    I've been back at Globe for five years.
3  I've been in premium accounting that entire time.
4  I was in premium accounting just prior to leaving
5  Globe as well.
6     Q    You say premium accounting.  Can you
7  tell us what that -- what your job duties are?
8     A    I manage the receipt and processing of
9  all premium collections.  And that's for all
10 collection types, not only for our direct bill
11 business but all of the payment options that we
12 offer to policyholders.
13    Q    And do you have an accounting degree or
14 anything like that?  You're not having to do any
15 mathematic computations, are you?
16    A    I'm not, no.  And no, I don't have a
17 degree.
18    Q    I'm just trying to figure out what that
19 department -- so basically the department,
20 premium accounting department is that you just
21 get the premiums and make sure they are credited
22 to the proper policy?
23    A    That's correct.
24    Q    And now I'm going to refer you to
25 Exhibit 3 which is one of the documents that

Page 16

1  Bobby faxed -- somebody faxed to us.  I think
2  Phil did, either that or Bobby.  I can't
3  remember.
4          Now, do you have those, ma'am?
5     A    Yes, I do.
6     Q    Okay.  Can you tell us what Exhibit 3
7  is?
8     A    Exhibit 3 is a print of the detail of
9  items processed by the clerk that processed the
10 Lurie's check on January 16th.  I printed a
11 detail of all of the pages that encompassed the
12 premiums she processed that day.
13    Q    And when you say "she," are you
14 referring to this Jeannie at the top?
15    A    Yes.  Yes, I am.
16    Q    So when it says Globe -- I'm reading
17 from the top of the first page, it says "Globe
18 Life," and it says "Premium accounting exception
19 transactions."  Then under that it says "Balance
20 report - detail for Jeannie Reaka"?
21    A    Jeannie Reaka.
22    Q    Now, she's the one that would enter all
23 this information?  I guess these are her --
24    A    That's correct, she entered the
25 information for all of these payments.

Page 17

1     Q    And it's your testimony that you
2  printed this off of the computer system yourself;
3  correct --
4     A    That's correct.
5     Q    -- Exhibit 3?  The second page of
6  Exhibit 3, if you go the third check down, says
7  check number 950, premium payment of 33.60.
8  $33.60?
9     A    Yes, I see it.
10    Q    And to your information, is that a
11 Lurie payment for the policy we're here today on?
12    A    Yes, it is.
13    Q    And it has a process date, do you see
14 over to the right where it says 1/16/04?  Do you
15 see that?
16    A    Yes.
17    Q    And could you tell us, does that mean
18 that the check was processed on January 16th,
19 2004, by Globe Life?
20    A    Yes, that's what it means.
21    Q    And could you tell us what "processed"
22 means?
23    A    Processed means that that payment
24 information was put into our system for it to be
25 used to update the policy.  That would have

Page 18

1  happened in the nightly cycle on January 16th.
2    Q   Obviously that was done for this
3  policy; correct?
4    A   That's correct.
5    Q   In the premium accounting department,
6  are you familiar or do you know one way or the
7  other whether somebody's late on their premium
8  payments or not?
9    A   We do, yes.
10   Q   And how are you made aware of that?  Is
11 it something that's on the computer system?  Tell
12 me how you would know if somebody was late on
13 their premium payments.
14   A   By the -- by the paid to date.  We have
15 certain criteria that if the payment is being
16 systematically processed, the machine would not
17 allow a payment to process after a certain number
18 of days.  This payment was handled manually.  The
19 clerk would have --
20   Q   What do you mean by that?
21   A   The clerk entered this information by
22 keying it into the computer.
23   Q   Did the machine allow her to process
24 this claim or this check for payment?
25   A   The computer did allow her to process

Page 19

1  this payment, yes.
2    Q   So there was no hold or anything like
3  that on the policy when this premium payment was
4  made; correct?
5    A   That's correct.
6    Q   And I noticed, just by looking through
7  these documents pretty quick, that on page 2 it's
8  got, right next to where it says check number 950
9  and you go across the middle, at the top it says
10 "over-under" and it has .60.  Looks like 60
11 cents.  Do you know what -- what does that mean?
12   A   Over-under is the terminology used on
13 this system for long and short.  The two-month
14 premium calculated by the system was $33 even.
15 We received a payment for $33.60.  Our tolerance
16 rules allowed us to take that 60 cents to long
17 and short.
18   Q   Can you explain -- a lot of folks that
19 might be listening to this or hearing this
20 testimony won't know anything about insurance or
21 accounting or anything like that.  Can you
22 explain what long and short is?
23   A   Long and short would be an amount that
24 we will accept a payment, whether it is long, in
25 this case it was 60 cents long for what the

Page 20

1  calculation for the two-month mode was, or it
2  could have been short by the same amount and we
3  still would have accepted it.
4    Q   And just for the record, long means an
5  overpayment?
6    A   Yes.
7    Q   And short would be an underpayment?
8    A   That's correct.
9    Q   So they overpaid -- the Luries overpaid
10 60 cents, and that's acceptable; correct?
11   A   That's correct.
12   Q   But they could also have paid 60 cents
13 less, which would be 29.40, and that still would
14 be acceptable?
15   A   We still would have accepted it.
16   Q   Okay.  In your premium accounting
17 department, are you all responsible for sending
18 out premium notices?
19   A   That's a function of our billing area.
20   Q   That wouldn't be part of your --
21   A   In 2004, it actually was my
22 responsibility for billing.  I no longer have
23 responsibility for the billing area.
24   Q   Do you know when in two thousand --
25 when did it switch over to go to the billing

Page 21

1  department from the premium notice department?
2    A   The responsibility for billing switched
3  over in late 2005.
4    Q   In your capacity with your employment
5  with Globe Life back in 2004, did you oversee the
6  issue of premium notices?
7    A   Yes, I did.
8    Q   And did you oversee -- to your
9  knowledge, did you oversee the issue of some
10 premium notices in this case?
11   A   It would have been in my
12 responsibility, yes.
13       MR. SANSPREE:  Bobby, I'm referring to
14 Lurie 24.  This should be something we produced
15 to you.
16       MR. POUNDSTONE:  Okay.
17       MR. SANSPREE:  Can you show the
18 witness, please, if you don't mind.
19       THE WITNESS:  I have it.
20   Q   (By Mr. Sanspree) Have you seen that
21 document before?
22   A   Yes, I have.
23   Q   And when did you see this document?
24 When is the first time you remember seeing this
25 one?

6 (Pages 18 to 21)

44f87bbd-3d1e-4943-9569-5a564215285e

Page 22

1  A  I reviewed a copy of this document
2  yesterday.
3  Q  Okay.  Other than reviewing it
4  yesterday, do you remember seeing this document
5  back in 2004?
6  A  No, I would not have personally seen
7  this document in 2004.
8  Q  And this document that I'm referring
9  to --
10     MR. SANSPREE:  Bobby, I guess we'll
11  mark it as 5.
12     (Plaintiff's Exhibit Number 5 marked
13     for identification purposes and made a
14     part of the record)
15  Q  (By Mr. Sanspree) Is this what you were
16  testifying to earlier that would come out of the
17  premium accounting office back then?
18  A  It would have come out of our billing
19  department which I had responsibility for at that
20  time.
21  Q  All right.  Maybe I'm confused, but the
22  billing -- you said it's the responsibility of
23  the billing department now but that changed in
24  2005.
25     Back in 2004, the premium notices, were

Page 23

1  they sent out by the premium accounting offices
2  back in 2004?
3  A  Not by the premium accounting office
4  specifically.  I was in charge of billing and
5  collections at that time.  I'm no longer in
6  charge of billing.
7  Q  Okay.  Are you familiar in any way with
8  the claim in this lawsuit?
9  A  Only what I have reviewed that is in
10  the file of what was provided.
11  Q  Is it standard accounting -- premium
12  accounting or billing practices in the billing
13  department to send out premium notices on
14  policies that have lapsed?
15  A  We send out a billing notice that is an
16  offer for reinstatement, and that is a standard
17  practice.
18  Q  What about on policies that have
19  lapsed, do you all send out premium notices that
20  there's no longer any policy in effect?
21  A  It is a premium notice but it's also an
22  offer of reinstatement.
23  Q  All right.  Well, I mean, say, for
24  instance, that a person doesn't have a policy --
25  or quit paying premiums a year ago.  Would you

Page 24

1  all send an offer of reinstatement to that
2  insured?
3  A  We would not.
4  Q  What I'm trying to get at, is there a
5  time period where you would stop sending premium
6  notices or offers of reinstatement?
7  A  Yes.  After 60 days we do not send
8  another offer.
9  Q  Ms. Hernandez, I guess you're here just
10  to tell us that the premium was made and
11  processed on the 16th of January, 2004, and
12  that's basically it?
13     MR. BUTLER:  She's here to answer your
14  questions.
15  Q  (By Mr. Sanspree) Was the premium made
16  and processed on January 16th, 2004?
17  A  There was, indeed, a premium processed
18  on January 16th.
19     MR. SANSPREE:  Well, thank you for your
20  time.
21     THE WITNESS:  Thank you.
22     MR. SANSPREE:  I don't have any other
23  questions.
24     (Deposition adjourned at 1:03 p.m.)
25

Page 25

1          C E R T I F I C A T E
2
3  STATE OF OKLAHOMA    )
                         ) SS:
4  COUNTY OF OKLAHOMA   )
5
6     I, ELIZABETH CAUDILL, CSR in and for
7  the State of Oklahoma, certify that BARBARA
8  HERNANDEZ was by me sworn to testify the truth;
9  that the above and foregoing deposition was taken
10  by me in stenotype and thereafter transcribed and
11  is a true and correct transcript of the testimony
12  of the witness; that the deposition was taken on
13  SEPTEMBER 14, 2006 at 12:39 p.m. in Oklahoma
14  City, Oklahoma; that I am not an attorney for or
15  a relative of either party, or otherwise
16  interested in this action.
17     Witness my hand and seal of office on
18  this 25th day of September, 2006.
19
20
21     _____
        ELIZABETH CAUDILL, CSR, RMR, CRR
22      CSR No. 161
23
24
25