# EXHIBIT A

# FREEDOM COURT REPORTING

Page 1

1    UNITED STATES DISTRICT COURT
2    MIDDLE DISTRICT OF ALABAMA
3    SOUTHERN DIVISION
4
5    CASE NO.  1:06-CV-0034MEF
6    KAREN LURIE,
7
8    Plaintiff(s),
9    v.
10   GLOBE LIFE and ACCIDENT INSURANCE
11   COMPANY, et al.,
12   Defendant(s).
13
14   DEPOSITION TESTIMONY OF:
15   WILLIAM MATTHEWS
16
17   Commissioner:
18   Renny D. McNaughton
19   December 21, 2006
20   Ozark, Alabama
21
22
23

Page 2

1    S T I P U L A T I O N
2    IT IS STIPULATED AND AGREED by and
3    between the parties through their respective
4    counsel that the deposition of William
5    Matthews, may be taken before Renny D.
6    McNaughton, Court Reporter and Notary
7    Public, State at Large, at the offices of
8    William Matthews, Ozark, Alabama, on the
9    21st day of December, 2006, commencing at
10   approximately 10:00 a.m.
11   IT IS FURTHER STIPULATED AND AGREED
12   that the signature to and the reading of the
13   deposition by the witness is waived, the
14   deposition to have the same force and effect
15   as if full compliance had been had with all
16   laws and rules of Court relating to the
17   taking of depositions.
18   IT IS FURTHER STIPULATED AND AGREED
19   that it shall not be necessary for any
20   objections to be made by counsel to any
21   questions, except as to form or leading
22   question and that counsel for the parties
23   may make objections and assign grounds at

Page 3

1    the time of trial or at the time said
2    deposition is offered in evidence, or prior
3    thereto.
4    In accordance with Rule 5(d) of the
5    Alabama Rules of Civil Procedure, as
6    amended, effective May 15, 1988, I Renny D.
7    McNaughton, am hereby delivering to Robert
8    Poundstone the original transcript of the
9    oral testimony taken the 21st day of
10   December, 2006, along with exhibits.
11   Please be advised that this is the
12   same and not retained by the Court Reporter,
13   nor filed with the Court.
14
15
16
17
18
19
20
21
22
23

Page 4

1    I N D E X
2    EXAMINATION BY:              PAGE NO.
3    Mr. Poundstone        6
4
5    E X H I B I T S
6    Defendant's
7    No. 1...Notice of Deposition    9
8    No. 2...Subpoena of Records     9
9    No. 3...1/02/04 Letter      42
10   No. 4...1/26/04 Letter      44
11   No. 5...2/03/04 Letter      46
12   No. 6...3/02/04 Letter      49
13   No. 7...4/26/04 Letter      50
14   No. 8...5/18/04 Letter      37
15   No. 9...Faxed Policy        58
16   No. 10...Affidavit       66
17   No. 11...Phone Records      11
18   No. 12 A..Phone Records     9
19   No. 12 B..10/17/06 Letter     70
20
21
22
23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 5

1    A P P E A R A N C E S
2
3    FOR THE DEFENDANT (S):
4    Robert E. Poundstone, IV
5    Bradley Arant Rose & White LLP
6    Alabama Center for Commerce, 401 Adams
7    Avenue, Suite 780
8    Montgomery, Alabama 36104
9    334-956-7700
10
11   FOR THE PLAINTIFF (S):
12   Christopher Sanspree
13   Beasley, Allen, Crow, Methvin, Portis &
14   Miles, P.C.
15   218 Commerce Street
16   Montgomery, AL 36104
17   800-898-2034
18
19
20
21
22
23

Page 6

1    I, Renny D. McNaughton, a Court
2    Reporter of Greenville, Alabama, and a
3    Notary Public for the State of Alabama at
4    Large, acting as Commissioner, certify that
5    on this date, pursuant to the Alabama Rules
6    of Civil Procedure, and the foregoing
7    stipulation of counsel, there came before me
8    at the offices of William Matthews, Ozark,
9    Alabama, commencing at approximately 10:00
10   a.m. on the 21st day of December, 2006,
11   William Matthews, witness in the above
12   cause, for oral examination, whereupon the
13   following proceedings were had:
14
15        WILLIAM MATTHEWS,
16   being first duly sworn, was examined and
17   testified as follows:
18        EXAMINATION
19   BY MR. POUNDSTONE
20   Q    Would you please state your full
21   name, for the record?
22   A    William Bush Matthews, Jr.
23   Q    Do you go by Will?

Page 7

1    A    Will, yeah.
2    Q    And what is your profession?
3    A    I'm an attorney and a judge,
4    also.
5    Q    And is that -- tell me where
6    you're a judge?
7    A    Midland City, Clayhatchee,
8    Newton, and Dothan.
9    Q    Okay.
10   A    I was here at Ozark 14 years
11   before I moved to Dothan.
12   Q    Okay.  What kind of judge are
13   you?
14   A    Municipal judge, part-time stuff.
15   Q    And I noticed that you've
16   withdrawn as representing Ms. Lurie in this
17   case, correct?
18   A    Yeah.
19   Q    Okay.
20   A    Because I'm a witness.
21   Q    Okay.  And do you --
22   A    It's unethical for me to be a
23   witness and be a party in this lawsuit.

Page 8

1    Q    Right.
2    A    Or be an attorney in this
3    lawsuit, I think.
4    Q    And, I assume, by doing that, you
5    expect to testify at trial?
6    A    Yes, sir.  If I'm called as a
7    witness, yeah.
8    Q    Now, obviously, this deposition
9    today is unusual because you are an attorney
10   and you did represent Ms. Lurie.  And I
11   understand that there may be instances today
12   where you want to assert the attorney/client
13   privilege.  And, certainly, I'm not going to
14   force you or try to make you divulge stuff
15   that is covered by the attorney/client
16   privilege.  I will say, just so we get it on
17   record, our position will be at trial that
18   if you assert the attorney/client privilege
19   for something that is asked in this
20   deposition, if testimony is offered on that
21   subject at trial, we'll certainly object to
22   that being entered into evidence and we'll
23   probably file a Motion in Limine in the same

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 9

1  regard.  So, I just wanted to put that on
2  the record.
3       (Whereupon, Defendant's
4       Exhibit Numbers 1 and 2 were
5       marked and attached to the
6       deposition.)
7  BY MR. POUNDSTONE
8       Q   I want to show you what I've
9  marked as Exhibits 1 and 2.  Exhibit 1 is a
10  copy of the deposition notice for your
11  deposition today, and Exhibit 2 is a
12  subpoena for documents that we previously
13  served upon you.  Have you received both of
14  those documents?
15       A   Yes, sir.
16       Q   Okay.  And have you reviewed the
17  documents that were requested in each one?
18       A   Yes.
19       Q   Okay.  And do you have any
20  documents responsive to those requests?
21       A   Actually, I don't.  The only --
22  the only thing in there, and I believe I
23  wrote you a letter and told you so, the only

Page 10

1  thing that I had after looking through my
2  phone records are two telephone calls.
3  Let's see, one call is on March the 10th,
4  2:15 p.m., to Oklahoma City, Oklahoma,
5  telephone number (405)270-1410 for 5.7
6  minutes.  And the other one, the other one
7  was on February the 18th for 11.3 minutes,
8  (405)270-1410.  That's the only actual
9  records that I have of phone calls.
10       Q   Okay.
11       A   Although, I know I probably made
12  15 calls to these people.
13       Q   And we'll just do it when we take
14  a break, but if we can just make a copy of
15  that, and I'm going to stick an exhibit
16  sticker on it and just put it as an
17  attachment.
18       A   I can give you these two phone
19  bills and they're in there.
20       Q   Okay.
21       A   Along with thousands of other
22  numbers.
23       MR. SANSPREE:  And just for the

Page 11

1       record, I'm not his lawyer, so
2       whatever he says you can have, you
3       can have.
4            (Whereupon, Defendant's
5       Exhibit Numbers 11 and 12A were
6       marked and attached to the
7       deposition.)
8  BY MR. POUNDSTONE
9       Q   Okay.  Super.  I'm going to mark
10  those.  I'm going -- actually, I've got my
11  exhibits premarked.  I'm going to mark those
12  as 11 and 12 A.
13       A   You can just keep them as far as
14  I'm concerned.
15       Q   Okay.  And, again, 11 and 12A are
16  the phone records of which show calls made
17  to Oklahoma City, correct?
18       A   Right.  And I assume that's to
19  that company, Globe.
20       Q   How long have you known Karen
21  Lurie?
22       A   Probably 15 to 20 years, at
23  least.

Page 12

1       Q   Okay.  How did you come to know
2  Ms. Lurie?
3       A   I represented her in a custody
4  case involving her daughter, who's now
5  probably 20 or 21 years old.  So that would
6  have been about 10 or 15 years ago.  She
7  had -- when she got divorced, her husband
8  got custody of the little girl.  And I filed
9  a modification to get custody for her, which
10  I was successful over in Henry County.  It
11  was a Henry County case.  And they appealed
12  the case to the Court of Civil Appeals, and
13  I think they appealed it to the Supreme
14  Court and they lost.  And then they came
15  back about a year or two later and filed
16  again and appealed it again and lost again.
17       So I've had extensive dealings with her
18  on that.
19       Q   Okay.
20       A   Had nothing to do, you know, with
21  this case.
22       Q   Okay.  Did that proceeding, I
23  take it that was a husband that she was

3 (Pages 9 to 12)

# FREEDOM COURT REPORTING

Page 13

1   married to prior to Mr. David Lurie?
2       A   Right.
3       Q   Is there any other matters, other
4   than the one we're here on today and the
5   custody proceeding, that you represented her
6   on?
7       A   No.  And I hadn't seen her until
8   Chris got killed.
9       Q   And "Chris," I guess "Chris" and
10  David Lurie are the same person?
11      A   I didn't know his name was David.
12  I always called him Chris.
13      Q   I think the Complaint said David
14  Lurie but he goes by Chris?
15      A   Yeah.  I always knew him as
16  Chris.  Now, I don't know if that's his real
17  name or a nickname or whatever, but that's
18  what I always called him.
19      Q   And I assume that you, in
20  addition to the custody proceeding, you also
21  did work for Ms. Lurie in connection with
22  Chris Lurie's death, correct?
23      A   Yeah.  She called me when he got

Page 14

1   killed, and I referred her to a lawyer in
2   Dothan, Mark Andrews.  And he and I handled
3   that case.
4       Q   When say he and you handled that
5   case, what case do you refer to?
6       A   It was the wrongful death case.
7       Q   Okay.  Against the driver?
8       A   Against the driver of the car.
9   Actually, I think it was a van he was
10  driving.
11      Q   Okay.  And I believe the accident
12  report does show that.
13      A   Yeah.
14      Q   Other than the wrongful death
15  case, the custody matter, and the matter
16  with the insurance policy with Globe Life,
17  are there any other matters in connection --
18  well, any other matters that you've
19  represented Ms. Lurie on.
20      A   Not that I can think of.  I'm
21  sure she's called me about stuff over the
22  years, but...
23      Q   Are there any other life

Page 15

1   insurance policies on Chris Lurie that you
2   did work on or helped Ms. Lurie on
3   concerning Chris's death?
4       A   I think there were, and I think
5   those have been paid out.
6       Q   When was the first time you
7   became aware of the Globe policy that's the
8   subject of this lawsuit?
9       A   She came in probably a week or
10  two after he got killed, and she was, like,
11  trying to get all his affairs in order, that
12  type thing.  So I would say it was probably
13  -- she would know better than me, but I mean
14  I would say it was a couple weeks -- within
15  a couple weeks after he died.
16      Q   Okay.  And he died on
17  January 6th, and I believe her testimony
18  indicated that she thought it was around
19  January 12th when she came to see you.
20      A   Whatever she would say would
21  probably be accurate.
22      Q   Okay.
23      A   If I kept my old appointment

Page 16

1   books going back -- it's been several years.
2   If I kept my appointment books, I could tell
3   you exactly, but I don't think we keep them.
4       Q   Did she contact you at any time
5   concerning that policy prior to the death of
6   Chris Lurie?
7       A   No.
8       Q   Okay.  She didn't call you -- she
9   testified that she put it in the mail on
10  January 4th.  She didn't --
11      A   She didn't call me about it.
12      Q   Okay.  You didn't talk to her
13  about the actual check while she was paying
14  it?
15      A   No.  In fact, I hadn't talked to
16  her until Chris got killed in probably a
17  couple years.
18      Q   Okay.  So, if I understand your
19  testimony right, she came to see you after
20  his death to talk about a number of issues
21  involving the death and not, specifically,
22  the Globe policy, is that accurate?
23      A   Firstly, it was the death case.

4 (Pages 13 to 16)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 17

1  And when I talked to her about the death
2  case, I asked her about any insurance
3  policies and that type thing, and I told her
4  I would help her with that, if she needed
5  help.
6      And I don't think she brought in the
7  policy that day, or the policies. It might
8  have been the next day or a couple days, but
9  I told her I needed death certificates to
10 send, you know, to file the claim. And if I
11 sent a letter to the company, y'all would
12 have that. I couldn't find it.
13     **Q    Yeah. I do have a letter that I**
14 **will show you in just a little bit.**
15     A   Okay.
16     **Q    What is the first time you**
17 **remember discussing the Globe policy with**
18 **Ms. Lurie?**
19     A   Well, it would have been when she
20 brought in the policies.
21     **Q    What, specifically, do you**
22 **remember discussing with her about the**
23 **policy?**

Page 18

1      A   Well, I think -- how many years
2  ago has this been, three?
3      **Q    2004.**
4      A   2004. She's -- I think she
5  brought in something saying "your policy was
6  going to lapse if you don't send the money
7  in," or something like that. And she told
8  me at that point that she mailed a check to
9  the company. And it was a fairly
10 insignificant amount of money, $30 or $40.
11 It wasn't much money.
12     And she said she mailed the check like
13 the day or two before he got killed. And
14 that was one of her questions, would she be
15 covered. And I felt like she would if the
16 check had been in the mail. That's what I
17 learned in law school: If you post
18 something, it's paid -- it's considered paid
19 if they don't receive it until after
20 something happens, it's still valid.
21     But I think at that point, she came
22 back later with a death certificate. And
23 you're going to show me the letter so I will

Page 19

1  know what I did next. I think that's the
2  first thing I did.
3      **Q    Okay. Are there any other**
4  **discussions that you remember having with**
5  **her concerning the Globe policy prior to the**
6  **time that you sent the letter in to Globe?**
7      A   No.
8      **Q    Okay. Do you remember what**
9  **documents you reviewed relating to the**
10 **policy prior to the initial letter that you**
11 **sent to Globe?**
12     A   I can't remember. I don't know
13 if I saw the policy or -- I think I did see
14 the policy. She had a policy, and I read
15 through it. And I don't even know what the
16 value of it was. I think it was a hundred
17 thousand dollars.
18     And I think what I did then, I called
19 the first day -- I remember like this: I
20 called out there and talked to somebody and
21 asked them what I needed to do to file a
22 claim -- help her file her claim. And she
23 told me a death certificate and some other

Page 20

1  stuff. They wanted accident reports. Why,
2  I don't know. But they wanted accident
3  reports from the state troopers, which that
4  was no problem, because the head of the
5  state troopers is a client of mine. So I
6  called him and he got me that, which
7  probably would have taken several weeks to
8  get.
9      And, usually, in a death case, it takes
10 them a while to, you know, do the
11 investigation. I think I've got that in
12 here somewhere. I think I've got a copy of
13 what they sent me in here. I've got a pile
14 of stuff. Let's see. See if I can find it;
15 I can give it to you. Let's see. I think
16 they sent me back -- no, this is something
17 Globe sent me.
18     But I sent them all this stuff, the
19 accident report, death certificate, you
20 know, that type thing.
21     **Q    Okay. And you said that you**
22 **believe you had this phone call the first**
23 **day that Ms. Lurie came to see you?**

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 21

1    A    Yes, I think so, or either the
2    second day. I think she came back the next
3    day or the next day.
4        Q    And just so we're clear on the
5    record, and I think it was alluded to in
6    your previous testimony, you don't have any
7    records that would show the phone call that
8    was made to Globe the first or second day
9    that she came to see you?
10    A    No. I dialed the 800-number, and
11    it's not on this -- this is the number I
12    called, the two I testified to earlier, that
13    (450)270-1410. But she had a toll-free
14    number, and I don't know what it was.
15        Q    Okay.
16    A    And I don't know if I've got
17    another file somewhere floating around the
18    office. I don't think I do.
19        Q    Did you make any recordings of
20    any phone calls with Globe?
21    A    No.
22        Q    Did you ever prepare a memo to
23    the file that summarized what took place in

Page 22

1    a phone call with Globe?
2    A    No, there wasn't a file.
3        Q    Okay.
4    A    I was just trying to help her out
5    to get her insurance, you know, money. Mark
6    Andrews had the file. I, basically, sent
7    the case to him.
8        Q    Do you recall who at Globe you
9    talked to?
10    A    No.
11        Q    And I'm talking about the initial
12    conversation.
13    A    I have no idea.
14        Q    Do you have any records that
15    would show who you spoke with?
16    A    No.
17        Q    Do you remember if it was a male
18    or female?
19    A    Yeah, it was a female, I remember
20    that.
21        Q    Do you recall what department she
22    worked in?
23    A    I think I asked for whoever

Page 23

1    handles claims, or whoever. So I guess it
2    would be the claims department.
3        Q    And, obviously, you said you
4    guess. You're not real certain who?
5    A    It would have to be somebody in
6    the claims department, that's what I asked
7    for. They told me how to file a claim, what
8    she needed, you know, what documents they
9    needed, that type thing. I can remember
10    that it wasn't the first person I talked to.
11    They referred me to somebody else, whoever I
12    called.
13        Q    Okay. Did you have any
14    substantive conversations with anybody else?
15    A    Not at that time.
16        Q    Okay. So you make the first
17    call, and was there any discussion at all
18    concerning whether or not the policy was
19    lapsed or had been reinstated in that call?
20    A    No, not at that time. I assumed
21    everything was fine. The first I heard they
22    weren't going to pay was in May when they
23    sent me that letter. I think I've got it

Page 24

1    sitting here. May the 18th.
2        Q    Did you have any conversations at
3    all during this time as to whether or not
4    the policy was in force?
5    A    Did I have any concerns?
6        Q    Did you have any conversations
7    with the person at Globe?
8    A    No. They didn't say anything
9    about that.
10        Q    All right. Let's just do it this
11    way: Tell me everything that you remember
12    being said during that phone call?
13    A    Okay. Well, basically, they told
14    me what I needed to send in at that point.
15    And then I want to say it was a week or two
16    later I talked to them, after I sent the
17    stuff, and they said they were going to
18    process the claim and "send you a check."
19    You know, I told them, basically, I was
20    not her lawyer as far as trying to get any
21    money. They didn't have to put my name on
22    the check. They could just make it out to
23    her as the widow or the administrator or

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 25

1 whatever she -- I don't know what she did.
2 Mark handled that. I didn't handle that.
3     **Q**   **Okay. Anything else that you**
4 **remember discussing on that first call? Did**
5 **you even identify who you were calling on**
6 **behalf of, what the policy number was?**
7     A   Oh, yeah. Yeah. Yeah.
8     **Q**   **Okay. But you didn't have any**
9 **conversations concerning whether or not the**
10 **policy was in force?**
11     A   Not that first call.
12     **Q**   **Okay. You didn't have any**
13 **conversations concerning whether or not it**
14 **had been reinstated?**
15     A   Not the first time. Maybe later.
16     **Q**   **And you didn't have any**
17 **conversations about premium history or**
18 **premium payments or anything like that?**
19     A   The first time?
20     **Q**   **Right.**
21     A   I might have the second day or
22 the, you know, the next day.
23     **Q**   Okay.

Page 26

1     A   Because she told me that she had
2 just mailed the check. So I think I did
3 not, but not the initial call. But I mean,
4 like, I think I called maybe that Wednesday
5 or something and that came up.
6     **Q**   Okay.
7     A   And, you know, I talked to
8 whoever I talked to up there. I said,
9 "Look, it's 30-something dollars, and she
10 mailed it last week, or the week before the
11 fellow got killed." And they said, "As long
12 as we get it by a certain time" -- you know,
13 but I always assumed if you mailed the
14 check, that's the date. But I think they
15 said if they got it by a certain time.
16     Later on, Ms. Lurie said, "Well, you
17 know the check went through," so we didn't
18 have any problem. I didn't think we had a
19 problem until I got this letter of May the
20 whatever.
21     **Q**   **Okay. So that first call, all**
22 **you discussed was how to make a claim?**
23     A   Yeah. And she came back in like

Page 27

1 a couple days later and we called them
2 again.
3     **Q**   **Okay.**
4     A   And I probably called them ten
5 times after that. Every time I called them,
6 it was just like she would call here and
7 say, "Have you heard anything," or whatever,
8 and I would call them.
9     **Q**   **Okay. Have we talked about**
10 **everything that you remember discussing**
11 **during that first call?**
12     A   I think so.
13     **Q**   **Okay. Now, you said there's a**
14 **second call a couple days later. What**
15 **prompted that second call?**
16     A   What prompted the second call?
17     **Q**   **Uh-huh.**
18     A   I can't remember.
19     **Q**   **Do you remember who you talked**
20 **with?**
21     A   No.
22     **Q**   **Do you remember if that was a**
23 **male or female?**

Page 28

1     A   It was a female, I feel sure.
2     **Q**   **Do you remember if it was the**
3 **same person that you talked to --**
4     A   I think at some point I talked to
5 a male later on the down the road in the
6 legal department, but it was a female, I
7 think.
8     **Q**   **Okay. Do you remember if it was**
9 **the same female that you talked to during**
10 **the first call?**
11     A   Yeah, it was the same person.
12     **Q**   **Okay. Tell me what you recall**
13 **that y'all talked about during that call?**
14     A   She felt like -- you know, she
15 was wondering, she might be late on the
16 payment or something. She said she had the
17 payment mailed, and they said that was no
18 problem, as long as they got it by a certain
19 date. And the thing was mailed before he
20 died. I don't know if they got it before
21 that date or not. I feel sure they did.
22     **Q**   Okay.
23     A   And I remember this, too. She

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 29

1  said, basically, she had all her bills
2  sitting out Christmas and just, basically,
3  forgot to mail all the checks, or whatever.
4  And he was starting a new job. In fact, I
5  don't -- I think this might have been his
6  first day of work. I can't remember. He
7  was going to work on his motorcycle when he
8  got killed.
9      Q    Okay. Is there anything else
10 that you remember discussing in that second
11 call?
12     A    Other than they assured me no
13 problem, you know, the check's in the mail,
14 no problem. Basically, it's thirty
15 something dollars, they weren't really
16 worried about it. They said, "We'll pay the
17 claim, don't worry about it."
18     Q    That's what she said, "We'll pay
19 it, don't worry about"?
20     A    If they got the money. If the
21 thing was timely mailed, and, obviously, not
22 mailed after the man died.
23     Q    Right. Did y'all talk about

Page 30

1  whether or not the policy was within the
2  grace period when the payment was made?
3      A    Yeah. I think they even waived
4  the grace period because it wasn't but $30.
5  I mean they just said, well, as long as she
6  mails the check and we get the check by, I
7  want to say she said by next week or
8  whatever, if the thing had been mailed, then
9  you've got no problem. I said okay. And
10 that's basically it.
11     You know, the other calls I made were
12 basically saying, you know, "My lady hadn't
13 got her money yet."
14     "Well, it's coming. We've approved
15 it."
16     They told me that. "We approved the
17 thing. It's already been approved. We're
18 going to get you a check." And it never
19 came, and then in May I got this letter, in
20 May.
21     Q    Okay. Back to that second call,
22 is that the only call that you ever
23 discussed whether or not the policy was in

Page 31

1  force with anyone at Globe?
2      A    There might have been one other
3  call. I can't remember. I mean it's been
4  two years ago.
5      Q    Okay. Do you remember if that
6  other call was before or after you received
7  the letter indicating that they had denied
8  the claim?
9      A    Oh, it was before. Oh, yeah.
10     Q    Okay. So you may have had two
11 calls where you discussed whether or not the
12 policy was in force?
13     A    Well, the two calls that I
14 called, I think those were to the legal
15 department, to make sure they had
16 everything. And they called me several
17 times, too, asking for stuff that I didn't
18 even feel was relevant. I mean they wanted
19 autopsy reports, they wanted police reports.
20 They wasn't -- I said, "Look, he's dead.
21 There's no -- you know, it's not a suicide.
22 It's not any, you know" -- I couldn't
23 understand why they wanted it all.

Page 32

1  And I got perturbed at them. They kept
2  calling wanting stuff. And I sent them more
3  than I probably should have even sent them.
4  And I don't know whether I got more
5  perturbed at them or perturbed because
6  Ms. Lurie would call me, you know, and,
7  "Tell me what's going?" I would say, "I
8  don't know what's going on. I mean, they
9  tell me they're going to send you a check.
10 They're going to send it to you. They're
11 not going to send it to me," you know.
12     Q    Okay.
13     A    So, that's basically it.
14     Q    And what I'm trying to find out
15 is, you know, I need to know every time that
16 you talked to somebody at Globe about the
17 coverage issue, whether or not there was
18 coverage for his death. And I know you said
19 the second call y'all discussed it. You
20 said there may have been another call where
21 it was discussed?
22     A    And they assured me that there
23 was coverage. Because, in fact, later on

8 (Pages 29 to 32)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 33

1  they said, "We've got her money and -- by
2  that time and it's covered and we've
3  approved it and the check is coming."
4      And I told my client that two or three
5  times: "The check is coming." And the only
6  time that I ever thought the check wasn't
7  coming is when they wrote me this letter,
8  this S.J. Whittaker, whoever that is.
9      Q  Which is the May 18th, which I've
10  gotten and will make an exhibit later?
11      A  Yeah.
12      Q  Denial of claim letter?
13      A  It says that the premium of $33
14  was received on January the 16th, 2004. And
15  I don't know -- when I talked to them, I
16  want to say it might have been a day or two
17  before that, they said, "As long as we get
18  the check within the next couple of days,
19  she's covered."
20      Q  Even if he's already dead?
21      A  Yeah. As long as she did not pay
22  the premium after he died. That was what
23  they told me.

Page 34

1      Q  And did y'all discuss whether or
2  not the premium was considered paid upon
3  mailing or report of receipt?
4      A  Yes. And they told me -- and I
5  told them, I said, "It's my understanding,
6  if you mail the check, if it gets lost in
7  the mail or whatever, it's considered -- and
8  you get it like late, it's considered paid."
9  And -- but the person that I was talking to
10  was not a lawyer, but they agreed with me,
11  and they said they felt like that was --
12      Q  Was that that second call?
13      A  Yeah. That was like -- let's
14  see, this says that they got the check on
15  January 16th. He died on --
16      Q  The sixth.
17      A  The sixth. I think he died on a
18  Monday, maybe a Tuesday, I can't remember.
19  Let me think. I think he died on a Monday,
20  or maybe he died on a Tuesday. Anyway, I
21  think she came the next Monday is when she
22  came, and I told her not to. She wanted to
23  come in like the day after the funeral or

Page 35

1  something, and I told her just wait until
2  Monday or whatever.
3      Q  Did you have any discussions with
4  anyone at Globe concerning the difference in
5  paying a premium late but during the grace
6  period and paying a premium after the grace
7  period and during the lapse, did y'all have
8  any discussions in that regard?
9      A  No.
10      Q  Did you have --
11      A  The only time I heard about this
12  is when I got this letter. Then it said,
13  "We're unable to accept this premium," and
14  they sent me a check for $33. They had
15  already cashed the check. They sent me a
16  check for $33.
17      Q  Which was refunding the premium?
18      A  Yeah.
19      Q  Did you ever make anybody at
20  Globe aware that the check was mailed beyond
21  the 31-day grace period?
22      A  The only thing I heard about that
23  was this.

Page 36

1      Q  Okay. The only time you ever
2  heard about the payment being made beyond
3  the grace period was the 18th letter?
4      A  Well, they told me if the payment
5  was made before he died, they would honor --
6  she would get her check. They said it was
7  late, it's $33, they give them extra, you
8  know, time or whatever if they forget to
9  mail the check, they're not going to cancel
10  their policy. That's basically what they
11  told me.
12      Q  Okay. But y'all didn't have any
13  discussions as to whether or not it was
14  late, within the grace period, or late,
15  beyond the grace period?
16      A  No. I wasn't aware of that until
17  I got this letter and the check for $33 they
18  sent to me.
19      Q  Okay. Which is the May 18th
20  letter. I've got it marked. I will just
21  show it to you and we'll go on and put it in
22  the record.
23      A  I'm sure that's the same one I'm

## 367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 37

1　looking at.
2　　　　(Whereupon, Defendant's
3　　　Exhibit Number 8 was marked and
4　　　attached to the deposition.)
5　BY MR. POUNDSTONE:
6　　　Q　I believe what I'm handing you
7　marked as Defendant's Exhibit 8 is the
8　May 18th letter, along with the check
9　attached, is that correct?
10　　　A　Yeah. With a little note that
11　says, "If we can help you in any other way,
12　please tell us."
13　　　Q　Okay. Now, I know this has been
14　a while and your memory may not be rock
15　solid on this, but I do want to talk about
16　any additional conversations beyond that
17　second call where you discussed whether or
18　not the policy was in force. And I need to
19　know first, do you specifically remember if
20　that another conversation took place?
21　　　A　Every conversation I ever had
22　with them was, after that, "We got the
23　premium, you've sent us all the documents."

Page 38

1　First, they asked me for more documents. I
2　sent them piles of stuff, you know. And
3　once I sent them, they said, "We've got
4　everything we need. We've approved your
5　claim, the check is coming. Tell your lady
6　that the check is coming." And I instructed
7　them to send it to her and not me.
8　　　Q　Okay. How many of these type
9　phone calls do you recall taking place?
10　　　A　Probably eight or ten, at least,
11　or maybe more.
12　　　Q　Do you remember the names of
13　anyone you talked to?
14　　　A　No.
15　　　Q　Do you have any records that
16　would show the names of any of the people
17　that you talked to?
18　　　A　No.
19　　　Q　Did you record any of the calls
20　--
21　　　A　I don't record any calls of
22　anybody that I -- you know, that I talk to.
23　I think it was against the law to do that.

Page 39

1　　　Q　Did you ever discuss with anybody
2　at Globe how and under what circumstances a
3　policy could be reinstated?
4　　　A　No. They never told me it was
5　cancelled until this.
6　　　Q　Is there anything that you talked
7　about with the Globe representative in that
8　second phone call that we haven't talked
9　about today?
10　　　A　Not that I can think of.
11　　　Q　Okay. And is there anything in
12　any of the phone calls concerning payment of
13　the premium, reinstatement of the policy, or
14　whether or not the policy was in force that
15　we haven't talked about so far today?
16　　　A　No.
17　　　Q　Did you have any discussions with
18　Ms. Lurie as to when she may have put the
19　premium -- overdue premium check in the
20　mail?
21　　　A　Yes.
22　　　Q　Okay.
23　　　A　I remember that.

Page 40

1　　　Q　Tell me what discussions you had
2　in that record regard?
3　　　A　She said she put the checks in
4　the mail, I want to say maybe Friday or
5　Saturday before he got killed, sometime over
6　the weekend maybe, but that she took them to
7　the post office and they were mailed. So it
8　wasn't like, you know, the day he got
9　killed. It was several days before he got
10　killed.
11　　　Q　Did it strike you as a bit
12　unusual that a Globe employee would tell you
13　that the policy was in force when they
14　didn't receive the premium prior to
15　Mr. Lurie's death?
16　　　MR. SANSPREE: Object to the
17　　　form.
18　　　A　Well, they said if it was in the
19　mail it was, you know. I explained to them
20　what happened. The lady mailed the check
21　and then the guy gets killed like the next
22　week. And she says, "As long as you send in
23　these documents, we will send it to whoever

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 41

1  and see if they approve it."
2      The next thing I hear, they approved
3  it, until May the whatever, and then they
4  say they didn't approve it. So they told me
5  one thing and then came back two or three
6  months later and sent me this letter.
7      **Q  So, just so we're clear, because**
8  **your testimony seems a little bit different**
9  **just then than it did previously, did the**
10  **Globe person that you talked to say, "Well,**
11  **just send the stuff in and we'll send it off**
12  **and see if they approve it," or did they**
13  **say, "The policy is in force because, you**
14  **know, the premium was"** --
15      A  Well, they always told me -- I
16  had never heard that the policy wasn't in
17  force, they weren't going to force the
18  policy. But they told me they had to send
19  it to somebody to look at all the stuff I
20  sent them and all that to get final
21  approval. And I sent them everything. I
22  mean it was a pile of stuff.
23      **Q  Did you ever know that Ms. Lurie**

Page 42

1  **put the premium payment in the mail after**
2  **the grace period had already expired?**
3      A  I don't know when she did it. I
4  don't know when the grace period was.
5      (Whereupon, Defendant's
6      Exhibit Number was marked 3 and
7      attached to the deposition.)
8  BY MR. POUNDSTONE
9      **Q  Okay. You were never aware of**
10  **those facts. I'll show you what I marked as**
11  **Exhibit 3. Have you seen that document**
12  **before?**
13      A  I have. In fact, I don't know
14  how I saw it, but I have seen this.
15      **Q  Do you know if that's something**
16  **that Ms. Lurie brought to you around the**
17  **time she came to see you the first or second**
18  **time?**
19      A  It might have been, but I
20  remember that. I think that was confirmed
21  when I called out there, and they called me
22  and said they received the money, or
23  whatever. So it was -- somebody called me.

Page 43

1      **Q  Do you remember any discussions**
2  **you had with Ms. Lurie concerning this**
3  **letter?**
4      A  I'm sure I had several.
5      **Q  Do you remember the substance of**
6  **any of those conversations?**
7      A  No. I think this just -- this
8  just confirms that they wanted the money by
9  the 17th, and I told them the fellow had
10  died. But they said as long as it was sent
11  to them before he died, then they -- you
12  know, it was fine.
13      **Q  Let me ask you this, and hold**
14  **onto that for just a second.**
15      A  All right.
16      **Q  Do you recognize the handwriting**
17  **on that document?**
18      A  No, huh-uh. I assume Ms. Lurie
19  wrote that down probably. I don't know.
20  It's not mine.
21      **Q  Will you read the -- will you**
22  **read the first sentence of paragraph 3 for**
23  **me?**

Page 44

1      A  "If you had not a chance to do
2  so, please send in your payment along with
3  attached notice and the benefits of your
4  policy will be reinstated, provided the
5  insured is still in good health. We must
6  receive your payment by January 17th, 2004."
7      **Q  Would you agree with me that**
8  **Chris Lurie was not in good health when**
9  **Globe received the premium payment?**
10      A  He was deceased.
11      **Q  And that's not good health, is**
12  **it?**
13      A  No.
14      (Whereupon, Defendant's
15      Exhibit Number 4 was marked and
16      attached to the deposition.)
17  BY MR. POUNDSTONE
18      **Q  I'm going to show you what I**
19  **marked as Exhibit 4. Have you seen that**
20  **document before?**
21      A  That's my signature. I wrote it,
22  yeah.
23      **Q  Okay. And is that -- earlier we**

11 (Pages 41 to 44)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 45

1  talked about the first written letter that
2  you sent to Globe concerning the claim.  Is
3  that the letter that you were talking about?
4      A   I'm sure -- I don't know if I
5  sent more than that letter or not, but that
6  is a letter I sent concerning some of the
7  stuff they wanted, accident report, death
8  certificate.  And then they called back
9  wanting more things.  I mean, that's, you
10 know --
11     Q   Do you remember whether or not
12 this letter was sent after the first call
13 that you had with someone at Globe?
14     A   Oh, yeah.
15     Q   Do you remember whether or not it
16 was sent before or after the second call you
17 had with someone at Globe?
18     A   It would be after.  This letter
19 would be after.
20     Q   Okay.  And there's no mention of
21 the premium issue in this letter.  Is there
22 any particular reason that you didn't
23 mention that?

Page 46

1      A   It wasn't an issue.  She paid the
2  premium.
3      Q   Okay.
4      A   And I knew at this point she had
5  paid the premium.  They had gotten money.
6  In fact, somebody called me and said they
7  got it by whatever date.
8          (Whereupon, Defendant's
9          Exhibit Number 5 was marked and
10         attached to the deposition.)
11 BY MR. POUNDSTONE
12     Q   I'm going to show you what I
13 marked as Exhibit 5.  That letter is
14 addressed to Ms. Lurie, so you may or may
15 not have seen it.  So let me ask you, have
16 you seen that letter before?
17     A   Oh, yeah.  Yeah.  She brought
18 this in, and this is what I'm, you know,
19 talking about the other things she wanted,
20 statement by the beneficiary, attending
21 physician statement, which I didn't know why
22 in the world they wanted that.  That was --
23 you know, a death certificate, I had already

Page 47

1  sent them that.  A police report, I had
2  already sent them that.  Obituary, I didn't
3  know why they wanted that.  We sent it to
4  them.  A newspaper article, we sent them
5  that.
6          And then this was a problem that I had:
7  Names and addresses of all the doctors who
8  had treated him in the past five years.  And
9  this set me off.  And I called them, and I
10 said this was ridiculous.  And they said,
11 "Well, this is part of our policy, we've got
12 to have this."
13         I said, "The man got killed in the car
14 wreck."
15         "Well, he might have been diabetic; or
16 he might have had blood pressure problems;
17 or he might have had a heart attack and
18 caused this accident."
19         I mean, I got livid.  And I can still
20 remember this.  I said, "Look, the guy got
21 killed in a head-on collision where the
22 other driver came over into his side of the
23 road.  He hit the guy head on with the

Page 48

1  motorcycle.  He went through the windshield
2  of that van and killed the driver of the
3  other car.  Both of them were killed."
4          But, you know, I just couldn't
5  understand this.  And I remember seeing
6  this, and that set off about two or three
7  phone calls to them about that.  So, yes, I
8  saw that.
9      Q   And just to be clear, I mean, do
10 you -- I mean, you don't have any knowledge
11 of whether or not, you know, conducting such
12 types of investigations are standard or not
13 in the life insurance industry?
14     A   I would say it's very unusual to
15 say the least when you've got a case that's
16 clearly -- you know, why in the world are
17 they looking at stuff like this?  I mean,
18 that -- red flags went off in my head right
19 there that there was trouble with paying the
20 claim when they're wanting all this stuff.
21 I couldn't figure out -- I said something is
22 going on.
23     Q   Okay.  But you've never worked in

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 49

1  the insurance industry, have you?
2      A    No.  I've defended insurance
3  companies for a long time though.
4      Q    And when you received this
5  February 2004 letter, was it your
6  understanding, at that time, that Globe
7  needed additional information before it
8  could begin the investigation process?
9      A    That's what they said, they had
10 to have all that before they would write a
11 check is what they told me.  And I think at
12 that stage, I even talked to one of their
13 lawyers or somebody in the legal department.
14         (Whereupon, Defendant's
15      Exhibit Number 6 was marked and
16      attached to the deposition.)
17 BY MR. POUNDSTONE
18     Q    Okay.  And I'm going to show you
19 what I marked as Exhibit 6.  There we go.
20 Okay.  Have you seen that letter before?
21     A    Well, I know I seen it.  I mean I
22 can look at my letterhead and signature.
23     Q    Okay.  And that is your signature

Page 50

1  there?
2      A    Yeah.
3      Q    Tell me what that letter is?
4      A    Evidently, I sent them a bunch of
5  stuff and that's what, you know --
6      Q    Okay.
7      A    The stuff in there that was
8  requested that I hadn't sent them.
9      Q    Okay.  And that was sent in
10 response to the February 3, letter that we
11 just looked at and marked as Exhibit 5?
12     A    Yeah.
13     Q    Okay.  And this letter is dated
14 March 2nd, correct?
15     A    And I don't know who L.S. Lawson
16 is, but that's whoever I talked to.
17     Q    Okay.  And this letter is dated
18 March 2nd, correct?
19     A    Yeah.
20         (Whereupon, Defendant's
21      Exhibit Number 7 was marked and
22      attached to the deposition.)
23

Page 51

1  BY MR. POUNDSTONE
2      Q    I'm going to show you what I
3  marked as Exhibit 7.  Do you recall seeing
4  that letter before?
5      A    It was sent to me.  I saw it if
6  it was sent to me.
7      Q    And it, obviously, is addressed
8  to you, correct?
9      A    Right.  I'm sure I got it.
10     Q    Okay.
11     A    That's my address.
12     Q    And this letter is dated
13 April 26th, 2004, correct?
14     A    Uh-huh.
15     Q    Is that your recollection as to
16 the approximate time period when Globe had
17 received all the information that it needed
18 to begin its investigation?
19     A    That would have been a lot longer
20 after I sent it to them if I sent it to them
21 on March the 2nd.  That's like six weeks
22 later.
23     Q    Let me ask you this:  Do you

Page 52

1  recall whether or not there was additional
2  information that Globe had to obtain a third
3  party to get because it was not provided by
4  either you or Ms. Lurie?
5      A    I sent them everything they asked
6  me to send them, I think.
7      Q    Let's go back briefly to the
8  May 18th letter.  What did you do after you
9  received this letter?
10     A    I don't think you want to hear
11 what I did, because it wasn't nice.  I hit
12 the damn roof when I saw that letter.  I was
13 incensed, and I'm still incensed.  And I
14 picked up the telephone, and I'm sure -- I
15 hadn't looked at the date.  Let me go back
16 to those phone records, see what these dates
17 were.  I think these were before -- that's
18 March the 10th.  I'm gone have to look at my
19 phone records.  I don't know if I called the
20 toll-free number or not, but I remember
21 calling them.
22     Q    Okay.
23     A    And I told them there would be a

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 53

1 lawsuit coming; I didn't handle that type
2 lawsuit but I would have somebody that did.
3    Q   Okay.  Do you remember -- let me
4 ask you this:  Did you have just one
5 conversation with Globe after you received
6 the May 18th letter?
7    A   I think I probably had two or
8 three.  In fact, I think one of their
9 lawyers called me.
10    Q   Do you remember what lawyer
11 called you?
12    A   No.  It was one of their
13 corporate people.
14    Q   Do you remember if it was a male
15 or female?
16    A   I'm sure it was a male.
17    Q   Okay.  And how about the other
18 folks you talked to, do you remember who
19 they were?
20    A   I can't remember.
21    Q   Okay.
22    A   I can remember getting that
23 letter though, I can remember that.

Page 54

1    Q   Do you remember anything specific
2 that was discussed in relation to the
3 policy, itself, and the coverage issue
4 during any of those calls?
5    A   Yeah.  I told them that I had
6 been assured the money was coming, I had
7 been assured that the claim was fine, they
8 just needed this information.  And, you
9 know, a lot of this stuff, I didn't
10 understand why they needed it but I provided
11 it.  I spent a lot of time getting this
12 information.  I wasn't getting paid to do
13 that.  You know, I did it as favor to her.
14 The whole, you know -- and I just -- it just
15 -- I was incensed when I got this letter.
16 This is what really incensed me.  I don't
17 have a copy of the check, but they put
18 something on there, you know, "If you need
19 anything, we will be glad to help you," or
20 some little --
21    Q   And that's page 2 of the
22 exhibit --
23    A   Yeah.

Page 55

1    Q   Which is Lurie --
2    A   "If we can help you any other
3 way, please tell us."  Yeah.
4    Q   Did any of the Globe
5 representatives that you talked to explain
6 why they made the decision to deny the
7 claim?
8    A   They said it was a corporate
9 decision not to allow it, because they say
10 that the policy had lapsed over a $15
11 premium or something.  And I explained to
12 them that the money had been mailed and
13 that -- before he died, the money had been
14 mailed, they got it before the lapse.  I
15 think it was the day before or a couple days
16 before, but they got their money and they
17 cashed the check.
18    And I said, "You cashed the check,
19 because I have a copy of the cashed check."
20 And they said, "Well, we've sent you a
21 refund for that check."
22    I said, "That's real good.  I'm going
23 to refer her to an attorney that will file

Page 56

1 suit for bad faith against your insurance
2 company.  I don't handle that type case.
3 I've represented insurance companies.  I've
4 been practicing law for 25 years, and I've
5 basically been a defense lawyer most of my
6 time.  And, you know, that's where it's
7 going."
8    And they said, "Well, you go get you
9 somebody real smart."
10    I said, "That's fine."
11    Q   Now, when you said that they
12 received a check before it had lapsed --
13    A   Before that date on there.
14    Q   Before the date on the --
15    A   That January 17th date.  They got
16 the money and put it in the bank before
17 then.
18    Q   What you're saying, that they got
19 it before the date on January 17th?
20    A   Right.
21    Q   That's listed on Exhibit 3,
22 correct?
23    A   That's right.  That's right.

14  (Pages 53 to 56)

## FREEDOM COURT REPORTING

Page 57

1    Q   But you recognize that the policy
2 was already lapsed before they received the
3 premium, because the grace period expired?
4    A   Well, according to this, I mean
5 it tells me, "The benefits of your policy
6 will be reinstated provided the insured is
7 still in good health. We must receive your
8 payment by January 17th." They got their
9 payment. It was mailed before he died. It
10 wasn't mailed after he died. They got the
11 check after he died, but it was mailed
12 before he died.
13    Q   Okay. But wouldn't you recognize
14 that the term reinstatement means that the
15 policy was lapsed, that there no longer was
16 coverage?
17    A   Well, they're telling him he's
18 got coverage. If he had been alive he'd had
19 coverage.
20    Q   Well, you don't read that as
21 offer to reinstate the policy, as opposed to
22 an opportunity --
23    A   It's like a late fee or

Page 58

1 something. I mean, they're talking about
2 $15 or $20. I mean, you know, get
3 realistic. If this was a thousand dollar
4 premium or something, I can see it being a
5 big deal.
6        (Whereupon, Defendant's
7        Exhibit Number 9 was marked and
8        attached to the deposition.)
9 BY MR. POUNDSTONE
10    Q   I'm going to show you what I
11 marked as Exhibit 9, and I will give you the
12 opportunity to look over that. Just let me
13 know when you're ready.
14    A   Go ahead.
15    Q   Okay. Have you seen that
16 document before?
17    A   I'm sure I have.
18    Q   Okay.
19    A   I don't know. I don't know if
20 I've seen this one or not.
21    Q   And I will represent to you that
22 is the Globe policy that Ms. Lurie has
23 produced in this lawsuit. Do you recall if

Page 59

1 you ever saw that policy?
2    A   Yeah, I probably did.
3    Q   Okay. And, actually, if you look
4 at the top of the document, it appears to
5 have a faxed tag line that shows that it was
6 either faxed to or from your office at some
7 point. And I don't believe the date is
8 clear enough to be able to read. Is that
9 correct?
10    A   Yeah. Right. I must have faxed
11 this -- I don't know if I faxed it to -- I
12 faxed it 10/02. I can't see when it was.
13    Q   Could be either January 21st or
14 June 21st.
15    A   I don't know.
16    Q   Okay. Do you recall whether or
17 not you reviewed the policy before you had
18 those first and second phone conversations
19 with someone at Globe?
20    A   I can't remember.
21    Q   Do you recognize whose
22 handwriting that is on this policy?
23    A   No. It's not mine. I'm sure I

Page 60

1 had a copy of this when I mailed them the
2 initial stuff, the death certificate and all
3 that. It's got a thing in here where you've
4 got to send them a notice of death, or
5 whatever, and I sent that letter on
6 January 26th.
7    Q   Would you turn to the page of
8 that document that is Bates stamped Lurie
9 0013.
10    A   I'm looking at it.
11    Q   Okay. Do you see the bottom,
12 last paragraph on that page, where it says,
13 "Termination of coverage"?
14    A   Yeah.
15    Q   Would you read that for me?
16    A   "Coverage of any insurance will
17 terminate at the end of grace period
18 following and premium due date for which
19 insured's fee for required premium is not
20 paid. A premium paid for any period after
21 the date coverage terminates will
22 constitute -- continue the insurer's
23 coverage in force and will be returned

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 61

1 unless accepted by us under the
2 reinstatement provision of the certificate."
3    Q    Now, sitting here today reading
4 that provision, would you acknowledge that
5 pursuant to the policy, any premiums
6 received after the grace period would only
7 continue the policy if the reinstatement
8 provisions were met?
9    A    There's several ways to get it
10 back in force if they say it wasn't in
11 force.
12    Q    But you recognize that that
13 policy language requires in order to keep
14 the policy from terminating, that the
15 reinstatement provisions in the policy be
16 met?
17    A    You have to pay up what you owe I
18 guess is what they're saying.
19    Q    Turn to the next page.
20    A    Which one?
21    Q    Lurie 0014.
22    A    Okay.
23    Q    And do see there's definition,

Page 62

1 the fourth paragraph down from the top, of
2 grace period?
3    A    Yeah.
4    Q    Read that definition for me.
5    A    "Grace period. A grade period of
6 31 days will be allowed each insured for the
7 payment of each premium after the first
8 during which period his or her insurance
9 shall continue in force."
10    Q    Okay. Now, do you recognize or
11 you would agree that pursuant to that
12 language, the grace period on the policy
13 extends for a period of 31 days past the
14 date that the premium is due, correct?
15    A    That's right.
16    Q    Okay. And you don't dispute in
17 this case that the grace period had lapsed
18 before Globe received the premium on
19 January 16th, do you?
20    A    No, it hadn't.
21    Q    Okay. And you don't dispute the
22 fact the grace period had run before
23 Mr. Lurie's death on January 6th, do you?

Page 63

1    A    It had.
2    Q    And it also run before Ms. Lurie
3 said she placed a check in the mail on
4 January 4th, correct?
5    A    That's right. It had about a
6 week, I think.
7    Q    Now, if you drop down to the next
8 line and read the provisions for
9 reinstatement, the next paragraph.
10    A    "Coverage may be reinstated
11 anytime within one year after default in
12 premium payment if the insured provides
13 evidence of insurability satisfactory to us
14 and all overdue premiums are paid."
15    Q    Okay. Now, pursuant to that
16 language, you would agree that in order to
17 reinstate the policy, two things were
18 required, correct, one of those?
19    A    That's what this says, yes.
20    Q    One of those being evidence of
21 insurability satisfactory to Globe?
22    A    Yes.
23    Q    And, two, that all overdue

Page 64

1 premiums are paid, correct?
2    A    Yeah.
3    Q    Now, if you go to the first
4 paragraph under that same page --
5    A    Is that 14?
6    Q    Yes, Lurie 14.
7    A    All right.
8    Q    And read the provisions for
9 payments. It's the first paragraph.
10    A    "Each premium a payable in
11 advance at our administrative office."
12    Q    Okay. Now, sitting here, you
13 acknowledge that pursuant to the policy,
14 payments are made at Globe's administrative
15 office, correct?
16    A    I assume so.
17    Q    And it doesn't say payments are
18 made when they're put in the mail, does it?
19    A    No.
20    Q    If you will, go back to Lurie
21 0013.
22    A    Okay.
23    Q    And drop down to the definition

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 65

1 for evidence of insurability, and it's one,
2 two, three, four, five, six, seven, the
3 seventh definition down from the top.
4     A   Okay. "Satisfaction proof is
5 determined by us that a person is acceptable
6 for insurance."
7     Q   Okay. Now, surely you'd
8 acknowledge that a deceased man is not
9 acceptable for life insurance, wouldn't you?
10     A   That's a stupid question. Of
11 course not.
12     Q   If you would, for me, just one
13 more provision of the policy I want you to
14 take a look at. If you would, go to Lurie
15 0014.
16     A   Okay.
17     Q   Under the general provisions, and
18 if you drop down, the seventh paragraph,
19 Entire Contract Changes, will you read that
20 provision for me?
21     A   "The certificate with group
22 policy enrollment and attached papers, if
23 any, is the entire contract between you and

Page 66

1 us, no changes in this certificate will be
2 effective until approved by us. This
3 approval must be noted or attached to the
4 certificate."
5     Q   In the entire you were handling
6 this matter for Ms. Lurie, you never
7 received any written modification of this
8 insurance policy, did you?
9     A   All of it was oral.
10     Q   So --
11     A   The only thing written I received
12 was this letter from them.
13     Q   So your contentions, at least in
14 this case, is that Globe somehow orally
15 modified the terms of this policy, is that
16 correct?
17     A   I'm not making any contentions.
18         MR. SANSPREE: He's just a
19         witness.
20     A   I'm just a witness, and I'm
21 telling what happened. That's up for a
22 judge to determine whether or not this
23 contract is enforceable or not.

Page 67

1         (Whereupon, Defendant's
2 Exhibit Number 10 was marked and
3 attached to the deposition.)
4 BY MR. POUNDSTONE
5     Q   Okay. I'll show you what I'm
6 going to mark as Exhibit 10 --
7     A   Okay.
8     Q   -- and ask if you've seen that
9 document before?
10     A   Yeah.
11     Q   Okay. Is that -- well, tell me
12 what that document is.
13     A   That's an affidavit I executed on
14 November the 2nd of this year.
15     Q   Okay. Is that your
16 understanding, that this was executed in
17 connection with Ms. Lurie's brief and
18 opposition to our summary judgment motion?
19     A   Actually, I don't know why --
20 what the purpose of it was.
21     Q   It is your affidavit?
22     A   But it's my affidavit and
23 everything in it is true.

Page 68

1     Q   Okay. That was my question.
2 Everything in that affidavit is accurate,
3 correct?
4     A   Yeah.
5     Q   Okay. Is there anything in that
6 affidavit that you think needs further
7 explaining?
8     A   It says it pretty good. The only
9 thing that's not in the affidavit concerning
10 this is the extra things they asked me to
11 provide you --
12     Q   Which we talked about. The
13 additional information --
14     A   Yeah, we talked about that.
15     Q   -- requested in that February
16 letter?
17     A   Doctors' statements, medical
18 records, medical history, that type thing.
19     Q   Okay. There's two exhibits
20 referenced in that affidavit that were not
21 attached when the brief was filed, and just
22 so -- and I think we've already got them --
23     A   They're in.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 69

1    Q  -- into evidence here.  Okay.
2  let's just reference the Exhibit Numbers
3  just so that we get that on the record.  The
4  January 26th letter that is referenced in
5  your affidavit as Exhibit A?
6    A  Right, I've seen it.
7    Q  Is what we marked as Exhibit 4,
8  the letter that's referenced in that
9  affidavit?
10    A  Right.  I assume that's the same
11  letter.
12    Q  And I'm showing you what we
13  earlier marked as Exhibit 8.
14    A  Right.
15    Q  Is that the letter that is
16  referenced in your affidavit and indicated
17  that it will be attached as Exhibit B?
18    A  Right.
19    Q  Okay.  I see that you've got some
20  files here with you today.
21    A  Yeah.
22    Q  Do you mind if I glance through
23  there to see if there's any documents that I

Page 71

1  that is the letter that you sent me in
2  response to the subpoena that we issued,
3  correct?
4    A  Yeah.
5    Q  Okay.
6    A  Yeah.  Yeah.
7    Q  That is -- well, do you want --
8  is that something -- let me ask you, I may
9  mark it, I may not.  Is that something that
10  you've done since this lawsuit was filed or
11  is that something that you made back in
12  January of 2004?
13    A  No, this is recent.
14    Q  Okay.
15    A  I just wrote down just to remind
16  myself.
17    Q  Okay.  I don't have any other
18  questions.
19    MR. SANSPREE:  I don't have
20    anything.
21
22
23

Page 70

1  don't have.
2    A  Be my guest.
3    Q  Okay.
4    A  You know, that's -- I don't know
5  if there's -- most of this stuff is
6  connected with this lawsuit.  I've just been
7  throwing it in a file.
8    MR. POUNDSTONE:  Chris, do you
9    want to look through it first to
10    see if anything --
11    MR. SANSPREE:  I know we gave you
12    a letter one time.
13    MR. POUNDSTONE:  Why don't we go
14    off the record and let Chris look
15    at it.
16    (Off-the-record.)
17    (Whereupon, Defendant's
18    Exhibit Number 12B was marked and
19    attached to the deposition.)
20  BY MR. POUNDSTONE:
21    Q  Show you what I'm going to mark
22  as Exhibit 12B, which is a letter from you
23  to me.  And just to put it in the record,

Page 72

1       CERTIFICATE
2  STATE OF ALABAMA
3  COUNTY OF BUTLER
4    I hereby certify that the above and
5  foregoing deposition was taken down by me in
6  stenotype and the questions and answers
7  thereto were transcribed by means of
8  computer-aided transcription, and that the
9  foregoing represents a true and correct
10  transcript of the testimony given by said
11  witness upon said hearing.
12    I further certify that I am neither of
13  counsel, nor of kin to the parties to the
14  action, nor am I in anywise interested in
15  the result of said cause.
16
17  _____
      RENNY MCNAUGHTON
18    Notary Public
19    My Commission Ends 11/06/07
20
21
22
23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

**A**

able 59:8
accept 35:13
acceptable 65:5
  65:9
accepted 61:1
accident 1:10
  14:11 20:1,2
  20:19 45:7
  47:18
accurate 15:21
  16:22 68:2
acknowledge
  61:4 64:13
  65:8
acting 6:4
action 72:14
actual 10:8
  16:13
Adams 5:6
addition 13:20
additional 37:16
  49:7 52:1
  68:13
address 51:11
addressed 46:14
  51:7
addresses 47:7
administrative
  64:11,14
administrator
  24:23
advance 64:11
advised 3:11
affairs 15:11
affidavit 4:16
  67:13,21,22
  68:2,6,9,20
  69:5,9,16
ago 12:6 18:2
  31:4
agree 44:7 62:11
  63:16
agreed 2:2,11,18

34:10
ahead 58:14
al 1:11 5:16
Alabama 1:2,20
  2:8 3:5 5:6,8
  6:2,3,5,9 72:2
alive 57:18
Allen 5:13
allow 55:9
allowed 62:6
alluded 21:5
amended 3:6
amount 18:10
Andrews 14:2
  22:6
answers 72:6
anybody 23:14
  35:19 38:22
  39:1
anytime 63:11
Anyway 34:20
anywise 72:14
appealed 12:11
  12:13,16
Appeals 12:12
appears 59:4
appointment
  15:23 16:2
approval 41:21
  66:3
approve 41:1,4
  41:12
approved 30:14
  30:16,17 33:3
  38:4 41:2 66:2
approximate
  51:16
approximately
  2:10 6:9
April 51:13
Arant 5:5
article 47:4
asked 8:19 17:2
  19:21 22:23

23:6 38:1 52:5
  68:10
asking 31:17
assert 8:12,18
assign 2:23
assume 8:4
  11:18 13:19
  43:18 64:16
  69:10
assumed 23:20
  26:13
assured 29:12
  32:22 54:6,7
attached 9:5
  11:6 37:4,9
  42:7 44:3,16
  46:10 49:16
  50:22 58:8
  65:22 66:3
  67:3 68:21
  69:17 70:19
attachment
  10:17
attack 47:17
attending 46:20
attorney 7:3 8:2
  8:9 55:23
attorney/client
  8:12,15,18
autopsy 31:19
Avenue 5:7
aware 15:7
  35:20 36:16
  42:9
a.m 2:10 6:10

**B**

B 4:5,19 69:17
back 12:15 16:1
  18:22 20:16
  21:2 26:23
  30:21 41:5
  45:8 52:7,15
  61:10 64:20

71:11
bad 56:1
bank 56:16
basically 22:6
  24:13,19 29:1
  29:2,14 30:10
  30:12 32:13
  36:10 56:5
Bates 60:8
Beasley 5:13
behalf 25:6
believe 9:22
  14:11 15:17
  20:22 37:6
  59:7
beneficiary
  46:20
benefits 44:3
  57:5
better 15:13
beyond 35:20
  36:2,15 37:16
big 58:5
bills 10:19 29:1
  11:16 21:20
bit 17:14 40:11
  41:8
blood 47:16
books 16:1,2
bottom 60:11
Bradley 5:5
break 10:14
brief 67:17
  68:21
briefly 52:7
brought 17:6,20
  18:5 42:16
  46:17
bunch 50:4
Bush 6:22
BUTLER 72:3

**C**

C 5:1
call 10:3 16:8,11

20:22 21:7
  22:1 23:17,19
  24:12 25:4,11
  26:3,21 27:6,8
  27:11,14,15,16
  28:10,13 29:11
  30:21,22 31:3
  31:6 32:6,19
  32:20 34:12
  37:17 39:8
  45:12,16
called 8:6 13:12
  13:18,23 14:21
  19:18,20 20:6
  21:12 23:12
  26:4 27:1,4,5
  31:14,16 42:21
  42:21,23 45:8
  46:6 47:9
  52:19 53:9,11
calling 25:5 32:2
  52:21
calls 10:2,9,12
  11:16 21:20
  30:11 31:11,13
  38:9,19,21
  39:12 48:7
  54:4
cancel 36:9
cancelled 39:5
car 14:8 47:13
  48:3
case 1:5 7:17
  12:4,11,12,21
  14:3,5,5,6,15
  16:23 17:2
  20:9 22:7
  48:15 56:2
  62:17 66:14
cashed 35:15
  55:17,18,19
cause 6:12 72:15
caused 47:18
Center 5:6

# FREEDOM COURT REPORTING

Page 74

certain 23:4
26:12,15 28:18
certainly 8:13
8:21
certificate 18:22
19:23 20:19
45:8 46:23
60:2 61:2
65:21 66:1,4
72:1
certificates 17:9
certify 6:4 72:4
72:12
chance 44:1
changes 65:19
66:1
check 16:13
18:8,12,16
24:18,22 26:2
26:14,17 30:6
30:6,18 32:9
33:3,5,6,18
34:6,14 35:14
35:15,16,20
36:6,9,17 37:8
38:5,6 39:19
40:20 49:11
54:17 55:17,18
55:19,21 56:12
57:11 63:3
checks 29:3 40:3
check's 29:13
Chris 13:8,9,9
13:12,14,16,22
15:1 16:6,16
44:8 70:8,14
Christmas 29:2
Christopher
5:12
Chris's 15:3
circumstances
39:2
City 7:7 10:4
11:17

Civil 3:5 6:6
12:12
claim 17:10
19:22,22 23:7
24:18 26:22
29:17 31:8
33:12 38:5
45:2 48:20
54:7 55:7
claims 23:1,2,6
Clayhatchee 7:7
clear 21:4 41:7
48:9 59:8
clearly 48:16
client 20:5 33:4
collision 47:21
come 12:1 34:23
coming 30:14
33:3,5,7 38:5,6
53:1 54:6
commencing 2:9
6:9
Commerce 5:6
5:15
Commission
72:19
Commissioner
1:17 6:4
companies 49:3
56:3
company 1:11
11:19 17:11
18:9 56:2
Complaint
13:13
compliance 2:15
computer-aided
72:8
concerned 11:14
concerning 15:3
16:5 19:5
23:18 25:9,13
35:4 39:12
43:2 45:2,6

68:9
concerns 24:5
conducting
48:11
confirmed 42:20
confirms 43:8
connected 70:6
connection
13:21 14:17
67:17
considered
18:18 34:2,7,8
constitute 60:22
contact 16:4
contentions
66:13,17
continue 60:22
61:7 62:9
contract 65:19
65:23 66:23
conversation
22:12 37:20,21
53:5
conversations
23:14 24:2,6
25:9,13,17
37:16 43:6
59:18
copy 9:10 10:14
20:12 54:17
55:19 60:1
corporate 53:13
55:8
correct 7:17
11:17 13:22
37:9 50:14,18
51:8,13 56:22
59:9 62:14
63:4,18 64:1
64:15 66:16
68:3 71:3 72:9
counsel 2:4,20
2:22 6:7 72:13
County 12:10,11

72:3
couple 15:14,15
16:17 17:8
27:1,14 33:18
55:15
course 65:11
Court 1:1 2:6,16
3:12,13 6:1
12:12,14
coverage 32:17
32:18,23 54:3
57:16,18,19
60:13,16,21,23
63:10
covered 8:15
18:15 33:2,19
Crow 5:13
custody 12:3,8,9
13:5,20 14:15

_____

## D

D 1:18 2:5 3:6
4:1 6:1
damn 52:12
date 6:5 26:14
28:19,21 46:7
52:15 56:13,14
56:15,19 59:7
60:18,21 62:14
dated 50:13,17
51:12
dates 52:16
daughter 12:4
David 13:1,10
13:11,13
day 2:9 3:9 6:10
17:7,8 18:13
19:19 20:23
21:2,3,3,8
25:21,22 29:6
33:16 34:23
40:8 55:15
days 17:8 27:1
27:14 33:18

40:9 55:15
62:6,13
dead 31:20
33:20
deal 58:5
dealings 12:17
death 13:22 14:6
14:14 15:3
16:5,20,21,23
17:1,9 18:22
19:23 20:9,19
32:18 40:15
45:7 46:23
60:2,4 62:23
deceased 44:10
65:8
December 1:19
2:9 3:10 6:10
decision 55:6,9
default 63:11
DEFENDANT
5:3
Defendant's 4:6
9:3 11:4 37:2,7
42:5 44:14
46:8 49:14
50:20 58:6
67:1 70:17
Defendant(s)
1:12
defended 49:2
defense 56:5
definition 61:23
62:4 64:23
65:3
delivering 3:7
Denial 33:12
denied 31:7
deny 55:6
department
22:21 23:2,6
28:6 31:15
49:13
deposition 1:14

# FREEDOM COURT REPORTING

2:4,13,14 3:2
4:7 8:8,20 9:6
9:10,11 11:7
37:4 42:7
44:16 46:10
49:16 50:22
58:8 67:3
70:19 72:5
**depositions** 2:17
**determine** 66:22
**determined** 65:5
**diabetic** 47:15
**dialed** 21:10
**died** 15:15,16
28:20 29:22
33:22 34:15,17
34:19,20 36:5
43:10,11 55:13
57:9,10,11,12
**difference** 35:4
**different** 41:8
**discuss** 34:1
39:1
**discussed** 26:22
30:23 31:11
32:19,21 37:17
54:2
**discussing** 17:17
17:22 25:4
27:10 29:10
**discussion** 23:17
**discussions** 19:4
35:3,8 36:13
39:17 40:1
43:1
**dispute** 62:16,21
**DISTRICT** 1:1
1:2
**DIVISION** 1:3
**divorced** 12:7
**divulge** 8:14
**doctors** 47:7
68:17
**document** 42:11

43:17 44:20
58:16 59:4
60:8 67:9,12
**documents** 9:12
9:14,17,20
19:9 23:8
37:23 38:1
40:23 69:23
**doing** 8:4
**dollar** 58:3
**dollars** 19:17
26:9 29:15
**Dothan** 7:8,11
14:2
**driver** 14:7,8
47:22 48:2
**driving** 14:10
**drop** 63:7 64:23
65:18
**due** 60:18 62:14
**duly** 6:16

———————

**E**

**E** 4:1,5 5:1,1,4
57:3
**earlier** 21:12
44:23 69:13
**effect** 2:14
**effective** 3:6
66:2
**eight** 38:10
**either** 21:1 52:4
59:6,13
**employee** 40:12
**Ends** 72:19
**enforceable**
66:23
**enrollment**
65:22
**entered** 8:22
**entire** 65:19,23
66:5
**et** 1:11
**evidence** 3:2
8:22 63:13,20

65:1 69:1
**Evidently** 50:4
**exactly** 16:3
**examination** 4:2
6:12,18
**examined** 6:16
**executed** 67:13
67:16
**exhibit** 9:4,9,11
10:15 11:5
33:10 37:3,7
42:6,11 44:15
44:19 46:9,13
49:15,19 50:11
50:21 51:3
54:22 56:21
58:7,11 67:2,6
69:2,5,7,13,17
70:18,22
**exhibits** 3:10 9:9
11:11 68:19
**expect** 8:5
**expired** 42:2
57:3
**explain** 55:5
**explained** 40:19
55:11
**explaining** 68:7
**extends** 62:13
**extensive** 12:17
**extra** 36:7 68:10

———————

**F**

**fact** 16:15 29:4
32:23 42:13
46:6 53:8
62:22
**facts** 42:10
**fairly** 18:9
**faith** 56:1
**far** 11:13 24:20
39:15
**favor** 54:13
**faxed** 4:15 59:5

59:6,10,11,12
**February** 10:7
49:5 50:10
68:15
**fee** 57:23 60:19
**feel** 28:1,21
31:18
**fellow** 26:11
43:9
**felt** 18:15 28:14
34:11
**female** 22:18,19
27:23 28:1,6,9
53:15
**figure** 48:21
**file** 8:23 17:17
19:21,22 21:17
21:23 22:2,6
23:7 55:23
70:7
**filed** 3:13 12:8
12:15 68:21
71:10
**files** 69:20
**final** 41:20
**find** 17:12 20:14
32:14
**fine** 23:21 43:12
54:7 56:10
**first** 6:16 15:6
17:16 19:2,19
20:22 21:8
23:10,16,21
25:4,11,15,19
26:21 27:11
28:10 29:6
37:19 38:1
42:17 43:22
45:1,12 59:18
62:7 64:3,9
70:9
**Firstly** 16:23
**five** 47:8 65:2
**flags** 48:18

**floating** 21:17
**folks** 53:18
**following** 6:13
60:18
**follows** 6:17
**force** 2:14 8:14
24:4 25:10
31:1,12 37:18
39:14 40:13
41:13,17,17
60:23 61:10,11
62:9
**foregoing** 6:6
72:5,9
**forget** 36:8
**forgot** 29:3
**form** 2:21 40:17
**four** 65:2
**fourth** 62:1
**Friday** 40:4
**full** 2:15 6:20
**funeral** 34:23
**further** 2:11,18
68:6 72:12

———————

**G**

**general** 65:17
**getting** 53:22
54:11,12
**girl** 12:8
**give** 10:18 20:15
36:7 58:11
**given** 72:10
**glad** 54:19
**glance** 69:22
**Globe** 1:10
11:19 14:16
15:7 16:22
17:17 19:5,6
19:11 20:17
21:8,20 22:1,8
24:7 31:1
32:16 35:4,20
39:2,7 40:12

# FREEDOM COURT REPORTING

41:10 44:9
45:2,13,17
49:6 51:16
52:2 53:5 55:4
58:22 59:19
62:18 63:21
66:14
**Globe's** 64:14
**go** 6:23 36:21
49:19 52:7,15
56:8 58:14
64:3,20 65:14
70:13
**goes** 13:14
**going** 8:13 10:15
11:9,10,11
16:1 18:6,23
23:22 24:17
29:7 30:18
32:7,8,9,10,11
36:9 41:17
44:18 46:12
48:22 49:18
51:2 55:22
56:7 58:10
67:6 70:21
**good** 44:5,8,11
55:22 57:7
68:8
**gotten** 33:10
46:5
**grace** 30:2,4
35:5,6,21 36:3
36:14,15 42:2
42:4 57:3
60:17 61:6
62:2,5,12,17
62:22
**grade** 62:5
**Greenville** 6:2
**grounds** 2:23
**group** 65:21
**guess** 13:9 23:1
23:4 61:18

**guest** 70:2
**guy** 40:21 47:20
47:23

## H

**H** 4:5
**handing** 37:6
**handle** 25:2 53:1
56:2
**handled** 14:2,4
25:2
**handles** 23:1
**handling** 66:5
**handwriting**
43:16 59:22
**happened** 40:20
66:21
**happens** 18:20
**head** 20:4 47:23
48:18
**head-on** 47:21
**health** 44:5,8,11
57:7
**hear** 41:2 52:10
**heard** 23:21
27:7 35:11,22
36:2 41:16
**hearing** 72:11
**heart** 47:17
**help** 17:4,5
19:22 22:4
37:11 54:19
55:2
**helped** 15:2
**Henry** 12:10,11
**history** 25:17
68:18
**hit** 47:23 52:11
**hold** 43:13
**honor** 36:5
**huh-uh** 43:18
**hundred** 19:16
**husband** 12:7,23

## I

**idea** 22:13
**identify** 25:5
**incensed** 52:13
52:13 54:15,16
**indicated** 15:18
69:16
**indicating** 31:7
**industry** 48:13
49:1
**information**
49:7 51:17
52:2 54:8,12
68:13
**initial** 19:10
22:11 26:3
60:2
**insignificant**
18:10
**instances** 8:11
**instructed** 38:6
**insurability**
63:13,21 65:1
**insurance** 1:10
14:16 15:1
17:2 22:5
48:13 49:1,2
56:1,3 60:16
62:8 65:6,9
66:8
**insured** 44:5
57:6 62:6
63:12
**insured's** 60:19
**insurer's** 60:22
**interested** 72:14
**investigation**
20:11 49:8
51:18
**investigations**
48:12
**involving** 12:4
16:21
**issue** 32:17
45:21 46:1

54:3
**issued** 71:2
**issues** 16:20
**IV** 5:4

## J

**January** 15:17
15:19 16:10
33:14 34:15
44:6 56:15,19
57:8 59:13
60:6 62:19,23
63:4 69:4
71:12
**job** 29:4
**Jr** 6:22
**judge** 7:3,6,12
7:14 66:22
**judgment** 67:18
**June** 59:14

## K

**Karen** 1:6 11:20
**keep** 11:13 16:3
61:13
**kept** 15:23 16:2
32:1
**killed** 13:8 14:1
15:10 16:16
18:13 26:11
29:8 40:5,9,10
40:21 47:13,21
48:2,3
**kin** 72:13
**kind** 7:12
**knew** 13:15 46:4
**know** 10:11 12:1
12:20 13:11,16
15:13 17:10
19:1,12,15
20:2,10,20
21:14,16 22:5
23:8 24:19
25:1,22 26:7
26:12,17 28:14

28:20 29:13
30:11,12 31:21
31:22 32:4,6,8
32:11,15,15,18
33:15 36:8
37:13,19 38:2
38:22 40:8,19
41:14,23 42:3
42:4,13,15
43:12,19 45:4
45:10 46:18,21
46:23 47:3
48:4,11,16
49:21 50:5,15
52:19 54:9,13
54:14,18 56:6
58:2,13,19,19
59:11,15 67:19
70:4,4,11
**knowledge**
48:10
**known** 11:20

## L

**L** 2:1
**lady** 30:12 38:5
40:20
**language** 61:13
62:12 63:16
**lapse** 18:6 35:7
55:14
**lapsed** 23:19
55:10 56:12
57:2,15 62:17
**Large** 2:7 6:4
**late** 28:15 34:8
35:5 36:7,14
36:14 57:23
**law** 18:17 38:23
56:4
**laws** 2:16
**Lawson** 50:15
**lawsuit** 7:23 8:3
15:8 53:1,2

58:23 70:6
71:10
**lawyer** 11:1 14:1
24:20 34:10
53:10 56:5
**lawyers** 49:13
53:9
**leading** 2:21
**learned** 18:17
**legal** 28:6 31:14
49:13
**letter** 4:9,10,11
4:12,13,14,19
9:23 17:11,13
18:23 19:6,10
23:23 26:19
30:19 31:7
33:7,12 35:12
36:3,17,20
37:8 41:6 43:3
45:1,3,5,6,12
45:18,21 46:13
46:16 49:5,20
50:3,10,13,17
51:4,12 52:8,9
52:12 53:6,23
54:15 60:5
66:12 68:16
69:4,8,11,15
70:12,22 71:1
**letterhead** 49:22
**let's** 10:3 20:14
20:15 24:10
34:13 52:7
69:2
**life** 1:10 14:16
14:23 48:13
65:9
**Limine** 8:23
**line** 59:5 63:8
**listed** 56:21
**little** 12:8 17:14
37:10 41:8
54:20

**livid** 47:19
**LLP** 5:5
**long** 11:20 26:11
28:18 30:5
33:17,21 40:22
43:10 49:3
**longer** 51:19
57:15
**look** 26:9 31:20
41:19 47:20
49:22 52:18
58:12 59:3
65:14 70:9,14
**looked** 50:11
52:15
**looking** 10:1
37:1 48:17
60:10
**lost** 12:14,16
34:6
**lot** 51:19 54:9,11
**Lurie** 1:6 7:16
8:10 11:21
12:2 13:1,10
13:14,21 14:19
15:1,2 16:6
17:18 20:23
26:16 32:6
39:18 41:23
42:16 43:2,18
44:8 46:14
52:4 55:1
58:22 60:8
61:21 63:2
64:6,20 65:14
66:6
**Lurie's** 13:22
40:15 62:23
67:17
**L.S** 50:15

**M**
**mail** 16:9 18:16
29:3,13 34:6,7

36:9 39:20
40:4,19 42:1
63:3 64:18
**mailed** 18:8,12
26:2,10,13
28:17,19 29:21
29:22 30:8
35:20 40:7,20
55:12,14 57:9
57:10,11 60:1
**mailing** 34:3
**mails** 30:6
**making** 66:17
**male** 22:17
27:23 28:5
53:14,16
**man** 29:22 47:13
65:8
**March** 10:3
50:14,18 51:21
52:18
**mark** 11:9,11
14:2 22:5 25:2
67:6 70:21
71:9
**marked** 9:5,9
11:6 36:20
37:3,7 42:6,10
44:15,19 46:9
46:13 49:15,19
50:11,21 51:3
58:7,11 67:2
69:7,13 70:18
**married** 13:1
**matter** 14:15,15
66:6
**matters** 13:3
14:17,18
**Matthews** 1:15
2:5,8 6:8,11,15
6:22
**McNaughton**
1:18 2:6 3:7
6:1 72:17

**mean** 15:13 26:3
30:5 31:3,18
32:8 41:22
45:9 47:19
48:9,10,17
49:21 57:4
58:1,2
**means** 57:14
72:7
**medical** 68:17
68:18
**memo** 21:22
**memory** 37:14
**mention** 45:20
45:23
**met** 61:8,16
**Methvin** 5:13
**MIDDLE** 1:2
**Midland** 7:7
**Miles** 5:14
**mind** 69:22
**mine** 20:5 43:20
59:23
**minutes** 10:6,7
**modification**
12:9 66:7
**modified** 66:15
**Monday** 34:18
34:19,21 35:2
**money** 18:6,10
18:11 22:5
24:21 29:20
30:13 33:1
42:22 43:8
46:5 54:6
55:12,13,16
56:16
**Montgomery**
5:8,16
**months** 41:6
**motion** 8:23
67:18
**motorcycle** 29:7
48:1

**moved** 7:11
**Municipal** 7:14

**N**
**N** 2:1 4:1 5:1
**name** 6:21 13:11
13:17 24:21
**names** 38:12,16
47:7
**necessary** 2:19
**need** 32:15
37:18 38:4
54:18
**needed** 17:4,9
19:21 23:8,9
24:14 49:7
51:17 54:8,10
**needs** 68:6
**neither** 72:12
**never** 30:18 39:4
41:16 42:9
48:23 66:6
**new** 29:4
**newspaper** 47:4
**Newton** 7:8
**nice** 52:11
**nickname** 13:17
**Notary** 2:6 6:3
72:18
**note** 37:10
**noted** 66:3
**notice** 4:7 9:10
44:3 60:4
**noticed** 7:15
**November** 67:14
**number** 10:5
16:20 21:11,14
25:6 37:3 42:6
44:15 46:9
49:15 50:21
52:20 58:7
67:2 70:18
**numbers** 9:4
10:22 11:5

# FREEDOM COURT REPORTING

69:2

**O**

**O** 2:1
**Obituary** 47:2
**object** 8:21
40:16
**objections** 2:20
2:23
**obtain** 52:2
**obviously** 8:8
23:3 29:21
51:7
**offer** 57:21
**offered** 3:2 8:20
**office** 21:18 40:7
59:6 64:11,15
**offices** 2:7 6:8
**Off-the-record**
70:16
**Oh** 25:7 31:9,9
45:14 46:17
**okay** 7:9,12,19
7:21 9:16,19
10:10,20 11:9
11:15 12:1,19
12:22 14:7,11
15:16,22 16:8
16:12,18 17:15
19:3,8 20:21
21:15 22:3
23:13,16 24:13
25:3,8,12,23
26:6,21 27:3,9
27:13 28:8,12
28:22 29:9
30:9,21 31:5
31:10 32:12
36:1,12,19
37:13 38:8
39:11,22 42:9
44:23 45:20
46:3 48:23
49:18,20,23

50:6,9,13,17
51:10 52:22
53:3,17,21
57:13 58:15,18
59:3,16 60:11
61:22 62:10,16
62:21 63:15
64:12,22 65:4
65:7,16 67:5,7
67:11,15 68:1
68:5,19 69:1
69:19 70:3
71:5,14,17
**Oklahoma** 10:4
10:4 11:17
**old** 12:5 15:23
**once** 38:3
**opportunity**
57:22 58:12
**opposed** 57:21
**opposition**
67:18
**oral** 3:9 6:12
66:9
**orally** 66:14
**order** 15:11
61:13 63:16
**original** 3:8
**overdue** 39:19
63:14,23
**owe** 61:17
**Ozark** 1:20 2:8
6:8 7:10

**P**

**P** 2:1 5:1,1
**page** 4:2 54:21
60:7,12 61:19
64:4
**paid** 15:5 18:18
18:18 34:2,8
46:1,5 54:12
60:20,20 63:14
64:1

**papers** 65:22
**paragraph**
43:22 60:12
62:1 63:9 64:4
64:9 65:18
**part** 47:11
**particular** 45:22
**parties** 2:3,22
72:13
**party** 7:23 52:3
**part-time** 7:14
**pay** 23:22 29:16
29:18 33:21
61:17
**payable** 64:10
**paying** 16:13
35:5,6 48:19
**payment** 28:16
28:17 30:2
36:2,4 39:12
42:1 44:2,6,9
57:8,9 62:7
63:12
**payments** 25:18
64:9,14,17
**people** 10:12
38:16 53:13
**period** 30:2,4
35:6,7,21 36:3
36:14,15 42:2
42:4 51:16
57:3 60:17,20
61:6 62:2,5,5,8
62:12,13,17,22
**person** 13:10
23:10 24:7
28:3,11 34:9
41:10 65:5
**perturbed** 32:1
32:5,5
**phone** 4:17,18
10:2,9,18
11:16 20:22
21:7,20 22:1

24:12 38:9
39:8,12 48:7
52:16,19 59:18
**physician** 46:21
**picked** 52:14
**pile** 20:13 41:22
**piles** 38:2
**place** 21:23
37:20 38:9
**placed** 63:3
**PLAINTIFF**
5:11
**Plaintiff(s)** 1:8
**please** 3:11 6:20
37:12 44:2
55:3
**point** 18:8,21
24:14 28:4
46:4 59:7
**police** 31:19
47:1
**policies** 15:1
17:3,7,20
**policy** 4:15
14:16 15:7
16:5,22 17:7
17:17,23 18:5
19:5,10,13,14
19:14 23:18
24:4 25:6,10
30:1,23 31:12
36:10 37:18
39:3,13,14
40:13 41:13,16
41:18 44:4
47:11 54:3
55:10 57:1,5
57:15,21 58:22
59:1,17,22
61:5,7,13,14
61:15 62:12
63:17 64:13
65:13,22 66:8
66:15

**Portis** 5:13
**position** 8:17
**post** 18:17 40:7
**Poundstone** 3:8
4:3 5:4 6:19
9:7 11:8 37:5
42:8 44:17
46:11 49:17
51:1 58:9 67:4
70:8,13,20
**practicing** 56:4
**premarked**
11:11
**premium** 25:17
25:18 33:13,22
34:2 35:5,6,13
35:17 37:23
39:13,19,19
40:14 41:14
42:1 44:9
45:21 46:2,5
55:11 57:3
58:4 60:18,19
60:20 62:7,14
62:18 63:12
64:10
**premiums** 61:5
63:14 64:1
**prepare** 21:22
**pressure** 47:16
**pretty** 68:8
**previous** 21:6
**previously** 9:12
41:9
**prior** 3:2 13:1
16:5 19:5,10
40:14
**privilege** 8:13
8:16,18
**probably** 8:23
10:11 11:22
12:5 15:9,12
15:21 16:16
20:7 27:4 32:3

# FREEDOM COURT REPORTING

38:10 43:19 53:7 59:2
**problem** 20:4 26:18,19 28:18 29:13,14 30:9 47:6
**problems** 47:16
**Procedure** 3:5 6:6
**proceeding** 12:22 13:5,20
**proceedings** 6:13
**process** 24:18 49:8
**produced** 58:23
**profession** 7:2
**prompted** 27:15 27:16
**proof** 65:4
**provide** 68:11
**provided** 44:4 52:3 54:10 57:6
**provides** 63:12
**provision** 61:2,4 65:13,20
**provisions** 61:8 61:15 63:8 64:8 65:17
**Public** 2:7 6:3 72:18
**purpose** 67:20
**pursuant** 6:5 61:5 62:11 63:15 64:13
**put** 9:1 10:16 16:9 24:21 36:21 39:18 40:3 42:1 54:17 56:16 64:18 70:23
**P.C** 5:14
**p.m** 10:4

**Q**
**question** 2:22 65:10 68:1
**questions** 2:21 18:14 71:18 72:6

**R**
**R** 5:1
**read** 19:14 43:21,22 57:20 59:8 60:15 62:4 63:8 64:8 65:19
**reading** 2:12 61:3
**ready** 58:13
**real** 13:16 23:4 55:22 56:9
**realistic** 58:3
**really** 29:15 54:16
**reason** 45:22
**recall** 22:8,21 28:12 38:9 51:3 52:1 58:23 59:16
**receipt** 34:3
**receive** 18:19 40:14 44:6 57:7
**received** 9:13 31:6 33:14 42:22 44:9 49:4 51:17 52:9 53:5 56:12 57:2 61:6 62:18 66:7,11
**recognize** 43:16 57:1,13 59:21 61:12 62:10
**recollection** 51:15

**record** 6:21 8:17 9:2 11:1 21:5 36:22 38:19,21 40:2 69:3 70:14,23
**recordings** 21:19
**records** 4:8,17 4:18 10:2,9 11:16 21:7 22:14 38:15 52:16,19 68:18
**red** 48:18
**refer** 14:5 55:23
**reference** 69:2
**referenced** 68:20 69:4,8 69:16
**referred** 14:1 23:11
**refund** 55:21
**refunding** 35:17
**regard** 9:1 35:8 40:2
**reinstate** 57:21 63:17
**reinstated** 23:19 25:14 39:3 44:4 57:6 63:10
**reinstatement** 39:13 57:14 61:2,7,15 63:9
**relating** 2:16 19:9
**relation** 54:2
**relevant** 31:18
**remember** 17:17 17:22 19:4,8 19:12,19 22:17 22:19 23:9 24:11 25:4 27:10,18,19,22 28:2,8,23 29:6

29:10 31:3,5 34:18 37:19 38:12 39:23 42:20 43:1,5 45:11,15 47:20 48:5 52:20 53:3,10,14,18 53:20,22,23 54:1 59:20
**remind** 71:15
**Renny** 1:18 2:5 3:6 6:1 72:17
**report** 14:12 20:19 34:3 45:7 47:1
**Reporter** 2:6 3:12 6:2
**reports** 20:1,3 31:19,19
**represent** 8:10 58:21
**representative** 39:7
**representatives** 55:5
**represented** 12:3 13:5 14:19 56:3
**representing** 7:16
**represents** 72:9
**requested** 9:17 50:8 68:15
**requests** 9:20
**required** 60:19 63:18
**requires** 61:13
**respective** 2:3
**response** 50:10 71:2
**responsive** 9:20
**result** 72:15
**retained** 3:12
**returned** 60:23

**reviewed** 9:16 19:9 59:17
**ridiculous** 47:10
**right** 8:1 11:18 13:2 16:19 24:10 25:20 29:23 43:15 48:18 51:9 56:20,23,23 59:10 62:15 63:5 64:7 69:6 69:10,14,18
**road** 28:5 47:23
**Robert** 3:7 5:4
**rock** 37:14
**roof** 52:12
**Rose** 5:5
**Rule** 3:4
**rules** 2:16 3:5 6:5
**run** 62:22 63:2

**S**
**S** 2:1 4:5 5:1,3 5:11
**Sanspree** 5:12 10:23 40:16 66:18 70:11 71:19
**Satisfaction** 65:4
**satisfactory** 63:13,21
**Saturday** 40:5
**saw** 19:13 42:14 48:8 51:5 52:12 59:1
**saying** 18:5 30:12 56:18 61:18
**says** 11:2 33:13 34:14 37:11 40:22 60:12 63:19 68:8

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

school 18:17
second 21:2,8
  25:21 27:14,15
  27:16 29:10
  30:21 32:19
  34:12 37:17
  39:8 42:17
  43:14 45:16
  59:18
see 10:3 15:19
  16:19 19:13
  20:14,14,15,23
  21:9 34:14
  41:1,12 42:17
  52:16 58:4
  59:12 60:11
  61:23 69:19,23
  70:10
seeing 48:5 51:3
seen 13:7 42:11
  42:14 44:19
  46:15,16 49:20
  49:21 58:15,20
  67:8 69:6
send 17:10 18:6
  24:14,18 32:9
  32:10,11 38:7
  40:22,23 41:11
  41:11,18 44:2
  52:6 60:4
sent 17:11 19:6
  19:11 20:13,16
  20:17,18 22:6
  23:23 24:16
  32:2,3 35:14
  35:15 36:18
  37:23 38:2,3
  41:6,20,21
  43:10 45:2,5,6
  45:12,16 47:1
  47:2,3,4 50:4,8
  50:9 51:5,6,20
  51:20 52:5
  55:20 60:5

71:1
sentence 43:22
served 9:13
set 47:9 48:6
seven 65:2
seventh 65:3,18
show 9:8 11:16
  14:12 17:14
  18:23 21:7
  22:15 36:21
  38:16 42:10
  44:18 46:12
  49:18 51:2
  58:10 67:5
  70:21
showing 69:12
shows 59:5
side 47:22
signature 2:12
  44:21 49:22,23
sir 8:6 9:15
sitting 24:1 29:2
  61:3 64:12
six 51:21 65:2
sixth 34:16,17
smart 56:9
solid 37:15
somebody 19:20
  23:5,11 32:16
  41:19 42:23
  46:6 49:13
  53:2 56:9
SOUTHERN
  1:3
specific 54:1
specifically
  16:21 17:21
  37:19
spent 54:11
spoke 22:15
stage 49:12
stamped 60:8
standard 48:12
starting 29:4

state 2:7 6:3,20
  20:3,5 72:2
statement 46:20
  46:21
statements
  68:17
STATES 1:1
stenotype 72:6
stick 10:15
sticker 10:16
STIPULATED
  2:2,11,18
stipulation 6:7
Street 5:15
strike 40:11
stuff 7:14 8:14
  14:21 20:1,14
  20:18 24:17
  31:17 32:2
  38:2 41:11,19
  41:22 45:7
  48:17,20 50:5
  50:7 54:9 60:2
  70:5
stupid 65:10
subject 8:21
  15:8
subpoena 4:8
  9:12 71:2
substance 43:5
substantive
  23:14
successful 12:10
suicide 31:21
suit 56:1
Suite 5:7
summarized
  21:23
summary 67:18
Super 11:9
Supreme 12:13
sure 14:21 28:1
  28:21 31:15
  36:23 43:4

45:4 51:9
  52:14 53:16
  58:17 59:23
surely 65:7
sworn 6:16
S.J 33:8

---

## T

T 2:1,1 4:5
tag 59:5
take 10:13 12:23
  65:14
taken 2:5 3:9
  20:7 72:5
takes 20:9
talk 16:12,20
  29:23 37:15
  38:22
talked 16:15
  17:1 19:20
  22:9 23:10
  24:16 26:7,8
  27:9,19 28:3,4
  28:9,13 32:16
  33:15 38:13,17
  39:6,8,15
  41:10 45:1
  49:12 50:16
  53:18 55:5
  68:12,14
talking 22:11
  34:9 45:3
  46:19 58:1
telephone 10:2,5
  52:14
tell 7:5 16:2
  24:11 28:12
  32:7,9 37:12
  38:5 40:1,12
  50:3 55:3
  67:11
telling 57:17
  66:21
tells 57:5

ten 27:4 38:10
term 57:14
terminate 60:17
terminates
  60:21
terminating
  61:14
Termination
  60:13
terms 66:15
testified 6:17
  16:9 21:12
testify 8:5
testimony 1:14
  3:9 8:20 15:17
  16:19 21:6
  41:8 72:10
thereto 3:3 72:7
thing 9:22 10:1
  15:12 17:3
  19:2 20:20
  23:9 28:19
  29:21 30:8,17
  34:14 41:2,5
  60:3 66:11
  68:9,18
things 45:9
  46:19 63:17
  68:10
think 8:3 12:13
  13:13 14:9,20
  15:4,4 16:3
  17:6 18:1,4,21
  19:1,13,16,18
  20:11,12,15
  22:23 23:23
  26:2,4,14,18
  27:12 28:4,7
  29:5 30:3
  31:14 34:17,19
  34:19,21 38:23
  39:10 42:20
  43:7 49:11

# FREEDOM COURT REPORTING

52:6,10,17
53:7,8 55:15
63:6 68:6,22
**third** 52:2
**thirty** 29:14
**thought** 15:18
33:6
**thousand** 19:17
58:3
**thousands** 10:21
**three** 18:2 33:4
41:5 48:6 53:8
65:2
**throwing** 70:7
**time** 3:1,1 15:6
16:4 17:16
19:6 23:15,20
24:3 25:15,19
26:12,15 27:5
32:15 33:2,6
35:11 36:1,8
42:17,18 49:3
49:6 51:16
54:11 56:6
70:12
**timely** 29:21
**times** 27:5 31:17
33:5
**today** 8:9,11
9:11 13:4 39:9
39:15 61:3
69:20
**told** 9:23 17:3,9
18:7 19:23
23:7 24:13,19
26:1 30:16
33:4,23 34:4,5
34:22 35:1
36:4,11 39:4
41:4,15,18
43:9 49:11
52:23 54:5
**toll-free** 21:13
52:20

**top** 59:4 62:1
65:3
**transcribed** 72:7
**transcript** 3:8
72:10
**transcription**
72:8
**treated** 47:8
**trial** 3:1 8:5,17
8:21
**troopers** 20:3,5
**trouble** 48:19
**true** 67:23 72:9
**try** 8:14
**trying** 15:11
22:4 24:20
32:14
**Tuesday** 34:18
34:20
**turn** 60:7 61:19
**two** 10:2,18
12:15 15:10
18:13 21:12
24:15 31:4,10
31:13 33:4,16
41:5 48:6 53:7
63:17,23 65:2
68:19
**type** 15:12 17:3
20:20 23:9
38:8 53:1 56:2
68:18
**types** 48:12

## U

**U** 2:1
**Uh-huh** 27:17
51:14
**unable** 35:13
**understand** 8:11
16:18 31:23
48:5 54:10
**understanding**
34:5 49:6

67:16
**unethical** 7:22
**UNITED** 1:1
**unusual** 8:9
40:12 48:14
**usually** 20:9

## V

**v** 1:9
**valid** 18:20
**value** 19:16
**van** 14:9 48:2

## W

**wait** 35:1
**waived** 2:13
30:3
**want** 8:12 9:8
24:15 30:7
33:16 37:15
40:4 52:10
65:13 70:9
71:7
**wanted** 9:1 20:1
20:2 31:18,19
31:23 34:22
43:8 45:7
46:19,22 47:3
**wanting** 32:2
45:9 48:20
**wasn't** 18:11
22:2 23:10
30:4 31:20
33:6 36:16
40:8 41:16
46:1 52:11
54:12 57:10
61:10
**way** 24:11 37:11
55:3
**ways** 61:9
**Wednesday** 26:4
**week** 15:9 24:15
26:10,10 30:7
40:22 63:6

**weekend** 40:6
**weeks** 15:14,15
20:7 51:21
**went** 26:17 48:1
48:18
**weren't** 23:22
29:15 41:17
**we'll** 8:21,22
10:13 29:16,18
36:21 41:11
**we're** 13:4 21:4
30:17 35:13
41:7
**we've** 30:14 33:1
33:2 38:3,4
47:11 55:20
68:22
**White** 5:5
**Whittaker** 33:8
**widow** 24:23
**William** 1:15
2:4,8 6:8,11,15
6:22
**windshield** 48:1
**withdrawn** 7:16
**witness** 2:13
6:11 7:20,23
8:7 66:19,20
72:11
**wondering**
28:15
**work** 13:21 15:2
29:6,7
**worked** 22:22
48:23
**world** 46:22
48:16
**worried** 29:16
**worry** 29:17,19
**wouldn't** 57:13
65:9
**wreck** 47:14
**write** 49:10
**written** 45:1

66:7,11
**wrongful** 14:6
14:14
**wrote** 9:23 33:7
43:19 44:21
71:15

## X

**X** 4:1,5

## Y

**yeah** 7:1,18 8:7
13:15,23 14:13
17:13 22:19
25:7,7,7 26:23
28:11 30:3
31:9 33:11,21
34:13 35:18
37:10 44:22
45:14 46:17,17
50:2,12,19
54:5,23 55:3
59:2,10 60:14
62:3 64:2
67:10 68:4,14
69:21 71:4,6,6
**year** 12:15 63:11
67:14
**years** 7:10 11:22
12:5,6 14:22
16:1,17 18:1
31:4 47:8 56:4
**y'all** 17:11 28:13
29:23 32:19
34:1 35:7
36:12

## $

**$15** 55:10 58:2
**$20** 58:2
**$30** 18:10 30:4
**$33** 33:13 35:14
35:16 36:7,17
**$40** 18:10

# FREEDOM COURT REPORTING

---

**0**

**0013** 60:9 64:21
**0014** 61:21
   65:15

---

**1**

**1** 4:7 9:4,9,9
**1/02/04** 4:9
**1/26/04** 4:10
**1:06-CV-0034...**
   1:5
**10** 4:16 12:6
   67:2,6
**10th** 10:3 52:18
**10/02** 59:12
**10/17/06** 4:19
**10:00** 2:10 6:9
**11** 4:17,17 11:5
   11:12,15
**11.3** 10:7
**11/06/07** 72:19
**12** 4:18,19 11:12
**12A** 11:5,15
**12B** 70:18,22
**12th** 15:19
**14** 7:10 64:5,6
**15** 3:6 10:12
   11:22 12:6
**16th** 33:14 34:15
   62:19
**17th** 43:9 44:6
   56:15,19 57:8
**18th** 10:7 24:1
   33:9 36:3,19
   37:8 52:8 53:6
**1988** 3:6

---

**2**

**2** 4:8 9:4,9,11
   54:21
**2nd** 50:14,18
   51:21 67:14
**2/03/04** 4:11
**2:15** 10:4

---

**20** 11:22 12:5
**2004** 18:3,4
   33:14 44:6
   49:5 51:13
   71:12
**2006** 1:19 2:9
   3:10 6:10
**21** 1:19 12:5
**21st** 2:9 3:9 6:10
   59:13,14
**218** 5:15
**25** 56:4
**26th** 51:13 60:6
   69:4

---

**3**

**3** 4:9 42:6,11
   43:22 50:10
   56:21
**3/02/04** 4:12
**30-something**
   26:9
**31** 62:6,13
**31-day** 35:21
**334-956-7700**
   5:9
**36104** 5:8,16
**37** 4:14

---

**4**

**4** 4:10 44:15,19
   69:7
**4th** 16:10 63:4
**4/26/04** 4:13
**401** 5:6
**405)270-1410**
   10:5,8
**42** 4:9
**44** 4:10
**450)270-1410**
   21:13
**46** 4:11
**49** 4:12

---

**5**

---

**5** 4:11 46:9,13
   50:11
**5(d)** 3:4
**5.7** 10:5
**5/18/04** 4:14
**50** 4:13
**58** 4:15

---

**6**

**6** 4:3,12 49:15
   49:19
**6th** 15:17 62:23
**66** 4:16

---

**7**

**7** 4:13 50:21
   51:3
**70** 4:19
**780** 5:7

---

**8**

**8** 4:14 37:3,7
   69:13
**800-number**
   21:10
**800-898-2034**
   5:17

---

**9**

**9** 4:7,8,15,18
   58:7,11

---