# FREEDOM COURT REPORTING

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  SOUTHERN DIVISION
4
5  KAREN LURIE,
6      Plaintiff,
7  versus            1:06-CV-0034MEF
8  GLOBE LIFE AND ACCIDENT
9  INSURANCE COMPANY, et al.,
10     Defendants.
11
12
13      * * * * * * * * * * * * *
14
15     DEPOSITION OF JOHN H. ALLEN,
16  taken pursuant to stipulation and agreement
17  before Jackie Parham, Certified Shorthand
18  Reporter and Commissioner for the State of
19  Alabama at Large, in the law offices of
20  Beasley, Allen, Crow, Methvin, Portis & Miles,
21  272 Commerce Street, Montgomery, Alabama, on
22  Thursday, the 7th day of December, 2006,
23  commencing at approximately 9:30 a.m.

**Page 2**

1      APPEARANCES
2
3  APPEARING ON BEHALF OF THE PLAINTIFF:
4  CHRISTOPHER E. SANSPREE, ESQUIRE
5  Beasley, Allen, Crow, Methvin,
6      Portis & Miles
7  272 Commerce Street
8  Montgomery, Alabama 36104
9
10
11 APPEARING ON BEHALF OF THE DEFENDANTS:
12 PHILIP H. BUTLER, ESQUIRE
13 Bradley, Arant, Rose & White
14 401 Adams Avenue
15 Suite 780
16 Montgomery, Alabama 36104
17
18
19      * * * * * * * * * * * *
20
21
22
23

**Page 3**

1      STIPULATION
2      It is hereby stipulated and agreed by
3  and between counsel representing the parties
4  that the deposition of
5      JOHN H. ALLEN
6  may be taken before Jackie Parham, Certified
7  Shorthand Reporter and Commissioner for the
8  State of Alabama at Large, without the
9  formality of a commission, and all formality
10 with respect to other procedural requirements
11 is waived; that objections to questions, other
12 than objections as to the form of the question,
13 need not be made at this time, but may be
14 reserved for a ruling at such time as the said
15 deposition may be offered in evidence or used
16 for any other purpose, by either party, as
17 provided for by the Federal Rules of Civil
18 Procedure.
19     It is further stipulated and agreed by
20 and between the parties hereto and the witness
21 that the signature of the witness to this
22 deposition is hereby not waived.
23

**Page 4**

1      INDEX OF EXHIBITS
2
3  DX-1 (Allen depo in Moorer case) ..... 13
4  DX-1A (Page 158 of Allen depo in .... 13
5      Moorer case)
6  DX-2 (CV) ........................... 16
7  DX-3 (John Allen depo in ............ 23
8      Provident case)
9  DX-3A (Pages 33 - 36 of John ........ 23
10     Allen depo in Provident
11     case)
12 DX-4 (John Allen depo in American ... 32
13     Fidelity case)
14 DX-4A (Page 19 of John Allen depo ... 32
15     in Am. Fidelity case)
16 DX-1B (Page 25 of John Allen depo ... 36
17     in Moorer case)
18 DX-5 (John Allen depo in American ... 55
19     Pioneer case)
20 DX-5A (Page 16 of depo of John ...... 55
21     Allen in Am. Pioneer case)
22 DX-6 (Cover of book entitled ........ 68
23     Liability Claim Practices)

1 (Pages 1 to 4)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-3



EXHIBIT
B

# FREEDOM COURT REPORTING

Page 5

1  DX-6A (Chapter 4 of Liability ....... 68
2  Claim Practices' book)
3  DX-7 (List of cases) ................. 69
4  DX-8 (Report from Mr. Allen) ......... 82
5  DX-9 (Current depo list) ............. 82
6  DX-10 (Final Notice of premium ...... 88
7  due)
8  DX-11 (Premiums and Reinstatement ... 95
9  document)
10  DX-12 (Notebook) .................... 153
11
12         * * * * * * * * * * * *
13         INDEX OF EXAMINATION
14  MR. BUTLER ........................... 6
15  MR. SANSPREE ........................ 148
16  MR. BUTLER ........................... 151
17
18
19
20
21
22
23

Page 6

1              JOHN H. ALLEN,
2      The witness, after having first been
3  duly sworn to speak the truth, the whole truth,
4  and nothing but the truth, testified as follows:
5              EXAMINATION
6  BY MR. BUTLER:
7  Q.   **Mr. Allen, would you please state your**
8       **full name, your residence address, and**
9       **your business address?**
10  A.   John H. Allen, 5721 Fifth Court South,
11       Birmingham, Alabama.  Business address is
12       the same.
13  Q.   **So your office is out of your home?**
14  A.   Correct.
15  Q.   **All right.  And what is your Social**
16       **Security number, please, sir?**
17  A.   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.
18  Q.   **And your date of birth?**
19  A.   3/27/49.
20  Q.   **All right.  What do you call your**
21       **business?**
22  A.   John H. Allen Consulting.
23  Q.   **Okay.  Is there anybody associated with**

Page 7

1       you in your business, or do you work by
2       yourself, or what?
3  A.   Work by myself.  Yes.
4  Q.   **Okay.  Are you married?**
5  A.   Divorced.
6  Q.   **Okay.  And please give me the names and**
7       **ages and where your children live, if you**
8       **have children.**
9  A.   Yeah.  I've got four of them.  Got a son,
10       John Clifford.  He lives here in
11       Montgomery.  He's thirty-three.  Then I've
12       got a daughter, Natalie, who lives --
13  Q.   **Let me interrupt you just a moment because**
14       **that'll save us some time, unbelievably.**
15  A.   All right.
16  Q.   **Your son, John, where does he work?**
17  A.   He works at Jackson Hospital.
18  Q.   **What's he do there?**
19  A.   He's an anesthetist.
20  Q.   **Got 'ya.  All right.  I interrupted.  Go**
21       **ahead.**
22  A.   Okay.  Then I've got a daughter, Natalie.
23       I think she's approximately twenty-five.

Page 8

1       Supposed to know these things, but close.
2       And she's a flight attendant out in Denver
3       with Sky West.  And then I've got a
4       daughter, Rachel, who's about
5       twenty-three, twenty-four, and she's in
6       Washington, D.C.  She's working with a
7       real estate firm up there.  And then I've
8       got a seventeen-year-old, Austin, who is a
9       student in Birmingham.
10  Q.   **Okay.  Is that all your children?**
11  A.   Yeah.
12  Q.   **Do you have a son named Grant?**
13  A.   Grant.  That was -- That was through
14       another woman back -- back in the -- I
15       guess he's about fourteen, fifteen years
16       old, something like that, maybe a little
17       older.
18  Q.   **So when you told me you had four children,**
19       **you really have five children?**
20  A.   Yeah.  Right.
21  Q.   **Okay.  Have you ever been arrested for a**
22       **criminal offense, other than a normal**
23       **traffic offense?**

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 9

1   A.   Yes.
2   Q.   What's that?
3   A.   1978 for misdemeanor possession of
4        marijuana, and 2003 for a DUI.
5   Q.   Is that all?
6   A.   Yes.
7   Q.   Okay.  You've given a number of
8        depositions in your career, haven't you,
9        sir?
10  A.   Yes.
11  Q.   And you realize that your testimony is
12       under oath in those depositions as well as
13       this one here today?
14  A.   Right.
15  Q.   Okay.  In 1978, were you convicted of that
16       offense?
17  A.   I pled guilty to misdemeanor possession.
18  Q.   Of marijuana?
19  A.   Right.
20  Q.   Okay.  And is that when you were married
21       and had children?
22  A.   Yes.
23  Q.   Okay.  It wasn't when you were a college

Page 10

1        student or anything?
2   A.   No.
3   Q.   Okay.  And then you had a DUI in 2003; is
4        that right?
5   A.   Right.
6   Q.   And that's the only thing you've been
7        arrested for?
8   A.   Yes.
9   Q.   Isn't it a fact that you were arrested for
10       and pled guilty to a felony drug offense
11       in 2004?
12  A.   No.
13  Q.   In Clanton?
14  A.   No.  I only pled guilty to a DUI.
15  Q.   Oh, is that right?
16  A.   Yeah.  The rest was dismissed.
17  Q.   The drug conviction was dismissed?
18  A.   There wasn't any conviction.
19  Q.   I mean, the drug charge was dismissed?
20  A.   The allegations were dismissed.  Yes.
21  Q.   You were arrested for that, weren't you?
22  A.   Yes.
23  Q.   What were you accused of with regard to

Page 11

1        the drug offense in Chilton County?
2   A.   That was concerning a minuscule amount of
3        cocaine and a small amount of marijuana.
4   Q.   And were you also charged with possession
5        of drug paraphernalia?
6   A.   Yeah.
7   Q.   And those were dismissed?
8   A.   Yes.
9   Q.   What was the disposition of the DUI?
10  A.   Paid a fine and went to the driving school
11       thing.
12  Q.   Okay.  Were you placed on probation?
13  A.   No, sir.
14  Q.   Who was your attorney in that action?
15  A.   Tommy --
16  Q.   Kirk?
17  A.   Kirk.  Yeah.
18  Q.   When was it disposed of?
19  A.   2000 -- Let's see. -- I can't remember
20       whether it was 2005 or 2006.
21  Q.   Okay.
22  A.   May have been 2006.
23  Q.   Was this in front of Judge Fuller in

Page 12

1        Chilton County?
2   A.   I believe that's correct.
3   Q.   With regard to the misdemeanor possession
4        of marijuana in 1978, was that in
5        Tuscaloosa County?
6   A.   Correct.
7   Q.   Have you ever lied under oath about that
8        arrest?
9   A.   Yes.
10  Q.   Okay.  In depositions in civil cases?
11  A.   One deposition.
12  Q.   Okay.  Was that in the Moorer versus
13       Republic American Deposition?
14  A.   I don't recall which one that was in.
15  Q.   Was Dee Miles, one of the lawyers in this
16       firm at Beasley, Allen, the lawyer when
17       you did that?
18  A.   I don't know.
19  Q.   Let me see if I can refresh your
20       recollection.  I've got a copy.  And what
21       I'm going to ask the court reporter to do
22       is just copy the first page of it so that
23       we'll have the style, and then I have a

3 (Pages 9 to 12)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 13

```
1   travel transcript, and just copy the page
2   that's involved. If you want the rest of
3   it, you're certainly welcome to it.
4        MR. SANSPREE: I might have the
5        whole thing. I don't have a
6        copy.
7        MR. BUTLER: I'll be glad to
8        furnish it to you. But do
9        you think we ought to
10       clutter the Record by having
11       the whole thing or --
12       MR. SANSPREE: If it's easier
13       just to mark it as an
14       exhibit, she can just copy
15       it. However you want to do
16       it, Phil.
17       (Defendant's Exhibit 1 marked
18       for purposes of identification)
19       (Defendant's Exhibit 1-A marked
20       for purposes of identification)
21  Q.   Let me show you a copy, which is a
22       condensed version or a travel transcript,
23       of the deposition of Joseph Moorer versus
```

Page 14

```
1    Republic American Life Insurance Company.
2    And I have marked on page 158, I think,
3    the page number involved.
4    A.  Yes.
5    Q.  When you answered the question there,
6        "Have you ever been arrested," you
7        answered "No," and that was incorrect,
8        wasn't it?
9    A.  Correct.
10   Q.  And you knew it was incorrect when you
11       gave that answer, didn't you?
12   A.  It was a judgment error.
13   Q.  A judgment error?
14   A.  Yes, sir.
15   Q.  Is it a judgment error, in your view, as a
16       witness when you knowingly answer a
17       question falsely under oath?
18   A.  I mean, it was a judgment error, and I
19       gave the wrong answer.
20   Q.  Yes, sir. And you knew it was wrong at
21       the time you gave it, didn't you?
22   A.  Yes.
23   Q.  Approximately how many depositions have
```

Page 15

```
1    you given in your career, Mr. Allen?
2    A.  Fifty-eight.
3    Q.  Fifty-eight?
4    A.  Fifty-eight or fifty-nine. Yeah.
5    Q.  To refresh your recollection, does it
6        appear that Dee Miles of the Beasley,
7        Allen firm was counsel for the plaintiff
8        in that case of Moorer versus Republic?
9    A.  Yes.
10   Q.  Okay. Thank you.
11       Have you ever filed any grievances
12       with the Alabama Bar Association against
13       lawyers who have taken your deposition in
14       civil cases wherein you were put up as an
15       expert witness?
16   A.  Yes.
17   Q.  Who have you filed grievances against?
18   A.  There was one Birmingham --
19   Q.  John Dodson?
20   A.  Huh?
21   Q.  John Dodson?
22   A.  Yeah. That may be him.
23   Q.  Anyone else?
```

Page 16

```
1    A.  I filed a grievance on a payment of a bill
2        with Jack Hollingsworth.
3    Q.  Okay. What was the nature of the
4        grievance against Mr. Dodson?
5    A.  Wasn't paying the bill.
6    Q.  That was all?
7    A.  Yes, sir.
8    Q.  What was the disposition of that?
9    A.  Paid the bill.
10   Q.  With regard to your formal education,
11       Mr. Sanspree has been kind enough to
12       furnish me, along with your report, of
13       course, your curriculum vitae. As I
14       understand your formal education -- We can
15       just mark that as an exhibit. That will
16       be fine. Thank you, sir.
17       (Defendant's Exhibit 2 marked
18       for purposes of identification)
19   Q.  Exhibit 2 is a copy of your current
20       curriculum vitae, is it not?
21   A.  Correct.
22   Q.  Have you reviewed that to see that it is,
23       in fact, current?
```

4  (Pages 13 to 16)

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 17

1  A.  Yes.
2  Q.  Okay.  And as I understand from your CV,
3     your formal education was at the
4     University of Alabama, Bachelor of Science
5     in General Business Administration; is
6     that correct?
7  A.  Yeah.  Commerce and Business
8     Administration.
9  Q.  Understood.  Okay.
10        Do you have any degrees from formal
11     education institutions subsequent to your
12     graduation from the University of Alabama
13     in 1971?
14  A.  I assume you're excluding from that, like,
15     the Insurance Institute of America, the
16     Associate in Claims designation?  I mean,
17     that is a formal --
18  Q.  I'm going to get to that.
19  A.  All right.  But as far as other colleges,
20     no, I don't have any other college
21     degrees.
22  Q.  All right, sir.  Go ahead and tell me
23     about -- I think you were telling me about

Page 18

1     your AIC designation.
2  A.  Right.
3  Q.  And what is that, please, sir?
4  A.  That's an Associate in Claims designation
5     that's -- You go through a series of
6     courses.  I believe there are four courses
7     involved on multiple claims areas.  You
8     take each course individually and then you
9     take a written exam.  And upon completion
10     of the -- I believe it's a four-course
11     program, then you receive your Associate
12     in Claims designation.
13  Q.  All right.  And did you accomplish that
14     while you were employed with Aetna?
15  A.  That's correct.
16  Q.  Did that course involve basically
17     commercial lines, property and
18     casualty-type insurance?
19  A.  It was all different types of insurance.
20     I don't recall the four courses as such.
21     But it was -- I mean, you had everything
22     from ocean marine.  It was, I guess, a
23     litany of different insurance courses.

Page 19

1  Q.  All right, sir.  Let me go back to your
2     college course, if I may, and ask one
3     question.  In your courses at the
4     University of Alabama, did you take any
5     courses in life insurance claims or life
6     insurance?
7  A.  No.
8  Q.  Did the AIC involve life insurance claims?
9  A.  I don't recall all that was in the books
10     at the time.
11  Q.  Have you ever taught on the subject of
12     insurance at seminars or things of that
13     nature?
14  A.  I discussed -- At one of the Association
15     of Certified Fraud Examiners, I have
16     talked at one time about insurance and
17     insurance claims.
18  Q.  Okay.  That's just one time?
19  A.  May have been twice.
20  Q.  Okay.  Has Mr. Sanspree shared the podium
21     with you in that seminar?
22  A.  Yes.
23  Q.  And Mr. Sanspree is the lawyer here today

Page 20

1     representing Ms. Lurie?
2  A.  Yes.
3  Q.  Okay.  Thank you.
4        Now, the Certified Fraud Examiners,
5     did you have to take any course or
6     complete any qualifications to become a
7     certified fraud examiner?
8  A.  You had to complete an application.  And
9     then based on my training, education and
10     experience, I was grandfathered into the
11     organization without having to take the
12     formal test.
13  Q.  Yes, sir.  That is not really an insurance
14     organization, is it?
15  A.  Well, it's made up of all realms of
16     people, from insurance to accountants.
17     You've got FBI agents.  You've got
18     treasury agents.  A lot of internal
19     auditors.  We've got several different
20     folks that are insurance company-oriented.
21     So it's a big cross-section of folks that
22     are involved.
23  Q.  Would you describe it as an insurance

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 21

1 professional organization?
2 A. I don't know whether it's totally
3 insurance. It's fraud-oriented, which,
4 you know, dovetails with insurance. But
5 it's not strictly related to the insurance
6 line.
7 Q. I see. During the course of your work as
8 an expert or professional witness, have
9 you utilized documents that you've
10 received in other cases to assist you in
11 forming your opinions in later cases?
12 A. Sometimes.
13 Q. Yes, sir. In doing so, do you attempt to
14 honor and obey court orders?
15 A. Yes, sir.
16 Q. Did you use some information in a
17 Provident case that had been ordered to be
18 protected or privileged?
19 A. I don't know of any.
20     MR. BUTLER: I'm going to do this
21     one the same way. But --
22     MR. SANSPREE: Am I on that one?
23     Do I have a copy of that

Page 22

1     one?
2     MR. BUTLER: I don't know.
3     MR. SANSPREE: Was I the
4     attorney?
5     MR. BUTLER: You were not the
6     attorney.
7     MR. SANSPREE: Okay.
8     MR. BUTLER: So for my purposes,
9     I would like to mark the
10     first page of it, which is
11     the cover page and some
12     other pages. It, again, is
13     a travel transcript. And
14     I'm interested in -- it's
15     all on one page, but it
16     covers pages 33, 34, 35 and
17     36.
18     MR. SANSPREE: That's fine.
19     However you want to do it,
20     Phil. If you don't mark the
21     whole thing, I'll just ask
22     you later about it.
23     MR. BUTLER: You're certainly

Page 23

1     welcome to it. This will
2     be, I think, Exhibit 3 and
3     then 3-A, please, ma'am.
4     (Defendant's Exhibit 3 and 3-A
5     marked for purposes of
6     identification)
7 Q. Let me show you Defendant's Exhibit 3,
8     please, sir, which is a case called
9     Pebbles versus Provident Life and Accident
10     Insurance Company. The lawyers in that,
11     if I can find them, appear to be a
12     Mr. Arnston, whom I don't know, a
13     Mr. Wilson Jenkins and Mr. Keith Medley.
14     That's marked as Defendant's Exhibit 3.
15     And then the reference that I have is over
16     on page -- I think I said 33 through 36.
17 A. Okay.
18 Q. I don't want to rush you. But you're
19     welcome to read that first.
20 A. Okay. This is on the Hangarter documents?
21 Q. Yes, sir. You might want to spell that.
22     It's a little unusual.
23 A. Hangarter.

Page 24

1 Q. Thank you, sir. And that was a previous
2     Provident case, was it not?
3 A. Yes.
4 Q. Handled by Mr. Sanspree?
5     MR. SANSPREE: No.
6 A. No.
7 Q. It wasn't?
8 A. No.
9 Q. Do you know whether it was handled by the
10     Beasley firm?
11 A. No. I think that was a California case.
12     MR. SANSPREE: It was a San
13     Francisco case.
14 Q. Did Mr. Sanspree furnish those documents
15     to you?
16 A. Yes.
17 Q. And did you know that they were under a
18     Protective Order?
19     MR. SANSPREE: They weren't,
20     Phil. I just got them from
21     the courthouse. I flew out
22     there to get them.
23 A. That's my understanding. They just came

6 (Pages 21 to 24)

# FREEDOM COURT REPORTING

|  | Page 25 |
|---|---|
| 1 | straight out of the courthouse. |
| 2 | MR. SANSPREE: If they were, then |
| 3 | the Court didn't protect |
| 4 | them, because I just flew |
| 5 | out there and got them. |
| 6 | Q.  Well, my question is, there seems to be a |
| 7 | discussion on these pages that I've marked |
| 8 | about the documents being privileged. And |
| 9 | as to when they were privileged, I think |
| 10 | you mentioned in your deposition here on |
| 11 | page -- on Exhibit 3-A that they became |
| 12 | privileged after your report or something |
| 13 | of that nature. |
| 14 | MR. SANSPREE: They were marked |
| 15 | "Privileged" at the |
| 16 | courthouse out of San |
| 17 | Francisco. But I just flew |
| 18 | out there and got them. |
| 19 | Nobody tried to protect |
| 20 | them. |
| 21 | A.  There were several things out of the |
| 22 | Provident thing that came up about |
| 23 | Privileged documents. |

|  | Page 26 |
|---|---|
| 1 | MR. SANSPREE: I remember. They |
| 2 | marked everything |
| 3 | "Privileged," and the Court |
| 4 | said it was not privileged. |
| 5 | You just can't mark a |
| 6 | document "Privileged" and |
| 7 | say it's privileged. |
| 8 | A.  Also, the New York thing was also marked |
| 9 | "Privileged and Confidential" and, yet, it |
| 10 | was later released. |
| 11 | Q.  Okay. But Mr. Sanspree was not involved |
| 12 | in this Pebbles case, was he? |
| 13 | A.  No. |
| 14 | Q.  Okay. But you did obtain from |
| 15 | Mr. Sanspree documents from other |
| 16 | Provident cases to assist you in your |
| 17 | investigation and forming opinions in the |
| 18 | Pebbles case; is that right? |
| 19 | A.  Well, I had been working on the cases. It |
| 20 | was just coincidental that this one came |
| 21 | along during the time that I had been |
| 22 | working on these other cases. |
| 23 | Q.  Okay. All right. If I may go a bit to |

|  | Page 27 |
|---|---|
| 1 | your employment background.  Upon |
| 2 | graduating from the University of Alabama, |
| 3 | was your first job with Alabama Power |
| 4 | Company? |
| 5 | A.  Yes. I mean, I had had other part-time |
| 6 | jobs, but that was the first, as such, |
| 7 | formal job. |
| 8 | Q.  Full-time job? |
| 9 | A.  Full-time job. Yeah. |
| 10 | Q.  Like most of us, you probably had |
| 11 | summertime jobs and things of that nature |
| 12 | going through school and that sort of |
| 13 | thing? |
| 14 | A.  Right. |
| 15 | Q.  All right. And what was your position at |
| 16 | Alabama Power? |
| 17 | A.  Resident claim agent. |
| 18 | Q.  And did that involve property claims? |
| 19 | A.  All kinds of claims. You had -- At that |
| 20 | time when I started, you handled some |
| 21 | workers' comp. You handled property. You |
| 22 | handled automobile, electrical contracts, |
| 23 | slip-and-fall, general liability stuff. |

|  | Page 28 |
|---|---|
| 1 | Q.  It did not involve life insurance, did it? |
| 2 | A.  No. |
| 3 | Q.  Okay. Were you terminated from that |
| 4 | position? |
| 5 | A.  Yes. |
| 6 | Q.  When? |
| 7 | A.  '78. |
| 8 | Q.  How long did you work for Alabama Power? |
| 9 | A.  From '71 to '78. |
| 10 | Q.  Okay. And why were you terminated? |
| 11 | A.  Because of the arrest. |
| 12 | Q.  The marijuana? |
| 13 | A.  The marijuana arrest. Yes, sir. |
| 14 | Q.  And you pled guilty to that, did you not? |
| 15 | A.  Yes. |
| 16 | Q.  Have you ever lied under oath in a |
| 17 | deposition in a civil case, such as this |
| 18 | one, about the reason you left Alabama |
| 19 | Power? |
| 20 | A.  No, sir. |
| 21 | Q.  Okay. |
| 22 | A.  I mean, the other case there, where I |
| 23 | didn't acknowledge that. |

7 (Pages 25 to 28)

# FREEDOM COURT REPORTING

Page 29

1  Q.  Okay. Where you didn't -- I'm sorry. I
2      didn't follow you.
3  A.  The first case that you talked about with
4      Mr. Miles, where I didn't acknowledge
5      being arrested.
6  Q.  Oh, yes, sir. I know that. I wasn't
7      asking that same question.
8  A.  Oh.
9  Q.  No, sir. Have you ever lied about the
10     marijuana conviction on job applications?
11 A.  Yes.
12 Q.  Okay. Why did you do that?
13 A.  Needed a job for my family.
14 Q.  Okay. It was not that you had forgotten
15     about your marijuana conviction, was it?
16 A.  Correct.
17 Q.  After you were terminated from Alabama
18     Power Company, where did you then go to
19     work?
20 A.  National Producers.
21 Q.  And what did you do at National Producers?
22 A.  Majority of the stuff was involving
23     inventory in cemeteries down in Columbus

Page 30

1      and Phenix City. Then some small amounts
2      of litigation, but not much.
3  Q.  Okay. Why did you leave National
4      Producers?
5  A.  It didn't look like it was going to be a
6      fruitful job.
7  Q.  Did it go bankrupt?
8  A.  The company did, I believe.
9  Q.  Yes, sir. Where did you next become
10     employed?
11 A.  Stonewall Dixie.
12 Q.  Is that an insurance company?
13 A.  Yes.
14 Q.  Did you go immediately from National
15     Producers to Stonewall Dixie?
16 A.  I'm not sure what the time lag was. It
17     wasn't real long.
18 Q.  All right. At Stonewall Dixie, were you
19     involved in adjusting claims?
20 A.  Yes.
21 Q.  And were those primarily automobile
22     accident claims and liquor liability
23     claims?

Page 31

1  A.  Correct.
2  Q.  Did not --
3  A.  And subrogation claims.
4  Q.  Yeah.
5  A.  Right.
6  Q.  But the subrogation would, yet and still,
7      generally involve automobile accidents,
8      wouldn't it?
9  A.  Correct.
10 Q.  Did not involve life insurance, did it?
11 A.  No.
12 Q.  Were you fired from Stonewall Dixie?
13 A.  Yeah.
14 Q.  Have you ever lied under oath in
15     depositions in civil cases, wherein you
16     were identified as an expert witness,
17     about whether or not you were fired from
18     Stonewall Dixie?
19 A.  I don't recall.
20 Q.  Let's see if I can help you. Do you
21     recall giving a deposition in a case
22     called Brooks versus American Fidelity?
23 A.  You know, I must have.

Page 32

1  Q.  Let's do this one the same way, the next
2      number, and then that number as A on page
3      19.
4           (Defendant's Exhibit 4 and 4-A
5            marked for purposes of
6            identification)
7  Q.  To refresh your recollection, I think it
8      was a case where the plaintiff's lawyer
9      was Archie Lamb.
10 A.  Okay.
11 Q.  Does that help you remember?
12 A.  You know, I know Archie Lamb, but I
13     don't --
14 Q.  You don't remember who the defense lawyer
15     was?
16 A.  No.
17 Q.  That's very disappointing. Look at that.
18 A.  Was it you?
19 Q.  What I've done is marked the title page as
20     4, or asked the court reporter to do that,
21     and 4-A, the page in reference which I
22     think is page 19. I think you were
23     answering my questions in that deposition.

8  (Pages 29 to 32)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 33

1  A.  Okay.
2  Q.  What was the question?
3  A.  "Why did you leave Stonewall Dixie"?
4  Q.  You didn't tell me you had been fired, did
5      you?
6  A.  No.
7  Q.  Why not?
8  A.  Well, I indicated I was basically tired of
9      handling those claims, and I was.
10  Q.  Yes, sir. Do you think that was a fair
11      and complete answer?
12  A.  I think it covered what you asked. And
13      there was a reduction in force, and that's
14      what Jim Sullivan agreed to.
15  Q.  Yes, sir. But that agreement that you
16      signed also referenced that it was an
17      involuntary separation that they were
18      firing you for, wasn't it?
19  A.  I believe so. It's been -- I don't know
20      how long since I've seen that.
21  Q.  Right.
22  A.  But, you know, I feel like I answered the
23      question.

## Page 34

1  Q.  Yes, sir.
2  A.  Because it was true.
3  Q.  Right. And you think that's a complete
4      answer to my question, "Why did you leave
5      Stonewall Dixie"? And you said, "I
6      basically was tired of handling automobile
7      claims and the homeowners' claims and
8      wanted something different. And Aetna had
9      an opening in the commercial insurance
10      division. So I went and applied for that
11      and was accepted for that position." You
12      don't think it would have been responsive
13      to my question to let me know, as to my
14      question "Why did you leave Stonewall
15      Dixie," that you remember being fired by
16      Stonewall Dixie?
17         MR. SANSPREE: Object to the
18         form.
19  A.  I mean, I felt like I answered the
20      question at the time. To go back and say
21      how I would have answered it umpteen years
22      later, I can't.
23  Q.  You're comfortable with that answer as

## Page 35

1      being a full response to the question?
2  A.  I feel like I answered your question at
3      that point in time.
4  Q.  Thank you, sir.
5      That's not the only time you lied
6      about having been fired from Stonewall
7      Jackson, is it?
8         MR. SANSPREE: Object to the
9         form.
10  A.  Dixie.
11  Q.  Stonewall Dixie Insurance Company.
12      Have you lied in other depositions
13      where you were put up as an expert witness
14      as to the reasons that you left Stonewall
15      Dixie Insurance Company?
16         MR. SANSPREE: Object to the
17         form.
18  A.  I don't recall all the answers.
19  Q.  Let me show you again this same
20      deposition, Moorer versus Republic
21      American Insurance Company, which we've
22      already marked as Defendant's Exhibit 1.
23      Let me ask the reporter to mark as Exhibit

## Page 36

1      1-B page 25.
2         (Defendant's Exhibit 1-B marked
3         for purposes of identification)
4  Q.  Read the bottom of 24 and page 25, which
5      I've marked as 1-B, please, sir.
6  A.  Okay.
7  Q.  Would you agree with me that you did not
8      give an honest answer to the question on
9      page 25 with regard to your employment at
10      Stonewall Dixie Insurance Company?
11  A.  I didn't recall any specific things about
12      that.
13  Q.  Oh, you didn't?
14  A.  At the time, you know --
15  Q.  Well, let's be a little more clear about
16      it, if I might borrow it back. I hate to
17      go back and forth, but it's the only copy
18      I have with me.
19  A.  All right.
20  Q.  The question was -- and I was not the
21      defense attorney involved in that. But it
22      starts at the bottom of page 24, and the
23      question is, "Now, before we get to Aetna,

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1  was there any time at Alabama Power
2  Company when you were disciplined or
3  criticized about your job"?  And your
4  answer was "No"; is that correct?
5  A.  Right.
6  Q.  And that's not true either, is it?
7  A.  Well, it wasn't about my job.
8  Q.  Oh, okay.  I withdraw the question.
9      The question in this Exhibit 1-B,
10  "How about when you were at National
11  Producers"?  And you said "No."  And the
12  question, "And Stonewall"?  "And when I
13  say "criticized," I'm talking about any
14  complaints, oral or written, any
15  reprimands, oral or written, discipline
16  for any reason."  And you said, "I don't
17  recall any specific things at Stonewall
18  Dixie."
19  A.  Yes.
20  Q.  You don't consider having been fired from
21  Stonewall Dixie a disciplinary action?
22  A.  Well, I mean, as far as the way I consider
23  that, I blew the whistle on some illegal

Page 38

1  activities that were taking place in the
2  company.  And I felt like, you know, there
3  was retribution taken against me for
4  blowing the whistle.
5  Q.  What did you blow the whistle on?
6  A.  Folks stealing money and stealing
7  property.
8  Q.  Who stole money?
9  A.  Folks out of Florida.
10  Q.  What are their names?
11  A.  I don't recall the names.  I found out in
12  the subro where checks were going out.
13  And then the president of Stonewall at the
14  time converted a vehicle to his own use
15  out of salvage.
16  Q.  Who was that?
17  A.  Jim Sullivan.
18  Q.  Okay.  Well, did you report that to the
19  stockholders?
20  A.  I reported it to the Great American.
21  Q.  To Great American?
22  A.  Yeah.
23  Q.  Was Stonewall Dixie a subsidiary of Great

Page 39

1  American?
2  A.  Yes.
3  Q.  Okay.  And whether or not you think it was
4  appropriate or not, you do consider a
5  termination from a job a disciplinary
6  action, don't you?
7  A.  I guess it can be.  I mean, I considered
8  what happened was a whistle-blowing
9  retribution.  So, I mean, as far as what
10  they write down, they can write anything
11  they want down to criticize you,
12  after-the-fact-type thing.  But I blew the
13  whistle, and they terminated me and
14  terminated a lot of folks within the
15  claims department.
16  Q.  Okay.  And you don't agree with their
17  action in terminating you, do you?
18  A.  Correct.
19  Q.  But, nevertheless, it was disciplinary,
20  wasn't it?
21      MR. SANSPREE:  Object to the
22      form.
23  A.  You think whatever — You know, that's --

Page 40

1      You know --
2  Q.  Do you consider that it was not
3  disciplinary?
4  A.  Well, "disciplinary" is more of, you know,
5  trying to change things.  I mean, all I
6  did was end up getting the ax.  So, you
7  know, there's a difference between
8  discipline and just having the ax fall on
9  you.
10  Q.  On this same page, Exhibit 1-B, you
11  answered a moment ago that you had never
12  lied about the reason you left Alabama
13  Power Company.  On this same page of the
14  exhibit, on page 20 and 21 of this same
15  deposition, you did, in fact, lie about
16  the reason why you left Alabama Power,
17  didn't you?
18      MR. SANSPREE:  He's already said
19      that, though.  Because
20      that's the same deposition
21      where he denied the
22      marijuana arrest.
23      MR. BUTLER:  That's right.  But

10  (Pages 37 to 40)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 41

1    he answered a moment ago
2    that be had never lied about
3    the reason he left Alabama
4    Power.
5    MR. SANSPREE: He tried to point
6       to that --
7    MR. BUTLER: The Record will
8       speak for itself.
9    MR. SANSPREE: He tried to point
10      you to the deposition a
11      second ago.
12   MR. BUTLER: Could be my
13      misunderstanding, but the
14      Record will speak for
15      itself.
16 Q.  Look at Exhibit 1-B, and the pages that
17      are referenced, I think, are 20 and 21.
18 A.  "Why did you leave Alabama Power Company?
19      I had a better opportunity with National
20      Producers. Is that the only reason you
21      left? Yes."
22 Q.  And that's not the truth, is it?
23 A.  Correct.

Page 42

1  Q.  And you knew it was not the truth at the
2       time you gave the answer?
3  A.  Yes.
4  Q.  Why did you answer knowingly something
5       that was untrue when you had sworn to give
6       testimony under oath?
7  A.  Again, you know, I made a judgment error
8       on not admitting my arrest or being fired.
9  Q.  It was just a judgment error?
10 A.  I consider it a judgment error. Yes, sir.
11 Q.  You consider giving false testimony under
12      oath a judgment error?
13 A.  I mean --
14 Q.  Is that right?
15 A.  I'd have to think about that. I mean, I
16      made some judgment errors on the status of
17      employment.
18 Q.  Do you want to answer it any further, or
19      is that your answer?
20 A.  That's my answer.
21 Q.  Thank you.
22      This is the deposition where Dee
23      Miles with Beasley, Allen was the lawyer

Page 43

1    for the plaintiff?
2  A.  Yes.
3  Q.  Thank you.
4       Have you ever lied about the reason
5       you left Stonewall Dixie on employment
6       applications?
7  A.  That would have been related to Aetna.
8       Yeah. I had answered that question
9       before.
10 Q.  Well, on the Aetna application, you said
11      that you lied about your termination with
12      Alabama Power, on the Aetna application.
13      You also lied about the reason you left
14      Stonewall Dixie Insurance Company to
15      Aetna, didn't you?
16 A.  The reason I -- What I stated to Aetna was
17      my conversation with Jim Sullivan, who
18      said that he would back me on a reduction
19      in force; that that would be an
20      explanation he would give to my employer.
21      And Aetna called Sullivan, talked with
22      him, and he explained my abilities, and
23      they hired me.

Page 44

1  Q.  So your position in not telling Aetna the
2       truth on your application was based upon
3       somebody else agreeing not to tell the
4       truth; is that right?
5  A.  It was based on an agreement I had with
6       the company on the reason that they would
7       say for my leaving.
8  Q.  Thank you.
9       When did you go to work for Aetna?
10 A.  July of '83.
11 Q.  Okay. And what type of work did you do at
12      Aetna, please, sir?
13 A.  Commercial claims. Started out in
14      commercial claims.
15 Q.  I think I know what you're talking about.
16      But so that the jury will know, what are
17      we talking about when we speak of
18      commercial claims?
19 A.  Commercial claims would be like businesses
20      -- mainly it would be a business
21      environment, workers' comp-type claims.
22      It would --
23 Q.  Casualty claims?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 45

1  A.  Casualty claims, bonds, fidelity bonds,
2      surety bonds, reclamation bonds.
3  Q.  **Business interruption claims?**
4  A.  Business interruption. Any type business
5      insurance.
6  Q.  **It did not involve life insurance, did it?**
7  A.  No.
8  Q.  **While at Aetna, were you ever criticized**
9      **for your claims-adjusting; that Aetna felt**
10     **like it placed the company at unreasonable**
11     **and unnecessary risk?**
12 A.  I had seen one criticism on that. I got
13     praised and got bonuses for doing good.
14 Q.  **Yes, sir.**
15 A.  And any criticism I had was a very small
16     percentage of the thousands of claims I
17     had. So to me that's just inherent in the
18     claims.
19 Q.  **Because, like everyone else, claims**
20     **adjusters make errors every day, don't**
21     **they; maybe not every day?**
22 A.  Maybe not every day.
23 Q.  **But they make errors?**

Page 46

1  A.  They make errors.
2  Q.  **And you're not exempt from that, are you?**
3  A.  Correct. I mean, people have different
4      thoughts about the way things are going to
5      be handled. And, I mean, on one of them
6      they had, I was criticized. So they
7      didn't want me to handle the claim. And
8      what did they do? They gave me the claim
9      anyway. So --
10 Q.  **Okay. And do you recall an instance where**
11     **you made an in excess of a half million**
12     **dollar offer on behalf of Alabama Power**
13     **that had been sued?**
14 A.  Oh, that -- I don't know whether it was a
15     half-million dollar offer. I think it was
16     a contractual defense that was owed to
17     Alabama Power, as a result of a cable
18     company that was attaching to a power
19     pole, that agreed to indemnify Alabama
20     Power if anything happened on their
21     property.
22 Q.  **Yes, sir. Do you recall your error being,**
23     **in that situation, where you did not**

Page 47

1      review the policy to determine whether
2      Alabama Power was even a named insured
3      under the policy?
4  A.  We had contractual coverage.
5  Q.  **Was Alabama Power the named insured under**
6      **the policy that you were making the offer**
7      **on?**
8  A.  I don't recall.
9  Q.  **Was it generally your practice to review**
10     **the policy involved in the course of your**
11     **claims investigation and adjusting?**
12 A.  And contracts. Any contracts that would
13     have existed between the insureds and the
14     Power Company.
15 Q.  **All right. How long did you work for**
16     **Aetna?**
17 A.  For who?
18 Q.  **For Aetna.**
19 A.  Oh, okay. That was between '83 to
20     December of '92.
21 Q.  **Okay. Why did you leave Aetna?**
22 A.  My job was eliminated.
23 Q.  **Okay.**

Page 48

1  A.  And that's contrary to Chadwick saying I
2      was fired, which was an outright lie.
3  Q.  **Chadwick was one of your supervisors,**
4      **wasn't he?**
5  A.  For a short period of time. He wasn't
6      there that long.
7  Q.  **Was he your supervisor when you left?**
8  A.  No. No. He was an assistant manager. I
9      had a supervisor that was between him.
10 Q.  **So, basically, he supervised your**
11     **supervisor?**
12 A.  Yes.
13 Q.  **Okay. Therefore, do you think he would be**
14     **in a position to know why you left Aetna?**
15 A.  You know, he got up there and lied. So,
16     you know, I think it was, you know,
17     uncalled-for what he did. But he lied and
18     I couldn't do anything about it.
19 Q.  **But he did testify under oath that you**
20     **were fired, didn't he?**
21 A.  That's right. And that wasn't the case.
22 Q.  **Okay. You say your job was eliminated?**
23 A.  Yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

FREEDOM COURT REPORTING

Page 49

1 Q. Okay. And where were you working for
2 Aetna at the time?
3 A. Birmingham.
4 Q. There were people still in the Birmingham
5 Aetna office when you left, weren't there?
6 A. It had shrunk significantly.
7 Q. Had you been demoted by Aetna before you
8 left?
9 A. Yes.
10 Q. Why?
11 A. It was on the way I was handling the
12 claims. But they still gave me the same
13 claims. They didn't change anything. I
14 received the same pay. Got the same
15 claims. Continued to handle the same
16 stuff for the entire period I was there.
17 Q. Have you ever testified that you were
18 deselected for new positions from Aetna in
19 Birmingham when you left?
20 A. I guess I may have. I recall the word
21 "deselected."
22 Q. It was your word, wasn't it?
23 A. Huh?

Page 50

1 Q. It was your word, wasn't it?
2 A. I believe so.
3 Q. Okay. Do you believe you were unjustly
4 criticized for your claims-handling
5 activities at Aetna?
6 A. Yes.
7 Q. Has your work for any of these insurance
8 companies that you worked for ever
9 involved the handling or adjusting of life
10 insurance claims?
11 A. No.
12 Q. Okay. Have you ever worked as a life
13 claims adjuster?
14 A. No.
15 Q. Have you ever been licensed as a life
16 insurance agent?
17 A. No.
18 Q. And have you ever taken any life insurance
19 courses?
20 A. I can't remember whether AIC had some life
21 insurance in that. They may or may not
22 have. I don't recall.
23 Q. When you left Aetna, you went into the

Page 51

1 consulting business, is that right, the
2 same business you're in today?
3 A. Yes.
4 Q. And what does that business generally
5 involve, please, sir?
6 A. I do some investigation from time to time
7 for -- I've done some for insurance
8 companies, for individuals, for attorneys.
9 Most of it involved expert witness work.
10 But it's generally a combination of expert
11 witness work and some investigation work.
12 Q. All right, sir. With regard to your
13 income, what overall -- it doesn't have to
14 be exact. But, in general, what is your
15 percentage of your income that comes from
16 being a professional witness in insurance
17 matters?
18 A. Majority of it.
19 Q. More than 75 percent?
20 A. I mean, it can vary from year-to-year as
21 far as what happens there. But probably
22 75 percent, at least.
23 Q. Okay. Are you a member of any expert

Page 52

1 witness groups or associations, such as
2 TASA or anybody like that?
3 A. I was at one time.
4 Q. Now are you?
5 A. No.
6 Q. Do you have any type of an advertising
7 brochure or website that you use to let
8 people know what you're holding yourself
9 out as an expert in?
10 A. No.
11 Q. Do you hold yourself out to those that
12 might be interested in hiring you as a
13 consultant as an expert in the field of
14 life insurance claims?
15 A. Yes.
16 Q. Oh, you do?
17 A. Yes.
18 Q. On what basis do you contend that you are
19 an expert in life insurance claims?
20 A. Because the principles of investigation
21 and coverage analysis are consistent in
22 life insurance claims as they are other
23 claims.

13 (Pages 49 to 52)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 53

1  Q.  How do you know that if you've not taken
2      any courses on life insurance claims and
3      you've not worked as a life insurance
4      claims examiner?
5          MR. SANSPREE: Object to the
6          form.
7  A.  That'd be from handling various cases in
8      which you review the manuals of the
9      various companies, on those that might
10     have a manual that, you know, say what's
11     involved, and it's consistent -- I believe
12     it's just years of reviewing multiple,
13     different companies' policies and
14     procedures. And, you know, the aspects of
15     the investigation and coverage analysis
16     are all consistent with what you do on an
17     insurance claim.
18 Q.  So then your expertise in life insurance
19     and life insurance claims have come from
20     your involvement as a professional witness
21     hired in connection with cases involving
22     life insurance; is that right?
23 A.  Yes.

Page 54

1  Q.  Okay. How many cases have you been
2      employed as an expert witness in life
3      insurance?
4  A.  I don't know.
5  Q.  You have no idea?
6  A.  No.
7  Q.  Can you think of more than one, not
8      counting this case?
9  A.  Not counting this case? I don't recall.
10     I couldn't tell you specifically. I know
11     there have been others, but I just don't
12     recall which cases they are.
13 Q.  There was one where Bill Wood at Norman,
14     Wood in Birmingham was the defense lawyer,
15     wasn't he, that again Dee Miles was the
16     plaintiff's lawyer?
17 A.  I don't know what case you're talking
18     about.
19 Q.  The case of Mobile Scottish Rite Bodies
20     versus New Hampshire Insurance Company.
21 A.  That wasn't a life claim.
22 Q.  It wasn't?
23 A.  No.

Page 55

1  Q.  Okay. What kind of claim was it?
2  A.  That was employee theft.
3  Q.  Employee theft. Okay.
4  A.  Yeah.
5  Q.  You are correct. I've got the wrong one
6      in my mind.
7          (Brief recess)
8          (Defendant's Exhibit 5 and 5-A
9          marked for purposes of
10         identification)
11 Q.  Let me show you what's been marked as
12     Defendant's Exhibit 5, which is a case
13     called American Pioneer Life Insurance
14     Company versus Transportation Techniques,
15     Inc. and John Esposito. Do you remember
16     that case? It involved Dee Miles with the
17     Beasley, Allen firm for the plaintiff --
18     excuse me. I think it was a dee action --
19     for the defendant, and William Wood as the
20     plaintiff lawyer filing the dec action.
21 A.  I remember the name Esposito, but I don't
22     remember much specifics about the case.
23 Q.  All right. Let me ask you to look at

Page 56

1      Exhibit 5-A, which is the bottom of page
2      16 in the deposition, and read -- I've
3      taken the time to highlight the question
4      and the answer there. You can read any
5      portion of it you'd like. But that's what
6      I'm going to be asking you about.
7  A.  The top of 16?
8  Q.  I think it's the highlighted portion.
9  A.  Okay.
10 Q.  This question asks you whether you had in
11     the past ever claimed to have experience
12     in reviewing, supervising or actually
13     handling life insurance claims, didn't it?
14 A.  Yes.
15 Q.  And it says, "Do you ever recollect where
16     you've taken that position?" And your
17     answer was "No"; isn't that right?
18 A.  That's what's down there.
19 Q.  is that correct? Did you answer
20     truthfully there?
21 A.  Which question are you talking about?
22 Q.  Right here (indicating).
23 A.  Okay. I'm sorry. I was on the wrong

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 57

1  page. Okay. I mean, it was coincidental
2  on life insurance claims. I mean, that
3  would --
4  **Q. Yes, sir. But this asks whether you had**
5  **in the past ever claimed to have had**
6  **experience in reviewing, supervising or**
7  **actually handling life insurance claims.**
8  A. Well, reviewing. You know, I mean,
9  there's a difference between being an
10  expert as a witness and a consultant,
11  where you're reviewing claims and looking
12  at stuff that may never go to a expert or
13  -- I mean, you can do work as a consultant
14  that you don't necessarily handle as an
15  expert. So there are a couple of
16  different things involved there. So you
17  can be involved with reviewing stuff and
18  still not have handled the thing on a --
19  you know, from an insurance company
20  perspective.
21  **Q. I see. And I understand you're not a**
22  **lawyer, are you, sir?**
23  A. Correct.

Page 58

1  **Q. Okay. And, so, I don't mean for this**
2  **question to be addressed to you in the**
3  **capacity of a lawyer. It's not a legal**
4  **question. Because Mr. Sanspree will**
5  **object to that, and I don't want him to**
6  **object. But, nevertheless, you told me a**
7  **moment ago that you had gained your**
8  **experience in life insurance as a**
9  **professional witness in reviewing life**
10  **insurance claims manuals, and life**
11  **insurance policies, and things of that**
12  **nature, and working on cases as a**
13  **consultant, professional witness; isn't**
14  **that right?**
15  A. Yeah. I mean, you would have life
16  insurance stuff that would be involved
17  with accidental deaths and stuff like
18  that.
19  **Q. Right.**
20  A. Where you would have inquiries and then
21  you'd look at, you know, potential for
22  subro or whatever involved in the thing.
23  **Q. But you wouldn't be acting in the capacity**

Page 59

1  of life insurance claims-handling or an
2  adjuster, would you?
3  A. Well, I mean, as far as a consultant, you
4  may be looking at it from the claims
5  adjuster's perspective, and giving a
6  review of claims-handling procedures as it
7  relates to a claim. Again, you're going
8  to have --
9  **Q. Well, maybe I better ask it this way. And**
10  **I don't mean to cut you off. But what is**
11  **your view, as a consultant, not in the**
12  **legal --**
13      (Brief interruption)
14  **Q. Let me ask this: I need to get your**
15  **understanding what enables you to give**
16  **expert opinion testimony on a subject**
17  **matter. And let me finish my question.**
18  **It's going to be kind of a long question.**
19  **But what I'm interested in, you are here**
20  **expressing opinions in this case on life**
21  **insurance claims-handling. You've told me**
22  **that you do not have recollection of any**
23  **courses on life insurance.**

Page 60

1  A. I didn't say that. I just said I didn't
2  recall what was in the AIC courses that
3  may have related to life insurance.
4  **Q. Is that different from what I said?**
5  A. Yeah. You're saying that, you know, I
6  never looked at any stuff.
7  **Q. No, I didn't. I said that you don't**
8  **recall having taken any life insurance**
9  **courses. Is that wrong?**
10  A. Well, I wasn't ruling it out. To me, your
11  question is ruling it out.
12      MR. BUTLER: Read my question
13      back, please, ma'am.
14      (Requested portion of Record
15      read by the Reporter)
16  **Q. Do you have recollection of life insurance**
17  **courses?**
18  A. Again, I don't recall what was in the AIC
19  group of courses as to -- you know,
20  because that falls under personal
21  insurance, which you can have a lot of
22  things under personal insurance. So --
23  **Q. Yes, sir. But, I mean, we may be**

15 (Pages 57 to 60)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 61

1  quibbling with words here and
2  understanding of words. But let me be
3  sure that I've got your testimony correct.
4  Do you recall having taken any life
5  insurance courses?
6  A.  Again, specifically on life alone --
7  Q.  I didn't say life alone.
8  A.  Again, I don't recall what's in the four
9  different courses, as to whether some of
10  the personal insurance is covered on life.
11  Q.  Okay.
12  A.  So --
13  Q.  All right. All right. And I think you
14  told me that you gained your knowledge and
15  experience on life insurance claims from
16  your work as a professional witness hired
17  to consult on life insurance cases; isn't
18  that correct?
19  A.  Yes. To me it's training, education, job
20  experience, job knowledge, and having been
21  through multiple companies and their
22  procedures manuals, for those companies
23  that have procedures manuals.

Page 62

1  Q.  Yes, sir.
2  A.  And the difference in this case is --
3  Q.  I didn't ask you that.
4  A.  Well --
5  Q.  I will, though.
6  A.  I mean, but -- I mean, the fact of the
7  matter is, the way it's going, the folks
8  testify that they have no training
9  manuals. So, I mean, I've had the benefit
10  of reviewing multiple companies' manuals
11  and procedures, for which this company
12  says they don't have any manuals or
13  procedures, and it's one-on-one training
14  and word-of-mouth.
15  Q.  Yes, sir.
16  A.  Now, that to me -- I've had much more
17  experience than any of these folks have,
18  because all of theirs is word-of-mouth
19  without any procedures.
20  Q.  In life insurance claims you've had much
21  more experience?
22  A.  Well, as far as going through and
23  understanding industry standards and

Page 63

1  manuals and procedures, for which Globe
2  says they have no manuals and procedures
3  or guidelines to go by. So I'm used to
4  reviewing industry standards and reviewing
5  the standards of the various companies.
6  But in this case they say they don't have
7  any. So, you know, for me, I think I'm
8  more qualified on handling claims relative
9  to this. I mean, even
10  Ms. What's-her-name, she states she didn't
11  even know what a reservation of rights was
12  -- Ms. Whitaker said she didn't know what
13  a reservation of rights was after thirty
14  years of being in insurance.
15  Q.  Right.
16  A.  So it's those type things. You know, it's
17  one-on-one. "I don't know anything about
18  reservation of rights. And we don't have
19  any claims or procedures manual, and
20  everything is one-on-one training." So
21  that to me -- I've had a lot more training
22  and experience than these folks who go
23  around operating without manuals or

Page 64

1  procedures.
2  Q.  Yes, sir. You would agree with me that
3  different kinds of insurance, be it life
4  insurance versus property and casualty,
5  for example, would have different
6  procedures and different terminology that
7  would apply to them, wouldn't you?
8  A.  Some would be consistent. Some might be a
9  little different.
10  Q.  Tell me, please, sir, how the terminology
11  of reservation of rights could possibly
12  apply in a life insurance claim.
13  A.  Because of having a coverage situation.
14  And it's my experience that whenever
15  you've got a coverage dispute, you should
16  notify the insured of the coverage
17  dispute. And I know a lot of companies
18  take the position, "Well, you don't have
19  to do that." But when you've got a
20  coverage issue, it's been my thing that
21  you advise the insured and let them know.
22  Q.  What is your understanding of the term in
23  the insurance industry, in general, of the

16 (Pages 61 to 64)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 65

1  term "reservation of rights"?
2  A.  That's advising the insured of a coverage
3      situation for which there is a issue as to
4      whether or not it's coverage.  You define
5      what's in the policy.  You define what's
6      in the -- or what the situation is.  And
7      that there is a question between the
8      policy coverages and the situation of the
9      individual filing the claim.
10 Q.  Do you know of any place in the insurance
11     industry where the term "reservation of
12     rights" is used, except in the liability
13     insurance context, where a liability
14     insurance carrier is proceeding to defend
15     its insured in a liability claim, but
16     reserving its rights and defenses to
17     challenge coverage in indemnity?
18 A.  I mean, usually it bonds to me; any time
19     you had a question of coverage, you advise
20     the insured and you reserve your rights.
21 Q.  Okay.  So we've said liability insurance
22     carriers for casualty claims and for
23     bonds.  Can you tell me anywhere in the

Page 66

1      insurance industry than it's used other
2      than that?
3          MR. SANSPREE:  Object to the
4          form.
5  A.  In the liability claims practices, which
6      is broad-based, and this is a
7      authoritative insurance document -- or
8      treatise, and it references the use of the
9      reservation of rights where you've got
10     questions of coverage.  So --
11 Q.  And it talks about liability coverage?
12 A.  It's speaking -- Basically, it's speaking
13     generic.  Whenever you've got -- I mean,
14     it is the liability claims.  It doesn't
15     say --
16 Q.  That's the entire title of this whole
17     treatise is "Liability Insurance Claim
18     Practice" -- or "Liability Claim
19     Practices"?
20 A.  Right.
21 Q.  We're not dealing here with liability
22     coverage, are we?
23 A.  Well, it's a form of liability coverage,

Page 67

1      but it's not liability coverage per se.
2      But, I mean, there is a liability for the
3      coverage that you've written.
4  Q.  You're saying that life insurance
5      coverage --
6  A.  No.
7  Q.  -- is the same as liability coverage?
8  A.  No, I'm not.
9          MR. SANSPREE:  Object to the
10         form.
11 Q.  Thank you.
12         MR. BUTLER:  Please, ma'am, mark
13         this as our next exhibit,
14         and specifically the page
15         number that the witness has
16         referred us to, being --
17     THE WITNESS:  Basically it's that
18         chapter.
19 Q.  The whole chapter, Chapter 4?
20 A.  Yeah.  I'll say Chapter 4.
21         MR. BUTLER:  -- Chapter 4 of this
22         book.  And I would ask the
23         court reporter to mark this

Page 68

1      and --
2      THE WITNESS:  We need to make a
3          copy of that.
4      MR. BUTLER:  -- to mark this as
5          our next numbered exhibit,
6          Chapter 4, that is the
7          chapter the witness relies
8          on for his testimony, and
9          then return it to
10         Mr. Sanspree so that
11         Mr. Allen will have it back.
12     THE WITNESS:  I just don't want
13         to put a sticker on there
14         because it'll tear the cover
15         up.
16     (Off-the-Record discussion)
17     MR. BUTLER:  Put a note on there
18         for our exhibit number for
19         the cover and first -- the
20         Roman numeral pages to
21         describe the edition, and
22         then Chapter 4, please,
23         ma'am.

17 (Pages 65 to 68)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 69

```
1          (Defendant's Exhibit 6 and 6-A
2            marked for purposes of
3            identification)
4   Q.   You told me that your experience with
5        regard to life insurance claims was
6        limited to your investigation as a
7        professional witness of civil cases in
8        which you've been hired.
9   A.   And a consultant.
10  Q.   And a consultant in those cases, right?
11  A.   Yes, sir.
12  Q.   All right. This particular case, American
13       Pioneer Life versus Transportation
14       Techniques, did involve life insurance,
15       didn't it?
16  A.   I don't recall it specifically involving
17       life.
18  Q.   Well, you identified it as -- Just a
19       moment.
20           (Defendant's Exhibit 7 marked
21             for purposes of identification)
22  Q.   Let me show you Exhibit 7. That comes
23       from your own documents, doesn't it?
```

Page 70

```
1   A.   Yes.
2   Q.   And there you describe that case as a life
3        insurance benefits case, don't you?
4   A.   Oh, okay. You're talking about -- I've
5        just got number 8 as "Denial of Life
6        Insurance Benefits." I didn't have the
7        name.
8   Q.   You didn't have the name of the case, but
9        you've got the names of the lawyers, don't
10       you?
11  A.   Yes.
12  Q.   And they're Dee Miles and Bill Wood,
13       aren't they?
14  A.   Yes.
15  Q.   And certainly there were questions in that
16       deposition that you've seen about life
17       insurance, weren't there?
18  A.   Yes.
19  Q.   Does that refresh your recollection that
20       this was a life insurance benefits case?
21  A.   Yes, sir.
22  Q.   What others have you served as a
23       professional expert or consultant witness
```

Page 71

```
1        in?
2   A.   I don't recall. I didn't --
3   Q.   Are there any?
4   A.   I don't recall. You know, I don't keep
5        track of stuff like that.
6   Q.   Well, you keep a list of them, don't you?
7   A.   I've got a list, but that doesn't
8        necessarily mean what type it is.
9   Q.   Well, look at whatever you need to know.
10       If that's the basis of your expertise, I
11       need to know what other life insurance
12       benefit cases that you have been involved
13       in.
14  A.   I don't recall.
15  Q.   You can't tell me any?
16  A.   Well, I don't recall.
17  Q.   Okay.
18  A.   I just don't recall all of them.
19  Q.   Can you tell me there have been more than
20       this one marked Defendant's Exhibit 5?
21  A.   As a consultant or as an expert?
22  Q.   Either.
23  A.   I know I've had numerous ones, but I just
```

Page 72

```
1        don't recall the names.
2   Q.   Can you tell me anything about them, who
3        the lawyers were, what court they were in
4        or anything?
5   A.   No, sir.
6   Q.   Okay. You have expressed opinions about
7        industry standards in this case with
8        regard to life insurance claims-handling,
9        have you not?
10  A.   Yes.
11  Q.   Okay. Where do you get your knowledge of
12       industry standards with regard to
13       adjusting and handling life insurance
14       claims, except for serving as a consultant
15       or an expert witness in other civil cases?
16  A.   And reviewing treatises and claims manuals
17       and procedures manuals.
18  Q.   What treatises have you reviewed?
19  A.   That's one that I had had and read from a
20       long time ago that has stuff on life.
21  Q.   Okay. Can you, to save us time so that I
22       won't have to read this treatise, can you
23       narrow it any for me by telling me which
```

18 (Pages 69 to 72)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 73

1    section or chapter or page that you would
2    rely upon for the subject of knowledge of
3    industry standards in handling of life
4    insurance claims?
5    A.  That would be under Chapter 10.
6    Q.  Okay.
7    A.  Looks like page 235 to 265.
8    Q.  Might I borrow it a moment?  Show me,
9    Mr. Allen, where in Chapter 10 of this
10   book, "Personal Insurance" by J. J.
11   Lonnie, George Raider, Donald Oakes, 1st
12   Edition, 1987, show me in Chapter 10, that
13   you've identified, what portion of that
14   chapter you rely upon with regard to your
15   opinions in this case, with regard to
16   claims-handling procedures for life
17   insurance claims.
18   A.  I don't think this discusses
19   claims-handling procedures.
20   Q.  Doesn't discuss it at all, does it?
21   A.  Correct.  And that's what I was telling
22   you, that the liability claims practices
23   of the claims-adjusting procedures have

Page 74

1    basic concepts that are involved in
2    investigating and handling claims that
3    are, you know, consistent for all types of
4    insurance policies.
5    Q.  And you're referring again to Exhibit 6?
6    A.  Well, that and, you know, you have, you
7    know, claims procedures in the property
8    end of the thing.
9    Q.  And you're showing me now a book called
10   "Adjustment of Property Losses."
11   A.  But it has some unfair claims practices,
12   which is what I was looking at on some of
13   this on fair claims-handling.
14   Q.  All right.  We'll get to that in a moment.
15   Keep that handy for me.  But it doesn't
16   have anything on life insurance claims,
17   does it?
18   A.  Which one?  On property?  No.
19   Q.  What is the name of it?
20   A.  "Adjustment of Property Losses."  It has
21   unfair claims practices in there.
22   Q.  Any other treatises that you've relied
23   upon to form your opinions in this case

Page 75

1    dealing with life insurance claims?
2    A.  No, sir.
3    Q.  Thank you.
4    A.  Well, Bibb Allen's book.  I've relied on
5    that for the aspects of acceptance of the
6    premium.
7    Q.  On the waiver issue?
8    A.  Waiver, yeah.
9    Q.  Okay.  And you think his treatise is --
10   And you've cited a case in your report.
11   Does that comes from Bibb Allen's book?
12   A.  Yes.
13   Q.  You don't pretend to have expertise in the
14   law governing insurance, do you?
15   A.  What do you mean?
16   Q.  Well, you don't hold yourself out as an
17   expert in insurance law, do you?
18   A.  No.  I'm not a lawyer.  So I'm not
19   rendering any legal opinions.
20   Q.  Thank you.
21   A.  I mean, I can read the information that
22   comes, that's common in the insurance
23   industry, to receive case law and other

Page 76

1    documents from various sources regarding
2    how claims are handled.  So it's not
3    unusual to see case law as an adjuster for
4    handling claims.
5    Q.  All right.  You and I had a discussion a
6    moment ago about the term, quote,
7    "reservation of rights," end quote.
8    A.  Right.
9    Q.  You use also the term, quote, "nonwaiver,"
10   end quote --
11   A.  Right.
12   Q.  -- in your report on this case, don't you?
13   A.  Yes, sir.
14   Q.  What does nonwaiver have to do with life
15   insurance claims-handling?
16   A.  Well, nonwaiver is in the same purview as
17   a reservation of rights, in that it's just
18   a -- Generally, a nonwaiver is a
19   standardized form-type thing, although it
20   can be manuscripted out, and basically
21   says you're investigating the claim, and
22   you'll get back with the insured at a
23   later time.  I mean, that's --

19 (Pages 73 to 76)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 77 |
|---|

1  **Q.  That's your understanding of "nonwaiver"?**
2  A.  Well, "nonwaiver" is you set out that you
3      have a claim. You're looking at the
4      claim. There may be a question of
5      coverage. You know, you're reserving your
6      rights to review the coverage aspects, and
7      then you'll advise thereafter.
8  **Q.  But what you're doing in that is, you're**
9      **offering to defend the insured in a**
10     **liability context, while you are reserving**
11     **the right to challenge coverage issues,**
12     **aren't you?**
13  A.  You would use the reservation of rights,
14     or a nonwaiver, in first-party.
15     First-party fire has a lot of reservation
16     of rights and nonwaivers involved. So you
17     see that -- you see it a lot in, you know,
18     the fire-type claim, or any first-party
19     claim where there's a question of coverage
20     involving the insured.
21  **Q.  Have you ever seen it used in the life**
22     **insurance context?**
23  A.  Not yet.

| Page 78 |
|---|

1  **Q.  Neither have I.**
2  A.  If the person doesn't even know what a
3     reservation of rights is, it's hard for
4     them to use one.
5  **Q.  Or if a person has no need of application**
6     **of the term "reservation of rights,"**
7     **there's no need to use one?**
8  A.  I'd disagree with that. Because any time
9     you've got a question of coverage, there's
10     a need. And as a claims manager, you're
11     going to run into situations involving
12     coverage. So if you've got twenty-five,
13     thirty years experience and you don't even
14     know how to reserve rights, or when to
15     question coverage, or notice coverage
16     questions --
17  **Q.  Can you point me to any -- any**
18     **authoritative source that would suggest**
19     **that the terms, quote, "reservation of**
20     **rights," end quote, or the term, quote,**
21     **"nonwaiver," end quote, has a place and**
22     **application in the context of handling**
23     **life insurance claims?**

| Page 79 |
|---|

1  A.  Not at this time.
2  **Q.  Well, this is the only time I've got to**
3     **ask you.**
4  A.  I know. I haven't seen anything.
5  **Q.  Neither have I.**
6  A.  But, you know, if I go looking, I may find
7     something. If I do, I will let you know.
8  **Q.  I'd appreciate it.**
9     **Have you ever been a plaintiff or a**
10    **defendant in a lawsuit?**
11  A.  Yes.
12  **Q.  Okay. What types of cases have you been a**
13     **plaintiff in?**
14  A.  As a landlord, as an individual.
15  **Q.  Were you other than an individual in your**
16     **landlord cases?**
17  A.  No. I was an individual in landlord
18     cases. Then sued a few folks. Dismissed
19     the last suit I filed against an
20     individual from Mobile -- or two
21     individuals in Mobile. Didn't dismiss
22     that one. Venue was changed.
23  **Q.  What was that case about?**

| Page 80 |
|---|

1  A.  Individual was interfering in my father's
2     funeral.
3  **Q.  Okay.**
4  A.  And had been a defendant in a defamation
5     of character suit.
6  **Q.  And you were a cross-claimant in that,**
7     **weren't you?**
8  A.  Yeah.
9  **Q.  Did you serve as your own lawyer?**
10  A.  Yes.
11  **Q.  And your own expert witness?**
12  A.  Yes.
13  **Q.  Were you ever involved in a lawsuit**
14     **against Allstate, involving your ex-wife,**
15     **concerning an auto accident?**
16  A.  I don't know whether I was involved -- I
17     don't know whether suit was filed against
18     Allstate.
19  **Q.  Wasn't there a bad faith suit filed?**
20  A.  Against Allstate and my ex-wife?
21  A.  Yeah.
22  A.  I don't recall.
23  **Q.  Okay. So then you wouldn't recall whether**

20 (Pages 77 to 80)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 81

1  you acted as an expert witness in that
2  either?
3  A.  That one was settled with Allstate.
4  Q.  It was settled?
5  A.  Yeah.
6  Q.  Before or after the suit was filed?
7  A.  I don't even -- I don't recall whether the
8  lawsuit was filed.  Do you have the style
9  on it?
10  Q.  I do somewhere.  Just a moment and I'll
11  see if I can help you with it.  John and
12  Carol Allen versus S. Freeman Green and
13  Allstate Insurance Company.  Civil action
14  number CV-1986-1088.  Circuit Court of
15  Jefferson County, Alabama.
16  A.  What year?
17  Q.  1986.
18  A.  Okay.  That was when I was still with
19  Aetna.  Yeah.  I didn't recall -- I recall
20  the claim against Allstate.  That was
21  where she was rear-ended.
22  Q.  You were a plaintiff in that case, weren't
23  you?

Page 82

1  A.  Yeah, I guess.  I didn't recall that.
2  Q.  You don't recall suing them for bad faith?
3  A.  Not from that one.  No.
4  Q.  Okay.
5  A.  It may have been worded in there.
6       (Defendant's Exhibit 8 marked
7       for purposes of identification)
8  Q.  Mr. Allen, let me show you what is marked
9  as Defendant's Exhibit 8, which appears to
10  be a report from you in this case dated
11  October 22nd, 2006.  See if that is an
12  accurate copy of that, please, sir.
13  A.  I think they had another list of the court
14  trials.  It's not a current list.
15  Q.  Do you have a current list?
16  A.  Here's a current list.
17  Q.  Let's mark this as the next number
18  exhibit, which will be the current list.
19       (Defendant's Exhibit 9 marked
20       for purposes of identification)
21  Q.  And the current list would be Defendant's
22  Exhibit 9; is that right, sir?
23  A.  Yes.

Page 83

1  Q.  Okay.  Going back to a question I asked
2  you earlier on the current list.  Can you
3  point out to me on Exhibit 9 any cases
4  that involve life insurance claims, other
5  than the one that Mr. Miles and Mr. Bill
6  Wood were involved in?
7  A.  Number 57, I know, is a life insurance
8  claim.
9  Q.  Okay.  That's Victoria Johnson versus
10  Northwestern Mutual Life?
11  A.  Right.
12  Q.  Is that case over?
13  A.  I don't know whether it's on appeal or
14  not.
15  Q.  Okay.  Gusty Yearout was one of the
16  plaintiff's attorneys?
17  A.  Right.
18  Q.  And Chris King was one of the defense
19  attorneys?
20  A.  Right.
21  Q.  Has it been tried?
22  A.  No.
23  Q.  Well, I don't want you to tell me

Page 84

1  something that would jeopardize either
2  side of the lawyers of this case --
3  A.  Right.
4  Q.  -- on information.  But what can you tell
5  me -- You say it might be on appeal; you
6  don't know?
7  A.  I don't know exactly what the status of
8  the case is.  They had some motions, but I
9  don't know if --
10  Q.  Summary judgment motions?
11  A.  Yeah.  But I don't know what's happened,
12  as far as whether there's been any appeal
13  on the motions or what that is there.
14  So --
15  Q.  Okay.  What type of issue was involved in
16  that case or is involved in that case?
17  A.  I think that involved -- Well, I know it
18  had issues on the payment of premium and a
19  potential lapse of premium payment.
20  Q.  Did the company, Northwestern Mutual,
21  contend that the policy was out of benefit
22  due to nonpayment of premium?
23  A.  Well, it had some other issues as far as

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 85

1 some accounts that were involved in
2 funding the payment of the premium. So
3 there was a dispute on that issue as far
4 as what was available to fund it, and then
5 the value of the policy at the time of the
6 alleged lapse, and then whether there were
7 any -- you know, what benefits might have
8 been due.
9 Q. Was this a universal life policy, or
10 interest-sensitive policy, or something
11 like that?
12 A. I think part of it had interest and part
13 of it didn't. I think there were a couple
14 different types of policy.
15 Q. Was the issue involving whether or not the
16 cash value, or the fund in the policy, was
17 sufficient to carry the premium payment?
18 A. There was some issues of cash value. Yes.
19 Q. It was not a death claim, right?
20 A. Yeah.
21 Q. Oh, it was a death claim?
22 A. Yeah.
23 Q. Okay. And did the insurance company take

Page 86

1 the position that the policy had lapsed
2 because the fund in the policy was not
3 sufficient to carry the premium?
4 A. That was part of it. Yes.
5 Q. Do you remember anything else?
6 A. I remember there was -- also you had a
7 question on the effective date of the
8 policy, and whether this was a renewal, or
9 whether it was a continuation, or whether
10 it was a new policy. And there were those
11 issues involved, too.
12 Q. Okay. Is that about all you can remember
13 about the issues involved in the case?
14 A. Yeah. I mean, that's the -- I mean,
15 whether the policy had cash value in it,
16 some portions, you know, would have
17 allowed for cash value. Some policies
18 didn't have cash value. So it was a
19 combination of those.
20 Q. I see. Okay. Any others?
21 A. 53, I think, had some elements. It was --
22 I'm thinking that may be on accidental
23 death, involving benefits on accidental

Page 87

1 death.
2 Q. Okay. Any others? Was the issue in that
3 Cottingham versus CNA case whether or not
4 the death was, in fact, accidental?
5 A. There's more to it than that. This was
6 where the guy had sustained -- I believe
7 this is the one where he had sustained a
8 burn. He was a diabetic. And he got
9 burned by the heater. And then he ended
10 up with having his leg amputated, and then
11 he ended up dying. So it was kind of a
12 chain of causal events associated with it.
13 Q. And the insurance company contended that
14 he died of disease as opposed to an
15 accident? Is that fair to say?
16 A. No, I don't think so.
17 Q. Okay. Do you remember what the issue was,
18 then?
19 A. It was over him dying, and whether there
20 was a causal relationship between the
21 injury and the death. That's all I
22 remember there.
23 Q. Any others?

Page 88

1 A. That's all I recall.
2 Q. Thank you, sir.
3 In your role as an expert witness
4 hired by the party to civil litigation, do
5 you attempt to give fair treatment to all
6 of the language in a policy or a document,
7 or do you consider your role to be that of
8 an advocate for the party who has hired
9 you?
10 A. I don't consider myself an advocate.
11 Q. Do you try to give fair treatment to all
12 of the documents?
13 A. Absolutely.
14 (Defendant's Exhibit 10 marked
15 for purposes of identification)
16 Q. Okay. Let me show you what is marked as
17 Defendant's Exhibit 10, which appears to
18 be a letter dated January the 2nd, I
19 think, 2004.
20 A. Yes.
21 Q. All right. Now, if you would, your pages
22 of your report do not appear to be
23 numbered.

22 (Pages 85 to 88)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 89

1  A.  They are.  Top right.
2  Q.  Yes, they are.  I'm sorry.
3  A.  Top left, I mean.
4  Q.  They sure are.  Let me find where I'm
5     talking about.  Okay.  The second page of
6     your report, if you will turn to that,
7     please, sir.
8  A.  All right.
9  Q.  And in the second paragraph on the second
10    page you refer to this particular letter,
11    do you not?
12 A.  Yes.
13 Q.  And your letter says, and I quote, "The
14    letter stated that if premium was received
15    by January 17, 2004, that the policy would
16    be reinstated."
17 A.  Uh-huh (positive response).
18 Q.  Okay.  You did not mention the rest of
19    that sentence, did you, from the letter?
20 A.  Which part are you talking about?
21 Q.  The part that says "provided the insured
22    is still in good health."
23 A.  Correct.

Page 90

1  Q.  Why not?
2  A.  Well, you know, that's just the way I
3     worded it.
4  Q.  I know it.  But why didn't you give the
5     rest of what the letter said with regard
6     to that same sentence that you are
7     paraphrasing?
8  A.  That's just the way I worded the sentence.
9  Q.  Is that not material to you, the condition
10    provided in there, quote, "provided the
11    insured is still in good health"?
12 A.  At the time the payment was mailed, he was
13    in good health.
14 Q.  That's not what I asked.  Is that not
15    material to you at all, that it says,
16    quote, "provided the insured is still in
17    good health"?
18 A.  I wasn't addressing the issue of his
19    health.  I was addressing the issue if it
20    was received by the 17th, it would be
21    reinstated.
22 Q.  Even if he was dead?
23 A.  And, you know, I went on to mention "A"

Page 91

1     and "B" under the policy.
2  Q.  Yes, sir.
3  A.  So, you know, I reference what the
4     certificate said, as far as, you know,
5     whether they require any evidence of
6     insurability, and the overdue premiums
7     were paid.
8  Q.  Okay.  Have you read this policy?
9  A.  Yes.
10 Q.  The entire policy?
11 A.  Well, whatever I had.  I don't recall
12    whether we have a certified copy of that
13    policy or not.  Whatever I had policy-wise
14    is in the notebook here.
15 Q.  Right.  If you will turn, please, sir, to
16    page 6 of your report.
17 A.  Okay.
18 Q.  The very top sentence up there where it
19    says, "It has been my experience that the
20    date anything is mailed is considered as
21    the date the item was transferred to the
22    addressee."
23 A.  Yes.

Page 92

1  Q.  Where does that experience come from with
2     regard to life insurance premium payers?
3  A.  That's not necessarily involving life
4     insurance, but just, in general, of when
5     payment is considered as being, you know,
6     sent, received.  I mean, I remember that
7     going back to college.  You know, once you
8     put it in the mail at that point in time,
9     that's when you've sent it on to the other
10    person.  So --
11 Q.  And that's when it's deemed received in
12    every instance, in your judgment?
13       MR. SANSPREE:  Object to form.
14 A.  I mean, as far as the taxes go, I mean,
15    that's the example I gave.  If you got it
16    in there before midnight on the 15th, it's
17    deemed as having been transferred over to
18    the Feds.  So, I mean, that's the best
19    example.
20 Q.  I'm painfully familiar with taxes.  But,
21    nevertheless, is it your understanding
22    that always an item is deemed received
23    when it is placed in the mail to the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 93

1 addressee?
2 A. I haven't read anything to the contrary to
3 that position, that once you put it in the
4 mail, it's deemed on the received side.
5 Q. You would agree that parties can contract
6 otherwise, wouldn't you?
7 A. What do you mean "contract"?
8 Q. Contract differently as to when something
9 is deemed received or payment made.
10 A. Are you talking about a written contract,
11 or an oral contract, or just --
12 Q. Either.
13 A. You know, you can have variations, I
14 guess.
15 Q. And if the rule is, as you stated, that an
16 item is deemed received by the addressee
17 once it's placed in the United States
18 mail, you would agree with me that parties
19 can contract otherwise, wouldn't you,
20 based on your knowledge? I'm not asking
21 you for a legal interpretation.
22 (Brief interruption)
23 A. Would you repeat the question again?

Page 94

1 Q. You told me that your understanding as to
2 -- regardless of what document or anything
3 that's placed in the mail is generally
4 deemed received by the addressee once it
5 is placed in the United States mail.
6 A. Correct.
7 Q. My next question was, wouldn't you agree
8 that parties could contract otherwise?
9 A. I mean, you know, you can contract for a
10 lot of different things. So the
11 possibility is there.
12 Q. Yes, sir. Have you read this policy with
13 regard to its definitions as to when
14 premiums are payable and how?
15 A. I remember there was, like, thirty-one
16 days per premium payment due on the other
17 side. Which one are you specifically
18 referring to?
19 Q. I'm going to refer you just a moment. But
20 as we sit here, do you remember, from your
21 review and investigation of the subject
22 Globe Life policy insuring the life of
23 David Lurie, what it said as to payments

Page 95

1 of premiums, and where they were to be
2 made, and such as that?
3 MR. SANSPREE: Without looking at
4 it?
5 MR. BUTLER: Yeah. Without
6 looking at it.
7 A. I would have to look at it.
8 Q. Thank you. I'll give you that
9 opportunity.
10 MR. BUTLER: Would you mark that
11 as the next number?
12 (Defendant's Exhibit 11 marked
13 for purposes of identification)
14 Q. Defendant's Exhibit 11, right up under the
15 top bold print "Premiums and
16 Reinstatement," it has "Payment". And
17 doesn't it say, "Each premium is payable
18 in advance at our administrative office"?
19 A. Yes.
20 Q. And that's in Oklahoma City, Oklahoma,
21 isn't it, wherever the administration
22 office is?
23 A. Wherever that is. Right.

Page 96

1 Q. Okay. Now, did you read Ms. Lurie's
2 deposition?
3 A. Yes.
4 Q. Did you read the deposition or a summary
5 provided to you?
6 A. I didn't get a summary. I read her
7 deposition.
8 Q. Okay. And what was her testimony as to
9 when she made a payment on this policy
10 that had lapsed?
11 A. She indicated that she had written a check
12 on January 4th and -- of 2004. Although,
13 the check stated January 4th, 2003. So we
14 had the year change.
15 Q. There would be no issue about that.
16 A. Okay. And then she said she had placed
17 that in the mail the evening of the 4th,
18 and that the mail was picked up the
19 morning of the 5th.
20 Q. Of 2004?
21 A. Of 2004. Yes.
22 Q. January the 5th of 2004?
23 A. Correct.

24 (Pages 93 to 96)

FREEDOM COURT REPORTING

Page 97

1  Q. And for purposes of your report, had you
2     deemed that it was received by Globe Life
3     when it was placed in the United States
4     mail; is that right?
5  A. Yes.
6  Q. Okay. Defendant's Exhibit 11, however,
7     under "Premiums and Reinstatement," states
8     that "Premium is payable in advance at our
9     administrative office," doesn't it?
10 A. Yes.
11 Q. Clearly it would not have been received by
12    the date of death of David Lurie, would
13    it?
14        MR. SANSPREE: Object to the
15        form.
16 A. I don't know. You know, if it was mailed
17    on the 5th -- You don't know about the
18    mail, as to whether it was there the next
19    day. I don't know what day. And there's
20    nothing I've seen in the evidence that
21    says what day it was received by Globe.
22    So I don't know.
23 Q. Have you read the depositions of the Globe

Page 98

1     people that were deposed?
2  A. Yes.
3  Q. Well, let me save some time.
4  A. All right.
5  Q. Assuming for the purposes of my question
6     that there's testimony that it was
7     received on or about January the 16th of
8     2004.
9  A. I know that's the date that it was posted.
10    Now, as to whether it was received what
11    day, that's unknown. The day it was
12    posted to the account would have been the
13    16th. So you don't know -- I mean, that's
14    a date of posting, which was a day prior
15    to the date of the 17th, which was what
16    was indicated that it had to, you know, be
17    posted by that date.
18 Q. Yes, sir. But did you get any information
19    from those depositions as to when would
20    have been the earliest that it would have
21    been received?
22 A. I don't recall that.
23 Q. Would you agree it would have been after

Page 99

1     the date of death of the insured, David
2     Lurie?
3  A. Well, I don't know.
4  Q. Okay. Nevertheless, the policy requires
5     it be "paid in advance at our
6     administrative office," doesn't it?
7        MR. SANSPREE: Object to the
8        form.
9  A. That's what it says.
10 Q. And if it wasn't received at the Globe
11    administrative office, then the
12    reinstatement offered in Defendant's
13    Exhibit 10 says that they must receive
14    their payment by January 17th, doesn't it?
15 A. Yes.
16 Q. And it says that the insured must be still
17    in good health, doesn't it?
18 A. Yeah.
19 Q. In fact, he was dead, wasn't he?
20 A. Not on the 2nd.
21 Q. Not on the 2nd, but he was dead --
22 A. The morning of the 6th.
23 Q. -- the morning of the 6th.

Page 100

1  A. Right.
2  Q. And the premium was only picked up by the
3     postman on January the 5th, right?
4  A. Yes.
5  Q. If Globe did not receive it until after
6     the 6th, then this reinstatement could not
7     have been, according to this letter,
8     effected, could it?
9  A. Well, that's if you're negating that it's
10    in the mail and it's in their possession.
11    And as far as the physical possession for
12    the dateline set there, it was in their
13    physical possession and posted before the
14    17th.
15 Q. Yes, sir. But he was not in good health,
16    you know, in between the time they
17    received the payment and the 17th, was
18    he --
19        MR. SANSPREE: Object to the
20        form.
21 Q. -- if they received it after the 6th?
22 A. Correct.
23 Q. Okay. You wouldn't expect a life

25 (Pages 97 to 100)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 101

1 insurance company to knowingly reinstate a
2 life insurance policy that had been lapsed
3 and out of benefit, if they knew that the
4 insured was dead, would you?
5 A.  Well, you know, the statement by Attorney
6 Mitchell is contrary to that, in that
7 Attorney Mitchell indicates that he
8 advised them as of the 12th of January
9 that Mr. Lurie was dead, and they said,
10 okay, just send the premium on in.
11 There's no problem as long as it's
12 received before the 17th. So the
13 affidavit of the attorney is reflective
14 that they were with the knowledge of the
15 death as of the 12th, and then the account
16 was posted on the 16th.
17 Q.  My question is, from what you know about
18 life insurance, would you expect a life
19 insurance company to reinstate a life
20 insurance policy that was out of benefit
21 with knowledge that the insured was
22 already dead?
23 A.  I think it's circumstantial as to the

Page 102

1 facts concerning the notice to the
2 insurance company.
3 Q.  How is that?
4 A.  Well, the attorney had advised them of
5 that.
6 Q.  That wasn't my question at all. Listen
7 very carefully. I'm going to ask it the
8 third time.
9    Based on your knowledge of life
10 insurance practices, would you expect a
11 life insurance company to knowingly agree
12 to reinstate a life insurance policy that
13 was out of benefit, knowing that the
14 insured was already dead?
15 A.  I don't think you can -- you know, that's
16 second-guessing what an insurance company
17 would do. They might --
18 Q.  Well, that's what you're doing in this
19 case.
20 A.  Well, no. Huh-uh (negative response).
21 I'm taking it on the facts of what was
22 shown as testimony by the insured's
23 attorney and the notice to the company.

Page 103

1    So --
2 Q.  Can you answer my question?
3 A.  No.
4 Q.  Thank you.
5    Since you referred to the attorney --
6 His name is Mitchell?
7    MR. SANSPREE:  His name is
8    Matthews.
9    MR. BUTLER:  I didn't think it
10    was Mitchell.
11 Q.  Have you talked to Mr. Matthews?
12 A.  No.
13 Q.  Do you know to whom he talked at Globe
14 Life?
15 A.  No.
16 Q.  Based on your experience in the insurance
17 business or industry, would you think it
18 reasonable to assume that an employee, an
19 unidentified at this point-in-time
20 employee at Globe, would say, go ahead,
21 and, you know, if we get the premium, it
22 doesn't matter whether the insured is dead
23 or not? Does that make sense to you?

Page 104

1 A.  I don't think you can ever truly say what
2 any employee may say about --
3 Q.  I didn't ask you what they might have
4 said. I said, does it make sense to you,
5 as a person that's been in the insurance
6 business for a lot of years?
7 A.  Makes sense that they would knowingly say
8 that? They had the information in front
9 of them, as far as the computer
10 information, on whether the account is
11 current, whether it's not current. They
12 have the information in front of them in
13 this situation. So, I mean, as far as
14 saying what the employee did or didn't do,
15 there's nothing tendered by Globe to show
16 that the event didn't happen.
17 Q.  Is it logical that such a Globe employee
18 would have said that?
19 A.  It's possible.
20 Q.  Is it logical?
21 A.  I don't know whether you could draw a fine
22 line of logic to the possibility that it,
23 you know, took effect. I mean, logically

26 (Pages 101 to 104)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 105

1  -- You may say, well, logically this
2  shouldn't happen, but "logically" doesn't
3  necessarily mean it doesn't happen.
4  Q.  That's right.  You use logic every day,
5  don't you?
6  A.  I think most everybody does.
7  Q.  I do, too.  Is it logical that such an
8  employee would have said that, knowing
9  that the person was already dead and
10 saying, "We'll reinstate anyway if we get
11 the premium in time"?
12 A.  I don't know what the employee knew about
13 the premium payment.
14 Q.  I don't either.
15 A.  And there's nothing been tendered by
16 anybody there that says that they did or
17 didn't talk with the attorney.
18 Q.  All right, sir.  Would you agree that
19 people who have actually worked in life
20 insurance claims for several years would
21 have more expertise than you with regard
22 to appropriate procedures, with regard to
23 life insurance claims?

Page 106

1  A.  Well, since Globe doesn't have any
2  policies or procedures, I would say no.
3  Q.  Okay.  Would you agree that they would
4  have more knowledge of industry standards
5  with regard to life insurance claims?
6  A.  No.  Not the Globe folks.  I mean, if you
7  haven't got any policies and procedures,
8  and everything is word-of-mouth, then that
9  would be impossible, in my opinion, for
10 these folks to have greater knowledge than
11 me when they haven't even read, you know,
12 any policies or procedures.
13 Q.  Okay.  You did learn from review of the
14 Globe depositions that the claims
15 examiners actually reviewed the policy
16 involved, and the benefits and exclusions
17 in those policies, in adjusting the claim?
18 A.  After the fact.
19 Q.  After the death?
20 A.  No.  Because as far as what Ms. Whitaker
21 indicated, she indicated that she got the
22 claim.  She looked at it.  She approved
23 it.  She sent it to Legal.  They approved

Page 107

1  it.  And then she gave it to the adjuster
2  to see if it was covered after the claim
3  manager had approved the thing, which is
4  totally contrary to what I've seen as an
5  industry standard.
6  Q.  You're not listening to my question.
7     Did you not find in the Globe
8  depositions of the Globe employees, the
9  three Globe employees that were deposed,
10 that the Globe procedure was to get a
11 printout of the actual policy involved in
12 the claim?
13 A.  Wasn't the actual policy.  I think it
14 would have been a specimen.
15 Q.  All right.  A specimen of the policy
16 involved in the claim?
17 A.  But you don't know that the specimen is a
18 certified copy of the policy that existed.
19 Q.  And you're not being an advocate here
20 today; is that right?
21 A.  I'm just telling you the way --
22 Q.  I understand.  Keep on.
23 A.  -- the way it was.

Page 108

1  Q.  All right, sir.  So did you read in the
2  depositions that the Globe adjusters would
3  have the policy language in front of them
4  as to benefits and exclusions?
5  A.  They would have a specimen, which I don't
6  know whether it was the actual policy
7  verbiage and addition dates that would
8  have been involved.  But there would have
9  been some form of a specimen policy with
10 them.
11 Q.  Do you have any knowledge or information
12 that it was not?
13 A.  No.
14 Q.  So with regard to your thought that it
15 might not have been exact is basically
16 totally guess and surmise, isn't it?
17 A.  Well, I don't know, because I haven't seen
18 a certified copy of the policy, and them
19 saying that, "Yes, I reviewed the
20 declaration sheets, and then I've reviewed
21 a certified copy of the policy as
22 certified by ONRA" (phonetic).
23 Q.  If it's not totally guess and surmise,

27  (Pages 105 to 108)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 109

1  what is it based on, your comment that it
2  might not have been the same benefit and
3  exclusion language that Mr. Lurie had in
4  his policy?
5  A.  The experience of seeing different
6  policies submitted as being the policy in
7  force when they weren't.
8  Q.  Okay. But you yourself, in analyzing the
9  actions of Globe Life after the fact, did
10  not read and rely on all of the provisions
11  of Mr. Lurie's policy that was represented
12  to you by Ms. Lurie's counsel as being a
13  copy of his policy, did you?
14  A.  I made my observation based on what was
15  submitted to me.
16  Q.  Yes, sir. And you did not take note of
17  the language with regard to payment of
18  premiums under "Premiums and
19  Reinstatement" contained on Exhibit 11,
20  did you?
21  A.  What do you mean? As far as addressing
22  that in my report, or what?
23  Q.  Yes, sir.

Page 110

1  A.  On which part, are you saying?
2  Q.  The thing we just got through a moment --
3  under "Payment."
4  A.  You know, I mean, it says what it says,
5  and "at the administrative office." I
6  mean, I guess it was addressed to the
7  administrative office. I don't know what
8  the address was on the envelope, but I
9  assume it was to the administrative
10  office.
11  Q.  Okay. But this says "Premium is payable
12  in advance at our administrative office."
13  And you interpret that to mean if it was
14  placed in the mail and mailed to the
15  administrative office, it's the date of
16  mailing? Is that your interpretation?
17  A.  I think it's subject to ambiguity.
18  Q.  Okay. You refer often in your report to
19  industry standards, and breach of industry
20  standards, with regard to the adjustment
21  of life insurance claims. Where are those
22  industry standards published in a manual
23  or a guideline?

Page 111

1  A.  Deviation from industry standards?
2  Q.  No, sir. The industry standards
3  themselves.
4  A.  Well, I mean, you've got a combination of
5  all the different industry treatises which
6  address claims of various forms. So as
7  far as one particular book that I can say
8  encompasses it all, I don't think there's
9  one book in itself that encompasses it.
10  It's a variety of industry treatises that
11  govern how claims are handled.
12  Q.  Well, I'm speaking of life insurance
13  claims here in this case. Because you do
14  understand that's what is involved in this
15  case?
16  A.  Yes.
17  Q.  Okay. Can you tell me where those
18  industry standards that you claim are
19  breached are set forth in any manual,
20  treatise or guideline?
21  A.  I mean, we'd have to take that one-by-one
22  on what's in the letter, and then I'd have
23  to go back and look through the various

Page 112

1  books and see what's there. I'm going on
2  my training, education and experience as
3  far as what is within an industry standard
4  and what's outside of an industry
5  standard. Industry standards say you're
6  supposed to have some sort of procedures
7  and manual, and Globe doesn't have any.
8  So how do they know what they're supposed
9  to do, other than word-of-mouth?
10  Q.  Well --
11  A.  I mean, they don't have any standards
12  within the company itself.
13  Q.  Yes, sir. Yes, sir. But you relied on
14  your training and experience, didn't you?
15  A.  And review of -- You know, my years of
16  experience and looking at things from a
17  consultant and an expert witness, same
18  point.
19  Q.  Yes, sir. But the Globe people, that you
20  read the depositions of, relied and
21  utilized their training and experience in
22  the very field of life claims-handling,
23  didn't they?

28  (Pages 109 to 112)

# FREEDOM COURT REPORTING

Page 113

1 A.   Their training and experience is strictly
2     a one-on-one, word-of-mouth with no
3     procedures in mind, or no set procedures
4     for the company.
5 Q.   And yours is superior because your
6     training and experience is working on
7     plaintiffs' cases as a professional
8     witness to give testimony in civil
9     lawsuits; is that right?
10        MR. SANSPREE:  Object to the
11        form.
12 A:   I do plaintiff and defense work.  So
13     it's --
14 Q.   I'm sorry.  Plaintiff and defense work.
15     Your training and experience would be
16     superior, in your judgment, to their
17     training and experience with regard to
18     life claims-adjusting; is that right?
19 A.   I would say with these folks, from what I
20     read, with them not having any training,
21     or education, or any certification, and
22     then having nothing to go on within the
23     company.

Page 114

1 Q.   Well, they have the policy, don't they,
2     that sets forth the contract?
3 A.   Yeah.  But they don't have any policies
4     and procedures manual.  I know you've seen
5     them, and they go down and explain how
6     you're supposed to do things when you get
7     a coverage issue, how it's supposed to be
8     addressed, how it's supposed to be
9     handled.  But here they say they've got
10     nothing but word-of-mouth to guide any of
11     these folks.  And then you've got a person
12     that says they've been there thirty years
13     and they don't know what a reservation of
14     rights is.  I know my experience is better
15     than theirs if they don't even have a
16     concept of that.
17 Q.   I might agree with you if you can point to
18     me any place that any company on life
19     insurance claims utilizes the terminology,
20     quote, "reservation of rights," end quote,
21     or "nonwaiver."  But you don't have any
22     such information, do you?
23 A.   Not today.

Page 115

1 Q.   And you're going to research that and
2     report that back to Mr. Sanspree if you
3     can find it?
4 A.   Only if I see anything on it.
5 Q.   I would appreciate it.
6        But you say it would be a breach of
7     industry standard for the Globe Life
8     claims personnel to use their training and
9     experience wherein they adjust claims
10     every day on these same type life
11     insurance policies and they actually
12     utilize the contract of insurance itself
13     to go by with regard to benefits and
14     exclusions?
15 A.   Well, I mean, this one, they accepted the
16     -- I mean, initially Globe says, "Yeah,
17     it's paid.  It's payable."  And then the
18     law firm looked at it and they say it's
19     payable.  And then you come back to the
20     examiner and they say, "Oh, no, we're not
21     going to pay the thing."  I mean, that's
22     just a total backwards approach from what
23     industry standards are.  And so --

Page 116

1 Q.   You say that what they should have done
2     initially, the first claims person that
3     touched the claim -- Do you know when the
4     proof of loss came in?
5 A.   I don't recall the date on that.
6 Q.   Wasn't it sometime in March?  I don't
7     either.
8 A.   It was after January.
9 Q.   I would hope it was after January.  But
10     assuming it was sometime in March of 2004,
11     once you've got proof of loss of the
12     claim, is it your view that the first
13     claims person that touched that should
14     have determined whether the policy was in
15     force or not at the date of death?
16 A.   Well, Ms. Whitaker never determined
17     whether --
18 Q.   Can you answer my question?
19 A.   Ms. Whitaker never determined whether the
20     policy was in force.  She never looked at
21     the policy.  She didn't determine anything
22     on the premium payment, and she okayed the
23     payment.

29 (Pages 113 to 116)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 117

1 Q.  Do you think that's an answer to my
2      question?
3 A.  That's what happened.
4 Q.  That's not an answer to my question,
5      though. I'm entitled to get answers to
6      the questions I ask, Mr. Allen. And I've
7      got all day.
8 A.  All right.
9          MR. BUTLER: Read back my
10             question, please.
11         (Requested portion of Record
12             read by the Reporter)
13 A.  Yes.
14 Q.  Thank you.
15         And it appears in this instance that
16      was not done; is that right?
17 A.  To my knowledge. Well, you know, I don't
18      know what -- I don't know exactly what was
19      done about that.
20 Q.  Let me ask you this, Mr. Allen: Do you
21      know any legitimate, logical reason that
22      Globe would have gone through the time and
23      expense to investigate the merits of this

Page 118

1      claim, if it knew from the outset that the
2      insured had died while the policy was out
3      of benefit?
4          MR. SANSPREE: Object to the
5             form.
6 A.  Repeat it one more time.
7 Q.  Yes, sir. Do you know whether there is
8      any legitimate, logical, reasonable basis
9      that Globe would have gone to the time and
10      expense of going into investigation of the
11      merits of whether this claim is payable,
12      if they already knew that the insured had
13      died while this policy was out of benefit?
14         MR. SANSPREE: Same objection.
15 A.  You'd still have some elements to
16      investigate on the timing, and when the
17      payments were submitted. There's a lot of
18      stuff you can look at from an
19      investigative standpoint. I mean, the way
20      the claim was sent in, it was sent in and
21      approved, and then the investigation was
22      started after the claim was approved.
23 Q.  Well, the investigation as to whether the

Page 119

1      policy was in force was investigated,
2      right, after the merits issue had been
3      investigated, the merits of the payability
4      of the claim as an accidental death?
5 A.  Yes.
6 Q.  Thank you.
7          And you say that was an error in the
8      order in which they went through this, in
9      your judgment?
10 A.  Yes.
11 Q.  Okay. And that ties back into your view
12      that the first claims person should have
13      determined whether the policy was in
14      benefit at the date of the insured's
15      death; isn't that right?
16 A.  That would be one thing you would look at.
17 Q.  What else would you look at?
18 A.  Well, you'd look at the cause of death,
19      and whether it might have been suicidal,
20      or whether it might have been accidental,
21      suicidal, homicide.
22 Q.  If the claims adjuster determined that the
23      policy was not in benefit on the date of

Page 120

1      death, that would be the end of it, in
2      your view, wouldn't it, or not?
3 A.  Not necessarily the end of it. I mean,
4      you've still got an obligation to
5      investigate the claim, investigate all
6      avenues, and make an informed decision and
7      subject it to a cognitive review where you
8      know all the factors involved before you
9      make a decision.
10 Q.  Yes, sir. And would that include
11      investigating what I call the merits? It
12      may be a poor phrase. But when I say
13      "merits," I'm talking about if there was
14      no issue of whether the policy was in
15      benefit, whether this was a payable claim
16      or not?
17 A.  Well, I mean, still you've got a question
18      as to, you know, whether it was in benefit
19      or not. I mean, you've got the
20      reinstatement thing. So it's kind of
21      convoluted as to the way the thing works.
22 Q.  Yes, sir. You would agree with me, would
23      you not, that this policy had clearly

30 (Pages 117 to 120)

# FREEDOM COURT REPORTING

Page 121

1 lapsed and was beyond the grace period on
2 January the 4th of 2004?
3 A.   Now, they had the reinstatement portion --
4 On the grace period, it says, "A grace
5 period of thirty-one days will be allowed
6 each insured for the payment of each
7 premium after the 1st, during which period
8 his or her insurance shall continue in
9 force."
10 Q.   Okay.
11 A.   Where you're having each insured and each
12 premium.  So it's stating a thirty-one-day
13 grace period on each premium, which would
14 be if you've got a November premium and
15 then you've got a December premium, it's
16 saying a thirty-one-day grace period on
17 each of the premiums.
18 Q.   Yes, sir.  But the policy had lapsed as
19 of, I think, December the 28th or toward
20 the end -- I can't remember the exact date
21 -- but toward the -- The policy had lapsed
22 and was out of benefit before the
23 beginning of 2004, wasn't it?

Page 122

1 A.   Yes, sir.
2 Q.   There's no issue about that, is there?
3 A.   No issue on the lapse.  They did reinstate
4 it, though.
5      MR. BUTLER:  Move to strike as
6      nonresponsive.
7 Q.   All right, sir.  So whether or not this
8 policy was in benefit on the date of death
9 turns on the issue of whether or not the
10 premium mailed on January the 5th is
11 deemed received by Globe on that date; is
12 that right?
13 A.   That's part of it.
14 Q.   Anything else?
15 A.   Well, the fact that you've got the
16 attorney that calls and advises them, as
17 he indicated on the 12th, that this had
18 happened, and then he receives word that
19 as long as it's received the 17th.
20 Q.   Okay.  In your reading, and investigation,
21 and review and analysis of the policy in
22 question in this case, did you determine
23 whether or not the insurance contract

Page 123

1 could be modified and changed by an oral
2 statement?
3 A.   As a general rule, they're not supposed to
4 be.  That doesn't mean that it doesn't
5 happen or you don't get those statements
6 from employees.
7 Q.   Well, let's forget about general rules and
8 things of a general nature.  Let's talk
9 about the language in this policy.  Did
10 you read in this policy where it can't be?
11 A.   I don't recall the exact section.  That's
12 a standard condition in most policies.
13 Q.   Yes, sir.  You wouldn't be surprised to
14 find it in here?
15 A.   Correct.
16 Q.   Okay.
17      (Brief recess)
18 Q.   Let me see if I've got this right,
19 Mr. Allen.  Do I understand that it is
20 your opinion, that with regard to this
21 particular claim on Mr. Lurie's death,
22 that initially the claims person that
23 handled the review of the proof of loss

Page 124

1 should have initially determined whether
2 the contract or policy of life insurance
3 was still in force at the day of this
4 death?  Is that fair?
5 A.   That would be one of the things.
6 Q.   All right.  But do I also understand your
7 testimony, that nevertheless, whatever --
8 you know, even if the adjuster determined
9 that the contract was not in benefit at
10 the date of his death, the adjuster should
11 have gone forward to determine whether the
12 claim was otherwise payable?
13 A.   Well, I mean, you need to investigate the
14 whole thing.  I mean, as far as the
15 premium payment, whether it was, you know,
16 sent and received in accordance with the
17 thing, the question on the letter -- or
18 the premium payment mailed by Ms. Lurie, I
19 mean, if it had the address of Globe Life
20 on it at the prescribed place, then that
21 would be in accordance with the policy
22 provisions on the premium payment, by
23 having it properly addressed to them when

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 125

1    it's put in the mail. So you've got all
2    these little things you need to look at in
3    order to ascertain, you know, what
4    happened, what was due, what wasn't due,
5    if they had any problem with the coverage,
6    any problem with the payment, any problem
7    with the reinstatement. Was it in
8    accordance with normal procedures?
9    Q.   Do you think they should have gone ahead
10       and determined whether the claim -- for
11       example, this is an accidental death
12       policy -- whether the claim was payable as
13       an accidental death, but for the issues
14       with regard to premium payment?
15   A.   I think they should have investigated the
16       whole thing before you go and you approve
17       payment, and then after you approve
18       payment by management and legal, and both
19       of those approve of payment, and then you
20       give it to an adjuster and say, all right,
21       now go investigate it, and see if there's
22       any reason to pay it. But that's after
23       you receive the approval, which is just

Page 126

1    totally contrary to the way I've seen
2    business done, which is where the adjuster
3    determines all the facts, submits that to
4    management, determines if there's any
5    question there, and then the management,
6    if they've got any further question, then
7    they may seek a legal opinion after that.
8    Here they passed it through both
9    management and legal, and then came back
10   and relied on the adjuster to come up with
11   a basis for denial.
12   Q.   But with regard to the procedures, you
13       think that they handled it somewhat
14       backwards based on procedures they should
15       have followed?
16   A.   Well, they don't have any procedures.
17   Q.   Well --
18   A.   I mean, they say --
19   Q.   They didn't say they --
20   A.   She said they didn't have a policies and
21       procedures manual, and it was
22       word-of-mouth. But that again is --
23   Q.   That's right. She said it was also based

Page 127

1    on experience, too, didn't she?
2    A.   The experience of not reading any manuals
3        or knowing what policy --
4    Q.   Is that what she said?
5    A.   No, she didn't say that. She says they
6        have no manuals, and everything is done
7        one-on-one.
8    Q.   Yes, sir.
9    A.   And that's not the way you find the
10       business is done within the insurance
11       companies.
12   Q.   And she said they train their adjusters
13       based on experience, and based on the
14       policies and benefits and exclusions,
15       don't they?
16   A.   That's one-on-one person.
17   Q.   Yes, sir. Okay. But, nevertheless, you
18       agree that they should have investigated
19       the -- regardless of the premium payment,
20       and whether the policy was in force or
21       not, they should have investigated the
22       entire claim?
23   A.   Yes.

Page 128

1    Q.   Okay. And the only difference is, they
2        didn't make the determinations in the
3        order that you say they should have; isn't
4        that correct?
5    A.   Yes.
6    Q.   Okay. Because they did do a -- Would you
7        agree with me that they did a thorough
8        investigation as to what we've been
9        calling the merits of the claim, as to
10       whether it was payable, but for the issues
11       concerning whether the policy was in
12       force? Did you look at that?
13   A.   Repeat the question again.
14   Q.   In other words -- Let's forget about the
15       issue, for right now, for the purpose of
16       my question, about whether the policy was
17       in force or not. I understand your
18       opinion on that.
19   A.   Okay.
20   Q.   Did you read what was done by the claims
21       personnel to investigate the merits of the
22       claim, in other words, whether he died of
23       accidental death, and things of that

32 (Pages 125 to 128)

# FREEDOM COURT REPORTING

### Page 129

1  nature, and that sort of thing? Did you
2  read that?
3  A.  Yeah. They did make a determination based
4  on the -- I think they ordered the
5  coroner's report or police report.
6  Q.  Yes, sir. And did you find that that part
7  of the investigation appeared to have been
8  done reasonably?
9  A.  Yes.
10  Q.  Okay. And the determination on that
11  portion was that it was a payable claim,
12  wasn't it?
13  A.  Correct.
14  Q.  And that was the opinion of Ms. Whitaker,
15  who's in charge of the Claims Department,
16  and it was the opinion of Brian Mitchell
17  in the Legal Department, wasn't it?
18  A.  Okay. Yeah. Because we've got Matthews
19  and Mitchell.
20  Q.  Right. So if there was any negligence
21  involved here, it was in regard to the
22  first person in the Claims Department at
23  Globe that first looked at the claim,

### Page 130

1  because she apparently did not determine
2  whether the policy was in force or not at
3  the date of death; is that right?
4  A.  That would have been the claim manager and
5  the Legal Department. Because she made
6  the -- Ms. Whitaker made the decision.
7  Q.  I don't think you're following my
8  question. I may not have stated it very
9  clearly. But I'm talking about the first
10  person that --
11  A.  Whoever took the phone call in?
12  Q.  No. I'm talking about when they received
13  the proof of loss.
14  A.  Okay.
15  Q.  Do you know who that person was that first
16  handled the claim upon receipt of the
17  proof of loss?
18  A.  I don't recall the name.
19  Q.  Okay. Fair enough.
20      Whoever that person was, in your
21  judgment, should have made the
22  investigation as to whether the policy was
23  in force, and investigated the issues with

### Page 131

1  regard to premiums; is that right?
2  A.  Well, it should have been an
3  all-encompassing investigation. And as to
4  whether they have theirs segmented out for
5  each person doing a given task, and then
6  somebody pulls everything together, you
7  know, I don't know specifically as to how
8  they handled that.
9  Q.  But it's your opinion that that should
10  have been the first order of business?
11  A.  Yeah. That's one of the first things you
12  look at, is your coverage.
13  Q.  So, then, if there is negligence involved
14  here in the processing of the Lurie claim,
15  it was with regard to that person not
16  doing that initially in this case; is that
17  right?
18  A.  Well, it moves on down the line. Because
19  one person is not doing it and then other
20  folks don't ask any questions about that,
21  and then they accept some basic things.
22  So it's moving on down where, you know,
23  several people are not doing a good

### Page 132

1  overview.
2  Q.  Okay. But that information should have
3  been determined initially, shouldn't it
4  have, about whether the policy was in
5  force or not on the premium issues?
6  A.  That should have been done before any
7  decision was made.
8  Q.  What possible benefit, in your judgment,
9  would there have been to Globe to spend
10  the time and expense to investigate the
11  merits if the policy was not in benefit at
12  the date of death?
13  A.  They wouldn't be in this lawsuit today if
14  they had investigated the thing properly.
15  Q.  You're not listening to my question.
16  Please take your time and listen to it.
17  We'll both get out of here a lot quicker.
18      My question is this: What possible
19  benefit would there have been to Globe to
20  spend the time and expense to investigate
21  the merits of the claim if Globe already
22  knew that the policy was not in benefit on
23  the date of Mr. Lurie's death?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 133

1 A.  You would still need to investigate it to
2     make sure that the entire investigative
3     process for the claim was completed and
4     that you've obtained all the relevant data
5     to make the decision -- make the informed
6     decision, and then you can make a
7     cognitive review of what information you
8     have and determine whether you have the
9     information you need to make the decision.
10 Q.  Do you agree with me that the options
11     facing Globe on the Lurie claim were
12     either to refund the premium, or to pay
13     the claim?
14 A.  I think they would have denied it, too,
15     and not refunded the premium or not paid
16     the claim.
17 Q.  Well, it wouldn't be appropriate to deny
18     the claim and not to refund this premium,
19     would it?
20 A.  Well, again, you know, what should be and
21     what is are two different things.  And I'm
22     not --
23 Q.  I'm not talking about "should be."  Do you

Page 134

1     actually believe, from an objective
2     standpoint, that Globe would have held the
3     $33.00 in premium after denying the claim?
4 A.  Shouldn't.  But, I mean, you know, they
5     refunded it.  But, I mean, you can't make
6     a general rule and say, okay, well, this
7     doesn't make sense.  Well, there are a lot
8     of things that are done that don't make
9     sense.
10 Q.  That's right.  So if Globe viewed their
11     options on this claim as either refunding
12     the premium or paying the claim, if they
13     determine that the claim should be denied
14     and should not be paid, if they view that
15     their option ultimately was refund of the
16     premium, it wouldn't be of much benefit
17     for Globe to hold that premium of $33.00
18     for three months, would it?
19 A.  Benefit to Globe strictly on withholding
20     the premium or the premium reimbursement?
21 Q.  Yes.
22 A.  No.
23 Q.  Okay.  And if, in fact, this claim was not

Page 135

1     payable under the policy and the governing
2     law -- and I'm not asking you to agree
3     with me on that, but to assume that that's
4     a fact -- the only damages that Ms. Lurie
5     would have, possibly, is the delay
6     occasioned by the refund of her premium,
7     wouldn't it, the loss of the use of her
8     $33.00?
9 A.  Repeat it one more time.  I mean, you're
10     asking -- you're getting multi-part
11     questions and then throwing --
12           MR. SANSPREE:  Just let him ask
13     it.
14           THE WITNESS:  All right.
15 Q.  Assuming for the purposes of my question
16     that Mr. Lurie, based on all the facts --
17     I'm not asking you to agree.  I'm asking
18     you to assume for the purposes of my
19     question, if the claim was not payable
20     according to what all took place, and the
21     provisions in the policy, and the
22     applicable law, then Ms. Lurie received
23     her refund of premium, so the only loss

Page 136

1     that she would have had would have been
2     the loss of use of that $33.00 for the
3     three months involved in the claims
4     determination; isn't that right?
5 A.  That's if you're saying everything else is
6     right, and that it's just the premium.
7 Q.  Yes, sir.
8 A.  That would be correct on the premium
9     alone.  I don't agree, as you said it,
10     with the end result.
11 Q.  Okay.  I noticed in your report -- or, at
12     least, I didn't find it, any reference to
13     your expressing an opinion of bad faith.
14     Have I missed something in your report?
15 A.  I believe bad faith is a jury
16     determination, and it's not my judgment
17     call as to what constitutes bad faith.
18     Mine is an evaluation of the deviation
19     from industry standards.  So I don't
20     comment on what -- I don't make the
21     judgment call on the bad faith.
22 Q.  Did you find any evidence of intentional
23     or malicious conduct on Globe's part of

34  (Pages 133 to 136)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 137

1 handling this claim as opposed to simply
2 violation of industry standards, in your
3 view, and negligence?
4 A.   They were intentionally looking for a way
5 to get rid of the claim.
6 Q.   Excuse me?
7 A.   I feel that after the claim manager
8 approved it and after Legal approved the
9 thing, then I think they intentionally
10 went looking for some other way to not pay
11 the claim.
12 Q.   If, in fact, the policy was out of benefit
13 at the date of death, wouldn't that be a
14 legitimate reason, in your judgment, to
15 deny the claim?
16 A.   Well, I mean, you would have to again --
17 Q.   Please answer my question, and then
18 explain it as long as you wish.
19 A.   Repeat it one more time.
20 Q.   See, that's our problem, is that you start
21 doing something other than answering my
22 question, and then you can't remember what
23 was asked of you.

Page 138

1         MR. BUTLER:  Please read it back.
2         (Requested portion of Record
3          read by the Reporter)
4 A.   Could be.
5 Q.   Thank you.
6         In other words, you think the claim
7 could be payable if, in fact, the policy
8 was out of benefit at the date of the
9 death?
10 A.   Well, I think this again --
11 Q.   Can you answer first and then explain?
12 A.   I'd like to explain it and then answer.
13 Q.   Then we don't remember the question.  But
14 go ahead.
15 A.   Well, let's repeat the question one more
16 time since --
17 Q.   See.
18 A.   I get started and then you stop me and
19 then we lose the role.
20 Q.   It's because you're answering something
21 other than the question, John.
22 A.   I'm getting to your question.  You're just
23 not --

Page 139

1 Q.   Go ahead.  Answer it as you want.
2 A.   Okay.  Well, give me the question again
3 and we'll start again.
4 Q.   Do you remember it?
5 A.   No.
6 Q.   See.
7         MR. BUTLER:  Give him the
8         question again.
9         (Requested portion of Record
10          read by the Reporter)
11 A.   I'd say no, as a qualified, due to the
12 fact that you've got to determine what
13 factors surround the basis for denial.  If
14 everything is clean, and everything was
15 done as it should be, then you may have a
16 legitimate reason.  If it wasn't done in
17 accordance with what should have been
18 done, then you may not have a reason.
19 Q.   Well, see, that's what my question is,
20 because you leave provisions in your
21 answer.  You said if everything was done
22 appropriately and the policy was out of
23 benefit, you may have a legitimate reason.

Page 140

1 Under what circumstances would you not,
2 under that scenario?
3 A.   Well, I mean, in this one you've got a lot
4 of things that didn't go right.
5 Q.   Yeah.  But didn't I ask you to assume for
6 the purposes of my question --
7 A.   But to assume is to get an answer that is
8 more in line with what you want to hear
9 and not in accordance with what I see.
10 Q.   I understand that.  I don't think I'm
11 going to get you to agree with me on every
12 provision, every issue in this case that
13 is my contention, Mr. Allen.  But if you
14 agree that, unquestionably, this
15 particular policy was out of benefit on
16 the date of death, wouldn't that be a
17 legitimate reason to deny the claim?  Yes
18 or no?
19 A.   Could be.
20 Q.   All right.
21 A.   That's what it is.  Because you want a
22 specific, and there are too many other
23 things that go in there that can cause a

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 141

1    variance.
2  Q.  Are you working for Mr. Sanspree in this
3       case on an hourly rate?
4  A.   Yes.
5  Q.  And what is your hourly rate?
6  A.   $175.00.
7  Q.  Okay. Approximately how many hours do you
8       have in the case?
9  A.   Let's see. I sent one bill for 39.10
10      hours. And I may have another 11 or 12
11      hours that I haven't billed for on that.
12 Q.  Can we get a copy?
13 A.   You can have a copy of the whole thing.
14      If she wants to copy this and then send it
15      to you, you can have a copy of everything
16      I've got in here.
17 Q.  Well, does that entire notebook include
18      everything that you used to form your
19      opinions in this case?
20 A.   I mean, it doesn't include the treatises.
21      But as far as the documents, I mean, these
22      would be the other documents, and then
23      whatever documents I had in here.

Page 142

1  Q.  I call myself marking the treatise that
2       you relied on for your opinions in the
3       case. But didn't -- We can go back
4       through it. But didn't we discuss all the
5       other treatises, and that you did not rely
6       on those for your opinions? Do you have
7       other treatises that --
8  A.   I've got other treatises. I mean, as far
9       as --
10 Q.  I'm only interested in those that you used
11      for opinions in this case, Mr. Allen. I
12      don't want to clutter the Record.
13 A.   Yeah.
14 Q.  If you did, then I want --
15 A.   I think as far as looking at that, that
16      has some -- on coverage aspects of the
17      things that I felt were germane. It's
18      nothing new that I didn't know. It's just
19      supportive to my position.
20 Q.  I understand that. And are there others
21      other than this Exhibit 6?
22 A.   No, sir. Again, we haven't -- there
23      wasn't anything --

Page 143

1  Q.  What's that one?
2  A.   That was on the personal insurance. It
3       didn't have anything on the adjusting.
4  Q.  That's what I recalled.
5  A.   This has some unfair claim practices,
6       which are across-the-board.
7  Q.  You express opinions of unfair claims
8       practices in this case?
9  A.   And then Bibb's book.
10 Q.  On unfair claims practices, what is your
11      basis for expressing an opinion that the
12      handling of this claim was an unfair
13      claims practice?
14 A.   Well, there's not an unfair claims
15      practice recognized in the State of
16      Alabama. But insurance companies who
17      handle claims across the nation are
18      required to abide by unfair claims
19      practices in their handling of claims. So
20      I think they would be subject to it in all
21      the states. And even though Alabama
22      doesn't have it, I think the folks -- from
23      what I've seen with other companies, even

Page 144

1       though Alabama doesn't recognize an unfair
2       claims practice, they abide by those in
3       administering claims within the State of
4       Alabama.
5  Q.  Okay. Well, what amounted to a violation
6       -- is it -- didn't you say Unfair Claims
7       Practice Act?
8  A.   Well, it's referred to as the --
9  Q.  I'm trying to see how you referred to it
10      in your report.
11 A.   I don't know that I've got -- That's just
12      -- I don't think I went into any unfair
13      claims practices on that.
14 Q.  I think you did.
15 A.   I may have.
16 Q.  Mr. Allen's book is "Alabama Liability
17      Insurance Handbook," isn't it?
18 A.   Right.
19 Q.  And this is not liability insurance, is
20      it?
21 A.   He covers a wide variety of insurance
22      claims, I think. So --
23 Q.  Can you find in your report any reference

36 (Pages 141 to 144)

# FREEDOM COURT REPORTING

Page 145

1  to Unfair Claims Act? It's on page 7, I
2  see, about the middle of the page. You
3  say, "Since there are no claims procedures
4  or claims manuals, this is an unfair
5  claims practice."
6  A.  Right.
7  Q.  Okay. So you're saying that there is a
8      requirement under the law that an
9      insurance company have a claims manual and
10     claims procedures printed?
11 A.  For Alabama there's not an unfair claims
12     practices law. But as far as the National
13     Association of Insurance Commissioners,
14     the NAIC, under Section C it says,
15     "Failing to adopt and implement reasonable
16     standards for the prompt investigation of
17     claims arising under insurance policies."
18 Q.  And you say those can't be done by
19     experience and word-of-mouth of the claims
20     examiners?
21 A.  I think you have to have some policies and
22     procedures that were evidenced in that
23     other case.

Page 146

1  Q.  That doesn't say so, though, does it, what
2      you just read from NAIC?
3  A.  It says, "Failing to adopt and implement
4      reasonable standards for the prompt
5      investigation of claims arising under
6      insurance policies."
7  Q.  But that doesn't say it has to be a
8      written manual or written procedures, does
9      it?
10 A.  Correct. But that other case I had
11     references written procedures.
12 Q.  Which one?
13 A.  Madison.
14     MR. SANSPREE: Maddox.
15 Q.  That said you had to have written claims
16     procedures and manuals?
17 A.  It references not having procedures, and
18     word-of-mouth stuff, leads itself to
19     problems.
20 Q.  Does it say it's illegal?
21 A.  I don't recall it saying it's illegal.
22 Q.  This is where there was no mechanism to
23     ensure that applicants were treated

Page 147

1      uniformly during the underwriting process,
2      doesn't it?
3  A.  That's part of it. Yes.
4  Q.  Wasn't this case about underwriting?
5  A.  It has underwriting. That's predominantly
6      underwriting.
7  Q.  Well, is it on claims?
8  A.  I think it speaks to the claim issues.
9  Q.  Where?
10 A.  As far as the fact of what you need to
11     have, in my opinion.
12 Q.  Where?
13 A.  It discusses claims from the standpoint of
14     bad faith, abnormal or just regular bad
15     faith.
16 Q.  Yes, sir. But with regard -- You point
17     out to me where in that provision it says
18     you've got to have written procedures and
19     published guidelines for the handling of
20     claims.
21 A.  It doesn't, to my recollection. It's
22     predominantly underwriting.
23 Q.  Thank you.

Page 148

1      Do you want to read and sign or --
2  A.  Please.
3  Q.  Okay.
4      MR. SANSPREE: I've got just a
5      few questions to follow up.
6      EXAMINATION
7  BY MR. SANSPREE:
8  Q.  John, during your work experience with the
9      various insurance companies you've
10     testified to having worked with earlier,
11     would the process of gathering information
12     to see whether or not a claim was covered,
13     would that be the same for liability and
14     property insurance as it would be with
15     life insurance?
16 A.  Yes.
17 Q.  And would you also, when you're adjusting
18     on liability of property and insurance
19     claim, would you look at the policy
20     language to determine coverages and
21     exclusions just like you would in a life
22     insurance claim case?
23 A.  Yes.

37 (Pages 145 to 148)

# FREEDOM COURT REPORTING

Page 149

1  Q.  And would the procedures in doing so be
2      the same for liability and property cases
3      as it would with life insurance?
4  A.  Yes.
5  Q.  Would the industry standards be the same,
6      as it relates to property and casualty and
7      liability insurance, as it would be with
8      life insurance?
9  A.  In the handling of claims, yes.
10 Q.  And do you remember giving testimony for
11     me in a life case in front of Judge Dement
12     in Alegro versus Monumental case?
13 A.  I remember Alegro.
14 Q.  And was that a death case involving life
15     insurance?
16 A.  I believe that's correct.  Yes.
17 Q.  And was your opinion accepted as an expert
18     opinion in Judge Dement's courtroom?
19 A.  Yes, I believe so.  I didn't give a
20     deposition, but I think I gave a report on
21     that.
22 Q.  John, you gave some testimony earlier
23     about the first sentence at the top of

Page 150

1      Defendant's 11, which states "Payment,"
2      and then it goes on to read, "Each premium
3      is payable in advance at our
4      administrative office."  Do you remember
5      giving that testimony earlier?
6  A.  Yes.
7  Q.  Assume with me that Ms. Lurie put the
8      premium payment in the mail on January 5th
9      and addressed it to the administrative
10     office.  Would that premium have been paid
11     at that administrative office at that
12     time?
13     MR. BUTLER:  Object to the form.
14         Calls for a legal
15         conclusion.  The witness is
16         not competent to testify as
17         to that.
18 Q.  In industry standards, would that premium
19     have been payable at that time?
20     MR. BUTLER:  Object to the form.
21 A.  Yes.
22 Q.  And was Mr. Lurie, to the best of your
23     knowledge, was he alive on January 5th,

Page 151

1      2004?
2  A.  Yes.
3  Q.  That's all I've got.
4  A.  That would have been the 4th, which would
5      have been when it was put in the mailbox,
6      and then the 5th when it was picked up.
7              REEXAMINATION
8  BY MR. BUTLER:
9  Q.  So your date is the 4th?  All you've got
10     to do is put it in the mailbox and that's
11     it?
12 A.  It was addressed to the administrative
13     office.
14 Q.  Okay.  Is the Alegro case on your list?
15 A.  I didn't give a deposition in that one.
16 Q.  Did you give trial testimony?
17     MR. SANSPREE:  No.  He just gave
18         a report.
19 A.  No.  I think it was just a report.
20 Q.  Well, explain to me how Judge Dement would
21     have had an opportunity to accept your
22     testimony as an expert based on a report,
23     as opposed to sworn testimony.

Page 152

1      MR. SANSPREE:  It was just filed
2          with a brief.
3      MR. BUTLER:  I understand that.
4  A.  I didn't make the decision.  You know, I
5      did my thing.
6  Q.  Is it your understanding -- Do you have
7      knowledge that Judge Dement accepted your
8      qualifications as an expert on life claims
9      when you didn't even give any testimony in
10     the case?
11 A.  Well, I gave a report.  I don't know
12     whether it was an affidavit or my report.
13     I don't recall.
14 Q.  Well, were you examined as to your
15     qualifications as an expert in life claims
16     in the Alegro case?
17 A.  I don't recall.
18 Q.  How do you know whether the procedures
19     would be the same in life insurance
20     claims-adjusting and property and
21     casualty, if you have no experience in
22     life insurance claims-adjusting?
23     MR. SANSPREE:  Object to the

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 153

1       form.
2   A.   That would be from having reviewed and
3        worked with life claims as an expert and
4        as a consultant.
5   Q.   **For lawyers in civil cases?**
6   A.   Yes.
7   Q.   **Thank you, sir. That's all.**
8        **(Off-the-Record discussion)**
9        MR. BUTLER: Let's mark this as
10       our next number, number 12.
11       We will mark it as 12 and
12       we'll get that back to you,
13       Mr. Allen.
14       (Defendant's Exhibit 12 marked
15       for purposes of identification)
16       MR. BUTLER: What is 12?
17       THE WITNESS: Exhibit 12 is a
18       three-ring binder that I
19       prepared that has my
20       handwritten notes,
21       deposition summaries, and
22       documents that were produced
23       by the plaintiff and

Page 154

1        defendant.
2        MR. BUTLER: Thank you, sir.
3
4        * * * * * * * * * * * *
5        FURTHER DEPONENT SAITH NOT
6        * * * * * * * * * * * *
7
8        REPORTER'S CERTIFICATE
9    STATE OF ALABAMA,
10   MONTGOMERY COUNTY,
11       I, Jackie Parham, Certified Shorthand
12   Reporter and Commissioner for the State of
13   Alabama at Large, do hereby certify that I
14   reported the deposition of:
15       JOHN H. ALLEN,
16   who was first duly sworn by me to speak the
17   truth, the whole truth, and nothing but the
18   truth, in the matter of:
19
20       IN THE UNITED STATES DISTRICT COURT
21       FOR THE MIDDLE DISTRICT OF ALABAMA
22            SOUTHERN DIVISION
23

Page 155

1    KAREN LURIE,
2        Plaintiff,
3    versus            1:06-CV-0034MEF
4    GLOBE LIFE AND ACCIDENT
5    INSURANCE COMPANY, et al.,
6        Defendants.
7
8    on Thursday, the 7th day of December, 2006.
9        The foregoing 154 computer-printed pages
10   contain a true and correct transcript of the
11   examination of said witness by counsel for the
12   parties set out herein. The reading and signing
13   of same is hereby not waived.
14       I further certify that I am neither of kin
15   nor of counsel to the parties to said cause, nor
16   in any manner interested in the results thereof.
17
18       _____
19       JACKIE PARHAM, Certified
20       Shorthand Reporter and
21       Commissioner for the State
22       of Alabama at Large
23

39 (Pages 153 to 155)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 156

**A**

abide 143:18
144:2
abilities 43:22
abnormal
147:14
**Absolutely**
88:13
accept 131:21
151:21
acceptance 75:5
accepted 34:11
115:15 149:17
152:7
accident 1:8
23:9 30:22
80:15 87:15
155:4
accidental 58:17
86:22,23 87:4
119:4,20
125:11,13
128:23
accidents 31:7
accomplish
18:13
account 98:12
101:15 104:10
accountants
20:16
accounts 85:1
accurate 82:12
accused 10:23
acknowledge
28:23 29:4
across-the-bo...
143:6
Act 144:7 145:1
acted 81:1
acting 58:23
action 11:14
37:21 39:6,17
55:18,20 81:13
actions 109:9

activities 38:1
50:5
actual 107:11,13
108:6
Adams 2:14
addition 108:7
address 6:8,9,11
110:8 111:6
124:19
addressed 58:2
110:6 114:8
124:23 150:9
151:12
addressee 91:22
93:1,16 94:4
addressing
90:18,19
109:21
adjust 115:9
adjuster 50:13
59:2 76:3
107:1 119:22
124:8,10
125:20 126:2
126:10
adjusters 45:20
108:2 127:12
adjuster's 59:5
adjusting 30:19
47:11 50:9
72:13 106:17
143:3 148:17
adjustment
74:10,20
110:20
administering
144:3
administration
17:5,8 95:21
administrative
95:18 97:9
99:6,11 110:5
110:7,9,12,15
150:4,9,11

151:12
admitting 42:8
adopt 145:15
146:3
advance 95:18
97:8 99:5
110:12 150:3
advertising 52:6
advise 64:21
65:19 77:7
advised 101:8
102:4
advises 122:16
advising 65:2
advocate 88:8
88:10 107:19
Aetna 18:14
34:8 36:23
43:7,10,12,15
43:16,21 44:1
44:9,12 45:8,9
47:16,18,21
48:14 49:2,5,7
49:18 50:5,23
81:19
affidavit 101:13
152:12
after-the-fact-...
39:12
agent 27:17
50:16
agents 20:17,18
ages 7:7
ago 40:11 41:1
41:11 58:7
72:20 76:6
agree 36:7 39:16
64:2 93:5,18
94:7 98:23
102:11 105:18
106:3 114:17
120:22 127:18
128:7 133:10
135:2,17 136:9

140:11,14
agreed 3:2,19
33:14 46:19
agreeing 44:3
agreement 1:16
33:15 44:5
ahead 7:21
17:22 103:20
125:9 138:14
139:1
AIC 18:1 19:8
50:20 60:2,18
al 1:9 155:5
Alabama 1:2,19
1:21 2:8,16 3:8
6:11 15:12
17:4,12 19:4
27:2,3,16 28:8
28:18 29:17
37:1 40:12,16
41:3,18 43:12
46:12,17,19
47:2,5 81:15
143:16,21
144:1,4,16
145:11 154:9
154:13,21
155:22
Alegro 149:12
149:13 151:14
152:16
alive 150:23
allegations
10:20
alleged 85:6
Allen 1:15,20
2:5 3:5 4:3,4,7
4:10,12,14,16
4:18,21 5:4 6:1
6:7,10,22
12:16 15:1,7
42:23 55:17
68:11 73:9
81:12 82:8

117:6,20
123:19 140:13
142:11 153:13
154:15
Allen's 75:4,11
144:16
allowed 86:17
121:5
Allstate 80:14
80:18,20 81:3
81:13,20
all-encompass...
131:3
ambiguity
110:17
America 17:15
American 4:12
4:18 12:13
14:1 31:22
35:21 38:20,21
39:1 55:13
69:12
amount 11:2,3
amounted 144:5
amounts 30:1
amputated
87:10
analysis 52:21
53:15 122:21
analyzing 109:8
anesthetist 7:19
answer 14:11,16
14:19 33:11
34:4,23 36:8
37:4 42:2,4,18
42:19,20 56:4
56:17,19 103:2
116:18 117:1,4
137:17 138:11
138:12 139:1
139:21 140:7
answered 14:5,7
33:22 34:19,21
35:2 40:11

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 41:1 43:8 | 125:17,19 | 103:18 110:9 | 27:1 | 101:3,20 |
| answering 32:23 | approved | 135:3,18 140:5 | backwards | 102:13 109:2 |
| 137:21 138:20 | 106:22,23 | 140:7 150:7 | 115:22 126:14 | 118:3,13 |
| answers 35:18 | 107:3 118:21 | assuming 98:5 | bad 80:19 82:2 | 119:14,23 |
| 117:5 | 118:22 137:8,8 | 116:10 135:15 | 136:13,15,17 | 120:15,18 |
| anybody 6:23 | approximately | attaching 46:18 | 136:21 147:14 | 121:22 122:8 |
| 52:2 105:16 | 1:23 7:23 | attempt 21:13 | 147:14 | 124:9 132:8,11 |
| anyway 46:9 | 14:23 141:7 | 88:5 | bankrupt 30:7 | 132:19,22 |
| 105:10 | Arant 2:13 | attendant 8:2 | Bar 15:12 | 134:16,19 |
| apparently | Archie 32:9,12 | attorney 11:14 | based 20:9 44:2 | 137:12 138:8 |
| 130:1 | areas 18:7 | 22:4,6 36:21 | 44:5 93:20 | 139:23 140:15 |
| appeal 83:13 | arising 145:17 | 101:5,7,13 | 102:9 103:16 | benefits 70:3,6 |
| 84:5,12 | 146:5 | 102:4,23 103:5 | 109:1,14 | 70:20 85:7 |
| appear 15:6 | Arnston 23:12 | 105:17 122:16 | 126:14,23 | 86:23 106:16 |
| 23:11 88:22 | arrest 12:8 | attorneys 51:8 | 127:13,13 | 108:4 115:13 |
| APPEARAN... | 28:11,13 40:22 | 83:16,19 | 129:3 135:16 | 127:14 |
| 2:1 | 42:8 | auditors 20:19 | 151:22 | best 92:18 |
| appeared 129:7 | arrested 8:21 | Austin 8:8 | basic 74:1 | 150:22 |
| APPEARING | 10:7,9,21 14:6 | authoritative | 131:21 | better 41:19 |
| 2:3,11 | 29:5 | 66:7 78:18 | basically 18:16 | 59:9 114:14 |
| appears 82:9 | ascertain 125:3 | auto 80:15 | 33:8 34:6 | beyond 121:1 |
| 88:17 117:15 | asked 32:20 | automobile | 48:10 66:12 | Bibb 75:4,11 |
| applicable | 33:12 83:1 | 27:22 30:21 | 67:17 76:20 | Bibb's 143:9 |
| 135:22 | 90:14 137:23 | 31:7 34:6 | 108:15 | big 20:21 |
| applicants | asking 29:7 56:6 | available 85:4 | basis 52:18 | bill 16:1,5,9 |
| 146:23 | 93:20 135:2,10 | Avenue 2:14 | 71:10 118:8 | 54:13 70:12 |
| application 20:8 | 135:17,17 | avenues 120:6 | 126:11 139:13 | 83:5 141:9 |
| 43:10,12 44:2 | asks 56:10 57:4 | ax 40:6,8 | 143:11 | billed 141:11 |
| 78:5,22 | aspects 53:14 | a.m 1:23 | Beasley 1:20 2:5 | binder 153:18 |
| applications | 75:5 77:6 | | 12:16 15:6 | Birmingham |
| 29:10 43:6 | 142:16 | _____ **B** _____ | 24:10 42:23 | 6:11 8:9 15:18 |
| applied 34:10 | assist 21:10 | B 91:1 | 55:17 | 49:3,4,19 |
| apply 64:7,12 | 26:16 | Bachelor 17:4 | beginning | 54:14 |
| appreciate 79:8 | assistant 48:8 | back 8:14,14 | 121:23 | birth 6:18 |
| 115:5 | Associate 17:16 | 19:1 34:20 | behalf 2:3,11 | bit 26:23 |
| approach | 18:4,11 | 36:16,17 43:18 | 46:12 | blew 37:23 |
| 115:2 | associated 6:23 | 60:13 68:11 | believe 12:2 | 39:12 |
| appropriate | 87:12 | 76:22 83:1 | 18:6,10 30:8 | blow 38:5 |
| 39:4 105:22 | Association | 92:7 111:23 | 33:19 50:2,3 | blowing 38:4 |
| 133:17 | 15:12 19:14 | 115:2,19 117:9 | 53:11 87:6 | Bodies 54:19 |
| appropriately | 145:13 | 119:11 126:9 | 134:1 136:15 | bold 95:15 |
| 139:22 | associations | 138:1 142:3 | 149:16,19 | bonds 45:1,1,2,2 |
| approval 125:23 | 52:1 | 153:12 | benefit 62:9 | 65:18,23 |
| approve 125:16 | assume 17:14 | background | 71:12 84:21 | bonuses 45:13 |

## FREEDOM COURT REPORTING

**book** 4:22 5:2
67:22 73:10
74:9 75:4,11
111:7,9 143:9
144:16
**books** 19:9
112:1
**borrow** 36:16
73:8
**bottom** 36:4,22
56:1
**Bradley** 2:13
**breach** 110:19
115:6
**breached** 111:19
**Brian** 129:16
**brief** 55:7 59:13
93:22 123:17
152:2
**broad-based**
66:6
**brochure** 52:7
**Brooks** 31:22
**burn** 87:8
**burned** 87:9
**business** 6:9,11
6:21 7:1 17:5,7
44:20 45:3,4,4
51:1,2,4
103:17 104:6
126:2 127:10
131:10
**businesses** 44:19
**BUTLER** 2:12
5:14,16 6:6
13:7 21:20
22:2,5,8,23
40:23 41:7,12
60:12 67:12,21
68:4,17 95:5
95:10 103:9
117:9 122:5
138:1 139:7
150:13,20

151:8 152:3
153:9,16 154:2

————— **C**
**C** 145:14
**cable** 46:17
**California** 24:11
**call** 6:20 120:11
130:11 136:17
136:21 142:1
**called** 23:8
31:22 43:21
55:13 74:9
**calling** 128:9
**calls** 122:16
150:14
**capacity** 58:3,23
**career** 9:8 15:1
**carefully** 102:7
**Carol** 81:12
**carrier** 65:14
**carriers** 65:22
**carry** 85:17 86:3
**case** 4:3,5,8,11
4:13,15,17,19
4:21 15:8
21:17 23:8
24:2,11,13
26:12,18 28:17
28:22 29:3
31:21 32:8
48:21 54:8,9
54:17,19 55:12
55:16,22 59:20
62:2 63:6
69:12 70:2,3,8
70:20 72:7
73:15 74:23
75:10,23 76:3
76:12 79:23
81:22 82:10
83:12 84:2,8
84:16,16 86:13
87:3 102:19

111:13,15
122:22 131:16
140:12 141:3,8
141:19 142:3
142:11 143:8
145:23 146:10
147:4 148:22
149:11,12,14
151:14 152:10
152:16
**cases** 5:3 12:10
15:14 21:10,11
26:16,19,22
31:15 53:7,21
54:1,12 58:12
61:17 69:7,10
71:12 72:15
79:12,16,18
83:3 113:7
149:2 153:5
**cash** 85:16,18
86:15,17,18
**casualty** 44:23
45:1 64:4
65:22 149:6
152:21
**casualty-type**
18:18
**causal** 87:12,20
**cause** 119:18
140:23 155:15
**cemeteries**
29:23
**certainly** 13:3
22:23 70:15
**certificate** 91:4
154:8
**certification**
113:21
**certified** 1:17
3:6 19:15 20:4
20:7 91:12
107:18 108:18
108:21,22

154:11 155:19
**certify** 154:13
155:14
**Chadwick** 48:1
48:3
**chain** 87:12
**challenge** 65:17
77:11
**change** 40:5
49:13 96:14
**changed** 79:22
123:1
**chapter** 5:1
67:18,19,19,20
67:21 68:6,7
68:22 73:1,5,9
73:12,14
**character** 80:5
**charge** 10:19
129:15
**charged** 11:4
**check** 96:11,13
**checks** 38:12
**children** 7:7,8
8:10,18,19
9:21
**Chilton** 11:1
12:1
**Chris** 83:18
**CHRISTOPH...**
2:4
**Circuit** 81:14
**circumstances**
140:1
**circumstantial**
101:23
**cited** 75:10
**City** 30:1 95:20
**civil** 3:17 12:10
15:14 28:17
31:15 69:7
72:15 81:13
88:4 113:8
153:5

**claim** 4:23 5:2
27:17 46:7,8
53:17 54:21
55:1 59:7
64:12 65:9,15
66:17,18 76:21
77:3,4,18,19
81:20 83:8
85:19,21
106:17,22
107:2,12,16
111:18 116:3
116:12 118:1
118:11,20,22
119:4 120:5,15
123:21 124:12
125:10,12
127:22 128:9
128:22 129:11
129:23 130:4
130:16 131:14
132:21 133:3
133:11,13,16
133:18 134:3
134:11,12,13
134:23 135:19
137:1,5,7,11
137:15 138:6
140:17 143:5
143:12 147:8
148:12,19,22
**claimed** 56:11
57:5
**claims** 17:16
18:4,7,12 19:5
19:8,17 27:18
27:19 30:19,22
30:23 31:3
33:9 34:7,7
39:15 44:13,14
44:18,19,21,23
45:1,3,16,18
45:19 47:11
49:12,13,15

# FREEDOM COURT REPORTING

50:10,13 52:14
52:19,22,23
53:2,4,19
56:13 57:2,7
57:11 58:10
59:4 61:15
62:20 63:8,19
65:22 66:5,14
69:5 72:14,16
73:4,17,22
74:2,7,11,16
74:21 75:1
76:2,4 78:10
78:23 83:4
105:20,23
106:5,14
110:21 111:6
111:11,13
114:19 115:8,9
116:2,13
119:12,22
123:22 128:20
129:15,22
136:3 143:7,10
143:13,14,17
143:18,19
144:2,3,6,13
144:22 145:1,3
145:4,5,9,10
145:11,17,19
146:5,15 147:7
147:13,20
149:9 152:8,15
153:3
**claims-adjusti...**
45:9 73:23
113:18 152:20
152:22
**claims-handling**
50:4 59:1,6,21
72:8 73:16,19
74:13 76:15
112:22
**Clanton** 10:13

**clean** 139:14
**clear** 36:15
**clearly** 97:11
   120:23 130:9
**Clifford** 7:10
**close** 8:1
**clutter** 13:10
   142:12
**CNA** 87:3
**cocaine** 11:3
**cognitive** 120:7
   133:7
**coincidental**
   26:20 57:1
**college** 9:23
   17:20 19:2
   92:7
**colleges** 17:19
**Columbus** 29:23
**combination**
   51:10 86:19
   111:4
**come** 53:19 92:1
   115:19 126:10
**comes** 51:15
   69:22 75:11,22
**comfortable**
   34:23
**commencing**
   1:23
**comment** 109:1
   136:20
**Commerce** 1:21
   2:7 17:7
**commercial**
   18:17 34:9
   44:13,14,18,19
**commission** 3:9
**Commissioner**
   1:18 3:7
   154:12 155:21
**Commissioners**
   145:13
**common** 75:22

**comp** 27:21
**companies** 50:8
   51:8 53:9,13
   61:21,22 62:10
   63:5 64:17
   127:11 143:16
   143:23 148:9
**company** 1:9
   14:1 23:10
   27:4 29:18
   30:8,12 35:11
   35:15,21 36:10
   37:2 38:2
   40:13 41:18
   43:14 44:6
   45:10 46:18
   47:14 54:20
   55:14 57:19
   62:11 81:13
   84:20 85:23
   87:13 101:1,19
   102:2,11,16,23
   112:12 113:4
   113:23 114:18
   145:9 155:5
**company-orie...**
   20:20
**competent**
   150:16
**complaints**
   37:14
**complete** 20:6,8
   33:11 34:3
**completed** 133:3
**completion** 18:9
**computer** 104:9
**computer-pri...**
   155:9
**comp-type**
   44:21
**concept** 114:16
**concepts** 74:1
**concerning** 11:2
   80:15 102:1

   128:11
**conclusion**
   150:15
**condensed** 13:22
**condition** 90:9
   123:12
**conduct** 136:23
**Confidential**
   26:9
**connection**
   53:21
**consider** 37:20
   37:22 39:4
   40:2 42:10,11
   88:7,10
**considered** 39:7
   91:20 92:5
**consistent** 52:21
   53:11,16 64:8
   74:3
**constitutes**
   136:17
**consult** 61:17
**consultant** 52:13
   57:10,13 58:13
   59:3,11 69:9
   69:10 70:23
   71:21 72:14
   112:17 153:4
**consulting** 6:22
   51:1
**contain** 155:10
**contained**
   109:19
**contend** 52:18
   84:21
**contended** 87:13
**contention**
   140:13
**context** 65:13
   77:10,22 78:22
**continuation**
   86:9
**continue** 121:8

**Continued**
   49:15
**contract** 93:5,7
   93:8,10,11,19
   94:8,9 114:2
   115:12 122:23
   124:2,9
**contracts** 27:22
   47:12,12
**contractual**
   46:16 47:4
**contrary** 48:1
   93:2 101:6
   107:4 126:1
**conversation**
   43:17
**converted** 38:14
**convicted** 9:15
**conviction** 10:17
   10:18 29:10,15
**convoluted**
   120:21
**copy** 12:20,22
   13:1,6,14,21
   16:19 21:23
   36:17 68:3
   82:12 91:12
   107:18 108:18
   108:21 109:13
   141:12,13,14
   141:15
**coroner's** 129:5
**correct** 6:14
   12:2,6 14:9
   16:21 17:6
   18:15 29:16
   31:1,9 37:4
   39:18 41:23
   46:3 55:5
   56:19 57:23
   61:3,18 73:21
   89:23 94:6
   96:23 100:22
   123:15 128:4

# FREEDOM COURT REPORTING

Page 160

129:13 136:8
146:10 149:16
155:10
**Cottingham**
87:3
**counsel** 3:3 15:7
109:12 155:11
155:15
**counting** 54:8,9
**County** 11:1
12:1,5 81:15
154:10
**couple** 57:15
85:13
**course** 16:13
18:8,16 19:2
20:5 21:7
47:10
**courses** 18:6.6
18:20,23 19:3
19:5 50:19
53:2 59:23
60:2,9,17,19
61:5,9
**court** 1:1 6:10
12:21 21:14
25:3 26:3
32:20 67:23
72:3 81:14
82:13 154:20
**courthouse**
24:21 25:1,16
**courtroom**
149:18
**cover** 4:22 22:11
68:14,19
**coverage** 47:4
52:21 53:15
64:13,15,16,20
65:2,4,17,19
66:10,11,22,23
67:1,3,5,7 77:5
77:6,11,19
78:9,12,15,15

114:7 125:5
131:12 142:16
**coverages** 65:8
148:20
**covered** 33:12
61:10 107:2
148:12
**covers** 22:16
144:21
**criminal** 8:22
**criticism** 45:12
45:15
**criticize** 39:11
**criticized** 37:3
37:13 45:8
46:6 50:4
**cross-claimant**
80:6
**cross-section**
20:21
**Crow** 1:20 2:5
**current** 5:5
16:19,23 82:14
82:15,16,18,21
83:2 104:11,11
**curriculum**
16:13,20
**cut** 59:10
**CV** 4:6 17:2
**CV-1986-1088**
81:14
_____
## D
**damages** 135:4
**data** 133:4
**date** 6:18 86:7
91:20,21 97:12
98:9,14,15,17
99:1 110:15
116:5,15
119:14,23
121:20 122:8
122:11 124:10
130:3 132:12

132:23 137:13
138:8 140:16
151:9
**dated** 82:10
88:18
**dateline** 100:12
**dates** 108:7
**daughter** 7:12
7:22 8:4
**David** 94:23
97:12 99:1
**day** 1:22 45:20
45:21,22 97:19
97:19,21 98:11
98:11,14 105:4
115:10 117:7
124:3 155:8
**days** 94:16
121:5
**dead** 90:22
99:19,21 101:4
101:9,22
102:14 103:22
105:9
**dealing** 66:21
75:1
**death** 85:19,21
86:23 87:1,4
87:21 97:12
99:1 101:15
106:19 116:15
119:4,15,18
120:1 122:8
123:21 124:4
124:10 125:11
125:13 128:23
130:3 132:12
132:23 137:13
138:9 140:16
149:14
**deaths** 58:17
**dec** 55:18,20
**December** 1:22
47:20 121:15

121:19 155:8
**decision** 120:6,9
130:6 132:7
133:5,6,9
152:4
**declaration**
108:20
**Dee** 12:15 15:6
42:22 54:15
55:16 70:12
**deemed** 92:11
92:17,22 93:4
93:9,16 94:4
97:2 122:11
**defamation** 80:4
**defend** 65:14
77:9
**defendant** 55:19
79:10 80:4
154:1
**Defendants** 1:10
2:11 155:6
**Defendant's**
13:17,19 16:17
23:4,7,14 32:4
35:22 36:2
55:8,12 69:1
69:20 71:20
82:6,9,19,21
88:14,17 95:12
95:14 97:6
99:12 150:1
153:14
**defense** 32:14
36:21 46:16
54:14 83:18
113:12,14
**defenses** 65:16
**define** 65:4,5
**definitions**
94:13
**degrees** 17:10
17:21
**delay** 135:5

**Dement** 149:11
151:20 152:7
**Dement's**
149:18
**demoted** 49:7
**denial** 70:5
126:11 139:13
**denied** 40:21
133:14 134:13
**Denver** 8:2
**deny** 133:17
137:15 140:17
**denying** 134:3
**department**
39:15 129:15
129:17,22
130:5
**depo** 4:3,4,7,10
4:12,14,16,18
4:20 5:5
**DEPONENT**
154:5
**deposed** 98:1
107:9
**deposition** 1:15
3:4,15,22
12:11,13 13:23
15:13 25:10
28:17 31:21
32:23 35:20
40:15,20 41:10
42:22 56:2
70:16 96:2,4,7
149:20 151:15
153:21 154:14
**depositions** 9:8
9:12 12:10
14:23 31:15
35:12 97:23
98:19 106:14
107:8 108:2
112:20
**describe** 20:23
68:21 70:2

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

deselected 49:18 49:21
designation 17:16 18:1,4 18:12
determination 129:3,10 136:4 136:16
determinations 128:2
determine 47:1 116:21 122:22 124:11 130:1 133:8 134:13 139:12 148:20
determined 116:14,16,19 119:13,22 124:1,8 125:10 132:3
determines 126:3,4
deviation 111:1 136:18
diabetic 87:8
died 87:14 118:2 118:13 128:22
difference 40:7 57:9 62:2 128:1
different 18:19 18:23 20:19 34:8 46:3 53:13 57:16 60:4 61:9 64:3 64:5,6,9 85:14 94:10 109:5 111:5 133:21
differently 93:8
disagree 78:8
disappointing 32:17
disciplinary 37:21 39:5,19

40:3,4
discipline 37:15 40:8
disciplined 37:2
discuss 73:20 142:4
discussed 19:14
discusses 73:18 147:13
discussion 25:7 68:16 76:5 153:8
disease 87:14
dismiss 79:21
dismissed 10:16 10:17,19,20 11:7 79:18
disposed 11:18
disposition 11:9 16:8
dispute 64:15,17 85:3
DISTRICT 1:1 1:2 154:20,21
division 1:3 34:10 154:22
Divorced 7:5
Dixie 30:11,15 30:18 31:12,18 33:3 34:5,15 34:16 35:10,11 35:15 36:10 37:18,21 38:23 43:5,14
document 5:9 26:6 66:7 88:6 94:2
documents 21:9 23:20 24:14 25:8,23 26:15 69:23 76:1 88:12 141:21 141:22,23 153:22

Dodson 15:19 15:21 16:4
doing 21:13 45:13 77:8 102:18 131:5 131:16,19,23 137:21 149:1
dollar 46:12,15
Donald 73:11
dovetails 21:4
draw 104:21
driving 11:10
drug 10:10,17 10:19 11:1,5
due 5:7 84:22 85:8 94:16 125:4,4 139:11
DUI 9:4 10:3,14 11:9
duly 6:3 154:16
DX-1 4:3
DX-1A 4:4
DX-1B 4:16
DX-10 5:6
DX-11 5:8
DX-12 5:10
DX-2 4:6
DX-3 4:7
DX-3A 4:9
DX-4 4:12
DX-4A 4:14
DX-5 4:18
DX-5A 4:20
DX-6 4:22
DX-6A 5:1
DX-7 5:3
DX-8 5:4
DX-9 5:5
dying 87:11,19
D.C 8:6

_____
E
_____
E 2:4
earlier 83:2

148:10 149:22 150:5
earliest 98:20
easier 13:12
edition 68:21 73:12
education 16:10 16:14 17:3,11 20:9 61:19 112:2 113:21
effect 104:23
effected 100:8
effective 86:7
either 3:16 37:6 71:22 81:2 84:1 93:12 105:14 116:7 133:12 134:11
electrical 27:22
elements 86:21 118:15
eliminated 47:22 48:22
employed 18:14 30:10 54:2
employee 55:2,3 103:18,20 104:2,14,17 105:8,12
employees 107:8 107:9 123:6
employer 43:20
employment 27:1 36:9 42:17 43:5
enables 59:15
encompasses 111:8,9
ended 87:9,11
ensure 146:23
entire 49:16 66:16 91:10 127:22 133:2 141:17

entitled 4:22 117:5
envelope 110:8
environment 44:21
error 14:12,13 14:15,18 42:7 42:9,10,12 46:22 119:7
errors 42:16 45:20,23 46:1
Esposito 55:15 55:21
ESQUIRE 2:4 2:12
estate 8:7
et 1:9 155:5
evaluation 136:18
evening 96:17
event 104:16
events 87:12
everybody 105:6
evidence 3:15 91:5 97:20 136:22
evidenced 145:22
exact 51:14 108:15 121:20 123:11
exactly 84:7 117:18
exam 18:9
examination 5:13 6:5 148:6 155:11
examined 152:14
examiner 20:7 53:4 115:20
examiners 19:15 20:4 106:15 145:20

# FREEDOM COURT REPORTING

Page 162

example 64:5
    92:15,19
    125:11
excess 46:11
excluding 17:14
exclusion 109:3
exclusions
    106:16 108:4
    115:14 127:14
    148:21
excuse 55:18
    137:6
exempt 46:2
exhibit 13:14,17
    13:19 16:15,17
    16:19 23:2,4,7
    23:14 25:11
    32:4 35:22,23
    36:2 37:9
    40:10,14 41:16
    55:8,12 56:1
    67:13 68:5,18
    69:1,20,22
    71:20 74:5
    82:6,9,18,19
    82:22 83:3
    88:14,17 95:12
    95:14 97:6
    99:13 109:19
    142:21 153:14
    153:17
EXHIBITS 4:1
existed 47:13
    107:18
expect 100:23
    101:18 102:10
expense 117:23
    118:10 132:10
    132:20
experience
    20:10 56:11
    57:6 58:8
    61:15,20 62:17
    62:21 63:22

64:14 69:4
    78:13 91:19
    92:1 103:16
    109:5 112:2,14
    112:16,21
    113:1,6,15,17
    114:14 115:9
    127:1,2,13
    145:19 148:8
    152:21
expert 15:15
    21:8 31:16
    35:13 51:9,10
    51:23 52:9,13
    52:19 54:2
    57:10,12,15
    59:16 70:23
    71:21 72:15
    75:17 80:11
    81:1 88:3
    112:17 149:17
    151:22 152:8
    152:15 153:3
expertise 53:18
    71:10 75:13
    105:21
explain 114:5
    137:18 138:11
    138:12 151:20
explained 43:22
explanation
    43:20
express 143:7
expressed 72:6
expressing
    59:20 136:13
    143:11
ex-wife 80:14,20
_____
F
_____
facing 133:11
fact 10:9 16:23
    40:15 62:6
    87:4 99:19

106:18 109:9
    122:15 134:23
    135:4 137:12
    138:7 139:12
    147:10
factors 120:8
    139:13
facts 102:1,21
    126:3 135:16
Failing 145:15
    146:3
fair 33:10 74:13
    87:15 88:5,11
    124:4 130:19
faith 80:19 82:2
    136:13,15,17
    136:21 147:14
    147:15
fall 40:8
falls 60:20
false 42:11
falsely 14:17
familiar 92:20
family 29:13
far 17:19 37:22
    39:9 51:21
    59:3 62:22
    84:12,23 85:3
    91:4 92:14
    100:11 104:9
    104:13 106:20
    109:21 111:7
    112:3 124:14
    141:21 142:8
    142:15 145:12
    147:10
father's 80:1
FBI 20:17
Federal 3:17
Feds 92:18
feel 33:22 35:2
    137:7
felony 10:10
felt 34:19 38:2

45:9 142:17
fidelity 4:13,15
    31:22 45:1
field 52:13
    112:22
fifteen 8:15
Fifth 6:10
Fifty-eight 15:2
    15:3,4
fifty-nine 15:4
filed 15:11,17
    16:1 79:19
    80:17,19 81:6
    81:8 152:1
filing 55:20 65:9
Final 5:6
find 23:11 79:6
    89:4 107:7
    115:3 123:14
    127:9 129:6
    136:12,22
    144:23
fine 11:10 16:16
    22:18 104:21
finish 59:17
fire 77:15
fired 31:12,17
    33:4 34:15
    35:6 37:20
    42:8 48:2,20
fire-type 77:18
firing 33:18
firm 8:7 12:16
    15:7 24:10
    55:17 115:18
first 6:2 12:22
    22:10 23:19
    27:3,6 29:3
    68:19 116:2,12
    119:12 129:22
    129:23 130:9
    130:15 131:10
    131:11 138:11
    149:23 154:16

first-party 77:14
    77:15,18
five 8:19
flew 24:21 25:4
    25:17
flight 8:2
Florida 38:9
folks 20:20,21
    38:6,9 39:14
    62:7,17 63:22
    79:18 106:6,10
    113:19 114:11
    131:20 143:22
follow 29:2
    148:5
followed 126:15
following 130:7
follows 6:4
force 33:13
    43:19 109:7
    116:15,20
    119:1 121:9
    124:3 127:20
    128:12,17
    130:2,23 132:5
foregoing 155:9
forget 123:7
    128:14
forgotten 29:14
form 3:12 34:18
    35:9,17 39:22
    53:6 66:4,23
    67:10 74:23
    92:13 97:15
    99:8 100:20
    108:9 113:11
    118:5 141:18
    150:13,20
    153:1
formal 16:10,14
    17:3,10,17
    20:12 27:7
formality 3:9,9
forming 21:11

# FREEDOM COURT REPORTING

Page 163

26:17
forms 111:6
form-type 76:19
forth 36:17
  111:19 114:2
forward 124:11
found 38:11
four 7:9 8:18
  18:6,20 61:8
fourteen 8:15
four-course
  18:10
Francisco 24:13
  25:1
fraud 19:15 20:4
  20:7
fraud-oriented
  21:3
Freeman 81:12
front 11:23
  104:8,12 108:3
  149:11
fruitful 30:6
full 6:8 35:1
Fuller 11:23
Full-time 27:8,9
fund 85:4,16
  86:2
funding 85:2
funeral 80:2
furnish 13:8
  16:12 24:14
further 3:19
  42:18 126:6
  154:5 155:14

——— G ———
gained 58:7
  61:14
gathering
  148:11
general 17:5
  27:23 51:14
  64:23 92:4

123:3,7,8
134:6
generally 31:7
  47:9 51:4,10
  76:18 94:3
generic 66:13
George 73:11
germane 142:17
getting 40:6
  135:10 138:22
give 7:6 36:8
  42:5 43:20
  59:15 88:5,11
  90:4 95:8
  113:8 125:20
  139:2,7 149:19
  151:15,16
  152:9
given 9:7 15:1
  131:5
giving 31:21
  42:11 59:5
  149:10 150:5
glad 13:7
Globe 1:8 63:1
  94:22 97:2,21
  97:23 99:10
  100:5 103:13
  103:20 104:15
  104:17 106:1,6
  106:14 107:7,8
  107:9,10 108:2
  109:9 112:7,19
  115:7,16
  117:22 118:9
  122:11 124:19
  129:23 132:9
  132:19,21
  133:11 134:2
  134:10,17,19
  155:4
Globe's 136:23
go 7:20 17:22
  18:5 19:1

26:23 29:18
30:7,14 34:20
36:17 44:9
57:12 63:3,22
79:6 92:14
103:20 111:23
113:22 114:5
115:13 125:16
125:21 138:14
139:1 140:4,23
142:3
goes 150:2
going 12:21
  17:18 21:20
  27:12 30:5
  38:12 46:4
  56:6 59:7,18
  62:7,22 78:11
  83:1 92:7
  94:19 102:7
  112:1 115:1,21
  118:10 140:11
good 45:13
  89:22 90:11,13
  90:17 99:17
  100:15 131:23
govern 111:11
governing 75:14
  135:1
grace 121:1,4,4
  121:13,16
graduating 27:2
graduation
  17:12
grandfathered
  20:10
Grant 8:12,13
Great 38:20,21
  38:23
greater 106:10
Green 81:12
grievance 16:1,4
grievances
  15:11,17

group 60:19
groups 52:1
guess 8:15 18:22
  39:7 49:20
  82:1 93:14
  108:16,23
  110:6
guide 114:10
guideline 110:23
  111:20
guidelines 63:3
  147:19
guilty 9:17
  10:10,14 28:14
Gusty 83:15
guy 87:6

——— H ———
H 1:15 2:12 3:5
  6:1,10,22
  154:15
half 46:11
half-million
  46:15
Hampshire
  54:20
Handbook
  144:17
handle 46:7
  49:15 57:14
  143:17
handled 24:4,9
  27:20,21,22
  46:5 57:18
  76:2 111:11
  114:9 123:23
  126:13 130:16
  131:8
handling 33:9
  34:6 49:11
  50:9 53:7
  56:13 57:7
  63:8 72:13
  73:3 74:2 76:4

78:22 137:1
143:12,19
147:19 149:9
handwritten
  153:20
handy 74:15
Hangarter
  23:20,23
happen 104:16
  105:2,3 123:5
happened 39:8
  46:20 84:11
  117:3 122:18
  125:4
happens 51:21
hard 78:3
hate 36:16
health 89:22
  90:11,13,17,19
  99:17 100:15
hear 140:8
heater 87:9
held 134:2
help 31:20 32:11
  81:11
hereto 3:20
highlight 56:3
highlighted 56:8
hired 43:23
  53:21 61:16
  69:8 88:4,8
hiring 52:12
hold 52:11 75:16
  134:17
holding 52:8
Hollingsworth
  16:2
home 6:13
homeowners
  34:7
homicide 119:21
honest 36:8
honor 21:14
hope 116:9

# FREEDOM COURT REPORTING

Page 164

Hospital 7:17
hourly 141:3,5
hours 141:7,10
141:11
Huh 15:20 49:23
Huh-uh 102:20

_____
I
_____
idea 54:5
identification
13:18,20 16:18
23:6 32:6 36:3
55:10 69:3,21
82:7,20 88:15
95:13 153:15
identified 31:16
69:18 73:13
illegal 37:23
146:20,21
immediately
30:14
implement
145:15 146:3
impossible
106:9
include 120:10
141:17,20
income 51:13,15
incorrect 14:7
14:10
indemnify 46:19
indemnity 65:17
INDEX 4:1 5:13
indicated 33:8
96:11 98:16
106:21,21
122:17
indicates 101:7
indicating 56:22
individual 65:9
79:14,15,17,20
80:1
individually
18:8

individuals 51:8
79:21
industry 62:23
63:4 64:23
65:11 66:1
72:7,12 73:3
75:23 103:17
106:4 107:5
110:19,19,22
111:1,2,5,10
111:18 112:3,4
112:5 115:7,23
136:19 137:2
149:5 150:18
information
21:16 75:21
84:4 98:18
104:8,10,12
108:11 114:22
132:2 133:7,9
148:11
informed 120:6
133:5
inherent 45:17
initially 115:16
116:2 123:22
124:1 131:16
132:3
injury 87:21
inquiries 58:20
instance 46:10
92:12 117:15
Institute 17:15
institutions
17:11
insurability
91:6
insurance 1:9
14:1 17:15
18:18,19,23
19:5,6,8,12,16
19:17 20:13,16
20:20,23 21:3
21:4,5 23:10

28:1 30:12
31:10 34:9
35:11,15,21
36:10 43:14
45:5,6 50:7,10
50:16,18,21
51:7,16 52:14
52:19,22 53:2
53:3,17,18,19
53:22 54:3,20
55:13 56:13
57:2,7,19 58:8
58:10,11,16
59:1,21,23
60:3,8,16,21
60:22 61:5,10
61:15,17 62:20
63:14 64:3,4
64:12,23 65:10
65:13,14,21
66:1,7,17 67:4
69:5,14 70:3,6
70:17,20 71:11
72:8,13 73:4
73:10,17 74:4
74:16 75:1,14
75:17,22 76:15
77:22 78:23
81:13 83:4,7
85:23 87:13
92:2,4 101:1,2
101:18,19,20
102:2,10,11,12
102:16 103:16
104:5 105:20
105:23 106:5
110:21 111:12
114:19 115:11
115:12 121:8
122:23 124:2
127:10 143:2
143:16 144:17
144:19,21
145:9,13,17

146:6 148:9,14
148:15,18,22
149:3,7,8,15
152:19,22
155:5
insured 47:2,5
64:16,21 65:2
65:15,20 76:22
77:9,20 89:21
90:11,16 99:1
99:16 101:4,21
102:14 103:22
118:2,12 121:6
121:11
insureds 47:13
insured's 102:22
119:14
insuring 94:22
intentional
136:22
intentionally
137:4,9
interest 85:12
interested 22:14
52:12 59:19
142:10 155:16
interest-sensit...
85:10
interfering 80:1
internal 20:18
interpret 110:13
interpretation
93:21 110:16
interrupt 7:13
interrupted 7:20
interruption
45:3,4 59:13
93:22
inventory 29:23
investigate
117:23 118:16
120:5,5 124:13
125:21 128:21
132:10,20

133:1
investigated
119:1,3 125:15
127:18,21
130:23 132:14
investigating
74:2 76:21
120:11
investigation
26:17 47:11
51:6,11 52:20
53:15 69:6
94:21 118:10
118:21,23
122:20 128:8
129:7 130:22
131:3 145:16
146:5
investigative
118:19 133:2
involuntary
33:17
involve 18:16
19:8 27:18
28:1 31:7,10
45:6 51:5
69:14 83:4
involved 13:2
14:3 18:7
20:22 26:11
30:19 36:21
47:10 50:9
51:9 53:11
55:16 57:16,17
58:16,22 71:12
74:1 77:16
80:13,16 83:6
84:15,16,17
85:1 86:11,13
106:16 107:11
107:16 108:8
111:14 120:8
129:21 131:13
136:3

# FREEDOM COURT REPORTING

involvement
53:20
involving 29:22
53:21 69:16
77:20 78:11
80:14 85:15
86:23 92:3
149:14
issue 64:20 65:3
75:7 84:15
85:3,15 87:2
87:17 90:18,19
96:15 114:7
119:2 120:14
122:2,3,9
128:15 140:12
issues 77:11
84:18,23 85:18
86:11,13
125:13 128:10
130:23 132:5
147:8
item 91:21 92:22
93:16
it'll 68:14

**J**

J 73:10,10
Jack 16:2
Jackie 1:17 3:6
154:11 155:19
Jackson 7:17
35:7
January 88:18
89:15 96:12,13
96:22 98:7
99:14 100:3
101:8 116:8,9
121:2 122:10
150:8,23
Jefferson 81:15
Jenkins 23:13
jeopardize 84:1
Jim 33:14 38:17

43:17
job 27:3,7,8,9
29:10,13 30:6
37:3,7 39:5
47:22 48:22
61:19,20
jobs 27:6,11
John 1:15 3:5
4:7,9,12,14,16
4:18,20 6:1,10
6:22 7:10,16
15:19,21 55:15
81:11 138:21
148:8 149:22
154:15
Johnson 83:9
Joseph 13:23
Judge 11:23
149:11,18
151:20 152:7
judgment 14:12
14:13,15,18
42:7,9,10,12
42:16 84:10
92:12 113:16
119:9 130:21
132:8 136:16
136:21 137:14
July 44:10
jury 44:16
136:15

**K**

KAREN 1:5
155:1
keep 71:4,6
74:15 107:22
Keith 23:13
kin 155:14
kind 16:11 55:1
59:18 87:11
120:20
kinds 27:19 64:3
King 83:18

Kirk 11:16,17
knew 14:10,20
42:1 101:3
105:12 118:1
118:12 132:22
know 8:1 12:18
21:2,4,19 22:2
23:12 24:9,17
29:6 31:23
32:12,12 33:19
33:22 34:13
36:14 38:2
39:23 40:1,4,7
42:7 44:15,16
46:14 48:14,15
48:16,16 52:8
53:1,10,14
54:4,10,17
57:8,19 58:21
60:5,19 63:7
63:11,12,16,17
64:17,21 65:10
71:4,9,11,23
74:3,6,7 77:5
77:17 78:2,14
79:4,6,7 80:16
80:17 83:7,13
84:6,7,9,11,17
85:7 86:16
90:2,4,23 91:3
91:4 92:5,7
93:13 94:9
97:16,16,17,19
97:22 98:9,13
98:16 99:3
100:16 101:5
101:17 102:15
103:13,21
104:21,23
105:12 106:11
107:17 108:6
108:17 110:4,7
112:8,15 114:4
114:13,14

116:3 117:17
117:18,18,21
118:7 120:8,18
124:8,15 125:3
130:15 131:7,7
131:22 133:20
134:4 142:18
144:11 152:4
152:11,18
knowing 102:13
105:8 127:3
knowingly
14:16 42:4
101:1 102:11
104:7
knowledge
61:14,20 72:11
73:2 93:20
101:14,21
102:9 106:4,10
108:11 117:17
150:23 152:7

**L**

lag 30:16
Lamb 32:9,12
landlord 79:14
79:16,17
language 88:6
108:3 109:3,17
123:9 148:20
lapse 84:19 85:6
122:3
lapsed 86:1
96:10 101:2
121:1,18,21
Large 1:19 3:8
154:13 155:22
law 1:19 75:14
75:17,23 76:3
115:18 135:2
135:22 145:8
145:12
lawsuit 79:10

80:13 81:8
132:13
lawsuits 113:9
lawyer 12:16
19:23 32:8,14
42:23 54:14,16
55:20 57:22
58:3 75:18
80:9
lawyers 12:15
15:13 23:10
70:9 72:3 84:2
153:5
leads 146:18
learn 106:13
leave 30:3 33:3
34:4,14 41:18
47:21 139:20
leaving 44:7
left 28:18 35:14
40:12,16 41:3
41:21 43:5,13
48:7,14 49:5,8
49:19 50:23
89:3
leg 87:10
legal 58:3 59:12
75:19 93:21
106:23 125:18
126:7,9 129:17
130:5 137:8
150:14
legitimate
117:21 118:8
137:14 139:16
139:23 140:17
letter 88:18
89:10,13,14,19
90:5 100:7
111:22 124:17
let's 11:19 31:20
32:1 36:15
82:17 123:7,8
128:14 138:15

# FREEDOM COURT REPORTING

Page 166

| | | | | |
|---|---|---|---|---|
| 141:9 153:9 | 101:18,18,19 | 72:20 101:11 | **M** | 9:18 11:3 12:4 |
| **liability** 4:23 5:1 | 102:9,11,12 | 122:19 137:18 | **Maddox** 146:14 | 28:12,13 29:10 |
| 27:23 30:22 | 103:14 105:19 | **Lonnie** 73:11 | **Madison** 146:13 | 29:15 40:22 |
| 65:12,13,15,21 | 105:23 106:5 | **look** 30:5 32:17 | **mail** 92:8,23 | **marine** 18:22 |
| 66:5,11,14,17 | 109:9 110:21 | 41:16 55:23 | 93:4,18 94:3,5 | **mark** 13:13 |
| 66:18,21,23 | 111:12 112:22 | 58:21 71:9 | 96:17,18 97:4 | 16:15 22:9,20 |
| 67:1,2,7 73:22 | 113:18 114:18 | 95:7 111:23 | 97:18 100:10 | 26:5 35:23 |
| 77:10 144:16 | 115:7,10 124:2 | 118:18 119:16 | 110:14 125:1 | 67:12,23 68:4 |
| 144:19 148:13 | 124:19 148:15 | 119:17,18 | 150:8 | 82:17 95:10 |
| 148:18 149:2,7 | 148:21 149:3,8 | 125:2 128:12 | **mailbox** 151:5 | 153:9,11 |
| **licensed** 50:15 | 149:11,14 | 131:12 148:19 | 151:10 | **marked** 13:17 |
| **lie** 40:15 48:2 | 152:8,15,19,22 | **looked** 60:6 | **mailed** 90:12 | 13:19 14:2 |
| **lied** 12:7 28:16 | 153:3 155:4 | 106:22 115:18 | 91:20 97:16 | 16:17 23:5,14 |
| 29:9 31:14 | **limited** 69:6 | 116:20 129:23 | 110:14 122:10 | 25:7,14 26:2,8 |
| 35:5,12 40:12 | **line** 21:6 104:22 | **looking** 57:11 | 124:18 | 32:5,19 35:22 |
| 41:2 43:4,11 | 131:18 140:8 | 59:4 74:12 | **mailing** 110:16 | 36:2,5 55:9,11 |
| 43:13 48:15,17 | **lines** 18:17 | 77:3 79:6 95:3 | **Majority** 29:22 | 69:2,20 71:20 |
| **life** 1:8 14:1 19:5 | **liquor** 30:22 | 95:6 112:16 | 51:18 | 82:6,8,19 |
| 19:5,8 23:9 | **list** 5:3,5 71:6,7 | 137:4,10 | **making** 47:6 | 88:14,16 95:12 |
| 28:1 31:10 | 82:13,14,15,16 | 142:15 | **malicious** | 153:14 |
| 45:6 50:9,12 | 82:18,21 83:2 | **Looks** 73:7 | 136:23 | **marking** 142:1 |
| 50:15,18,20 | 151:14 | **lose** 138:19 | **management** | **married** 7:4 |
| 52:14,19,22 | **listen** 102:6 | **loss** 116:4,11 | 125:18 126:4,5 | 9:20 |
| 53:2,3,18,19 | 132:16 | 123:23 130:13 | 126:9 | **material** 90:9,15 |
| 53:22 54:2,21 | **listening** 107:6 | 130:17 135:7 | **manager** 48:8 | **matter** 59:17 |
| 55:13 56:13 | 132:15 | 135:23 136:2 | 78:10 107:3 | 62:7 103:22 |
| 57:2,7 58:8,9 | **litany** 18:23 | **Losses** 74:10,20 | 130:4 137:7 | 154:18 |
| 58:10,15 59:1 | **litigation** 30:2 | **lot** 20:18 39:14 | **manner** 155:16 | **matters** 51:17 |
| 59:20,23 60:3 | 88:4 | 60:21 63:21 | **manual** 53:10 | **Matthews** 103:8 |
| 60:8,16 61:4,6 | **little** 8:16 23:22 | 64:17 77:15,17 | 63:19 110:22 | 103:11 129:18 |
| 61:7,10,15,17 | 36:15 64:9 | 94:10 104:6 | 111:19 112:7 | **ma'am** 23:3 |
| 62:20 64:3,12 | 125:2 | 118:17 132:17 | 114:4 126:21 | 60:13 67:12 |
| 67:4 69:5,13 | **live** 7:7 | 134:7 140:3 | 145:9 146:8 | 68:23 |
| 69:14,17 70:2 | **lives** 7:10,12 | **Lurie** 1:5 20:1 | **manuals** 53:8 | **mean** 10:19 |
| 70:5,16,20 | **logic** 104:22 | 94:23 97:12 | 58:10 61:22,23 | 14:18 17:16 |
| 71:11 72:8,13 | 105:4 | 99:2 101:9 | 62:9,10,12 | 18:21 27:5 |
| 72:20 73:3,16 | **logical** 104:17 | 109:3 124:18 | 63:1,2,23 | 28:22 34:19 |
| 74:16 75:1 | 104:20 105:7 | 131:14 133:11 | 72:16,17 127:2 | 37:22 39:7,9 |
| 76:14 77:21 | 117:21 118:8 | 135:4,16,22 | 127:6 145:4 | 40:5 42:13,15 |
| 78:23 83:4,7 | **logically** 104:23 | 150:7,22 155:1 | 146:16 | 46:3,5 51:20 |
| 83:10 85:9 | 105:1,2 | **Lurie's** 96:1 | **manuscripted** | 57:1,2,8,13 |
| 92:2,3 94:22 | **long** 28:8 30:17 | 109:11,12 | 76:20 | 58:1,15 59:3 |
| 94:22 97:2 | 33:20 47:15 | 123:21 132:23 | **March** 116:6,10 | 59:10 60:23 |
| 100:23 101:2 | 48:6 59:18 | | **marijuana** 9:4 | 62:6,6,9 63:9 |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

65:18 66:13 67:2 71:8 75:15,21 76:23 86:14,14 89:3 92:6,14,14,18 93:7 94:9 98:13 100:13 104:23 105:3 106:6 109:21 110:4,6,13 111:4,21 112:11 115:15 115:16,21 118:19 120:3 120:17,19 123:4 124:13 124:14,19 126:18 134:4,5 135:9 137:16 140:3 141:20 141:21 142:8

mechanism 146:22

Medley 23:13

member 51:23

mention 89:18 90:23

mentioned 25:10

merits 117:23 118:11 119:2,3 120:11,13 128:9,21 132:11,21

Methvin 1:20 2:5

middle 1:2 145:2 154:21

midnight 92:16

Miles 1:20 2:6 12:15 15:6 29:4 42:23 54:15 55:16 70:12 83:5

million 46:11

mind 55:6 113:3

Mine 136:18

minuscule 11:2

misdemeanor 9:3,17 12:3

missed 136:14

misunderstan— 41:13

Mitchell 101:6,7 103:6,10 129:16,19

Mobile 54:19 79:20,21

modified 123:1

moment 7:13 40:11 41:1 58:7 69:19 73:8 74:14 76:6 81:10 94:19 110:2

money 38:6,8

Montgomery 1:21 2:8,16 7:11 154:10

months 134:18 136:3

Monumental 149:12

Moorer 4:3,5,17 12:12 13:23 15:8 35:20

morning 96:19 99:22,23

motions 84:8,10 84:13

Move 122:5

moves 131:18

moving 131:22

multiple 18:7 53:12 61:21 62:10

multi-part 135:10

Mutual 83:10 84:20

——————

## N

——————

NAIC 145:14 146:2

name 6:8 55:21 70:7,8 74:19 103:6,7 130:18

named 8:12 47:2 47:5

names 7:6 38:10 38:11 70:9 72:1

narrow 72:23

Natalie 7:12,22

nation 143:17

National 29:20 29:21 30:3,14 37:10 41:19 145:12

nature 16:3 19:13 25:13 27:11 58:12 123:8 129:1

necessarily 57:14 71:8 92:3 105:3 120:3

need 3:13 59:14 68:2 71:9,11 78:5,7,10 124:13 125:2 133:1,9 147:10

Needed 29:13

negating 100:9

negative 102:20

negligence 129:20 131:13 137:3

neither 78:1 79:5 155:14

never 40:11 41:2 57:12 60:6

116:16,19,20

nevertheless 39:19 58:6 92:21 99:4 124:7 127:17

new 26:8 49:18 54:20 86:10 142:18

nonpayment 84:22

nonresponsive 122:6

nonwaiver 76:9 76:14,16,18 77:1,2,14 78:21 114:21

nonwaivers 77:16

normal 8:22 125:8

Norman 54:13

Northwestern 83:10 84:20

note 68:17 109:16

notebook 5:10 91:14 141:17

notes 153:20

notice 5:6 78:15 102:1,23

noticed 136:11

notify 64:16

November 121:14

number 6:16 9:7 14:3 32:2,2 67:15 68:18 70:5 81:14 82:17 83:7 95:11 153:10 153:10

numbered 68:5 88:23

numeral 68:20

numerous 71:23

——————

## O

——————

Oakes 73:11

oath 9:12 12:7 14:17 28:16 31:14 42:6,12 48:19

obey 21:14

object 34:17 35:8,16 39:21 53:5 58:5,6 66:3 67:9 92:13 97:14 99:7 100:19 113:10 118:4 150:13,20 152:23

objection 118:14

objections 3:11 3:12

objective 134:1

obligation 120:4

observation 109:14

obtain 26:14

obtained 133:4

occasioned 135:6

ocean 18:22

October 82:11

offense 8:22,23 9:16 10:10 11:1

offer 46:12,15 47:6

offered 3:15 99:12

offering 77:9

office 6:13 49:5 95:18,22 97:9 99:6,11 110:5 110:7,10,12,15 150:4,10,11

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

151:13
**offices** 1:19
**Off-the-Record**
68:16 153:8
**Oh** 10:15 29:6,8
36:13 37:8
46:14 47:19
52:16 70:4
85:21 115:20
**okay** 6:23 7:4,6
7:22 8:10,21
9:7,15,20,23
10:3 11:12,21
12:10,12 15:10
16:3 17:2,9
19:18,20 20:3
22:7 23:17,20
26:11,14,23
28:3,10,21
29:1,12,14
30:3 32:10
33:1 36:6 37:8
38:18 39:3,16
44:11 46:10
47:19,21,23
48:13,22 49:1
50:3,12 51:23
54:1 55:1,3
56:9,23 57:1
58:1 61:11
65:21 70:4
71:17 72:6,11
72:21 73:6
75:9 79:12
80:3,23 81:18
82:4 83:1,9,15
84:15 85:23
86:12,20 87:2
87:17 88:16
89:5,18 91:8
91:17 96:1,8
96:16 97:6
99:4 100:23
101:10 106:3

106:13 109:8
110:11,18
111:17 119:11
121:10 122:20
123:16 127:17
128:1,6,19
129:10,18
130:14,19
132:2 134:6,23
136:11 139:2
141:7 144:5
145:7 148:3
151:14
**okayed** 116:22
**Oklahoma**
95:20,20
**old** 8:16
**older** 8:17
**once** 92:7 93:3
93:17 94:4
116:11
**ones** 71:23
**one-by-one**
111:21
**one-on-one**
62:13 63:17,20
113:2 127:7,16
**ONRA** 108:22
**opening** 34:9
**operating** 63:23
**opinion** 59:16
106:9 123:20
126:7 128:18
129:14,16
131:9 136:13
143:11 147:11
149:17,18
**opinions** 21:11
26:17 59:20
72:6 73:15
74:23 75:19
141:19 142:2,6
142:11 143:7
**opportunity**

41:19 95:9
151:21
**opposed** 87:14
137:1 151:23
**option** 134:15
**options** 133:10
134:11
**oral** 37:14,15
93:11 123:1
**order** 24:18
119:8 125:3
128:3 131:10
**ordered** 21:17
129:4
**orders** 21:14
**organization**
20:11,14 21:1
**ought** 13:9
**outright** 48:2
**outset** 118:1
**outside** 112:4
**overall** 51:13
**overdue** 91:6
**overview** 132:1
**owed** 46:16
————— **P** —————
**page** 4:4,14,16
4:20 12:22
13:1 14:2,3
22:10,11,15
23:16 25:11
32:2,19,21,22
36:1,4,9,22
40:10,13,14
56:1 57:1
67:14 73:1,7
89:5,10 91:16
145:1,2
**pages** 4:9 22:12
22:16 25:7
41:16 68:20
88:21 155:9
**paid** 11:10 16:9

91:7 99:5
115:17 133:15
134:14 150:10
**painfully** 92:20
**paragraph** 89:9
**paraphernalia**
11:5
**paraphrasing**
90:7
**Parham** 1:17 3:6
154:11 155:19
**part** 85:12,12
86:4 89:20,21
110:1 122:13
129:6 136:23
147:3
**particular** 69:12
89:10 111:7
123:21 140:15
**parties** 3:3,20
93:5,18 94:8
155:12,15
**party** 3:16 88:4
88:8
**part-time** 27:5
**passed** 126:8
**pay** 49:14
115:21 125:22
133:12 137:10
**payability** 119:3
**payable** 94:14
95:17 97:8
110:11 115:17
115:19 118:11
120:15 124:12
125:12 128:10
129:11 135:1
135:19 138:7
150:3,19
**payers** 92:2
**paying** 16:5
134:12
**payment** 16:1
84:18,19 85:2

85:17 90:12
92:5 93:9
94:16 95:16
96:9 99:14
100:17 105:13
109:17 110:3
116:22,23
121:6 124:15
124:18,22
125:6,14,17,18
125:19 127:19
150:1,8
**payments** 94:23
118:17
**Pebbles** 23:9
26:12,18
**people** 20:16
46:3 49:4 52:8
98:1 105:19
112:19 131:23
**percent** 51:19
51:22
**percentage**
45:16 51:15
**period** 48:5
49:16 121:1,4
121:5,7,13,16
**person** 78:2,5
92:10 104:5
105:9 114:11
116:2,13
119:12 123:22
121:19 129:22
130:10,15,20
131:5,15,19
**personal** 60:20
60:22 61:10
73:10 143:2
**personnel** 115:8
128:21
**perspective**
57:20 59:5
**Phenix** 30:1
**Phil** 13:16 22:20

# FREEDOM COURT REPORTING

Page 169

24:20
**PHILIP** 2:12
**phone** 130:11
**phonetic** 108:22
**phrase** 120:12
**physical** 100:11
    100:13
**picked** 96:18
    100:2 151:6
**Pioneer** 4:19,21
    55:13 69:13
**place** 38:1 65:10
    78:21 114:18
    124:20 135:20
**placed** 11:12
    45:10 92:23
    93:17 94:3,5
    96:16 97:3
    110:14
**plaintiff** 1:6 2:3
    15:7 43:1
    55:17,20 79:9
    79:13 81:22
    113:12,14
    153:23 155:2
**plaintiffs** 113:7
**plaintiff's** 32:8
    54:16 83:16
**please** 6:7,16 7:6
    18:3 23:3,8
    36:5 44:12
    51:5 60:13
    64:10 67:12
    68:22 82:12
    89:7 91:15
    117:10 132:16
    137:17 138:1
    148:2
**pled** 9:17 10:10
    10:14 28:14
**podium** 19:20
**point** 35:3 41:5
    41:9 78:17
    83:3 92:8

112:18 114:17
    147:16
**point-in-time**
    103:19
**pole** 46:19
**police** 129:5
**policies** 53:13
    58:11 74:4
    86:17 106:2,7
    106:12,17
    109:6 114:3
    115:11 123:12
    126:20 127:14
    145:17,21
    146:6
**policy** 47:1,3,6
    47:10 65:5,8
    84:21 85:5,9
    85:10,14,16
    86:1,2,8,10,15
    88:6 89:15
    91:1,8,10,13
    94:12,22 96:9
    99:4 101:2,20
    102:12 106:15
    107:11,13,15
    107:18 108:3,6
    108:9,18,21
    109:4,6,11,13
    114:1 116:14
    116:20,21
    118:2,13 119:1
    119:13,23
    120:14,23
    121:18,21
    122:8,21 123:9
    123:10 124:2
    124:21 125:12
    127:3,20
    128:11,16
    130:2,22 132:4
    132:11,22
    135:1,21
    137:12 138:7

139:22 140:15
    148:19
**policy-wise**
    91:13
**poor** 120:12
**portion** 56:5,8
    60:14 73:13
    117:11 121:3
    129:11 138:2
    139:9
**portions** 86:16
**Portis** 1:20 2:6
**position** 27:15
    28:4 34:11
    44:1 48:14
    56:16 64:18
    86:1 93:3
    142:19
**positions** 49:18
**positive** 89:17
**possession** 9:3
    9:17 11:4 12:3
    100:10,11,13
**possibility** 94:11
    104:22
**possible** 104:19
    132:8,18
**possibly** 64:11
    135:5
**posted** 98:9,12
    98:17 100:13
    101:16
**posting** 98:14
**postman** 100:3
**potential** 58:21
    84:19
**power** 27:3,16
    28:8,19 29:18
    37:1 40:13,16
    41:4,18 43:12
    46:12,17,18,20
    47:2,5,14
**practice** 47:9
    66:18 143:13

143:15 144:2,7
    145:5
**practices** 4:23
    5:2 66:5,19
    73:22 74:11,21
    102:10 143:5,8
    143:10,19
    144:13 145:12
**praised** 45:13
**predominantly**
    147:5,22
**premium** 5:6
    75:6 84:18,19
    84:22 85:2,17
    86:3 89:14
    92:2 94:16
    95:17 97:8
    100:2 101:10
    103:21 105:11
    105:13 110:11
    116:22 121:7
    121:12,13,14
    121:15 122:10
    124:15,18,22
    125:14 127:19
    132:5 133:12
    133:15,18
    134:3,12,16,17
    134:20,20
    135:6,23 136:6
    136:8 150:2,8
    150:10,18
**premiums** 5:8
    91:6 94:14
    95:1,15 97:7
    109:18,18
    121:17 131:1
**prepared** 153:19
**prescribed**
    124:20
**president** 38:13
**pretend** 75:13
**previous** 24:1
**primarily** 30:21

**principles** 52:20
**print** 95:15
**printed** 145:10
**printout** 107:11
**prior** 98:14
**privileged** 21:18
    25:8,9,12,15
    25:23 26:3,4,6
    26:7,9
**probably** 27:10
    51:21
**probation** 11:12
**problem** 101:11
    125:5,6,6
    137:20
**problems**
    146:19
**procedural** 3:10
**procedure** 3:18
    107:10
**procedures**
    53:14 59:6
    61:22,23 62:11
    62:13,19 63:1
    63:2,19 64:1,6
    72:17 73:16,19
    73:23 74:7
    105:22 106:2,7
    106:12 112:6
    113:3,3 114:4
    125:8 126:12
    126:14,16,21
    145:3,10,22
    146:8,11,16,17
    147:18 149:1
    152:18
**proceeding**
    65:14
**process** 133:3
    147:1 148:11
**processing**
    131:14
**produced**
    153:22

Producers 29:20
29:21 30:4,15
37:11 41:20
professional
21:1,8 51:16
53:20 58:9,13
61:16 69:7
70:23 113:7
program 18:11
prompt 145:16
146:4
proof 116:4,11
123:23 130:13
130:17
properly 124:23
132:14
property 18:17
27:18,21 38:7
46:21 64:4
74:7,10,18,20
148:14,18
149:2,6 152:20
protect 25:3,19
protected 21:18
Protective 24:18
provided 3:17
89:21 90:10,10
90:16 96:5
Provident 4:8
4:10 21:17
23:9 24:2
25:22 26:16
provision
140:12 147:17
provisions
109:10 124:22
135:21 139:20
published
110:22 147:19
pulls 131:6
purpose 3:16
128:15
purposes 13:18
13:20 16:18

22:8 23:5 32:5
36:3 55:9 69:2
69:21 82:7,20
88:15 95:13
97:1 98:5
135:15,18
140:6 153:15
pursuant 1:16
purview 76:16
put 15:14 35:13
68:13,17 92:8
93:3 125:1
150:7 151:5,10
------------------
Q
qualifications
20:6 152:8,15
qualified 63:8
139:11
question 3:12
14:5,17 19:3
25:6 29:7 33:2
33:23 34:4,13
34:14,20 35:1
35:2 36:8,20
36:23 37:8,9
37:12 43:8
56:3,10,21
58:2,4 59:17
59:18 60:11,12
65:7,19 77:4
77:19 78:9,15
83:1 86:7
93:23 94:7
98:5 101:17
102:6 103:2
107:6 116:18
117:2,4,10
120:17 122:22
124:17 126:5,6
128:13,16
130:8 132:15
132:18 135:15
135:19 137:17

137:22 138:13
138:15,21,22
139:2,8,19
140:6
questions 3:11
32:23 66:10
70:15 78:16
117:6 131:20
135:11 148:5
quibbling 61:1
quicker 132:17
quote 76:6,7,9
76:10 78:19,20
78:20,21 89:13
90:10,16
114:20,20
------------------
R
Rachel 8:4
Raider 73:11
rate 141:3,5
read 23:19 36:4
56:2,4 60:12
60:15 72:19,22
75:21 91:8
93:2 94:12
96:1,4,6 97:23
106:11 108:1
109:10 112:20
113:20 117:9
117:12 123:10
128:20 129:2
138:1,3 139:10
146:2 148:1
150:2
reading 122:20
127:2 155:12
real 8:7 30:17
realize 9:11
really 8:19
20:13
realms 20:15
rear-ended
81:21

reason 28:18
37:16 40:12,16
41:3,20 43:4
43:13,16 44:6
117:21 125:22
137:14 139:16
139:18,23
140:17
reasonable
103:18 118:8
145:15 146:4
reasonably
129:8
reasons 35:14
recall 12:14
18:20 19:9
31:19,21 35:18
36:11 37:17
38:11 46:10,22
47:8 49:20
50:22 54:9,12
60:2,8,18 61:4
61:8 69:16
71:2,4,14,16
71:18 72:1
80:22,23 81:7
81:19,19 82:1
82:2 88:1
91:11 98:22
116:5 123:11
130:18 146:21
152:13,17
recalled 143:4
receipt 130:16
receive 18:11
75:23 99:13
100:5 125:23
received 21:10
49:14 89:14
90:20 92:6,11
92:22 93:4,9
93:16 94:4
97:2,11,21
98:7,10,21

99:10 100:17
100:21 101:12
122:11,19
124:16 130:12
135:22
receives 122:18
recess 55:7
123:17
reclamation
45:2
recognize 144:1
recognized
143:15
recollect 56:15
recollection
12:20 15:5
32:7 59:22
60:16 70:19
147:21
Record 13:10
41:7,14 60:14
117:11 138:2
139:9 142:12
reduction 33:13
43:18
REEXAMIN...
151:7
refer 89:10
94:19 110:18
reference 23:15
32:21 91:3
136:12 144:23
referenced
33:16 41:17
references 66:8
146:11,17
referred 67:16
103:5 144:8,9
referring 74:5
94:18
reflective 101:13
refresh 12:19
15:5 32:7
70:19

# FREEDOM COURT REPORTING

Page 171

refund 133:12
133:18 134:15
135:6,23
refunded 133:15
134:5
refunding
134:11
regard 10:23
12:3 16:10
36:9 51:12
69:5 72:8,12
73:14,15 90:5
92:2 94:13
105:21,22
106:5 108:14
109:17 110:20
113:17 115:13
123:20 125:14
126:12 129:21
131:1,15
147:16
regarding 76:1
regardless 94:2
127:19
regular 147:14
reimbursement
134:20
reinstate 101:1
101:19 102:12
105:10 122:3
reinstated 89:16
90:21
reinstatement
5:8 95:16 97:7
99:12 100:6
109:19 120:20
121:3 125:7
related 21:5
43:7 60:3
relates 59:7
149:6
relationship
87:20
relative 63:8

released 26:10
relevant 133:4
relied 74:22
75:4 112:13,20
126:10 142:2
relies 68:7
rely 73:2,14
109:10 142:5
remember 11:19
26:1 32:11,14
34:15 50:20
55:15,21,22
86:5,6,12
87:17,22 92:6
94:15,20
121:20 137:22
138:13 139:4
149:10,13
150:4
rendering 75:19
renewal 86:8
repeat 93:23
118:6 128:13
135:9 137:19
138:15
report 5:4 16:12
25:12 38:18
75:10 76:12
82:10 88:22
89:6 91:16
97:1 109:22
110:18 115:2
129:5,5 136:11
136:14 144:10
144:23 149:20
151:18,19,22
152:11,12
reported 38:20
154:14
reporter 1:18
3:7 12:21
32:20 35:23
60:15 67:23
117:12 138:3

139:10 154:12
155:20
REPORTER'S
154:8
represented
109:11
representing 3:3
20:1
reprimands
37:15
Republic 12:13
14:1 15:8
35:20
Requested 60:14
117:11 138:2
139:9
require 91:5
required 143:18
requirement
145:8
requirements
3:10
requires 99:4
research 115:1
reservation
63:11,13,18
64:11 65:1,11
66:9 76:7,17
77:13,15 78:3
78:6,19 114:13
114:20
reserve 65:20
78:14
reserved 3:14
reserving 65:16
77:5,10
residence 6:8
Resident 27:17
respect 3:10
response 35:1
89:17 102:20
responsive
34:12
rest 10:16 13:2

89:18 90:5
result 46:17
136:10
results 155:16
retribution 38:3
39:9
return 68:9
review 47:1,9
53:8 59:6 77:6
94:21 106:13
112:15 120:7
122:21 123:23
133:7
reviewed 16:22
72:18 106:15
108:19,20
153:2
reviewing 53:12
56:12 57:6,8
57:11,17 58:9
62:10 63:4,4
72:16
rid 137:5
right 6:15,20
7:15,20 8:20
9:14,19 10:4,5
10:15 17:19,22
18:2,13 19:1
26:18,23 27:14
27:15 30:18
31:5 33:21
34:3 36:19
37:5 40:23
42:14 44:4
47:15 48:21
51:1,12 53:22
55:23 56:17,22
58:14,19 61:13
61:13 63:15
66:20 69:10,12
74:14 76:5,8
76:11 77:11
82:22 83:11,17
83:20 84:3

85:19 88:21
89:1,8 91:15
95:14,23 97:4
98:4 100:1,3
105:4,18
107:15,20
108:1 113:9,18
117:8,16 119:2
119:15 122:7
122:12 123:18
124:6 125:20
126:23 128:15
129:20 130:3
131:1,17
134:10 135:14
136:4,6 140:4
140:20 144:18
145:6
rights 63:11,13
63:18 64:11
65:1,12,16,20
66:9 76:7,17
77:6,13,16
78:3,6,14,20
114:14,20
risk 45:11
Rite 54:19
role 88:3,7
138:19
Roman 68:20
Rose 2:13
rule 93:15 123:3
134:6
rules 3:17 123:7
ruling 3:14
60:10,11
run 78:11
rush 23:18

_____
S
_____
S 81:12
SAITH 154:5
salvage 38:15
San 24:12 25:16

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| **Sanspree** 2:4 | **se** 67:1 | **separation** | 33:10,15 34:1 | **source** 78:18 |
| 5:15 13:4,12 | **second** 41:11 | 33:17 | 35:4 36:5 | **sources** 76:1 |
| 16:11 19:20,23 | 89:5,9,9 | **series** 18:5 | 42:10 44:12 | **South** 6:10 |
| 21:22 22:3,7 | **second-guessing** | **serve** 80:9 | 45:14 46:22 | **SOUTHERN** |
| 22:18 24:4,5 | 102:16 | **served** 70:22 | 51:5,12 57:4 | 1:3 154:22 |
| 24:12,14,19 | **section** 73:1 | **serving** 72:14 | 57:22 60:23 | **speak** 6:3 41:8 |
| 25:2,14 26:1 | 123:11 145:14 | **set** 77:2 100:12 | 62:1,15 64:2 | 41:14 44:17 |
| 26:11,15 34:17 | **Security** 6:16 | 111:19 113:3 | 64:10 69:11 | 154:16 |
| 35:8,16 39:21 | **see** 11:19 12:19 | 155:12 | 70:21 72:5 | **speaking** 66:12 |
| 40:18 41:5,9 | 16:22 21:7 | **sets** 114:2 | 75:2 76:13 | 66:12 111:12 |
| 53:5 58:4 66:3 | 31:20 57:21 | **settled** 81:3,4 | 82:12,22 88:2 | **speaks** 147:8 |
| 67:9 68:10 | 76:3 77:17,17 | **seventeen-yea...** | 89:7 91:2,15 | **specific** 36:11 |
| 92:13 95:3 | 81:11 82:11 | 8:8 | 94:12 98:18 | 37:17 140:22 |
| 97:14 99:7 | 86:20 107:2 | **shared** 19:20 | 100:15 105:18 | **specifically** |
| 100:19 103:7 | 112:1 115:4 | **sheets** 108:20 | 108:1 109:16 | 54:10 61:6 |
| 113:10 115:2 | 123:18 125:21 | **short** 48:5 | 109:23 111:2 | 67:14 69:16 |
| 118:4,14 | 137:20 138:17 | **Shorthand** 1:17 | 112:13,13,19 | 94:17 131:7 |
| 135:12 141:2 | 139:6,19 140:9 | 3:7 154:11 | 118:7 120:10 | **specifics** 55:22 |
| 146:14 148:4,7 | 141:9 144:9 | 155:20 | 120:22 121:18 | **specimen** 107:14 |
| 151:17 152:1 | 145:2 148:12 | **show** 13:21 23:7 | 122:1,7 123:13 | 107:15,17 |
| 152:23 | **seeing** 109:5 | 35:19 55:11 | 127:8,17 129:6 | 108:5,9 |
| **save** 7:14 72:21 | **seek** 126:7 | 69:22 73:8,12 | 136:7 142:22 | **spell** 23:21 |
| 98:3 | **seen** 33:20 45:12 | 82:8 88:16 | 147:16 153:7 | **spend** 132:9,20 |
| **saying** 48:1 60:5 | 70:16 77:21 | 104:15 | 154:2 | **standard** 107:5 |
| 67:4 104:14 | 79:4 97:20 | **showing** 74:9 | **sit** 94:20 | 112:3,5 115:7 |
| 105:10 108:19 | 107:4 108:17 | **shown** 102:22 | **situation** 46:23 | 123:12 |
| 110:1 121:16 | 114:4 126:1 | **shrunk** 49:6 | 64:13 65:3,6,8 | **standardized** |
| 136:5 145:7 | 143:23 | **side** 84:2 93:4 | 104:13 | 76:19 |
| 146:21 | **segmented** | 94:17 | **situations** 78:11 | **standards** 62:23 |
| **says** 56:15 62:12 | 131:4 | **sign** 148:1 | **Sky** 8:3 | 63:4,5 72:7,12 |
| 63:2 76:21 | **seminar** 19:21 | **signature** 3:21 | **slip-and-fall** | 73:3 106:4 |
| 89:13,21 90:15 | **seminars** 19:12 | **signed** 33:16 | 27:23 | 110:19,20,22 |
| 91:19 97:21 | **send** 101:10 | **significantly** | **small** 11:3 30:1 | 111:1,2,18 |
| 99:9,13,16 | 141:14 | 49:6 | 45:15 | 112:5,11 |
| 105:16 110:4,4 | **sense** 103:23 | **signing** 155:12 | **Social** 6:15 | 115:23 136:19 |
| 110:11 114:12 | 104:4,7 134:7 | **simply** 137:1 | **somebody** 44:3 | 137:2 145:16 |
| 115:16 121:4 | 134:9 | **sir** 6:16 9:9 | 131:6 | 146:4 149:5 |
| 127:5 145:14 | **sent** 92:6,9 | 11:13 14:14,20 | **somewhat** | 150:18 |
| 146:3 147:17 | 106:23 118:20 | 16:7,16 17:22 | 126:13 | **standpoint** |
| **scenario** 140:2 | 118:20 124:16 | 18:3 19:1 | **son** 7:9,16 8:12 | 118:19 134:2 |
| **school** 11:10 | 141:9 | 20:13 21:13,15 | **sorry** 29:1 56:23 | 147:13 |
| 27:12 | **sentence** 89:19 | 23:8,21 24:1 | 89:2 113:14 | **start** 137:20 |
| **Science** 17:4 | 90:6,8 91:18 | 28:13,20 29:6 | **sort** 27:12 112:6 | 139:3 |
| **Scottish** 54:19 | 149:23 | 29:9 30:9 | 129:1 | **started** 27:20 |

# FREEDOM COURT REPORTING

44:13 118:22
138:18
**starts** 36:22
**state** 1:18 3:8
6:7 143:15
144:3 154:9,12
155:21
**stated** 43:16
89:14 93:15
96:13 130:8
**statement** 101:5
123:2
**statements**
123:5
**states** 1:1 63:10
93:17 94:5
97:3,7 143:21
150:1 154:20
**stating** 121:12
**status** 42:16
84:7
**stealing** 38:6,6
**sticker** 68:13
**stipulated** 3:2
3:19
**stipulation** 1:16
3:1
**stockholders**
38:19
**stole** 38:8
**Stonewall** 30:11
30:15,18 31:12
31:18 33:3
34:5,14,16
35:6,11,14
36:10 37:12,17
37:21 38:13,23
43:5,14
**stop** 138:18
**straight** 25:1
**Street** 1:21 2:7
**strictly** 21:5
113:1 134:19
**strike** 122:5

**student** 8:9 10:1
**stuff** 27:23
29:22 49:16
57:12,17 58:16
58:17 60:6
71:5 72:20
118:18 146:18
**style** 12:23 81:8
**subject** 19:11
59:16 73:2
94:21 110:17
120:7 143:20
**submits** 126:3
**submitted** 109:6
109:15 118:17
**subro** 38:12
58:22
**subrogation**
31:3,6
**subsequent**
17:11
**subsidiary**
38:23
**sued** 46:13
79:18
**sufficient** 85:17
86:3
**suggest** 78:18
**suicidal** 119:19
119:21
**suing** 82:2
**suit** 79:19 80:5
80:17,19 81:6
**Suite** 2:15
**Sullivan** 33:14
38:17 43:17,21
**summaries**
153:21
**summary** 84:10
96:4,6
**summertime**
27:11
**superior** 113:5
113:16

**supervised**
48:10
**supervising**
56:12 57:6
**supervisor** 48:7
48:9,11
**supervisors** 48:3
**supportive**
142:19
**supposed** 8:1
112:6,8 114:6
114:7,8 123:3
**sure** 30:16 61:3
89:4 133:2
**surety** 45:2
**surmise** 108:16
108:23
**surprised**
123:13
**surround**
139:13
**sustained** 87:6,7
**sworn** 6:3 42:5
151:23 154:16

---
**T**
**take** 18:8,9 19:4
20:5,11 64:18
85:23 109:16
111:21 132:16
**taken** 1:16 3:6
15:13 38:3
50:18 53:1
56:3,16 60:8
61:4
**talk** 105:17
123:8
**talked** 19:16
29:3 43:21
103:11,13
**talking** 37:13
44:15,17 54:17
56:21 70:4
89:5,20 93:10

120:13 130:9
130:12 133:23
**talks** 66:11
**TASA** 52:2
**task** 131:5
**taught** 19:11
**taxes** 92:14,20
**tear** 68:14
**Techniques**
55:14 69:14
**tell** 17:22 33:4
44:3 54:10
64:10 65:23
71:15,19 72:2
83:23 84:4
111:17
**telling** 17:23
44:1 72:23
73:21 107:21
**tendered** 104:15
105:15
**term** 64:22 65:1
65:11 76:6,9
78:6,20
**terminated** 28:3
28:10 29:17
39:13,14
**terminating**
39:17
**termination**
39:5 43:11
**terminology**
64:6,10 114:19
**terms** 78:19
**test** 20:12
**testified** 6:4
49:17 148:10
**testify** 48:19
62:8 150:16
**testimony** 9:11
42:6,11 59:16
61:3 68:8 96:8
98:6 102:22
113:8 124:7

149:10,22
150:5 151:16
151:22,23
152:9
**Thank** 15:10
16:16 20:3
24:1 35:4
42:21 43:3
44:8 67:11
75:3,20 88:2
95:8 103:4
117:14 119:6
138:5 147:23
153:7 154:2
**That'd** 53:7
**theft** 55:2,3
**theirs** 62:18
114:15 131:4
**thereof** 155:16
**thing** 10:6 11:11
13:5,11 22:21
25:22 26:8
27:13 39:12
57:18 58:22
64:20 74:8
76:19 107:3
110:2 115:21
119:16 120:20
120:21 124:14
124:17 125:16
129:1 132:14
137:9 141:13
152:5
**things** 8:1 19:12
25:21 27:11
36:11 37:17
40:5 46:4
57:16 58:11
60:22 63:16
94:10 112:16
114:6 123:8
124:5 125:2
128:23 131:11
131:21 133:21

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 134:8 140:4,23 142:17 | thoughts 46:4 thousands 45:16 | total 115:22 totally 21:2 | 41:22 42:1 44:2,4 154:17 | 92:21 94:1 152:6 |
| think 7:23 13:9 | three 107:9 | 107:4 108:16 | 154:17,18 | **Understood** |
| 14:2 17:23 | 134:18 136:3 | 108:23 126:1 | truthfully 56:20 | 17:9 |
| 23:2,16 24:11 | three-ring | touched 116:3 | try 88:11 | underwriting |
| 25:9 32:7,22 | 153:18 | 116:13 | trying 40:5 | 147:1,4,5,6,22 |
| 32:22 33:10,12 | throwing 135:11 | track 71:5 | 144:9 | unfair 74:11,21 |
| 34:3,12 39:3 | Thursday 1:22 | traffic 8:23 | turn 89:6 91:15 | 143:5,7,10,12 |
| 39:23 41:17 | 155:8 | train 127:12 | turns 122:9 | 143:14,18 |
| 42:15 44:15 | ties 119:11 | training 20:9 | Tuscaloosa 12:5 | 144:1,6,12 |
| 46:15 48:13,16 | time 3:13,14 | 61:19 62:8,13 | twenty-five 7:23 | 145:1,4,11 |
| 54:7 55:18 | 7:14 14:21 | 63:20,21 112:2 | 78:12 | unidentified |
| 56:8 61:13 | 19:10,16,18 | 112:14,21 | twenty-four 8:5 | 103:19 |
| 63:7 73:18 | 26:21 27:20 | 113:1,6,15,17 | twenty-three 8:5 | uniformly 147:1 |
| 75:9 82:13 | 30:16 34:20 | 113:20 115:8 | twice 19:19 | United 1:1 93:17 |
| 84:17 85:12,13 | 35:3,5 36:14 | transcript 13:1 | two 79:20 | 94:5 97:3 |
| 86:21 87:16 | 37:1 38:14 | 13:22 22:13 | 133:21 | 154:20 |
| 88:19 101:23 | 42:2 48:5 49:2 | 155:10 | type 44:11 45:4 | universal 85:9 |
| 102:15 103:9 | 51:6,6 52:3 | transferred | 52:6 63:16 | University 17:4 |
| 103:17 104:1 | 56:3 65:18 | 91:21 92:17 | 71:8 84:15 | 17:12 19:4 |
| 105:6 107:13 | 72:20,21 76:23 | Transportation | 115:10 | 27:2 |
| 110:17 111:8 | 78:8 79:1,2 | 55:14 69:13 | types 18:19 74:3 | unjustly 50:3 |
| 117:1 121:19 | 85:5 90:12 | travel 13:1,22 | 79:12 85:14 | unknown 98:11 |
| 125:9,15 | 92:8 98:3 | 22:13 | | unnecessary |
| 126:13 129:4 | 100:16 102:8 | treasury 20:18 | **U** | 45:11 |
| 130:7 133:14 | 105:11 117:22 | treated 146:23 | Uh-huh 89:17 | unquestionably |
| 137:9 138:6,10 | 118:6,9 132:10 | treatise 66:8,17 | ultimately | 140:14 |
| 140:10 142:15 | 132:16,20 | 72:22 75:9 | 134:15 | unreasonable |
| 143:20,22 | 135:9 137:19 | 111:20 142:1 | umpteen 34:21 | 45:10 |
| 144:12,14,22 | 138:16 150:12 | treatises 72:16 | unbelievably | untrue 42:5 |
| 145:21 147:8 | 150:19 | 72:18 74:22 | 7:14 | unusual 23:22 |
| 149:20 151:19 | timing 118:16 | 111:5,10 | uncalled-for | 76:3 |
| thinking 86:22 | tired 33:8 34:6 | 141:20 142:5,7 | 48:17 | use 21:16 38:14 |
| third 102:8 | title 32:19 66:16 | 142:8 | understand | 52:7 66:8 76:9 |
| thirty 63:13 | today 9:13 19:23 | treatment 88:5 | 16:14 17:2 | 77:13 78:4,7 |
| 78:13 114:12 | 51:2 107:20 | 88:11 | 57:21 107:22 | 105:4 115:8 |
| thirty-one 94:15 | 114:23 132:13 | trial 151:16 | 111:14 123:19 | 135:7 136:2 |
| 121:5 | told 8:18 58:6 | trials 82:14 | 124:6 128:17 | usually 65:18 |
| thirty-one-day | 59:21 61:14 | tried 25:19 41:5 | 140:10 142:20 | utilize 115:12 |
| 121:12,16 | 69:4 94:1 | 41:9 83:21 | 152:3 | utilized 21:9 |
| thirty-three | Tommy 11:15 | true 34:2 37:6 | understanding | 112:21 |
| 7:11 | top 56:7 89:1,3 | 155:10 | 24:23 59:15 | utilizes 114:19 |
| thorough 128:7 | 91:18 95:15 | truly 104:1 | 61:2 62:23 | |
| thought 108:14 | 149:23 | truth 6:3,3,4 | 64:22 77:1 | **V** |

# FREEDOM COURT REPORTING

value 85:5,16,18 86:15,17,18
variance 141:1
variations 93:13
variety 111:10 144:21
various 53:7,9 63:5 76:1 111:6,23 148:9
vary 51:20
vehicle 38:14
Venue 79:22
verbiage 108:7
version 13:22
versus 1:7 12:12 13:23 15:8 23:9 31:22 35:20 54:20 55:14 64:4 69:13 81:12 83:9 87:3 149:12 155:3
Victoria 83:9
view 14:15 59:11 116:12 119:11 120:2 134:14 137:3
viewed 134:10
violation 137:2 144:5
vitae 16:13,20

**W**

waived 3:11,22 155:13
waiver 75:7,8
want 13:2,15 22:19 23:18,21 39:11 42:18 46:7 58:5 68:12 83:23 139:1 140:8,21 142:12,14 148:1

wanted 34:8
wants 141:14
Washington 8:6
wasn't 9:23 10:18 14:8 16:5 24:7 29:6 30:17 33:18 37:7 39:20 48:4,5,21 49:22 50:1 54:15,21,22 60:10 80:19 90:18 99:10,19 102:6 107:13 116:6 121:23 125:4 129:12 129:17 139:16 142:23 147:4
way 21:21 32:1 37:22 46:4 49:11 59:9 62:7 90:2,8 107:21,23 118:19 120:21 126:1 127:9 137:4,10
website 52:7
welcome 13:3 23:1,19
went 11:10 34:10 50:23 90:23 119:8 137:10 144:12
weren't 10:21 24:19 49:5 70:17 80:7 81:22 109:7
West 8:3
we'll 12:23 74:14 105:10 132:17 139:3 153:12
we're 66:21 115:20

we've 20:19 35:21 65:21 128:8 129:18
What's-her-n... 63:10
whistle 37:23 38:4,5 39:13
whistle-blowing 39:8
Whitaker 63:12 106:20 116:16 116:19 129:14 130:6
White 2:13
wide 144:21
William 55:19
Wilson 23:13
wish 137:18
withdraw 37:8
withholding 134:19
witness 3:20,21 6:2 14:16 15:15 21:8 31:16 35:13 51:9,11,16 52:1 53:20 54:2 57:10 58:9,13 61:16 67:15,17 68:2 68:7,12 69:7 70:23 72:15 80:11 81:1 88:3 112:17 113:8 135:14 150:15 153:17 155:11
woman 8:14
Wood 54:13,14 55:19 70:12 83:6
word 49:20,22 50:1 122:18
worded 82:5

90:3,8
words 61:1,2 128:14,22 138:6
word-of-mouth 62:14,18 106:8 112:9 113:2 114:10 126:22 145:19 146:18
work 7:1,3,16 21:7 28:8 29:19 44:9,11 47:15 50:7 51:9,11,11 57:13 61:16 113:12,14 148:8
worked 50:8,12 53:3 105:19 148:10 153:3
workers 27:21 44:21
working 8:6 26:19,22 49:1 58:12 113:6 141:2
works 7:17 120:21
wouldn't 31:8 58:23 64:7 80:23 93:6,19 94:7 100:23 120:2 123:13 132:13 133:17 134:16 135:7 137:13 140:16
write 39:10,10
written 18:9 37:14,15 67:3 93:10 96:11 146:8,8,11,15 147:18
wrong 14:19,20 55:5 56:23

60:9

**Y**

ya 7:20
yeah 7:9 8:11,20 10:16 11:6,17 15:4,22 17:7 27:9 31:4,13 38:22 43:8 55:4 58:15 60:5 67:20 75:8 80:8,21 81:5,19 82:1 84:11 85:20,22 86:14 95:5 99:18 114:3 115:16 129:3 129:18 131:11 140:5 142:13
year 81:16 96:14
Yearout 83:15
years 8:15 34:21 53:12 63:14 78:13 104:6 105:20 112:15 114:12
year-to-year 51:20
York 26:8

**$**

$175.00 141:6
$33.00 134:3,17 135:8 136:2

**1**

1 13:17 35:22
1st 73:11 121:7
1-A 13:19
1-B 36:1,2,5 37:9 40:10 41:16
1:06-CV-0034... 1:7 155:3
10 73:5,9,12

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

88:14,17 99:13
**11** 95:12,14 97:6
  109:19 141:10
  150:1
**12** 141:10
  153:10,11,14
  153:16,17
**12th** 101:8,15
  122:17
**13** 4:3,4
**148** 5:15
**15th** 92:16
**151** 5:16
**153** 5:10
**154** 155:9
**158** 4:4 14:2
**16** 4:6,20 56:2,7
**16th** 98:7,13
  101:16
**17** 89:15
**17th** 90:20 98:15
  99:14 100:14
  100:17 101:12
  122:19
**19** 4:14 32:3,22
**1971** 17:13
**1978** 9:3,15 12:4
**1986** 81:17
**1987** 73:12

---

**2**
**2** 16:17,19
**2nd** 88:18 99:20
  99:21
**20** 40:14 41:17
**2000** 11:19
**2003** 9:4 10:3
  96:13
**2004** 10:11
  88:19 89:15
  96:12,20,21,22
  98:8 116:10
  121:2,23 151:1
**2005** 11:20

**2006** 1:22 11:20
  11:22 82:11
  155:8
**21** 40:14 41:17
**22nd** 82:11
**23** 4:7,9
**235** 73:7
**24** 36:4,22
**25** 4:16 36:1,4,9
**265** 73:7
**272** 1:21 2:7
**28th** 121:19

---

**3**
**3** 23:2,4,7,14
**3-A** 23:3,4 25:11
**3/27/49** 6:19
**32** 4:12,14
**33** 4:9 22:16
  23:16
**34** 22:16
**35** 22:16
**36** 4:9,16 22:17
  23:16
**36104** 2:8,16
**39.10** 141:9

---

**4**
**4** 5:1 32:4,20
  67:19,20,21
  68:6,22
**4th** 96:12,13,17
  121:2 151:4,9
**4-A** 32:4,21
**401** 2:14
**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**
  6:17

---

**5**
**5** 55:8,12 71:20
**5th** 96:19,22
  97:17 100:3
  122:10 150:8
  150:23 151:6
**5-A** 55:8 56:1

**53** 86:21
**55** 4:18,20
**57** 83:7
**5721** 6:10

---

**6**
**6** 5:14 69:1 74:5
  91:16 142:21
**6th** 99:22,23
  100:6,21
**6-A** 69:1
**68** 4:22 5:1
**69** 5:3

---

**7**
**7** 69:20,22 145:1
**7th** 1:22 155:8
**71** 28:9
**75** 51:19,22
**78** 28:7,9
**780** 2:15

---

**8**
**8** 70:5 82:6,9
**82** 5:4,5
**83** 44:10 47:19
**88** 5:6

---

**9**
**9** 82:19,22 83:3
**9:30** 1:23
**92** 47:20
**95** 5:8

---

## 367 VALLEY AVENUE

# FREEDOM
# COURT REPORTING

367 Valley Avenue
Birmingham, Alabama 35209
205.397.2397
877.373.3660

## WITNESS CERTIFICATION

I, _John H. Allen_, do hereby acknowledge that I have read the foregoing transcript of my testimony and that it is a true and correct transcription of the answers given by me to the questions propounded, except for the changes, if any, noted on the attached errata sheet.

_John H. Allen_
Witness
Printed name: _John H. Allen_

Sworn to and subscribed before me, this the _19_ day of _JAN_, 2007.

_James G. Prenton_
Notary Public
My Commission expires: _9-27-2007_

Deposition of:     John Allen
Taken:             12/07/2006
Court Reporter:    Jackie Parham

## TRANSCRIPT ERRATA SHEET

Deposition of:      John Allen
Taken:              12/07/2006
Court Reporter:     Jackie Parham

| Page #: | Line #: | Correction/Reason for change: |
|---------|---------|-------------------------------|
| 78-17 → | | Additional research information on Reservation of Rights involved in Life Claims. |
| 79-8 → | | |
| 114 | 17 | |
| 115 | 5 | |
| | | Examples of other life insurance companies using Reservation of Rights letters in life insurance claims I personally worked on each of these cases. |
| | | Exhibit "A": Letter of May 12, 2000 Page: Reserving of rights by Monumental in case of Allegro v Monumental Life Ins. Co. |
| | | Exhibit "B": Letter of January 12, 2004 Page 1, Great-West Life Ins company Reserves rights to obtain additional medical information. |
| | | ② Letter of December 12, 2003, Page 1 reserves rights on ① conducting additional inquiries ② Contract ③ applicable law. Case of Puk v s Great-West Life & Annuity Ins Co |