# Exhibit "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| KAREN LURIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:06-cv-00034-MEF |
| | ) | |
| GLOBE LIFE AND ACCIDENT | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT GLOBE LIFE AND ACCIDENT INSURANCE COMPANY'S SUPPLEMENT TO ITS MOTION FOR SUMMARY JUDGMENT

Defendant **Globe Life and Accident Insurance Company** (hereinafter "Globe" or "Defendant") respectfully supplements its summary judgment with excerpts from the depositions of Plaintiff's attorney, William Matthews, and Plaintiff's expert, John Allen, which may assist the Court in deciding summary judgment in light of the statements made in the pre-trial conference in this matter.  Both of these deposition have been taken since Globe moved for summary judgment:

I.    **TESTIMONY OF THE PLAINTIFF'S ATTORNEY, WILLIAM MATTHEWS.**

A. **Matthews, Like The Plaintiff, Has No Records Or Other Evidence To Support The Contention That Plaintiff And Matthews Notified Globe Of The Insured's Death Prior To The Past Due Premium Check Arriving At Globe's Offices.**

Mr. Matthews has absolutely no documentation to support his contentions that he notified Globe of the Insured's death prior to Globe receiving the Plaintiff's past due premium check. Specifically, Matthews has no phone records, recordings or memoranda memorializing the call. *Matthews Depo.* at 21:4-22:2.[1]  Furthermore, Mathews does not remember or have any record of

---

[1]    The deposition transcript of William Matthews is attached hereto as Exhibit "A."

the name of the Globe employee with whom he allegedly spoke. *Matthews Depo.* at 22:8-16. Rather, Matthews only remembers that he talked with a female. *Matthews Depo.* at 22:17-20.

**B. The Substance Matthews' Alleged Conversations With A Globe Employee Prior To Globe Receiving The Past Due Premium Check.**

Mr. Matthews testified that in his first phone conversation with a Globe, he talked with a Globe employee (who he could only identify as a female) who told him how to go about filing a claim and the documents that were needed to file a claim. *Matthews Depo.* at 23:3:15. Matthews testified that all he discussed on this first call was how to go about making a claim. *Matthews Depo.* at 26:21-27:2. According to Matthews, he did not have any conversations with the Globe employee concerning whether the policy was in force, whether it had been reinstated or the premium payment history. *Matthews Depo.* at 25:8-22.

Mathews further testified that he had a second call a couple days later with the same Globe employee because the Plaintiff was wondering if she was late on her premium payment. *Matthews Depo.* at 27:13-28:21. Matthews never had any discussions with the Globe employee as to whether the Plaintiff made her premium payment within the 31 day grace period or beyond the grace period. *Matthews Depo.* at 35:19-36:18. Furthermore, Matthews never discussed with the Globe employee how and under what circumstances the policy could be reinstated. *Matthews Depo.* at 39:1-5.

Matthews testimony concerning the substance of this call was inconsistent. For example, Matthews initially testified that the Globe employee told him that there was "no problem" as long as Globe received the check by a certain date. *Matthews Depo.* at 29:12-30:10. Later, Matthews testified that he told the Globe employee "It's my understanding, if you mail the check, if it gets lost in the mail or whatever, it's considered - - and you get like late, it's considered paid." *Matthews Depo.* at 34:4-11. Matthews further testified concerning the Globe

employee's response: "but the person I was talking to was not a lawyer, but they agreed with me, and they said they felt like that was. . ." *Matthews Depo.* at 34:9-11. Finally, when asked if it struck him as odd that a Globe employee would tell him that the policy was in force when they did not receive the premium prior to the Insured's death, Matthews revealed that the Globe employee <u>had not</u> represented to him that the policy was in force:

> Well they said if it was in the mail it was, you know. I explained to them what happened. The lady mailed the check and then the guy gets killed like the next week.[2] And she says, "As long as you send in these documents, we will send it to whoever and **see if they approve it**."

*Matthews Depo.* at 40:18-41:1 (emphasis added).

Because this testimony seemed to differ from his previous testimony, Globe's counsel gave Mr. Matthews another opportunity to clarify what he meant:

> Q.    So, just so we're clear, because your testimony seems a little bit different just then than it did previously, did the Globe person that you talked to say, "Well, just send the stuff in and we'll send it off and see if they approve it," or did they say, "The policy is in force because, you know the premium was" - -
>
> A.    Well, they always told me - - I had never heard that the policy wasn't in force, they weren't going to force the policy. **But they told me that they had to send it to somebody to look at all the stuff I sent them and all that to get final approval**. And I sent them everything. I mean it was a pile of stuff.

*Matthews Depo.* at 41:7-22 (emphasis added). Globe continues to maintain, and has set forth in its previous summary judgment briefs, that any statements that may have been made to Mr. Matthews in an alleged phone call are inconsequential and Globe is entitled to summary judgment regardless of the substance of any such conversation. Furthermore, even assuming the law would permit the Plaintiff to make an argument of an oral modification or waiver, her own lawyer's testimony clearly shows that the Globe employee did not attempt to waive or modify any of the policy terms. Rather, accepting Mr. Matthews' testimony as true, the Globe employee

---

[2]    Actually, the Plaintiff testified that the check was picked up by the mail carrier the day before the Insured's death.

merely stated that Mr. Matthews should submit a claim to the appropriate Globe Department and they would make a decision on the claim.

### C. Matthews' testimony confirms that no modifications were made in accordance with the terms of the policy.

Matthews testified in his deposition that he never received any written modification of the policy. *Matthews Depo.* at 66:5-9. Accordingly, Matthews' testimony confirms that no modifications were ever made in accordance with the express terms of the policy.

## II.    THE TESTIMONY OF PLAINTIFF'S PURPORTED EXPERT, JOHN ALLEN.

### A. It Is Undisputed That At The Time Plaintiff Allegedly Mailed The Premium Payment, January 5, 2004, The Subject Policy Was Lapsed And Out Of Benefit.

At the pre-trial conference, Plaintiff's counsel stated that there was a dispute as to whether the subject policy was lapsed and out of benefit at the time Plaintiff placed premium payment in the mail; Plaintiff's counsel stated that the dispute arose from the expert's report.

However, Plaintiff's only purported expert, John Allen, testified that the subject policy had lapsed and was out of benefit at the beginning of 2004. *Allen* Depo. at 122-122.

### B. Defendant Did Not Waive Inadequate Reinstatement By Investigating Merits Of Claim When Plaintiff's Expert Opines That Defendant Was Required To Investigate Merits Of The Claim Even If Policy Was Out Of Benefit.

Also at pre-trial conference, Plaintiff's counsel argued that Globe waived the right to deny that the policy was out of benefit when the loss occurred by accepting the premium and investigating the claim on its merits. However, Plaintiff expert testified that in his opinion, Globe was obligated to perform a full investigation of the claim on its merits even if it contended the policy was out of benefit at the time of loss. *Allen* Depo. at 118, 120, 127. His testimony ws that the investigation of the claim on the merits was done reasonably (*Allen* Depo. at 119, 129) but that the order of the investigation was in error. *Allen* Depo. at 119, 128.

Therefore, Plaintiff's theory that Globe somehow waived the right to challenge whether the policy was in force at time of loss, fails due to Plaintiff's expert's testimony.

/s/Robert E. Poundstone IV
Philip H. Butler (BUT007)
Robert E. Poundstone IV (POU006)
**Attorneys for Defendant Globe Life and**
**Accident Insurance Company**
BRADLEY ARANT ROSE & WHITE LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701
E-mail: pbutler@bradleyarant.com
        bpoundstone@bradleyarant.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 23rd, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Christopher Sanspree, Esq.
*Beasley, Allen, Crow, Methvin,*
*Portis & Miles, P.C.*
P. O. Box 4160
Montgomery, AL 36103-4160
Chris.sanspree@beasleyallen.com

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants: **None.**

/s/Robert E. Poundstone IV
Robert E. Poundstone IV (POU006)
BRADLEY ARANT ROSE & WHITE LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701
E-mail: bpoundstone@bradleyarant.com

# Exhibit "A"

# FREEDOM COURT REPORTING

1          UNITED STATES DISTRICT COURT

2          MIDDLE DISTRICT OF ALABAMA

3              SOUTHERN DIVISION

4

5      CASE NO.  1:06-CV-0034MEF

6   KAREN LURIE,

7                              ORIGINAL

8         Plaintiff(s),

9   v.

10  GLOBE LIFE and ACCIDENT INSURANCE

11  COMPANY, et al.,

12        Defendant(s).

13

14        DEPOSITION TESTIMONY OF:

15            WILLIAM MATTHEWS

16

17  Commissioner:

18  Renny D. McNaughton

19  December 21, 2006

20  Ozark, Alabama

21

22

23

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

1         S T I P U L A T I O N

2       IT IS STIPULATED AND AGREED by and

3 between the parties through their respective

4 counsel that the deposition of William

5 Matthews, may be taken before Renny D.

6 McNaughton, Court Reporter and Notary

7 Public, State at Large, at the offices of

8 William Matthews, Ozark, Alabama, on the

9 21st day of December, 2006, commencing at

10 approximately 10:00 a.m.

11       IT IS FURTHER STIPULATED AND AGREED

12 that the signature to and the reading of the

13 deposition by the witness is waived, the

14 deposition to have the same force and effect

15 as if full compliance had been had with all

16 laws and rules of Court relating to the

17 taking of depositions.

18       IT IS FURTHER STIPULATED AND AGREED

19 that it shall not be necessary for any

20 objections to be made by counsel to any

21 questions, except as to form or leading

22 question and that counsel for the parties

23 may make objections and assign grounds at

# FREEDOM COURT REPORTING

Page 3

1    the time of trial or at the time said

2    deposition is offered in evidence, or prior

3    thereto.

4        In accordance with Rule 5(d) of the

5    Alabama Rules of Civil Procedure, as

6    amended, effective May 15, 1988, I Renny D.

7    McNaughton, am hereby delivering to Robert

8    Poundstone the original transcript of the

9    oral testimony taken the 21st day of

10   December, 2006, along with exhibits.

11       Please be advised that this is the

12   same and not retained by the Court Reporter,

13   nor filed with the Court.

14

15

16

17

18

19

20

21

22

23

# FREEDOM COURT REPORTING

Page 4

1                    I N D E X

2        EXAMINATION BY:                    PAGE NO.

3      Mr. Poundstone                    6

4

5                    E X H I B I T S

6      Defendant's

7      No. 1...Notice of Deposition      9

8      No. 2...Subpoena of Records       9

9      No. 3...1/02/04 Letter            42

10     No. 4...1/26/04 Letter            44

11     No. 5...2/03/04 Letter            46

12     No. 6...3/02/04 Letter            49

13     No. 7...4/26/04 Letter            50

14     No. 8...5/18/04 Letter            37

15     No. 9...Faxed Policy              58

16     No. 10...Affidavit                66

17     No. 11...Phone Records            11

18     No. 12 A..Phone Records           9

19     No. 12 B..10/17/06 Letter         70

20

21

22

23

# FREEDOM COURT REPORTING

Page 5

1            A P P E A R A N C E S

2

3   FOR THE DEFENDANT (S):

4   Robert E. Poundstone, IV

5   Bradley Arant Rose & White LLP

6   Alabama Center for Commerce, 401 Adams

7   Avenue, Suite 780

8   Montgomery, Alabama 36104

9   334-956-7700

10

11  FOR THE PLAINTIFF (S):

12  Christopher Sanspree

13  Beasley, Allen, Crow, Methvin, Portis &

14  Miles, P.C.

15  218 Commerce Street

16  Montgomery, AL 36104

17  800-898-2034

18

19

20

21

22

23

# FREEDOM COURT REPORTING

Page 6

1    I, Renny D. McNaughton, a Court

2  Reporter of Greenville, Alabama, and a

3  Notary Public for the State of Alabama at

4  Large, acting as Commissioner, certify that

5  on this date, pursuant to the Alabama Rules

6  of Civil Procedure, and the foregoing

7  stipulation of counsel, there came before me

8  at the offices of William Matthews, Ozark,

9  Alabama, commencing at approximately 10:00

10  a.m. on the 21st day of December, 2006,

11  William Matthews, witness in the above

12  cause, for oral examination, whereupon the

13  following proceedings were had:

14

15        WILLIAM MATTHEWS,

16  being first duly sworn, was examined and

17  testified as follows:

18             EXAMINATION

19  BY MR. POUNDSTONE

20    Q    Would you please state your full

21  name, for the record?

22    A    William Bush Matthews, Jr.

23    Q    Do you go by Will?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

1    A    Will, yeah.

2    Q    And what is your profession?

3    A    I'm an attorney and a judge,

4    also.

5    Q    And is that -- tell me where

6    you're a judge?

7    A    Midland City, Clayhatchee,

8    Newton, and Dothan.

9    Q    Okay.

10    A    I was here at Ozark 14 years

11    before I moved to Dothan.

12    Q    Okay.  What kind of judge are

13    you?

14    A    Municipal judge, part-time stuff.

15    Q    And I noticed that you've

16    withdrawn as representing Ms. Lurie in this

17    case, correct?

18    A    Yeah.

19    Q    Okay.

20    A    Because I'm a witness.

21    Q    Okay.  And do you --

22    A    It's unethical for me to be a

23    witness and be a party in this lawsuit.

# FREEDOM COURT REPORTING

Page 8

1        Q      Right.

2        A      Or be an attorney in this

3    lawsuit, I think.

4        Q      And, I assume, by doing that, you

5    expect to testify at trial?

6        A      Yes, sir.  If I'm called as a

7    witness, yeah.

8        Q      Now, obviously, this deposition

9    today is unusual because you are an attorney

10   and you did represent Ms. Lurie.  And I

11   understand that there may be instances today

12   where you want to assert the attorney/client

13   privilege.  And, certainly, I'm not going to

14   force you or try to make you divulge stuff

15   that is covered by the attorney/client

16   privilege.  I will say, just so we get it on

17   record, our position will be at trial that

18   if you assert the attorney/client privilege

19   for something that is asked in this

20   deposition, if testimony is offered on that

21   subject at trial, we'll certainly object to

22   that being entered into evidence and we'll

23   probably file a Motion in Limine in the same

# FREEDOM COURT REPORTING

Page 9

1    regard.  So, I just wanted to put that on

2    the record.

3                    (Whereupon, Defendant's

4              Exhibit Numbers 1 and 2 were

5              marked and attached to the

6              deposition.)

7    BY MR. POUNDSTONE

8         Q    I want to show you what I've

9    marked as Exhibits 1 and 2.  Exhibit 1 is a

10   copy of the deposition notice for your

11   deposition today, and Exhibit 2 is a

12   subpoena for documents that we previously

13   served upon you.  Have you received both of

14   those documents?

15        A    Yes, sir.

16        Q    Okay.  And have you reviewed the

17   documents that were requested in each one?

18        A    Yes.

19        Q    Okay.  And do you have any

20   documents responsive to those requests?

21        A    Actually, I don't.  The only --

22   the only thing in there, and I believe I

23   wrote you a letter and told you so, the only

## FREEDOM COURT REPORTING

1    thing that I had after looking through my

2    phone records are two telephone calls.

3    Let's see, one call is on March the 10th,

4    2:15 p.m., to Oklahoma City, Oklahoma,

5    telephone number (405)270-1410 for 5.7

6    minutes.  And the other one, the other one

7    was on February the 18th for 11.3 minutes,

8    (405)270-1410.  That's the only actual

9    records that I have of phone calls.

10           Q    Okay.

11           A    Although, I know I probably made

12   15 calls to these people.

13           Q    And we'll just do it when we take

14   a break, but if we can just make a copy of

15   that, and I'm going to stick an exhibit

16   sticker on it and just put it as an

17   attachment.

18           A    I can give you these two phone

19   bills and they're in there.

20           Q    Okay.

21           A    Along with thousands of other

22   numbers.

23                MR. SANSPREE:  And just for the

# FREEDOM COURT REPORTING

Page 11

1           record, I'm not his lawyer, so

2           whatever he says you can have, you

3           can have.

4               (Whereupon, Defendant's

5       Exhibit Numbers 11 and 12A were

6       marked and attached to the

7       deposition.)

8   BY MR. POUNDSTONE

9       Q    Okay.  Super.  I'm going to mark

10  those.  I'm going -- actually, I've got my

11  exhibits premarked.  I'm going to mark those

12  as 11 and 12 A.

13      A    You can just keep them as far as

14  I'm concerned.

15      Q    Okay.  And, again, 11 and 12A are

16  the phone records of which show calls made

17  to Oklahoma City, correct?

18      A    Right.  And I assume that's to

19  that company, Globe.

20      Q    How long have you known Karen

21  Lurie?

22      A    Probably 15 to 20 years, at

23  least.

## FREEDOM COURT REPORTING

Page 12

1    Q    Okay.  How did you come to know

2  Ms. Lurie?

3    A    I represented her in a custody

4  case involving her daughter, who's now

5  probably 20 or 21 years old.  So that would

6  have been about 10 or 15 years ago.  She

7  had -- when she got divorced, her husband

8  got custody of the little girl.  And I filed

9  a modification to get custody for her, which

10  I was successful over in Henry County.  It

11  was a Henry County case.  And they appealed

12  the case to the Court of Civil Appeals, and

13  I think they appealed it to the Supreme

14  Court and they lost.  And then they came

15  back about a year or two later and filed

16  again and appealed it again and lost again.

17    So I've had extensive dealings with her

18  on that.

19    Q    Okay.

20    A    Had nothing to do, you know, with

21  this case.

22    Q    Okay.  Did that proceeding, I

23  take it that was a husband that she was

# FREEDOM COURT REPORTING

Page 13

1    married to prior to Mr. David Lurie?

2          A     Right.

3          Q     Is there any other matters, other

4    than the one we're here on today and the

5    custody proceeding, that you represented her

6    on?

7          A     No.  And I hadn't seen her until

8    Chris got killed.

9          Q     And "Chris," I guess "Chris" and

10   David Lurie are the same person?

11         A     I didn't know his name was David.

12   I always called him Chris.

13         Q     I think the Complaint said David

14   Lurie but he goes by Chris?

15         A     Yeah.  I always knew him as

16   Chris.  Now, I don't know if that's his real

17   name or a nickname or whatever, but that's

18   what I always called him.

19         Q     And I assume that you, in

20   addition to the custody proceeding, you also

21   did work for Ms. Lurie in connection with

22   Chris Lurie's death, correct?

23         A     Yeah.  She called me when he got

## FREEDOM COURT REPORTING

Page 14

1   killed, and I referred her to a lawyer in

2   Dothan, Mark Andrews.  And he and I handled

3   that case.

4        Q     When say he and you handled that

5   case, what case do you refer to?

6        A     It was the wrongful death case.

7        Q     Okay.  Against the driver?

8        A     Against the driver of the car.

9   Actually, I think it was a van he was

10  driving.

11       Q     Okay.  And I believe the accident

12  report does show that.

13       A     Yeah.

14       Q     Other than the wrongful death

15  case, the custody matter, and the matter

16  with the insurance policy with Globe Life,

17  are there any other matters in connection --

18  well, any other matters that you've

19  represented Ms. Lurie on.

20       A     Not that I can think of.  I'm

21  sure she's called me about stuff over the

22  years, but...

23       Q     Are there any other life

# FREEDOM COURT REPORTING

Page 15

1  insurance policies on Chris Lurie that you

2  did work on or helped Ms. Lurie on

3  concerning Chris's death?

4      A    I think there were, and I think

5  those have been paid out.

6      Q    When was the first time you

7  became aware of the Globe policy that's the

8  subject of this lawsuit?

9      A    She came in probably a week or

10 two after he got killed, and she was, like,

11 trying to get all his affairs in order, that

12 type thing.  So I would say it was probably

13 -- she would know better than me, but I mean

14 I would say it was a couple weeks -- within

15 a couple weeks after he died.

16     Q    Okay.  And he died on

17 January 6th, and I believe her testimony

18 indicated that she thought it was around

19 January 12th when she came to see you.

20     A    Whatever she would say would

21 probably be accurate.

22     Q    Okay.

23     A    If I kept my old appointment

## FREEDOM COURT REPORTING

Page 16

1  books going back -- it's been several years.

2  If I kept my appointment books, I could tell

3  you exactly, but I don't think we keep them.

4       Q    Did she contact you at any time

5  concerning that policy prior to the death of

6  Chris Lurie?

7       A    No.

8       Q    Okay.  She didn't call you -- she

9  testified that she put it in the mail on

10  January 4th.  She didn't --

11       A    She didn't call me about it.

12       Q    Okay.  You didn't talk to her

13  about the actual check while she was paying

14  it?

15       A    No.  In fact, I hadn't talked to

16  her until Chris got killed in probably a

17  couple years.

18       Q    Okay.  So, if I understand your

19  testimony right, she came to see you after

20  his death to talk about a number of issues

21  involving the death and not, specifically,

22  the Globe policy, is that accurate?

23       A    Firstly, it was the death case.

## FREEDOM COURT REPORTING

Page 17

1  And when I talked to her about the death

2  case, I asked her about any insurance

3  policies and that type thing, and I told her

4  I would help her with that, if she needed

5  help.

6       And I don't think she brought in the

7  policy that day, or the policies.  It might

8  have been the next day or a couple days, but

9  I told her I needed death certificates to

10  send, you know, to file the claim.  And if I

11  sent a letter to the company, y'all would

12  have that.  I couldn't find it.

13       Q    Yeah.  I do have a letter that I

14  will show you in just a little bit.

15       A    Okay.

16       Q    What is the first time you

17  remember discussing the Globe policy with

18  Ms. Lurie?

19       A    Well, it would have been when she

20  brought in the policies.

21       Q    What, specifically, do you

22  remember discussing with her about the

23  policy?

## FREEDOM COURT REPORTING

Page 18

1          A     Well, I think -- how many years

2     ago has this been, three?

3          Q     2004.

4          A     2004. She's -- I think she

5     brought in something saying "your policy was

6     going to lapse if you don't send the money

7     in," or something like that. And she told

8     me at that point that she mailed a check to

9     the company. And it was a fairly

10    insignificant amount of money, $30 or $40.

11    It wasn't much money.

12          And she said she mailed the check like

13    the day or two before he got killed. And

14    that was one of her questions, would she be

15    covered. And I felt like she would if the

16    check had been in the mail. That's what I

17    learned in law school: If you post

18    something, it's paid -- it's considered paid

19    if they don't receive it until after

20    something happens, it's still valid.

21          But I think at that point, she came

22    back later with a death certificate. And

23    you're going to show me the letter so I will

## FREEDOM COURT REPORTING

Page 19

1  know what I did next.  I think that's the

2  first thing I did.

3       Q    Okay.  Are there any other

4  discussions that you remember having with

5  her concerning the Globe policy prior to the

6  time that you sent the letter in to Globe?

7       A    No.

8       Q    Okay.  Do you remember what

9  documents you reviewed relating to the

10  policy prior to the initial letter that you

11  sent to Globe?

12      A    I can't remember.  I don't know

13  if I saw the policy or -- I think I did see

14  the policy.  She had a policy, and I read

15  through it.  And I don't even know what the

16  value of it was.  I think it was a hundred

17  thousand dollars.

18      And I think what I did then, I called

19  the first day -- I remember like this:  I

20  called out there and talked to somebody and

21  asked them what I needed to do to file a

22  claim -- help her file her claim.  And she

23  told me a death certificate and some other

## FREEDOM COURT REPORTING

Page 20

1    stuff.  They wanted accident reports.  Why,

2    I don't know.  But they wanted accident

3    reports from the state troopers, which that

4    was no problem, because the head of the

5    state troopers is a client of mine.  So I

6    called him and he got me that, which

7    probably would have taken several weeks to

8    get.

9           And, usually, in a death case, it takes

10   them a while to, you know, do the

11   investigation.  I think I've got that in

12   here somewhere.  I think I've got a copy of

13   what they sent me in here.  I've got a pile

14   of stuff.  Let's see.  See if I can find it;

15   I can give it to you.  Let's see.  I think

16   they sent me back -- no, this is something

17   Globe sent me.

18          But I sent them all this stuff, the

19   accident report, death certificate, you

20   know, that type thing.

21          Q    Okay.  And you said that you

22   believe you had this phone call the first

23   day that Ms. Lurie came to see you?

# FREEDOM COURT REPORTING

1      A     Yes, I think so, or either the

2  second day.  I think she came back the next

3  day or the next day.

4      Q     And just so we're clear on the

5  record, and I think it was alluded to in

6  your previous testimony, you don't have any

7  records that would show the phone call that

8  was made to Globe the first or second day

9  that she came to see you?

10     A     No.  I dialed the 800-number, and

11  it's not on this -- this is the number I

12  called, the two I testified to earlier, that

13  (450)270-1410.  But she had a toll-free

14  number, and I don't know what it was.

15     Q     Okay.

16     A     And I don't know if I've got

17  another file somewhere floating around the

18  office.  I don't think I do.

19     Q     Did you make any recordings of

20  any phone calls with Globe?

21     A     No.

22     Q     Did you ever prepare a memo to

23  the file that summarized what took place in

## FREEDOM COURT REPORTING

Page 22

1    a phone call with Globe?

2          A    No, there wasn't a file.

3          Q    Okay.

4          A    I was just trying to help her out

5    to get her insurance, you know, money.   Mark

6    Andrews had the file.  I, basically, sent

7    the case to him.

8          Q    Do you recall who at Globe you

9    talked to?

10         A    No.

11         Q    And I'm talking about the initial

12   conversation.

13         A    I have no idea.

14         Q    Do you have any records that

15   would show who you spoke with?

16         A    No.

17         Q    Do you remember if it was a male

18   or female?

19         A    Yeah, it was a female, I remember

20   that.

21         Q    Do you recall what department she

22   worked in?

23         A    I think I asked for whoever

## FREEDOM COURT REPORTING

Page 23

1  handles claims, or whoever.  So I guess it

2  would be the claims department.

3      Q    And, obviously, you said you

4  guess.  You're not real certain who?

5      A    It would have to be somebody in

6  the claims department, that's what I asked

7  for.  They told me how to file a claim, what

8  she needed, you know, what documents they

9  needed, that type thing.  I can remember

10  that it wasn't the first person I talked to.

11  They referred me to somebody else, whoever I

12  called.

13      Q    Okay.  Did you have any

14  substantive conversations with anybody else?

15      A    Not at that time.

16      Q    Okay.  So you make the first

17  call, and was there any discussion at all

18  concerning whether or not the policy was

19  lapsed or had been reinstated in that call?

20      A    No, not at that time.  I assumed

21  everything was fine.  The first I heard they

22  weren't going to pay was in May when they

23  sent me that letter.  I think I've got it

## FREEDOM COURT REPORTING

Page 24

1    sitting here.  May the 18th.

2         Q     Did you have any conversations at

3    all during this time as to whether or not

4    the policy was in force?

5         A     Did I have any concerns?

6         Q     Did you have any conversations

7    with the person at Globe?

8         A     No.  They didn't say anything

9    about that.

10        Q     All right.  Let's just do it this

11   way:  Tell me everything that you remember

12   being said during that phone call?

13        A     Okay.  Well, basically, they told

14   me what I needed to send in at that point.

15   And then I want to say it was a week or two

16   later I talked to them, after I sent the

17   stuff, and they said they were going to

18   process the claim and "send you a check."

19        You know, I told them, basically, I was

20   not her lawyer as far as trying to get any

21   money.  They didn't have to put my name on

22   the check.  They could just make it out to

23   her as the widow or the administrator or

# FREEDOM COURT REPORTING

Page 25

1  whatever she -- I don't know what she did.

2  Mark handled that.  I didn't handle that.

3       Q    Okay.  Anything else that you

4  remember discussing on that first call?  Did

5  you even identify who you were calling on

6  behalf of, what the policy number was?

7       A    Oh, yeah.  Yeah.  Yeah.

8       Q    Okay.  But you didn't have any

9  conversations concerning whether or not the

10  policy was in force?

11      A    Not that first call.

12      Q    Okay.  You didn't have any

13  conversations concerning whether or not it

14  had been reinstated?

15      A    Not the first time.  Maybe later.

16      Q    And you didn't have any

17  conversations about premium history or

18  premium payments or anything like that?

19      A    The first time?

20      Q    Right.

21      A    I might have the second day or

22  the, you know, the next day.

23      Q    Okay.

# FREEDOM COURT REPORTING

Page 26

1    A    Because she told me that she had

2    just mailed the check.  So I think I did

3    not, but not the initial call.  But I mean,

4    like, I think I called maybe that Wednesday

5    or something and that came up.

6        Q    Okay.

7        A    And, you know, I talked to

8    whoever I talked to up there.  I said,

9    "Look, it's 30-something dollars, and she

10   mailed it last week, or the week before the

11   fellow got killed."  And they said, "As long

12   as we get it by a certain time" -- you know,

13   but I always assumed if you mailed the

14   check, that's the date.  But I think they

15   said if they got it by a certain time.

16       Later on, Ms. Lurie said, "Well, you

17   know the check went through," so we didn't

18   have any problem.  I didn't think we had a

19   problem until I got this letter of May the

20   whatever.

21       Q    Okay.  So that first call, all

22   you discussed was how to make a claim?

23       A    Yeah.  And she came back in like

## FREEDOM COURT REPORTING

Page 27

1    a couple days later and we called them

2    again.

3              Q    Okay.

4              A    And I probably called them ten

5    times after that.  Every time I called them,

6    it was just like she would call here and

7    say, "Have you heard anything," or whatever,

8    and I would call them.

9              Q    Okay.  Have we talked about

10   everything that you remember discussing

11   during that first call?

12             A    I think so.

13             Q    Okay.  Now, you said there's a

14   second call a couple days later.  What

15   prompted that second call?

16             A    What prompted the second call?

17             Q    Uh-huh.

18             A    I can't remember.

19             Q    Do you remember who you talked

20   with?

21             A    No.

22             Q    Do you remember if that was a

23   male or female?

## FREEDOM COURT REPORTING

Page 28

1    A    It was a female, I feel sure.

2    Q    Do you remember if it was the

3  same person that you talked to --

4    A    I think at some point I talked to

5  a male later on the down the road in the

6  legal department, but it was a female, I

7  think.

8    Q    Okay.  Do you remember if it was

9  the same female that you talked to during

10  the first call?

11    A    Yeah, it was the same person.

12    Q    Okay.  Tell me what you recall

13  that y'all talked about during that call?

14    A    She felt like -- you know, she

15  was wondering, she might be late on the

16  payment or something.  She said she had the

17  payment mailed, and they said that was no

18  problem, as long as they got it by a certain

19  date.  And the thing was mailed before he

20  died.  I don't know if they got it before

21  that date or not.  I feel sure they did.

22    Q    Okay.

23    A    And I remember this, too.  She

## FREEDOM COURT REPORTING

Page 29

1    said, basically, she had all her bills

2    sitting out Christmas and just, basically,

3    forgot to mail all the checks, or whatever.

4    And he was starting a new job.  In fact, I

5    don't -- I think this might have been his

6    first day of work.  I can't remember.  He

7    was going to work on his motorcycle when he

8    got killed.

9         Q    Okay.  Is there anything else

10   that you remember discussing in that second

11   call?

12        A    Other than they assured me no

13   problem, you know, the check's in the mail,

14   no problem.  Basically, it's thirty

15   something dollars, they weren't really

16   worried about it.  They said, "We'll pay the

17   claim, don't worry about it."

18        Q    That's what she said, "We'll pay

19   it, don't worry about"?

20        A    If they got the money.  If the

21   thing was timely mailed, and, obviously, not

22   mailed after the man died.

23        Q    Right.  Did y'all talk about

## FREEDOM COURT REPORTING

1  whether or not the policy was within the

2  grace period when the payment was made?

3      A    Yeah.  I think they even waived

4  the grace period because it wasn't but $30.

5  I mean they just said, well, as long as she

6  mails the check and we get the check by, I

7  want to say she said by next week or

8  whatever, if the thing had been mailed, then

9  you've got no problem.  I said okay.  And

10  that's basically it.

11      You know, the other calls I made were

12  basically saying, you know, "My lady hadn't

13  got her money yet."

14      "Well, it's coming.  We've approved

15  it."

16      They told me that.  "We approved the

17  thing.  It's already been approved.  We're

18  going to get you a check."  And it never

19  came, and then in May I got this letter, in

20  May.

21      Q    Okay.  Back to that second call,

22  is that the only call that you ever

23  discussed whether or not the policy was in

## FREEDOM COURT REPORTING

Page 31

1    force with anyone at Globe?

2        A    There might have been one other

3    call.  I can't remember.  I mean it's been

4    two years ago.

5        Q    Okay.  Do you remember if that

6    other call was before or after you received

7    the letter indicating that they had denied

8    the claim?

9        A    Oh, it was before.  Oh, yeah.

10       Q    Okay.  So you may have had two

11   calls where you discussed whether or not the

12   policy was in force?

13       A    Well, the two calls that I

14   called, I think those were to the legal

15   department, to make sure they had

16   everything.  And they called me several

17   times, too, asking for stuff that I didn't

18   even feel was relevant.  I mean they wanted

19   autopsy reports, they wanted police reports.

20   They wasn't -- I said, "Look, he's dead.

21   There's no -- you know, it's not a suicide.

22   It's not any, you know" -- I couldn't

23   understand why they wanted it all.

# FREEDOM COURT REPORTING

Page 32

1    And I got perturbed at them.  They kept

2  calling wanting stuff.  And I sent them more

3  than I probably should have even sent them.

4  And I don't know whether I got more

5  perturbed at them or perturbed because

6  Ms. Lurie would call me, you know, and,

7  "Tell me what's going?"  I would say, "I

8  don't know what's going on.  I mean, they

9  tell me they're going to send you a check.

10  They're going to send it to you.  They're

11  not going to send it to me," you know.

12    Q    Okay.

13    A    So, that's basically it.

14    Q    And what I'm trying to find out

15  is, you know, I need to know every time that

16  you talked to somebody at Globe about the

17  coverage issue, whether or not there was

18  coverage for his death.  And I know you said

19  the second call y'all discussed it.  You

20  said there may have been another call where

21  it was discussed?

22    A    And they assured me that there

23  was coverage.  Because, in fact, later on

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 33

1  they said, "We've got her money and -- by

2  that time and it's covered and we've

3  approved it and the check is coming."

4      And I told my client that two or three

5  times:  "The check is coming."  And the only

6  time that I ever thought the check wasn't

7  coming is when they wrote me this letter,

8  this S.J. Whittaker, whoever that is.

9      Q    Which is the May 18th, which I've

10  gotten and will make an exhibit later?

11      A    Yeah.

12      Q    Denial of claim letter?

13      A    It says that the premium of $33

14  was received on January the 16th, 2004.  And

15  I don't know -- when I talked to them, I

16  want to say it might have been a day or two

17  before that, they said, "As long as we get

18  the check within the next couple of days,

19  she's covered."

20      Q    Even if he's already dead?

21      A    Yeah.  As long as she did not pay

22  the premium after he died.  That was what

23  they told me.

# FREEDOM COURT REPORTING

Page 34

1    Q    And did y'all discuss whether or

2    not the premium was considered paid upon

3    mailing or report of receipt?

4    A    Yes.  And they told me -- and I

5    told them, I said, "It's my understanding,

6    if you mail the check, if it gets lost in

7    the mail or whatever, it's considered -- and

8    you get it like late, it's considered paid."

9    And -- but the person that I was talking to

10   was not a lawyer, but they agreed with me,

11   and they said they felt like that was --

12   Q    Was that that second call?

13   A    Yeah.  And that was like -- let's

14   see, this says that they got the check on

15   January 16th.  He died on --

16   Q    The sixth.

17   A    The sixth.  I think he died on a

18   Monday, maybe a Tuesday, I can't remember.

19   Let me think.  I think he died on a Monday,

20   or maybe he died on a Tuesday.  Anyway, I

21   think she came the next Monday is when she

22   came, and I told her not to.  She wanted to

23   come in like the day after the funeral or

## FREEDOM COURT REPORTING

Page 35

1    something, and I told her just wait until

2    Monday or whatever.

3         Q    Did you have any discussions with

4    anyone at Globe concerning the difference in

5    paying a premium late but during the grace

6    period and paying a premium after the grace

7    period and during the lapse, did y'all have

8    any discussions in that regard?

9         A    No.

10        Q    Did you have --

11        A    The only time I heard about this

12   is when I got this letter.  Then it said,

13   "We're unable to accept this premium," and

14   they sent me a check for $33.  They had

15   already cashed the check.  They sent me a

16   check for $33.

17        Q    Which was refunding the premium?

18        A    Yeah.

19        Q    Did you ever make anybody at

20   Globe aware that the check was mailed beyond

21   the 31-day grace period?

22        A    The only thing I heard about that

23   was this.

## FREEDOM COURT REPORTING

Page 36

1    Q    Okay.  The only time you ever

2 heard about the payment being made beyond

3 the grace period was the 18th letter?

4    A    Well, they told me if the payment

5 was made before he died, they would honor --

6 she would get her check.  They said it was

7 late, it's $33, they give them extra, you

8 know, time or whatever if they forget to

9 mail the check, they're not going to cancel

10 their policy.  That's basically what they

11 told me.

12    Q    Okay.  But y'all didn't have any

13 discussions as to whether or not it was

14 late, within the grace period, or late,

15 beyond the grace period?

16    A    No.  I wasn't aware of that until

17 I got this letter and the check for $33 they

18 sent to me.

19    Q    Okay.  Which is the May 18th

20 letter.  I've got it marked.  I will just

21 show it to you and we'll go on and put it in

22 the record.

23    A    I'm sure that's the same one I'm

## FREEDOM COURT REPORTING

Page 37

1  looking at.

2          (Whereupon, Defendant's

3      Exhibit Number 8 was marked and

4      attached to the deposition.)

5  BY MR. POUNDSTONE

6      Q    I believe what I'm handing you

7  marked as Defendant's Exhibit 8 is the

8  May 18th letter, along with the check

9  attached, is that correct?

10     A    Yeah.  With a little note that

11 says, "If we can help you in any other way,

12 please tell us."

13     Q    Okay.  Now, I know this has been

14 a while and your memory may not be rock

15 solid on this, but I do want to talk about

16 any additional conversations beyond that

17 second call where you discussed whether or

18 not the policy was in force.  And I need to

19 know first, do you specifically remember if

20 that another conversation took place?

21     A    Every conversation I ever had

22 with them was, after that, "We got the

23 premium, you've sent us all the documents."

## FREEDOM COURT REPORTING

Page 38

1   First, they asked me for more documents. I

2   sent them piles of stuff, you know. And

3   once I sent them, they said, "We've got

4   everything we need. We've approved your

5   claim, the check is coming. Tell your lady

6   that the check is coming." And I instructed

7   them to send it to her and not me.

8        Q    Okay. How many of these type

9   phone calls do you recall taking place?

10       A    Probably eight or ten, at least,

11  or maybe more.

12       Q    Do you remember the names of

13  anyone you talked to?

14       A    No.

15       Q    Do you have any records that

16  would show the names of any of the people

17  that you talked to?

18       A    No.

19       Q    Did you record any of the calls

20  --

21       A    I don't record any calls of

22  anybody that I -- you know, that I talk to.

23  I think it was against the law to do that.

# FREEDOM COURT REPORTING

Page 39

1    Q    Did you ever discuss with anybody

2    at Globe how and under what circumstances a

3    policy could be reinstated?

4    A    No.  They never told me it was

5    cancelled until this.

6    Q    Is there anything that you talked

7    about with the Globe representative in that

8    second phone call that we haven't talked

9    about today?

10    A    Not that I can think of.

11    Q    Okay.  And is there anything in

12    any of the phone calls concerning payment of

13    the premium, reinstatement of the policy, or

14    whether or not the policy was in force that

15    we haven't talked about so far today?

16    A    No.

17    Q    Did you have any discussions with

18    Ms. Lurie as to when she may have put the

19    premium -- overdue premium check in the

20    mail?

21    A    Yes.

22    Q    Okay.

23    A    I remember that.

## FREEDOM COURT REPORTING

Page 40

1    Q    Tell me what discussions you had

2  in that record regard?

3    A    She said she put the checks in

4  the mail, I want to say maybe Friday or

5  Saturday before he got killed, sometime over

6  the weekend maybe, but that she took them to

7  the post office and they were mailed.  So it

8  wasn't like, you know, the day he got

9  killed.  It was several days before he got

10  killed.

11    Q    Did it strike you as a bit

12  unusual that a Globe employee would tell you

13  that the policy was in force when they

14  didn't receive the premium prior to

15  Mr. Lurie's death?

16         MR. SANSPREE:  Object to the

17         form.

18    A    Well, they said if it was in the

19  mail it was, you know.  I explained to them

20  what happened.  The lady mailed the check

21  and then the guy gets killed like the next

22  week.  And she says, "As long as you send in

23  these documents, we will send it to whoever

## FREEDOM COURT REPORTING

Page 41

1    and see if they approve it."

2        The next thing I hear, they approved

3    it, until May the whatever, and then they

4    say they didn't approve it.  So they told me

5    one thing and then came back two or three

6    months later and sent me this letter.

7        Q    So, just so we're clear, because

8    your testimony seems a little bit different

9    just then than it did previously, did the

10   Globe person that you talked to say, "Well,

11   just send the stuff in and we'll send it off

12   and see if they approve it," or did they

13   say, "The policy is in force because, you

14   know, the premium was" --

15       A    Well, they always told me -- I

16   had never heard that the policy wasn't in

17   force, they weren't going to force the

18   policy.  But they told me they had to send

19   it to somebody to look at all the stuff I

20   sent them and all that to get final

21   approval.  And I sent them everything.  I

22   mean it was a pile of stuff.

23       Q    Did you ever know that Ms. Lurie

## FREEDOM COURT REPORTING

Page 42

1    put the premium payment in the mail after

2    the grace period had already expired?

3         A    I don't know when she did it.  I

4    don't know when the grace period was.

5              (Whereupon, Defendant's

6         Exhibit Number was marked 3 and

7         attached to the deposition.)

8    BY MR. POUNDSTONE

9         Q    Okay.  You were never aware of

10   those facts.  I'll show you what I marked as

11   Exhibit 3.  Have you seen that document

12   before?

13        A    I have.  In fact, I don't know

14   how I saw it, but I have seen this.

15        Q    Do you know if that's something

16   that Ms. Lurie brought to you around the

17   time she came to see you the first or second

18   time?

19        A    It might have been, but I

20   remember that.  I think that was confirmed

21   when I called out there, and they called me

22   and said they received the money, or

23   whatever.  So it was -- somebody called me.

## FREEDOM COURT REPORTING

1    Q    Do you remember any discussions

2    you had with Ms. Lurie concerning this

3    letter?

4    A    I'm sure I had several.

5    Q    Do you remember the substance of

6    any of those conversations?

7    A    No.  I think this just -- this

8    just confirms that they wanted the money by

9    the 17th, and I told them the fellow had

10   died.  But they said as long as it was sent

11   to them before he died, then they -- you

12   know, it was fine.

13   Q    Let me ask you this, and hold

14   onto that for just a second.

15   A    All right.

16   Q    Do you recognize the handwriting

17   on that document?

18   A    No, huh-uh.  I assume Ms. Lurie

19   wrote that down probably.  I don't know.

20   It's not mine.

21   Q    Will you read the -- will you

22   read the first sentence of paragraph 3 for

23   me?

## FREEDOM COURT REPORTING

Page 44

1    A    "If you had not a chance to do

2   so, please send in your payment along with

3   attached notice and the benefits of your

4   policy will be reinstated, provided the

5   insured is still in good health.  We must

6   receive your payment by January 17th, 2004."

7        Q    Would you agree with me that

8   Chris Lurie was not in good health when

9   Globe received the premium payment?

10       A    He was deceased.

11       Q    And that's not good health, is

12  it?

13       A    No.

14            (Whereupon, Defendant's

15            Exhibit Number 4 was marked and

16            attached to the deposition.)

17  BY MR. POUNDSTONE

18       Q    I'm going to show you what I

19  marked as Exhibit 4.  Have you seen that

20  document before?

21       A    That's my signature.  I wrote it,

22  yeah.

23       Q    Okay.  And is that -- earlier we

## FREEDOM COURT REPORTING

Page 45

1    talked about the first written letter that

2    you sent to Globe concerning the claim.  Is

3    that the letter that you were talking about?

4         A    I'm sure -- I don't know if I

5    sent more than that letter or not, but that

6    is a letter I sent concerning some of the

7    stuff they wanted, accident report, death

8    certificate.  And then they called back

9    wanting more things.  I mean, that's, you

10   know --

11        Q    Do you remember whether or not

12   this letter was sent after the first call

13   that you had with someone at Globe?

14        A    Oh, yeah.

15        Q    Do you remember whether or not it

16   was sent before or after the second call you

17   had with someone at Globe?

18        A    It would be after.  This letter

19   would be after.

20        Q    Okay.  And there's no mention of

21   the premium issue in this letter.  Is there

22   any particular reason that you didn't

23   mention that?

## FREEDOM COURT REPORTING

1          A     It wasn't an issue.  She paid the

2     premium.

3          Q     Okay.

4          A     And I knew at this point she had

5     paid the premium.  They had gotten money.

6     In fact, somebody called me and said they

7     got it by whatever date.

8               (Whereupon, Defendant's

9          Exhibit Number 5 was marked and

10          attached to the deposition.)

11     BY MR. POUNDSTONE

12          Q     I'm going to show you what I

13     marked as Exhibit 5.  That letter is

14     addressed to Ms. Lurie, so you may or may

15     not have seen it.  So let me ask you, have

16     you seen that letter before?

17          A     Oh, yeah.  Yeah.  She brought

18     this in, and this is what I'm, you know,

19     talking about the other things she wanted,

20     statement by the beneficiary, attending

21     physician statement, which I didn't know why

22     in the world they wanted that.  That was --

23     you know, a death certificate, I had already

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 47

1  sent them that.  A police report, I had

2  already sent them that.  Obituary, I didn't

3  know why they wanted that.  We sent it to

4  them.  A newspaper article, we sent them

5  that.

6       And then this was a problem that I had:

7  Names and addresses of all the doctors who

8  had treated him in the past five years.  And

9  this set me off.  And I called them, and I

10  said this was ridiculous.  And they said,

11  "Well, this is part of our policy, we've got

12  to have this."

13       I said, "The man got killed in the car

14  wreck."

15       "Well, he might have been diabetic; or

16  he might have had blood pressure problems;

17  or he might have had a heart attack and

18  caused this accident."

19       I mean, I got livid.  And I can still

20  remember this.  I said, "Look, the guy got

21  killed in a head-on collision where the

22  other driver came over into his side of the

23  road.  He hit the guy head on with the

## FREEDOM COURT REPORTING

Page 48

1    motorcycle.  He went through the windshield

2    of that van and killed the driver of the

3    other car.  Both of them were killed."

4         But, you know, I just couldn't

5    understand this.  And I remember seeing

6    this, and that set off about two or three

7    phone calls to them about that.  So, yes, I

8    saw that.

9         Q    And just to be clear, I mean, do

10   you -- I mean, you don't have any knowledge

11   of whether or not, you know, conducting such

12   types of investigations are standard or not

13   in the life insurance industry?

14        A    I would say it's very unusual to

15   say the least when you've got a case that's

16   clearly -- you know, why in the world are

17   they looking at stuff like this?  I mean,

18   that -- red flags went off in my head right

19   there that there was trouble with paying the

20   claim when they're wanting all this stuff.

21   I couldn't figure out -- I said something is

22   going on.

23        Q    Okay.  But you've never worked in

# FREEDOM COURT REPORTING

Page 49

1   the insurance industry, have you?

2        A    No.  I've defended insurance

3   companies for a long time though.

4        Q    And when you received this

5   February 2004 letter, was it your

6   understanding, at that time, that Globe

7   needed additional information before it

8   could begin the investigation process?

9        A    That's what they said, they had

10  to have all that before they would write a

11  check is what they told me.  And I think at

12  that stage, I even talked to one of their

13  lawyers or somebody in the legal department.

14            (Whereupon, Defendant's

15       Exhibit Number 6 was marked and

16       attached to the deposition.)

17  BY MR. POUNDSTONE

18       Q    Okay.  And I'm going to show you

19  what I marked as Exhibit 6.  There we go.

20  Okay.  Have you seen that letter before?

21       A    Well, I know I seen it.  I mean I

22  can look at my letterhead and signature.

23       Q    Okay.  And that is your signature

# FREEDOM COURT REPORTING

Page 50

1    there?

2          A     Yeah.

3          Q     Tell me what that letter is?

4          A     Evidently, I sent them a bunch of

5    stuff and that's what, you know --

6          Q     Okay.

7          A     The stuff in there that was

8    requested that I hadn't sent them.

9          Q     Okay.  And that was sent in

10   response to the February 3, letter that we

11   just looked at and marked as Exhibit 5?

12         A     Yeah.

13         Q     Okay.  And this letter is dated

14   March 2nd, correct?

15         A     And I don't know who L.S. Lawson

16   is, but that's whoever I talked to.

17         Q     Okay.  And this letter is dated

18   March 2nd, correct?

19         A     Yeah.

20               (Whereupon, Defendant's

21               Exhibit Number 7 was marked and

22               attached to the deposition.)

23

## FREEDOM COURT REPORTING

1   BY MR. POUNDSTONE

2        Q    I'm going to show you what I

3   marked as Exhibit 7.  Do you recall seeing

4   that letter before?

5        A    It was sent to me.  I saw it if

6   it was sent to me.

7        Q    And it, obviously, is addressed

8   to you, correct?

9        A    Right.  I'm sure I got it.

10       Q    Okay.

11       A    That's my address.

12       Q    And this letter is dated

13  April 26th, 2004, correct?

14       A    Uh-huh.

15       Q    Is that your recollection as to

16  the approximate time period when Globe had

17  received all the information that it needed

18  to begin its investigation?

19       A    That would have been a lot longer

20  after I sent it to them if I sent it to them

21  on March the 2nd.  That's like six weeks

22  later.

23       Q    Let me ask you this:  Do you

## FREEDOM COURT REPORTING

Page 52

1  recall whether or not there was additional

2  information that Globe had to obtain a third

3  party to get because it was not provided by

4  either you or Ms. Lurie?

5      A    I sent them everything they asked

6  me to send them, I think.

7      Q    Let's go back briefly to the

8  May 18th letter.  What did you do after you

9  received this letter?

10     A    I don't think you want to hear

11  what I did, because it wasn't nice.  I hit

12  the damn roof when I saw that letter.  I was

13  incensed, and I'm still incensed.  And I

14  picked up the telephone, and I'm sure -- I

15  hadn't looked at the date.  Let me go back

16  to those phone records, see what these dates

17  were.  I think these were before -- that's

18  March the 10th.  I'm gone have to look at my

19  phone records.  I don't know if I called the

20  toll-free number or not, but I remember

21  calling them.

22     Q    Okay.

23     A    And I told them there would be a

# FREEDOM COURT REPORTING

Page 53

1    lawsuit coming; I didn't handle that type

2    lawsuit but I would have somebody that did.

3         Q    Okay.  Do you remember -- let me

4    ask you this:  Did you have just one

5    conversation with Globe after you received

6    the May 18th letter?

7         A    I think I probably had two or

8    three.  In fact, I think one of their

9    lawyers called me.

10        Q    Do you remember what lawyer

11   called you?

12        A    No.  It was one of their

13   corporate people.

14        Q    Do you remember if it was a male

15   or female?

16        A    I'm sure it was a male.

17        Q    Okay.  And how about the other

18   folks you talked to, do you remember who

19   they were?

20        A    I can't remember.

21        Q    Okay.

22        A    I can remember getting that

23   letter though, I can remember that.

## FREEDOM COURT REPORTING

Page 54

1    Q    Do you remember anything specific

2    that was discussed in relation to the

3    policy, itself, and the coverage issue

4    during any of those calls?

5    A    Yeah.  I told them that I had

6    been assured the money was coming, I had

7    been assured that the claim was fine, they

8    just needed this information.  And, you

9    know, a lot of this stuff, I didn't

10   understand why they needed it but I provided

11   it.  I spent a lot of time getting this

12   information.  I wasn't getting paid to do

13   that.  You know, I did it as favor to her.

14   The whole, you know -- and I just -- it just

15   -- I was incensed when I got this letter.

16   This is what really incensed me.  I don't

17   have a copy of the check, but they put

18   something on there, you know, "If you need

19   anything, we will be glad to help you," or

20   some little --

21   Q    And that's page 2 of the

22   exhibit --

23   A    Yeah.

## FREEDOM COURT REPORTING

Page 55

1    Q    Which is Lurie --

2    A    "If we can help you any other

3    way, please tell us."  Yeah.

4    Q    Did any of the Globe

5    representatives that you talked to explain

6    why they made the decision to deny the

7    claim?

8    A    They said it was a corporate

9    decision not to allow it, because they say

10   that the policy had lapsed over a $15

11   premium or something.  And I explained to

12   them that the money had been mailed and

13   that -- before he died, the money had been

14   mailed, they got it before the lapse.  I

15   think it was the day before or a couple days

16   before, but they got their money and they

17   cashed the check.

18        And I said, "You cashed the check,

19   because I have a copy of the cashed check."

20   And they said, "Well, we've sent you a

21   refund for that check."

22        I said, "That's real good.  I'm going

23   to refer her to an attorney that will file

## FREEDOM COURT REPORTING

Page 56

1  suit for bad faith against your insurance

2  company.  I don't handle that type case.

3  I've represented insurance companies.  I've

4  been practicing law for 25 years, and I've

5  basically been a defense lawyer most of my

6  time.  And, you know, that's where it's

7  going."

8       And they said, "Well, you go get you

9  somebody real smart."

10      I said, "That's fine."

11      Q    Now, when you said that they

12 received a check before it had lapsed --

13      A    Before that date on there.

14      Q    Before the date on the --

15      A    That January 17th date.  They got

16 the money and put it in the bank before

17 then.

18      Q    What you're saying, that they got

19 it before the date on January 17th?

20      A    Right.

21      Q    That's listed on Exhibit 3,

22 correct?

23      A    That's right.  That's right.

# FREEDOM COURT REPORTING

Page 57

1    Q    But you recognize that the policy

2  was already lapsed before they received the

3  premium, because the grace period expired?

4    A    Well, according to this, I mean

5  it tells me, "The benefits of your policy

6  will be reinstated provided the insured is

7  still in good health.  We must receive your

8  payment by January 17th."  They got their

9  payment.  It was mailed before he died.  It

10  wasn't mailed after he died.  They got the

11  check after he died, but it was mailed

12  before he died.

13    Q    Okay.  But wouldn't you recognize

14  that the term reinstatement means that the

15  policy was lapsed, that there no longer was

16  coverage?

17    A    Well, they're telling him he's

18  got coverage.  If he had been alive he'd had

19  coverage.

20    Q    Well, you don't read that as

21  offer to reinstate the policy, as opposed to

22  an opportunity --

23    A    It's like a late fee or

## FREEDOM COURT REPORTING

Page 58

1    something.  I mean, they're talking about

2    $15 or $20.  I mean, you know, get

3    realistic.  If this was a thousand dollar

4    premium or something, I can see it being a

5    big deal.

6              (Whereupon, Defendant's

7         Exhibit Number 9 was marked and

8         attached to the deposition.)

9    BY MR. POUNDSTONE

10        Q    I'm going to show you what I

11   marked as Exhibit 9, and I will give you the

12   opportunity to look over that.  Just let me

13   know when you're ready.

14        A    Go ahead.

15        Q    Okay.  Have you seen that

16   document before?

17        A    I'm sure I have.

18        Q    Okay.

19        A    I don't know.  I don't know if

20   I've seen this one or not.

21        Q    And I will represent to you that

22   is the Globe policy that Ms. Lurie has

23   produced in this lawsuit.  Do you recall if

## FREEDOM COURT REPORTING

Page 59

1   you ever saw that policy?

2        A    Yeah, I probably did.

3        Q    Okay.  And, actually, if you look

4   at the top of the document, it appears to

5   have a faxed tag line that shows that it was

6   either faxed to or from your office at some

7   point.  And I don't believe the date is

8   clear enough to be able to read.  Is that

9   correct?

10       A    Yeah.  Right.  I must have faxed

11  this -- I don't know if I faxed it to -- I

12  faxed it 10/02.  I can't see when it was.

13       Q    Could be either January 21st or

14  June 21st.

15       A    I don't know.

16       Q    Okay.  Do you recall whether or

17  not you reviewed the policy before you had

18  those first and second phone conversations

19  with someone at Globe?

20       A    I can't remember.

21       Q    Do you recognize whose

22  handwriting that is on this policy?

23       A    No.  It's not mine.  I'm sure I

# FREEDOM COURT REPORTING

Page 60

1    had a copy of this when I mailed them the

2    initial stuff, the death certificate and all

3    that.   It's got a thing in here where you've

4    got to send them a notice of death, or

5    whatever, and I sent that letter on

6    January 26th.

7         Q    Would you turn to the page of

8    that document that is Bates stamped Lurie

9    0013.

10        A    I'm looking at it.

11        Q    Okay.   Do you see the bottom,

12   last paragraph on that page, where it says,

13   "Termination of coverage"?

14        A    Yeah.

15        Q    Would you read that for me?

16        A    "Coverage of any insurance will

17   terminate at the end of grace period

18   following and premium due date for which

19   insured's fee for required premium is not

20   paid.  A premium paid for any period after

21   the date coverage terminates will

22   constitute -- continue the insurer's

23   coverage in force and will be returned

## FREEDOM COURT REPORTING

Page 61

1  unless accepted by us under the

2  reinstatement provision of the certificate."

3      Q    Now, sitting here today reading

4  that provision, would you acknowledge that

5  pursuant to the policy, any premiums

6  received after the grace period would only

7  continue the policy if the reinstatement

8  provisions were met?

9      A    There's several ways to get it

10  back in force if they say it wasn't in

11  force.

12      Q    But you recognize that that

13  policy language requires in order to keep

14  the policy from terminating, that the

15  reinstatement provisions in the policy be

16  met?

17      A    You have to pay up what you owe I

18  guess is what they're saying.

19      Q    Turn to the next page.

20      A    Which one?

21      Q    Lurie 0014.

22      A    Okay.

23      Q    And do see there's definition,

## FREEDOM COURT REPORTING

Page 62

1  the fourth paragraph down from the top, of

2  grace period?

3       A     Yeah.

4       Q     Read that definition for me.

5       A     "Grace period.  A grade period of

6  31 days will be allowed each insured for the

7  payment of each premium after the first

8  during which period his or her insurance

9  shall continue in force."

10      Q     Okay.  Now, do you recognize or

11  you would agree that pursuant to that

12  language, the grace period on the policy

13  extends for a period of 31 days past the

14  date that the premium is due, correct?

15      A     That's right.

16      Q     Okay.  And you don't dispute in

17  this case that the grace period had lapsed

18  before Globe received the premium on

19  January 16th, do you?

20      A     No, it hadn't.

21      Q     Okay.  And you don't dispute the

22  fact the grace period had run before

23  Mr. Lurie's death on January 6th, do you?

# FREEDOM COURT REPORTING

Page 63

1    A    It had.

2    Q    And it also run before Ms. Lurie

3    said she placed a check in the mail on

4    January 4th, correct?

5    A    That's right.  It had about a

6    week, I think.

7    Q    Now, if you drop down to the next

8    line and read the provisions for

9    reinstatement, the next paragraph.

10    A    "Coverage may be reinstated

11    anytime within one year after default in

12    premium payment if the insured provides

13    evidence of insurability satisfactory to us

14    and all overdue premiums are paid."

15    Q    Okay.  Now, pursuant to that

16    language, you would agree that in order to

17    reinstate the policy, two things were

18    required, correct, one of those?

19    A    That's what this says, yes.

20    Q    One of those being evidence of

21    insurability satisfactory to Globe?

22    A    Yes.

23    Q    And, two, that all overdue

## FREEDOM COURT REPORTING

Page 64

1  premiums are paid, correct?

2      A    Yeah.

3      Q    Now, if you go to the first

4  paragraph under that same page --

5      A    Is that 14?

6      Q    Yes, Lurie 14.

7      A    All right.

8      Q    And read the provisions for

9  payments.  It's the first paragraph.

10     A    "Each premium a payable in

11 advance at our administrative office."

12     Q    Okay.  Now, sitting here, you

13 acknowledge that pursuant to the policy,

14 payments are made at Globe's administrative

15 office, correct?

16     A    I assume so.

17     Q    And it doesn't say payments are

18 made when they're put in the mail, does it?

19     A    No.

20     Q    If you will, go back to Lurie

21 0013.

22     A    Okay.

23     Q    And drop down to the definition

## FREEDOM COURT REPORTING

Page 65

1  for evidence of insurability, and it's one,

2  two, three, four, five, six, seven, the

3  seventh definition down from the top.

4       A    Okay.  "Satisfaction proof is

5  determined by us that a person is acceptable

6  for insurance."

7       Q    Okay.  Now, surely you'd

8  acknowledge that a deceased man is not

9  acceptable for life insurance, wouldn't you?

10      A    That's a stupid question.  Of

11 course not.

12      Q    If you would, for me, just one

13 more provision of the policy I want you to

14 take a look at.  If you would, go to Lurie

15 0014.

16      A    Okay.

17      Q    Under the general provisions, and

18 if you drop down, the seventh paragraph,

19 Entire Contract Changes, will you read that

20 provision for me?

21      A    "The certificate with group

22 policy enrollment and attached papers, if

23 any, is the entire contract between you and

## FREEDOM COURT REPORTING

1    us, no changes in this certificate will be

2    effective until approved by us.   This

3    approval must be noted or attached to the

4    certificate."

5         Q    In the entire you were handling

6    this matter for Ms. Lurie, you never

7    received any written modification of this

8    insurance policy, did you?

9         A    All of it was oral.

10        Q    So --

11        A    The only thing written I received

12   was this letter from them.

13        Q    So your contentions, at least in

14   this case, is that Globe somehow orally

15   modified the terms of this policy, is that

16   correct?

17        A    I'm not making any contentions.

18             MR. SANSPREE:  He's just a

19             witness.

20        A    I'm just a witness, and I'm

21   telling what happened.  That's up for a

22   judge to determine whether or not this

23   contract is enforceable or not.

## FREEDOM COURT REPORTING

Page 67

1           (Whereupon, Defendant's

2      Exhibit Number 10 was marked and

3      attached to the deposition.)

4  BY MR. POUNDSTONE

5      Q    Okay.  I'll show you what I'm

6  going to mark as Exhibit 10 --

7      A    Okay.

8      Q    -- and ask if you've seen that

9  document before?

10     A    Yeah.

11     Q    Okay.  Is that -- well, tell me

12 what that document is.

13     A    That's an affidavit I executed on

14 November the 2nd of this year.

15     Q    Okay.  Is that your

16 understanding, that this was executed in

17 connection with Ms. Lurie's brief and

18 opposition to our summary judgment motion?

19     A    Actually, I don't know why --

20 what the purpose of it was.

21     Q    It is your affidavit?

22     A    But it's my affidavit and

23 everything in it is true.

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

Page 68

1    Q    Okay.  That was my question.
2  Everything in that affidavit is accurate,
3  correct?
4    A    Yeah.
5    Q    Okay.  Is there anything in that
6  affidavit that you think needs further
7  explaining?
8    A    It says it pretty good.  The only
9  thing that's not in the affidavit concerning
10  this is the extra things they asked me to
11  provide you --
12    Q    Which we talked about.  The
13  additional information --
14    A    Yeah, we talked about that.
15    Q    -- requested in that February
16  letter?
17    A    Doctors' statements, medical
18  records, medical history, that type thing.
19    Q    Okay.  There's two exhibits
20  referenced in that affidavit that were not
21  attached when the brief was filed, and just
22  so -- and I think we've already got them --
23    A    They're in.

# FREEDOM COURT REPORTING

1  Q    -- into evidence here.  Okay.

2  let's just reference the Exhibit Numbers

3  just so that we get that on the record.  The

4  January 26th letter that is referenced in

5  your affidavit.as Exhibit A?

6  A    Right, I've seen it.

7  Q    Is what we marked as Exhibit 4,

8  the letter that's referenced in that

9  affidavit?

10  A    Right.  I assume that's the same

11  letter.

12  Q    And I'm showing you what we

13  earlier marked as Exhibit 8.

14  A    Right.

15  Q    Is that the letter that is

16  referenced in your affidavit and indicated

17  that it will be attached as Exhibit B?

18  A    Right.

19  Q    Okay.  I see that you've got some

20  files here with you today.

21  A    Yeah.

22  Q    Do you mind if I glance through

23  there to see if there's any documents that I

# FREEDOM COURT REPORTING

Page 70

1    don't have.

2         A    Be my guest.

3         Q    Okay.

4         A    You know, that's -- I don't know

5    if there's -- most of this stuff is

6    connected with this lawsuit.  I've just been

7    throwing it in a file.

8              MR. POUNDSTONE:  Chris, do you

9              want to look through it first to

10             see if anything --

11             MR. SANSPREE:  I know we gave you

12             a letter one time.

13             MR. POUNDSTONE:  Why don't we go

14             off the record and let Chris look

15             at it.

16             (Off-the-record.)

17             (Whereupon, Defendant's

18        Exhibit Number 12B was marked and

19             attached to the deposition.)

20   BY MR. POUNDSTONE

21        Q    Show you what I'm going to mark

22   as Exhibit 12B, which is a letter from you

23   to me.  And just to put it in the record,

## FREEDOM COURT REPORTING

Page 71

1    that is the letter that you sent me in

2    response to the subpoena that we issued,

3    correct?

4         A    Yeah.

5         Q    Okay.

6         A    Yeah.  Yeah.

7         Q    That is -- well, do you want --

8    is that something -- let me ask you, I may

9    mark it, I may not.  Is that something that

10   you've done since this lawsuit was filed or

11   is that something that you made back in

12   January of 2004?

13        A    No, this is recent.

14        Q    Okay.

15        A    I just wrote down just to remind

16   myself.

17        Q    Okay.  I don't have any other

18   questions.

19             MR. SANSPREE:  I don't have

20             anything.

21

22

23

# FREEDOM COURT REPORTING

C E R T I F I C A T E

STATE OF ALABAMA:

JEFFERSON COUNTY:


     I hereby certify that the above and foregoing deposition was taken down by me in stenotype, and the questions and answers thereto were reduced to typewriting under my supervision, and that the foregoing represents a true and correct transcript of the deposition given by said witness upon said hearing.

     I further certify that I am neither of counsel nor kin to the parties to the action, nor am I in any way interested in the result of said cause.


*Renny McNaughton*

# FREEDOM COURT REPORTING

| A | | | | |
|---|---|---|---|---|
| | 34:10 | 23:6 38:1 52:5 | 71:11 | 20:22 21:7 |
| able 59:8 | ahead 58:14 | 68:10 | bad 56:1 | 22:1 23:17,19 |
| accept 35:13 | al 1:11 5:16 | asking 31:17 | bank 56:16 | 24:12 25:4,11 |
| acceptable 65:5 | Alabama 1:2,20 | assert 8:12,18 | basically 22:6 | 26:3,21 27:6,8 |
| 65:9 | 2:8 3:5 5:6,8 | assign 2:23 | 24:13,19 29:1 | 27:11,14,15,16 |
| accepted 61:1 | 6:2,3,5,9 72:2 | assume 8:4 | 29:2,14 30:10 | 28:10,13 29:11 |
| accident 1:10 | alive 57:18 | 11:18 13:19 | 30:12 32:13 | 30:21,21 31:3 |
| 14:11 20:1,2 | Allen 5:13 | 43:18 64:16 | 36:10 56:5 | 31:6 32:6,19 |
| 20:19 45:7 | allow 55:9 | 69:10 | Bates 60:8 | 32:20 34:12 |
| 47:18 | allowed 62:6 | assumed 23:20 | Beasley 5:13 | 37:17 39:8 |
| accurate 15:21 | alluded 21:5 | 26:13 | behalf 25:6 | 45:12,16 |
| 16:22 68:2 | amended 3:6 | assured 29:12 | believe 9:22 | called 8:6 13:12 |
| acknowledge | amount 18:10 | 32:22 54:6,7 | 14:11 15:17 | 13:18,23 14:21 |
| 61:4 64:13 | Andrews 14:2 | attached 9:5 | 20:22 37:6 | 19:18,20 20:6 |
| 65:8 | 22:6 | 11:6 37:4,9 | 59:7 | 21:12 23:12 |
| acting 6:4 | answers 72:6 | 42:7 44:3,16 | beneficiary | 26:4 27:1,4,5 |
| action 72:14 | anybody 23:14 | 46:10 49:16 | 46:20 | 31:14,16 42:21 |
| actual 10:8 | 35:19 38:22 | 50:22 58:8 | benefits 44:3 | 42:21,23 45:8 |
| 16:13 | 39:1 | 65:22 66:3 | 57:5 | 46:6 47:9 |
| Adams 5:6 | anytime 63:11 | 67:3 68:21 | better 15:13 | 52:19 53:9,11 |
| addition 13:20 | Anyway 34:20 | 69:17 70:19 | beyond 35:20 | calling 25:5 32:2 |
| additional 37:16 | anywise 72:14 | attachment | 36:2,15 37:16 | 52:21 |
| 49:7 52:1 | appealed 12:11 | 10:17 | big 58:5 | calls 10:2,9,12 |
| 68:13 | 12:13,16 | attack 47:17 | bills 10:19 29:1 | 11:16 21:20 |
| address 51:11 | Appeals 12:12 | attending 46:20 | bit 17:14 40:11 | 30:11 31:11,13 |
| addressed 46:14 | appears 59:4 | attorney 7:3 8:2 | 41:8 | 38:9,19,21 |
| 51:7 | appointment | 8:9 55:23 | blood 47:16 | 39:12 48:7 |
| addresses 47:7 | 15:23 16:2 | attorney/client | books 16:1,2 | 54:4 |
| administrative | approval 41:21 | 8:12,15,18 | bottom 60:11 | cancel 36:9 |
| 64:11,14 | 66:3 | autopsy 31:19 | Bradley 5:5 | cancelled 39:5 |
| administrator | approve 41:1,4 | Avenue 5:7 | break 10:14 | car 14:8 47:13 |
| 24:23 | 41:12 | aware 15:7 | brief 67:17 | 48:3 |
| advance 64:11 | approved 30:14 | 35:20 36:16 | 68:21 | case 1:5 7:17 |
| advised 3:11 | 30:16,17 33:3 | 42:9 | briefly 52:7 | 12:4,11,12,21 |
| affairs 15:11 | 38:4 41:2 66:2 | a.m 2:10 6:10 | brought 17:6,20 | 14:3,5,5,6,15 |
| affidavit 4:16 | approximate | | 18:5 42:16 | 16:23 17:2 |
| 67:13,21,22 | 51:16 | B | 46:17 | 20:9 22:7 |
| 68:2,6,9,20 | approximately | B 4:5,19 69:17 | bunch 50:4 | 48:15 56:2 |
| 69:5,9,16 | 2:10 6:9 | back 12:15 16:1 | Bush 6:22 | 62:17 66:14 |
| ago 12:6 18:2 | April 51:13 | 18:22 20:16 | BUTLER 72:3 | cashed 35:15 |
| 31:4 | Arant 5:5 | 21:2 26:23 | | 55:17,18,19 |
| agree 44:7 62:11 | article 47:4 | 30:21 41:5 | C | cause 6:12 72:15 |
| 63:16 | asked 8:19 17:2 | 45:8 52:7,15 | C 5:1 | caused 47:18 |
| agreed 2:2,11,18 | 19:21 22:23 | 61:10 64:20 | call 10:3 16:8,11 | Center 5:6 |

# FREEDOM COURT REPORTING

certain 23:4
  26:12,15 28:18
certainly 8:13
  8:21
certificate 18:22
  19:23 20:19
  45:8 46:23
  60:2 61:2
  65:21 66:1,4
  72:1
certificates 17:9
certify 6:4 72:4
  72:12
chance 44:1
changes 65:19
  66:1
check 16:13
  18:8,12,16
  24:18,22 26:2
  26:14,17 30:6
  30:6,18 32:9
  33:3,5,6,18
  34:6,14 35:14
  35:15,16,20
  36:6,9,17 37:8
  38:5,6 39:19
  40:20 49:11
  54:17 55:17,18
  55:19,21 56:12
  57:11 63:3
checks 29:3 40:3
check's 29:13
Chris 13:8,9,9
  13:12,14,16,22
  15:1 16:6,16
  44:8 70:8,14
Christmas 29:2
Christopher
  5:12
Chris's 15:3
circumstances
  39:2
City 7:7 10:4
  11:17

Civil 3:5 6:6
  12:12
claim 17:10
  19:22,22 23:7
  24:18 26:22
  29:17 31:8
  33:12 38:5
  45:2 48:20
  54:7 55:7
claims 23:1,2,6
Clayhatchee 7:7
clear 21:4 41:7
  48:9 59:8
clearly 48:16
client 20:5 33:4
collision 47:21
come 12:1 34:23
coming 30:14
  33:3,5,7 38:5,6
  53:1 54:6
commencing 2:9
  6:9
Commerce 5:6
  5:15
Commission
  72:19
Commissioner
  1:17 6:4
companies 49:3
  56:3
company 1:11
  11:19 17:11
  18:9 56:2
Complaint
  13:13
compliance 2:15
computer-aided
  72:8
concerned 11:14
concerning 15:3
  16:5 19:5
  23:18 25:9,13
  35:4 39:12
  43:2 45:2,6

68:9
concerns 24:5
conducting
  48:11
confirmed 42:20
confirms 43:8
connected 70:6
connection
  13:21 14:17
  67:17
considered
  18:18 34:2,7,8
constitute 60:22
contact 16:4
contentions
  66:13,17
continue 60:22
  61:7 62:9
contract 65:19
  65:23 66:23
conversation
  22:12 37:20,21
  53:5
conversations
  23:14 24:2,6
  25:9,13,17
  37:16 43:6
  59:18
copy 9:10 10:14
  20:12 54:17
  55:19 60:1
corporate 53:13
  55:8
correct 7:17
  11:17 13:22
  37:9 50:14,18
  51:8,13 56:22
  59:9 62:14
  63:4,18 64:1
  64:15 66:16
  68:3 71:3 72:9
counsel 2:4,20
  2:22 6:7 72:13
County 12:10,11

72:3
couple 15:14,15
  16:17 17:8
  27:1,14 33:18
  55:15
course 65:11
Court 1:1 2:6,16
  3:12,13 6:1
  12:12,14
coverage 32:17
  32:18,23 54:3
  57:16,18,19
  60:13,16,21,23
  63:10
covered 8:15
  18:15 33:2,19
Crow 5:13
custody 12:3,8,9
  13:5,20 14:15

## D
D 1:18 2:5 3:6
  4:1 6:1
damn 52:12
date 6:5 26:14
  28:19,21 46:7
  52:15 56:13,14
  56:15,19 59:7
  60:18,21 62:14
dated 50:13,17
  51:12
dates 52:16
daughter 12:4
David 13:1,10
  13:11,13
day 2:9 3:9 6:10
  17:7,8 18:13
  19:19 20:23
  21:2,3,3,8
  25:21,22 29:6
  33:16 34:23
  40:8 55:15
days 17:8 27:1
  27:14 33:18

40:9 55:15
  62:6,13
dead 31:20
  33:20
deal 58:5
dealings 12:17
death 12:22 14:6
  14:14 15:3
  16:5,20,21,23
  17:1,9 18:22
  19:23 20:9,19
  32:18 40:15
  45:7 46:23
  60:2,4 62:23
deceased 44:10
  65:8
December 1:19
  2:9 3:10 6:10
decision 55:6,9
default 63:11
DEFENDANT
  5:3
Defendant's 4:6
  9:3 11:4 37:2,7
  42:5 44:14
  46:8 49:14
  50:20 58:6
  67:1 70:17
Defendant(s)
  1:12
defended 49:2
defense 56:5
definition 61:23
  62:4 64:23
  65:3
delivering 3:7
Denial 33:12
denied 31:7
deny 55:6
department
  22:21 23:2,6
  28:6 31:15
  49:13
deposition 1:14

# FREEDOM COURT REPORTING

Page 75

2:4,13,14 3:2
4:7 8:8,20 9:6
9:10,11 11:7
37:4 42:7
44:16 46:10
49:16 50:22
58:8 67:3
70:19 72:5
**depositions** 2:17
**determine** 66:22
**determined** 65:5
**diabetic** 47:15
**dialed** 21:10
**died** 15:15,16
28:20 29:22
33:22 34:15,17
34:19,20 36:5
43:10,11 55:13
57:9,10,11,12
**difference** 35:4
**different** 41:8
**discuss** 34:1
39:1
**discussed** 26:22
30:23 31:11
32:19,21 37:17
54:2
**discussing** 17:17
17:22 25:4
27:10 29:10
**discussion** 23:17
**discussions** 19:4
35:3,8 36:13
39:17 40:1
43:1
**dispute** 62:16,21
**DISTRICT** 1:1
1:2
**DIVISION** 1:3
**divorced** 12:7
**divulge** 8:14
**doctors** 47:7
68:17
**document** 42:11

43:17 44:20
58:16 59:4
60:8 67:9,12
**documents** 9:12
9:14,17,20
19:9 23:8
37:23 38:1
40:23 69:23
**doing** 8:4
**dollar** 58:3
**dollars** 19:17
26:9 29:15
**Dothan** 7:8,11
14:2
**driver** 14:7,8
47:22 48:2
**driving** 14:10
**drop** 63:7 64:23
65:18
**due** 60:18 62:14
**duly** 6:16

—————————

**E**

E 4:1,5 5:1,1,4
**earlier** 21:12
44:23 69:13
**effect** 2:14
**effective** 3:6
66:2
**eight** 38:10
**either** 21:1 52:4
59:6,13
**employee** 40:12
**Ends** 72:19
**enforceable**
66:23
**enrollment**
65:22
**entered** 8:22
**entire** 65:19,23
66:5
**et** 1:11
**evidence** 3:2
8:22 63:13,20

65:1 69:1
**Evidently** 50:4
**exactly** 16:3
**examination** 4:2
6:12,18
**examined** 6:16
**executed** 67:13
67:16
**exhibit** 9:4,9,11
10:15 11:5
33:10 37:3,7
42:6,11 44:15
44:19 46:9,13
49:15,19 50:11
50:21 51:3
54:22 56:21
58:7,11 67:2,6
69:2,5,7,13,17
70:18,22
**exhibits** 3:10 9:9
11:11 68:19
**expect** 8:5
**expired** 42:2
57:3
**explain** 55:5
**explained** 40:19
55:11
**explaining** 68:7
**extends** 62:13
**extensive** 12:17
**extra** 36:7 68:10

—————————

**F**

**fact** 16:15 29:4
32:23 42:13
46:6 53:8
62:22
**facts** 42:10
**fairly** 18:9
**faith** 56:1
**far** 11:13 24:20
39:15
**favor** 54:13
**faxed** 4:15 59:5

59:6,10,11,12
**February** 10:7
49:5 50:10
68:15
**fee** 57:23 60:19
**feel** 28:1,21
31:18
**fellow** 26:11
43:9
**felt** 18:15 28:14
34:11
**female** 22:18,19
27:23 28:1,6,9
53:15
**figure** 48:21
**file** 8:23 17:10
19:21,22 21:17
21:23 22:2,6
23:7 55:23
70:7
**filed** 3:13 12:8
12:15 68:21
71:10
**files** 69:20
**final** 41:20
**find** 17:12 20:14
32:14
**fine** 23:21 43:12
54:7 56:10
**first** 6:16 15:6
17:16 19:2,19
20:22 21:8
23:10,16,21
25:4,11,15,19
26:21 27:11
28:10 29:6
37:19 38:1
42:17 43:22
45:1,12 59:18
62:7 64:3,9
70:9
**Firstly** 16:23
**five** 47:8 65:2
**flags** 48:18

**floating** 21:17
**folks** 53:18
**following** 6:13
60:18
**follows** 6:17
**force** 2:14 8:14
24:4 25:10
31:1,12 37:18
39:14 40:13
41:13,17,17
60:23 61:10,11
62:9
**foregoing** 6:6
72:5,9
**forget** 36:8
**forgot** 29:3
**form** 2:21 40:17
**four** 65:2
**fourth** 62:1
**Friday** 40:4
**full** 2:15 6:20
**funeral** 34:23
**further** 2:11,18
68:6 72:12

—————————

**G**

**general** 65:17
**getting** 53:22
54:11,12
**girl** 12:8
**give** 10:18 20:15
36:7 58:11
**given** 72:10
**glad** 54:19
**glance** 69:22
**Globe** 1:10
11:19 14:16
15:7 16:22
17:17 19:5,6
19:11 20:17
21:8,20 22:1,8
24:7 31:1
32:16 35:4,20
39:2,7 40:12

**FREEDOM COURT REPORTING**

41:10 44:9
45:2,13,17
49:6 51:16
52:2 53:5 55:4
58:22 59:19
62:18 63:21
66:14
**Globe's** 64:14
**go** 6:23 36:21
49:19 52:7,15
56:8 58:14
64:3,20 65:14
70:13
**goes** 13:14
**going** 8:13 10:15
11:9,10,11
16:1 18:6,23
23:22 24:17
29:7 30:18
32:7,8,9,10,11
36:9 41:17
44:18 46:12
48:22 49:18
51:2 55:22
56:7 58:10
67:6 70:21
**good** 44:5,8,11
55:22 57:7
68:8
**gotten** 33:10
46:5
**grace** 30:2,4
35:5,6,21 36:3
36:14,15 42:2
42:4 57:3
60:17 61:6
62:2,5,12,17
62:22
**grade** 62:5
**Greenville** 6:2
**grounds** 2:23
**group** 65:21
**guess** 13:9 23:1
23:4 61:18

**guest** 70:2
**guy** 40:21 47:20
47:23

**H**
**H** 4:5
**handing** 37:6
**handle** 25:2 53:1
56:2
**handled** 14:2,4
25:2
**handles** 23:1
**handling** 66:5
**handwriting**
43:16 59:22
**happened** 40:20
66:21
**happens** 18:20
**head** 20:4 47:23
48:18
**head-on** 47:21
**health** 44:5,8,11
57:7
**hear** 41:2 52:10
**heard** 23:21
27:7 35:11,22
36:2 41:16
**hearing** 72:11
**heart** 47:17
**help** 17:4,5
19:22 22:4
37:11 54:19
55:2
**helped** 15:2
**Henry** 12:10,11
**history** 25:17
68:18
**hit** 47:23 52:11
**hold** 43:13
**honor** 36:5
**huh-uh** 43:18
**hundred** 19:16
**husband** 12:7,23

**I**

**idea** 22:13
**identify** 25:5
**incensed** 52:13
52:13 54:15,16
**indicated** 15:18
69:16
**indicating** 31:7
**industry** 48:13
49:1
**information**
49:7 51:17
52:2 54:8,12
68:13
**initial** 19:10
22:11 26:3
60:2
**insignificant**
18:10
**instances** 8:11
**instructed** 38:6
**insurability**
63:13,21 65:1
**insurance** 1:10
14:16 15:1
17:2 22:5
48:13 49:1,2
56:1,3 60:16
62:8 65:6,9
66:8
**insured** 44:5
57:6 62:6
63:12
**insured's** 60:19
**insurer's** 60:22
**interested** 72:14
**investigation**
20:11 49:8
51:18
**investigations**
48:12
**involving** 12:4
16:21
**issue** 32:17
45:21 46:1

54:3
**issued** 71:2
**issues** 16:20
**IV** 5:4

**J**
**January** 15:17
15:19 16:10
33:14 34:15
44:6 56:15,19
57:8 59:13
60:6 62:19,23
63:4 69:4
71:12
**job** 29:4
**Jr** 6:22
**judge** 7:3,6,12
7:14 66:22
**judgment** 67:18
**June** 59:14

**K**
**Karen** 1:6 11:20
**keep** 11:13 16:3
61:13
**kept** 15:23 16:2
32:1
**killed** 13:8 14:1
15:10 16:16
18:13 26:11
29:8 40:5,9,10
40:21 47:13,21
48:2,3
**kin** 72:13
**kind** 7:12
**knew** 13:15 46:4
**know** 10:11 12:1
12:20 13:11,16
15:13 17:10
19:1,12,15
20:2,10,20
21:14,16 22:5
23:8 24:19
25:1,22 26:7
26:12,17 28:14

28:20 29:13
30:11,12 31:21
31:22 32:4,6,8
32:11,15,15,18
33:15 36:8
37:13,19 38:2
38:22 40:8,19
41:14,23 42:3
42:4,13,15
43:12,19 45:4
45:10 46:18,21
46:23 47:3
48:4,11,16
49:21 50:5,15
52:19 54:9,13
54:14,18 56:6
58:2,13,19,19
59:11,15 67:19
70:4,4,11
**knowledge**
48:10
**known** 11:20

**L**
**L** 2:1
**lady** 30:12 38:5
40:20
**language** 61:13
62:12 63:16
**lapse** 18:6 35:7
55:14
**lapsed** 23:19
55:10 56:12
57:2,15 62:17
**Large** 2:7 6:4
**late** 28:15 34:8
35:5 36:7,14
36:14 57:23
**law** 18:17 38:23
56:4
**laws** 2:16
**Lawson** 50:15
**lawsuit** 7:23 8:3
15:8 53:1,2

58:23 70:6
71:10
lawyer 11:1 14:1
24:20 34:10
53:10 56:5
lawyers 49:13
53:9
leading 2:21
learned 18:17
legal 28:6 31:14
49:13
letter 4:9,10,11
4:12,13,14,19
9:23 17:11,13
18:23 19:6,10
23:23 26:19
30:19 31:7
33:7,12 35:12
36:3,17,20
37:8 41:6 43:3
45:1,3,5,6,12
45:18,21 46:13
46:16 49:5,20
50:3,10,13,17
51:4,12 52:8,9
52:12 53:6,23
54:15 60:5
66:12 68:16
69:4,8,11,15
70:12,22 71:1
letterhead 49:22
let's 10:3 20:14
20:15 24:10
34:13 52:7
69:2
life 1:10 14:16
14:23 48:13
65:9
Limine 8:23
line 59:5 63:8
listed 56:21
little 12:8 17:14
37:10 41:8
54:20

livid 47:19
LLP 5:5
long 11:20 26:11
28:18 30:5
33:17,21 40:22
43:10 49:3
longer 51:19
57:15
look 26:9 31:20
41:19 47:20
49:22 52:18
58:12 59:3
65:14 70:9,14
looked 50:11
52:15
looking 10:1
37:1 48:17
60:10
lost 12:14,16
34:6
lot 51:19 54:9,11
Lurie 1:6 7:16
8:10 11:21
12:2 13:1,10
13:14,21 14:19
15:1,2 16:6
17:18 20:23
26:16 32:6
39:18 41:23
42:16 43:2,18
44:8 46:14
52:4 55:1
58:22 60:8
61:21 63:2
64:6,20 65:14
66:6
Lurie's 13:22
40:15 62:23
67:17
L.S 50:15

### M

mail 16:9 18:16
29:3,13 34:6,7

36:9 39:20
40:4,19 42:1
63:3 64:18
mailed 18:8,12
26:2,10,13
28:17,19 29:21
29:22 30:8
35:20 40:7,20
55:12,14 57:9
57:10,11 60:1
mailing 34:3
mails 30:6
making 66:17
male 22:17
27:23 28:5
53:14,16
man 29:22 47:13
65:8
March 10:3
50:14,18 51:21
52:18
mark 11:9,11
14:2 22:5 25:2
67:6 70:21
71:9
marked 9:5,9
11:6 36:20
37:3,7 42:6,10
44:15,19 46:9
46:13 49:15,19
50:11,21 51:3
58:7,11 67:2
69:7,13 70:18
married 13:1
matter 14:15,15
66:6
matters 13:3
14:17,18
Matthews 1:15
2:5,8 6:8,11,15
6:22
McNaughton
1:18 2:6 3:7
6:1 72:17

mean 15:13 26:3
30:5 31:3,18
32:8 41:22
45:9 47:19
48:9,10,17
49:21 57:4
58:1,2
means 57:14
72:7
medical 68:17
68:18
memo 21:22
memory 37:14
mention 45:20
45:23
met 61:8,16
Methvin 5:13
MIDDLE 1:2
Midland 7:7
Miles 5:14
mind 69:22
mine 20:5 43:20
59:23
minutes 10:6,7
modification
12:9 66:7
modified 66:15
Monday 34:18
34:19,21 35:2
money 18:6,10
18:11 22:5
24:21 29:20
30:13 33:1
42:22 43:8
46:5 54:6
55:12,13,16
56:16
Montgomery
5:8,16
months 41:6
motion 8:23
67:18
motorcycle 29:7
48:1

moved 7:11
Municipal 7:14

### N

N 2:1 4:1 5:1
name 6:21 13:11
13:17 24:21
names 38:12,16
47:7
necessary 2:19
need 32:15
37:18 38:4
54:18
needed 17:4,9
19:21 23:8,9
24:14 49:7
51:17 54:8,10
needs 68:6
neither 72:12
never 30:18 39:4
41:16 42:9
48:23 66:6
new 29:4
newspaper 47:4
Newton 7:8
nice 52:11
nickname 13:17
Notary 2:6 6:3
72:18
note 37:10
noted 66:3
notice 4:7 9:10
44:3 60:4
noticed 7:15
November 67:14
number 10:5
16:20 21:11,14
25:6 37:3 42:6
44:15 46:9
49:15 50:21
52:20 58:7
67:2 70:18
numbers 9:4
10:22 11:5

69:2

**O**

**O** 2:1
**Obituary** 47:2
**object** 8:21
  40:16
**objections** 2:20
  2:23
**obtain** 52:2
**obviously** 8:8
  23:3 29:21
  51:7
**offer** 57:21
**offered** 3:2 8:20
**office** 21:18 40:7
  59:6 64:11,15
**offices** 2:7 6:8
**Off-the-record**
  70:16
**Oh** 25:7 31:9,9
  45:14 46:17
**okay** 7:9,12,19
  7:21 9:16,19
  10:10,20 11:9
  11:15 12:1,19
  12:22 14:7,11
  15:16,22 16:8
  16:12,18 17:15
  19:3,8 20:21
  21:15 22:3
  23:13,16 24:13
  25:3,8,12,23
  26:6,21 27:3,9
  27:13 28:8,12
  28:22 29:9
  30:9,21 31:5
  31:10 32:12
  36:1,12,19
  37:13 38:8
  39:11,22 42:9
  44:23 45:20
  46:3 48:23
  49:18,20,23

50:6,9,13,17
51:10 52:22
53:3,17,21
57:13 58:15,18
59:3,16 60:11
61:22 62:10,16
62:21 63:15
64:12,22 65:4
65:7,16 67:5,7
67:11,15 68:1
68:5,19 69:1
69:19 70:3
71:5,14,17
**Oklahoma** 10:4
  10:4 11:17
**old** 12:5 15:23
**once** 38:3
**opportunity**
  57:22 58:12
**opposed** 57:21
**opposition**
  67:18
**oral** 3:9 6:12
  66:9
**orally** 66:14
**order** 15:11
  61:13 63:16
**original** 3:8
**overdue** 39:19
  63:14,23
**owe** 61:17
**Ozark** 1:20 2:8
  6:8 7:10

**P**

**P** 2:1 5:1,1
**page** 4:2 54:21
  60:7,12 61:19
  64:4
**paid** 15:5 18:18
  18:18 34:2,8
  46:1,5 54:12
  60:20,20 63:14
  64:1

**papers** 65:22
**paragraph**
  43:22 60:12
  62:1 63:9 64:4
  64:9 65:18
**part** 47:11
**particular** 45:22
**parties** 2:3,22
  72:13
**party** 7:23 52:3
**part-time** 7:14
**pay** 23:22 29:16
  29:18 33:21
  61:17
**payable** 64:10
**paying** 16:13
  35:5,6 48:19
**payment** 28:16
  28:17 30:2
  36:2,4 39:12
  42:1 44:2,6,9
  57:8,9 62:7
  63:12
**payments** 25:18
  64:9,14,17
**people** 10:12
  38:16 53:13
**period** 30:2,4
  35:6,7,21 36:3
  36:14,15 42:2
  42:4 51:16
  57:3 60:17,20
  61:6 62:2,5,5,8
  62:12,13,17,22
**person** 13:10
  23:10 24:7
  28:3,11 34:9
  41:10 65:5
**perturbed** 32:1
  32:5,5
**phone** 4:17,18
  10:2,9,18
  11:16 20:22
  21:7,20 22:1

24:12 38:9
39:8,12 48:7
52:16,19 59:18
**physician** 46:21
**picked** 52:14
**pile** 20:13 41:22
**piles** 38:2
**place** 21:23
  37:20 38:9
**placed** 63:3
**PLAINTIFF**
  5:11
**Plaintiff(s)** 1:8
**please** 3:11 6:20
  37:12 44:2
  55:3
**point** 18:8,21
  24:14 28:4
  46:4 59:7
**police** 31:19
  47:1
**policies** 15:1
  17:3,7,20
**policy** 4:15
  14:16 15:7
  16:5,22 17:7
  17:17,23 18:5
  19:5,10,13,14
  19:14 23:18
  24:4 25:6,10
  30:1,23 31:12
  36:10 37:18
  39:3,13,14
  40:13 41:13,16
  41:18 44:4
  47:11 54:3
  55:10 57:1,5
  57:15,21 58:22
  59:1,17,22
  61:5,7,13,14
  61:15 62:12
  63:17 64:13
  65:13,22 66:8
  66:15

**Portis** 5:13
**position** 8:17
**post** 18:17 40:7
**Poundstone** 3:8
  4:3 5:4 6:19
  9:7 11:8 37:5
  42:8 44:17
  46:11 49:17
  51:1 58:9 67:4
  70:8,13,20
**practicing** 56:4
**premarked**
  11:11
**premium** 25:17
  25:18 33:13,22
  34:2 35:5,6,13
  35:17 37:23
  39:13,19,19
  40:14 41:14
  42:1 44:9
  45:21 46:2,5
  55:11 57:3
  58:4 60:18,19
  60:20 62:7,14
  62:18 63:12
  64:10
**premiums** 61:5
  63:14 64:1
**prepare** 21:22
**pressure** 47:16
**pretty** 68:8
**previous** 21:6
**previously** 9:12
  41:9
**prior** 3:2 13:1
  16:5 19:5,10
  40:14
**privilege** 8:13
  8:16,18
**probably** 8:23
  10:11 11:22
  12:5 15:9,12
  15:21 16:16
  20:7 27:4 32:3

# FREEDOM COURT REPORTING

38:10 43:19
53:7 59:2
**problem** 20:4
26:18,19 28:18
29:13,14 30:9
47:6
**problems** 47:16
**Procedure** 3:5
6:6
**proceeding**
12:22 13:5,20
**proceedings**
6:13
**process** 24:18
49:8
**produced** 58:23
**profession** 7:2
**prompted** 27:15
27:16
**proof** 65:4
**provide** 68:11
**provided** 44:4
52:3 54:10
57:6
**provides** 63:12
**provision** 61:2,4
65:13,20
**provisions** 61:8
61:15 63:8
64:8 65:17
**Public** 2:7 6:3
72:18
**purpose** 67:20
**pursuant** 6:5
61:5 62:11
63:15 64:13
**put** 9:1 10:16
16:9 24:21
36:21 39:18
40:3 42:1
54:17 56:16
64:18 70:23
**P.C** 5:14
**p.m** 10:4

**Q**
**question** 2:22
65:10 68:1
**questions** 2:21
18:14 71:18
72:6

**R**
**R** 5:1
**read** 19:14
43:21,22 57:20
59:8 60:15
62:4 63:8 64:8
65:19
**reading** 2:12
61:3
**ready** 58:13
**real** 13:16 23:4
55:22 56:9
**realistic** 58:3
**really** 29:15
54:16
**reason** 45:22
**recall** 22:8,21
28:12 38:9
51:3 52:1
58:23 59:16
**receipt** 34:3
**receive** 18:19
40:14 44:6
57:7
**received** 9:13
31:6 33:14
42:22 44:9
49:4 51:17
52:9 53:5
56:12 57:2
61:6 62:18
66:7,11
**recognize** 43:16
57:1,13 59:21
61:12 62:10
**recollection**
51:15

**record** 6:21 8:17
9:2 11:1 21:5
36:22 38:19,21
40:2 69:3
70:14,23
**recordings**
21:19
**records** 4:8,17
4:18 10:2,9
11:16 21:7
22:14 38:15
52:16,19 68:18
**red** 48:18
**refer** 14:5 55:23
**reference** 69:2
**referenced**
68:20 69:4,8
69:16
**referred** 14:1
23:11
**refund** 55:21
**refunding** 35:17
**regard** 9:1 35:8
40:2
**reinstate** 57:21
63:17
**reinstated** 23:19
25:14 39:3
44:4 57:6
63:10
**reinstatement**
39:13 57:14
61:2,7,15 63:9
**relating** 2:16
19:9
**relation** 54:2
**relevant** 31:18
**remember** 17:17
17:22 19:4,8
19:12,19 22:17
22:19 23:9
24:11 25:4
27:10,18,19,22
28:2,8,23 29:6

29:10 31:3,5
34:18 37:19
38:12 39:23
42:20 43:1,5
45:11,15 47:20
48:5 52:20
53:3,10,14,18
53:20,22,23
54:1 59:20
**remind** 71:15
**Renny** 1:18 2:5
3:6 6:1 72:17
**report** 14:12
20:19 34:3
45:7 47:1
**Reporter** 2:6
3:12 6:2
**reports** 20:1,3
31:19,19
**represent** 8:10
58:21
**representative**
39:7
**representatives**
55:5
**represented**
12:3 13:5
14:19 56:3
**representing**
7:16
**represents** 72:9
**requested** 9:17
50:8 68:15
**requests** 9:20
**required** 60:19
63:18
**requires** 61:13
**respective** 2:3
**response** 50:10
71:2
**responsive** 9:20
**result** 72:15
**retained** 3:12
**returned** 60:23

**reviewed** 9:16
19:9 59:17
**ridiculous** 47:10
**right** 8:1 11:18
13:2 16:19
24:10 25:20
29:23 43:15
48:18 51:9
56:20,23,23
59:10 62:15
63:5 64:7 69:6
69:10,14,18
**road** 28:5 47:23
**Robert** 3:7 5:4
**rock** 37:14
**roof** 52:12
**Rose** 5:5
**Rule** 3:4
**rules** 2:16 3:5
6:5
**run** 62:22 63:2

**S**
**S** 2:1 4:5 5:1,3
5:11
**Sanspree** 5:12
10:23 40:16
66:18 70:11
71:19
**Satisfaction**
65:4
**satisfactory**
63:13,21
**Saturday** 40:5
**saw** 19:13 42:14
48:8 51:5
52:12 59:1
**saying** 18:5
30:12 56:18
61:18
**says** 11:2 33:13
34:14 37:11
40:22 60:12
63:19 68:8

school 18:17
second 21:2,8
  25:21 27:14,15
  27:16 29:10
  30:21 32:19
  34:12 37:17
  39:8 42:17
  43:14 45:16
  59:18
see 10:3 15:19
  16:19 19:13
  20:14,14,15,23
  21:9 34:14
  41:1,12 42:17
  52:16 58:4
  59:12 60:11
  61:23 69:19,23
  70:10
seeing 48:5 51:3
seen 13:7 42:11
  42:14 44:19
  46:15,16 49:20
  49:21 58:15,20
  67:8 69:6
send 17:10 18:6
  24:14,18 32:9
  32:10,11 38:7
  40:22,23 41:11
  41:11,18 44:2
  52:6 60:4
sent 17:11 19:6
  19:11 20:13,16
  20:17,18 22:6
  23:23 24:16
  32:2,3 35:14
  35:15 36:18
  37:23 38:2,3
  41:6,20,21
  43:10 45:2,5,6
  45:12,16 47:1
  47:2,3,4 50:4,8
  50:9 51:5,6,20
  51:20 52:5
  55:20 60:5

71:1
sentence 43:22
served 9:13
set 47:9 48:6
seven 65:2
seventh 65:3,18
show 9:8 11:16
  14:12 17:14
  18:23 21:7
  22:15 36:21
  38:16 42:10
  44:18 46:12
  49:18 51:2
  58:10 67:5
  70:21
showing 69:12
shows 59:5
side 47:22
signature 2:12
  44:21 49:22,23
sir 8:6 9:15
sitting 24:1 29:2
  61:3 64:12
six 51:21 65:2
sixth 34:16,17
smart 56:9
solid 37:15
somebody 19:20
  23:5,11 32:16
  41:19 42:23
  46:6 49:13
  53:2 56:9
SOUTHERN
  1:3
specific 54:1
specifically
  16:21 17:21
  37:19
spent 54:11
spoke 22:15
stage 49:12
stamped 60:8
standard 48:12
starting 29:4

state 2:7 6:3,20
  20:3,5 72:2
statement 46:20
  46:21
statements
  68:17
STATES 1:1
stenotype 72:6
stick 10:15
sticker 10:16
STIPULATED
  2:2,11,18
stipulation 6:7
Street 5:15
strike 40:11
stuff 7:14 8:14
  14:21 20:1,14
  20:18 24:17
  31:17 32:2
  38:2 41:11,19
  41:22 45:7
  48:17,20 50:5
  50:7 54:9 60:2
  70:5
stupid 65:10
subject 8:21
  15:8
subpoena 4:8
  9:12 71:2
substance 43:5
substantive
  23:14
successful 12:10
suicide 31:21
suit 56:1
Suite 5:7
summarized
  21:23
summary 67:18
Super 11:9
Supreme 12:13
sure 14:21 28:1
  28:21 31:15
  36:23 43:4

45:4 51:9
  52:14 53:16
  58:17 59:23
surely 65:7
sworn 6:16
S.J 33:8

T
T 2:1,1 4:5
tag 59:5
take 10:13 12:23
  65:14
taken 2:5 3:9
  20:7 72:5
takes 20:9
talk 16:12,20
  29:23 37:15
  38:22
talked 16:15
  17:1 19:20
  22:9 23:10
  24:16 26:7,8
  27:9,19 28:3,4
  28:9,13 32:16
  33:15 38:13,17
  39:6,8,15
  41:10 45:1
  49:12 50:16
  53:18 55:5
  68:12,14
talking 22:11
  34:9 45:3
  46:19 58:1
telephone 10:2,5
  52:14
tell 7:5 16:2
  24:11 28:12
  32:7,9 37:12
  38:5 40:1,12
  50:3 55:3
  67:11
telling 57:17
  66:21
tells 57:5

ten 27:4 38:10
term 57:14
terminate 60:17
terminates
  60:21
terminating
  61:14
Termination
  60:13
terms 66:15
testified 6:17
  16:9 21:12
testify 8:5
testimony 1:14
  3:9 8:20 15:17
  16:19 21:6
  41:8 72:10
thereto 3:3 72:7
thing 9:22 10:1
  15:12 17:3
  19:2 20:20
  23:9 28:19
  29:21 30:8,17
  35:22 41:2,5
  60:3 66:11
  68:9,18
things 45:9
  46:19 63:17
  68:10
think 8:3 12:13
  13:13 14:9,20
  15:4,4 16:3
  17:6 18:1,4,21
  19:1,13,16,18
  20:11,12,15
  21:1,2,5,18
  22:23 23:23
  26:2,4,14,18
  27:12 28:4,7
  29:5 30:3
  31:14 34:17,19
  34:19,21 38:23
  39:10 42:20
  43:7 49:11

## FREEDOM COURT REPORTING

52:6,10,17
53:7,8 55:15
63:6 68:6,22
**third** 52:2
**thirty** 29:14
**thought** 15:18
33:6
**thousand** 19:17
58:3
**thousands** 10:21
**three** 18:2 33:4
41:5 48:6 53:8
65:2
**throwing** 70:7
**time** 3:1,1 15:6
16:4 17:16
19:6 23:15,20
24:3 25:15,19
26:12,15 27:5
32:15 33:2,6
35:11 36:1,8
42:17,18 49:3
49:6 51:16
54:11 56:6
70:12
**timely** 29:21
**times** 27:5 31:17
33:5
**today** 8:9,11
9:11 13:4 39:9
39:15 61:3
69:20
**told** 9:23 17:3,9
18:7 19:23
23:7 24:13,19
26:1 30:16
33:4,23 34:4,5
34:22 35:1
36:4,11 39:4
41:4,15,18
43:9 49:11
52:23 54:5
**toll-free** 21:13
52:20

**top** 59:4 62:1
65:3
**transcribed** 72:7
**transcript** 3:8
72:10
**transcription**
72:8
**treated** 47:8
**trial** 3:1 8:5,17
8:21
**troopers** 20:3,5
**trouble** 48:19
**true** 67:23 72:9
**try** 8:14
**trying** 15:11
22:4 24:20
32:14
**Tuesday** 34:18
34:20
**turn** 60:7 61:19
**two** 10:2,18
12:15 15:10
18:13 21:12
24:15 31:4,10
31:13 33:4,16
41:5 48:6 53:7
63:17,23 65:2
68:19
**type** 15:12 17:3
20:20 23:9
38:8 53:1 56:2
68:18
**types** 48:12

**U**

**U** 2:1
**Uh-huh** 27:17
51:14
**unable** 35:13
**understand** 8:11
16:18 31:23
48:5 54:10
**understanding**
34:5 49:6

67:16
**unethical** 7:22
**UNITED** 1:1
**unusual** 8:9
40:12 48:14
**usually** 20:9

**V**

**v** 1:9
**valid** 18:20
**value** 19:16
**van** 14:9 48:2

**W**

**wait** 35:1
**waived** 2:13
30:3
**want** 8:12 9:8
24:15 30:7
33:16 37:15
40:4 52:10
65:13 70:9
71:7
**wanted** 9:1 20:1
20:2 31:18,19
31:23 34:22
43:8 45:7
46:19,22 47:3
**wanting** 32:2
45:9 48:20
**wasn't** 18:11
22:2 23:10
30:4 31:20
33:6 36:16
40:8 41:16
46:1 52:11
54:12 57:10
61:10
**way** 24:11 37:11
55:3
**ways** 61:9
**Wednesday** 26:4
**week** 15:9 24:15
26:10,10 30:7
40:12 63:6

**weekend** 40:6
**weeks** 15:14,15
20:7 51:21
**went** 26:17 48:1
48:18
**weren't** 23:22
29:15 41:17
**we'll** 8:21,22
10:13 29:16,18
36:21 41:11
**we're** 13:4 21:4
30:17 35:13
41:7
**we've** 30:14 33:1
33:2 38:3,4
47:11 55:20
68:22
**White** 5:5
**Whittaker** 33:8
**widow** 24:23
**William** 1:15
2:4,8 6:8,11,15
6:22
**windshield** 48:1
**withdrawn** 7:16
**witness** 2:13
6:11 7:20,23
8:7 66:19,20
72:11
**wondering**
28:15
**work** 13:21 15:2
29:6,7
**worked** 22:22
48:23
**world** 46:22
48:16
**worried** 29:16
**worry** 29:17,19
**wouldn't** 57:13
65:9
**wreck** 47:14
**write** 49:10
**written** 45:1

66:7,11
**wrongful** 14:6
14:14
**wrote** 9:23 33:7
43:19 44:21
71:15

**X**

**X** 4:1,5

**Y**

**yeah** 7:1,18 8:7
13:15,23 14:13
17:13 22:19
25:7,7,7 26:23
28:11 30:3
31:9 33:11,21
34:13 35:18
37:10 44:22
45:14 46:17,17
50:2,12,19
54:5,23 55:3
59:2,10 60:14
62:3 64:2
67:10 68:4,14
69:21 71:4,6,6
**year** 12:15 63:11
67:14
**years** 7:10 11:22
12:5,6 14:22
16:1,17 18:1
31:4 47:8 56:4
**y'all** 17:11 28:13
29:23 32:19
34:1 35:7
36:12

**$**

**$15** 55:10 58:2
**$20** 58:2
**$30** 18:10 30:4
**$33** 33:13 35:14
35:16 36:7,17
**$40** 18:10

# FREEDOM COURT REPORTING

Page 82

| 0 | | |
|---|---|---|

**0013** 60:9 64:21
**0014** 61:21
  65:15

**1**

**1** 4:7 9:4,9,9
**1/02/04** 4:9
**1/26/04** 4:10
**1:06-CV-0034...**
  1:5
**10** 4:16 12:6
  67:2,6
**10th** 10:3 52:18
**10/02** 59:12
**10/17/06** 4:19
**10:00** 2:10 6:9
**11** 4:17,17 11:5
  11:12,15
**11.3** 10:7
**11/06/07** 72:19
**12** 4:18,19 11:12
**12A** 11:5,15
**12B** 70:18,22
**12th** 15:19
**14** 7:10 64:5,6
**15** 3:6 10:12
  11:22 12:6
**16th** 33:14 34:15
  62:19
**17th** 43:9 44:6
  56:15,19 57:8
**18th** 10:7 24:1
  33:9 36:3,19
  37:8 52:8 53:6
**1988** 3:6

**2**

**2** 4:8 9:4,9,11
  54:21
**2nd** 50:14,18
  51:21 67:14
**2/03/04** 4:11
**2:15** 10:4

**20** 11:22 12:5
**2004** 18:3,4
  33:14 44:6
  49:5 51:13
  71:12
**2006** 1:19 2:9
  3:10 6:10
**21** 1:19 12:5
**21st** 2:9 3:9 6:10
  59:13,14
**218** 5:15
**25** 56:4
**26th** 51:13 60:6
  69:4

**3**

**3** 4:9 42:6,11
  43:22 50:10
  56:21
**3/02/04** 4:12
**30-something**
  26:9
**31** 62:6,13
**31-day** 35:21
**334-956-7700**
  5:9
**36104** 5:8,16
**37** 4:14

**4**

**4** 4:10 44:15,19
  69:7
**4th** 16:10 63:4
**4/26/04** 4:13
**401** 5:6
**405)270-1410**
  10:5,8
**42** 4:9
**44** 4:10
**450)270-1410**
  21:13
**46** 4:11
**49** 4:12

**5**

**5** 4:11 46:9,13
  50:11
**5(d)** 3:4
**5.7** 10:5
**5/18/04** 4:14
**50** 4:13
**58** 4:15

**6**

**6** 4:3,12 49:15
  49:19
**6th** 15:17 62:23
**66** 4:16

**7**

**7** 4:13 50:21
  51:3
**70** 4:19
**780** 5:7

**8**

**8** 4:14 37:3,7
  69:13
**800-number**
  21:10
**800-898-2034**
  5:17

**9**

**9** 4:7,8,15,18
  58:7,11

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660